# Exhibit 1

DESHEILA HOWLETT
December 27, 2017

---

**Page 1**

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF MICHIGAN
3    SOUTHERN DIVISION
4
5    DESHEILA C. HOWLETT,
6         Plaintiff,
7    vs.              Case No. 17-11260
8              Hon. Terence G. Berg
9    CITY OF WARREN, COMMISSIONER    Mag. R. Steven Whalen
10   JERE GREEN, acting in his
11   individual capacity, LT. LAWRENCE
12   GARDNER, SHAWN JOHNSON, DAWN
13   McLANE, BARBARA BEYER, ANWAR KHAN,
14   DARRIN LABIN, WILLIAM ROSS, KEVIN
15   BARNHILL, PAUL HOUTOS, SCOTT TAYLOR,
16        Defendants.
17   _____
18
19
20   The Videotaped Deposition of DESHEILA HOWLETT,
21   Taken at 333 West Fort Street, 15th Floor,
22   Detroit, Michigan,
23   Commencing at 10:09 a.m.,
24   Wednesday, December 27, 2017,
25   Before Alison C. Webster, CSR-6266, RPR.

---

**Page 2**

1    APPEARANCES:
2
3    LEONARD MUNGO
4    The Mungo Law Firm, P.L.C.
5    333 West Fort Street
6    Suite 1500
7    Detroit, Michigan 48226
8    313.963.0407
9    mungol16@msn.com
10   Appearing on behalf of the Plaintiff.
11
12   JAMES R. ACHO
13   ELIZABETH RAE-O'DONNELL
14   Cummings, McClory, Davis & Acho, P.L.C.
15   17436 College Parkway
16   Livonia, Michigan 48152
17   734.261.2400
18   jacho@cmda-law.com
19   erae@cmda-law.com
20   Appearing on behalf of the Defendants.
21
22
23
24
25

---

**Page 3**

1    ETHAN VINSON
2    City of Warren, City Attorney's Office
3    One City Square
4    Suite 400
5    Warren, Michigan 48093
6    586.574.4671
7    evinson@cityofwarren.org
8    Co-counsel appearing on behalf of the Defendants.
9
10   ALSO PRESENT:
11   Justin Dloski, Video Technician
12   Mark Simlar
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1              TABLE OF CONTENTS
2
3    Witness                          Page
4    DESHEILA HOWLETT
5
6    EXAMINATION
7    BY MR. ACHO:                      8
8    EXAMINATION
9    BY MR. MUNGO:                    217
10   RE-EXAMINATION
11   BY MR. ACHO:                     272
12
13              EXHIBITS
14
15   Exhibit                         Page
16
17   (Exhibits attached to transcript.)
18
19   DEPOSITION EXHIBIT 1              31
20   DEPOSITION EXHIBIT 2              50
21   DEPOSITION EXHIBIT 3              54
22   DEPOSITION EXHIBIT 4              66
23   DEPOSITION EXHIBIT 5              66
24   DEPOSITION EXHIBIT 6              76
25

---



US LEGAL SUPPORT
The Power of Commitment™

Pages 1 to 4

DESHEILA HOWLETT
December 27, 2017

Page 5

1  Detroit, Michigan
2  Wednesday, December 27, 2017
3  10:09 a.m.
4
5           VIDEO TECHNICIAN:  We are now on the record
6  at 10:09 a.m.  This is the videotaped deposition of
7  Desheila Howlett being taken on December 27th, 2017.
8           We are located at 333 West Fort Street,
9  Suite 1500, Detroit, Michigan.
10          We are here in the matter of Howlett versus
11 City of Warren, et al., case number 17-11260.
12 My name is Justin Dloski.
13          If the attorneys would identify themselves
14 for the record, the reporter will then swear in the
15 witness.
16          MR. ACHO:  Okay.  Let the record reflect
17 this is the date and time set for the deposition of
18 Desheila Howell pursuant to Notice and concurrence of
19 counsel.  It is to be used for all purposes allowable
20 under the court rules.
21          Ms. Howlett, my name is James Acho.  I'm
22 representing --
23          COURT REPORTER:  Mr. Acho, if I can
24 interrupt and swear in the witness.
25          MR. ACHO:  Sorry.

Page 6

1           COURT REPORTER:  Thank you.
2           Ms. Howlett, would you please raise your
3  right hand?
4           Do you swear or affirm the testimony you
5  are about to give in this matter will be the truth,
6  the whole truth, and nothing but the truth?
7           MS. HOWLETT:  Yes, I do.
8           COURT REPORTER:  Thank you.
9           DESHEILA HOWLETT,
10 was thereupon called as a witness herein, and after
11 having first been duly sworn to testify to the truth,
12 the whole truth and nothing but the truth, was
13 examined and testified as follows:
14          MR. ACHO:  As I was saying, my name is
15 James Acho and I represent the City of Warren, and I'm
16 here to take your deposition.  As you know, I
17 introduced myself to you prior to the deposition.
18          Madam Court Reporter, did you get down my
19 preface remarks, or do you need them again regarding
20 the deposition is being taken pursuant to Notice and
21 concurrence with counsel and is to be used for all
22 purposes allowed under the court rules.
23          Also present here today to my right is
24 Ms. Beth Rae-O'Donnell, my co-counsel.  To her right
25 is Mr. Mark Simlar from the City of Warren.  To his

Page 7

1  right is Mr. Ethan Vinson, City attorney for the City
2  of Warren, and your counsel, Mr. Mungo.
3           For the record, Mr. Mungo handed me, prior
4  to the deposition, a report from Dr. Gerald Shiener,
5  dated November 27th of this year, so I suppose what I
6  would do at this point is just reserve my right, if
7  necessary, to continue your deposition for limited
8  purposes after today if there is anything regarding
9  this report that we need to come back about since it's
10 a month old and I was just handed it moments ago.  So
11 I don't anticipate that, but I would just like to
12 protect the record.
13          Was there something else that you indicated
14 you wanted to add --
15          MR. MUNGO:  Yes.
16          MR. ACHO:  -- Mr. Mungo?
17          MR. MUNGO:  Yes, sir.  I would like the
18 record to reflect that I had requested in previous
19 telephone conversation with Mr. Vincent --
20          MR. VINSON:  Vinson.
21          MR. VINSON:  -- Vinson, City attorney of
22 Warren, the application for short-term disability
23 benefits and a copy of the document, excerpt from the
24 Collective Bargaining Agreement between the City of
25 Warren and the Warren Police Officers Association

Page 8

1  pertaining to short-term disability benefits, and he
2  did provide me with those two documents today, the
3  denial, and was pointing out to me that she was
4  denied -- Ms. Howlett was denied her short-term
5  disability benefits because it was a -- there was a
6  determination that the injury was work-related; is
7  that correct?
8           MR. VINSON:  That's correct.
9           MR. ACHO:  Okay.
10          EXAMINATION
11 BY MR. ACHO:
12 Q.  Can you please state your full legal name for the
13    record?
14 A.  Desheila Cheri Howlett.
15 Q.  And how is Cheri spelled?
16 A.  C-h-e-r-i.
17 Q.  Okay.  Ms. Howlett, are you on any medications today
18    that would in any way affect the way you testify or as
19    to your memory?
20 A.  I am on medication.
21 Q.  Okay.  Do any of those medications, as you know it,
22    affect memory?
23 A.  Not to my knowledge.
24 Q.  So there's no reason why your memory would be impaired
25    in any way today?



DESHEILA HOWLETT
December 27, 2017

Page 9

1   A.  No, sir.
2   Q.  Okay.  Have you ever had your deposition taken before?
3   A.  Regarding my job, yes.
4   Q.  Okay.  What job was that?
5   A.  Being a police officer.
6   Q.  Being a police officer where?
7   A.  In the city of Warren.
8   Q.  Okay.  And what was that deposition regarding?
9   A.  A car accident that I investigated.
10  Q.  When was this?
11  A.  Probably within the last year or so.
12  Q.  Okay.  Do you know the end result of the case?
13  A.  No, I do not.
14  Q.  Were you a defendant?
15  A.  No.
16  Q.  Okay.  Have you ever been a defendant in a case -- in
17      any type of civil or criminal case?
18  A.  No.
19  Q.  Okay.  Have you ever been a plaintiff?
20  A.  Yes.
21  Q.  You have.
22  A.  Yes.
23  Q.  Other than this case, I mean.
24  A.  Yes.
25  Q.  Okay.  And how many times and -- let's start with the

Page 10

1       most recent.
2   A.  2011, car accident.
3   Q.  And did you file a lawsuit?
4   A.  Yes.
5   Q.  Where did you file a lawsuit?
6   A.  Through Mike Morse.
7   Q.  Okay.  Did he win?
8   A.  Yes, sir.
9   Q.  Because you know that's what he does.
10      Where was the lawsuit filed?
11  A.  In the city of Southfield is where the accident
12      occurred.
13  Q.  Okay.  So Oakland County Circuit, maybe?
14  A.  I think it's the county that I live in, so it would be
15      Macomb, they said.
16  Q.  Okay.  Do you remember the name of the defendant?
17  A.  No.
18  Q.  What were the injuries that you alleged you suffered
19      from the car accident?
20  A.  I had a -- like a strained or torn muscle in my left
21      arm and three bulging disks in my lower back and a
22      tear in my spine, top of my spine.
23  Q.  Did you undergo any surgery?
24  A.  No.
25  Q.  Did you undergo physical therapy?

Page 11

1   A.  Yes.
2   Q.  Did you miss time from work?
3   A.  Yes.
4   Q.  How much time did you miss from work?
5   A.  Four months.
6   Q.  Did you collect -- strike that.
7       You -- did the accident happen on the job?
8   A.  No, sir.
9   Q.  So you did not have the benefit of workers' comp for
10      that -- those four months off; correct?
11  A.  Short-term disability.
12  Q.  Short-term?  Okay.  Did you settle the case?
13  A.  Yes, sir.
14  Q.  How much did you settle it for?
15  A.  25,000.
16  Q.  Okay.  Did you allege any type of emotional damages as
17      a result of the accident?  Meaning, a lot of people
18      that are in car accidents will allege anxiety, that
19      they have anxiety driving after they've been in an
20      accident.
21  A.  No, sir.
22  Q.  And you -- you believe it was filed in Macomb County
23      Circuit?
24  A.  Yes.
25  Q.  I'm sorry if I asked you this.  Do you know the name

Page 12

1       of the defendant?
2   A.  No.
3   Q.  But you're sure it was 2011?
4   A.  Yes.
5   Q.  Okay.  Any other times where you have been a plaintiff
6       in a lawsuit?
7   A.  Yes.
8   Q.  Okay.  When was the time previous to the car accident
9       in 2011?
10  A.  I believe it would have been 2003, approximately.
11  Q.  Okay.  What kind of case was that?
12  A.  I had invested in a business and several other people
13      invested and we all lost our investments.
14  Q.  What kind of business?
15  A.  It was like a -- it was called Hurt So Good Music
16      Productions.
17  Q.  Okay.  A music production company?
18  A.  Yes.
19  Q.  Okay.  Who was the defendant that you sued?
20  A.  Sheryl Hurt.
21  Q.  How do you spell that?
22  A.  I believe it's with an S, Sheryl, and Hurt, H-u-r-t.
23  Q.  S-h-e-r-y-l?
24  A.  Or I, I'm not sure.
25  Q.  Okay.  How much did you allege that you lost in that



The Power of Commitment™

DESHEILA HOWLETT
December 27, 2017

---

**Page 13**

1  investment?
2  A. It was a total of 16,000.
3  Q. From -- from you or from everyone?
4  A. From me.
5  Q. Okay. How did you know Ms. Hurt?
6  A. She -- one of my best friends, she was a friend of
7  hers, and she had a jewelry store, where I went to
8  school at Eastern.
9  Q. Okay. Ms. Hurt has a jewelry store?
10 A. She had.
11 Q. She had. No longer does?
12 A. Not to my knowledge.
13 Q. Do you have communication to this day with Ms. Hurt?
14 A. No.
15 Q. Do you have any contact information for her?
16 A. No.
17 Q. Do you know where she lives?
18 A. Last I heard of, I think it was, like, Ypsilanti,
19    Ann Arbor area.
20 Q. Okay. Where did you file that lawsuit?
21 A. Ypsilanti.
22 Q. Would it have been Washtenaw County Circuit?
23 A. Should be, yes.
24 Q. Okay. Who was your attorney?
25 A. I didn't have an attorney.

---

**Page 14**

1  Q. So you were -- you represented yourself?
2  A. Yes.
3  Q. Any other lawsuits?
4  A. No.
5  Q. So those are the only two times where you sued
6     somebody?
7  A. Uh-huh.
8  Q. Yes?
9  A. Yes.
10 Q. I'm sorry, I did not -- typically, I give ground
11    rules. I just need you to answer in the affirmative
12    or the negative as opposed to an uh-huh or huh-uh
13    because our court reporter won't be able to take it
14    down.
15 A. Yes.
16 Q. Also, if you need a break at any time, just ask me.
17    It's not a problem. I would just ask that you answer
18    any question that's on the table that's been posed
19    before you take a break.
20 A. Yes.
21 Q. Okay. Have you ever been a witness in a case, civil
22    or criminal?
23 A. Only for work-related things.
24 Q. Only for criminal matters where the police
25    arrested somebody?

---

**Page 15**

1  A. Yes, sir.
2  Q. Okay. What is your Social Security number?
3     MR. ACHO: I would ask that, for
4     Ms. Howlett's protection, only the last four digits
5     are reflected in the record.
6  A. ▉▉▉▉▉▉▉▉
7  BY MR. ACHO:
8  Q. Do you --
9     MR. MUNGO: Excuse me just a moment.
10    We did just get the last four? Thank you.
11 BY MR. ACHO:
12 Q. Do you possess a valid Michigan driver's license?
13 A. Yes, sir.
14 Q. Did you bring it with you today?
15 A. Yes.
16 Q. Can I see it?
17 A. It's in his office.
18 Q. That's all right. We'll look at it later. Do you
19    know your driver's license number off the top of your
20    head?
21 A. No, sir.
22 Q. Okay.
23    MR. MUNGO: It's -- Counsel, it is part of
24    the documents that we have given you in discovery, in
25    discovery requests. If you want her to pull it out

---

**Page 16**

1  now, she can do that, or if you want to do it later --
2     MR. ACHO: That's all right. We'll come
3     back to it.
4  BY MR. ACHO:
5  Q. What is your date of birth?
6  A. ▉▉▉▉▉▉
7  Q. And where were you born?
8  A. Flint, Michigan.
9  Q. Your ethnic origin -- your ethnicity would be best
10    described as what?
11 A. African-American.
12 Q. Typically I ask individuals if they've ever been
13    convicted of a crime, but knowing that you have been
14    hired at multiple police departments, I'm assuming you
15    don't have any type of felony convictions; is that
16    accurate?
17 A. Yes, sir.
18 Q. Okay. Have you ever been arrested before?
19 A. No, sir.
20 Q. Okay. Where do you currently reside?
21 A. You want the actual address?
22 Q. Please.
23 A. ▉▉▉▉▉▉▉▉▉▉
24 Q. Okay.
25    MR. MUNGO: Counsel, it should be reflected

---



US LEGAL SUPPORT
The Power of Commitment™

Pages 13 to 16

DESHEILA HOWLETT
December 27, 2017

### Page 17

1. in the record that that has been provided to the
2. defendants as part of the discovery.
3.     MR. ACHO:  No, no, I know that these are
4. typically part of the written requests, but
5. sometimes --
6.     MR. MUNGO:  No, that's fine.
7.     MR. ACHO:  Yeah, sometimes things change in
8. the interim and sometimes answers change, truthfully,
9. so...
10. BY MR. ACHO:
11. Q.  Is this a home or an apartment?
12. A.  A home.
13. Q.  Okay.  Do you own the home or rent?
14. A.  Own.
15. Q.  You own it?
16. A.  Yes.
17. Q.  Okay.  Do you have a mortgage?
18. A.  Yes.
19. Q.  Who is the mortgage through?
20. A.  The name just changed.
21.     MR. MUNGO:  Is it in the records that we
22. provided?
23.     THE WITNESS:  Yes.
24.     MR. MUNGO:  Okay.  You want to take a look?
25. Or it's up to counsel.

### Page 18

1.     MR. ACHO:  Well, is that something -- I
2. mean, a lot of these things, I would think she would
3. know off the top of her head, to be honest with you,
4. so...
5.     MR. MUNGO:  Well, Counsel, there is a --
6. many of the questions that you're asking her is
7. already provided in her response to a --
8.     MR. ACHO:  No, I know, but as I just
9. indicated, sometimes I will ask things that I
10. requested in a written form because sometimes answers
11. change.
12.     MR. MUNGO:  No, that's fine.  That's fine.
13. I understand that.  It -- I just note -- noted that
14. you hadn't asked her if any of this information had
15. changed yet.  So I -- it's up to you.  You can go
16. ahead and continue.  But she does have it in here, if
17. you want her to look at it --
18.     MR. ACHO:  Okay.
19.     MR. MUNGO:  -- and find it.
20.     MR. ACHO:  I don't recall that specific
21. one.
22. BY MR. ACHO:
23. Q.  So do you know, as we sit here, who your mortgage is
24. through?
25. A.  The company just got bought out by somebody else, so

### Page 19

1. you know how they transfer you over?
2. Q.  I do.
3. A.  So I don't know, off the top of my head.  I'm sorry.
4. Q.  How much is your mortgage?
5. A.  1,101.
6. Q.  Is that with property taxes included?
7. A.  Yes.
8. Q.  Do you have any home equity loans?
9. A.  No.
10. Q.  How long have you lived in this home?
11. A.  Four years.
12. Q.  Where did you live prior?
13. A.  Prior to that, it would have been the city of Madison
14. Heights.
15. Q.  And was that a home or an apartment?
16. A.  Apartment.
17. Q.  Do you remember the address?
18. A.  No.
19. Q.  Do you know who the landlord was?
20. A.  It was a large company.  They own a lot of apartment
21. buildings.
22. Q.  All right.  Would you be able to, if not at break,
23. after the deposition, get that address to me through
24. your attorney?
25. A.  It should be in here.

### Page 20

1. Q.  Okay.
2.     MR. MUNGO:  If you want it now, Counsel,
3. she can get it for you.
4.     MR. ACHO:  That's okay.
5.     MR. MUNGO:  It's -- which -- just for the
6. record, so that the record is clear, that information
7. has been provided through response to the discovery
8. requests.
9.     MR. ACHO:  Okay.  Some of this, also, you
10. understand, is a test of your client's memory, and so
11. far she's been unable to answer a number of questions
12. that I would think she would know, so it's -- there's
13. a method to the madness, as you're aware.
14. BY MR. ACHO:
15. Q.  So prior to the --
16.     MR. MUNGO:  Yeah.  And, Counsel, just as --
17. my client understands that there's certain things that
18. she will remember and there are certain things that
19. she won't.
20.     MR. ACHO:  So it's convenient.
21.     MR. MUNGO:  Being -- being human --
22.     MR. ACHO:  It's a convenient memory?  Is
23. that what you're saying?
24.     MR. MUNGO:  Well --
25.     MR. ACHO:  If it's convenient to her



US LEGAL SUPPORT
The Power of Commitment™

DESHEILA HOWLETT
December 27, 2017

### Page 21

1 lawsuit, she'll remember it, but...
2     MR. MUNGO: Well -- well, it's --
3     MR. ACHO: If it could potentially hurt
4 her, is that what you're saying?
5     MR. MUNGO: Well, if convenient is
6 synonymous with human -- being a human memory.
7     MR. ACHO: All right.
8     MR. MUNGO: So that's why she brought her
9 documents, because I'm assuming that you want accurate
10 testimony from her, and so that's why she brought the
11 documents so that she could readily access it in the
12 event that she does not recall, so that she can give
13 you accurate testimony.
14     MR. ACHO: Okay.
15 BY MR. ACHO:
16 Q. I asked where you lived prior to the home that you
17 reside in, and you said that would be Madison Heights.
18 Isn't it true that you lived in a home in Warren that
19 you rented a condominium in Warren that you rented
20 from one of the other police officers?
21 A. The condominium was not in Warren.
22 Q. Where was it at?
23 A. Nineteen Mile and Hall Road.
24 Q. And what city is that?
25 A. Clinton Township.

### Page 22

1 Q. Okay. And did you live there prior to the Madison
2 Heights address? It was after Madison Heights, wasn't
3 it?
4 A. No.
5 Q. No?
6     VIDEO TECHNICIAN: If you can try not to --
7 because it makes noise.
8     THE WITNESS: Okay.
9 BY MR. ACHO:
10 Q. When did you live at the Clinton Township address?
11 A. It would have been -- let me see. If I've been in
12 Warren for four, Madison Heights a year, approximately
13 five or six years ago.
14 Q. Okay. And who did you rent that home from?
15 A. Curt Priemer.
16 Q. And how do you spell his name?
17 A. C-u-r-t P-r-i-e-m-e-r.
18 Q. Okay. And Curt Priemer is a police officer in the
19 city of Warren?
20 A. Yes.
21 Q. Okay. How is it you came to rent a home from him?
22 A. He let people know that he was going to be moving out
23 soon and that he wanted to rent his property.
24 Q. Okay. And so you approached him and said you wanted
25 to rent it?

### Page 23

1 A. Yes.
2 Q. Okay. And he agreed to rent it to you?
3 A. Yes.
4 Q. And how long did you live there?
5 A. It was a year lease, but I didn't complete the year.
6 Q. Is that because he evicted you?
7 A. No, sir.
8 Q. Did he begin eviction proceedings?
9 A. No, sir.
10 Q. He did not?
11 A. No.
12 Q. Was there -- well, how is it you happened to leave
13 prior to the expiration of the lease?
14 A. My mother was terminally ill and died.
15 Q. Okay. But how does that have anything to do with you
16 leaving prior to the expiration of a lease?
17 A. Because we had a conversation about the fact that my
18 mother needed full-term -- full-time care.
19 Q. And so Mr. Priemer allowed you to break the lease?
20 A. Yes, sir.
21 Q. And it's your testimony that he never started eviction
22 proceedings?
23 A. No.
24 Q. Was there any type of disagreement between you and
25 Mr. Priemer over the fact that you had been late or

### Page 24

1 failed to make rent payments?
2 A. I had never been late on a payment and I didn't fail
3 to make any payments.
4 Q. So there was never any issue with the timeliness of
5 your paying rent?
6 A. No, sir.
7 Q. So if Officer Priemer were to testify that there were,
8 would he be mistaken?
9 A. No.
10 Q. How -- well, I'm confused. How --
11 A. He asked for an additional month at the end because I
12 was leaving early, is the only discrepancy.
13 Q. Okay. With whom do you reside currently?
14 A. Christina Howlett.
15 Q. And Christina with a C?
16 A. Yes.
17 Q. Okay. Are you married?
18 A. Yes.
19 Q. And are you married to Christina Howlett?
20 A. Yes.
21 Q. Okay. Were you married in the state of Michigan?
22 A. No.
23 Q. Where were you married?
24 A. California.
25 Q. Is your marriage recognized in the state of Michigan?



DESHEILA HOWLETT
December 27, 2017

## Page 25

1  A. Yes.
2  Q. Do you have children?
3  A. No.
4  Q. Did you at one time have a child?
5  A. No.
6  Q. Did you adopt a child at one point?
7  A. No.
8  Q. You did not?
9  A. No.
10 Q. A number of officers have told me that you had, for a
11    brief time, adopted a child and then something went
12    awry and you no longer had custody of that child.
13    Could you enlighten me as to what they're talking
14    about?
15 A. They're talking about my Goddaughter who I provided
16    more, like, a baby-sitting care when her grandmother
17    was at work.
18 Q. And that's it?
19 A. Yes.
20 Q. And you never attempted to adopt that child?
21 A. Absolutely not.
22 Q. Have you ever been treated for substance abuse?
23 A. No.
24 Q. Drugs or alcohol?
25 A. No.

## Page 26

1  Q. Do you use drugs or alcohol?
2  A. I drink occasionally.
3  Q. Just socially?
4  A. Yes, sir.
5  Q. How long have you been married to Christina?
6  A. Since 2014.
7  Q. Is Christina employed?
8  A. Yes.
9  Q. Where is she employed?
10 A. St. John's.
11 Q. Is that a hospital?
12 A. Yes.
13 Q. And is she a nurse?
14 A. Yes.
15 Q. Do you know approximately how much she earns?
16 A. Around about 55-.
17 Q. Okay. I know you aren't working currently, but what
18    is your current salary?
19 A. I was right at about $89,000 a year.
20 Q. So your total household income is roughly 145,000; is
21    that accurate?
22 A. It was, yes.
23 Q. Do you have any sources of income outside of the City
24    of Warren or Christina's job at St. John's?
25 A. No.

## Page 27

1  Q. Do you own your own vehicle?
2  A. Yes.
3  Q. And what do you drive?
4  A. It's a Kia Sportage.
5  Q. What year?
6  A. 2011.
7  Q. Do you have a monthly car note that you --
8  A. Not on the Kia, no.
9  Q. Okay. On Christina's vehicle?
10 A. Yes.
11 Q. And how much is that car payment?
12 A. 400-something, I believe.
13 Q. Do you know roughly what the insurance payment is on
14    your vehicles monthly?
15 A. Right at $400.
16 Q. And approximately what do you pay monthly for home
17    insurance?
18 A. It's right around 100, but it's included in the
19    mortgage.
20 Q. Do you have any student loans?
21 A. Not anymore.
22 Q. You've paid them all off?
23 A. Yes.
24 Q. Does Christina have student loans?
25 A. Yes.

## Page 28

1  Q. And approximately how much per month are her student
2     loans?
3  A. They're in deferment right now.
4  Q. How come?
5  A. Household responsibilities.
6  Q. Can you sort of elaborate for me?
7  A. We went from a two-person income to a one-person
8     income, so she's prioritizing what she pays.
9  Q. So you have no income currently?
10 A. No.
11 Q. Do you and Christina have any children together?
12 A. No.
13 Q. Does Christina have any children?
14 A. No.
15 Q. Were you ever previously married?
16 A. No.
17 Q. You're a high school graduate, I take it?
18 A. Yes.
19 Q. What year?
20 A. 1991.
21 Q. Okay. What high school?
22 A. Flint Northern.
23 Q. Were you involved in any extracurricular activities at
24    Flint Northern?
25 A. Yes.



US LEGAL SUPPORT
The Power of Commitment™

DESHEILA HOWLETT
December 27, 2017

---

Page 29

1  Q. Okay. What -- like what?
2  A. Basketball, soccer.
3  Q. Anything else?
4  A. No.
5  Q. Did you win any awards at Flint Northern?
6  A. Yes.
7  Q. What awards did you win?
8  A. Most dedicated, most improved.
9  Q. And these are for the athletics?
10 A. Yes. And I believe an MVP award, also.
11 Q. Okay. Did you also win an award for most fashionable
12    while you were there?
13 A. No.
14 Q. Did you run for that award?
15 A. You don't run, but you do get nominated for that.
16 Q. Were you nominated for that?
17 A. Yes.
18 Q. Okay. Were you disappointed that you didn't win?
19 A. Yes.
20 Q. You make it a point to appear fashionably attired, you
21    take pride in how you look?
22 A. Yes.
23 Q. Okay. After Flint Northern, did you go to college?
24 A. Yes.
25 Q. Where did you attend college?

---

Page 30

1  A. Eastern Michigan.
2  Q. Did you graduate from EMU?
3  A. Yes.
4  Q. And what was your degree in?
5  A. Criminal Justice.
6  Q. What year?
7  A. '97, I graduated.
8  Q. Okay. Did you attend any grad school after that?
9  A. No.
10 Q. Did you go right to the police academy after
11    graduating from EMU or did you work first?
12 A. I believe I had a job and then started school -- the
13    Flint Academy after that.
14 Q. Okay. Where were you working?
15 A. It was a community-based program for teaching
16    elementary students how to play soccer --
17 Q. Okay.
18 A. -- in the city of Flint.
19 Q. Okay. All right. And then you went to the police
20    academy?
21 A. Yes.
22 Q. And what year was that?
23 A. Also '97.
24 Q. '97. And that's the Flint Police Academy?
25 A. Yes.

---

Page 31

1  Q. So I'd like to look at your employment history.
2      MR. ACHO: I'm going to mark this as
3  Exhibit 1.
4      MARKED FOR IDENTIFICATION:
5      DEPOSITION EXHIBIT 1
6      10:36 a.m.
7  BY MR. ACHO:
8  Q. This is -- it's a large packet. We can ignore most of
9  it.
10     MR. ACHO: I have one for you unless you
11    already have one.
12     MR. MUNGO: Thank you.
13 BY MR. ACHO:
14 Q. We can ignore most of it. I've tabbed certain areas
15    that I'll refer to, but I wanted to give it to you in
16    total.
17     So you graduated the Flint Police Academy
18    in '97. Were you offered a job upon graduating from
19    the police academy?
20 A. I didn't graduate from the Flint Police Academy.
21 Q. Okay. What happened at Flint that you didn't
22    graduate?
23 A. I transferred to Detroit.
24 Q. Okay. What prompted you to transfer?
25 A. Because Detroit was my first choice.

---

Page 32

1  Q. The academy was or to work for the City?
2  A. To work for the City.
3  Q. Okay. There's a high placement with the City of
4    Detroit Police Department for graduates from DPA;
5    right?
6  A. Yes.
7  Q. Okay. Did you graduate from the Detroit Police
8    Academy in '97?
9  A. It would have been '98.
10 Q. Okay. Upon graduating Detroit Police Academy, were
11    you offered a job anywhere?
12 A. Detroit.
13 Q. Okay. So you became employed with the City of Detroit
14    Police Department in -- my records reflect 1997. Do
15    you know if that's accurate?
16 A. Well, they start paying us to go to the academy.
17 Q. Okay. So my records reflect November 1997 is when you
18    started on Detroit's payroll. Would that be accurate?
19 A. I believe.
20 Q. And for how long did you work for the City of Detroit
21    Police Department?
22 A. Six-and-a-half years.
23 Q. Okay. And what was your rank when you left?
24 A. Technically, I was a police officer.
25 Q. Okay. Did you receive any promotions in your

---



DESHEILA HOWLETT
December 27, 2017

---

**Page 33**

1    six-and-a-half years?
2    A.  I transferred departments.
3    Q.  Okay.  From where to where?
4    A.  I started off in the 6th Precinct and then I went to
5        vice, which is undercover.  Then I went to general
6        licensing, and then I transferred to the child abuse
7        unit.
8    Q.  Did you have any issues during your employment with
9        the City of Detroit?
10   A.  No.
11   Q.  None at all?
12   A.  No.
13   Q.  Have you ever told anyone that you left the City of
14       Detroit Police Department because you had issues
15       there?
16   A.  No.
17   Q.  You didn't tell Oak Park that?
18   A.  No.  I told them that I was looking for a more secure
19       pay and a better pension.
20   Q.  Okay.  What was insecure about the pay that you were
21       receiving in Detroit?
22   A.  It was very lackluster for a person with a degree, I
23       thought.
24   Q.  Do you know what your salary was at the City of
25       Detroit?

---

**Page 34**

1    A.  In the Academy, we were at, like, $12, and then I
2        think after five years you max out at 47,5-.
3    Q.  Okay.  Did you ever tell anyone that you couldn't
4        handle working in the child abuse unit, that
5        emotionally -- you were too emotionally overwrought?
6    A.  Not that I couldn't handle it, but it was very
7        disturbing.
8    Q.  Is it true that it caused you some anxiety and
9        depression?
10   A.  No.
11   Q.  You didn't seek any treatment for that at that time?
12   A.  No.
13   Q.  Did you talk to a counselor from the City of
14       Detroit --
15   A.  No.
16   Q.  -- for anxiety and depression that you were suffering
17       as a result of working in the child abuse unit?
18   A.  No.
19   Q.  So you left Detroit after six-and-a-half years,
20       roughly late 2002; is that correct?
21   A.  Yes.
22   Q.  Okay.  And where did you go after you left Detroit?
23   A.  The City of Oak Park.
24   Q.  Okay.  And you were offered conditional employment
25       with the Oak Park Public Safety Department in December

---

**Page 35**

1    of 2002; is that correct?
2    A.  Yes.
3    Q.  It was -- their offer of employment was conditioned on
4        you successfully completing the FTO program; correct?
5    A.  Yes.
6    Q.  Did you successfully complete the FTO program?
7    A.  The FTO program, yes.
8    Q.  You did?
9    A.  Yes.
10   Q.  Okay.  So I handed you what was marked Exhibit 1, a
11       packet.  I have tabbed with paperclips a couple of
12       areas that I wanted to highlight.  The first area
13       that's paperclipped -- is yours paperclipped?
14   A.  No, sir.
15   Q.  I thought they all were.
16           MR. ACHO:  Yours are not?
17           MR. MUNGO:  No, sir.
18           MR. ACHO:  All right.  Well, then I'm just
19       going to --
20           MR. MUNGO:  Oh, yes, yes, they are.
21           MR. ACHO:  They should be.
22           MR. MUNGO:  They are at the bottom.
23           THE WITNESS:  Oh, at the bottom.
24           MR. MUNGO:  You must have done these
25       yourself.  Been there before.

---

**Page 36**

1    BY MR. ACHO:
2    Q.  So this first area where I tabbed is an exam, Current
3        Candidate Exam, name, Desheila Howlett, first
4        responder.  Written exam date was 10-20-2003, and it
5        said that you failed this exam; is that correct?
6    A.  Yes, sir.
7    Q.  Okay.  Did you file a workers' compensation case
8        against the City of Oak Park?
9    A.  Workers' compensation?  It would be -- what do you
10       apply for after you are terminated?  Unemployment is
11       what I filed for.
12   Q.  Never workers' comp?
13   A.  No.
14   Q.  Did the City of Oak Park contest your unemployment?
15   A.  No.
16   Q.  The medical first responders test that I just showed
17       you, did you ever end up passing that test?
18   A.  They said that they lost our scores and then we had to
19       retake it.
20   Q.  And you failed that again, didn't you?
21   A.  I believe so.
22   Q.  So you never passed it; correct?
23   A.  Well, they lost our original scores, so they didn't
24       know if we had passed or not.
25   Q.  So the only record that the City of Oak Park has, the

---



DESHEILA HOWLETT
December 27, 2017

---

### Page 37

1  one I showed you, is that you failed.
2  A.  **Right.**
3  Q.  Okay.  The second tab I have is a memo, and this
4  appears to be disciplinary action against you by the
5  Oak Park Police Department.  Do you recognize this
6  document?
7  A.  **Yes, I do.**
8  Q.  Okay.  And, in fact, you did receive discipline on
9  December 5th, 2003; is that correct?
10 A.  **Yes.**
11 Q.  And that was for failure to properly report private
12 property?
13 A.  **Yes.**
14 Q.  Motor -- motor vehicle accident?
15 A.  **Yes.**
16 Q.  Okay.  The final paragraph -- we won't go through the
17 entire thing.  The final paragraph says,
18 "Officer Howlett stated that she then placed the
19 damage on her log sheet and was going to report it to
20 this officer or Sergeant Bernard.  Officer Howlett
21 stated that she did not report the incident
22 immediately because she was scared, especially after
23 hearing at role call that Officer Knapp had been
24 terminated.  Officer Howlett stated that she and
25 Sergeant Bernard were scheduled for an exam at 45B

### Page 38

1  District Court on 12-4-03 at 9:00 and she was going to
2  mention it then, but Sergeant Bernard was" in -- "was
3  not there.
4       Officer Howlett stated that she came in
5  early to speak with this officer and Sergeant Bernard,
6  but Sergeant Bernard was scheduled off and this
7  officer was not available.  This officer's
8  recommendation regarding the above private property
9  MVC is that Officer Howlett receives discipline.
10 Respectfully submitted, Lieutenant Cooper."
11      Do you see that?
12 A.  **Yes, sir.**
13 Q.  Would you agree that you failed to be honest with the
14 City of Oak Park Police Department regarding this
15 incident?
16 A.  **I didn't give full disclosure.**
17 Q.  Right.  Because you said you were scared; is that
18 right?
19 A.  **Yes.**
20 Q.  Okay.  The next tab I have is from October 2, 2003.
21 It would be where the next paperclip is.  This is a
22 memo to Major Smith from Lieutenant Pousak, October 2,
23 2003.  This is Officer Howlett's performance review.
24 Have you seen this before?
25 A.  **Yes.**

### Page 39

1  Q.  Okay.  And you were given falling marks for
2  interpersonal communication; is that right?
3  A.  **Yes.**
4  Q.  What did you understand that to mean?
5  A.  **That I wasn't communicating very well.**
6  Q.  Okay.  And why did you not communicate well?
7  A.  **I was advised that when you're on probation, that you**
8  **should be quiet, and I was advised that just because**
9  **you come from another department and had experience,**
10 **you have to, basically, humble yourself and allow them**
11 **to reteach you their way because every department does**
12 **things differently, so I was doing as I was told.**
13 Q.  Okay.  But even when Lieutenant Pousak spoke to you,
14 you refused to even look him in the eye; isn't that
15 true?
16 A.  **Yes.**
17 Q.  So how do you explain that?  Was it just belligerence
18 on your part or you didn't like Lieutenant Pousak?
19 A.  **What -- what was it that made you do that?**
20 A.  **He didn't like me, I felt, and, so, I didn't know how**
21 **to be on probation and also stand up for myself.**
22 Q.  You've seen some of the FTO comments that were made
23 and evaluations that were made of you in Oak Park;
24 correct?
25 A.  **Yes.**

### Page 40

1  Q.  You had deficiencies that were noted in safe work
2  practices; is that right?
3  A.  **Maybe one.**
4  Q.  Okay.  You refused to sign the evaluation; correct?
5  A.  **Yes.**
6  Q.  Why did you refuse to sign it?
7  A.  **Because I was being attacked personally.**
8  Q.  By whom?
9  A.  **Pousak.**
10 Q.  And why do you think Lieutenant Pousak was attacking
11 you personally?
12 A.  **Because there was so many things that didn't even**
13 **pertain to my job as a police officer, like going to**
14 **make lunch runs or staying on patrol too long, and**
15 **that shouldn't be a negative, it should be a positive.**
16 Q.  Why do you believe Lieutenant Pousak would have
17 singled you out or had some axe to grind against you?
18 A.  **I have no idea.**
19 Q.  Ms. Howlett, do you have a bit of a complex -- a
20 martyr complex where you believe that everybody is
21 after you wherever you go?
22 A.  **Absolutely not.**
23 Q.  But hasn't that happened at every department you've
24 been at?
25 A.  **No.**

---



Pages 37 to 40

DESHEILA HOWLETT
December 27, 2017

Page 41

1  Q.  Didn't you tell Oak Park Police Department, I left
2      Detroit because of how I was treated?
3  A.  No.
4  Q.  And Oak Park, you are saying the lieutenant had it out
5      for you, and Warren, you're saying people had it out
6      for you.  Do you think maybe that's something more
7      psychological than fact?
8  A.  No.
9  Q.  Okay.  You ultimately did not pass probation in the
10     City of Oak Park Police Department; correct?
11 A.  Correct.
12 Q.  You never became a full-fledged police officer in
13     Oak Park; correct?
14 A.  Correct.
15 Q.  So let's fast-forward to your employment with the City
16     of Warren P.D., which is the reason we're here.  When
17     did you first become employed with the City of Warren
18     Police Department?
19 A.  It would have been August of 2006.
20 Q.  How did you become aware of a job opening at the City
21     of Warren P.D.?
22 A.  I used to read articles in the paper and also look on
23     the Internet for job postings for a police department.
24 Q.  Okay.  So once you read about an opening, did you
25     submit an application?

Page 42

1  A.  Yes.
2  Q.  And you were called in for an interview; is that
3      right?
4  A.  Yes.
5  Q.  And who called you for an interview?
6  A.  I think it was Randall.  He passed away.
7  Q.  Would Randall be a last name or first time?
8  A.  Last name.
9  Q.  Would he be a lieutenant, or...
10 A.  I think it was Thomas Randall.
11 Q.  Okay.  Was he a commanding officer, as you understand
12     it?
13 A.  Yes.
14 Q.  Okay.  And was Lieutenant Randall white?
15 A.  Yes.
16 Q.  Okay.  And he indicated that the interview went well;
17     is that right?
18 A.  Yes.
19 Q.  And he sent you for a second interview.  Is that
20     accurate?
21 A.  There were quite a few different steps --
22 Q.  Right --
23 A.  -- I had to go through, yes.
24 Q.  -- there were.  But at each step, you met with
25     different individuals; correct?

Page 43

1  A.  Yes.
2  Q.  Who did you meet with after Lieutenant Randall, if you
3      know?
4  A.  My background was done by Lieutenant Gallasso.
5  Q.  Okay.  And Lieutenant Gallasso felt that you were a
6      qualified enough candidate to work for the City of
7      Warren; is that right?
8  A.  Yes.
9  Q.  And Lieutenant Gallasso is white; correct?
10 A.  Yes.
11 Q.  Okay.  And then after Lieutenant Gallasso, who did you
12     meet with?
13 A.  I had to go to school up in Kirkland to get my
14     recertification.
15 Q.  Right.  And why did you have to get recertified?
16 A.  Because after you haven't been a police officer for a
17     certain amount of years, you lose your certification.
18     You have to get recertified.
19 Q.  Okay.  So that brings me to another question.  You
20     left Oak Park in '03; is that right?
21 A.  Yes.
22 Q.  But you didn't start with the City of Warren until
23     later in 2006; correct?
24 A.  Yes.
25 Q.  So what did you do with that three-and-a-half-year

Page 44

1      gap?  What did you do with your time?
2  A.  Worked multiple jobs.
3  Q.  What jobs did you work?
4  A.  General Motors would have been one, Detroit Medical
5      Center, and then I worked security for -- I'm trying
6      to think of this Federal Court building down here -- I
7      think it was called Knight Security -- and also Armor
8      Guard Truck, trucking company.
9  Q.  Okay.  Did you work the jobs simultaneously or did you
10     work one, leave; work one, leave; work one, leave;
11     work one, leave?
12 A.  Some of them overlapped, yes.
13 Q.  Okay.  Where did you work for General Motors?
14 A.  The plant on Van Dyke in Flint, Michigan.
15 Q.  What did you do there?
16 A.  Assembly.
17 Q.  Do you recall from when to when you worked there?
18 A.  No, sir.
19 Q.  Okay.  Do you recall approximately how long you worked
20     there?
21 A.  Four months.
22 Q.  Four months.  Why did you leave?
23 A.  Because I was also working at DMC, and in order to
24     drive the hour between cities and work an eight-hour
25     shift and then a ten-hour shift, it was just a bit



US LEGAL SUPPORT
The Power of Commitment™

DESHEILA HOWLETT
December 27, 2017

Page 45

1    much.
2    Q.  Okay.  And what did you do for DMC?
3    A.  Security.
4    Q.  How long did you work for them?
5    A.  Two years, I believe.
6    Q.  Were you at any one particular location?
7    A.  It would have been Harper Hospital.
8    Q.  And why did you leave DMC?
9    A.  Let me see.  DMC, for the job at Warren.
10   Q.  Okay.  How long did you work for Knight Security at
11       Federal Court?
12   A.  That also would have been, like, a six- to eight-month
13       period, if I recall.
14   Q.  Why did you leave there?
15   A.  I was working that job simultaneously with the other
16       security job, and, so, again, it just became too many
17       hours.  I was at, like, 90 hours a week.
18   Q.  Who was your supervisor at Knight Security?
19   A.  I don't remember.
20   Q.  Knight is K-n-i-g-h-t?
21   A.  Yeah.
22   Q.  Are they based out of Detroit?
23   A.  Yes.
24   Q.  Do you know who owns them?
25   A.  No, but they were working -- it's the McNamara

Page 46

1        Building, is the name of the building.
2    Q.  Right.
3    A.  Yeah.
4    Q.  Do you remember who your supervisor was at DMC?
5    A.  DMC, no.
6    Q.  The armored car company, what company was that?
7    A.  Guardian.
8    Q.  Guardian.  And Guardian is based out of where?
9    A.  Hamtramck.
10   Q.  Who was your supervisor with Guardian?
11   A.  I don't know.
12   Q.  Do you know how long you worked there?
13   A.  About a year.
14   Q.  During that three-and-a-half-year time frame that
15       we're talking about when you worked those jobs, were
16       you applying to other municipal police departments?
17   A.  Yes.
18   Q.  Can you give me some of the police departments that
19       you recall applying to?
20   A.  The sheriff's department for Detroit.
21   Q.  Wayne County?
22   A.  Yes.
23   Q.  Did you get an interview with Wayne County Sheriff?
24   A.  I was offered the position.
25   Q.  And when were you offered the position?

Page 47

1    A.  I don't know what -- what year.
2    Q.  Were you offered a position as a deputy?
3    A.  Yes.
4    Q.  And why didn't you take it?
5    A.  Because the pay wasn't much different from Detroit.
6    Q.  Do you remember who you interviewed with at the Wayne
7        County Sheriff's Department?
8    A.  No.
9    Q.  And you don't know exactly when you were offered that
10       job?
11   A.  No.
12   Q.  Was it just before you applied to Warren?
13   A.  I applied for a lot of different departments all at
14       the same time, and so that department, along with
15       Madison Heights, would have all been within the time I
16       was working all those part-time jobs.
17   Q.  Okay.  So, Madison Heights, were you offered a job
18       there?
19   A.  Yes.
20   Q.  And do you happen to know approximately when?
21   A.  No.
22   Q.  Okay.  Offered a job as a police officer?
23   A.  Yes.
24   Q.  And why did you not take it?
25   A.  About $3,000 difference between Detroit and their

Page 48

1        department, also.
2    Q.  So money was more the deciding factor than anything
3        else in your desire to act as a police officer in a
4        city, is that fair to say?  That money was the
5        motivating factor?
6    A.  Benefits and pension, yes.
7    Q.  Are the pensions better or the same with Wayne County
8        Sheriff's Department and Madison Heights as compared
9        to Detroit?
10   A.  Almost equivalent.
11   Q.  Do you know, off the top of your head, what the
12       pension scale is in Detroit?
13   A.  No.
14   Q.  Is it similar to Warren?
15   A.  Less.
16   Q.  Did you apply to any other police departments during
17       that time frame, that three-and-a-half-year time
18       frame?
19   A.  It would have been Bloomfield.
20   Q.  Bloomfield Township or West Bloomfield?
21   A.  I believe the Township.
22   Q.  Okay.  Did Bloomfield Township offer you a job?
23   A.  No.
24   Q.  Any other --
25   A.  I think I applied out in -- not Wixom, but it would



DESHEILA HOWLETT
December 27, 2017

Page 49

1   have been -- it will come to me in a second. There's
2   one other place that I applied. I can't think of it.
3   Q.  Okay. If you happen to think of it along the way,
4   just let me know.
5        So we'll again fast-forward to your
6   employment with Warren. Did either Lieutenant Randall
7   or Lieutenant Gallasso ask you why there was a
8   three-and-a-half-year gap between your having acted as
9   a police officer?
10  A.  Yes.
11  Q.  And you were able to explain it sufficiently enough
12  that they passed you along in the interview process?
13  A.  Yes.
14  Q.  After Lieutenant Gallasso, who did you meet with?
15  A.  After I came back from that certification school, they
16  put us in a -- like a one-week tutorial kind of thing
17  to get acclimated with Warren's process, and then we
18  started our FTO program.
19  Q.  Did you meet with the current or then police chief or
20  police commissioner?
21  A.  I don't recall.
22  Q.  You were offered a job as a police officer at some
23  point; correct?
24  A.  Yes.
25  Q.  And did you meet with either the commissioner or

Page 50

1   deputy commissioner at that time when they extended
2   the offer of employment?
3   A.  I don't recall.
4   Q.  Do you recall what commanding officer said to you,
5   Desheila, we're happy to offer you this job as a
6   police officer?
7   A.  No.
8   Q.  You remember meeting with someone, though, other than
9   Randall and Gallasso?
10  A.  Probably so, yes.
11  Q.  I'm going to hand you what I'm going to mark as
12  Exhibit 2. This is your personnel file from the City
13  of Warren.
14        MR. ACHO:  Here's one for you, Counsel.
15        MR. MUNGO:  Thank you.
16        MARKED FOR IDENTIFICATION:
17        DEPOSITION EXHIBIT 2
18        11:00 a.m.
19  BY MR. ACHO:
20  Q.  So you were extended -- if we look at the first page,
21  dated August 3, 2006, second paragraph indicates that
22  you will begin work as a police officer candidate for
23  the City of Warren on Thursday, August 10th. And it
24  goes on to say that, "provided you complete
25  recertification training at Kirkland Community

Page 51

1   College."
2        And you indicated you did complete that
3   recertification at Kirkland; correct?
4   A.  Yes.
5   Q.  Okay. The second page is a personnel order, City of
6   Warren Police Department. It says, "Subject:
7   Promotions." It's dated August 10th, 2006 -- strike
8   that.
9        Dated August 23rd. It says, "The following
10  promotion is effective as indicated and provisional
11  dependent upon satisfactory performance of below-named
12  personnel during the probation period and Police
13  Officer Candidate Deshelia Howlett promoted to police
14  officer." And it's signed by Police Commissioner
15  James Vohs. Do you see that?
16  A.  Yes.
17  Q.  Did you meet with Police Commissioner Vohs?
18  A.  I don't recall.
19  Q.  But you at least recall receiving this letter?
20  A.  Yes, sir.
21  Q.  Okay. Commissioner Vohs was white; is that right?
22  A.  Yes.
23  Q.  How long was your probationary period?
24  A.  One year.
25  Q.  And you were in the FTO program during the entirety of

Page 52

1   the probation; is that right?
2   A.  No.
3   Q.  For how long during the probationary period were you
4   in the FTO program?
5   A.  It's generally four months.
6   Q.  Okay. You were the only black police officer at the
7   City of Warren Police Department when you were
8   appointed; is that correct?
9   A.  Yes, sir.
10  Q.  You were proud of that fact; is that right?
11  A.  Yes, sir.
12  Q.  You indicated that to a number of people at the City
13  of Warren Police Department; correct?
14  A.  Yes.
15  Q.  And, in fact, these individuals at the City of Warren
16  told you they were proud to have you; right?
17  A.  Yes.
18  Q.  Yes?
19  A.  Some, yes.
20  Q.  Okay. Well, specifically, the people that hired you.
21  A.  Yes.
22  Q.  Okay. Let's look at the FTO program. The third page
23  says it's called the "limbo phase." Have you heard
24  that term before?
25  A.  Yes.



DESHEILA HOWLETT
December 27, 2017

Page 53

1  Q.  What does Limbo mean, as you understand it?
2  A.  You're kind of fluctuating.
3  Q.  Fluctuating in what -- in what regard? I don't --
4  A.  You're a police candidate and you're not a police
5      officer yet, so you're being reviewed and graded.
6  Q.  Got it. You're continually being evaluated throughout
7      the process.
8  A.  Yes.
9  Q.  Okay. In August 2006, your first FTO training officer
10     was Scott Taylor; is that right?
11 A.  Yes.
12 Q.  You passed the FTO step under Scott Taylor; is that
13     right?
14 A.  Yes.
15 Q.  That would have been approximately when,
16     September 20th of 2006?
17 A.  It's generally a month, yes --
18 Q.  Right.
19 A.  -- like 30 days each.
20 Q.  Got it. Did you used to joke around with Scott
21     Taylor?
22 A.  We had a relaxed environment.
23 Q.  So he would joke, you would joke, sort of play off
24     each other?
25 A.  Yes.

Page 54

1  Q.  I'm going to come back to this document, but I want to
2      hand you what I'm marking as Exhibit 3. This is your
3      First Amended Complaint.
4          MARKED FOR IDENTIFICATION:
5          DEPOSITION EXHIBIT 3
6          11:03 a.m.
7  BY MR. ACHO:
8  Q.  Now, one of your allegations -- and I'd like to look
9      at -- most of them are under 13, I believe. Page 10,
10     if we look at subsection (s), your allegation in your
11     Complaint against Scott Taylor is, "Defendant Sergeant
12     Scott Taylor, another one of plaintiff's field
13     training officers, told plaintiff that she would be
14     nominated for a 'hood' (KKK award) after plaintiff, a
15     female African-American, received five citizen
16     complaints from African-American citizens."
17         Do you see that?
18 A.  Yes.
19 Q.  Can you tell me exactly what happened with this
20     conversation? Because you indicated that you two used
21     to joke with each other. So tell me your recollection
22     of how this conversation went down.
23 A.  That if five black citizens complained against me, I
24     would basically be nominated into the club.
25 Q.  Okay. Was he joking with you?

Page 55

1  A.  Probably.
2  Q.  And you indicated earlier that you would joke with
3      each other; right?
4  A.  About certain things, yes.
5  Q.  So why, eight years later, is this in your lawsuit?
6  A.  Because it's an accumulation of all the things.
7  Q.  Okay. The KKK piece is something your attorney wrote;
8      is that right? That's not something Taylor said.
9  A.  No, that's just how I understood it, what I understood
10     it to mean.
11 Q.  Well, correct me if I'm wrong, when I hear hood, I
12     don't think clan, I think inner city. What do you
13     think of when you hear hood?
14 A.  In the context that he said it, KKK.
15 Q.  How did you know that?
16 A.  If a white person is talking to a black person and
17     they're saying, yeah, you're getting complaints from
18     other black people, and by the time you get up to five
19     complaints, we'll -- we'll nominate you an official
20     hood award, then it's not hoodie or ghetto hood.
21 Q.  Okay. So did you say to him, hey, Scott, that comment
22     bothers me?
23 A.  No.
24 Q.  Did you tell him that you were offended in any way?
25     You didn't, did you?

Page 56

1  A.  No.
2  Q.  Why not?
3  A.  Again, you're on probation at another department and
4      you just really don't complain or can't complain.
5  Q.  Is it your understanding that if there is something
6      unlawful or that runs afoul of policy, that you are
7      somehow precluded from complaining simply because
8      you're on probation?
9  A.  Policing, it's different from any other job, any other
10     atmosphere, and, so, if you make complaints or tell on
11     people, it just doesn't fare well.
12 Q.  Okay. So you would agree, you did not make any type
13     of complaint about Scott Taylor's alleged comment to
14     you to anyone; correct?
15 A.  Right.
16 Q.  All right. You didn't go to human resources and
17     complain?
18 A.  No.
19 Q.  You knew, at the time, where HR was; correct?
20 A.  Yes.
21 Q.  Because you had previously been introduced to them
22     when you were hired.
23 A.  Yes.
24 Q.  You didn't say anything to Scott Taylor's supervisor,
25     did you?



DESHEILA HOWLETT
December 27, 2017

---

Page 57

1  A.  No.
2  Q.  So after you completed your FTO training program,
3      isn't it true that Scott Taylor came to your home and
4      helped you change a tire?
5  A.  Yes.
6  Q.  And you asked him to come to your home; correct?
7  A.  Yes.
8  Q.  So if he was some racist individual, do you think he
9      would have come to your home to change your tire?
10 A.  I don't know.
11 Q.  Isn't it true that he doesn't belong in this lawsuit?
12 A.  If there's -- if I'm asked offensive things that were
13     stated to me over a span of time, then that would have
14     been included in one of the forms.
15 Q.  If you felt offended by somebody, or you felt, you
16     know what, this person just might not like black
17     people, why would you ask him to come to your home to
18     help you with your car?
19 A.  In my time of working there, there are people who have
20     offended me, but I have to continuously move forward,
21     as they say, let go and let God, so that's what I
22     continued to just move forward.  I continued to just move forward
23     with everyone.
24 Q.  Including asking him to come to your home to help you?
25 A.  Yes.

Page 58

1  Q.  Okay.  Did you have any other contact with Scott
2      Taylor after the FTO program was concluded?
3  A.  Intermittently, yes.
4  Q.  Okay.  And that back and forth was always pleasant;
5      correct?
6  A.  Yes.
7  Q.  You always had a good relationship with him?
8  A.  Yes.
9  Q.  Do you have any other allegations against Scott Taylor
10     other than this one isolated comment?
11 A.  No.
12 Q.  He never retaliated against you in any way, did he?  I
13     mean, he passed you at least through his portion of
14     the FTO program.
15 A.  Yes.
16 Q.  Do you know if Scott Taylor has harassed anyone else?
17 A.  I wouldn't know.
18 Q.  Okay.  Do you know how long Scott Taylor has been an
19     FTO trainer?
20 A.  No.
21 Q.  Do you know how many individuals he passed or did not
22     pass?
23 A.  No.
24 Q.  Do you know that he has failed a number of people, but
25     he passed you through?  You don't know that?

Page 59

1  A.  No.
2  Q.  But if I told you he did, you have no reason to -- or
3      basis to dispute that.
4  A.  Right.
5  Q.  Who else was your FTO trainer for phase 1 of the
6      program?
7  A.  I ended up with seven or eight different FTO trainers,
8      so I had Ross --
9  Q.  Let's stop there.  I'm not trying to cut you off, it's
10     just -- we'll just go piecemeal.  So William Ross
11     would have been the next FTO trainer?
12 A.  I don't know the specific order, but --
13 Q.  Fair enough.
14 A.  -- he's one of them, yes.
15 Q.  Fair enough.  I know you don't have instant recall.
16     Let's assume William Ross, on September 21, 2006, took
17     over as your FTO trainer.  You would have no reason to
18     dispute that.
19 A.  True.
20 Q.  Okay.  And is Mr. Ross named in your Complaint?
21 A.  Yes.
22 Q.  Okay.  I'm going to look at the Complaint.  Your
23     allegation against Officer Ross was that he said,
24     you'll pass because you're black; is that right?
25 A.  Yes.

Page 60

1  Q.  Okay.  What prompted this -- I'd like to know exactly
2      what he said and in what context this was said, where
3      you were at and how this came about.
4  A.  I recall one time we were, like, in the lobby of the
5      police department --
6  Q.  Okay.
7  A.  -- and in passing he just let me know that, whether I
8      was good or bad, it didn't matter, they were going to
9      pass me through.
10     Because he knew that the City of Warren wanted a black
11     police officer.
12 Q.  Yes.
13 Q.  Okay.  And Ross is white?
14 A.  Yes.
15 Q.  Okay.  And did you have a good relationship with him?
16 A.  Yes.
17 Q.  Casual comments back and forth, casual conversation?
18 A.  Yes.
19 Q.  Okay.  You got the feeling that Ross felt he could be
20     open with you, speak person to person?
21 A.  Yes.
22 Q.  Okay.  It's fair to say, when white people and black
23     people have a relationship where they communicate,
24     that -- strike that.  I'm going to come back to that.
25     So when Ross makes this comment to you, was



US LEGAL SUPPORT
The Power of Commitment™

DESHEILA HOWLETT
December 27, 2017

Page 61

1    it in response to you saying, I don't know if I'm
2    going to pass the FTO program?  You had some concerns
3    about your performance?
4    A.  Well, I had one instance with one FTO person, so out
5    of the eight, I only had one problem with one.
6    Q.  But you brought it up to Ross, which prompted him to
7    say, don't worry about it, you're going to be all
8    right, they want a black officer here; is that fair?
9    A fair characterization?
10   A.  Yes.
11   Q.  Okay.  So Ross wasn't saying it in a mean or
12   belittling way, was he?
13   A.  Well, it is belittling if it doesn't matter how you
14   do.
15   Q.  Isn't it more a statement on progression, that the
16   department wants an African-American officer there?
17   A.  Even if they're not worthy of it?
18   Q.  Isn't that how Ross meant it?  Isn't that how you took
19   it when he said it?
20   A.  I took it that it didn't matter if I was complete
21   garbage or great, that I was going to pass either way.
22   Q.  I get that.  I'm saying, when you took what Ross --
23   his inflection, his tone, his comment to you, speaking
24   to you as somebody he had this type of communication
25   with, you didn't take it as him trying to belittle you

Page 62

1    or demean you; right?
2         MR. MUNGO:  Objection, Counsel, that has
3    been asked and answered.
4         MR. ACHO:  I'm sorry, I don't remember.
5    BY MR. ACHO:
6    Q.  So if you can just tell me again.  You didn't take it
7    as though he knew he was trying to belittle you; right?
8    A.  Belittle me?  I just didn't think it was fair.
9    Q.  I understand that.  And it might be and it might not
10   be.  I'm just talking about Ross's comment to you.
11   You didn't take it as he was coming at you from a bad
12   place or being mean to you or trying to demean you,
13   did he?
14   A.  No.
15        MR. MUNGO:  Objection.  Objection, asked
16   and answered.
17   BY MR. ACHO:
18   Q.  All right.  Did you say to him, hey, Ross, I don't
19   like that kind of talk, I don't like that comment?
20   A.  No.
21   Q.  Did anyone witness this conversation?
22   A.  I don't recall.
23   Q.  Did you go to Ross's supervisor and say, hey, you
24   know, Ross made an offhand comment that I don't care
25   for?

Page 63

1    A.  No.
2    Q.  You didn't make a complaint to anyone at the time;
3    correct?
4    A.  No.
5    Q.  And you didn't go to HR?
6    A.  No.
7    Q.  Do you have other allegations against Officer Ross?
8    A.  Just that he let me know that after my first, second,
9    third, fourth and fifth year, they all thought that I
10   was going to sue.
11   Q.  They thought you were going to sue.
12   A.  Yes.
13   Q.  And, in fact, he was right.  You did sue; right?
14   A.  Uh-huh.
15   Q.  Yes?
16   A.  Yes.
17   Q.  So that's not a complaint, that's him being accurate;
18   right?
19   A.  Six years later, yes.
20   Q.  So he was off by a year.
21        MR. MUNGO:  He's not a very good prophet.
22   BY MR. ACHO:
23   Q.  By the way, Ross passed you at phase 1, step 1;
24   correct?
25   A.  Yes.

Page 64

1    Q.  Do you know if Ross has failed other candidates?
2    A.  No.
3    Q.  Are you aware that he had failed a number of other
4    candidates in the FTO program, at least his portion,
5    but he passed you?
6    A.  You don't -- you're not privy to other people's
7    scores, so you don't know.
8    Q.  Fair enough.  So if I told you he had, in fact, failed
9    other individuals but passed you, you would have no
10   reason to dispute that?
11   A.  True.
12   Q.  All right.  Did you have any other contact with
13   Officer Ross after the FTO training program?
14   A.  We worked the same shift.  I was on day shift for --
15   with him for a while.
16   Q.  And you had a good relationship with him, didn't you?
17   A.  Yes.
18   Q.  No reason to complain about him; right?
19   A.  No.
20   Q.  Treated you like any other fellow officer; right?
21   A.  Yes.
22        MR. ACHO:  Can we take a very short break?
23   Maybe you could use a short break?
24        MR. MUNGO:  What paragraph were you
25   speaking from, the First Amended Complaint, Counsel,



DESHEILA HOWLETT
December 27, 2017

Page 65

1    regarding Ross?
2         MR. ACHO:  I -- I don't know offhand,
3    but --
4         MS. RAE-O'DONNELL:  Paragraph 13.
5         MR. MUNGO:  13?
6         MR. ACHO:  Yeah, 13 is where the bulk of
7    the claims are.
8         MR. MUNGO:  It was at 13 what?  I should be
9    able to find it.
10        MS. RAE-O'DONNELL:  (C).
11        MR. ACHO:  (C), yep.
12        VIDEO TECHNICIAN:  Off the record, 11:17.
13        (Off the record at 11:17 a.m.)
14        (Back on the record at 11:40 a.m.)
15        VIDEO TECHNICIAN:  Back on the record,
16    11:40.
17   BY MR. ACHO:
18   Q.  When we left off, I had asked you about William Ross
19        and we discussed the comment and I asked you if you
20        had complained to HR or anyone about Ross, and you
21        indicated you had not; is that correct?
22   A.  Yes.
23   Q.  All right.  You did sign acknowledging that you
24        received training on departmental rules prohibiting
25        discrimination and sexual harassment in the rules of

Page 66

1    conduct and procedure; correct?
2    A.  Yes.
3         MR. ACHO:  Okay.  I'm going to mark two
4    orders as Exhibits 4 and 5.
5         MARKED FOR IDENTIFICATION:
6         DEPOSITION EXHIBIT 4-5
7         11:40 a.m.
8         MR. MUNGO:  Was the Complaint 3, Counsel?
9         MR. ACHO:  Good question.  Yes.
10   BY MR. ACHO:
11   Q.  Exhibit 4 is an Order dated January 10, 2003.  It's a
12        City of Warren Police Department Order on
13        Discrimination and Sexual Harassment and the
14        Prohibition of same, do you see that?
15   A.  Yes.
16   Q.  And you received this as part of your training;
17        correct?
18   A.  Yes.
19   Q.  You were advised that the City of Warren does not
20        tolerate or condone harassment of any sort or
21        discriminatory behavior of any sort; correct?
22   A.  Yes.
23   Q.  You were advised that, as an employee, you had a
24        responsibility to report these matters to management's
25        attention; correct?

Page 67

1    A.  Yes.
2    Q.  Okay.  Exhibit 5 is another general order from the
3        City of Warren Police Department, and this is dated
4        February 28, 2014, and it is titled Rules of Conduct.
5        You received and reviewed this policy, as well;
6        correct?
7    A.  Yes.
8    Q.  These are the conduct standards and the code of ethics
9        for the City of Warren Police Department; correct?
10   A.  Yes.
11   Q.  On page 5, it discusses conduct toward fellow
12        employees, and it discusses, under subsection 4,
13        accountability, responsibility and discipline.  And it
14        states, under section 4, "that any complaints against
15        any member of the department are to be reported to a
16        supervisor"; correct?
17   A.  Yes.
18   Q.  All right.  You signed for this order, as well; is
19        that right?
20   A.  Yes.
21   Q.  All right.  And if we look, going back to Exhibit 2,
22        which is your personnel file on page 4, there is a
23        page where you signed and initialed for the receipt
24        and review and training on numerous departmental
25        policies.  Do you see that?

Page 68

1    A.  Yes.
2    Q.  Okay.
3         MR. MUNGO:  I'm sorry, Counsel, what page
4    was that?
5         MR. ACHO:  That was page 4 of the personnel
6    file.
7         MR. MUNGO:  Of the personnel file.  You
8    haven't marked that as an exhibit?
9         MR. ACHO:  I did.
10        MR. MUNGO:  Which one?
11        MR. ACHO:  Exhibit 2.
12        MR. MUNGO:  Exhibit 2.  And that was
13   page 5, you said?
14        MR. ACHO:  Page 4.
15        MR. MUNGO:  Did you see that?
16        THE WITNESS:  Uh-huh.
17   BY MR. ACHO:
18   Q.  All right.  So you were passed on from step 1 of the
19        FTO program to step 2; correct?
20   A.  Yes.
21   Q.  And you passed step 2 of the FTO program with no
22        issue; is that correct?
23   A.  Yes.
24   Q.  You're not making any allegations of discrimination at
25        the step 2 level of the FTO, are you?



DESHEILA HOWLETT
December 27, 2017

Page 69

1  A.  No.
2  Q.  All right.  Who were your step 2 FTO trainers, do you
3      remember?
4  A.  It would have been Springer.
5  Q.  And would Bonnet have been another?
6  A.  Yes.
7  Q.  Okay.  And Bonnet and Springer are both white;
8      correct?
9  A.  Yes.
10 Q.  They indicated in their report that you had solid or
11     good knowledge of the policies and procedures 3.02 and
12     3.01, the orders we just looked at.  They indicated
13     that you had good knowledge of the policies; correct?
14 A.  Yes.
15 Q.  And you asked questions for clarification when you
16     didn't understand; correct?
17 A.  Yes.
18 Q.  So you were then passed on to phase 3; is that right?
19 A.  Yes.
20 Q.  All right.  Now, your step 3 FTO trainer was Anwar
21     Khan; correct?
22 A.  Yes.
23 Q.  And that was roughly 11 years ago; is that right?
24 A.  Yes.
25 Q.  Fair to say it was November of 2006?

Page 70

1  A.  Yes.
2  Q.  And you named Officer Khan as a defendant in your
3      lawsuit; is that right?
4  A.  Yes.
5  Q.  All right.  What are your allegations against
6      Officer Khan?
7  A.  It's more so about being a female police officer.  He
8      doesn't feel that women should work, let alone be
9      police officers.
10 Q.  Why do you say that?
11 A.  Because he said it to me.
12 Q.  Okay.  Are you aware that his own wife works as a
13     nurse?
14 A.  He told me that she had a degree in it, but that she
15     didn't actually work the hours.
16 Q.  Okay.
17 A.  She was a stay-at-home mom.
18 Q.  If I was to tell you that she has worked continuously
19     for the last ten years as a nurse at a hospital, would
20     you have any reason to dispute that?
21 A.  Well, that's just not what he told me.
22 Q.  Okay.  Officer Khan, do you have any complaints about
23     him regarding race?
24 A.  No.
25 Q.  Officer Khan is of Arabic descent?

Page 71

1  A.  Yes.
2  Q.  And he's a darker-skinned individual; is that right?
3  A.  Yes.
4  Q.  His complexion would be more along the lines of some
5      African-Americans as opposed to Arabs, would you say?
6  A.  Yes.
7  Q.  Other than the one comment that you allege he said
8      that women shouldn't work, do you have any other
9      complaints against Khan?
10 A.  He said that America was better off prior to 1940,
11     1941, when all the men went off to war and then the
12     women started working jobs, and, basically, our
13     society declined due to the women entering the
14     workforce, so now there's nobody to tend to the
15     children.
16 Q.  Where were you when he said that?  Were you in a
17     vehicle with him?
18 A.  Yes.
19 Q.  Okay.  Describe the rapport that you had with
20     Officer Khan.
21 A.  He wouldn't talk, and if he did talk, he would kind of
22     yell.  We went to an Arabic restaurant and I wasn't
23     familiar with the menu, and so I tried to order, like,
24     a chicken soup, or something, and then he basically
25     told me that he could tell that I didn't care for it, so

Page 72

1      then he told me that he would give me a passing grade
2      if I said I liked the food.
3  Q.  He would give you a passing grade in the FTO
4      training --
5  A.  Yes.
6  Q.  -- if you said you liked the soup at the Arabic
7      restaurant?
8  A.  Yes.
9  Q.  All right.  I don't recall reading that claim in your
10     Amended Complaint.  Is there any particular reason
11     why?
12 A.  It just came to mind.
13 Q.  Okay.  Is it fair to say that Officer Khan was joking
14     when he made that comment to you?
15 A.  I have no idea.  He didn't joke.
16 Q.  Did you honestly believe that he would pass you in the
17     FTO program if you said you liked the soup?
18 A.  Well, he said he would give me a passing grade for
19     that day.
20 Q.  All right.  Did you say you liked the soup?
21 A.  No.
22 Q.  How come?
23 A.  Because I didn't like it.
24 Q.  So you will do things even if it doesn't mean
25     promotion if you think it's the right thing to do;



DESHEILA HOWLETT
December 27, 2017

Page 73

1  right?
2  A.  Yes.
3  Q.  Okay.  But I asked you earlier why you didn't
4     complain, and you said that that's not something that
5     you do in order to, sort of, protect your job.
6  A.  Saying that you like a food that you don't like is a
7     lie, but complaining against other officers is a
8     different type of offense --
9  Q.  Okay.
10 A.  -- that suffers a different type of, you know...
11 Q.  Even if it means not complying with orders that say
12    you have to report complaints about other officers?
13 A.  It's just not done.
14 Q.  By you.
15 A.  By anyone, really.
16 Q.  So nobody -- so it's your testimony that nobody
17    complains to HR or supervisors about conduct of other
18    officers?
19 A.  Hardly ever.
20 Q.  And what do you base that on?
21 A.  Different examples of seeing when a person did
22    complain, the things that happened to that person.  It
23    just doesn't fare very well.  And the times that I've
24    complained, nothing better.  If anything, it just
25    makes everything worse.

Page 74

1  Q.  Okay.  Well, give me some examples of officers who
2     have complained to supervisors or HR about other
3     officers' behavior and it didn't fare well for them.
4  A.  John Adams.
5  Q.  Okay.  Who's John Adams?
6  A.  He was a police officer with the City of Warren.
7  Q.  Okay.  And is he still?
8  A.  No.
9  Q.  Okay.  Tell me about what you know about
10    Officer Adams.
11 A.  His issue or complaint was about officers being
12    heavy-handed.
13 Q.  Okay.
14 A.  And he went into command staff to report it, and then
15    it got back to the people that he was complaining
16    about, and then they started calling him a P word and
17    a snitch and nobody wanted to work with him.
18 Q.  When was this?
19 A.  I'm not exactly sure.
20 Q.  Was it around the time you were hired?  Was it in the
21    last couple of years?
22 A.  He and I were hired on together, so it would have been
23    quite a few years ago, because he left to go to law
24    school and stuff like that, so I don't remember
25    exactly.

Page 75

1  Q.  So he may have intended to leave and go to law school
2     anyway; right?
3  A.  I guess so.
4  Q.  Have you spoken to him?
5  A.  No.
6  Q.  Okay.  Give me some examples, though, where officers
7     complained about the treatment of them by fellow
8     officers where it didn't go well.
9  A.  Khan punched another officer in the head and command
10    had heard about it, and then they asked him if he
11    wanted to file a complaint, and the officer said no,
12    because you can't.  The general rule is, you don't
13    complain on one another.  So even though the command
14    knows about it, they don't do anything unless you make
15    an actual complaint against another officer.
16 Q.  Who was the officer that you allege Officer Khan
17    punched?
18 A.  Twardesky.
19 Q.  Do you know the first name of Officer Twardesky?
20 A.  Jim.
21 Q.  Okay.  Is Officer Twardesky still in the department?
22 A.  He's a detective, yes.
23 Q.  Do you know the type of relationship that Khan and
24    Twardesky had?
25 A.  He was his FTO at one point.

Page 76

1  Q.  Do you know if they were friends or are friends?
2  A.  No, I'm not sure.
3  Q.  Okay.  I have what I'll mark as Exhibit 6, your
4     Answers to Interrogatories.
5        MARKED FOR IDENTIFICATION:
6        DEPOSITION EXHIBIT 6
7        11:52 a.m.
8  BY MR. ACHO:
9  Q.  And without belaboring it and going through all of it,
10    I ask -- Ms. O'Donnell and I ask, on a number of
11    occasions, to provide any type of written
12    documentation or any documentation supporting any of
13    your allegations, and your response was that you don't
14    possess any documentation; is that right?
15 A.  Yes.
16 Q.  Is that because you didn't file any type of complaint?
17 A.  The only complaints that I recall, I made one with
18    Mark Simlar regarding a dispatcher and the final
19    complaint with Barb Beyer.
20 Q.  Okay.  The Complaint that you made with Mark Simlar
21    regarding a dispatcher, who was that dispatcher?
22 A.  Dawn.
23 Q.  Dawn?
24 A.  McLane.
25 Q.  Okay.  And when was this complaint to Mark Simlar?



DESHEILA HOWLETT
December 27, 2017

Page 77

1  A. I believe 2010 or '11, somewhere in there.
2  Q. All right. Now, Mr. Simlar is present here today;
3     correct?
4  A. Yes.
5  Q. What is his position, if you know?
6  A. Human resources department.
7  Q. And you believed he was the individual to complain to?
8  A. Well, they had me meet with him, so...
9  Q. Who's "they"? Let -- I'll tell you what. Let's
10    back -- backtrack a little bit. Tell me about the
11    incident with Dawn McLane and then take me from there.
12 A. I was sent to a man with a gun run, and there was no
13    information given, no description of the person, no
14    vehicle, no information regarding the gun, no color of
15    clothing, and I was in very close proximity to where
16    that run was, so the odds of me getting there first
17    were very great. So I waited for her to give more
18    information, and at the point that no more information
19    came through, I went on the air and asked for further
20    information, if there was any, and she was just very
21    belligerent and never give me any further information.
22    So after I finished the run, I came into the station
23    and I decided to make a complaint.
24 Q. Okay. And what was your complaint, that officer --
25    that Dispatcher McLane was difficult or didn't provide

Page 78

1     more information?
2  A. On a serious run, yes.
3  Q. Okay. Since you are familiar with the police culture,
4     would you agree with me that sometimes things get
5     heated between dispatchers and officers?
6  A. Sure.
7  Q. Dispatchers have a highly, highly stressful job?
8  A. Yes.
9  Q. Especially in a city the size of Warren.
10 A. Yes.
11 Q. Okay. What did Mr. Simlar do with the complaint
12    regarding Ms. McLane?
13 A. I have no idea.
14 Q. Okay. Who was it that told you to meet with
15    Mr. Simlar? Who did you complain to initially?
16 A. It would have been whoever was in the office at that
17    time, but I don't -- I don't remember.
18 Q. All right. But you didn't have any reason to believe
19    that Ms. McLane withheld information from you because
20    of your race or your gender, did you?
21 A. No.
22 Q. Okay. It was just butting heads, a personality
23    conflict with another employee; right?
24 A. Yes.
25 Q. I mean, it's nothing that gives rise to your lawsuit;

Page 79

1     correct?
2  A. In the fact that you're not given the proper
3     information and that it shows that when I did complain
4     nothing happened, so...
5  Q. How do you know nothing happened?
6  A. Because they usually type it up on a memo and they put
7     it in an email to everyone of discipline that's been
8     given.
9  Q. So other officers that have been disciplined, that
10    memo is disseminated to everybody in the department?
11 A. Yes.
12 Q. Can you give some examples of officers that have been
13    disciplined where it was disseminated to everybody?
14 A. If people get days off or get suspended or something
15    like that, they'll put an email out.
16 Q. For officers?
17 A. Yes.
18 Q. Can you give some examples?
19 A. So many.
20 Q. There's "so many" because Warren takes a lot of
21    disciplinary action against officers?
22 A. From time to time.
23 Q. If things are reported, they'll take action; right?
24 A. From time to time. It depends on who it is.
25 Q. Do you think they're selective?

Page 80

1  A. Yes.
2  Q. And what is the selectivity based on?
3  A. If you are on special teams, special assignments, like
4     the special response team, things like that. If
5     you're in different units, the rules don't apply to
6     everyone the same.
7  Q. Were you ever on special units?
8  A. No.
9  Q. Okay. Getting back to Dawn McLane, you don't know for
10    certain that she did or did not receive any
11    disciplinary action; correct?
12 A. No.
13 Q. Also, when I asked you about how do you know when
14    officers were disciplined, you said, when police
15    officers received discipline, there's usually a memo
16    and it goes out to the department. But Dawn McLane is
17    not a police officer; correct?
18 A. Correct.
19        THE WITNESS: There it goes.
20        MR. MUNGO: That's okay. That's okay. No
21    problem, no problem, no problem. No biggie. No
22    problem. Got it. We got it. No, no, no, I got it. I
23    got it. I got it. It's okay.
24        MR. ACHO: All right. No biggie because
25    your copies are good, so we've got them in.



DESHEILA HOWLETT
December 27, 2017

Page 81

1    MR. MUNGO: Thank you, sir. No problem.
2    All right. It's nothing but water.
3    MR. ACHO: Are we still on the record?
4    Okay.
5    BY MR. ACHO:
6    Q.  So regarding Dawn McLane, isn't it true that you went
7    up to the jail and you saw Mr. Simlar and you told
8    him, regarding Dawn McLane and discipline, when
9    Mr. Simlar asked you, what would you like us to do,
10   you said, you guys do whatever you want? Do you
11   recall that conversation?
12   A.  Probably, because I would either say that or, don't do
13   anything.
14   Q.  Okay. So let's go back to Officer Khan. If you can
15   look at this packet, Exhibit -- you have it,
16   Exhibit 2. That should be it. Nope. It should be in
17   here. If you turn those over, it should be in there.
18   There you go. No, this is it. If we look at Officer
19   Khan's evaluation during the FTO program --
20   MR. MUNGO: Which one is that, Counsel?
21   MR. ACHO: Exhibit 2, I believe.
22   BY MR. ACHO:
23   Q.  -- you would agree that Officer Khan is extremely
24   critical of your performance; correct?
25   A.  Yes.

Page 82

1    THE WITNESS: I don't know what page he's
2    on.
3    BY MR. ACHO:
4    Q.  For instance, there was an instance where an
5    individual received an OWI and you failed to read him
6    his rights before the PPB was administered. Do you
7    remember that?
8    A.  No.
9    Q.  You don't remember that happening?
10   A.  Not offhand, no.
11   Q.  But if he said it happened, you would have no reason
12   to deny it, would you?
13   A.  No, sir. What page are you on?
14   Q.  I'm just going through -- I made notes regarding the
15   documentation.
16   A.  Okay.
17   Q.  But I was asking if you recall that incident --
18   A.  No.
19   Q.  -- and him being critical of you for it.
20   A.  I recall him being critical overall, yes.
21   Q.  Do you recall him being critical of the fact that you
22   would draw up crash diagrams incorrectly?
23   A.  Yes.
24   Q.  Do you recall him being critical that when you would
25   draw up a crash diagram, you would leave out pertinent

Page 83

1    information needed for prosecution?
2    A.  Yes.
3    Q.  Do you recall that he was critical that you completely
4    failed to process an OWI report, did not include
5    DataMaster or sobriety task information?
6    A.  Yes.
7    Q.  You would agree those are key pieces of evidence for
8    prosecution; correct?
9    A.  Yes.
10   Q.  Khan had to do the report for you, didn't he?
11   A.  Yes.
12   Q.  And Khan was also critical of your safety procedures,
13   the fact that you put yourself in danger; correct?
14   A.  Yes.
15   Q.  Khan indicated that you walked into a home where a man
16   removed a semiautomatic weapon and pointed it and you
17   did not pull out your weapon and he had to take over,
18   do you recall that?
19   A.  I unclipped my holster, but I did not draw my weapon.
20   Q.  Okay. And Khan was critical of you for it; correct?
21   A.  Yes.
22   Q.  You would agree that failing to take care of that
23   situation put both you and Khan's lives in danger;
24   correct?
25   A.  Negative. The man's son was present at the time and I

Page 84

1    did not feel that he was trying to shoot or harm us.
2    He was just letting us know that he had a weapon and
3    he was presenting it to us in a safe way.
4    Q.  Okay. Officer Khan noted that you had difficulty
5    using LEIN and SOS; correct?
6    A.  Yes.
7    Q.  That you were not comfortable with it; correct?
8    A.  Yes.
9    Q.  At some points, Officer Khan noted when your
10   performance improved, did he not?
11   A.  I think rarely, but yes.
12   Q.  So that would indicate that he was trying to be fair
13   with you; correct?
14   A.  No.
15   Q.  If he was deliberately unfair, why would there be
16   certain days where he would indicate, Desheila's
17   performance improved?
18   A.  Well, if you do a hundred negative things and then
19   throw in two good things, it doesn't really weigh
20   itself out.
21   Q.  Is it fair to say that Khan is known as a pretty stern
22   taskmaster?
23   A.  When it comes to female officers, yes.
24   Q.  Isn't it true that he's failed a number of male
25   officers in FTO?



DESHEILA HOWLETT
December 27, 2017

Page 85

1  A. And also passed some for things that would be
2     considered, you know --
3  Q. That's not my question. My question is, isn't it true
4     that he has failed a number of male officers in the
5     FTO program?
6         MR. MUNGO: If you know.
7  A. I only know about the female officers.
8  BY MR. ACHO:
9  Q. How is it you only know about the female?
10 A. Because we would all share a locker room.
11 Q. So you never heard that he failed male candidates in
12    FTO?
13 A. No.
14 Q. If I told you that he had failed many male candidates
15    in FTO, you would have no reason to dispute that,
16    would you?
17 A. No.
18 Q. Could it be just that Khan is a very stern and
19    demanding FTO officer?
20 A. I believe it's a little more than that, though.
21 Q. All right. Do you recall that Khan was critical when
22    he was explaining the civil eviction process to you,
23    he wrote that you turned your head, you did not want
24    to hear what he had to say?
25 A. No, I don't recall that.

Page 86

1  Q. Do you recall him indicating on multiple occasions
2     that you had difficulty in accepting constructive
3     criticism?
4  A. Sure.
5  Q. Okay. Do you recall not calling out location when
6     doing a pat down of a citizen?
7  A. No.
8  Q. Do you recall him being critical of you for that?
9  A. No.
10 Q. Officer Khan noted multiple times that's still, toward
11    the end of the FTO phase, you were not calling out
12    every run, do you recall that?
13 A. No.
14 Q. Do you recall going to the wrong address on multiple
15    occasions?
16 A. My mapping was the hardest thing for me, learning a
17    large city like that, so yes.
18 Q. And he was critical of you for that; correct?
19 A. Yes.
20 Q. Do you think it's fair that an FTO officer should
21    expect a candidate to know the boundaries and
22    territories and the mapping of the city?
23 A. Yes.
24 Q. Do you remember a traffic safety stop of a vehicle
25    with a broken headlight where Officer Khan had warned

Page 87

1  you to pull your vehicle off the roadway and you had
2  not?
3  A. No.
4  Q. Do you recall telling you to run the passengers of
5     the vehicle through LEIN and you failed to do so?
6  A. No.
7  Q. Was he critical of your directional skills? I'm not
8     referring to mapping, I'm talking about directional
9     skills.
10 A. Yes.
11 Q. He indicated that you -- strike that.
12        He indicated that he was alarmed that you
13    did not have a basic sense of direction as an officer.
14 A. It's called cross-triangulation, I was having problems
15    with.
16 Q. Okay. And he noted those concerns; correct?
17 A. Yes.
18 Q. He also noted concerns that you had with orientation
19    and geography of the city; correct?
20 A. Which is the same thing, yes.
21 Q. All right. As a result of these deficiencies, you
22    were given a performance improvement plan; correct?
23 A. Yes.
24 Q. All right. And the performance improvement plan was
25    to be for no more than 15 days; correct?

Page 88

1  A. Yes.
2  Q. Who put you on the performance improvement plan?
3  A. Whoever was in charge of that back then. I believe it
4     was Aherns was over the FTO program.
5  Q. And how do you spell Aherns?
6  A. A-h-e-r-n-s, Aherns.
7  Q. You had no reason to dispute the PIP, did you?
8  A. I thought it was personal, but I went along with it.
9  Q. You recognized that there were, in fact, numerous
10    areas where you were deficient and needed improvement;
11    correct?
12 A. Yes.
13 Q. Other than the comment regarding women not being
14    able -- strike that.
15        Other than the comment where you allege
16    Khan said women shouldn't work, or words to that
17    effect, do you have other claims against Officer Khan?
18 A. He failed Krystal -- her name was Gogo at the time,
19    but now it's Krystal Gill -- in the third phase, and
20    then he also failed Makowski, Shannon Makowski [ph],
21    in the third phase. And Matt Nichols purposely told
22    Khan to take Makowski in the third phase, projecting
23    that he would fail her, because they had a personal
24    conflict.
25 Q. How do you know that?



DESHEILA HOWLETT
December 27, 2017

Page 89

1  A.  Matt told me.
2  Q.  And who is Matt Nichols?
3  A.  Right now, he's the deputy chief.
4  Q.  And how is it Matt Nichols would have the occasion to
5      make such a comment to you?
6  A.  We were having a conversation and he let me know that
7      Shannon gave him a ticket when she worked at another
8      police department, before she came to our department,
9      so...
10  Q.  Shannon's last name is what?
11  A.  Makowski.
12  Q.  Okay.  Do you have a relationship today with Matt
13      Nichols where you speak to each other?
14  A.  Not since -- not since February.
15  Q.  Not since February.  What happened in February?
16  A.  I left.
17  Q.  Okay.  Prior to February, what kind of relationship
18      did you have with Deputy Chief Nichols?
19  A.  Confidant.
20  Q.  Confidant?
21  A.  Uh-huh.
22  Q.  Can you tell me what you mean by that?
23  A.  I would talk to him about my struggles and things that
24      were going on in the department for my entire duration
25      of time of being there.

Page 90

1  Q.  And Matt Nichols was always receptive and willing to
2      listen to whatever you had to say; correct?
3  A.  Yes.
4  Q.  And Matt Nichols -- Deputy Chief Nichols wanted to see
5      things go well for you; correct?
6  A.  Yes.
7  Q.  He liked you.
8  A.  Yes.
9  Q.  Isn't it true that you referred to Officer Khan
10      multiple times as a sand nigger?
11  A.  No.
12  Q.  You never said that?
13  A.  I know who did say it, but I didn't.
14  Q.  Well, who said it?
15  A.  Derek Scott.
16  Q.  Derek Scott?
17  A.  Yes.
18  Q.  Isn't it fair to say that more than one person could
19      make such a comment?
20  A.  He told me that they're either sand niggers or dune
21      coons.
22  Q.  Okay.  But if multiple officers were to say that you
23      referred to him as a sand nigger, would they be lying?
24  A.  Like I said, Derek had that conversation with me.
25  Q.  I understand that.  I'm asking you pointblank if you

Page 91

1      referred to Officer Khan as a sand nigger in front of
2      other officers.
3          MR. MUNGO:  Objection, asked and answered.
4  BY MR. ACHO:
5  Q.  You did, didn't you?
6          MR. ACHO:  She didn't answer it.
7          MR. MUNGO:  Asked and answered.
8          MR. ACHO:  She did not answer it.
9          MR. MUNGO:  She said that --
10          MR. ACHO:  She said Derek Scott.
11          MR. MUNGO:  Yeah, right.
12          MR. ACHO:  I understand.  But she's not --
13      I'm asking her pointblank if she referred to him as a
14      sand nigger, because multiple officers told me she
15      did.
16  BY MR. ACHO:
17  Q.  You don't deny that, do you?
18  A.  Maybe I did.  I don't recall.
19  Q.  All right.  Did you ever tell Officer Khan that you
20      and Jeff Steinberg would make the ultimate baby
21      together?
22  A.  Jeff Steinberg?
23  Q.  Yes.
24  A.  No.
25  Q.  It's true that you found a couple of the officers at

Page 92

1      Warren P.D. sexually attractive; yes?
2  A.  Yes.
3  Q.  And you made your opinion about their sexual
4      attractiveness or worthiness clear to other people;
5      correct?
6  A.  I had relationships with officers.
7  Q.  Sexual relationships.
8  A.  No.
9  Q.  But you wanted to have sexual relationships with a
10      couple of officers; yes?
11  A.  There were a couple of people that I liked as people,
12      yes.
13  Q.  All right.  Did you ever refer to white people as
14      crackers around other officers?
15  A.  No.  Again, Derek explained to me what -- where --
16      where the meaning came from in the steel mills of
17      people cracking corn to make liquor out of, because I
18      didn't know what the meaning of it was, so he just
19      kind of educated me on the history of the word.
20  Q.  Have you worked with Officer Khan since the FTO phase?
21  A.  I'm sure we had overlapping runs from time to time.
22  Q.  What is your relationship -- strike that.
23          Prior to February of this year, what was
24      your relationship like with Officer Khan?
25  A.  He would eye glare, stare, no speaking at all, kind of



DESHEILA HOWLETT
December 27, 2017

Page 93

1  look down at the feet when we pass each other.  I was
2  on my way to a run and he pulled me over.  At that
3  time, I was a detective so I was in an unmarked car,
4  and I explained thoroughly to him why I was in a rush
5  to get to the run, and then he proceeded to go into
6  the station and make -- try to make a complaint.  When
7  I came back from the run, my supervisor told me that
8  he was trying to get me written up.
9  Q.  You were going to Warren Fitzgerald High School;
10     correct?
11  A.  Yes.
12  Q.  You were going to a football game?
13  A.  No.
14  Q.  What were you going there for?
15  A.  A teacher was having sex with students.
16  Q.  Okay.  And that required you to go 30, 40 miles an
17     hour above the speed limit?
18  A.  I wasn't going 30, 40 above the speed limit, but what
19     it is this:  Evidence tech calls out, he's at my
20     scene, teacher is having sex on the desk with the
21     student.  I need to get there to let him know what I
22     need tech'd.  But I heard him call out prior to me, so
23     I was just trying to hurry up and get there.
24  Q.  All right.  You were in your own personal car;
25     correct?

Page 94

1  A.  My detective car.
2  Q.  Your detective car.  But Khan didn't know that was a
3     department-issued vehicle; correct?
4  A.  I would assume not.
5  Q.  All right.  And as soon as you flashed your badge to
6     him, he said, hey, just slow down, and let you go;
7     right?
8  A.  No.
9  Q.  Well, tell me what the conversation was.
10  A.  I thoroughly explained that I was on my way to
11     Fitzgerald and that I was trying to get there because
12     an evidence tech had already called out.  And he -- I
13     remember getting back in his car and he made, like, a
14     skirting sound, when you, like, drag the tires, and
15     the parking lot that we were in, it made all the
16     employees turn to look because he left in such a, you
17     know, hasty way.
18  Q.  Okay.  You said he tried to make a complaint about
19     you.  Isn't it true, if he wanted to have made a
20     complaint about you, he would have?
21  A.  Supervisors don't always take complaints if they don't
22     feel whatever it about.
23  Q.  So do you have any knowledge that he attempted to make
24     a complaint and was shot down?
25  A.  Yes.

Page 95

1  Q.  And where does that knowledge come from?
2  A.  Sergeant Eidt.
3  Q.  Sergeant Eidt?
4  A.  Yeah.
5  Q.  And how is that spelled?
6  A.  E-i-d-t.
7  Q.  And what did Sergeant Eidt tell you about that?
8  A.  That Khan tried to get me written up.
9  Q.  And that he was shot down by Eidt?
10  A.  Or who he initially gave the complaint to.  I would
11     assume that he complained to whoever his supervisor
12     was, and then that supervisor must have contacted my
13     supervisor, which is Sergeant Eidt.
14  Q.  In total -- and I know you told me you share a locker
15     room with the female officers, but in total, do you
16     know how many FTO recruits that Officer Khan has had
17     in the past and how many he has either failed or
18     recycled versus how many he has passed?
19  A.  No, sir.
20  Q.  Okay.  You sort of lumped him in with one of your
21     complaints with an Officer Labin.
22  A.  Labin.
23  Q.  Labin.  That is page 5 of your Complaint, which is
24     Exhibit 3, and it says, subsection (b), "Defendant
25     Anwar Khan and Darrin Labin, white male, approached

Page 96

1  another white police officer who was a friend of the
2  plaintiff and inquired of him whether he had engaged
3  in sexual relations with plaintiff and whether he had
4  a threesome with plaintiff and another female."
5     You see that?
6  A.  Yes.
7  Q.  Okay.  Why is there a -- why is that Complaint part of
8  this lawsuit?
9  A.  Because Khan is against women working, being in
10  policing, and it wasn't a racial thing between him and
11  I.  He was always coming at me from a sexist
12  standpoint, I felt, and to inquire to other people
13  whether I've had sexual relations with them or not is
14  not appropriate.
15  Q.  Well, would you agree that it's not appropriate to
16  publicly state that you would like to have sexual
17  relations with multiple police officers?
18        MR. MUNGO:  Objection, assuming facts that
19  are not in evidence.
20        MR. ACHO:  You've got to let me finish my
21  question.  And she already admitted to it.  What are
22  you talking about?  She already said on the record
23  that she's told people she wanted to have sex with a
24  couple of officers.
25        MR. MUNGO:  That -- that's



DESHEILA HOWLETT
December 27, 2017

Page 97

```
 1    mischaracterizing --
 2              MR. ACHO:  It is?
 3              MR. MUNGO:  -- her testimony.  Yes, sir.
 4    She did not say --
 5              MR. ACHO:  We can go back and have her read
 6    it, but, I mean, I think it's in the record.
 7              MR. MUNGO:  That's not what she said.
 8              MR. ACHO:  All right.
 9              MR. MUNGO:  And, Counsel, I may also object
10    to the fact that it's not relevant.  It is not
11    proportional to the defense of the allegations in this
12    Complaint at all and it is designed and has the effect
13    of harassing and upsetting my client.
14              MR. ACHO:  Okay.  First of all, if she's
15    upset, it's certainly not my intention, but nobody is
16    harassing her.  I'm allowed to ask certain questions.
17    She's already admitted to certain things, so I need to
18    determine her veracity.
19              MR. MUNGO:  Well, Counsel, you know that --
20              MR. ACHO:  And relevance is not a proper
21    objection in a deposition and you know this, so --
22              MR. MUNGO:  Well --
23              MR. ACHO:  It's not.  So let me ask --
24              MR. MUNGO:  But -- but --
25              MR. ACHO:  Go ahead.
```

Page 98

```
 1              MR. MUNGO:  -- Counsel, if the inquiry is
 2    not designed to elicit information --
 3              MR. ACHO:  It is designed.
 4              MR. MUNGO:  -- that is -- that is
 5    proportional, that is proportional.
 6              MR. ACHO:  She has a claim here.
 7              MR. MUNGO:  Just as in interrogatories and
 8    request for production of documents, the information
 9    that's being requested must be proportional to the
10    defense --
11              MR. ACHO:  Sir, your client --
12              MR. MUNGO:  Counsel --
13              MR. ACHO:  -- told fellow officers that she
14    would make the perfect baby with a couple of them, and
15    now she's saying here, it was inappropriate to ask
16    about sexual relations, and I'm saying, it's not
17    inappropriate if that door has been opened.
18              MR. MUNGO:  That -- first of all, that's an
19    objection because that is mischaracterizing her
20    testimony.
21              MR. ACHO:  Okay.
22              MR. MUNGO:  But go ahead.  Go ahead,
23    Counsel.
24              MR. ACHO:  All right.
25    BY MR. ACHO:
```

Page 99

```
 1    Q.  Was it Khan or Labin?  Because they're both lumped in
 2        there.  Who made the comment?
 3    A.  My understanding is, the officer was in the urinal
 4        using the restroom and that he was flanked by both of
 5        these officers, one on the left side, one on the
 6        right, and in the middle of his urinating, was asked
 7        if we were together.
 8    Q.  All right.  So this comment wasn't made to you or
 9        within your earshot.
10    A.  No, just to someone who associates with me.
11    Q.  All right.  Who -- who told you that this comment was
12        made?
13    A.  Matt Nichols.
14    Q.  Matt Nichols, all right.  And how did Matt Nichols
15        broach this with you?  Was it said in the context of
16        hey, FYI, this was said, you should sort of watch what
17        you say, or, hey, get a load of this, in a funny way?
18        How did you take it?
19    A.  He felt bombarded -- because why would you talk to
20        somebody when you're in the middle of peeing in a
21        restroom?  And I just asked him, I don't know, in a --
22        you know, not in -- in the restroom or whatever, and
23        then he said that they just kept digging into our
24        relationship.
25    Q.  Digging into yours and Matt Nichols relationship?
```

Page 100

```
 1    A.  Yes.
 2    Q.  All right.  I'll come back to that.  Is that the only
 3        claim that you have against Darrin Labin?
 4    A.  And about whoever made the comment that Marlene Kerr
 5        would have been the other officer with a threesome of
 6        us.
 7    Q.  Marlene Kerr?
 8    A.  Yes.
 9    Q.  K-e-r-r?
10    A.  Yes.
11    Q.  Marlene Kerr is a current officer at Warren?
12    A.  Yes.
13    Q.  Are you friends with her?
14    A.  Yes.
15    Q.  Did you have any type of romantic relationship with
16        her?
17    A.  No.
18              MR. MUNGO:  Objection, Counsel.  Again,
19    that is not proportionate.  It's not relevant and it's
20    not proportional --
21              MR. ACHO:  Relevance is not appropriate --
22              MR. MUNGO:  -- to your defense in this
23    matter and it's designed to harass and intimidate and
24    embarrass and humiliate my client.
25    BY MR. ACHO:
```



DESHEILA HOWLETT
December 27, 2017

Page 101

1  Q.  Do you feel intimated by my asking you the question?
2  A.  It's kind of peculiar, but I don't know.
3  Q.  Well, you know what I find peculiar, guys, is that
4     report that you handed me from Shiener says that you
5     are married to a woman, but you have an ongoing
6     relationship with another woman.  It says it right in
7     that report that I was just handed today.
8  A.  No.
9  Q.  Is that not accurate?
10 A.  No.
11 Q.  Did you find that peculiar when you read it?
12        MR. MUNGO:  That is not in that -- that is
13     not in that report.
14        MR. ACHO:  Oh, it isn't?
15        MR. MUNGO:  No.
16        MR. ACHO:  Someone hand it to me.  I'm
17     going to read to you what it says, specifically.
18        MR. MUNGO:  And if that is in there, that's
19     inaccurate.
20 BY MR. ACHO:
21 Q.  It says, "She currently lives with her wife.  She is
22     in a committed relationship with another woman."
23     That's what it says.  Now --
24        MR. MUNGO:  Then that's -- then that's
25     actually inaccurate.

Page 102

1        MR. ACHO:  Well, how do you know?  This is
2     his -- this is his evaluation of your client, not you.
3     You weren't in the room with her.
4        MR. MUNGO:  Let me see it.
5        MR. ACHO:  How do you know that?
6        MR. VINSON:  What page is that?
7        MR. MUNGO:  My -- my client knows.
8        MR. ACHO:  You want your client to know
9     that.
10 BY MR. ACHO:
11 Q.  Do you have any idea why Dr. Shiener would put that in
12     a report?
13 A.  It could be a typo.
14 Q.  That's -- wow.  That's an awfully peculiar typo to say
15     you're in a committed relationship with another woman,
16     but okay.  Anyways, moving on.
17        Do you have any other claims against Darrin
18     Labin?
19 A.  No.
20 Q.  All right.  After Matt Nichols relayed this comment to
21     you, this alleged comment to you, did you take any
22     type of action by way of a complaint?
23 A.  No.
24 Q.  You never filed a complaint with HR or anyone else;
25     correct?

Page 103

1  A.  Correct.
2  Q.  What was Matt Nichols' rank at the time of this?
3  A.  Probably a sergeant, I believe.
4  Q.  All right.  In paragraph 13 of your Complaint, you
5     state that you were, "denied privileges to enjoy
6     rights and benefits of similarly situated white police
7     officers"; correct?
8  A.  Yes.
9  Q.  And specifically, you claim you were denied light-duty
10     opportunities; correct?
11 A.  Yes.
12 Q.  All right.  Can you expound a little bit on that
13     claim?  What are you referring to?
14 A.  In 2011 when I was hit by the drunk driver en route to
15     work, my understanding is our contract says that we're
16     carried to and from work.  So after being off for four
17     months and being in physical therapy for eight months,
18     I tried to come back to work at the three-month marker
19     and I was denied.  They said that they didn't have any
20     light-duty positions available, so that I couldn't
21     come back until I could come back full duty, so I
22     returned the following month.
23 Q.  All right.  Your accident was an off-duty or non-duty
24     accident; correct?
25 A.  Off duty, but en route to work, yes.

Page 104

1  Q.  But off duty.
2  A.  Right.
3  Q.  All right.  And you're aware that for light duty or
4     desk duty, that preference, pursuant to policy, is
5     only given for on-duty accidents or injuries; correct?
6  A.  Based on that's what the paper says, but that's not
7     how they apply it in practice.
8  Q.  But that is what the policy is.
9  A.  Right.
10 Q.  All right.  Are you aware of white officers who were
11     not involved in on-duty accidents that were given
12     light duty?
13 A.  Yes, sir.
14 Q.  Okay.
15        MR. MUNGO:  Counsel, after your next
16     question, we need to take a break.
17        MR. ACHO:  Okay.  I suppose you want to
18     call Shiener.
19        MR. MUNGO:  I'm sorry?
20        MR. ACHO:  I suppose you want to call
21     Shiener?
22        MR. MUNGO:  No.  You --
23        MR. ACHO:  I would.
24        MR. MUNGO:  No, no.  You just don't know
25     how to read.



DESHEILA HOWLETT
December 27, 2017

Page 105

1    MR. ACHO: I don't?
2    MR. MUNGO: No, you don't. That was
3 describing her relationship --
4    MR. ACHO: I don't know how I got through
5 law school.
6    MR. MUNGO: That was describing her
7 relationship with her wife. Either you don't know how
8 to read or --
9    MR. ACHO: Well, in fairness -- in
10 fairness, you handed it to me moments before the
11 deposition. It's a long document.
12    MR. MUNGO: Well, well, well, you still
13 need to know how to read. But in any event --
14    MR. ACHO: I do know --
15    MR. MUNGO: -- ask your question -- ask
16 your question so that we can --
17    MR. ACHO: I do know how to read. I read
18 to you what it says. I'm looking at it right now. It
19 says...
20    MR. MUNGO: Then you need a -- then you
21 need a course in grammar.
22    MR. ACHO: In grammar?
23    MR. MUNGO: Go ahead. Go ahead.
24    MR. ACHO: I was a journalism major. Now I
25 feel bad. I don't know how I got my degree.

Page 106

1    MR. MUNGO: No, Counsel, you okay, you
2 okay. You just -- you just got a little overzealous.
3    MR. ACHO: You think so?
4    MR. MUNGO: That's all. Yeah, you got a
5 little overexcited about something that shouldn't have
6 excited you, that's all.
7    MR. ACHO: Well, I think he needs to issue
8 an amended report.
9    MR. MUNGO: It was wishful thinking,
10 Counsel.
11    MR. ACHO: All right. All right. Okay.
12    MR. MUNGO: But I can relate.
13    MR. ACHO: All right.
14 BY MR. ACHO:
15 Q. So who are the white officers that received these
16 light-duty privileges that you did not receive?
17 A. William Ross would be one.
18 Q. Okay. Now, let's stop there. What was Officer Ross's
19 claim for injury?
20 A. Mental fatigue.
21 Q. Mental fatigue from on the job; correct?
22 A. He wanted to study for the promotional exam.
23 Q. Right. But he had mental fatigue on the job; correct?
24 A. I don't know if it was job related or not.
25 Q. But it might have been; correct?

Page 107

1 A. Maybe.
2 Q. All right. So who's the next one?
3    MR. MUNGO: Take the --
4    MR. ACHO: Are there many more?
5 A. Yes.
6 BY MR. ACHO:
7 Q. Can you remember them and we'll come back to this?
8    MR. ACHO: Go ahead.
9    VIDEO TECHNICIAN: Off the record, 12:26.
10    (Off the record at 12:26 p.m.)
11    (Back on the record at 12:49 p.m.)
12    VIDEO TECHNICIAN: Back on the record,
13 12:49.
14 BY MR. ACHO:
15 Q. When we left off, you were telling me about white
16 officers that you believe were given light-duty or
17 desk-duty positions or benefits that you were denied,
18 and the first person you gave me was William Ross, who
19 had claimed mental fatigue, we said. We don't know if
20 it was job related or not, but it might have.
21    And then you said you had a lot of other
22 individuals to name, so I'm wondering who those other
23 people are.
24 A. We go by last names a lot, so I'm stating the last
25 names, Reichling.

Page 108

1 Q. Raglind?
2 A. Reichling.
3 Q. How do you spell that?
4 A. Should be, like, R-e-i-c-h-l-i-n-g.
5 Q. And what was Officer Reichling's injury?
6 A. He was off duty and his motorcycle was falling over in
7 his garage, so he reaches out to grab it and his arm
8 was snatched out of the socket.
9 Q. So he came back to work at some point?
10 A. Light duty, yes.
11 Q. Light duty. And what was he doing?
12 A. Working the desk.
13 Q. Okay. When you heard that Reichling had received desk
14 duty for an off-duty incident, did you complain to
15 anyone?
16 A. No.
17 Q. Who else was given light duty?
18 A. Let's see. Light duty was also given to
19 Officer Booms.
20 Q. Boom?
21 A. Booms, B-o-o-m-s.
22 Q. Booms. And what was Officer Booms' injury?
23 A. He had a cast on his foot, so I don't know if it was a
24 torn ligament or what.
25 Q. Do you know if it was work related?



DESHEILA HOWLETT
December 27, 2017

## Page 109

1    A. It wasn't work related, and he was on crutches.
2    Q. What was the injury from, do you know?
3    A. Huh-uh. And they put him in the property room.
4    Q. But again, you don't know if it was --
5    A. It's my understanding that it wasn't work related, no.
6    Q. Who told you it wasn't?
7    A. Everybody was talking about it.
8    Q. Okay. Did you complain at that time that
9        Officer Booms was given light duty?
10   A. No.
11   Q. Okay. Anyone else?
12   A. Also there was an officer on the midnight shift, his
13       name was Mays.
14   Q. M-a-y-s?
15   A. Yes. And because he was getting close to retirement,
16       he didn't really want to use any sick time, so they
17       allowed him to work with a cast on his hand. And then
18       I'm trying to think who had a pulled groin muscle from
19       playing softball that was on the desk.
20   Q. While you're thinking of that, did you complain to
21       anyone that Mays was given desk duty?
22   A. No, because all of these people mostly were prior to
23       me getting injured, so I just thought it was like a
24       rule of thumb that they took care of us in that way.
25       And so once I got injured, I found that it's

## Page 110

1        not a given that you get light duty, so...
2    Q. Okay. But you don't have any information or evidence
3        that you were denied desk duty or light duty because
4        you were a female or African-American, do you?
5    A. I was just -- like I said, me as an individual was
6        denied the opportunity to come back until I could come
7        back full duty.
8    Q. All right. Did you, at any time, go to HR or anyone
9        else and file a complaint over the fact that you were
10       not given light duty?
11   A. No.
12   Q. Why not?
13   A. Again, filing complaints doesn't seem to fare well,
14       and then --
15   Q. Okay.
16   A. -- if I -- if I complain or make comments about things
17       that are unjust, it just always gets worse for me.
18   Q. Okay. When did you make complaints and things got
19       worse for you?
20   A. There was a complaint made for me, and the fallout of
21       that is people basically stopped talking to you or
22       they make you the problem even if you haven't done
23       anything. There's been times where I talked to other
24       officers that are hurting or offending me, and other
25       people go, see, that's why I don't associate or talk

## Page 111

1        to her. So again, nothing changes, and then you just
2        lose people.
3    Q. Okay. What officers did you complain to that you felt
4        were offending you that started treating you a certain
5        way?
6    A. Barnhill.
7    Q. Okay. And is that Kevin Barnhill?
8    A. Yes.
9    Q. And what is it that you said to Barnhill, or what is
10       it that he said to you?
11   A. There had been 10 or 11 occasions where he constantly
12       reminded me that I was black, and so after I realized
13       that he was never gonna stop and that every time he
14       runs into me he has to acknowledge that I'm black, I
15       told him that it was offensive. And then other people
16       that heard me directly talking to him said, see, see,
17       that's why I don't talk to him.
18   Q. Okay. The comments that you're referring to regarding
19       Barnhill, you allege in your Complaint that -- on
20       page 5 and 6, 13(d), and are these the allegations
21       that you're referring to?
22   A. Yes.
23   Q. It says, "Defendant Kevin Barnhill, white male, always
24       spoke to plaintiff in a derogatory, stereo-typed
25       fashion using a slave voice."

## Page 112

1        What is a "slave voice"?
2    A. If you watch a movie and they have people during
3        slavery time, they're talking very slow or very
4        jumbled or gibberish kind of thing.
5    Q. And he would talk to you like that?
6    A. Yes. His tone would change.
7    Q. All right. "Saying things like, 'sister gurl,' and,
8        'whattup, doe', employing mimicking, stereotypical and
9        demeaning portrayals of African-Americans."
10   A. Yes.
11   Q. Is that right?
12   A. Yes.
13   Q. All right. How many times did Officer Barnhill speak
14       to you in that fashion?
15   A. By the time I addressed the problem to him, it was --
16       he was on the 10th or 11th time of doing it.
17   Q. All right. And when was this?
18   A. I don't -- I don't have a timeline.
19   Q. Okay. Would this have occurred in a matter of months
20       or over a full year?
21   A. It was a great span of time, yes.
22   Q. All right. Is it after you started working there?
23   A. Yes.
24   Q. Okay. How is it you would interact with Kevin
25       Barnhill? Were you partners?



DESHEILA HOWLETT
December 27, 2017

## Page 113

1  A. We would overlap at runs. I would talk to him. I
2     encouraged him to study for promotional exam.
3  Q. Okay. So you and Barnhill were friends, were you not?
4  A. I would think that we were associates, yes.
5  Q. No, that's not what I said, "associates." I said, you
6     guys were friends.
7  A. No. Friends, you hang out with after work and things
8     like that.
9  Q. That's the only way you can be a friend?
10  A. Again, we were associates at work, yes.
11  Q. If you are encouraging somebody to study and do well
12     on a test, isn't that a friendly gesture?
13  A. Again, I continued to extend myself to him.
14  Q. I get it.
15  A. Yeah.
16  Q. What I'm saying is, you guys were friends, weren't
17     you?
18  A. Not friends, no.
19  Q. All right. Did you feel like you could speak openly
20     to him?
21  A. I tried, yeah.
22  Q. You felt comfortable prodding him on to study and do
23     well on exams; right?
24  A. Yes.
25  Q. And is it fair to say Barnhill felt comfortable around

## Page 114

1     you?
2  A. Maybe too comfortable.
3        MR. MUNGO: Objection, assuming a fact not
4     in evidence.
5  BY MR. ACHO:
6  Q. Okay. Do you believe that Barnhill felt comfortable
7     around you?
8  A. Yes.
9  Q. Okay. So if Barnhill felt comfortable around you,
10     he's making comments probably in a joking fashion,
11     fair to say?
12  A. Just treat me like a human being.
13  Q. Was he not treating you like a human being?
14  A. I mean, you don't have to remind me that I'm a black
15     person. I know already.
16  Q. Did he say, hey, you're a black female?
17  A. But he's speaking how ghetto black girls speak. When
18     I'm not speaking that way, there's no need to address
19     me that way.
20  Q. Is it true that Barnhill used to be a pastor?
21  A. Yes.
22  Q. Is it true that he conducts himself in a Christian
23     fashion?
24  A. No.
25  Q. Why do you say that?

## Page 115

1  A. He's very inappropriate. I mean, he was caught
2     stalking a lady on her terrace, you know.
3  Q. When was this?
4  A. Some years back. He ran her plate, got her personal
5     information and showed up at her house. So that's not
6     very pastorally.
7  Q. Was he disciplined for that?
8  A. I would assume so.
9  Q. How do you know about that incident? Did he tell you
10     about it?
11  A. No. Just how a lot of people would talk about it, how
12     crazy it was for an officer to be caught -- another
13     police department to be called on an officer and a
14     officer to be accused of B&E, which is breaking and
15     entering.
16  Q. So it didn't happen in Warren?
17  A. No.
18  Q. Okay. Is it possible that Barnhill was just joking
19     with you and not trying to demean you?
20        MR. MUNGO: Objection, assuming a fact not
21     in evidence.
22  A. I'm not sure.
23  BY MR. ACHO:
24  Q. So it's possible.
25  A. Anything's possible, yes.

## Page 116

1  Q. Fair to say, based on your experience of 40-plus years
2     as an African-American, that sometimes when you
3     encounter white people who you may be on a friendly
4     basis with, they may come off as awkward or not
5     necessarily know how to know -- act or joke around
6     people of color?
7  A. You're asking me their state of mind? What they
8     think?
9  Q. No. I'm just asking you, in your experience, isn't it
10     fair to say that a lot of white people, when you
11     encounter them, are awkward or goofy and not
12     necessarily trying to hurt you, but just don't know
13     how to really come off as funny?
14        MR. MUNGO: Objection, assuming a fact not
15     in evidence.
16  BY MR. ACHO:
17  A. It's no fact. I'm just asking you in your experience.
18  A. But a lot of white people don't.
19  Q. I know a lot of white people don't, but isn't it fair
20     to say that a lot of white people do?
21  A. Act awkward, sure.
22  Q. Okay. And couldn't it just have been that Barnhill
23     was awkward and not trying to hurt you, per se?
24  A. After so many years of being there and having so many
25     conversations, there should get to a point where the



DESHEILA HOWLETT
December 27, 2017

Page 117

1   awkwardness ceases.
2   Q.   Well, how many -- strike that.
3        You testified earlier that once you
4   addressed it with Barnhill, that you felt the 10 or 11
5   times that he had joked or made comments, that you
6   addressed it with him, that it stopped after that.
7   A.   That's why I addressed it because I wanted it to stop.
8   Q.   And it stopped; right?
9   A.   Yes.
10  Q.   Because you told him, hey, it bugs me.  And so what
11  did he tell you?
12  A.   I don't recall him saying anything.
13  Q.   Didn't he say to you, you know what, Desheila, it was
14  never my intent to hurt you, I was joking around?
15  A.   Again, I don't remember him saying anything.
16  Q.   Is it possible that he said that to you?
17  A.   It's possible.
18       MR. MUNGO:  Objection, asked and answered.
19  BY MR. ACHO:
20  Q.   Did you ever make any type of notes or memorialize
21  anywhere when Barnhill would make comments to you?
22  A.   No.
23  Q.   Did you ever write down in a journal, you know,
24  Barnhill spoke in a slave voice on this date, or
25  something?

Page 118

1   A.   No.
2   Q.   Nothing like that?  And you never complained about
3   Barnhill to HR or any supervisor, did you?
4   A.   No.
5   Q.   Do you believe you were treated differently by some of
6   your fellow officers after you addressed your issues
7   with Barnhill?
8   A.   People have a tendency to shut down or not really know
9   what to say, so they just don't speak at all.
10  Q.   Okay.  And who are you referring to?
11  A.   I can't remember exactly who was standing around at
12  that time, but it just -- there's always, like, this
13  period of adjustment, if I speak out or adjust or say
14  anything, where I kind of get shunned for a period of
15  time, so...
16  Q.   So is it your testimony that you were shunned after
17  you addressed it with Kevin Barnhill?
18  A.   Yes.
19  Q.   Can you name anybody, as we sit here, who shunned you?
20       MR. MUNGO:  Objection, asked and answered.
21  A.   No.
22  BY MR. ACHO:
23  Q.   You've said, every time I speak up.  Other than the
24  Barnhill incident, what other times have you spoken
25  up?

Page 119

1   A.   I addressed Derek Scott.
2   Q.   Okay.  Derek Scott, is he named as a defendant?
3   A.   No.
4   Q.   How come?
5   A.   Because our disagreement wasn't race based.
6   Q.   All right.  What was your disagreement with
7   Derek Scott?
8   A.   He had a good relationship with a lot of dispatchers
9   and they would, basically, let him have free days and
10  they would send me to his area to do runs while he's
11  not doing any runs.
12  Q.   But you didn't have any reason to believe that was
13  because you were a woman or African-American.
14  A.   No.
15  Q.   How is it you are able to delineate when something is
16  prompted by your race or your gender and when
17  something is not?
18  A.   Some things, it's because of the tone that they're
19  saying it in or they're mocking things that black
20  people say or do or they're specifically asking me
21  questions as a black person, like, Desheila, what is
22  the meaning of this?  Desheila, why do you-all do
23  that?  They're specifically coming to me, but then you
24  never have a conversation or talk to me at any other
25  time until you need the breakdown or definition on all

Page 120

1   things black.
2   Q.   Okay.  But the light-duty jobs, you said you were
3   denied because of your race; right?
4   A.   Because, to my knowledge, I'm the only person that
5   wasn't allowed to work the desk when needed.
6   Q.   Okay.  But with Derek Scott, you were able to
7   delineate that that's not because of your race or your
8   gender.  I just -- I'm trying to figure out how you
9   determine what actions are based on race in general
10  and which aren't.
11  A.   Again, they address me -- specifically ask me things
12  pertaining to all things black.
13  Q.   I understand those people.  I'm referring more to the
14  light duty.  There was no comments made to you
15  regarding light duty, were there?
16  A.   Well, the Derek thing -- again, it's just a
17  misunderstanding or me trying to address the fact that
18  he's at work and he's not working and that I'm doing
19  my job and his job.
20  Q.   All right.  Who did you complain to about the
21  Derek Scott situation?
22  A.   To Derek.
23  Q.   Is Derek a supervisor?
24  A.   No.
25  Q.   Okay.  You knew that, under the policies, you were



DESHEILA HOWLETT
December 27, 2017

## Page 121

1   supposed to report things to HR or a supervisor;
2   correct?
3   A.  Yes.
4   Q.  And you chose not to, for whatever reason, but you
5   went to Derek himself; correct?
6   A.  Yes.
7   Q.  And you believe you were shunned after that?
8   A.  He told -- we made up and then he told me that, when
9   he got in the locker room a lot of the guys were like,
10  see, that's why I don't talk to her.
11  Q.  All right.  How is it you made -- you made up?
12  A.  We decided to move forward.  He acknowledged that he
13  was goofing off.
14  Q.  And then after you made up, he went and told other
15  officers that you had approached him?
16  A.  No.  He told me that when they got in the locker room
17  at the end of shift, he could overhear them saying,
18  see, that's why I don't talk to her.
19  Q.  How would they know?
20  A.  Because when I addressed him, it was a room full of --
21  Q.  Oh, so --
22  A.  -- people.
23  Q.  -- you addressed him in front of other people?
24  A.  Yes.
25  Q.  What other people were there, do you recall?

## Page 122

1       MR. MUNGO:  Objection, asked and answered.
2       MR. ACHO:  It has not been.
3  A.  No, I don't know everybody that was in the room at the
4  time.
5  BY MR. ACHO:
6  Q.  Can you name anybody that was in the room?
7       MR. MUNGO:  Same objection, asked and
8  answered.
9       MR. ACHO:  It has not been.
10  A.  You can ask Derek because he would know who was
11  talking about it in the locker room, the male locker
12  room.
13  BY MR. ACHO:
14  Q.  I will ask him, but --
15  A.  Okay.
16  Q.  -- as we sit here -- when you said you complained to
17  him in front of a room full of people, as we sit here
18  today, you can't remember anyone else that was there?
19  A.  No.
20       MR. MUNGO:  Objection, asked and answered.
21  BY MR. ACHO:
22  Q.  Did anybody that was in that room shun you, as you
23  have stated?
24       MR. MUNGO:  Objection, asked and answered.
25  A.  Every time that I spoke up for myself and addressed

## Page 123

1   the individual as an individual that was doing
2   something inappropriate or improper, it would just
3   become an overall quietness.
4  BY MR. ACHO:
5  Q.  I know you said that.  You've said that.
6       MR. ACHO:  Counsel, she's not answering my
7  question.
8  BY MR. ACHO:
9  Q.  Just referring to Derek Scott, you address him in
10  front of a room full of people, people -- none of
11  which you can name as we sit here.  Did any of these
12  people shun you?
13  A.  I -- I felt tension after speaking my -- my mind or my
14  peace or trying to get my point across.
15  Q.  From whom did you feel tension?
16  A.  The people on my shift.
17  Q.  Okay.  Who are these people that you felt tension
18  from?
19  A.  What will happen is, you just come to work and
20  everybody is like --
21       MR. MUNGO:  He wants to know who.
22  A.  -- more quiet or reserved.
23       MR. MUNGO:  He wants to know who the people
24  are.
25  A.  This is so many years ago, I --

## Page 124

1       MR. MUNGO:  Okay.
2  A.  -- I don't know.
3       MR. MUNGO:  You've got to say that.
4  A.  Okay.
5  BY MR. ACHO:
6  Q.  So you don't know who?
7  A.  No.
8  Q.  All right.  You mentioned somebody earlier.  You said
9  police officers don't complain about each other
10  because you'll suffer some type of adverse
11  treatment -- my words, not yours, but you said it
12  doesn't fare well.  And I asked you, well, what other
13  officers, and you gave me the name of a John Adams;
14  correct?
15  A.  Yes.
16  Q.  Isn't it true that John Adams came back to the City of
17  Warren Police Department while he was finishing his
18  law degree?
19  A.  Temporarily.
20  Q.  But he came back; right?
21  A.  Yes.
22  Q.  And now he's employed as an attorney here in town;
23  correct?
24  A.  Somewhere.  I don't know where, yes.
25  Q.  Are you aware that he's attended the last couple of



DESHEILA HOWLETT
December 27, 2017

Page 125

1  Christmas parties -- the City of Warren Police
2  Department Christmas parties?
3  A. I wouldn't know that, no.
4  Q. Okay. Do you still work with Officer -- strike that.
5     Prior to February, did you still work with
6  Officer Barnhill?
7  A. He was assigned to the jail and I was a detective, so
8  no.
9  Q. You would pass each other, sort of in passing from
10  time to time; correct?
11  A. Yes.
12  Q. And it was always friendly?
13  A. He kind of stopped talking.
14  Q. But he would say hello.
15  A. No.
16  Q. Well, did he ever, again, make any type of what you
17  called stereotypical or mocking remarks to you after
18  you addressed it with him?
19  A. No.
20  Q. All right. The incident in 2011 when you were in a
21  car accident, how long were you off work? You said
22  four months; correct?
23  A. Yes.
24  Q. All right. And you said you wanted to come back after
25  three, and you had been denied the ability to work

Page 126

1  desk duty or light duty; correct?
2  A. Yes.
3  Q. Had you been made any promises at all that you could
4  come back and work light duty or desk duty?
5  A. No.
6  Q. So nobody made you that promise or guarantee; correct?
7  A. Correct.
8  Q. The condo that you rented from Officer Curt Priemer,
9  isn't it true that Officer Barnhill came and painted
10  your condo?
11  A. I paid him, yes.
12  Q. But he came and painted the condo; correct?
13  A. Yes.
14  Q. And this was approximately five years ago?
15  A. Give or take, yes.
16  Q. It was long after you had addressed your issue
17  regarding some comments; correct?
18  A. I don't believe it was after. It was -- he painted
19  first, prior to.
20  Q. Okay. But you had a good enough relationship with him
21  that you had him come into your home?
22     MR. MUNGO: Objection, mischaracterizing
23  her -- her testimony.
24  BY MR. ACHO:
25  Q. You had a good enough relationship with him that you

Page 127

1  allowed him to come into your home; correct?
2  A. I continued to forgive and move forward with all of
3  them, yes.
4  Q. So, yes, you allowed him to come into your home?
5  A. Yes.
6  Q. All right. You would not allow a person in your home
7  that you did not trust, would you?
8  A. No.
9  Q. And you wouldn't allow a person into your home that
10  you thought was a hateful person, would you?
11  A. No.
12  Q. In 13(k) of your Complaint, page 7, you claim that
13  "Defendants," unnamed here, "repeatedly refused to
14  support plaintiff with proper backup"; is that
15  correct?
16  A. Yes.
17  Q. You told that to Kevin Dietz in a Channel 4 interview;
18  is that right?
19  A. Yes.
20  Q. That is pretty much the cardinal sin among police
21  officers, would you agree?
22  A. Yes.
23  Q. I mean, that's a very, very serious allegation you're
24  making; correct?
25  A. Yes.

Page 128

1  Q. Yes?
2  A. Yes.
3  Q. You believe that there are officers that deliberately
4  would not back you up because you're African-American?
5  A. Yes.
6  Q. What officers do you feel wouldn't back you up?
7  A. I was advised that I needed to slow down and not be
8  the first person out at runs and give them an
9  opportunity to show up so that I wouldn't be left
10  alone.
11  Q. Who told you that?
12  A. A dispatcher who's since retired.
13  Q. And what is that dispatcher's name?
14  A. Debbie Broach.
15  Q. Debbie?
16  A. Broach.
17  Q. B-r-o-a-c-h?
18  A. Yes.
19  Q. Do you still communicate with Ms. Broach?
20  A. No.
21  Q. Do you know what Ms. Broach based that comment on?
22  A. I was in her office, her cubicle where the dispatchers
23  are, and she showed me the screen, and it has a map of
24  the city, and all the scout cars are like red circles
25  and so you can track the movement of people. And she



DESHEILA HOWLETT
December 27, 2017

Page 129

1　　was telling me that they -- if they do come, they come
2　　slowly or they don't take the most direct route to me
3　　or they'll call out for lunch, so she just wanted me
4　　to be careful so I wouldn't get hurt.
5　Q.　Did she indicate it's because you're black?
6　A.　No.
7　Q.　Could it just be that officers don't rush to scenes?
8　A.　Generally, the calvary comes pretty fast, so...
9　Q.　But Debbie Broach did not say to you, listen, they're
10　　not going to back you up because you're
11　　African-American?
12　A.　No, she didn't specify why.
13　Q.　Don't you think you should have something like that
14　　pretty concrete before you go on television and make
15　　accusations against a department of such a --
16　　　　MR. MUNGO:　Objection --
17　BY MR. ACHO:
18　Q.　-- serious nature?
19　　　　MR. MUNGO:　Objection, argumentative.
20　　　　MR. ACHO:　It's not argumentative.
21　A.　I understood what she was trying to warn me about my
22　　safety, and if I'm the only person of a race, what
23　　else would it be?
24　BY MR. ACHO:
25　Q.　My question is, don't you think you should have had

Page 130

1　　something more concrete before you go out publicly and
2　　make such a serious allegation --
3　　　　MR. MUNGO:　Objection.
4　BY MR. ACHO:
5　Q.　-- against the department?
6　A.　It's not the only --
7　　　　MR. MUNGO:　Objection, asked and answered.
8　　　　MR. ACHO:　It's not asked and answered.
9　　　　MR. MUNGO:　You've got to let me get my
10　　objection.
11　　　　Objection, asked and answered.
12　　　　MR. ACHO:　It has not been.
13　BY MR. ACHO:
14　Q.　Don't you think you should have had something more
15　　concrete?
16　A.　No.
17　Q.　Would you agree with me that if officers did not back
18　　up another officer just based on race, that that would
19　　be a terrible human being?
20　A.　It would be problematic.
21　Q.　Problematic?
22　A.　Yeah.
23　Q.　That person would be completely bereft of any moral
24　　fiber, would they not?
25　A.　I don't know.

Page 131

1　Q.　What officers in that department do you believe would
2　　deliberately not back you up because of your race?
3　A.　Can I give you an instance?
4　Q.　You can as long as you agree to come back to my
5　　question, but yes.
6　A.　Knowing, based off what she was saying that they would
7　　come, because it's their job to come, but they're
8　　coming slower, then I have to proceed in a different
9　　manner.　I have to either not get there as fast or I
10　　have to know that I'm going to have to be able to hold
11　　on and deal with whatever I have to for however long I
12　　have to deal with it.　Okay?
13　Q.　And that -- that's Debbie Broach's words to you?
14　A.　No, that's the way I understand it, if she's telling
15　　me to slow down and don't be the first one out to make
16　　sure that I have assistance.
17　Q.　Okay.　Go ahead.
18　A.　So, after I got promoted to being a detective, you
19　　still have to, you know, go out of the office.
20　　Detective Chisholm and I were going to -- oh, that
21　　same teacher that was having sex with the underage
22　　students at Fitzgerald, he was at Twelve and Ryan, the
23　　behavioral clinic for attempted suicide.　So we have
24　　an arrest warrant for a person who's a criminal sexual
25　　conduct, first-degree person, and Chisholm called

Page 132

1　　dispatch and asked if we could have patrol meet us
2　　there because we're in plain clothes.　You have to
3　　have a patrolled officer -- you know, a uniformed
4　　officer visible, whatever.
5　　　　And we get there, and we're in the car
6　　waiting, and it was about ten minutes before the guy
7　　was going to be released and a car has not been
8　　dispatched to us.　So we start to notice the radio
9　　traffic, that all the runs that they're sending people
10　　to are not high-priority runs.　It's like assist a
11　　motorist or something like that.
12　　　　So prior to us leaving the office, I
13　　happened to look at the patrol schedule to see who was
14　　working that day, and Officer Dylan happened to be in
15　　a two-man that area of Twelve and Ryan.
16　Q.　How do you spell Dylan?
17　A.　D-y-l-a-n, Dylan.
18　Q.　Okay.
19　A.　And so since dispatch hadn't dispatched our run and
20　　the guy is almost about to get out, I asked Chisholm
21　　if he had Dylan's number.　He physically called Dylan
22　　on the phone and asked him to come back us up, and
23　　Dylan agreed.　Dylan goes over the air and
24　　specifically states, I'm in my route -- I'm on my way
25　　to Twelve and Ryan.　And dispatch goes, where? Ten



DESHEILA HOWLETT
December 27, 2017

Page 133

1    and Ryan?  Because they had another run over at Ten
2    and Ryan.  And he said, no, Twelve and Ryan.
3          So they get there in the nick of time and
4    it all inevitably worked out, but it's just the fact
5    of how -- how is it that you're sending people to all
6    these little things and we've got the biggest thing
7    going right now and nobody is being dispatched to our
8    aide.  We shouldn't have to call on our personal cell
9    phones to get help.
10   Q.   But you did receive help.
11   A.   Thanks -- yes.
12   Q.   Okay.  So you told me about that scenario.  What
13        instances do you have where you were repeatedly --
14        your words, repeatedly not provided backup?
15   A.   By the time she told me to slow down, after that point
16        in time, I started making sure that I wasn't the first
17        one out so that I wouldn't be alone, but there's times
18        when detectives, who normally don't make runs, would
19        show up just to make sure that I was okay because it's
20        like crickets, radio silence.  They know nobody is
21        coming for me.
22   Q.   But detectives did show up for you.
23   A.   I know, but I'm talking about patrolmen.
24   Q.   Can you give me some of those instances?  I'm trying
25        to document, as I assume you would have documented

Page 134

1    when these instances happened.  You would agree with
2    me that there could be nothing more serious than if
3    you feel your life is at risk because you're not being
4    backed up.  That would be something you would
5    document; correct?
6    A.   You can't document and survive at the same time.
7    Q.   Okay.  You value your life, do you not?
8    A.   Yes.
9    Q.   Did you value it enough to go complain to anyone, HR
10        or any supervisor, that, hey, I'm not being backed up?
11   A.   I felt that it would make it worse for me.
12   Q.   So the answer is no, you never complained?
13   A.   No, I didn't complain about it.  I just changed how I
14        did my job.
15   Q.   Didn't you think that if you felt your life was in
16        danger, that is something worth going to HR or a
17        supervisor over to complain about?
18             MR. MUNGO:  Objection, asked and answered.
19             MR. ACHO:  I agree, but I'm asking in a
20        different way.
21             MR. MUNGO:  It's the same question,
22        Counsel.  Objection, asked and answered.
23             You've got to answer.
24   A.   It would be worse for me if I spoke out.
25   BY MR. ACHO:

Page 135

1    Q.   Do you need a break?
2             Are there any witnesses that would say you
3        were not backed up by police officers in the
4        department?
5    A.   Debbie Broach.  Derek Scott could possibly attest to
6        some of the situations.
7    Q.   Is Derek Scott still employed as a police officer in
8        Warren?
9    A.   Yes.
10   Q.   Okay.  Debbie Broach, you indicated, retired?
11   A.   Yes.  Matt Nichols was aware of a lot of the personnel
12        issues with me and other people.
13   Q.   How so?  Did you go speak to him?
14   A.   Yes.
15   Q.   And did you tell him that you did not want anything
16        done?
17   A.   Yes.  He was about to be promoted and I didn't want
18        his promotion to be blocked.
19   Q.   Why would his promotion have been blocked?
20   A.   Because you're standing up for one person and you're
21        going against the grain of everyone else.
22   Q.   So you told me at that time, don't do anything
23        regarding my complaints or regarding these issues?
24        Yes?
25   A.   Yes.

Page 136

1    Q.   All right.  After he was promoted and -- what was he
2        promoted to, lieutenant?
3    A.   Deputy chief.
4    Q.   Deputy chief.  When was this?
5    A.   February or January.  In January.
6    Q.   Of this year?
7    A.   Yes.
8    Q.   Okay.  After he was promoted, did you tell him, okay,
9        now that you've been promoted, can you do something
10        about this?
11   A.   He wasn't promoted until after I left.  It was, like,
12        within a week later or so.
13   Q.   All right.  At the time you spoke to him, Matt
14        Nichols, prior to becoming deputy chief, he was a
15        high-ranking command officer, though; correct?
16   A.   Yes.
17   Q.   But you still did not want him to do anything with
18        what you had told him; correct?
19   A.   He told me that the mayor had chosen him for deputy
20        chief but that nobody else in the building knew it, so
21        he knew that his promotion was coming, so that was the
22        context of the conversation.  I said, well, you know,
23        make sure you get your spot first, because I didn't
24        want them to not give it to him.
25   Q.   You indicated that Matt Nichols had been a long time



DESHEILA HOWLETT
December 27, 2017

Page 137

1  friend; correct?
2  A.  Yes.
3  Q.  So prior to January when he was a commanding officer
4     for a number of years --
5  A.  Yes.
6  Q.  -- which he was; correct?
7  A.  Yes.
8  Q.  You never told him to do anything with your issues.
9     In fact, you didn't complain to him, did you?
10 A.  I would call it conversation, venting my frustrations
11    about how things were going, and then he would tell
12    me, in response, how other officers would address him
13    due to the fact that we were associates.
14 Q.  But he still continued his communication with you;
15    correct?
16 A.  Until February, yes.
17 Q.  Because he wanted to see you do well in the
18    department, both as a high-ranking command officer and
19    as a friend; correct?
20 A.  He even asked me to go to his class and speak to the
21    class about my unique position and the lack of
22    diversity in the police department.
23 Q.  Because Warren wanted to have black police officers;
24    right?
25        MR. MUNGO:  Objection, assuming a fact not

Page 138

1     in evidence.
2  BY MR. ACHO:
3  Q.  Well, they made it clear that they wanted you; yes?
4  A.  Yes.
5  Q.  Okay.  And never at any time did you want Matt Nichols
6     to do anything with what you discussed with him;
7     correct?
8  A.  I told Matt that I didn't want to burn a bridge.
9  Q.  All right.  I know what you said about your
10    interpretation about Debbie Broach's comments, but as
11    we sit here, nobody in the department stated to you at
12    any time that you weren't being backed up because of
13    your race, did they?
14        MR. MUNGO:  Objection, asked and answered.
15 A.  No.
16 BY MR. ACHO:
17 Q.  Can you think of any other factors that contributed to
18    slow response time for runs?
19 A.  No.
20 Q.  Do you know if any white officers have complained
21    about slow response time from fellow officers?
22 A.  No.
23 Q.  You've never heard that before?
24 A.  No.
25 Q.  What is it you believe -- you told me Debbie Broach.

Page 139

1     What is it you believe Derek Scott would tell me?
2  A.  About how he was treated and being associated with me
3     and --
4  Q.  I'm sorry, it's my fault.  I should have been more
5     specific.  What is it you believe Derek Scott would
6     tell me regarding specifically officers not backing
7     you up based on race?
8        MR. MUNGO:  Objection, assuming facts not
9     in evidence.
10 BY MR. ACHO:
11 Q.  Let me go back.  I asked you what witnesses could tell
12    me or speak to officers not backing you up, and you
13    said Debbie Broach and Derek Scott; correct?
14 A.  Yes.
15 Q.  All right.  You already told me what Debbie said.
16    What is it -- if I were to depose Derek Scott, what do
17    you believe Derek would tell me regarding that?
18 A.  Different conversations about safety and us deciding
19    to work together whenever possible and his experience
20    in how I was treated or reacted to or things that were
21    stated, that there was a difference between me and
22    other people, other officers.
23 Q.  Okay.  I asked you about complaints.  I'm not
24    referring to complaints with HR or a supervisor.  You
25    told me earlier, when you had a problem with, I

Page 140

1     believe it was Barnhill, that you confronted him in
2     front of a roomful of other officers; right?
3  A.  No, that was Derek Scott.
4  Q.  Derek Scott, forgive me.  But there have been times
5     where, if you have an issue, you had no problem
6     talking about that beef with an officer in front of
7     other officers; correct?
8  A.  It would probably be one time every hundredth time.
9  Q.  All right.  Here's my question.  Did you ever address
10    fellow officers in a room and say, guys, I feel like
11    I'm not being backed up and I feel like it's because
12    of my race?
13 A.  No.
14 Q.  And why not?
15 A.  If every time you address something small or to an
16    individual you get backlash or you get shunned or not
17    talked to or not invited to lunch, and you're already
18    so isolated, why would you continue to poke the bear,
19    as they say?
20 Q.  Because you're saying your life could have been on the
21    line.  This isn't something small.  This is --
22        MR. MUNGO:  Objection.  Objection, Counsel,
23    that's argumentative.  And, Counsel, you've asked her
24    that question more than -- more than three or four
25    times.



DESHEILA HOWLETT
December 27, 2017

Page 141

1    MR. ACHO: I'm clarifying for her.
2  BY MR. ACHO:
3  Q.  This is not a small, isolated incident.  This is a
4       very -- arguably, no bigger deal that you could have
5       encountered.  I don't understand why you wouldn't have
6       broached the subject with your fellow officers --
7            MR. MUNGO: Objection.
8  BY MR. ACHO:
9  Q.  -- if you really felt your life was in danger.
10            MR. MUNGO: Counsel, first of all, that's
11       argumentative.  And secondly, she's asked and answered
12       the question more than three or four times, and I'm
13       about to tell her not to answer that anymore.
14            MR. ACHO: You had this deposition
15       videotaped.  I didn't.  There must be some reason, and
16       your reasons are your own, but I'm going to approach
17       this as if we are at trial, and so I'm going to ask
18       her the questions.
19  BY MR. ACHO:
20  Q.  Because I would want a jury to know, if you really
21       felt your life was on the line, that officers aren't
22       going to back you up, I would think virtually anyone
23       would speak up and say something, but you didn't, and
24       I'm trying to figure out why.
25            MR. MUNGO: Counsel, that question --

Page 142

1       objection, asked and answered.  Counsel, you've asked
2       that question over and over.  She's given you the same
3       answer, and that answer has been over and over, that
4       she's afraid to speak up because she's treated
5       differently.
6            Counsel, that's clearly on the record more
7       than three or four times, and it's getting to the
8       point where this is constituting harassment, and my
9       client, as you can see, is having great difficulty
10       answering questions that she's required to answer in
11       accordance with the court rules and the rules of
12       discovery, and to go beyond that pale, Counsel, is
13       just not fair.  It's not fair to my client.
14            Now, if you've got a question that you
15       haven't asked already, you know, please ask it, or any
16       other question that's appropriate, but to continue to
17       ask her why she hasn't made reports --
18            MR. ACHO: Do you realize you're repeating
19       yourself three or four times in your objection, which
20       is now a soliloquy?
21            MR. MUNGO: Well --
22            MR. ACHO: Are you expecting a Tony award?
23       I don't know what you're doing.
24            MR. MUNGO: Well --
25            MR. ACHO: Just state it and let's move.

Page 143

1  Come on.
2            MR. MUNGO: The award to me would be that
3  you understand what the objection is.
4            MR. ACHO: I get what you're saying --
5            MR. MUNGO: I have to say more and more --
6            MR. ACHO: -- but I have to approach
7  this --
8            MR. MUNGO: No, Counsel, I have to say more
9  and more each time because you don't seem to be
10  getting the objection.
11            MR. ACHO: Okay.  All right.
12            MR. MUNGO: And my client -- my client has
13  been under treatment for some while, and, you know,
14  this is --
15            MR. ACHO: Meaning what?  Meaning what?
16            MR. MUNGO: This is a difficult experience
17  for her emotionally.
18            MR. ACHO: I understand.  But she has filed
19  a very serious lawsuit making very serious
20  allegations, so guess what?  I have, you know, the
21  opportunity to delve into it, and that's what I'm
22  doing.
23            MR. MUNGO: She has been very seriously
24  violated.  Counsel, you've got to ask questions --
25            MR. ACHO: Seriously violated?

Page 144

1            MR. MUNGO: Yeah, yeah.  You have to ask
2  questions, Counsel.
3            MR. ACHO: All right.
4            MR. MUNGO: And -- and, by the way,
5  Counsel, you have asked her for her driver's license,
6  and I believe that she has already provided that to
7  you, but there is a copy right there, if you want
8  to -- if you want it, before we forget.
9            MR. ACHO: Okay.
10            MR. MUNGO: You wanted to see her driver's
11  license.
12            MR. ACHO: I did.  So let the record
13  reflect the driver's license number is
14  H XXX XXX XXX XXX.  Thank you.
15  BY MR. ACHO:
16  Q.  In your Complaint --
17            MR. MUNGO: And by the way, I'm a little
18  concerned about her driver's license number being put
19  on that record there.  Counsel, can you just make a
20  note --
21            Can you strike that, ma'am, from the
22  record, her driver's license number?
23            Counsel, can you just write it down in your
24  notes --
25            MR. ACHO: Sure.



DESHEILA HOWLETT
December 27, 2017

---

Page 145

1           MR. MUNGO: -- please?
2           MR. ACHO:  Will do.
3           MR. MUNGO:  Ma'am, did you strike that for
4    the record?  All right.
5    BY MR. ACHO:
6    Q.  On page 8 of your Complaint, under section (M),
7        subsection (M), "Plaintiff was repeatedly demeaned and
8        disparaged by defendants' supervisors and white
9        coworkers who suggested to her white partner that he
10       should be concerned about his life being in danger
11       because he had an African-American police officer as a
12       partner due to the City of Warren Police Department's
13       custom, policy and practice of not providing timely
14       backup to plaintiff due to her race and gender."
15           All right.  So we have to go through this
16       sort of piecemeal.  It starts out that you were
17       repeatedly demeaned and disparaged by defendants'
18       supervisors and coworkers.  Let's stop there.
19           What supervisors repeatedly demeaned and
20       disparaged you?
21   A.  I was told that I was used as an example in the
22       promotion interviews when they asked how the
23       candidates felt about affirmative action, and my
24       supervisor called me in his office and was excited to
25       tell me how he was able to use me as an example

---

Page 146

1        because he's the only person in the department with a
2        black employee, and he said that he told them that I
3        was a -- she's even a hard worker, as if it's some
4        type of anomaly and those two things don't go
5        together, so...
6    Q.  Who is this supervisor?
7    A.  Sergeant Mills.
8    Q.  Sergeant Mills?
9    A.  Yes.
10   Q.  You said Sergeant Mills was excited to tell you.
11       Wouldn't that suggest to you that he wasn't trying to
12       demean or disparage you, that he was being
13       complimentary?
14   A.  By saying that black people work hard?
15   Q.  I'm just asking you.  You said he was excited.
16   A.  Again, I think that he was trying to compliment me,
17       but it's not complimentary.
18   Q.  Because he's awkward and goofy because he doesn't know
19       how to act around a black person probably; right?
20           MR. MUNGO:  Objection, assuming a fact not
21       in evidence.
22   A.  He told me --
23   BY MR. ACHO:
24   Q.  Isn't that what a lot of this is, is awkward --
25   A.  After ten years?

---

Page 147

1    Q.  I don't know.
2    A.  Okay.
3    Q.  Who is the partner that should have been concerned
4        about his life being in danger because he had you as a
5        partner?
6    A.  Chisholm.
7    Q.  Chisholm.  Like -- spelled like Shirley?
8    A.  Yeah.
9    Q.  What is Chisholm's first name?
10   A.  He's a detective, and I can't remember now.
11   Q.  Did he tell you he was afraid for his life?
12   A.  No, but he told me that he was asked if he was
13       concerned about having to be my partner.
14   Q.  Did he say, having a female partner?  Not because you
15       were black, it's because you were female?
16   A.  No.  My understanding was he was -- we used to work
17       together on patrol, then I was promoted to detective.
18       He was the next detective to come up.  So the question
19       that he kept getting asked is, was, how do you feel
20       about having to go up there and work with Howlett?
21       Just me specifically.
22   Q.  And that could have just been a personality thing, not
23       because you're black; right?
24           MR. MUNGO:  Objection.
25   A.    I don't know.

---

Page 148

1    BY MR. ACHO:
2    Q.  You don't know.  In fact, you were promoted to
3        detective; correct?
4    A.  Yes.
5    Q.  Do you think the department, if they had this
6        tremendous avarice against you, would have promoted
7        you to detective?
8    A.  It's based on scores.
9    Q.  But they could have found a way to prevent promoting
10       you if they wanted to, couldn't they?
11   A.  I'm not sure.
12   Q.  Who promoted you to detective?
13   A.  I would say the City as a collective.
14   Q.  But weren't you called in by one of your commanding
15       officers and told, hey, you're being promoted to
16       detective?
17   A.  I just remember being on a list and they just go by
18       number, so... by the time they got to my number, I
19       don't even think I was in town at that time.
20   Q.  Well, how did you find out that you were to show up in
21       plain clothes and report to the detective's office?
22   A.  Somebody called me.  I was out of town and they were
23       going to have a promotion ceremony on a certain date
24       and they were wondering if I would be back in time for
25       that, but I don't remember who the call was from.

---



DESHEILA HOWLETT
December 27, 2017

Page 149

1  Q.  Were you back in time?
2  A.  Yes.
3  Q.  So you were at the promotion ceremony and awarded at
4     the promotion ceremony with your promotion to
5     detective; correct?
6  A.  Yes.
7  Q.  And the police commissioner was there; correct?
8  A.  Yes.
9  Q.  All right. And the commanding officers were present;
10    correct?
11  A.  Yes.
12  Q.  All of them white males; correct?
13  A.  Yes.
14  Q.  And all of them congratulated you, did they not?
15  A.  Yes.
16  Q.  Did you believe they were happy that you had been
17    promoted?
18  A.  I don't know.
19  Q.  They expressed that to you, though; correct?
20  A.  Yes.
21  Q.  When Chisholm allegedly told you that people were
22    telling him that he should be worried about having you
23    as a partner, how did you respond to Chisholm?
24  A.  Chisholm directly said, right after that, they don't
25    even know that you and I used to work together, so he

Page 150

1     already had a rapport, and then that was it.
2  Q.  So Chisholm blew it off, in essence?
3  A.  Yes.
4  Q.  Did you ever hear within your earshot or did anyone
5     ever say to you, hey, you're putting your partner's
6     life in danger?
7  A.  No.
8  Q.  After Chisholm made that comment to you, you did not
9     go to HR or any supervisor and report it, did you?
10  A.  No.
11  Q.  And again, you know the policies and procedures and
12    code of conduct for the department; correct?
13  A.  Yes.
14  Q.  On page 10 of your Complaint, 13(q), that's
15    "Sergeant Paul" -- is it pronounced Houtos?
16  A.  Houtos?
17  Q.  -- "Houtos asked plaintiff, what is up with this
18    blue-black thing and is it similar to red bone."
19    First of all, you knew Sergeant Paul Houtos
20    because you both came from Detroit P.D.; correct?
21  A.  I didn't know him from Detroit, but, yes, we both came
22    from Detroit.
23  Q.  But you didn't ever interact with him when you were in
24    Detroit?
25  A.  No.

Page 151

1  Q.  Okay. Did you ever talk with Houtos about your shared
2     experiences at the Detroit P.D.?
3  A.  We talked about -- he got promoted prior to me, so I
4     would ask him a lot about techniques to study.
5  Q.  Did you ever sort of swap war stories from Detroit?
6  A.  I don't recall that.
7  Q.  Okay. When did you work with Sergeant Houtos?
8  A.  He was never my direct supervisor. He just came and
9     specifically asked me this question.
10  Q.  Did you ever work with him in investigations?
11  A.  He was assigned out. We worked on two different
12    sides.
13  Q.  Okay. Was he ever your sergeant?
14  A.  No.
15  Q.  All right. This blue-black and red bone comment, do
16    you know the context in which it came up?
17  A.  He told me that his wife works with a lot of black
18    people and they're using slang or saying certain
19    terminology, so they wanted clarification or a
20    definition of those terms.
21  Q.  Okay. Isn't it true that Houtos was working a case
22    and the term "blue-black and red bone" came up in the
23    context of a case he was investigating?
24  A.  No.
25  Q.  All right. Didn't -- a victim didn't describe a

Page 152

1     suspect as blue-black and Houtos was asking your
2     advice as to what that meant?
3  A.  No.
4  Q.  You would agree that Houtos was just asking for your
5     help in this situation?
6  A.  My help as a black person, yes.
7  Q.  Yes. Because as a white person, he didn't know what
8     blue-black meant; right?
9  A.  Yes.
10  Q.  You didn't have any reason to believe that Houtos was
11    trying to insult you or demean you, did you?
12  A.  I just know that we don't have conversation, and I
13    don't want to be asked everything regarding a race of
14    people. I'm not the source on that, you know.
15  Q.  I get that you don't want to be the source or the
16    token or any of those things, but couldn't it be that
17    these people aren't trying to insult you or demean
18    you, they just don't know any other way to ask and
19    maybe it just comes off as awkward, but there's no
20    real intent to be mean?
21  A.  You can Google it.
22       MR. MUNGO:  Objection, assuming a fact not
23    in evidence.
24       Go ahead, you can answer.
25  A.  There's so many resources for information. You can



DESHEILA HOWLETT
December 27, 2017

Page 153

1    Google things, you know.
2    BY MR. ACHO:
3    Q.  So Houtos asked you, what's this blue-black mean.
4        What was your -- what was your response to him?
5    A.  I told him it's about skin color.
6    Q.  Okay.  And you weren't angry when you answered, were
7        you?
8    A.  Again, you don't express anger, discontent, anything.
9        You just get through each moment and you survive that
10       moment until the next thing.
11   Q.  Houtos had no reason to believe that you were angry or
12       upset at him asking you, did he?
13   A.  No.
14   Q.  All right.  You didn't say to him, hey, Paul, you
15       know, why are you asking me?
16   A.  No.
17   Q.  You just answered; right?
18   A.  Yes.
19   Q.  So Houtos wouldn't have thought there was anything
20       wrong; correct?
21   A.  No.
22   Q.  And you never went to HR or any other supervisor and
23       complained about Paul Houtos, did you?
24   A.  No.
25   Q.  Isn't it true that Houtos gave you helpful studying

Page 154

1        tips when you were preparing for the corporal exam?
2    A.  He basically told me to not study like you do when
3        you're in college because this is not the same.
4    Q.  But he was trying to be helpful in his remarks to you;
5        right?
6    A.  Right.
7    Q.  And he came up to you and complimented you when you
8        did well on the exam, didn't he?
9    A.  Yes.
10   Q.  Did Houtos ever discipline you in any way?
11   A.  No.
12   Q.  Have you told me all of your allegations against Paul
13       Houtos?
14   A.  Yes.
15   Q.  There's no other allegations against Houtos?
16   A.  No.
17   Q.  He didn't make any other remarks to you that you
18       believe were based on your protected status as a
19       female or African-American, did he?
20   A.  No.
21       VIDEO TECHNICIAN:  I have to switch tapes.
22       MR. ACHO:  Well, quick or --
23       MR. MUNGO:  Potty break.
24       MR. ACHO:  Yeah, yeah, we want to keep
25       going.  How do you feel?  You need something to eat

Page 155

1    or --
2        THE WITNESS:  Huh-uh.
3        MR. ACHO:  Well, you know what?  Let's sort
4    of --
5        MS. RAE-O'DONNELL:  Take a quick break.
6        MR. ACHO:  Yeah, and sort of --
7        VIDEO TECHNICIAN:  Off the record, 1:44.
8        (Off the record at 1:44 p.m.)
9        (Back on the record at 2:04 p.m.)
10       VIDEO TECHNICIAN:  Back on the record,
11   2:04.
12   BY MR. ACHO:
13   Q.  Ms. Howlett, in your Complaint on page 6, 13(g), you
14       allege -- and these allegations are regarding Shawn
15       Johnson -- you allege that when he was a sergeant,
16       that he only allowed white officers to come into his
17       office to use a color copier, and that he told you to
18       go somewhere else to make color copies; is that
19       correct?
20   A.  Yes.
21   Q.  Is that your only allegation against Shawn Johnson?
22   A.  Yes.
23   Q.  Isn't it true that you and Sergeant Johnson were in
24       separate units?
25   A.  Yes.

Page 156

1    Q.  Isn't it true that you were not in the same special
2        investigative unit with Sergeant Johnson?
3    A.  True.
4    Q.  You were close to his unit, but you were not in the
5        same office; correct?  Yes?
6    A.  Yes.
7    Q.  And it's true you had a color copier for your special
8        unit; correct?
9    A.  No.
10   Q.  You did not?
11   A.  No.
12   Q.  Where did that unit make color copies?
13   A.  Family investigations was where I was assigned, and we
14       didn't have our own color copier.
15   Q.  At one point, you were using the color copier in
16       Sergeant Johnson's; correct?
17   A.  Yes.
18   Q.  And he told you that the color copier was not for
19       other units; correct?
20   A.  No.  He just asked if there was somewhere else that I
21       could go to make copies.
22   Q.  But didn't he tell you that his unit had private and
23       confidential information that should not be shared
24       with other units, and he didn't want anyone from other
25       units coming in there?



DESHEILA HOWLETT
December 27, 2017

Page 157

1  A. No.
2  Q. He never told you that?
3  A. No.
4  Q. Is it true that Sergeant Johnson could restrict which
5     investigation units had access to the equipment for
6     his unit?
7  A. Not to my knowledge. It was common practice for
8     people to go in there because you're on a floor with
9     only two copiers, so people would just use the two
10    copiers, the two color copiers.
11 Q. All right. What facts or evidence do you have that
12    Sergeant Johnson did not allow you to use the color
13    copier from his unit because you are African-American?
14 A. The fact that all my coworkers who are white would go
15    in and didn't -- they were never asked not to use it,
16    and I am the only person that he asked to go elsewhere
17    to make my copies.
18 Q. Okay. Did you go to HR or a supervisor and complain
19    about this?
20 A. No.
21 Q. Are there any witnesses that would testify that they
22    were all able to make color copies from that special
23    unit and you were not?
24 A. They should all be able to testify that they were able
25    to use it.

Page 158

1  Q. Okay. When Sergeant Johnson said to you, look, you
2     can't use this color copier, what was your response to
3     him?
4  A. I just stopped going in when he was there.
5  Q. Did you say to him, hey, look, other officers from my
6     unit are able to use this copier, why aren't I?
7  A. No.
8  Q. Why not?
9  A. Never trying to be confrontational.
10 Q. So you have no documented complaint as to this
11    allegation?
12 A. No.
13 Q. Do you have any other allegations regarding Sergeant
14    Johnson, any other comments he made to you based on
15    race or sex?
16 A. No.
17 Q. Did Sergeant Johnson ever discipline you?
18 A. No.
19 Q. 13 -- and these sort of bounce around -- (e), (n), (r)
20    and (t), and it's just in that same -- most of your
21    allegations are contained within 13, and I'm referring
22    to Paul Kelly, Dale Malesh, Officer Dean. You
23    indicate that Paul Kelly and Dale Malesh --
24           MR. MUNGO: Excuse me just a minute. Let's
25    go off the record.

Page 159

1           VIDEO TECHNICIAN: Off the record.
2           (Off the record at 2:09 p.m.)
3           (Back on the record at 2:10 p.m.)
4           VIDEO TECHNICIAN: Back on the record,
5     2:10.
6  BY MR. ACHO:
7  Q. The allegations regarding Sergeant Johnson and the
8     color copier, how long ago was this?
9  A. Within the last two years.
10 Q. Okay. The allegations -- and I know we're stepping
11    back, but regarding Paul Houtos, how long ago -- the
12    blue-black, red bone comment, how long ago was that?
13 A. Same time frame, round about two to two-and-a-half
14    years.
15 Q. Okay. So Paul Kelly and Dale Malesh, you indicate,
16    would continuously approach you with extreme sexual
17    overtones and asking you to go on dates; is that
18    right?
19 A. Yes.
20 Q. Okay. When is the last time you ever worked with
21    either Paul Kelly or Dale Malesh?
22 A. Because I was assigned to the jail and then promoted
23    to detective, I didn't work with them one on one, but
24    I would just see them in passing.
25 Q. Okay. But you haven't seen them in years; correct?

Page 160

1  A. Well, Paul Kelly, yes, but not Dale Malesh, no.
2  Q. Dale Malesh has not worked for the City of Warren
3     Police Department in over six years; correct?
4  A. Well, what happened, he had a position where he wasn't
5     technically a Warren police officer anymore, but he
6     was assigned to the schools as a retired police
7     officer --
8  Q. Okay.
9  A. -- and that's when I would see him.
10 Q. So when's the last time you have seen him?
11 A. It's probably been three -- three or so years, yeah.
12 Q. Okay. And when's the last time you've had
13    conversations with Paul Kelly?
14 A. I would just bump into Paul in the main office area of
15    the lobby of the police station or coming in and out
16    of dispatch. Just at different times, we would cross
17    paths.
18 Q. You never were his partner?
19 A. We did answer runs together sometimes, but not
20    assigned to each other, no.
21 Q. You worked in patrol with him?
22 A. Yes.
23 Q. How long ago would have been the last time you worked
24    patrol with Paul?
25 A. He actually was assigned to the traffic unit and they



DESHEILA HOWLETT
December 27, 2017

Page 161

1　get assigned to patrol runs. They're, like, our
2　assist where they back us up.
3　Q.　Okay. So how long ago are we talking?
4　A.　I was detective for almost two years. I was in the
5　jail together before that, so it would have been while
6　I was still on patrol, so maybe four years ago.
7　Q.　Okay. Now, you said they approached you with,
8　"extreme sexual overtones." I need you to be
9　specific. What do you mean by that?
10　A.　Paul wanted to take me flying and asked me to go on
11　lunch dates or go out to the bar with him after work,
12　and then he alluded that if I didn't, that he might
13　not be as friendly or continue to show up to a lot of
14　my stuff like he had been doing in the past.
15　Q.　But what is sexual in asking you to go out to a local
16　bar or tavern as police officers often do?
17　A.　Well, no, he's married.
18　Q.　Okay.
19　A.　And he would be -- it's the tone of it and it's the
20　leaning into you -- you know when a person is trying
21　to address you in a different way that's not just
22　social.
23　Q.　Isn't it true that when Paul Kelly invited you out to
24　a local tavern, that there were other officers that
25　were going to be there?

Page 162

1　A.　He asked me more than one occasion, so maybe one time
2　there were going to be other people.
3　Q.　Did he ever ask you to go out one on one?
4　A.　Yes.
5　Q.　Did he ever say anything to you sexual?
6　A.　He talked in a sly manner, like with sexual overtones.
7　Q.　I guess you have to educate me because I don't -- I
8　don't understand.
9　A.　Well, like, there's one employee there that's half
10　Asian and he's like, I'd like to put my other half in
11　her. So it would be those kind of comments, you know.
12　Q.　He said that about her?
13　A.　Right.
14　Q.　But has he said anything like that to you?
15　A.　Again, the repeated asking me to go out, and then
16　letting me know that he was gonna stop helping me if I
17　didn't go out with him.
18　Q.　So when he asked you to go out, what was your
19　response?
20　A.　I would always just say no or that I was busy or had
21　other plans.
22　Q.　Do you know an officer that they used to refer to by
23　the name of Junior?
24　A.　Yes.
25　Q.　Okay. What's his name?

Page 163

1　A.　Stieber [ph].
2　Q.　Stieber. Did you send scantily clad photos of
3　yourself to Stieber?
4　A.　Stieber text me when I was on vacation. He asked me
5　what I was doing. I said, I'm sitting poolside, and
6　then he said, send me a picture, and I sent him a
7　picture of me poolside.
8　Q.　But did you also send him other photos?
9　A.　No.
10　Q.　That was just the one photo?
11　A.　Yeah.
12　Q.　Did you ever sext -- sexually text with him
13　explicitly?
14　A.　No.
15　Q.　Did you ever send photos of yourself to any other
16　officers?
17　A.　No.
18　Q.　Did you ever tell Paul Kelly that you wanted to sleep
19　with Stieber?
20　A.　No.
21　Q.　Did you tell other officers that?
22　A.　I do recall making a comment about we would make a
23　cute baby.
24　Q.　Besides that, though, did you ever say, if I was going
25　to blank a white guy, it would be him?

Page 164

1　A.　No.
2　Q.　Did you ever complain to HR or anyone else about Paul
3　Kelly inviting you out?
4　A.　No.
5　Q.　What comments did Malesh make to you?
6　A.　Malesh wanted me to come to the school and have
7　lunches with him at the school property, told me he
8　would buy the lunches if I would just show up from
9　time to time come eat with him.
10　Q.　How is that sexual?
11　A.　He is just --
12　　　　MR. ACHO: You're writing really large. I
13　hope you're not -- you're not doing what I think
14　you're doing.
15　　　　MR. MUNGO: Now you're -- now you're being
16　nosey.
17　　　　MR. ACHO: I'm being nosey because it's my
18　dep. I hope you're not doing what I think you're
19　doing.
20　　　　MR. MUNGO: Well, oh, oh, oh, oh, no, no,
21　no, no, no, no, no.
22　　　　MR. ACHO: I've never saw somebody write
23　with eight-inch font.
24　　　　MR. MUNGO: No, no, no. Oh, no, I just --
25　　　　MR. ACHO: All right.



DESHEILA HOWLETT
December 27, 2017

Page 165

1          MR. MUNGO:  You really --
2          MR. ACHO:  I'm paranoid, man.  I'm a
3     lawyer.  I stay jaded.
4          MR. MUNGO:  That's okay.
5     BY MR. ACHO:
6     Q.   What --
7          MR. MUNGO:  Go right ahead, Counsel.
8     BY MR. ACHO:
9     Q.   What about asking you to come to a school and have
10    lunch at a school in a public setting is sexual?
11    A.   He also asked me to go out after duty, when we're not
12    working.  He always wanted me to stop by the office.
13    Q.   Let me stop you there real quick.  Isn't it true that
14    officers at Warren Police Department and other police
15    departments go out for a beer after or go to happy
16    hours --
17         MR. MUNGO:  Objection, assuming --
18    BY MR. ACHO:
19    Q.   -- as you know?
20         MR. MUNGO:  Objection, assuming a fact not
21    in evidence.
22    BY MR. ACHO:
23    Q.   Based on your experience, don't officers fraternize?
24    A.   Some officers fraternize and some officers date each
25    other, yes.

Page 166

1     Q.   All right.  So if officers ask you to come out to a
2     bar for happy hour, there's nothing sexual in that.
3     A.   When we go as a group, no.
4     Q.   Isn't it fair to say that you complained about being
5     shunned, but then when certain officers would go out
6     of their way to make you feel included, you would
7     rebuff their attempts?
8     A.   No, because it's in a sexual manner.  I can't be your
9     friend unless we're having sex?  That's the
10    difference.
11    Q.   Did anyone ever say that to you?
12    A.   That's what I'm telling you the difference is, though,
13    of when I'm being asked out versus when I'm not being
14    talked to at all.
15    Q.   So that's your interpretation of their comments, is
16    that it was sexual.
17    A.   It's my experience.
18    Q.   But it's your interpretation.
19    A.   It's my experience.
20    Q.   I understand.  But since there is no sexual words
21    made, sexual references, you're interpreting their
22    overtures as sexual.
23    A.   Yes.
24    Q.   Did you ever complain to HR or anyone else regarding
25    Malesh?

Page 167

1     A.   No.
2     Q.   On page 10, 13(r), you reference an Officer Dean.
3          Who's Officer Dean?
4     A.   Dean Toward.
5     Q.   So Dean is his first name?
6     A.   Yes.
7     Q.   How is Toward spell?
8     A.   T-o-w-a-r-d.
9     Q.   And is Dean Toward still employed with the City of
10    Warren, as you know?
11    A.   Not anymore.
12    Q.   Where is he at?
13    A.   I don't know.
14    Q.   Do you know the circumstances by which he left Warren?
15    A.   I think it was a lawsuit.
16    Q.   He sued Warren?
17    A.   Yes.
18    Q.   Do you know what the basis of the lawsuit was?
19    A.   Something about a whistleblower kind of thing.  I
20    don't know all the details.
21    Q.   You assert that Officer Dean Toward asked you your
22    level of education so he would know how to speak to
23    you.
24    A.   Yes.
25    Q.   When was this comment allegedly made?

Page 168

1     A.   It was early on in my career, after I was out of the
2     FTO program and whenever I got assigned to the same
3     shift as him, which would have been day shift.
4     Q.   So it could have been seven, eight years ago?
5     A.   Yeah.
6     Q.   Where were these comments allegedly made?
7     A.   We were on the street.
8     Q.   Were you working?
9     A.   Yes.
10    Q.   Were there any witnesses to this comment?
11    A.   No.
12    Q.   Do you know for certain that that comment was based on
13    your race or sex?
14    A.   Well, I've heard him say it other times, and he's
15    generally talking to black people or people who live
16    on the south end of Warren.  They get treated quite
17    differently, to say the least.
18    Q.   Differently by whom, Dean Toward or other officers?
19    A.   Dean Toward and other officers.
20    Q.   You believe that other officers treat people on the
21    south side of Warren differently, is what you're
22    saying?
23    A.   Yes.
24    Q.   In what way?
25    A.   Just disrespectful, whether cussing or talking to them



DESHEILA HOWLETT
December 27, 2017

**Page 169**

1   in a demeaning way as if they're less educated or
2   maybe they don't pay as many taxes.  Or a lot of them
3   are renters, so they'll say stuff like you need to go
4   back south of Eight Mile, and, you know, just --
5   Q.  Have you ever told officers tell people you need to go
6       back south of Eight Mile?
7   A.  Over at my time there, yes.
8   Q.  And did you speak out?
9   A.  No.
10  Q.  Did you ever complain?
11  A.  No.
12  Q.  When Officer Dean allegedly made that comment, did you
13      go to HR or anyone else and complain?
14  A.  No.
15  Q.  How long has Officer Toward been gone from Warren, if
16      you know?
17  A.  I'm not sure what his exact date was that he left.  I
18      don't know.
19  Q.  13(t), which is right under there, you said,
20      "Plaintiff's white male coworker openly and repeatedly
21      used and said 'nigger' in front of plaintiff and in
22      the presence of other white officers."
23          You see that?
24  A.  Yes.
25  Q.  Who is this white coworker?

**Page 170**

1   A.  Jason Booms.
2   Q.  Jason Booms.  And when did this occur and how many
3       times?
4   A.  It was back when I was still on patrol again before I
5       went to the jail.  We were at different runs together,
6       and, like, if someone wrote it on a piece of paper the
7       other officers would say, and the N word, but Jason
8       would always say the full blast of it, you know.
9   Q.  So they would actually write the N word in the report?
10  A.  No.  Like, say you get to somebody's house.  So the
11      person has written it on a piece of paper.  So the
12      other officers would say, the N word, and then Jason
13      would get it and just read it and say it full on, you
14      know.
15  Q.  I don't really know.  What -- who -- why would it be
16      written on paper?  I don't follow.
17  A.  I don't know why the person wrote it on a piece of
18      paper.
19  Q.  What person, the officer?
20  A.  No.  It would have been a citizen's house that we were
21      at.  It might be on paper at the citizen's house.
22  Q.  And they would write it on paper, and so he would just
23      repeat what they said.
24  A.  Yes.
25  Q.  Well, that's -- that's just him reading what a citizen

**Page 171**

1   wrote down; correct?
2   A.  Well, if you were there, you would know he's looking
3       at me, trying to get a response, egging me on, and
4       then he follows me to the next scene and continues
5       with the badgering, you know.
6           MR. MUNGO:  What badgering?
7   BY MR. ACHO:
8   Q.  I don't know exactly what badgering you mean.
9   A.  He's saying -- I'm arresting a black person -- what
10      are you trying to do, single-handedly take down all
11      blacks or gays, right after the N word.
12  Q.  Give me the context in which that comment was made.
13      What do you single-handedly try -- what do you mean?
14  A.  I --
15          MR. MUNGO:  Don't talk in code.  Tell
16      him -- just spell it out.
17  BY MR. ACHO:
18  Q.  Right.  I mean, I don't -- I don't know the context.
19          MR. MUNGO:  Spell it out.
20  BY MR. ACHO:
21  Q.  That's a whole different comment, now, that I'm not
22      aware of.  Where were you when Jason Booms said, are
23      you trying to take down all gays?
24  A.  We were at a run.
25  Q.  Approximately when?  Five years ago?  Two years ago?

**Page 172**

1   Seven years ago?
2           MR. MUNGO:  If you recall.
3   A.  I don't recall exactly when, but the black person that
4       I was arresting had a warrant for their arrest.
5   BY MR. ACHO:
6   Q.  Okay.
7   A.  And this is the run right after he was saying the
8       N word stuff.  Okay?
9   Q.  Okay.
10  A.  This is the very next run and then he says, oh, look
11      at you now, trying to single-handedly take down blacks
12      and gays.  So --
13  Q.  Well --
14  A.  -- the two things back to back.  And of course I
15      didn't say anything.
16  Q.  Was one of the people gay?  Where did that --
17  A.  The guy had very feminine characteristics.
18  Q.  Fair to say he was joking with you, Jason Booms?
19  A.  I have -- no.
20  Q.  Did you have the type of relationship with him where
21      you would joke back and forth?
22  A.  No.
23  Q.  When is the last time you worked with Jason Booms?
24  A.  A very long time.
25  Q.  Years?



DESHEILA HOWLETT
December 27, 2017

Page 173

1    A.  Yes.
2    Q.  More than three years?
3    A.  Yes.
4    Q.  Did you ever go to HR or any supervisor and complain
5        about Jason Booms' comments?
6    A.  No.
7    Q.  Barbara Beyer.  Barbara Beyer is no longer a defendant
8        in this lawsuit; is that correct?
9           MR. MUNGO:  That's correct.
10   BY MR. ACHO:
11   Q.  Okay.  Do you know why that is?
12   A.  No.
13   Q.  You initially sued her; correct?
14   A.  She was named as a defendant, yes.
15   Q.  Right.  And why did you name Barbara Beyer as a
16       defendant?
17   A.  Because she was screaming, that nigger, that nigger,
18       at me.
19   Q.  At you, or out loud within your earshot?
20   A.  Out loud within my earshot.
21   Q.  All right.  Can you tell me the context of that
22       situation, why the woman used that word?
23   A.  I was going around the corner to ask her a question.
24       I had come back from vacation and I couldn't find
25       certain documents, so I didn't know if they ever log

Page 174

1        things or do they just randomly place them on a desk.
2        So when I turned the corner, she looked at me and she
3        started screaming, that nigger, that nigger.
4           So being in police mode, I decide to look
5        out the glass because I'm assuming there's some type
6        of threat or something that needs to be addressed.  I
7        look out the glass and there's no one standing there.
8        Her office, besides it being encased in glass, there's
9        a glass door.  I look out of the glass door, there's
10       nobody in the hallway.  So whatever she's talking
11       about is not current for her level of agitation or
12       whatever you want to call it.
13          So when she screams out, that nigger, that
14       nigger would have killed me if the glass wasn't there,
15       it threw me, so I kind of fell back.  She grabbed a
16       hold of my arm so I don't, like, fall all the way
17       back, and then she goes, I didn't mean you, not you.
18       I was going to tell you the story anyway.
19   Q.  And did she tell you the story?
20   A.  Yeah.
21   Q.  Okay.  Because you and Barb Beyer were friends; right?
22   A.  I thought.  We were friendly.  We would bring each
23       other lunch sometimes and go out.
24   Q.  Right.  So she wasn't using that word against you, was
25       she?

Page 175

1    A.  She was talking about another black man, though.
2    Q.  Okay.
3    A.  Appropriate?
4    Q.  I'm going to ask you the questions.
5    A.  Okay.  Go ahead.
6    Q.  You guys were friends.  Did you have lunch together?
7    A.  Uh-huh, yes.
8    Q.  Did you make a complaint to HR or anyone else about
9        Barb Beyer?
10   A.  I talked to Sergeant Mills and Matt Nichols about it.
11   Q.  Okay.  And was a complaint lodged?  There was a formal
12       complaint against Barb Beyer; correct?
13   A.  Yes.
14   Q.  Who is no longer a defendant in this case; correct?
15   A.  Based on you telling me that today, yes.
16   Q.  Based on your attorney confirming that she is not;
17       correct?
18   A.  Okay.  Yes.
19   Q.  But you don't know why she is not.
20   A.  No.
21   Q.  Okay.  Do you know what happened to Ms. Beyer as a
22       result of the complaint?
23   A.  No.
24   Q.  Do you know that she was given discipline action?
25   A.  No.

Page 176

1    Q.  You've never been told that?
2    A.  No.
3    Q.  If she was, in fact, handed disciplinary action, you
4        would agree that would be the right approach for the
5        City of Warren Police Department to take for her using
6        those epithets.
7    A.  Yes.
8    Q.  13(f), you discuss Officer Roland Bell.  You know
9        Officer Roland Bell?
10   A.  Yes.
11   Q.  You make allegations that, "He asked plaintiff why she
12       was walking gingerly after having a fibroid removed,
13       and when plaintiff explained to her" -- "when
14       plaintiff" -- strike that, let me start over.
15          "Roland Bell, white male, asked plaintiff
16       why she was walking gingerly after having a fibroid
17       removed, and when plaintiff explained, he told her,
18       'no, it's because of all that big, black dick in
19       you.'"
20          Do you see that?
21   A.  Yes, sir.
22   Q.  Did he make that comment?
23   A.  Yes.
24   Q.  And he made that to you in a total joking fashion, did
25       he not?



DESHEILA HOWLETT
December 27, 2017

Page 177

1  A. No.
2  Q. You and Roland Bell would joke with each other; right?
3  A. Roland Bell would bring me diapers for my Goddaughter.
4  Q. Right. For -- in fact, he brought you diapers and
5     formula when he thought you were adopting that child,
6     did he not?
7  A. Yes, and I also gave him money when his son died.
8  Q. Five to ten times, though, he and his wife brought you
9     diapers and formula, did they not?
10 A. Yes.
11 Q. And Roland Bell coaches an all-black football team,
12    doesn't he?
13 A. Yes.
14 Q. So this isn't like a white guy that dislikes black
15    people, is it?
16 A. It comes from the people that are closest to you. The
17    people who you talk to are the ones that are doing
18    these things.
19 Q. But he was joking around with you, wasn't he?
20    MR. MUNGO: Objection, assumes a fact not
21    in evidence.
22 BY MR. ACHO:
23 Q. Let me ask you this: This guy brings diapers and
24    formula to your house five to ten times.
25 A. Not to my house, but...

Page 178

1  Q. I'm sorry, to you. Because the understanding in the
2     department was that you were adopting a child. Do you
3     believe that his comment to you was anything other
4     than a joke?
5  A. First and foremost, working in the jail, I needed the
6     guys to know that I wasn't fully fit, that I was
7     hurting that day, so I let them know that I had had
8     the procedure done to make sure that they are extra
9     aware and pay attention to me on the floor for that
10    day.
11       So in saying that, it's a personal female
12    thing, but if I'm not walking fully brisk and all of
13    that, so then just leave it at that. Why do I have to
14    be getting banged up by a big, black dick to be
15    walking tenderly when I just told you I just had a
16    medical procedure.
17 Q. Because he was making a joke, wasn't he?
18 A. Okay.
19 Q. Didn't you and Bell used to joke with each other all
20    the time?
21 A. Not in an offensive manner.
22 Q. Didn't you and Bell used to joke with each other all
23    the time?
24 A. We had a casual relationship.
25 Q. So you may have interpreted it as offensive, but I'm

Page 179

1     just driving at, he was just joking with you, wasn't
2     he?
3  A. Okay.
4     MR. MUNGO: You -- you -- you --
5  A. I said --
6     MR. MUNGO: He's asking you a question.
7     You have to answer.
8  A. I said that I was offended and I said that it wasn't a
9     joke to me.
10 BY MR. ACHO:
11 Q. All right. Did you say, Roland, I'm offended by that?
12 A. No.
13 Q. If you had such a relationship with him, why wouldn't
14    you have said that to him if you were, in fact,
15    offended?
16 A. I had become in habit of being offended and not
17    addressing it all the time, just allowing things to
18    kind of roll off so that I wouldn't hinder the few,
19    you know, occasions that I had to talk with certain
20    people.
21 Q. Was anyone else present when Bell allegedly made that
22    comment?
23 A. No.
24 Q. Isn't it true that after that comment, you and Bell
25    continued on to be friends and joke with each other?

Page 180

1  A. Yes.
2  Q. And he brought you diapers and formula after that.
3  A. Yes.
4  Q. And you never complained to HR or anyone else about
5     this alleged comment from Roland Bell; correct?
6  A. No.
7  Q. He's a good guy, you would agree?
8  A. He has his problems, but he's fine.
9  Q. 13(h), "Defendant Arthur Gill, white male, former
10    sergeant, removed plaintiff from her day shift in
11    favor of a similarly situated white female officer,
12    despite the fact that the white female officer had
13    less seniority than plaintiff who was entitled to fill
14    that position based upon her higher seniority."
15       Now, you say Defendant Arthur Gill is a
16    former sergeant. Was he removed as a sergeant or is
17    he retired? Do you know?
18 A. I don't know his status, if he fired or quit or
19    retired, but he's just not there at this time.
20 Q. Okay. And how long ago did Arthur Gill leave the
21    Warren Police Department?
22 A. It's been a couple of years.
23 Q. Okay. This specific allegation, can you tell me about
24    this incident?
25 A. That's when I was hit by the drunk driver.



US LEGAL SUPPORT
The Power of Commitment™

Pages 177 to 180

DESHEILA HOWLETT
December 27, 2017

Page 181

1  Q.  In 2011?
2  A.  5-5 of 2011, Cinco de Mayo, and then I ended up being
3      off for the four months, and when I came back, I got
4      put on midnight shift, but Krystal Gill, who used to
5      be Krystal Gogo, his wife, who has a year less
6      seniority than me, was allowed to have the day shift
7      position.
8  Q.  Could it have been simply a case of nepotism and not
9      anything to do with race?
10     MR. MUNGO:  Objection, assuming facts not
11     in evidence.
12 A.  I'm not sure.
13 BY MR. ACHO:
14 Q.  Do you have any evidence that Gill made that shift
15     change because of your sex or race?
16 A.  No.  I just know that after I was put on the night
17     shift I got hit by a drunk driver, and I would never
18     have been on my way to work if I wasn't bumped off my
19     proper shift.
20 Q.  So did you complain to Art Gill about that?
21 A.  No, I talked to Mike Sauger?
22 Q.  Sauger, S-a-u-g-e-r?
23 A.  Yes.
24 Q.  And who is Mike Sauger?
25 A.  Union president.

Page 182

1  Q.  And what did Mike Sauger say?
2  A.  That, basically, even though the language states that
3      we're carried to and from, that there was really
4      nothing he could do for me at the time because the
5      City -- we didn't have a contract with the City at
6      that time, so he really didn't want to, like, go to
7      them and bother them in my defense.
8  Q.  How long were you on that shift?
9  A.  Before I got hit, probably about two or three weeks.
10 Q.  Okay.  Did you ever complain to HR or any supervisor
11     about the shift change?
12 A.  No.
13 Q.  Okay.  Speaking of shifts, around the time that you
14     were on the City thought that you were going to adopt
15     a child, didn't command officers reduce your workload
16     and your shift time to allow you to spend more time
17     with the child?
18 A.  Reduce my workload?
19 Q.  Or adjust your shift time to allow you to spend more
20     time with the child.
21 A.  My times of coming and going may have been different,
22     but it still was an eight-hour shift.
23 Q.  Okay.  But they adjusted your going and coming time as
24     an accommodation to you; correct?
25 A.  Yes.

Page 183

1  Q.  It was a magnanimous thing for them to do?
2  A.  Yes.
3  Q.  It was a generous thing for them to do?
4  A.  Yes.
5  Q.  And it's because they knew that you were dealing with
6      this situation with this child.
7  A.  Yes.
8  Q.  Do you know whose call that was?
9  A.  No.
10 Q.  Did you ever thank anyone for that?
11 A.  I don't recall.
12 Q.  Dawn McLane is listed in your Complaint as a
13     defendant.  There are no specific allegations in the
14     Complaint as to Dawn McLane, but I see her listed
15     individually.  Can you tell me what your specific
16     allegations are against Dawn McLane?
17 A.  That was just the first time that I had talked to
18     Mr. Simlar in regards to hostile work environment.
19 Q.  Okay.  Can you give me a little more?  Because I still
20     don't know what --
21 A.  That was the situation with the man with the gun run
22     where she didn't give me any information and I made
23     the complaint.
24 Q.  Okay.  But that wasn't necessarily based on race, you
25     said.

Page 184

1  A.  I was asked if I thought it was based on race, and I
2      said at the time that, no, I didn't.
3  Q.  Okay.  So is there any other reason Ms. McLane is
4      listed here as a defendant?
5  A.  No.
6  Q.  Speaking of Mr. Simlar, he has always been pleasant to
7      deal with, has he not?
8  A.  Yes.
9  Q.  And has always been willing to do the right thing on
10     behalf of the City and the department; correct?
11 A.  From my experience.  I have met him twice, so yes.
12 Q.  But both times, he asked you if you wanted
13     things done; correct?
14 A.  Yes.
15 Q.  And both times you told him you did not; correct?
16 A.  In a crying, fearful manner, yes.
17 Q.  Okay.  And who were you afraid of?
18 A.  Retribution.
19 Q.  Do you remember a time when Mr. Simlar set up an
20     appointment for you with a psychologist and you did
21     not show up?
22 A.  Yes.
23 Q.  Why didn't you show up?
24 A.  The psychiatrist that he had call me, or psychologist,
25     she was talking to me over the phone, and she said



DESHEILA HOWLETT
December 27, 2017

Page 185

1  that she couldn't meet with me in person due to the
2  fact that she's, basically, hired by the City, and she
3  could tell that I needed to talk to someone and I
4  needed help, but she didn't want to have to document
5  that help if she had met me in person.
6       So what she wanted to do, she said, because
7  she does backgrounds for new hires, for new police
8  officers, she wanted to kind of manage the case but
9  then not meet me individually, so she wanted to refer
10  me to someone else to go to speak -- talk to or
11  whatever.
12       So in the process of those couple of days
13  of her calling all those different times, I ended up
14  getting physically sick and I couldn't attend to her
15  calls, and I told her that I was sick and that
16  somebody was coming to check on me, and then she,
17  basically, stated that if I didn't call her back
18  within a 15-minute span of time, she was going to send
19  the Warren police to my house, and so I --
20  Q.  Because she was concerned for you.
21  A.  Even though --
22       MR. MUNGO:  Objection, assuming a fact not
23  in evidence.
24  BY MR. ACHO:
25  Q.  Okay.  Well, she wasn't going to send them for a

Page 186

1  crime, was she?
2  A.  Well, I told her I didn't need assistance.
3  Q.  But they were worried about you; correct?
4       MR. MUNGO:  Objection, assuming a fact not
5  in evidence.
6  BY MR. ACHO:
7  Q.  Do you believe that they were worried about you?
8  A.  That she -- we're speaking of her.
9  Q.  And Mark Simlar.
10  A.  Yes, he was very concerned for me.
11  Q.  And Commissioner Green?  Do you remember a meeting
12  with Mark Simlar, Commissioner Green and Deputy Chief
13  Gallasso where they were all present?
14  A.  Asking me if I was being treated a certain kind of
15  way?
16  Q.  Yes.
17  A.  Yes.
18  Q.  And they all expressed concern and they wanted to make
19  sure that you were being treated fairly; correct?
20       MR. MUNGO:  Objection, assuming a fact not
21  in evidence.
22  BY MR. ACHO:
23  Q.  Correct?
24  A.  Yes.
25  Q.  All right.  When was this meeting, approximately?

Page 187

1  A.  Maybe 2011.
2  Q.  Okay.  13(o), on page 8 in your Complaint, you make
3  very specific allegations against Detective Shawn
4  Johnson; correct?
5  A.  Yes.
6  Q.  When's the first time you worked with Shawn Johnson,
7  if you know?
8  A.  He was one of my FTOs in the beginning when I got
9  hired on.
10  Q.  Okay.  Post-FTO, when did you work with him
11  professionally where you were colleagues?
12  A.  Whenever I was assigned to the midnight shift.
13  Q.  Okay.  After your promotion into the detective bureau
14  special victims unit, did you work with Johnson?
15  A.  Yes.
16  Q.  And what were your job duties there?
17  A.  He was pretty much supposed to show me the ins and
18  outs, like a training officer, to speak.
19  Q.  You say that he did the following things:  That he
20  "sniffed you in a sexually suggestive manner;" that he
21  "rubbed his hands through your hair and suggested to
22  you in no uncertain terms that he was the white slave
23  master and you were the slave mistress subject to his
24  sexual whims and desires."  Is that true?
25  A.  Yes.

Page 188

1  Q.  Okay.  You and Johnson had a playful relationship,
2  didn't you?
3  A.  We had good conversation and we would talk, yes.
4  Q.  Did you think that he did those things that I just
5  mentioned to be cruel or demeaning, or he was just
6  playing with you?
7  A.  It was very sexual in nature, the way he was doing it,
8  and I didn't --
9  Q.  You -- but wouldn't you sexually banter back and
10  forth?
11  A.  No.
12  Q.  Comparing you to the gorilla on the label of Gorilla
13  Glue, did that happen?
14  A.  Yes.
15  Q.  Did you make comments to him back about being a
16  cracker?  I mean, wouldn't you guys sort of bust each
17  other's chops that way?
18  A.  No.  Actually, I had to educate him on black people
19  being compared to apes, monkeys, chimpanzees and why
20  it would be so offensive to us, and the fact that
21  during the renaissance, you know, the white women
22  would start to go to the jazz clubs and stuff and the
23  men didn't want them to have sex with those black
24  people, so they used to say that, after dusk dark,
25  tails drop out of our butts.  So I thought if I gave



DESHEILA HOWLETT
December 27, 2017

Page 189

1   him a historical reference, he would understand why
2   it's not okay.
3   Q.   Okay.  And what was his response to that?
4   A.   I don't recall him saying anything.  The whole office
5        got quiet because it was -- it was a bit much.
6   Q.   But everybody listened to what you had to say; right?
7   A.   Yeah.
8   Q.   You felt respected at that time?
9   A.   No.
10  Q.   It says he, "Continually subjected you to racially
11       discriminatory comments by characterizing your style
12       of dress as a black thang, mocking you in a
13       stereotypical African-American accent, inquiring why
14       do you-all name your kids ghetto names like Honey
15       Brown and Destiny, physically spelling out Destiny
16       incorrectly, and asking why do black people move to
17       Atlanta, is it because you don't like living around
18       white people?"
19            All of those things I just mentioned are
20       things he said; correct?
21  A.   Yes.
22  Q.   Were they also said in a joking tone?
23  A.   No.
24  Q.   You don't think he was joking?
25  A.   No.

Page 190

1   Q.   You think he was deliberately trying to be mean to
2        you?
3   A.   Yes.
4   Q.   You never filed a complaint yourself against Shawn
5        Johnson, did you?
6   A.   No.
7   Q.   You didn't go to HR or anyone else and file a
8        complaint; correct?
9   A.   No.
10  Q.   But Warren and the police department did take
11       disciplinary or corrective action against Shawn
12       Johnson, didn't they?
13  A.   My understanding is that a third-party person made a
14       complaint for me.
15  Q.   And that woman is a retired sergeant named Kathy
16       Miller; correct?
17  A.   Retired, but not a sergeant, yes.
18  Q.   All right.  Kathy Miller and you met at a tavern;
19       correct?
20  A.   Yes.
21  Q.   The same tavern that Paul Kelly had invited you to go
22       to; correct?
23  A.   I just know it was Gallasso's retirement party is
24       where she and I were at the same time.
25  Q.   When did Kathy Miller leave the Warren Police

Page 191

1        Department, if you know?
2   A.   Within the last few years.  I don't know exactly.
3   Q.   And did you used to confide in her?
4   A.   Sometimes.
5   Q.   She's a white woman, I take it?
6   A.   Yes.
7   Q.   Okay.  How was it that Miller brought this complaint
8        to Warren's attention and not you?
9   A.   We were at the retirement party, I was paying my
10       respects, and she just touched me and she said, how
11       are things going?  And I just kind of started to cry
12       and tell her about all the things, and then I left.
13       And then I was contacted by, I believe, Sergeant Eidt
14       informing me that she had gone over to City Hall and
15       filed a third-party complaint for me.
16  Q.   And Sergeant Eidt investigated what Kathy Miller told
17       him; correct?
18  A.   Yes.
19  Q.   And Sergeant Mills was your direct supervisor;
20       correct?
21  A.   At one point in time, he was.
22  Q.   You were advised that even though you didn't make the
23       complaint, that Eidt had to follow up and investigate.
24  A.   Yes.
25  Q.   As you would expect them to do; correct?

Page 192

1   A.   Yes.
2   Q.   If you're going to foster an environment where there
3        is no racial discrimination, certainly you have to
4        investigate such a claim; correct?
5   A.   Yes.
6   Q.   Sergeant Eidt asked you to write out a statement; is
7        that correct?
8   A.   Yes.
9   Q.   And you did on July 7th, 2015; correct?
10  A.   Yes.
11  Q.   In 2015, it was accurate when you wrote it and signed
12       it?
13  A.   Yes.
14  Q.   Didn't you advise Sergeant Mills that you did not want
15       to file a formal complaint?
16  A.   Yes.
17  Q.   Is it true that you called dispatcher Dawn McLane and
18       told her you didn't want to file a complaint against
19       Johnson, that you just wanted to go out with -- for
20       drinks with him and hash it out?
21  A.   I wanted to resolve it amongst ourselves, if we could,
22       because if a complaint gets filed, then I'm going to
23       lose out on everybody, and instead of them thinking
24       that what he was saying was disrespectful, it will be,
25       Sheila's the problem, Sheila's a race baiter.  I even



DESHEILA HOWLETT
December 27, 2017

Page 193

1  offered to take a closet office just so that they
2  could feel better every day and not have to talk
3  around me, you know.
4      I've belittled myself in every way you can
5  to just survive, so, yes, I told her that if we could
6  work it out, I want to, because once I found out that
7  somebody else made a complaint, I knew all the guys
8  would think that I complained and that I was a rat.
9  Q.  Do you need a few minutes?
10 A.  Let's just get done.
11 Q.  So the department investigated your allegations and
12     Johnson was disciplined; correct?
13 A.  I know that he was talked to.
14 Q.  Well, wasn't he given time off?
15 A.  Not to my knowledge, no, sir.
16 Q.  He was moved away from you, wasn't he?
17 A.  Yes.
18 Q.  Were you satisfied that he was moved away from you?
19 A.  At the time, until we were put back together.
20 Q.  Is there a reason you were put back together?  Weren't
21     they reconfiguring your office and there was no
22     choice?
23 A.  We both were assigned to family investigations
24     division.  Union president comes up on the second
25     floor and is advised of -- of the bullet points that

Page 194

1  they made me write out.  I hear the union president
2  say, I got to come up here and deal with this stupid
3  shit.  Union president then goes into the office with
4  our sergeant, Johnson's and I, Sergeant Eidt, and they
5  have some type of discussion.
6      Union president then leaves the floor,
7  never talks to me or asks me anything, but again I
8  heard how he feels about having to come up here and
9  deal with this stupid shit.  So the next thing that I
10 know is that they decide to put Shawn John on criminal
11 investigation side, and even though we're both
12 assigned to this side, he's being moved over there.
13     So sometime later another position becomes
14 available for the criminal side.  They ask me if I
15 want to take the position, and then I specifically
16 ask, if I do take the position, do I physically have
17 to move to that side or is it okay for me to continue
18 to stay separate.
19     They tell me, Sergeant Eidt and
20 Sergeant Mills, that yes, I can continue to stay
21 separate since that's working thus far.  About two
22 weeks later, I'm moved to the other side.  Lieutenant
23 Gardner, who's the supervisor at that time, who did
24 not work on the floor when all of this happened, asked
25 me was it still a problem between Shawn John and I,

Page 195

1  and I told him yes, and he said, well, what's the
2  problem?
3      So I explained about -- police officers
4  call it eye fucking or glaring that he does and how he
5  can't have conversations, how he won't share the work
6  because sometimes our cases overlap ironically and how
7  -- so it's just -- it's a thing that keeps going,
8  so...
9  Q.  So you think he was eyeballing you?
10 A.  I don't think.  I know.
11 Q.  Did he --
12 A.  And when I would specifically ask him for the work,
13     he's hollering at me and it's uncomfortable for the
14     people that are stuck in between us.
15 Q.  At the time you -- when did this occur, approximately?
16     How long ago?
17 A.  This was going on October, November, December.
18 Q.  Of '16?
19 A.  Right.  Right before '17.
20 Q.  Do you know, has Detective Johnson ever harassed any
21     other women at Warren P.D.?
22 A.  Yes.
23 Q.  He has.  Who?
24 A.  Dawn McLane.
25 Q.  Dawn McLane.  And how do you know that?

Page 196

1  A.  Matt Nichols told me that he beat her up.
2  Q.  Matt Nichols told you he beat her?
3  A.  Yes.
4  Q.  Was he married to Dawn McLane?
5  A.  No.
6  Q.  Were they in a relationship?
7  A.  Yes.
8  Q.  They were in a dating relationship?
9  A.  Yes.
10 Q.  And Matt Nichols told you that Shawn Johnson beat up
11     Dawn McLane.  Is that your testimony?
12 A.  He specifically told me that they got into a fight and
13     that, I guess, Shawn was boot stomping her, and she
14     was cowering like this in a fetal position, trying to
15     protect her face, and that she wears a lot of rings,
16     and in some kind of way, he ended up with a busted
17     lip, which he was physically at work with a busted
18     lip.
19          And so when she left his house, he called
20     the police on her, and so whatever suburb they live
21     in, they made a police report, but she's, like, the
22     defendant in the report.  So somebody from our job got
23     in touch with her and said, hey, if you're at home,
24     get out of there because they're coming to arrest you,
25     she leaves.



DESHEILA HOWLETT
December 27, 2017

Page 197

1   Some kind of way she gets in touch with
2   Matt, like the following morning, and my understanding
3   is she's bruised from her -- all over.  Matt calls the
4   supervisor at the suburban department, I think
5   Sterling Heights, and says, I'm bringing in an
6   employee.  I got two employees that got into a fight.
7   Can you guarantee me that she won't be arrested,
8   because there's two sides to the story.
9         Matt says that that supervisor then says
10  that I can't promise you anything, but he then
11  proceeds to bring her in.  So in the car ride of him
12  taking her to make her side of the report, she's
13  explaining how he's boot stomping her and how she --
14  he tried to kick her out of the car when they were
15  driving from wherever.
16        So Matt says that when he gets there, the
17  supervisor says, hey, evidence tech has to take
18  pictures of her physical injuries, and then the guy
19  wanted him to walk in there with her, and he's like,
20  I'm not going in there while my employee gets
21  undressed, you know.  So all that stuff happened, both
22  sides got documented, and then we're all at work and
23  she's not able to sit completely solid because she's
24  so battered and his lip is busted and nothing happens.
25        That's a crime that's committed by an

Page 198

1   officer and nothing happens.  You know, my
2   antagonizer.  Everything is just -- nothing is
3   happening.
4   Q.  When was this alleged incident between --
5   A.  In January.
6   Q.  January '17?
7   A.  I don't know the exact date.
8   Q.  I mean, was it this year?
9   A.  Oh, 2017, yes, sir.
10  Q.  Yeah, sorry.  How do you know that there was no
11      disciplinary action or anything came of it?
12  A.  Because Matt told me that Internal Affairs doesn't
13      have to investigate as long as the two complainants
14      decide not to file against each other.  So he's like,
15      after everybody got out of their drunky their clown
16      stupid mode, they realize, oh, and so they decided not
17      to do anything.  So even though our department has
18      already been informed and talked to the other
19      department, it was their way of not having to do
20      anything.
21  Q.  Do you still talk to Matt Nichols?
22  A.  Again, no.
23  Q.  When was the last time you spoke to him?
24  A.  That Wednesday when Barb did what she did, I went down
25      to his office for about an hour, and then the next

Page 199

1   day --
2   Q.  That was February 1, 2017?
3   A.  Is that a Wednesday?
4   Q.  I don't know.
5   A.  It's a -- it's a Wednesday --
6   Q.  Okay.
7   A.  -- of when I talked to him, when it happened, and then
8       that Thursday I was advised to go meet with
9       Mr. Simlar.
10  Q.  Who advised you to go meet with Mr. Simlar?
11  A.  Sergeant Mills said that -- after I had talked to him
12      that Wednesday about what happened, that he had to
13      inform other people.  So he told Sergeant Eidt,
14      because that's Barb's boss, and then he told
15      Lieutenant Gardner and then he must have had a
16      conversation with Chief Green.
17            So then when I got to work Thursday
18      morning, he said, hey, we get -- we got to go talk to
19      Green.  They're going to send you to talk to
20      Mark Simlar, he said, but it's like a secret squirrel
21      thing.  They want you to go over -- they don't want
22      you in that building because people will see you in
23      that building, he's going to meet you over on the
24      second floor of the community center, and so on, so
25      forth.

Page 200

1            So en route to the community center -- oh,
2   and I was told to slide out, don't let nobody know
3   where I was going, don't make it obvious that I'm
4   going anywhere.  I get over there, I talk to Mark for
5   about two hours, but en route to there I called Matt
6   to let him know that I was being called in for a
7   meeting.  Then as soon as I left the meeting, I called
8   Matt to let him know some of the things that were
9   discussed and I kind of reiterated that -- I kind of
10  told him the ten-year struggle.  You know, the history
11  of everything, you know.
12            And so Mark suggested that I go home that
13  day, and he asked if it was okay for him to give a
14  psychologist or somebody my information.  He told me,
15  don't feel weak, and it's not a sign of, you know,
16  something bad that you need somebody to talk to, so I
17  said okay.
18            So then that Friday morning, I wake up, I
19  get dressed for work, and I drive to work and I'm
20  stuck in a parking lot because I can't get out of the
21  car.  And when Barb had said what she said, I -- I
22  started shaking real bad and I sweat.  So then when
23  I'm in the car, it's the same thing, and I can only
24  describe it as like an adrenalin dump.  So I called
25  Sergeant Mills and I said, Sergeant, I'm here, but I



DESHEILA HOWLETT
December 27, 2017

Page 201

1   can't get out the car.
2           And so he was like, Sheila, I just want you
3   to feel better when you come back to work, so just go
4   ahead and go home. So then I called Derek Scott, who
5   should have been assigned to the jail that day, and he
6   just wasn't -- happened not to be there, so I think
7   Marlene Kerr or somebody answered, and literally
8   that's that.
9   Q.   You walked off the job in February 2017; correct?
10          MR. MUNGO: Objection, assuming a fact not
11   in evidence.
12   A.   I was told to go home, yes.
13   BY MR. ACHO:
14   Q.   Okay. But you haven't come back, have you?
15   A.   No.
16   Q.   The City has never fired you, have they?
17   A.   No.
18   Q.   And they've never disciplined you, have they?
19   A.   No.
20   Q.   So why haven't you come back?
21   A.   Because I'm still in treatment.
22   Q.   Okay. Now, as I indicated at the beginning of the
23   deposition -- and I'm just, once again, reserving my
24   right to continue the deposition should it become
25   necessary -- your counsel handed me a report from

Page 202

1        Dr. Gerald Shiener. When you say you're still in
2   treatment, you're not referring to Gerry Shiener, are
3   you?
4   A.   No.
5   Q.   Okay. Because he's not a treater; right?
6   A.   No.
7   Q.   He's just a guy that you pay for an evaluation and a
8   report; right?
9   A.   Yes.
10   Q.   Who are you treating with?
11   A.   Dr. Valivonis.
12   Q.   Valivonis? Can you spell that?
13   A.   V-a-l-v-i-n-o-i-s, something like that.
14   Q.   Valivonis?
15          MR. MUNGO: V-a-l-i-v-o-n-i-s, Valivonis.
16          MR. ACHO: I'm sorry, one more time?
17   Sorry.
18          MR. MUNGO: V-a-l-i-v-o-n-i-s.
19          MR. ACHO: Valivonis, okay.
20   BY MR. ACHO:
21   Q.   Where is Dr. Valivonis located?
22   A.   Birmingham.
23   Q.   Is that a he or she?
24   A.   She.
25   Q.   And is she a psychotherapist?

Page 203

1   A.   Psychologist.
2   Q.   Psychologist. So she cannot write scripts for meds;
3   correct?
4   A.   Correct.
5   Q.   All right. How often do you see Dr. Valivonis and for
6   how long have you seen her?
7   A.   Since March, twice a week, one hour per session.
8   Q.   Okay. And is insurance covering that?
9   A.   Yes.
10   Q.   Okay. Has Dr. Valivonis diagnosed you with anything
11   clinically?
12   A.   Yes.
13   Q.   What has she diagnosed you with?
14   A.   Depression, anxiety and posttraumatic stress disorder.
15          MR. MUNGO: And I'm going to object to the
16   extent the client has answered the question, and she
17   should, as you posed it to her, but she is not a
18   psychologist, and I --
19          MR. ACHO: Fair enough. I was just
20   wondering --
21          MR. MUNGO: -- the medical records -- the
22   medical records will speak for themselves.
23          MR. ACHO: No, no, I get it. I just wanted
24   to know if she had been told any.
25          MR. MUNGO: And by the way, Counsel, didn't

Page 204

1   you get releases for those? Okay.
2   BY MR. ACHO:
3   Q.   So, with depression and anxiety, I know frequently
4   people will take medication for that. Do you take any
5   medication?
6   A.   Yes, sir.
7   Q.   And what do you take?
8   A.   Fluoxetine and alprazolam.
9   Q.   Fluoxetine is generic for Wellbutrin, is it?
10   A.   Yeah, I think they're all kind of like a -- like a
11   Prozac kind of thing.
12   Q.   Right. And alprazolam is a generic for Xanax; is that
13   right?
14   A.   Yes.
15   Q.   How often do you take -- I assume the fluoxetine you
16   take daily?
17   A.   Yes.
18   Q.   The alprazolam as needed?
19   A.   Daily.
20   Q.   You take that daily, as well?
21   A.   It's just at night.
22   Q.   At night. Does it help you sleep?
23   A.   The dreams are almost too vivid, I should say. I'm,
24   like, jumping out of my sleep, swinging, kicking,
25   so...



DESHEILA HOWLETT
December 27, 2017

## Page 205

1   Q.  How long have you been taking the Wellbutrin and
2       Xanax?
3   A.  Is that the fluoxetine one?
4   Q.  Yeah.
5   A.  That one, maybe since, like, August, because they
6       tried to get me on meds earlier and I wanted to try
7       to, like, not be medicated, so...
8   Q.  Do you feel like the medication is helping you?
9   A.  Well, it levels me out a lot better because I was
10      having too many just spikes in the highs and lows, you
11      know.
12  Q.  Has Dr. Valivonis indicated to you that you are ready
13      to go back to work?
14  A.  No.
15  Q.  What has she told you?
16  A.  She said because it was like getting these baby cuts
17      over a ten-year span of time -- because I took it for
18      so long -- that by the time I started speaking out and
19      voicing it and it came out, that it kind of just
20      exploded.  And I used to like -- you know how the
21      Asian people cup the muscles in a sore part, every
22      time something would happen, I would just survive each
23      instance.  So she said by the time it all accumulated
24      and I got past the point of, oh, it's going to get
25      better in time, and I realize it's never getting

## Page 206

1       better, that I just had a meltdown, I guess, is how
2       you would say it.
3           MR. MUNGO:  Okay.  You still got to answer
4       his question.  He needs a yes --
5           MR. ACHO:  That's okay.  I was able to pull
6       one out.
7   BY MR. ACHO:
8   Q.  You know how you just said, "you know how the Asian
9       people," if I told you I was offended by that, would I
10      be legitimately offended, do you think?
11  A.  Would you be?
12  Q.  Or do you think I think you're just trying to make a
13      comment?
14          MR. MUNGO:  Objection, argumentative.
15          MR. ACHO:  Fair enough.
16          MR. MUNGO:  Argumentative.
17          MR. ACHO:  It is.  I was just making a
18      point.
19  BY MR. ACHO:
20  Q.  All right.  I want to ask you this, and I don't in any
21      mean -- in any way mean to embarrass you or anything
22      like this, but is it fair to say that you are somebody
23      who has had traumatic experiences a number of times in
24      life and that is what has caused you to be in this
25      state?

## Page 207

1   A.  Absolutely not.
2   Q.  All right.  When you were a child, my understanding is
3       your best friend was kidnapped and murdered; is that
4       right?
5   A.  Not my best friend, my boyfriend.
6   Q.  Boyfriend, okay.  Certainly that's a traumatic event;
7       correct?
8   A.  Yes.
9   Q.  Did you seek any type of professional counseling for
10      that?
11  A.  No.  I became a police officer because of it.
12  Q.  Okay.  Was your nephew murdered, as well?
13  A.  My nephew?
14  Q.  Did you have a nephew that was?
15  A.  No.
16  Q.  Okay.  How is your relationship with your parents?
17  A.  My mother is deceased and my father is -- he has
18      cancer right now, but he's at my house, so...
19  Q.  So you have a good relationship with him.
20  A.  Yes.
21  Q.  Tell me about the situation with the child that you
22      indicated you were the caretaker, and I said that the
23      City thought you were adopting the child.  Can you
24      tell me about that situation?
25  A.  Her mother died when she was 35 days old.  Upon her

## Page 208

1       mother dying, the father was not around, so my
2       Godmother, being the grandmother of the baby, had her
3       day in, day out.  She ended up having to go back to
4       work after, you know, you have a little bit of leave
5       for bereavement, or whatever, and she needed somebody
6       to help baby-sit.  So the baby would come to my house
7       the days that she would go to work, and so she might
8       work 8, 9, 10, 11, 12 hours, whatever the case might
9       be, and the baby was in my care for about nine months.
10      And then after she would get off work, she would come
11      pick her up and take her home, so she never stayed the
12      night technically.
13  Q.  Did you ever move for custody of the child through the
14      courts?
15  A.  No.
16  Q.  Do you know who Greg Murray is?
17  A.  Yes.
18  Q.  Well, you tell me who he is.
19  A.  He got hired as a -- like a diversity coordinator or
20      something of the sort.
21  Q.  Exactly, diversity coordinator.  And he was prior to
22      your leaving Warren; correct?
23  A.  I believe he was hired in January and I left in
24      February, but I had never met him personally, no.
25  Q.  And he's African-American; correct?



US LEGAL SUPPORT
The Power of Commitment™

DESHEILA HOWLETT
December 27, 2017

## Page 209

1   A.   Yes.
2   Q.   And you're aware that the City has made attempts to
3        become more culturally diverse?  Yes?
4   A.   I would assume so.
5   Q.   In fact, didn't Mayor Fouts publicly acknowledge you
6        at a dinner or luncheon?
7   A.   Yes, with explanation.
8   Q.   Okay.
9   A.   It's like a dog and pony show when you have your one
10       black employee stand up and say, look at how diverse
11       we are.  One doesn't equal diversity.  So I asked my
12       supervisors if I could not continue to have to go to
13       these things to be announced because it's taking from
14       my work, and they pay the $25 or 50 or whatever it was
15       for dinner.  He had me sitting with senators and such
16       so that when the TV Warren thing is scanning across,
17       I'm in front, and all my coworkers of higher rank and
18       stature are sitting over there snarking and making
19       comments that this is garbage that I'm over here being
20       paraded.
21  Q.   The mayor was complimentary of you, though, was he
22       not?
23  A.   Yes.
24            MR. ACHO:  Give me a couple of minutes.
25            VIDEO TECHNICIAN:  Off the record at 3:06.

## Page 210

1            (Off the record at 3:06 p.m.)
2            (Back on the record at 3:29 p.m.)
3            VIDEO TECHNICIAN:  Back on the record at
4        3:29.
5   BY MR. ACHO:
6   Q.   Ms. Howlett, I just want to go back and clear up one
7        area, and that's with Shawn Johnson.  When he was
8        moved away from you, and then he was moved back,
9        didn't you have a discussion with Sergeant Mills about
10       the reason that Shawn Johnson was going to be moved
11       back with you?
12  A.   No.  It was a conversation with Lieutenant Gardner.
13  Q.   Okay.  But do you remember Lieutenant Gardner asking
14       you if you had a problem with it and you saying you
15       did not?
16  A.   No, sir.  I specifically asked not to be put back with
17       him.  I wasn't going to take the promotion, the
18       position, if we had to sit together.  So after I was
19       told that we didn't have to be back together, a couple
20       of weeks later, we were put back together.
21  Q.   I understand.  But a couple weeks later, wasn't there
22       a reconfiguration of the building where they were
23       remodeling and Sergeant Mills said to you, listen,
24       this remodeling is going on, we've got to put Shawn
25       back with you, do you have a problem with that?

## Page 211

1   A.   No.  Lieutenant Gardner told me, like on a Monday,
2        that I needed to move my desk by that Friday, is what
3        happened.
4   Q.   Okay.  And you were never asked if you were okay with
5        it?
6   A.   Only if the problem still had continued, and I stated
7        that it was still continuing because he was still
8        hollering at me, still doing the glare/stare thing and
9        it was still -- he wasn't sharing his work with me.
10  Q.   All right.  So I asked you about your psychologist and
11       whether or not she feels you're ready to return to
12       work, and you indicated that she has not told you to
13       go back to work; is that right?
14  A.   Yes.
15  Q.   Has she given you any type of prognosis, like when you
16       might be able to return to work?
17  A.   She said I can't go back into policing at all.
18  Q.   At all?  So what are your plans?
19  A.   To start all over, I have to go into a different field.
20       I'm probably going to have to get schooling because
21       all my training is in policing.
22  Q.   What are you looking for from this lawsuit?
23  A.   I would love for each person to be able to walk in
24       that building and literally do a good job and nothing
25       else matter.  It not, you know, be about race or

## Page 212

1        gender or any of that, just treat each other like
2        human beings, you know.  And so I thought that if I
3        just lasted, endured, in time they would get to know
4        me for me, and it didn't happen and doesn't happen.
5        So, you know, as an officer, you're, like, on a team
6        with people.  You need to feel like the team is equal.
7        And so even forgiving everybody over and over and over
8        again for all those things is because trying to
9        survive in it.
10  Q.   I appreciate that, but I asked you, what do you want
11       from this lawsuit?
12  A.   I want things to get better there, the City of Warren,
13       the department.
14  Q.   Okay.  And how do you propose that we accomplish that?
15  A.   Well, first you have to acknowledge that it's
16       happening.
17  Q.   That what is happening?
18  A.   The hostile environment, the racist stuff, the gender
19       bias, all these things.  How can you fix it if nobody
20       admits to doing it?
21  Q.   Okay.  So if the City of Warren took some type of
22       proactive measure whereby they say, we're taking this
23       step to ensure that these type of things don't happen,
24       you would be satisfied?
25  A.   The City of Warren, from my experience, says what



DESHEILA HOWLETT
December 27, 2017

## Page 213

1   needs to be said for the media or for things to appear
2   a certain way, and at the end of the day, nothing
3   happens, nothing changes, they just articulate that
4   they're going to do this and that.
5   Q.   You live in Warren; correct?
6   A.   Yes.
7   Q.   You bought a home in Warren?
8   A.   Yes.
9   Q.   Why do you live in a city that you believe is racist?
10  A.   Because in the past -- again, I thought with time that
11       it would get better, so I literally put myself in a
12       position to be there as a citizen and as a patrolman
13       and paying taxes there.  I invested in that city.
14  Q.   Why haven't you moved out of the city?
15  A.   I have no income.  In order to qualify for a home
16       loan, I need income.
17  Q.   Are you taking any steps at this point to look at a
18       different career?
19  A.   I've gone to a person and -- a specialist to see what
20       else could I possibly be interested in or possibly
21       good at to try to reassess what could potentially be
22       next, so yes.
23  Q.   What about going back into police work in a city that
24       is more predominantly African-American?
25  A.   Again, I don't want to be in policing at all, and I

## Page 214

1   don't believe that I can, due to all the things that
2   have happened.  They shun that.
3   Q.   You had issues at Oak Park; right?
4   A.   With one individual, yes.
5   Q.   And you had issues in Detroit; correct?
6   A.   No.
7   Q.   Do you think maybe at some point you decided you
8        didn't want to be a police officer anyway?
9   A.   Absolutely not.
10  Q.   So you wouldn't be willing to give it a shot in, say,
11       Flint or another city like that?
12  A.   My police career has ended.  It is over.
13  Q.   Okay.  So what are you looking for out of this lawsuit
14       for yourself besides a guarantee that this doesn't
15       happen, or whatever it is that you had said?  What
16       else are you looking for?  Anything else?
17  A.   I don't think that it's fair that my career has been
18       taken from me and I have to start all over when I went
19       to school for this.  I invested ten years of my time
20       with this corporation, so...
21  Q.   But they didn't take your career from you, did they?
22       They didn't fire you.
23  A.   I had a nervous breakdown because of them.
24  Q.   People have nervous breakdowns at work all the time,
25       though, don't they?

## Page 215

1        MR. MUNGO:  Objection, argumentative.
2   BY MR. ACHO:
3   Q.   Warren hasn't taken your policing career from you,
4        have they?
5   A.   Yes.
6   Q.   So what are you looking for by way of compensation?
7   A.   I need to be made whole in whatever way is possible.
8   Q.   All right.  And what does making you "whole" include?
9        MR. MUNGO:  Objection, that calls for
10       speculation, and with regard to her -- who -- she
11       who -- Counsel, you already know she's relying on
12       experts and economists and her therapist and her
13       vocational rehab specialist, so, you know --
14       MR. ACHO:  Right.  But --
15       MR. MUNGO:  -- she's not going to be
16       able -- she's not going to be able to provide
17       testimony that is consistent with what's being
18       requested in her Complaint already through her legal
19       counsel and her experts, requirements that are set
20       forth by her experts.
21       MR. ACHO:  Okay.
22       MR. MUNGO:  So -- but to that extent, but
23       if you can answer the question.
24       MR. ACHO:  Yeah, I don't know what any of
25       that really means.

## Page 216

1   BY MR. ACHO:
2   Q.   But what are you looking for?
3   A.   Again, to be able to move on with my life and pay my
4        bills.
5   Q.   Okay.  I guess what I'm saying is, is there a certain
6        dollar amount that you're looking for?
7        MR. MUNGO:  Objection, asked and answered.
8        MR. ACHO:  No, she has not answered that.
9   A.   No, there is not a certain dollar amount.
10  BY MR. ACHO:
11  Q.   Is there anything that I haven't asked you that you
12       would like me to know or the City of Warren or the
13       Warren Police Department to know that we haven't
14       covered?
15  A.   In an attempt to be accepted, I made myself small and
16       tried to endure all of the things from all of the
17       different people and would go home and take a nap
18       every day just from being exhausted of surviving each
19       day, and I would start over and forgive and start over
20       and forgive hoping that, in time, it would just get
21       better, and in all actuality, the longer that I was
22       there, the worse it got.  And so, you know, I just
23       allowed myself to be dehumanized to the point that I'm
24       broken.  And like I said, I just wanted to be
25       accepted, so I allowed a lot of things, you know.



DESHEILA HOWLETT
December 27, 2017

Page 217

1  Q.  Okay.
2      MR. ACHO:  I don't have anything.
3      MR. MUNGO:  I do have a few questions for
4  you.  Do you need to take a -- let's take a quick
5  break, please.  Give me about five minutes.
6      VIDEO TECHNICIAN:  Off the record at 3:38.
7      (Off the record at 3:38 p.m.)
8      (Back on the record at 3:43 p.m.)
9      VIDEO TECHNICIAN:  Back on the record,
10  3:43.
11          EXAMINATION
12  BY MR. MUNGO:
13  Q.  Ms. Howlett, I have just a few questions for you.  You
14  recall earlier opposing counsel, Mr. Acho, had asked
15  you questions regarding the averments in your
16  Complaint where you identified -- named specific
17  employees at the Warren Police Department and various
18  verbal and other conduct that they engaged in that you
19  characterized as racist in their nature.
20  A.  Yes, sir.
21  Q.  Do you recall those questions?  And each of those
22  individuals had engaged in different verbal and/or
23  physical conduct that you characterized and identified
24  as being racist in their nature; correct?
25  A.  Yes.

Page 218

1  Q.  Okay.  And each one of those individuals -- without
2  going into detail for each of the individuals that
3  counsel asked you about -- you recall counsel asking
4  you whether or not you were friends with various of
5  those individuals, employees, some of which are
6  defendants in this Complaint?
7  A.  Yes.
8  Q.  Okay.  And you remember counsel also asking you, in
9  addition to whether or not you were friends with them,
10  whether or not you were chummy with them and
11  conversational with them and joked with them?
12  A.  Yes.
13  Q.  And you never filed any complaints against any of
14  them.  Do you recall counsel asking you that?
15  A.  Hardly ever.
16  Q.  Hardly ever.  Okay.  With regard to the friendship --
17  the question as to whether or not you were friends
18  with any of those individuals and chummy with any of
19  those individuals and engaged in joking with those
20  individuals in the course of their engaging in verbal
21  and other physical conduct that's characterized as
22  racist in nature, is it true that you were, in fact,
23  friends and chummy and joking with these individuals
24  while they were engaged in the kind of conduct that
25  you characterized as racist?

Page 219

1  A.  Not during the time that they were engaged in that
2  inappropriate conduct, no.
3  Q.  Okay.  So how would you describe your relationship
4  with those individuals if you would not describe your
5  relationship as being friendly with those individuals?
6  How would you --
7  A.  You're with them eight hours a day, and, you know, you
8  try to just survive the day, endure, you know, and
9  after they do something wrong or hurt me, I just tried
10  to start over each day.
11  Q.  Uh-huh.  So how do you then -- and it's important,
12  Ms. Howlett, that we have a clear record of your
13  understanding of the nature of the relationship that
14  you had with those individuals, the employees at the
15  Warren Police Department, many of whom actually
16  engaged in verbal and physical conduct that was
17  characterized as racist in nature.  How would you
18  characterize your relationship with them?  Explain for
19  the record, please.
20  A.  Because it's a group of people and they have more
21  similarities than me, so I'm kind of like an
22  individual compared to the group.  I would put the
23  group's needs ahead of my own.  So like I said, when I
24  offered to take a hall closet, I just wanted them to
25  feel comfortable and better, and since it's just one

Page 220

1  me, it's easier if I make myself small and try to get
2  over it than to expect all of them as a collective to
3  change, especially after so much time of being there,
4  so I think I got accustomed to being berated.
5      And I would put my headphones on, you know,
6  because they say, if you have the headphones on, you
7  can't hear some or all these comments, you know, how
8  I'm eating a banana or heating up ribs, when I really
9  have lamb chops for dinner, and it's just -- just a
10  protective shield.
11      So I was like a -- Stockholm syndrome, I
12  guess, for the most part, where you become just
13  dependent on them for your survival because, again,
14  we're police officers.  Even as a detective, I still
15  need them to back me up.  I still need them to serve
16  warrants with me.  You know, you physically need them.
17      So you can't -- you can't -- the only way I
18  can explain it is, I isolate myself as much as I could
19  as far as, like, watching what I say and how I say it,
20  because one of the detectives told me after that
21  bullet point thing I made on Shawn John, that they may
22  be fearful that I'm documenting in some kind of way,
23  and that I needed to watch what I said and how I said
24  it before I spoke every day so that they wouldn't be
25  taking notes against me.  So can you imagine being at



DESHEILA HOWLETT
December 27, 2017

## Page 221

1  work and trying to think before you talk?  It's
2  just -- I don't know.
3  Q.  So then you mentioned that it was like the Stockholm
4  syndrome.  Could you help us better understand the
5  character and the nature of your relationship with the
6  employees at the Warren Police Department by kind of
7  expanding on what the Stockholm syndrome is --
8  A.  For me --
9  Q.  -- and how it related to your experience?
10  A.  For me, it's like I'm dependent on a group of people
11  who say whatever they want, do whatever they want and
12  get away with whatever they want, and I can't survive
13  without them, you know.  My living, my paying my bills
14  and, you know, wanting to retire from there, I needed
15  them more than me as one individual mattered.
16  Q.  So to the extent that there was this -- as counsel
17  described, this friendship that I -- would that be
18  more characterized as equals sharing in common fun
19  that was not tearing the other down?
20  A.  Yes.
21  Q.  And in what sense?  How so?
22  A.  I mean, there's days where you just have conversations
23  about whatever is going on in the world or you discuss
24  your cases or you discuss family and things like that,
25  but then at any given time, the conversation could

## Page 222

1  just veer left, you know.  I had a Band-Aid on my
2  finger one day and, you know, Shawn was like, what
3  happened?  I'm like, oh, my dad's dog snipped me.
4  He's like, why?  I'm like, because I was trying to get
5  out from under the bed.  He was like, oh, he just
6  didn't want to come from under the bed because all
7  what would be going on in your bedroom.
8       So it's like you never know what little
9  conversation is going to spin into this whole other
10  thing.
11  Q.  Now, is Shawn Johnson the same police officer with the
12  Warren Police Department that you testified to earlier
13  in response to counsel's question who beat --
14  A.  Dawn.
15  Q.  -- Dawn --
16  A.  McLane.
17  Q.  -- McLane?
18  A.  Yeah.
19  Q.  Is that the same one?
20  A.  Yeah.
21  Q.  And did this beating of Dawn McLane by Shawn John
22  occur prior to or after Shawn and you were separated
23  because of Shawn's discriminatory conduct against you?
24  A.  It occurred after we were separated, but after we were
25  put back together again.

## Page 223

1  Q.  Okay.  So you were now back in the environment with
2  someone who you were separated from because of similar
3  conduct that was also manifested in his violent
4  treatment of Ms. McLane?
5       MR. ACHO:  I'm going to object.  What
6  you're doing is editorializing.  That's not even
7  appropriate.  I have to -- please, I let you -- gave
8  you a long -- no, no good.  Objection.
9       Go ahead.
10  A.  Yes, sir.
11  BY MR. MUNGO:
12  Q.  Do you understand my question?
13  A.  Yes.
14  Q.  What's your understanding of my question?
15  A.  That the remedy to his and I problem was to separate
16  us, but then they put us back together, and then the
17  problem continued and actually got worse because he
18  physically assaulted someone.
19  Q.  Okay.  Did that make you feel more or less fearful of
20  being in this environment?
21  A.  More fearful.
22  Q.  Okay.  Okay.  You were -- did Shawn, after that point
23  in time -- Shawn Johnson, after that point in time, do
24  anything to cause you to feel that you were in
25  immediate peril of physical harm or ongoing

## Page 224

1  harassment?
2  A.  Just the not extending his work.  I would go to his
3  desk when he would go to workout for an hour and try
4  to get the document that I needed and make a copy, and
5  then I would try to sneak it back into his file.  And
6  then Detective Ron Snyder would be like, hurry up,
7  Sheila, he's coming, you know, because you're just
8  trying to get around these impossible things.  But
9  that's childish not to be able to pass the work and
10  share the work kind of thing, you know.
11  Q.  Okay.  And so the command knew that you were objecting
12  all this time to being back in this environment after
13  having been separated because of his discriminatory
14  harassment; correct?
15  A.  Yes.
16       MR. ACHO:  I'm going to object.  That
17  mischaracterizes the testimony.  But go ahead.
18  BY MR. MUNGO:
19  Q.  Is that correct?
20  A.  Yes.
21  Q.  Okay.  And you indicated earlier that Shawn Johnson
22  had made some comments in -- within the office,
23  racially, sexually, possibly, discriminatory comments
24  to you, out loud, within the office, and others were
25  there and heard it.  You recall that testimony



DESHEILA HOWLETT
December 27, 2017

**Page 225**

1  earlier?
2  A. Yes, sir.
3  Q. Okay. Approximately how many other individuals were
4  in the office at that time? You probably don't
5  remember the exact number, but if you can -- if you
6  do, fine, but approximate.
7  A. The other detectives would be Detective Newman,
8  Detective Ron Snyder, Detective\Twardesky. Yes.
9  Q. Okay. And what was it that Shawn Johnson said at that
10  time?
11  A. Which time?
12  Q. If you recall, out loud when these other
13  individuals -- the other detectives were there and
14  heard him.
15  A. Mainly the comment about the Gorilla Glue because,
16  like I said, I tried to take the time to explain it.
17  They would hear him asking me what I was having for
18  lunch, was it chicken or ribs. They would hear him
19  talking about my color combinations and how he would
20  announce, Sheila had on burgundy today, Sheila has on
21  purple today, and that's -- and the way she's
22  matchy-matchy, that's a black thing, kind of thing,
23  they would hear that.
24       And then he would go on vacation and he
25  would come back, and when he would sit at his desk,

**Page 226**

1  something would be gone or missing and he would turn
2  around and go, really, Sheila, you took whatever. So
3  then I would say, it's always got to be the brown
4  person that steals, and then everybody would just kind
5  of grimace.
6  Q. Okay. Did he do this all in one day or did this occur
7  over a period of time?
8  A. A span of time.
9  Q. What span of time would you say?
10  A. From the time I got promoted, really, until the
11  complaint came about. I think it was like a -- about
12  four months of you, you know...
13  Q. Just ongoing.
14  A. Yeah.
15  Q. And was this prior to or after he was separated from
16  you because of his discriminatory actions toward you?
17  A. That was all prior to us being separated.
18  Q. Prior to you being separated, okay.
19       Now, with all of this going on in the
20  office over a four-month period of time and all the
21  other detectives hearing Shawn make all these racist,
22  discriminatory, demeaning comments to you, did anyone
23  ever speak up or say that that's inappropriate, Shawn,
24  or report that to command?
25  A. No.

**Page 227**

1  Q. No? So they knew that it was going on; correct?
2       MR. ACHO: I'm going to object. You're --
3  you're speculating. You don't know what their
4  knowledge was. You don't even know what they heard.
5  But go ahead.
6       MR. MUNGO: Haven't you heard, Counsel, I'm
7  a prophet?
8       MR. ACHO: Just like that guy predicted
9  that she was going to sue. You're both close.
10       MR. MUNGO: Okay.
11       MR. ACHO: You can answer.
12       MR. MUNGO: So -- so let the -- let the
13  record reflect there's laughter in the room here for a
14  moment. Okay.
15  BY MR. MUNGO:
16  Q. So none of these individuals ever voiced any concern
17  or objection to Shawn's verbal discriminatory conduct
18  towards you?
19  A. No. It just seemed like people were physically
20  uncomfortable.
21  Q. Okay. But no one ever said anything?
22  A. No.
23  Q. Over this four-month period of time, is it likely to
24  you -- is it likely to you that the command was not
25  aware of Shawn Johnson's verbal discriminatory conduct

**Page 228**

1  and/or physical conduct, discriminatory conduct
2  towards you?
3  A. Sometimes the supervisors walk in and they overhear
4  the conversation or that somebody is resaying
5  something that someone else said and they get wind of
6  it that way.
7  Q. Okay. So is it likely to you -- is it likely, based
8  upon your experience and observations during this
9  period of time in which Shawn was engaged in these
10  consistent discriminatory -- racially discriminatory
11  and sexually discriminatory and demeaning comments
12  toward you, is it likely that command was not aware?
13       MR. ACHO: I'm going to object again as to
14  speculating as to their knowledge. They may have
15  thought they were joking. They don't...
16  BY MR. MUNGO:
17  Q. Is it likely that they were not aware?
18  A. No.
19  Q. Okay. And as you just testified, you saw different
20  command walking through when he was making these
21  comments; correct?
22  A. Yes.
23  Q. And everybody else in the room heard him; correct?
24  A. Yes.
25  Q. And isn't it likely that the command heard it, if they



DESHEILA HOWLETT
December 27, 2017

Page 229

1   was walking through as right -- as well; correct?
2   A. Yes.
3   Q. In fact, after the Beyer incident when she was
4      yelling, that nigger could have killed me if that
5      window wasn't there, repeatedly using the N word in
6      your presence, you were then taken secretly, as your
7      testimony was -- I'm just kind of summing it up using
8      my own words here -- you were kind of secretly taken
9      to a meeting with Mr. Simlar?
10  A. Yes, sir.
11  Q. Is Mr. Simlar in this room, by the way?
12  A. Yes, sir.
13  Q. Where is he located at?
14  A. Sitting on the end.
15  Q. Sitting on the end. Okay. And what is his role and
16     responsibility there at the City of Warren?
17  A. I know he works in the human resources department.
18  Q. Okay. So they took you to meet with Mr. Simlar?
19  A. Yes, sir.
20  Q. Who was it that told you not to say where you were
21     coming in and when you were coming in and where you
22     were meeting and don't go out this way so that you can
23     draw attention? Who was it that told you that?
24  A. Sergeant Mills.
25  Q. Sergeant Mills, okay. And what was his relationship

Page 230

1   to you from the command of a reporting standpoint?
2   A. My direct supervisor.
3   Q. He was your direct supervisor. Okay. Now, was he one
4      of the command people that would walk pass through the
5      office back and forth when Shawn John was -- when
6      Shawn Johnson was making these racially and gender
7      discriminatory, demeaning comments?
8   A. No. That would have been Sergeant Eidt.
9   Q. Sergeant Eidt. And what was his relationship to you
10     regarding reporting?
11  A. My direct supervisor.
12  Q. He's another direct supervisor. Okay. All right.
13     And so when you finally met with Mr. Simlar, what
14     happened during that meeting with Mr. Simlar? Was
15     there anything said during the meeting with
16     Mr. Simlar? And if so, questions asked, answers
17     given, we want to put that in the record.
18  A. There was another young lady who sat in the meeting
19     with us, and he told me that she always sat in on
20     these kinds of things and that he trusted her. He had
21     a yellow notepad like that, and I started to talk and
22     I said that there's probably not enough pages in the
23     notepad to cover my ten-year experience there.
24        He started to ask things; we started to
25     talk; I was emotional; he was emotional. The other

Page 231

1   young lady appeared to be affected. And at one point
2   he seemed overwhelmed by all the information and he
3   was like, this is institutional, you know. He was
4   like --
5   Q. Wait -- wait a minute. Hold on a second. Hold on a
6      second. Who is this saying, this is institutional, he
7      was overwhelmed?
8   A. Mark Simlar, his eyes were watering and his face was
9      red and he seemed to be affected by what I was saying.
10  Q. And what were you telling Mark Simlar?
11  A. About all the different racial things, officer safety
12     issues, and he reminded me that he had taken a
13     complaint back in 2011 with Dawn. And so, I guess,
14     the span of time of all these different things
15     happening from all these different people, he said
16     that there was an institutional problem and that he
17     didn't really know what he could do to change it or
18     help me.
19  Q. What complaint did he take from Dawn and who was Dawn?
20  A. Dawn McLane was the dispatcher that didn't give me the
21     information on the gun run.
22  Q. And what -- what complaint did he take from her?
23  A. Well, from me. It was -- I said I felt like it was a
24     hostile work environment.
25  Q. Okay. Okay. Because the dispatcher was doing what?

Page 232

1   A. Being belligerent on the recorded line and not giving
2      us pertinent information that you need.
3   Q. Being belligerent to who?
4   A. To me.
5   Q. Okay. So the complaint that you made to Mark Simlar,
6      you did make that complaint to Mark Simlar?
7   A. Which one?
8   Q. With McLane, the dispatcher.
9   A. Well, I made it with supervision and supervision got
10     in touch with human resources because they're in a
11     different building and they had us meet.
12  Q. Did Mr. Simlar ever meet with you and discuss that
13     matter with you?
14  A. Yes.
15  Q. Okay. And what was the content of that conversation?
16  A. Well, they kept asking if I thought it was because of
17     my race, and back then I said no.
18  Q. What do you believe now?
19  A. Probably, actually.
20  Q. Probably. What makes you think -- believe that it was
21     probably your race?
22  A. In the beginning, you want to assume that everything
23     is happening to everybody, you know, or that it's
24     nothing -- nothing to you personally. But then over
25     time when they show you in so many different ways and



US LEGAL SUPPORT
The Power of Commitment™

DESHEILA HOWLETT
December 27, 2017

## Page 233

1  so many different facets, no matter whether I'm
2  working in jail or patrol or as a detective, no matter
3  where I go and what I do, the commentary still
4  continues.
5  Q.  Okay.  Now, this question was not asked, and I would
6  like to put it into the record and make it very clear
7  at this point.  All of the individuals that were
8  complained -- that you complained about in your
9  Complaint and all of the individuals that you've
10  referenced throughout this deposition, are all of
11  these individuals, with the except of Anwar -- is that
12  his right name --
13  A.  Yes.
14  Q.  -- Anwar?  Are all of these individuals Caucasian?
15  A.  Yes, sir.
16  Q.  Okay.  Including Mr. Simlar?
17  A.  Yes, sir.
18  Q.  Okay.  All right.  And so you were the only
19  African-American working as -- in that police
20  department as an officer or otherwise?
21  A.  Yes, sir.
22  Q.  Okay.  All right.  As far as you know, are you the
23  first African-American that had been employed as a
24  police officer in the City of Warren?
25  A.  My understanding is, they offered it to one male

## Page 234

1  before me who asked what the city's demographic was
2  and then he turned it down, and then there was another
3  guy who -- I guess he was in the police academy,
4  because the City of Warren sometimes pays for that,
5  but he didn't pass the Academy, so technically ever
6  fully hired and working in the building, it would just
7  be me.
8  Q.  Okay.  All right.  Now, when you first came in --
9  well, you were there for ten years; correct?
10  A.  Yes.
11  Q.  Okay.  For the ten-year period that you were there,
12  were there ever any diversity training as it relates
13  to African-Americans?  Cultural diversity training as
14  it relates to African-Americans during -- during your
15  entire ten years there?
16  A.  My first year in 2006.
17  Q.  2006.  And what did that training consist of?
18  A.  How to talk to and deal with African-Americans whether
19  they're speaking in a loud tone of voice, whether
20  they're using their hands, how far away to stand, what
21  verbal cues to see or know when they're being
22  disrespectful, just kind of like rules of engagement
23  kind of thing.
24  Q.  Okay.  And how long did that training last?
25  A.  It was a part of our 40-hour block, so it was just a

## Page 235

1  subsection of an entire training.
2  Q.  Okay.  So that we'll have some idea for the record,
3  the jury and the judge, how long of a period of time
4  did that segment consist of?
5  A.  The cultural diversity day --
6  Q.  Or approximately, if you don't remember.
7  A.  Yeah.  The cultural diversity day is usually like a
8  four-hour span or an entire day, eight hours, but I
9  don't recall how many hours we were in there.
10  Q.  Okay.  So at a maximum, it could have been eight
11  hours?
12  A.  Yes.
13  Q.  Okay.  One day?
14  A.  Yes.
15  Q.  Okay.  Had it ever occurred, any other additional
16  diversity cultural -- diversity training as it relates
17  to African-Americans occur during your ten-year period
18  there since that first training?
19  A.  No, sir.
20  Q.  Okay.  Do you recall counselor's question to you
21  earlier as to whether or not the psychologist was
22  concerned about you?
23  A.  Yes, sir.
24  Q.  Do you really know whether or not the psychologist was
25  concerned about you?

## Page 236

1  A.  The lady that they had call me?
2  Q.  Yes.
3  A.  At first, I thought she was.
4  Q.  Okay.  But you thought different later?
5  A.  Because she just kept saying, oh, my God, you know,
6  it's egregious and you work in a cesspool and, you
7  know, you need to sue and all that.  And then when she
8  called me back the next day, it was like completely
9  different.  It was, well, maybe you can go somewhere
10  else and maybe you can start over and maybe you need
11  to see somebody, but then she wouldn't meet me in
12  person, so I wasn't able to gain any trust with her
13  because she wouldn't meet me on record, you know.
14  Q.  What was the psychologist's name?
15  A.  I think Greenberg or Greenbriar or something like
16  that.  Forsberg, I think maybe Forsberg.
17  Q.  Forsberg?
18  A.  Yeah.
19  Q.  Okay.  Linda Forsberg?
20  A.  Yes.
21  Q.  And when Mark Simlar -- you testified that
22  Mark Simlar, during your meeting with him after the
23  Shawn Johnson incident, that -- I'm sorry, after the
24  Beyer incident, that he said that the problem is
25  systemic.  What was your understanding as to what



DESHEILA HOWLETT
December 27, 2017

Page 237

1    Mr. Simlar was describing in his statement?
2         MR. ACHO:  Just so we're clear, she didn't
3    use the word, "systemic," so I would object.  She
4    alleges that he used the word "institutional,."  But
5    go ahead.
6    BY MR. MUNGO:
7    Q.  Okay.  What -- and I want to be accurate for the
8    record.  What word did you recall Mr. Simlar using?
9    Let's do that first.
10   A.  That the problem was institutional.
11   Q.  Okay.  It was institutional.  And what was your
12   understanding as to what Mr. Simlar meant when he said
13   the problem was institutional?  What problem?
14   A.  All of the things that I was talking to him about
15   regarding my race and things being biased or sexist
16   against me.  The fact that it was happening with so
17   many different people, he felt like it was, like, a
18   totality.
19   Q.  When you say -- what was happening with so many
20   different people?
21   A.  You know, the commentary and treating me a certain
22   kind of way.
23   Q.  Okay.  So meaning -- so meaning all the different
24   people treating you the same way, in a racially
25   derogatory way?

Page 238

1    A.  Yes, sir.
2    Q.  In a racially demeaning way?
3    A.  Yes, sir.
4    Q.  Okay.  All right.  And did he seem to speak of this
5    from the standpoint of his personal knowledge or just
6    from what you were telling him?
7    A.  I thought it was based on our two hours of
8    conversation.
9    Q.  Okay.  And so just to be clear for the record, when
10   you said Mark Simlar said it was institutional, was he
11   speaking -- and I want to take -- you mentioned both
12   race and gender discrimination.  Was it your
13   understanding that he meant that racism was
14   institutional in the Warren Police Department?
15   A.  That's what I thought he meant, sir, yes.
16   Q.  Okay.  And was it your understanding, also, that when
17   he used the word, "institutional," that he meant that
18   the gender discrimination was institutional as well?
19   A.  At the time, I think we were focusing on the race --
20   Q.  On the race, okay.
21   A.  -- issue.
22   Q.  All right.  Very well.  There was a question asked to
23   you by opposing counsel regarding your being -- not
24   being allowed to work a certain shift, but white
25   police officers were when they were injured.

Page 239

1    A.  Light duty.
2    Q.  Light duty.
3    A.  Yes, sir.
4    Q.  Okay.  And the question was asked whether or not you
5    believe that it was because of your race.  Do you
6    recall counsel asking you that question?
7    A.  Yes, sir.
8    Q.  Do you believe it was because of your race?
9    A.  At the time, I didn't, but due to everybody getting it
10   prior to me being injured, I just thought it was
11   something that it was kind of like carte blanche to
12   everybody.  Upon me needing it and being denied it, I
13   realized that it didn't apply to me.
14   Q.  Okay.  But I guess you got to be a little bit clearer.
15   You've got to be more clear.  Did you -- do you -- do
16   you or don't you believe that you were denied the
17   opportunity to work that same shift that your
18   similarly situated white officers were able to work,
19   light duty, because of your race?
20   A.  Yes, sir.
21   Q.  Okay.  And is there any -- for the record, I want you
22   to articulate for the record, why did you surmise that
23   it was because of your race?
24   A.  Because if I'm the only black employee and everybody
25   else is getting to work light duty for

Page 240

1    non-duty-related issues and I'm hit by a drunk driver
2    on my way to work and I'm supposed to be covered to
3    and from, but I'm not allowed to work the desk, but
4    they can have a pulled hamstring muscle from playing
5    softball, rip an arm out of a socket in the garage at
6    home pulling up a motorcycle and get light duty, or
7    just say, I'm tired of dealing with the citizens, I'm
8    mentally fatigued, I want to sit here and study for my
9    promotional exam, and when I came back, the guy is on
10   a crutch and has a cast on his foot but he can work,
11   and then another officer is out driving with a broken
12   hand with a cast on his hand, but he can work.  So
13   what else -- what's the difference?
14   Q.  Okay.  You recall counsel asking you, after reviewing
15   your Complaint and allegations of the race and sexual
16   demeaning conduct toward you by different employees,
17   each time he would give an example of that conduct by
18   various Caucasian Warren police officers, he would ask
19   you whether or not you complained.  You recall that?
20   A.  Yes, sir.
21   Q.  Okay.  And you indicated that you did not complain.
22   You recall that?
23   A.  Quite often, yes.
24   Q.  Quite often.  And I just want the record clear,
25   Ms. Howlett, as to why it was that you did not



DESHEILA HOWLETT
December 27, 2017

Page 241

1    complain in all of those instances in which you were
2    subject to racially and gender derogatory comments and
3    conduct.
4    A.   I thought it was my -- I thought it was my plight to
5    bear because I knew I was going to be the only black
6    person upon accepting the job, and I thought that if I
7    was consistent and did a good job and gave them an
8    opportunity to get to know me for me, that it would,
9    at some point, get to a point where my race didn't
10   matter.
11        So as things would happen one by one, I
12   would just go, that's an isolated incident, survive
13   that incident and move on to the next thing. But then
14   as the years progressed and it just continued and kind
15   of got rampant or even worse, you come to a
16   realization at some point like, wow, I could literally
17   be here 25 years and this is just going to be a
18   constant variable.
19        Another thing that I took upon myself was
20   feeling like, by being the first, you're opening this
21   door for the next ones to come behind you. So if I
22   complain and I'm, you know, aggressive or angry black
23   woman or whatever they want to say, it might make it
24   hard on the next one. Well, who knew there's not
25   another one coming, you know.

Page 242

1         So for me it was just like, if you're a
2    secretary and you are telling another secretary, your
3    life doesn't depend on that, though, but if you're an
4    officer speaking against other officers, how does that
5    fare well? You know, the one guy who told about the
6    police brutality, they called him a P word and don't
7    want to work with him.
8    Q.   Tell us about the police brutality that the one
9    officer complained of.
10   A.   John Adams felt like they were being too rough on
11   people and beating people up unnecessarily.
12   Q.   "Felt like they" who?
13   A.   Different officers.
14   Q.   Being beating up on who?
15   A.   On -- on citizens. So he took it to command, and some
16   kind of way it magically gets all around the
17   department that he's a snitch and a fake and a punk
18   and nobody should work with him.
19   Q.   And so that caused you to fear making complaints
20   against any officers violating rules and laws, as
21   well?
22   A.   And also seeing that when I address you as an adult
23   one on one about things that I just -- you've done it
24   ten times, you're not going to stop, and they take
25   how everybody else takes the other person's side. So

Page 243

1    I'm like, wow. So Sheila is wrong even when she's not
2    wrong because if they're all similar and I'm the one
3    different thing, if I continue to speak out, again,
4    nothing's happening, that person doesn't change,
5    nothing happens with supervision, but then I'm more
6    isolated again and again.
7    Q.   So you were fearful of reporting these violations of
8    your civil rights to command.
9    A.   Yes, sir.
10   Q.   Even though, based on your testimony earlier, it was
11   your belief that command already knew about this
12   conduct; correct?
13   A.   Some things, yes.
14   Q.   Okay. Yet they took no action.
15   A.   No, sir.
16   Q.   Okay. And over time, I guess what you're saying is
17   that you just held this in; correct?
18   A.   Yes.
19   Q.   How did this affect your life with your family and
20   your friends, your social life, as you were going
21   through holding all this in over ten years?
22   A.   A lot of times stuff would happen at work, I wouldn't
23   be able to discuss it with my family because they
24   would be like, what did you say and what did you do,
25   and they couldn't understand the position that I was

Page 244

1    in not to be able to say or do because, again, my life
2    depends on these resources here, you know.
3         And so if I -- if I said anything to them,
4    they would be so outraged at the stupid stuff that was
5    happening, but then they would want me to do
6    something, and all I wanted to do was retire. You
7    don't want to quit, you don't want to start over, you
8    don't want to be a problem, you just want to finish
9    what you started.
10        So, again, trying to just get through each
11   instance, hoping it would get better, which I guess
12   was naive for the most part because it's just not, you
13   know.
14   Q.   So -- so, then, based on your testimony, what I hear
15   you saying -- and correct me if I'm wrong -- is that
16   you felt in order to keep a paycheck coming in, the
17   price was to endure this dehumanizing treatment?
18   A.   Yes.
19   Q.   And did it get to a point where it was like a tipping
20   point there where it, like, culminated in -- in some
21   sort of a health issue?
22   A.   After I went to Matt's class and he asked me to speak
23   to them because of my unique position and the lack of
24   diversity in policing --
25   Q.   And just for the record, who is Matt?



DESHEILA HOWLETT
December 27, 2017

Page 245

1    A.  Deputy Chief Matt Nichols.
2    Q.  Matt Nichols, okay.
3    A.  Matt Nichols.  And so I told him that I didn't want to
4        go speak to his class because they're going to be
5        young idealistic kids that have never really
6        experienced anything.
7    Q.  And what was this class, to clarify?
8    A.  Something about the lack of -- I mean, the lack of
9        diversity in policing.  It was a --
10   Q.  Okay.  Was it like a college course or a high school
11       course or --
12   A.  Community college for policing --
13   Q.  Okay.  Go ahead.
14   A.  -- in Macomb.  And so, you know, he kind of kept
15       asking me about it.  And then I said, if I go in
16       there, what do you want me to say?  He's like, I want
17       you to be honest and just tell them your experience,
18       and if they ask you something, just discuss that.  And
19       then I said, I'm going to sound like a victim and then
20       they're gonna say all these things that I should have
21       done and I've never done anything, and that's kind of
22       exactly what happened.
23           So the reason why I'm bringing that up is
24       because prior to talking to Mark for those two hours,
25       Mr. Simlar, that was the first time that I talked

Page 246

1        about a span of ten years and what happened.
2    Q.  Was this prior to or after the Beyer incident?  It was
3        prior -- it was prior to the Beyer incident, but was
4        it prior to or after the Shawn Johnson incident?
5    A.  It was after.
6    Q.  Yeah.  And was Matt Nichols aware of the Shawn Johnson
7        incident --
8    A.  Yes.
9    Q.  -- at that point in time?
10           Okay.  And so tell us about your
11       experience, then, at Matt Nichols' class.
12   A.  So I get in the class and the kids are just utter
13       dismay and they're like, but aren't you on a team and
14       aren't you guys a group?  And I told them, I -- I
15       failed two blue for the black and two black for the
16       blue.  You never fit.  And then I explained to them
17       the thin blue line, how the police are supposed to
18       protect the citizens from that black -- you know, the
19       line that you talk, and if you're on the team but
20       you're not accepted and you're not trusted or they
21       don't equally reciprocate anything, it's kind of like
22       you're an island of one, is what I told them.  And so
23       it was just like I thought, they were saying all these
24       things that I should do.
25           So I leave that class after exposing all

Page 247

1        that stuff, and I couldn't put it back down, though.
2        I couldn't section it off how I had done before.
3    Q.  Now, what was Matt Nichols' rank at that time?
4    A.  Lieutenant.
5    Q.  He was a lieutenant.  And was this experience -- did
6        Matt Nichols hear your presentation to this class?
7    A.  Yes.
8    Q.  And you were explaining to the class your experience
9        at the Warren Police Department?
10   A.  Yes, and that's what he wanted me to do.  That's why
11       he asked me to speak.
12   Q.  And were you explaining to them all of the different
13       derogatory, demeaning -- racially demeaning and
14       derogatory and gender conduct you were subject to?
15   A.  Yes, sir.
16   Q.  Okay.  And was this prior to -- was this prior to or
17       after you were put back in the same environment where
18       Shawn Johnson was?
19   A.  It was after I was put back with Shawn.
20   Q.  Okay.  How long after, approximately?
21   A.  The class was right before the holidays, so it's all
22       right within that same vicinity of time of last
23       winter.  And then after the class, like I said, I
24       couldn't push all that back down, and then I get -- I
25       go on vacation and my coworkers are like, oh, did you

Page 248

1        hear what the mayor said?  That was like in January.
2    Q.  What was that about?
3    A.  Comparing black women to chimpanzees, elongated
4        jawlines and talking about handicapped people and --
5    Q.  The mayor of the City of Warren?
6    A.  Yes.  And calling women cunts and just a bunch of
7        nasty things.  So I get back and they're talking about
8        that, and then Shawn John's lip is busted and
9        Twardesky is like, oh, did you see his lip?  Him and
10       Dawn got into a fight.  And so it was just like, you
11       know, all these things all at once.
12   Q.  So did Lieutenant Mc -- Nichols know that you had
13       problems being back in that same environment with
14       Shawn Johnson after he had harassed you sexually and
15       racially?
16   A.  Yeah, he knew I had been put back.
17   Q.  Okay.  And did you -- did he know that you didn't want
18       to be back there?
19   A.  Well, I told them that I wouldn't have taken the
20       promotion if I had known.
21   Q.  Okay.  So he knew that you were put back in that
22       environment and didn't do anything about it?
23   A.  Correct.
24   Q.  Okay.  What was that?  She's got to hear you.
25   A.  Yes.



DESHEILA HOWLETT
December 27, 2017

Page 249

1 Q. You remember counsel asked you a question about
2 Roland Bell?
3 A. Yes, sir.
4 Q. And he said you were walking gingerly because of all
5 that big, black -- that -- and that name they -- the
6 male genital.
7 A. Yes, sir.
8 Q. Okay. And counsel asked you, didn't Roland Bell bring
9 you diapers and formula and coach an all-black
10 football team?
11 A. Yes, sir.
12 Q. Okay. Do you think that was an equal exchange for
13 allowing him to insult you --
14 A. No, sir.
15 Q. -- with such racially and sexually demeaning
16 conduct --
17 A. No, sir.
18 Q. -- verbal conduct?
19 A. No, sir.
20 Q. Do you think all those other things he did justified
21 him making that racially and -- sexually demeaning
22 statement to you?
23 A. No, sir.
24 Q. Do you think there's any basis that would justify that
25 kind of demeaning verbal conduct?

Page 250

1 A. No, sir.
2 Q. What's on the south side of Warren?
3 A. That's considered south of Ten Mile, so it would be
4 between Eight and Ten Mile, and then from Dequindre
5 all the way down to Hayes is considered the south end
6 of town.
7 Q. Okay. Does that consist of a particular race or group
8 of people or a class of people?
9 A. It's different races, but it will be considered the
10 poorer section of town. That's where most majority of
11 the crimes occur where we get most of our police runs
12 to.
13 Q. Okay. And this Jason Booms used the N word. Do you
14 recall that question counsel asked you --
15 A. Yes.
16 Q. -- about Jason Booms using the N word? And in your
17 opinion, was he using the N word excessively and
18 unnecessarily?
19 A. Yes, sir.
20 Q. Okay. And in your opinion, was it connected with his
21 duty as an officer?
22 A. It wasn't necessary, no.
23 Q. And so what was your opinion as to why he was using
24 that racially derogatory and demeaning word in your
25 presence?

Page 251

1 A. Trying to hurt me.
2 Q. Remember the question counsel asked you about
3 Chisholm?
4 A. Yes, sir.
5 Q. Okay. And he was your partner?
6 A. Sometimes, yes.
7 Q. Sometimes. Okay. And he was the one that indicated
8 that -- or he said that someone indicated to him that
9 his life was in danger when working with you; is that
10 correct?
11 A. Yes.
12 Q. Did I -- did I say that right?
13 A. They wanted to know if he was concerned for his own
14 safety, if he had to be my partner.
15 Q. Okay. And what was your understanding as to why they
16 would ask him that question?
17 A. I was already promoted to detective and a lot of the
18 younger or new people hadn't worked with me yet, and
19 they weren't working there at the time that he and I
20 worked together, so they didn't know we had a prior
21 history. So my understanding was, out of all the
22 things he had to be worried about, being promoted to
23 detective and all the new stuff he had to learn, the
24 only thing people was asking him was, how do you feel
25 about having to work with Howlett.

Page 252

1 Q. But how did that relate to him being concerned about
2 his life being in danger?
3 A. Because that's what they were saying, aren't you
4 concerned about your welfare, having to work with
5 Howlett.
6 Q. So what -- what's your understanding of what they
7 meant by his welfare?
8 A. His safety.
9 Q. Okay. And how would that -- his safety come into
10 question while working with you?
11 A. It just seems like some kind of way, I'm a problem or
12 problems are associated with me. So it's all these
13 detectives up there and they're only asking, is that
14 his biggest concern, and he just brushes it off like,
15 we already worked together. It's not a problem.
16 Q. Okay. Did -- did I understand you earlier to say that
17 that was also in the context -- or did I misunderstand
18 you and say that was also in the context of not
19 getting backup?
20 A. There was another situation where him and I were out
21 on a run and we didn't receive assistance so he used
22 his cell phone to call for help.
23 Q. I see. I see. And is that, according to your
24 understanding, what you believe was meant by him being
25 concerned for his safety or others asking him about



DESHEILA HOWLETT
December 27, 2017

Page 253

1 him being concerned for his safety, working with you?
2 A. Us not getting a backup was after he had told me that
3  that was people's questions of whether it was his
4  concern.
5 Q. Okay.  Okay.  But you had problems with backup before
6  you and he were working together; correct?
7 A. Yes.
8 Q. Remember counsel asked you about the backup and you
9  indicated that -- you gave an example where the
10  detectives finally showed up?
11 A. Yes.
12 Q. Okay.  It's my understanding from your testimony --
13  and maybe I misunderstand -- that after you had
14  complained about not having backup, that that problem
15  was fixed, that you did get proper backup, timely
16  backup; is that true?
17 A. I didn't complain.
18 Q. You didn't complain?
19 A. No.
20 Q. Was the problem ever fixed of you -- in other words,
21  did you ever begin to receive proper, timely backup?
22 A. No.
23 Q. Okay.  From your testimony earlier, it would appear
24  that that's what you were saying, is that ultimately
25  you did get proper backup.

Page 254

1 A. No.
2 Q. That's not -- yeah, go ahead.
3 A. Earlier, I stated that I changed how I did things.
4  Instead of getting there so promptly or so fast, I
5  took her advice and I would slow down and make sure
6  that they're out before me so that I wouldn't be
7  alone.
8 Q. Okay.  You took whose advice?
9 A. Dispatcher Broach, Debbie Broach.
10 Q. Debbie Broach.  What was her advice?
11 A. To slow down and not be the first one out so that I
12  wouldn't be left alone too long.
13 Q. So you were now out policing and going to calls that
14  required you to get there quicker, but you did not
15  get -- you did not -- you purposely did not get there
16  quicker -- as quick as -- as quickly as you could have
17  because of your concern for improper -- concern about
18  improper backup?
19 A. Yes, sir.
20 Q. Okay.  So how often or -- on average, how much delay
21  in time would occur in your getting to a particular
22  scene that you were dispatched to because of your
23  concern for improper backup?
24 A. If I was already close to the area, I would just stay
25  parked for a while until I could kinda hear the sirens

Page 255

1  or hear them coming or they saying, I'm almost out.
2  But if I was further away from a run, I would start in
3  the direction of it and then kind of just park a block
4  or two away, and then when I hear them call out, I
5  would turn the corner and --
6 Q. When you hear them call out what, Ms. Howlett?
7 A. Police officers call out on the scene.
8 Q. Okay.  So when they got on the scene, that's when you
9  went there?  Okay.  And that delay, could that have
10  put the lives of citizens in jeopardy?
11 A. Probably.
12 Q. Probably.
13 A. Yes, sir.
14 Q. Okay.  What would you say the delay in time was on
15  average?  I know it would differ from situation to
16  situation, but on average, how much delay in getting
17  to a scene would occur?
18 A. I don't -- I don't know the exact time.  I just know I
19  would go from going as fast as I could to slowing
20  down, so so many minutes per run.
21 Q. Okay.  Okay.  And your fear of getting there prior to
22  backup was what exactly, for the record?  Let's be
23  clear.
24 A. When she told me that they were not coming in the most
25  direct route to me and that they would come but they

Page 256

1  would go the long way around or they would call out
2  for lunch, it made me feel like my life was in danger.
3 Q. Okay.  How so, Ms. Howlett?  We have to put this in
4  the record.  And I know you already know, but we need
5  to make the record clear.  How did you feel your life
6  was in danger as a result of going directly to the
7  scene when you're dispatched rather than slowing down?
8 A. Because if you're being left alone for an unnecessary
9  amount of time or extra time, the chances of something
10  happening and you not having assistance is greater.
11 Q. Okay.  What could possibly happen?  What are the basic
12  tenets of police rules in going to a scene that causes
13  you to be concerned about your safety, your wellbeing
14  and getting there before backup?
15 A. Serious runs, they assign a two-man car, so that's
16  physically two police officers working in one car.
17 Q. Yes.
18 A. But most of the time I was assigned an individual car.
19  So what they tried to do, if they don't have a two-man
20  available, is send two individual cars --
21 Q. Okay.
22 A. -- to handle a serious run.
23 Q. Okay.
24 A. So now if you're in your car and you're there alone,
25  until the other person comes, you're alone.



US LEGAL SUPPORT
The Power of Commitment™

DESHEILA HOWLETT
December 27, 2017

Page 257

1  Q.  Okay. So what could possibly happen, Ms. Howlett? I
2      know you've lived this life, but let's not assume that
3      those who would possibly benefit from the -- your
4      testimony, knowing graphically what could possibly
5      happen to put -- to jeopardize your wellbeing by being
6      out alone without proper backup?
7  A.  I could have been injured. I could have been maimed.
8      I could have been killed.
9  Q.  Okay. Okay. By what and whom?
10 A.  The arresting person that I'm there to secure or a
11     person coming down off of some type of narcotic. You
12     know, a citizen who is not pro police, anything.
13 Q.  You remember counsel asked you a question about
14     Derek Scott painting your house and he asked you if
15     you would let someone hateful in your house. Did you
16     know whether or not Derek Scott was hateful?
17 A.  That was Kevin Barnhill.
18         MR. ACHO: Just so the record's clear --
19 BY MR. MUNGO:
20 Q.  I'm sorry, Kevin -- Kevin Barnhill. Did you know
21     whether or not he was hateful?
22 A.  We didn't have problems at the time he painted my
23     house. That happened later.
24 Q.  Okay. Do you -- how do you measure whether or not
25     someone is hateful?

Page 258

1  A.  If they continue to repeatedly do the same thing over
2      and over knowing that it's offending you because they
3      can tell that you're not happy with it and they just
4      continue to do it.
5  Q.  Okay. Could someone in -- in Kevin Barnwell's
6      situation may have been interested in the money, and,
7      therefore, disguised his hatred or dislike of blacks
8      when he came to paint your house?
9  A.  I don't know.
10 Q.  So do you really know whether or not he was hateful of
11     blacks?
12 A.  No.
13 Q.  Okay.
14         VIDEO TECHNICIAN: Hey, Leonard, I have to
15     switch tape in like three minutes, just so you know.
16         MR. MUNGO: Okay. All right.
17 BY MR. MUNGO:
18 Q.  Counsel raised the issue of -- in the Shiener's report
19     right after the sentence where it indicated that you
20     were married to another -- that you were married to a
21     same sex and right -- that sentence right after says
22     you were in a committed relationship with another
23     female. What is your understanding of that statement?
24 A.  That Dr. Shiener was talking about me being in a
25     committed relationship with my wife.

Page 259

1  Q.  And is that your understanding of what Dr. Shiener's
2      understanding of your situation is?
3  A.  Yes, sir.
4  Q.  And how do you know that? Because you've had
5      conversations with Dr. Shiener?
6  A.  Yes, sir.
7  Q.  There was a litany of things that counsel took you
8      through in terms of your experience at Oak Park where
9      there was all these criticisms by the -- you may have
10     to help me with the person's name.
11 A.  Lieutenant Pousak.
12 Q.  Lieutenant Pousak. And notwithstanding -- did the
13     City of Warren have access to all of that information
14     and those records and personnel files from Oak Park?
15 A.  Yes, sir.
16 Q.  Prior to hiring you?
17 A.  Yes, sir.
18 Q.  And was there any discussion with you by -- in fact,
19     who did your background check at Warren before you
20     were hired?
21 A.  It would have been Lieutenant Gallasso at the time.
22 Q.  Lieutenant Gallasso. Did he mention -- did you have
23     an opportunity to discuss with him about your
24     experience in Oak Park prior to you being hired in
25     Warren?

Page 260

1  A.  Yes. He talked with me and my parents.
2  Q.  Okay. And what did he say about Oak Park?
3  A.  That he felt like it was personal, one person
4      nitpicking and attacking, and it was a shame that my
5      career had been stopped or suspended over something
6      stupid. And then he gave an example of me patrolling
7      too long or -- you know, me being out on patrol too
8      long, and then he said to my parents, what could be
9      wrong with that? And then he mentioned the thing
10     about me not going to get lunch for the troops, how
11     that's not even work related but it's in my personnel
12     file.
13 Q.  Okay. So they didn't think anything of -- they
14     thought they saw Lieutenant Paluso --
15 A.  Pousak.
16 Q.  Pousak. They saw Lieutenant -- the Warren Police
17     Department saw Lieutenant Pousak's criticisms of you
18     as being personal?
19 A.  Yes.
20 Q.  And not professional?
21 A.  Yes.
22 Q.  Okay.
23         VIDEO TECHNICIAN: I think if you want to
24     get it on video, I'm going to have to switch. I'm
25     running -- I'm running out.



DESHEILA HOWLETT
December 27, 2017

## Page 261

1       MR. MUNGO:  Do what you need to do, my
2  friend.
3       VIDEO TECHNICIAN:  Off the record, 4:37.
4       (Off the record at 4:37 p.m.)
5       (Back on the record at 4:38 p.m.)
6       VIDEO TECHNICIAN:  Back on the record,
7  4:38.
8  BY MR. MUNGO:
9  Q.  All right.  You recall counsel asked you earlier about
10     your turning down potential jobs with the various
11     police departments that you applied to between your
12     employment at Oak Park and Warren, that you turned
13     them down because it wasn't enough pay.
14  **A.  Yes, sir.**
15  Q.  Okay.  Why were you concerned with the pay, the amount
16     of pay?
17  **A.  The amount of time that I had spent in Detroit, being**
18     **six-and-a-half years --**
19  Q.  Yes.
20  **A.  -- and to start over in seniority for the same or**
21     **almost equivalent benefit, it wouldn't -- it wouldn't**
22     **behoove me.  I would have to get another job after I**
23     **retire and basically work until I die.**
24  Q.  Okay.  Okay.  Was there any particular reason why you
25     should -- you believe you should have accepted less

## Page 262

1     rather than more pay when you could command more pay?
2  **A.  Not with my experience and having a degree, no, sir.**
3  Q.  Okay.  Remember counsel asked you about Houtos and he
4     asked you -- Houtos was asking you about the
5     blue-black.
6  **A.  Houtos.**
7  Q.  Houtos, I'm sorry.
8  **A.  Yeah.**
9       Okay.  Counsel asked you whether or not he
10     intended -- you believe he intended to injure you.  Do
11     you know whether or not -- what his intent was?
12  **A.  I don't know his intention was.**
13  Q.  Okay.  Did it injure you emotionally?
14  **A.  I felt it was unfair to come to me for everything**
15     **black, every black question.**
16  Q.  So did you feel offended or injured behind that or
17     not?
18  **A.  Yes.**
19  Q.  And he was the same individual -- he was a sergeant
20     who said that if you didn't help him -- if you didn't
21     go out with him, he wouldn't help you?
22  **A.  No.  That was Officer Paul Kelly.**
23  Q.  Officer Paul Kelly, okay.  Did any of the command --
24     was any of the command aware of that demand put upon

## Page 263

1     you?
2  **A.  No.**
3  Q.  How do you know?
4  **A.  Because I never told anybody.**
5  Q.  Okay.  Did -- do you think that anyone else may have
6     been privy to that information or maybe have overheard
7     that information --
8       MR. ACHO:  Objection.
9  BY MR. MUNGO:
10  Q.  -- being -- being conveyed to you?
11       MR. ACHO:  Speculation.
12  **A.  Not that I know of.**
13  BY MR. MUNGO:
14  Q.  Not that you know of.  Okay.  And how many occasions
15     were you told that by this officer?
16  **A.  Quite a few times because we would end up at the same**
17     **runs together or we would bump into each other in the**
18     **common area hallway or in the front lobby of the**
19     **police station.**
20  Q.  Okay.  So when he said he wouldn't help you, in your
21     mind, did that include when you go out on runs,
22     dispatch?
23  **A.  Yes.  Because he was a primary helper on runs.**
24  Q.  And so did you interpret that as something that would
25     put your life in peril?

## Page 264

1  **A.  Yes, sir.**
2  Q.  And when he asked you to go out with him, what do you
3     think he was asking you for?
4  **A.  To date.**
5  Q.  To date for what purpose?
6  **A.  Possibly a sexual relationship because although he was**
7     **married, he would kind of have relationships with**
8     **other people outside of his marriage.**
9  Q.  Okay.  Okay.  I'm going to ask you -- you've been off
10     work now as a Warren police officer for how long?
11  **A.  Technically, February 1st, that Friday that I showed**
12     **up and they sent me home.**
13  Q.  February 1st of what year?
14  **A.  2017.**
15  Q.  Of 2017.  And did you continue to receive a paycheck?
16  **A.  I had 40 days of sick time that they paid me for, they**
17     **put me on a FMLA, which is Family Medical Leave Act,**
18     **and currently I'm on unpaid medical.**
19  Q.  Okay.  So for how long did you receive a paycheck or
20     any form of income, any -- any source or form of
21     income from the City of Warren since you've been off
22     or since you used up your sick time?
23  **A.  My 40 days would have run out back in April.**
24  Q.  So the last time you received a paycheck from the City
25     of Warren was when?



DESHEILA HOWLETT
December 27, 2017

### Page 265

1  A. I believe it was April.
2  Q. April of 2017?
3  A. Yes, sir.
4  Q. And since then, no income at all?
5  A. No, sir.
6  Q. No unemployment?
7  A. No.
8  Q. No workers' comp?
9  A. No, sir.
10  Q. No short-term disability benefits?
11  A. No, sir.
12  Q. Okay. Did you apply for workers' comp?
13  A. Yes.
14  Q. And were you denied?
15  A. Yes.
16  Q. Okay. Did you apply for short-term disability
17     benefits?
18  A. Yes.
19  Q. Were you denied?
20  A. Yes.
21  Q. Okay. Is it your understanding that the City of
22     Warren has told you that since your injury was work
23     related, as counsel here today has also confirmed,
24     that because your income -- because your injury was
25     work related, that you are not entitled to a

### Page 266

1     short-term disability?
2  A. Short-term disability. Basically, after I was denied,
3     it's now under review, I guess. They're looking into
4  Q. Okay. Did you hear counsel -- counsel gave me these
5     documents today concerning your application --
6  A. Okay.
7  Q. -- for disability and the -- counsel -- general
8     counsel for the City of Warren indicated that your
9     short-term disability benefits was denied because your
10     injury was work related. Did you hear him say that
11     today?
12  A. Yeah, I heard him say that. That was my first time
13     hearing it.
14  Q. I just want to know if you heard it.
15  A. Yes.
16  Q. Okay. All right. And did you agree with that
17     position?
18  A. That my injury's work related?
19  Q. That your short-term disability benefits are precluded
20     because your injury is work related. Do you agree
21     with that assessment?
22  A. I don't know what -- what the rules are on when you
23     get unemployment, short-term versus long-term
24     disability.
25  Q. Okay. So you're not familiar with that. But you do

### Page 267

1     understand that that's the City's position, is that
2     you're not entitled to short-term disability because
3     your injury was work related?
4  A. Yes, sir.
5  Q. Okay. What was your income prior to your leaving on
6     sick -- because you were unable to work, what was
7     your -- what was your income, annual income, at the
8     City of Warren as a police officer?
9  A. 89,000.
10  Q. 89,000. And did you also have benefits?
11  A. Medical packages.
12  Q. Medical package. Do you have any idea what that
13     medical package is worth?
14  A. Between 12- to 14,000 per employee, I believe.
15  Q. Per employee, okay. 12- to 14,000, okay.
16        So your total including your income -- as
17     best you are able to determine, your total income,
18     including benefits, with the City of Warren as a
19     police officer -- and I think you were serving as a
20     sergeant; is that correct?
21  A. Detective.
22  Q. Detective. Was what, if you were to add both your
23     annual income coupled with your benefits?
24  A. It would have been in the 100,000 marker, 105-,
25     somewhere in there.

### Page 268

1  Q. $105,000 a year, okay. And how old are you now?
2  A. 44.
3  Q. 44. And what was the retirement age there at the City
4     of Warren? The earliest you could retire?
5  A. You have to be -- they do 30 and out there, so -- I
6     mean, I'm sorry, 25 and out. So 25 plus whatever age
7     you hired in at. You know, you could be finished
8     after 25 years.
9  Q. Okay. And so how many more years would you have had
10     to work there at Warren before you were able to
11     retire?
12  A. 15.
13  Q. Another 15 years, okay. Okay. And so how have you
14     survived without any income up to this point since --
15     since April of 2017?
16  A. My wife's income.
17  Q. Okay. And counsel asked you a question earlier, do
18     you recall as to your ability -- your ability to
19     return to work, and you answered the question -- and I
20     don't want to -- I'm not even sure if I can repeat
21     your answer exactly, but I want the record to be
22     clear. Are you able to return to work?
23  A. Not in policing, no.
24  Q. Not in policing. And why is that, as best as you can
25     explain for the record.



DESHEILA HOWLETT
December 27, 2017

---

**Page 269**

1    A.  The way she's explaining to me is like --
2    Q.  The way "she" who?
3    A.  My -- the way my doctor is explaining it is because it
4        happened --
5    Q.  Which doctor?
6    A.  Valivonis.  That so many things happened over such a
7        period of time from so many different people, that the
8        working environment for me has pretty much been
9        sullied as far as being in policing where you also
10       have to trust, respect one another and know that
11       they're going to be there for your safety, so...
12   Q.  Okay.  Did she ever indicate that you were able to
13       return to work at all in any profession?
14   A.  She said probably with six months to a year or more of
15       therapy, and if I stayed on medication.
16   Q.  Have you began to explore alternative careers?
17   A.  I'm looking into potentially just completely getting
18       out of law enforcement and going into, like, interior
19       design.
20   Q.  Okay.  Are you working with any particular
21       professionals to assist you with that transition?
22   A.  Yes, I have a work coach.
23   Q.  Okay.  And who is that?
24   A.  I can't remember his name offhand.  Is it Ancell?
25   Q.  Dr. Ancell?

---

**Page 270**

1    A.  Ancell.
2    Q.  Okay.  He's an occupational therapist or --
3    A.  Yes.
4    Q.  Okay.  Occupational.  Yeah, I think that's the term
5        for it.  That helps you with selecting a career and
6        planning for transition from one career to another.
7            And by the way, do you have an expert to
8        help you determine what your exact economic losses
9        would be as a result of the discriminatory acts of the
10       City of Warren and the police department?
11   A.  Yes, sir.
12   Q.  Okay.  And who would that expert be?
13   A.  I haven't met with him yet.
14   Q.  Okay.  But you do have an expert?
15   A.  Yes.
16   Q.  Okay.  Had you complained to anyone other than those
17       that you've gone on the record here today as having
18       complained to who are members of the Warren Police
19       Department, whether in command or not, about the
20       discriminatory and demeaning treatment that you have
21       received while working at the Warren Police
22       Department?
23   A.  Other than the people that I've already mentioned
24       related to work, it would just be my friends and
25       family.

---

**Page 271**

1    Q.  Your friends and family.  Have you -- have you -- you
2        have complained to them --
3    A.  Yes, sir.
4    Q.  -- about that?  Okay.  And then just for a moment, can
5        you tell me, generally, how this has affected your
6        life, the quality of your life?  What is your life
7        like now compared to what it was before you had
8        experienced this discrimination and it had culminated
9        into this landslide of avalanche of emotional
10       dishevelment in your life in requiring--
11           MR. ACHO:  Is there any other colorful
12       adjective you wish to editorialize with?  I mean,
13       goodness, I've been giving --
14   BY MR. MUNGO:
15   Q.  You can -- you can describe the difference.  Do you
16       need the question again?
17   A.  No.
18   Q.  Okay.
19   A.  When you lose your profession and it's something that
20       you've done your entire adult life and my ability to
21       provide for my family, you know, and so it's a sense
22       of kind of bewilderment because you haven't done
23       anything wrong, you.  Followed all the rules, you go
24       to school, you don't commit a crime, you get into your
25       career and it's supposed to end in some type of

---

**Page 272**

1    retirement/pension kind of thing.  And so to have to,
2    first of all, get myself together mentally and
3    emotionally and then from all of this and move
4    forward, and then start over back in school trying to
5    get into a whole other field, it's just -- it's too
6    much to fathom for me, you know.
7        And so living in a city that I can no
8    longer work for, but I can't even move out of it, to
9    feel a peace of mind -- imagine cutting your grass or
10   going to the mailbox and always looking over your
11   shoulder.  It's just -- it's bad.  My blinds are
12   closed.  I don't go out a lot because people are
13   continuously like, oh, well, what's next?  Well, I'm
14   still trying to survive this, you know.
15       So my schedule is opposite everybody's.
16   You know, I try to be at home on the weekends when my
17   neighbor go up north and just be opposite of
18   everybody.  So pretty much just sedentary and going to
19   these appointments for counseling.
20           MR. MUNGO:  Okay.  I think that's it for
21       me.
22           MR. ACHO:  I do have some followup.
23                   RE-EXAMINATION
24   BY MR. ACHO:
25   Q.  You just said, you know, it's hard because you haven't

---



US LEGAL SUPPORT
The Power of Commitment™

DESHEILA HOWLETT
December 27, 2017

Page 273

1   done anything wrong, you followed all the rules. But
2   you didn't follow all the rules, did you? Police
3   departments have policies; correct? And they're meant
4   to be followed; correct?
5   A.  Yes.
6   Q.  One such policy the City of Warren has, the P.D., is
7   that when you're a single officer in a single patrol
8   car, that you are not to go on a run and you are not
9   to engage until you have backup; correct?
10  A.  If at all possible.
11  Q.  That's the policy; right?
12  A.  Not if a person is being murdered or hollering for
13  help.
14  Q.  Did you ever encounter a situation where a person was
15  being murdered and you didn't have backup?
16  A.  No.
17  Q.  Okay. So the policy is that you weren't to engage
18  until you had backup. Isn't that what Ms. Broach told
19  you?
20  A.  No, that's not what she told me.
21  Q.  Isn't that why she told you not to arrive so soon?
22  A.  No.
23  Q.  Mr. Mungo asked you about commanding officers possibly
24  hearing allegedly racist and sexist comments. Do you
25  recall that?

Page 274

1   A.  Yes.
2   Q.  You don't know if these command officers knew whether
3   or not these other officers were joking with you, do
4   you?
5   A.  I knew that they knew about it, but I don't know in
6   what context they took it.
7   Q.  Exactly. So they don't know if it's joking or not;
8   correct?
9   A.  Well, Sergeant Mills said Shawn was being stupid.
10  Q.  Right. But he doesn't -- stupid, silly, acting a
11  fool, these are all terms given to people joking
12  around; right?
13          MR. MUNGO: Objection --
14  BY MR. ACHO:
15  Q.  Correct?
16          MR. MUNGO: -- assumes a fact that's not in
17  evidence.
18  A.  For me, no.
19  BY MR. ACHO:
20  Q.  Okay. For you, no. But you don't know what the
21  command officers knew, do you?
22  A.  No, I don't.
23  Q.  Correct. And that is the reason why these policies
24  existed for you to make complaints, but you didn't;
25  correct?

Page 275

1   A.  Not all the time, no.
2   Q.  In fact, virtually none of the times. So aren't you
3   really partially or largely at fault for things going
4   south with you in Warren? Would you admit that?
5   A.  I accept my responsibility and being there for ten
6   years.
7   Q.  All right. So you accept the responsibility for not
8   complying with the orders.
9   A.  For the safety of my life, yes.
10  Q.  That's how you view it.
11  A.  Yes.
12  Q.  You gave some testimony regarding Mr. Simlar. You
13  said he had tears in his eyes, which, I believe,
14  because he's a humane individual. But you also said
15  that he said, this is institutional, but that is not
16  necessarily accurate, is it?
17  A.  Why would that be?
18  Q.  Well, isn't the way the conversation went down is,
19  Mr. Simlar said to you, after your comments, so based
20  on what you're telling me, you think this is
21  institutional? Wasn't he simply congealing your
22  comments and reducing them down to that?
23  A.  The way that myself and the female that was sitting in
24  the room looked at each other was that he was
25  acknowledging that the problem in Warren is a

Page 276

1   institutional problem because he continued to state
2   that he didn't know what he was going to do to help
3   because it was, like, bigger than the scope of what he
4   thought and that it involved so many different layers,
5   so many different people.
6   Q.  Fair enough. But just so the record is clear, what
7   Mr. Simlar said is, Ms. Howlett, what you're telling
8   me is, you believe this is institutional.
9   A.  No, not that I believe. He was saying that he thought
10  it was institutional, because I never said the word,
11  "institutional."
12  Q.  I understand Mr. Simlar said the word,
13  "institutional," but just so we are accurate, what
14  Mr. Simlar said to you was, so what you're telling me
15  is you believe this is institutional.
16  A.  That's not how -- in the context of how he said it,
17  that I believe, no.
18  Q.  How you believe. But you don't know 100 percent what
19  he said; correct?
20  A.  No, he never said how I believe.
21  Q.  What did he say exactly?
22          MR. MUNGO: Objection, asked and answered.
23          MR. ACHO: I don't know if it has been.
24          MR. MUNGO: It certainly has been.
25  A.  This problem is institutional.



DESHEILA HOWLETT
December 27, 2017

Page 277

1    BY MR. ACHO:
2    Q.  That's -- those were his exact words?
3    A.  Yes.
4    Q.  It was a statement.
5    A.  And another person was in the room.  Ask her.
6    Q.  Who was that person?
7    A.  His assistant.
8              MR. ACHO:  I don't have anything further.
9              MR. MUNGO:  I don't have anything further
10   either.
11             MR. VINSON:  Just take a little break.
12             MR. ACHO:  I'm sorry?
13             MR. VINSON:  Take a little break.
14             MR. ACHO:  Let's just take a quick break,
15   I'm sorry.  I may have something further.
16             VIDEO TECHNICIAN:  Off the record, 4:59.
17             (Off the record at 4:59 p.m.)
18             (Back on the record at 5:05 p.m.)
19             MR. ACHO:  So, Ms. Howlett, I have nothing
20   further and I thank you for your time today.
21             THE WITNESS:  Thank you, sir.
22             (Proceedings concluded at 5:05 p.m.)
23
24
25

Page 278

1              CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3                     ) SS
4    COUNTY OF OAKLAND )
5
6         I, ALISON WEBSTER, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing questions
9    and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20
21        ALISON WEBSTER, CSR-6266, RPR
22        Notary Public,
23        Oakland County, Michigan.
24   My Commission expires:  May 1, 2023
25



Pages 277 to 278