# Exhibit 26

Detective Brent Chisolm
February 21, 2018

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESHEILA C. HOWLETT,
    Plaintiff,
  vs.    Case No. 17-11260
          Hon. Terence G. Berg
          Mag. Judge Steven Whalen
CITY OF WARREN; COMMISSIONER JERE GREEN,
acting in his individual capacity; LT.
LAWRENCE GARDNER; SHAWN JOHNSON; DAWN
MCLANE; ANWAR KHAN; DARRIN LABIN;
WILLIAM ROSS; KEVIN BARNHILL; PAUL
HOUTOS; SCOTT TAYLOR,
    Defendants.

_____

The Deposition of DT. BRENT CHISOLM,
Taken at 1 City Square,
Warren, Michigan
Commencing at 9:58 a.m.
Wednesday, February 21, 2018
Before Joanne Marie Bugg, CSR-2592, RPR, RMR, CRR

## Page 2

```
 1   APPEARANCES:
 2   LEONARD MUNGO
 3   The Mungo Law Firm, P.L.C.
 4   333 West Fort Street, Suite 1500
 5   Detroit, Michigan 48226
 6   313.963.0407
 7   mungo116@msn.com
 8       Appearing on behalf of the Plaintiff.
 9   JAMES R. ACHO
10   ELIZABETH RAE-O'DONNELL
11   Cummings, McClorey, Davis & Acho, P.C.
12   17436 College Parkway
13   Livonia, Michigan 48152
14   734.261.2400
15   jacho@cmda-law.com
16   erae@cmda-law.com
17       Appearing on behalf of the Defendants.
18   ETHAN VINSON
19   City of Warren, City Attorney's Office
20   1 City Square, Suite 400
21   Warren, Michigan 48093
22   586.574.4671
23   evinson@cityofwarren.org
24       Appearing on behalf of the Defendants.
25   ALSO PRESENT:  Lt. Daniel Bradley
```

## Page 3

```
 1              TABLE OF CONTENTS
 2   WITNESS                          PAGE
 3   DT. BRENT CHISOLM
 4   EXAMINATION BY MR. MUNGO:          4
 5   EXAMINATION BY MR. ACHO:          78
 6   RE-EXAMINATION BY MR. MUNGO:      79
 7   RE-EXAMINATION BY MR. ACHO:       89
 8   EXAMINATION BY MS. RAE-O'DONNELL:  90
 9   RE-EXAMINATION BY MR. MUNGO:      91
10   RE-EXAMINATION BY MR. ACHO:       92
11   RE-EXAMINATION BY MR. MUNGO:      93
12
13              EXHIBITS
14   EXHIBIT                          PAGE
15   (Exhibits 1, 2, 3, 5 & 6 attached to transcript.)
16   DEPOSITION EXHIBIT 1             42
17   Discrimination and Sexual Harassment General Order
18   DEPOSITION EXHIBIT 2             65
19   Rules of Conduct - General Order
20   DEPOSITION EXHIBIT 3             66
21   Discipline - Shawn Johnson
22   DEPOSITION EXHIBIT 5             93
23   Affidavit of Gregory A. Murray
24   DEPOSITION EXHIBIT 6             93
25   Resignation Letter from Gregory A. Murray
```

## Page 4

```
 1   Warren, Michigan
 2   Wednesday, February 21, 2018
 3   9:58 a.m.
 4
 5              DT. BRENT CHISOLM,
 6   was thereupon called as a witness herein, and after
 7   having first been duly sworn to testify to the truth,
 8   the whole truth and nothing but the truth, was examined
 9   and testified as follows:
10              EXAMINATION
11   BY MR. MUNGO:
12   Q.  Okay. So, sir, this is a deposition that's pursuant to
13       a civil lawsuit that's currently pending in the Federal
14       District Court, Eastern District of Michigan. Desheila
15       Howlett is the plaintiff, and the City of Warren and
16       others are the defendants. And this deposition, sir, is
17       being taken pursuant to the Federal Court Rules that
18       will be used for purposes of this particular case.
19           Okay. My name is Leonard Mungo. I don't know
20       if I said that already. I represent Ms. Howlett. And
21       if you would like to take a break at any point in time,
22       you just say so, okay, whatever the reason is.
23           I have a very short window today with you,
24       so we're going to dive right into the deposition. I
25       just have one other note that I'd like to bring to your
```

Carroll Court Reporting
586-468-2411

Detective Brent Chisolm
February 21, 2018

Page 5

1  attention, sir, and I think this always saves us some
2  time as we proceed, is that your attorneys will from
3  time to time make objections on the record. And what
4  tends to happen if you're not really familiar with, and
5  attend a lot of depositions, you can get kind of caught
6  up in listening to the objections rather than
7  remembering my question. And they only make the
8  objections after I ask my question. Otherwise, the
9  objections are not really effective for their purposes.
10  And they're good lawyers, and they will be doing it. So
11  in order to keep from having to repeat the question
12  every time that happens which, you know, extends the
13  time and duration of the deposition, if you could just
14  remember my question, and let them make their objection
15  unless, of course, they're speaking to you and giving
16  you directions. It would help save us some time.
17       I'm going to ask you, sir, to state your
18  full, correct and legal spelling of your name for the
19  record.
20  A.  Brent Michael Chisolm.  B-R-E-N-T M-I-C-H-A-E-L
21       C-H-I-S-O-L-M.
22  Q.  Okay. Thank you, sir. And are you employed, sir?
23  A.  Yes.
24  Q.  Okay.  And by whom are you employed?
25  A.  The City of Warren.

Page 6

1  Q.  And for how long have you been employed with the City
2       of Warren?
3  A.  About 10, 11 years.
4  Q.  And in what capacity?
5  A.  I'm currently a detective corporal.
6  Q.  Okay. And have you been employed as a police officer
7       for the City of Warren for that entire period of time
8       that you just articulated into the record?
9  A.  Yes.
10  Q.  Okay. State your gender and your race for the record,
11       please.
12  A.  Male white.
13  Q.  And I want you to, for the record, state whether or not
14       you know the plaintiff in this case, Desheila Howlett?
15  A.  Yes.
16  Q.  Okay. Very good. And, for the record, sir, could you
17       please state how you come to know Desheila Howlett?
18  A.  She was also or is also employed by the Warren Police
19       Department.
20  Q.  Okay. Have you known her since her the beginning of
21       your employment at the Warren Police Department, or
22       shortly thereafter?
23  A.  She started before I did, so throughout the entirety of
24       my employment here I've known her.
25  Q.  Okay. Very good. Have you ever worked with Desheila

Page 7

1  Howlett as a partner, or on occasion as a team, or in
2  any capacity?  If so, could you just state for the
3  record in what capacity you have worked with Desheila
4  Howlett?
5  A.  Yes. I worked with her in the patrol division, and as a
6       detective.
7  Q.  Okay. Very good. And for how long, approximately, did
8       you work with Ms. Howlett in the patrol division?
9  A.  I'm not certain.
10  Q.  Do you have like a ballpark?  You know, was it like
11       more than a year, or less than a year, as best you can?
12       And if you don't recall at all, we'll just move on.
13  A.  I'm not certain.
14  Q.  That's okay. That's fine. And you are a detective now?
15  A.  Yes.
16  Q.  Okay. And you worked with Ms. Howlett while you were a
17       detective, and she was a detective; is that correct?
18  A.  Yes.
19  Q.  Okay. Very good. Do you have any memory as to how long
20       you worked together as detectives, any rough ballpark
21       period of time that you can articulate?
22  A.  I was promoted as a detective in March of 2016. And so
23       I worked with her since that time period.
24  Q.  Okay. So I can't read my own notes. I know I'm the only
25       one that happens to. I can't read my own note. Okay.

Page 8

1  Dt. Chisolm, I'm going to ask you a question about an
2  occasion which both you and Dt. Howlett were on a
3  particular case, and it involved the arrest of an
4  alleged sex offender who you and Dt. Howlett went out
5  to arrest.  This person was a teacher that worked,
6  formerly worked at Fitzgerald High School. Does that
7  ring a bell?
8  A.  Yes.
9  Q.  Okay.  And at the time that you went out to arrest this
10       individual, you and Dt. Howlett, this person was being
11       held at a behavioral clinic because he was alleged to
12       have attempted suicide. Do you recall that?
13  A.  Yes.
14  Q.  Okay. And you notified dispatch that you were on your
15       way out there to arrest this individual?
16  A.  I don't know if we did that or not.
17  Q.  You don't know if you did that or not?
18  A.  At that point.
19  Q.  Did you do it at all, notify dispatch that you were on
20       your way out there?
21  A.  I don't remember if I did that.
22  Q.  Do you remember whether or not it was done by anyone?
23  A.  Either myself or Dt. Howlett would have done that.
24  Q.  Okay. Was it done, or do you know?
25  A.  I'm not certain. At some point, I believe Dt. Howlett

2  (Pages 5 to 8)

Detective Brent Chisolm
February 21, 2018

## Page 9

1    made that phone call to dispatch.
2    Q.  So dispatch was not notified prior to the phone call to
3    dispatch?
4    A.  Correct. That's my recollection.
5    Q.  That's your recollection. And when was the phone call
6    made, prior to going out to the location, or after
7    arriving at the location?
8    A.  After arriving at the location.
9    Q.  Okay.  Is that what you typically do?
10   A.  Yes.
11   Q.  You usually go to the location, and then call dispatch
12   on the phone?
13   A.  On a case-by-case basis sometimes.
14   Q.  Okay. Tell me why this particular case dispatch was
15   notified by telephone rather than, well, strike that.
16   What is your normal method for notifying dispatch for
17   the need of backup?
18   A.  There are several ways. Either on the radio, or by
19   phone, or have somebody else call for you.
20   Q.  Okay.
21   A.  The two primary methods are phone and by radio.
22   Q.  By phone and by radio. Which is the one that is used
23   more frequently, radio or phone?
24   A.  I would say about equal.
25   Q.  It's about equal, okay. So your testimony here today is

## Page 10

1    that the notification to dispatch for backup was not
2    made until you and Dt. Howlett had arrived at the scene
3    where you were going to make the arrest; is that
4    correct?
5    A.  Until we had left the police station. I don't know if
6    we had actually arrived at the scene, or if we were
7    there. I'm not certain.
8    Q.  Okay. Okay. So you don't know whether or not the call
9    to dispatch, which was by way of cell phone, and not
10   radio, correct, the first time that you contacted
11   dispatch?
12   A.  I don't remember exactly.
13   Q.  You don't remember what now?
14   A.  I don't remember exactly if it was by phone or by radio
15   the first time we called. I remember there was a phone
16   call that I made to a patrol officer, but I don't
17   remember exactly the first time that a phone call was
18   made, or that we called somebody on the radio. Those
19   details I don't remember.
20   Q.  Okay. You just remember that there were two contacts to
21   dispatch?
22   A.  I don't remember that there were two contacts to
23   dispatch either.  I remember at some point dispatch was
24   notified.
25       MR. MUNGO: Okay. So could you read his

## Page 11

1    answer back just a moment ago?
2        (Requested portion of the record was read
3        back 10:11 a.m.)
4        "ANSWER: I don't remember exactly if it was by
5    phone or by radio the first time we called. I
6    remember there was a phone call that I made to a
7    patrol officer, but I don't remember exactly the
8    first time that a phone call was made, or that we
9    called somebody on the radio.  Those details I
10   don't remember."
11   BY MR. MUNGO:
12   Q.  And so when you use the term first time, that suggests
13   to me that there was a second time that a call was
14   made. And based on your testimony here just now, you
15   used the word the first time. So are you sure there
16   were not two calls made to dispatch?
17   A.  I don't know.
18   Q.  Okay. So and that's your testimony here today. I just
19   want to be clear what it is, detective, that's all.
20   That you don't know whether or not two calls were made
21   to dispatch for backup on that day. I just want to be
22   clear.
23   A.  Correct.
24   Q.  Okay.  Okay.  And is that because you don't recall?
25   A.  Yes.

## Page 12

1    Q.  Okay.  And so in saying that and, again, I just want to
2    be clear for the record in terms of what your testimony
3    is.  So in saying that, there could have been two calls
4    made to dispatch?
5    A.  Yeah.  I don't know.
6    Q.  Okay. All right. So now you have to listen to my
7    question. I got that part, okay?  That's in the record.
8    And it'll be there forever. All I'm asking --
9        MR. ACHO: He answered your question. He
10   doesn't know.
11   BY MR. MUNGO:
12   Q.  All I'm asking you is does that mean that there could
13   have been two calls?
14   A.  I don't know.
15   Q.  Is it possible it could have been two calls?
16       MR. ACHO:  Asked and answered thrice.
17   A.  It's possible, but I don't know.
18   BY MR. MUNGO:
19   Q.  All right.  So what is your normal practice when you go
20   out before you go out on a call, would you contact
21   dispatch before you proceed to the location that you're
22   headed for your job for the assignment, or you will
23   call for backup once you get there?
24   A.  In what capacity, as a detective?
25   Q.  Oh, I would be talking about as a detective, because

3 (Pages 9 to 12)

Detective Brent Chisolm
February 21, 2018

## Page 13

1  I'm specifically interested in what procedures you were
2  following as a detective.  And we're specifically
3  talking about the situation with you and Desheila
4  Howlett.
5  A.  The normal procedure is not to contact dispatch unless
6  we need additional backup, or if we need uniform patrol
7  officers for some reason.
8  Q.  Okay. All right. What circumstances would that need be
9  dictated?  Under what circumstances?
10  A.  The normal reason that we call for patrol officers to
11  come to a scene is to transport a suspect that's been
12  arrested. Other times would be if there's an issue on
13  the street that people don't believe in our legitimacy
14  because we're plainclothes, things of that nature.
15  Q.  Were you plainclothes that day?
16  A.  Yes.
17  Q.  Were you driving an unmarked car?
18  A.  Yes.
19  Q.  So would that be a situation in which backup, since you
20  were going to arrest this guy, would that be a
21  situation in which backup would have been procedurally
22  required?
23  A.  At some point — well, it depends.
24  Q.  Well, you have to explain that. Okay. You're
25  testifying.

## Page 14

1  A.  Okay. If we go to a scene, and a person that we want to
2  arrest isn't there, then we won't call for backup.
3  Normally we wait until the person — we see the person,
4  or we arrest the person before we call for a patrol
5  officer to transport that subject.
6  Q.  Was that the case in this particular situation with you
7  and Ms. Howlett?  You didn't know whether or not the
8  person was there at the behavioral clinic?
9  A.  I wasn't certain if he was there or not.
10  Q.  So how did you find out that he was there?
11  A.  After the patrol officers arrived, I went inside with
12  some of them. And I asked the front desk if he was at
13  the clinic, and they told me that he was about to be
14  discharged.
15  Q.  So you did not know that prior to going out to arrest
16  him?
17  A.  Not with certainty.
18  Q.  Okay. So when you say not with certainty, that means
19  you had information that he was there?
20  A.  Yes.
21  Q.  And what's that information based on?  Who was that
22  information provided to you by?
23  A.  A one party consent call between the victim and the
24  suspect.
25  Q.  Beg your pardon?

## Page 15

1  A.  As part of that investigation, the victim contacted the
2  suspect about the allegations of the sexual assault. He
3  told her that he was there.
4  Q.  On that day that you went out to arrest him?
5  A.  No.
6  Q.  Or prior to?
7  A.  Prior to. A few days, a day or a couple days before
8  that.
9  Q.  Okay. So you had every reason to believe that he was,
10  in all likelihood, there, correct?
11  A.  I suspected he was there. That's why we went there. I
12  don't know if I had every reason to believe.  I
13  suspected that he was there.
14  Q.  Well, yeah, and otherwise you wouldn't have been there
15  unless you believed that he was there, right?
16  A.  Correct.
17  Q.  So if you believed that a suspected was there that you
18  were going to arrest, it wouldn't be appropriate to
19  call for backup at that point?  And since you were in
20  plainclothes in an unmarked car, that wouldn't be
21  appropriate procedurally?
22  A.  No.  That's a case-by-case basis.
23  Q.  Tell me why this case would be different that you
24  wouldn't call for a backup in advance of going out
25  there, since you believed that he was there, and you

## Page 16

1  were in plainclothes and an unmarked car?
2  A.  It's in the City of Warren, and he didn't have a
3  violent criminal history.
4  Q.  Okay. That kind of differs from your testimony just a
5  moment ago, right?
6  A.  No. I don't think it does.
7      MR. ACHO:  Counsel, just so there's no
8  mischaracterization, I don't think it does. I think
9  he's being consistent.  Go ahead and answer it
10  thoroughly.
11  BY MR. MUNGO:
12  Q.  You have to understand I notice you were looking at
13  counsel as though you were looking for some direction.
14  This deposition is — you're under oath.
15  A.  Yeah.
16  Q.  And he's not under oath, and he's testifying.
17      MR. ACHO:  He understands.
18  BY MR. MUNGO:
19  Q.  You're testifying, and he's not testifying.
20      MR. ACHO:  He understands all that.
21  BY MR. MUNGO:
22  Q.  You cannot follow his direction in terms of parroting
23  anything that he may say.
24      MR. ACHO:  Counsel, I gave no direction.  I
25  was giving no direction, just so the record is clear.

4  (Pages 13 to 16)

Detective Brent Chisolm
February 21, 2018

Page 17

1   I just stated that you've been consistent.  If you
2   remember the question that Mr. Mungo asked you, you can
3   answer it again.
4   BY MR. MUNGO:
5   Q.  So then if you're going to arrest someone that you
6       believe is at a particular location, and you're in
7       plainclothes, and you're in an unmarked car, and if the
8       person does not have any history of violent behavior,
9       then you don't need to call for backup.  That's the
10      procedures that you've come to learn to follow at the
11      Warren Police Department, sir?
12  A.  Everything's on a case-by-case basis.
13  Q.  I'm talking about this particular case, sir.  Is that
14      the policy that you've learned that you must follow
15      under those circumstances?
16          MR. ACHO:  I'm going to object.  He just
17      answered your question, and I think you're not getting
18      the answer you want, and you're asking him the same
19      question again, but he answered it.
20  BY MR. MUNGO:
21  Q.  You still have to answer the question.
22  A.  It's a case-by-case basis.
23  Q.  And I just want to know.  I just want to know what in
24      this particular case, what in this particular case led
25      you to determine that you didn't need backup?

Page 18

1          MR. ACHO:  Hang on.  I would like you to
2   read back his answer to that identical question less
3   than five minutes ago, because he already answered it.
4          MR. MUNGO:  Go ahead.  You can read it.
5          MR. ACHO:  I'm not trying to give you a hard
6   time, counsel, but to speed this along you asked the
7   same questions repeatedly, and he answered that.
8          MR. MUNGO:  That's not true.
9          MR. ACHO:  I can tell you verbatim what his
10  answer was.
11         MR. MUNGO:  Let her read it.  Let her read
12  it.
13         MR. ACHO:  Can I tell you?  Because I
14  remember.
15         MR. MUNGO:  That's not working.  Let her
16  read it.
17         MR. ACHO:  Go ahead.
18         MR. MUNGO:  You want her to read it, let her
19  read it.  And if this goes a little longer, it goes a
20  little longer.
21         (Requested portion of the record was read
22  back 10:21 a.m.)
23         "ANSWER:  It's in the City of Warren, and he
24  didn't have a violent criminal history."
25         MR. MUNGO:  Okay.  Go back to the question.

Page 19

1
2          (The requested portion of the record was
3      read by the reporter at 10:17 a.m.)
4      "QUESTION: Tell me why this case would be
5      different than you wouldn't call for a backup in
6      advance of going out there, since you believed
7      that he was there, and you were in plainclothes
8      and an unmarked car?"
9   BY MR. MUNGO:
10  Q.  That's good.  So you just heard her read the question
11      and your answer?
12  A.  Yes.
13  Q.  Okay.  Is that your testimony as to the basis for making
14      a decision whether or not you would call backup when
15      you're on a run to arrest an individual within the City
16      of Warren?
17  A.  I don't follow the question.  Can you ask it in a
18      different way maybe?
19  Q.  Okay.
20          MR. ACHO:  Can I help speed this along?
21  BY MR. MUNGO:
22  Q.  You just heard my question.  She read back and your
23      answer.
24  A.  Yes.
25  Q.  Okay.  And do you have any more testimony to clarify or

Page 20

1   add to why you did not call for backup prior to going
2   out to arrest that gentleman other than what you
3   already testified to in the record?
4   A.  I don't know.  I can't -- that's what I remember.  And I
5   don't know.
6   Q.  So your question is that you don't know if you have
7       additional information or knowledge of procedures that
8       would make your decision different than what you have
9       already explained in the record?
10  A.  No.  Your question is --
11          MR. ACHO:  Objection as to argumentative.
12  A.  Your question's confusing, because it has many parts to
13      it, so I'm not following your question.
14          MR. ACHO:  It's a compound question.  It's
15      argumentative when you throw in lack of knowledge of
16      procedures.
17  BY MR. MUNGO:
18  Q.  Okay.  Simple.  You heard her question.  The question she
19      read back, and the answer you gave?
20  A.  Yes.
21  Q.  Sir, are there any other procedures or guidelines that
22      you are obligated to follow when making a decision to
23      call for backup when you're going to arrest someone in
24      the situation in which you and Desheila Howlett were
25      in?  If so, put that in the record, please.

5  (Pages 17 to 20)

Detective Brent Chisolm
February 21, 2018

---

**Page 21**

1  A. When I'm going to arrest somebody, there are no other
2     procedures that I have to follow when I'm going to
3     arrest someone.
4  Q. Other than what you've put in record?
5  A. Correct.
6  Q. Okay. Did this person have a violent history?
7  A. No.
8  Q. So you didn't need backup?
9  A. That's incorrect.
10 Q. Okay. So now you're saying that you did need it, and
11    you're saying you don't need it in this particular
12    situation. I thought that you needed it if the person
13    had a violent background?
14 A. He didn't have a violent background. We didn't need
15    backup before we went there. We didn't have to have
16    backup when we got there.
17 Q. So why did you have backup then?
18 A. When you arrest somebody for a felony, it is our policy
19    that they be transported in a marked patrol car to the
20    police department.
21 Q. Oh, so you knew before you went there that you were
22    going to need a marked patrol car?
23 A. No.
24 Q. You didn't know that? Did you expect to arrest him for
25    a felony?

**Page 22**

1  A. Yes.
2  Q. But you didn't know you needed a marked patrol car?
3  A. Correct.
4  Q. You weren't in a marked patrol car, you and Desheila
5     Howlett, correct?
6  A. Correct.
7  Q. Okay. So you needed a marked patrol car. Shouldn't you
8     have called for one?
9  A. We would only need a marked patrol car in the event he
10    was arrested.
11 Q. In the event he was arrested. So did the marked patrol
12    car get there at the time that you arrested him, or
13    after you had arrested him?
14 A. I don't remember. I believe shortly before, but I'm not
15    certain.
16 Q. They got there shortly before?
17 A. Yes. I believe they got there shortly before, but I'm
18    not certain.
19 Q. Okay. All right.
20 A. This was sometime ago.
21 Q. All right. So you had enough information to establish
22    that he was there to support your going out there to
23    arrest him?
24 A. Yes.
25 Q. But that wasn't sufficient information to notify a

**Page 23**

1     marked patrol car to be there?
2  A. Yes.
3  Q. For the arrest you said yes, it was, or was not
4     sufficient information.
5  A. That is not necessarily sufficient information to
6     warrant calling for a marked patrol car.
7  Q. What would be the best practice to call for a marked
8     car, or not call for a marked car under those
9     circumstances, sir?
10 A. In my mind, it depends on the case. And in this case,
11    it didn't matter if they got there before or after.
12 Q. I'm sorry?
13 A. In this case, I don't think it mattered if they would
14    have gotten there before or after.
15 Q. Okay. So the best practice is to wait until you arrest
16    the guy before you called the marked car?
17 A. Sometimes, and sometimes not.
18 Q. In this particular case, what was your thinking?
19 A. I don't know. I don't remember.
20 Q. Okay. So I'm going to ask you your opinion today, sir.
21    And in that situation, would it have been the best
22    practice to call this marked patrol car prior to making
23    the arrest, or after you make the arrest, so at the
24    time that you see the person?
25 A. Calling for a marked patrol car prior to arresting

**Page 24**

1     somebody is a double edged sword. When I say that, I
2     mean if a person that I want to arrest sees a marked
3     patrol vehicle, they might change their pattern of
4     behavior. So sometimes it's a good thing to call them
5     because maybe you will need them because they're
6     violent and these things.
7         Other times it's not good, because if they
8     see a marked patrol car, they may change their
9     behavior, and I might not be able to arrest them. So
10    it really is dependent on everything that's going on at
11    that time.
12 Q. Okay. So in this particular case, the person was inside
13    the building, correct?
14 A. Yes.
15 Q. And he wasn't released, correct?
16 A. Yes.
17 Q. So there wouldn't have been any real opportunity for
18    him to see a marked patrol car, correct?
19 A. No. There are windows in the building.
20 Q. Okay. So the marked patrol car couldn't have sat around
21    the corner, correct?
22 A. They could have.
23 Q. They could have. Did you think about that?
24 A. I don't remember.
25 Q. Did you think that would have been a better practice

6 (Pages 21 to 24)

Detective Brent Chisolm
February 21, 2018

## Page 25

1    than to call the marked patrol car after you made the
2    arrest?
3    A.  In this particular case, I don't think that would
4    matter.
5    Q.  In your opinion it doesn't matter whether the patrol
6    car is there on the scene around the corner where the
7    patrol car couldn't be seen by him, even though he was
8    in the building detained at this clinic. You think that
9    it would have been a better practice to not call a
10   marked patrol car until after you arrested him; is that
11   your testimony here today?
12   A.  I need you to repeat it, because again you have a run
13   on question that is complex.
14   Q.  Well, just say you don't understand the question.
15   A.  Okay. I don't understand the question, sir.
16   Q.  Thank you. You don't have to give me an
17   English lesson.
18            MR. ACHO:  Counsel, you don't have to be
19   argumentative.  I purposely didn't object.
20   BY MR. MUNGO:
21   Q.  The question is, the question is in your thinking and
22   your opinion, sir, in that circumstance when you and
23   Desheila Howlett was there, that you didn't believe
24   that it would have been the best practice to have that
25   patrol car sitting around the corner prior to your

## Page 26

1    making that arrest.  In your opinion, would that have
2    been the best practice?
3    A.  I don't know. It depends. There are too many factors,
4    and I don't remember all of them.
5    Q.  So your answer to my question, sir, is you don't know,
6    correct?
7    A.  I don't know.
8    Q.  Thank you. During that time after the car was called,
9    the backup car was called, cars were sent to other
10   locations, and you heard that over the radio, did you
11   not, the dispatch radio, did you not?
12   A.  I don't know. I don't remember. I don't know.
13   Q.  So that could have happened?
14   A.  It's possible.
15   Q.  Okay. All right. That they were sent to other locations
16   of lesser priority than the priority in your arrest,
17   correct?
18   A.  I don't know that to be the case.
19   Q.  Is it possible that that could have happened?
20            MR. ACHO:  I'd object.  You're asking him to
21   speculate.  Go ahead.  You can answer it.
22   A.  I don't remember the specific runs that they were
23   dispatched to, if they were dispatched.
24   BY MR. MUNGO:
25   Q.  You understand my question is was it possible that that

## Page 27

1    could have happened on that day?
2    A.  The realm that most things are possible, I guess it's
3    possible.
4    Q.  So your answer is that that is possible that it could
5    have occurred that day that cars were sent to lesser
6    priority runs than to your location?
7    A.  It's unlikely, but possible.
8    Q.  Okay. But you don't remember anything that would make
9    it unlikely, correct, on that day?
10   A.  Well, I don't remember what kind of calls they were
11   sent to.
12   Q.  Okay. All right. Thank you.
13   A.  If they were sent.
14   Q.  Okay.  And so now, and I don't recall what you said,
15   sir, did you say you're the one that called the
16   dispatch on the cell phone, or was it Ms. Howlett?
17   A.  I don't remember.
18   Q.  You said you didn't remember. Okay. Do you remember the
19   conversation over the radio with regard to the dispatch
20   that you had called for backup on that day for, that
21   there was a discrepancy between the car being sent to
22   12 Mile, 12 and 10 versus -- I'm sorry. 12 Mile versus
23   12 Mile and Mound, do you recall that?
24   A.  No.
25   Q.  Okay.  Do you recall any confusion in terms of where

## Page 28

1    the car was being sent that Desheila called for backup
2    with?
3    A.  No.
4    Q.  Do you remember any questions to you by anyone relative
5    to your working with Desheila Howlett?  Were you ever
6    asked any questions about your working with Desheila
7    Howlett by anyone?
8    A.  I don't know what you mean.
9    Q.  Okay.  You do know Desheila Howlett?
10   A.  Yes.
11   Q.  You did work with her?
12   A.  Yes.
13   Q.  You do know what questions would be -- you do know what
14   questions about your working with Desheila Howlett
15   means, right?
16   A.  Not exactly. I guess that's where our confusion is
17   right there.
18   Q.  Okay. So no one ever asked you any questions about your
19   working with Desheila Howlett, or you don't understand
20   that question?
21   A.  I don't know what you're asking.
22   Q.  Why don't you know whether or not someone asked you
23   about your working with Desheila Howlett?
24   A.  Maybe it's the way that you're asking the question.
25            MR. ACHO:  Counsel, it's overly broad.

7 (Pages 25 to 28)

Detective Brent Chisolm
February 21, 2018

Page 29

1  BY MR. MUNGO:
2  Q. What do you understand the question to mean?
3  A. I don't understand the question.
4  Q. You don't understand the question. You work with
5     Desheila Howlett, but no one ever asked you about your
6     working with Desheila Howlett, and you don't understand
7     that question?
8  A. No.
9  Q. Why don't you understand that question?
10     MR. ACHO: Counsel, if I might object, I
11     think he doesn't understand because it's vague and
12     overly broad. If you could narrowly tailor it, I think
13     he could answer it.
14  BY MR. MUNGO:
15  Q. Okay. He's not asking the questions. I am. This I my
16     deposition. You are under oath. He's not under oath.
17     You can answer the question.
18     MR. ACHO: Sir, I'm not testifying.
19  BY MR. MUNGO:
20  Q. You can answer the question, sir.
21     MR. ACHO: He has said twice.
22  A. I don't know what you're asking.
23  BY MR. MUNGO:
24  Q. When you worked with Desheila Howlett, what did you do?
25  A. Investigate crimes.

Page 30

1  Q. Did anyone ask you about your investigating crimes
2     while working with Desheila Howlett?
3  A. Yes.
4  Q. And who asked you questions about that?
5  A. Many people would ask about the crimes that I would
6     investigate, and the cases. All kinds of people would
7     ask about the cases I would work on.
8  Q. Did they specifically ask you about Desheila Howlett in
9     the context of your investigating?
10  A. No.
11  Q. No one ever did? No one ever asked you about whether
12     or not you were worried about working with Desheila
13     Howlett?
14  A. No.
15  Q. And you're sure about that?
16  A. Yes.
17  Q. Were any questions asked you about your being fearful
18     of working with Desheila Howlett because she doesn't
19     get appropriate backup, would you be fearful of your
20     life?
21  A. Can you ask that again?
22  Q. Did anyone ever ask you were you not concerned about
23     your safety, your personal safety while working with
24     Desheila Howlett because she doesn't get adequate
25     backup? Someone did ask you that, didn't they?

Page 31

1  A. I'm trying to answer your question. It is like four
2     questions and a lot of things in there.
3  Q. Answer them one at a time.
4  A. Okay. Can you ask one question at a time so that I can
5     answer them.
6  Q. You don't remember them?
7  A. It is like four questions.
8     MR. MUNGO: Ask the question back. Read the
9     question to him, please.
10     (Requested portion of the record was read
11     back 10:35 a.m.)
12     "QUESTION: Did anyone ever ask you were you not
13     concerned about your safety, your personal safety
14     while working with Desheila Howlett because she
15     doesn't get adequate backup? Someone did ask you
16     that, didn't they?"
17  A. There's a double negative in there. That's what was
18     throwing me off.
19  BY MR. MUNGO:
20  Q. Are you an English teacher?
21  A. No.
22  Q. Then what are you?
23  A. Just --
24  Q. You're a detective?
25  A. Just a detective.

Page 32

1  Q. And you're a deponent right now, and you're under oath
2     and have to answer that question. There are two
3     questions.
4     MR. ACHO: Counsel.
5  A. I don't understand your question.
6  BY MR. MUNGO:
7  Q. Do you understand English?
8     MR. ACHO: Counsel, you're being
9     argumentative, and you're borderline badgering the man.
10     He's answered his questions.
11  A. Yes.
12  BY MR. MUNGO:
13  Q. Okay. Then listen to my question, sir. Did anyone ever
14     tell you or ask you the question are you concerned
15     about your physical safety in working with Desheila
16     Howlett because she doesn't receive adequate backup?
17  A. Nobody ever said anything like that to me.
18  Q. Nobody said or asked?
19  A. Nobody's asked any question like that. I don't believe
20     Desheila didn't get adequate backup. I was never
21     fearful of working with Desheila. I asked her to go
22     with me in that arrest case. If I was fearful, why
23     would I ask her to go with me? I wasn't fearful of
24     that at all.
25  Q. Okay. How long did you work with Desheila Howlett?

8 (Pages 29 to 32)

Detective Brent Chisolm
February 21, 2018

## Page 33

1   A.  While in patrol, and then almost the entire time from
2       when I got promoted to detective until she hasn't been
3       at work.
4   Q.  Until she hasn't been at work. Okay. How many runs did
5       you go out with Desheila on?
6   A.  Just because we're not assigned in a patrol car
7       together, when we're on patrol, that doesn't mean we
8       don't get called to go to the same run. So if I had to
9       estimate, I'd say thousands.
10  Q.  You went on thousands of runs with Desheila Howlett?
11  A.  Yes.
12  Q.  Would the run sheets reflect that?
13  A.  Yes, it would.
14  Q.  How many times did you have to call for backup out of
15      those thousands, more than once?
16  A.  When we call for another car, there are many reasons
17      why we might need another police car to show up.
18  Q.  That wasn't my question.
19  A.  I'm trying to answer your question. So calling for
20      backup is usually like an emergency situation. That's
21      how I think of calling for backup. And it's very rare
22      that I've ever had to call for backup. I don't know,
23      and I can't remember if there's ever been a time I've
24      called for backup in an emergency type situation when I
25      was working with Desheila.

## Page 34

1   Q.  Did Desheila ever call for backup while you were
2       working with her?
3   A.  Not that I remember.
4   Q.  You don't ever remember Desheila ever calling for
5       backup all the thousands of times you went on runs with
6       her?
7   A.  No.
8   Q.  Not a one?
9   A.  No.
10  Q.  You would be the one that always called for backup?
11  A.  No.
12  Q.  Who else would call for backup?
13  A.  Again, sometimes we call for another car, and that's
14      not --
15  Q.  Who, you or Desheila?
16  A.  Oh, either one. I don't know.
17  Q.  But Desheila never called for backup on those thousands
18      of runs, correct?
19  A.  No. I don't remember that to be the case at all.
20  Q.  So you would be the only one calling for backup,
21      correct?
22  A.  No.
23  Q.  Who else would call for backup between you and
24      Desheila, sir?
25  A.  Either one of us.

## Page 35

1   Q.  On those thousands of runs?
2   A.  Either one of us.
3   Q.  But you just said that Desheila never did, right?
4   A.  I didn't say that.
5           MR. ACHO: Can we --
6   BY MR. MUNGO:
7   Q.  You didn't say that?
8           MR. ACHO: Can we take a break? Would you
9       mind?
10          MR. MUNGO: Read the answer beak.
11          MR. ACHO: Can we take a break?
12          MR. MUNGO: Let me finish this question,
13      then you can take a break.
14  BY MR. MUNGO:
15  Q.  Okay. All right. So, sir, I just want to be clear on
16      your testimony. You said you've gone on thousands of
17      runs with Desheila Howlett, correct?
18  A.  Yes.
19  Q.  Okay. You said that Desheila Howlett on those
20      thousands of runs never called for backup?
21  A.  I didn't say that.
22  Q.  You did not say that?
23  A.  Correct.
24  Q.  Okay. So how many times did Desheila Howlett call for
25      backup on those thousands of runs?

## Page 36

1   A.  I don't know.
2           MR. ACHO: If you know.
3   BY MR. MUNGO:
4   Q.  You don't know. So then she did call for backup on some
5       of those thousands of runs. You just don't know how
6       many?
7   A.  I don't know if she called for backup. I don't know if
8       she ever used it. I don't know. I don't know if she
9       ever called for backup, and I don't know the
10      circumstances she called for. I just don't know.
11  Q.  So then you have no testimony as to whether or not
12      Desheila Howlett ever called for backup in the
13      thousands of runs that you and Desheila Howlett went
14      on; is that correct?
15  A.  I don't know with certainty.
16  Q.  Don't know with certainty. So since you don't know with
17      certainty, she may have called for backup on more than
18      half of those runs, correct?
19  A.  Possible. I don't know.
20          MR. MUNGO: Okay. All right. Take your
21      break.
22          MR. ACHO: Go ahead. Just keep going. That's
23      all right.
24          MR. MUNGO: No, now I need a break.
25      (Break at 10:40 a.m.)

9  (Pages 33 to 36)

Detective Brent Chisolm
February 21, 2018

| Page 37 |
| --- |

1     (Back on the record at 10:48 a.m.)
2  BY MR. MUNGO:
3    Q.  Okay.  So, Dt. Chisolm, you indicated that you had
4       called the clinic at the location where you made the
5       arrest earlier, correct?  You made that call, did I
6       remember that correctly?  I don't want to have her read
7       it back.  Is that accurate?
8    A.  That I called the clinic?
9    Q.  To determine the release time.
10   A.  I don't remember if I did that or not.
11   Q.  Okay.  So it could have been you or Ms. Howlett?  You
12      have to verbally answer.
13   A.  It could have.
14   Q.  Okay.  And do you know whether or not, even though you
15      don't know who may have called the clinic, do you know
16      whether or not more than one call had to be made
17      because of the HIPAA issues that you were dealing with
18      that they didn't want to give you information about his
19      release?
20   A.  I don't know.
21   Q.  You don't know that.  Okay.  All right.  So more than one
22      call could have been made?
23   A.  I don't know.
24   Q.  Okay.  You did know prior to going out there that the
25      person that you were going to arrest was going to be

| Page 38 |
| --- |

1       arrested for a felony, correct?
2          MR. ACHO:  Asked and answered.  Go ahead.
3  BY MR. MUNGO:
4    Q.  Yeah, you did, but I want to make sure.  Am I correct
5       you did say yes earlier, I believe, correct?
6    A.  Yes.
7    Q.  Okay.  You also knew that the gentleman, prior to going
8       out to arrest him, had attempted suicide, correct?
9    A.  Yes.
10   Q.  Okay.  You don't remember talking to Darlene, the
11      dispatcher, on your cell phone on that day?
12   A.  What's the name of the person?
13   Q.  The dispatcher, Dawn.  Hold on a second.  I may have the
14      name wrong.  I apologize.  Officer Dahlin, you don't
15      remember talking to Officer Dahlin on your cell phone?
16   A.  I did talk to Officer Dahlin on my cell phone.
17   Q.  Regarding what?
18   A.  Coming to the scene.  Coming to that arrest location.
19   Q.  Coming to that arrest location.  And that was, again,
20      before or after the arrest?
21   A.  Before.
22   Q.  It was before the arrest.  How long before the arrest?
23   A.  I don't remember.
24   Q.  You don't remember.  Was it after you saw the person
25      that you were arresting, or prior to you seeing the

| Page 39 |
| --- |

1       person that you were arresting?
2    A.  Prior.
3    Q.  Prior to seeing the person.  Was it prior to you
4       entering into the facilities?
5    A.  Yes.
6    Q.  It was prior to you entering into the facilities.  Was
7       there some time that passed between your call to
8       Officer Dahlin, and entering into the facility?
9    A.  Yes.
10   Q.  Okay.  Was it like five minutes, 10 minutes, 15
11      minutes?
12   A.  I don't remember.
13   Q.  You don't remember.  But it wasn't a long period of
14      time?
15   A.  I don't remember.
16   Q.  You don't remember.  So did the car get there before you
17      went in?
18   A.  Yes.
19   Q.  It did get there before you went into the building,
20      okay.  So you weren't concerned about him seeing the
21      car, and then running off or anything, right, from the
22      windows of the facility?
23   A.  That was still a concern.
24   Q.  You were concerned?
25   A.  Yes.

| Page 40 |
| --- |

1    Q.  Okay.  And was this the kind of facility where he was
2       detained, this person was detained and couldn't freely
3       leave the building?
4    A.  I don't know.
5    Q.  You have no clue?
6    A.  I don't know.
7    Q.  You didn't find that out before you went in there?
8    A.  No.
9    Q.  Okay.  You didn't have any concern about that as a
10      detective prior to going out and making the arrest as
11      to what his limitations were on his mobility and
12      freedom?
13   A.  I don't know.
14   Q.  You don't remember.  When you say you don't know, you
15      don't remember?
16   A.  Can you repeat the question for me?
17         MR. MUNGO:  Read the question back.
18         (Requested portion of the record was read
19         back 10:53 a.m.)
20         "QUESTION:  Okay.  You didn't have any concern
21         about that as a detective prior to going out and
22         making the arrest as to what his limitations were
23         on his mobility and freedom?"
24   A.  No.
25  BY MR. MUNGO:

10 (Pages 37 to 40)

Detective Brent Chisolm
February 21, 2018

## Page 41

1  Q.  You didn't. So how did you know he would be there when
2      you got there?
3  A.  I didn't.
4  Q.  Do you usually handle your approach to arrests in that
5      way with that limited amount of information about the
6      person you're going to arrest?
7  A.  Everything's on a case-by-case basis.
8  Q.  I understand. And you reflecting on your life and your
9      experiences, is that how you handle most of your cases
10     when you go out to arrest people for felony cases?
11 A.  He did not know that he had a warrant for his arrest.
12     And so the element of surprise was something I think we
13     relied on in that case.
14 Q.  Yes, sir. But you do know that wasn't my question. Can
15     you read my question back, please? Listen my question,
16     sir.
17 A.  It's all on a case-by-case basis.
18         (The requested portion of the record was
19         read by the reporter at 10:55 a.m.)
20         "QUESTION: I understand. And you reflecting on
21         your life and your experiences, is that how you
22         handle most of your cases when you go out to
23         arrest people for felony cases?"
24 BY MR. MUNGO:
25 Q.  You said that a number of times, and I'm just asking

## Page 42

1      you does that happen to represent most of the cases
2      that you go out on that you would operate with making
3      an arrest without knowing about the freedoms and the
4      mobility of the person you're going to arrest?
5          MR. ACHO:  Counsel, he has answered your
6      question, but you can answer it one more time.
7  A.  Depends. It's on a case-by-case basis.
8  BY MR. MUNGO:
9  Q.  What I'm asking you, sir, I know it's on a case-by-case
10     basis, and only you know about each one of your cases.
11     Is that like half of your cases that you would handle
12     them like that, or less than half?
13 A.  I can't answer that question. I would have to speculate
14     as to how many cases, and what information I had. So
15     everything is on a case-by-case basis.
16 Q.  So you don't know the answer to my question; would that
17     be fair?
18 A.  Yes.
19         MR. MUNGO:  Let the record reflect I'm about
20     to show the deponent Deposition Exhibit Number 1.
21     Could you take a look at that document, sir.
22     MARKED BY THE REPORTER:
23     DEPOSITION EXHIBIT 1
24     Discrimination and Sexual Harassment General
25     Order

## Page 43

1      10:56 a.m.
2  BY MR. MUNGO:
3  Q.  Let the record reflect I'm about to show the deponent
4      Deposition Exhibit Number 1. Could you take a look at
5      that document, sir. Let me know when you've had a
6      chance to review it.
7  A.  The discrimination and sexual harassment general order.
8  Q.  Deposition Exhibit Number 1 has a title on it of what,
9      sir?
10 A.  Discrimination and sexual harassment, and it's a
11     general order.
12 Q.  And it has an effective date of what, sir?
13 A.  10 January 2003.
14 Q.  10 January of 2003. Have you ever seen that document
15     before?
16 A.  Yes.
17 Q.  When did you see that document?
18 A.  Before I've been employed as a police officer, I know
19     it was one of the documents that we had to study for
20     for the test to detective. I've seen it before.
21 Q.  And when did you study for the test for detective?
22 A.  There were two times. One in the year 2008, 2009ish,
23     and then in 2010, 2011ish.
24 Q.  Okay. Two times?
25 A.  So a few times, yes.

## Page 44

1  Q.  Okay. So other than when you were studying to become a
2      detective, have you ever seen that document?
3  A.  When we are hired by the police department, we review
4      all the general orders, so when I was first hired.
5  Q.  So other than those three occasions, have ever seen
6      that document before?
7  A.  There may have been some training that would have had
8      this document, but I'm not certain.
9  Q.  Would your answer to that question be you don't know?
10 A.  Yes. I don't know.
11 Q.  Okay. Thank you. All right. Do you know what racial and
12     sexual harassment means?
13 A.  Yes.
14 Q.  What does sexual harassment mean, sir?
15 A.  There's two kinds. It's basically requiring favors,
16     the quid pro quo, and then hostile work environment by
17     making comments, and things like that.
18 Q.  Like what Shawn Johnson did with regard to Desheila
19     Howlett?
20 A.  I don't know.
21 Q.  So you don't know. What do you mean you don't know?
22     What about that question you don't know?
23         MR. ACHO:  Counsel, why are you laughing?
24 A.  I don't know what happened between Shawn Johnson and
25     Desheila Howlett.

11 (Pages 41 to 44)

Detective Brent Chisolm
February 21, 2018

Page 45

1  BY MR. MUNGO:
2  Q.  Okay. Okay. And so you've never learned that there were
3      allegations that Shawn Johnson had racially harassed
4      Desheila Howlett?  You never knew about that, sir?
5  A.  I never heard it with my own ears.  The only thing I
6      heard was what Desheila would have told me.
7  Q.  And that would have been with your ears?
8  A.  Yes.
9  Q.  Okay.  So you have heard something with your own ears?
10 A.  I didn't hear anything that Shawn Johnson would have
11     said to Desheila in that context.  I heard what
12     Desheila has told me.
13 Q.  Very good. So you do have knowledge that Shawn Johnson
14     had racially harassed Desheila Howlett?
15 A.  From Desheila, yes.
16 Q.  Yes. And was that prior to Shawn Johnson being
17     disciplined for the racial harassment or after?
18     MR. ACHO:  Objection. Lack of personal
19     knowledge.
20 A.  I don't know. I don't know when he was disciplined. I
21     don't know those dates or anything.
22 BY MR. MUNGO:
23 Q.  Okay. So around what period of time did Desheila
24     Howlett share this with you?
25 A.  When I was a detective.

Page 46

1  Q.  Which would have been between what?
2  A.  2016, 2017.
3  Q.  2016, 2017. Okay. All right. So do you know what
4      inappropriate racial conduct is that would constitute
5      racial harassment?
6  A.  Generally, yes.
7  Q.  What is your understanding of what constitutes racial
8      harassment, sir?
9  A.  Any comments, any mistreatment or different treatment
10     on the basis of race.
11 Q.  Such as?
12     MR. ACHO:  Counsel, you're asking him to
13     speculate.  Maybe give him examples. He's not here to
14     give a lesson in discrimination.
15 BY MR. MUNGO:
16 Q.  You realize he's now testifying for you.
17 A.  I understand.
18 Q.  You're under oath, sir.  You have to answer.
19     MR. ACHO:  You've told him that three times.
20     He knows. And I'm not here to testify.
21 BY MR. MUNGO:
22 Q.  Go ahead, sir.  Answer the question.
23 A.  Sure. Treat somebody differently because of their race.
24     It could be anything.  It could be many things. There's
25     a lot of things.

Page 47

1  Q.  Give me one?
2  A.  Okay. Being unwilling to work with somebody because
3      they're black. That would be an example.
4  Q.  Okay. What else?
5      MR. ACHO:  Counsel, how many examples do you
6      want?  Why don't you give him some.
7  A.  Using disparaging comments to somebody.  Using
8      disparaging comments with any of these.
9  BY MR. MUNGO:
10 Q.  What would be an example of a disparaging comment that
11     would constitute racial harassment based on your
12     understanding, sir?
13 A.  There's so much. It's hard to narrow it down.  Anything
14     that would have to do with the appearance of somebody,
15     or their sexual orientation, anything like that.
16     Anything like that.
17 Q.  Racial harassment?
18 A.  For racial harassment, it would be limited to the color
19     of their skin.  Anything that had to do with the color
20     of their skin that's a negative comment, negative
21     connotation. Anything like that.
22 Q.  Okay. Do you consider rubbing your hand through a
23     female's hair as being a form of sexual harassment?
24 A.  Maybe.
25 Q.  And why do you say maybe?

Page 48

1  A.  If it's consensual, then it wouldn't be.  If it's non
2      consensual, and it happens at work, then it clearly is.
3  Q.  Okay. All right. What about sniffing a female, sniffing
4      a female, getting up close and sniffing, smelling a
5      female.  What about that, do you consider that sexual
6      harassment?
7  A.  I don't know.
8  Q.  Why wouldn't you know whether or not that would
9      constitute sexual harassment?  What is your difficulty
10     there?
11 A.  I would have to understand the circumstances.
12 Q.  To sniff a coworker without their permission, what
13     about that?  Is that enough circumstance for you in
14     order for you to give an answer, an opinion as to
15     whether or not that would constitute harassment?
16 A.  No.
17 Q.  That's not enough?
18 A.  No.
19 Q.  So that wouldn't constitute sexual harassment, so far
20     as you're concerned, non consensual sniffing of a
21     coworker?
22 A.  Maybe.
23 Q.  Female coworker?
24 A.  I don't know.
25 Q.  Sir, you said maybe, I don't know.  Is your answer you

12  (Pages 45 to 48)

Detective Brent Chisolm
February 21, 2018

---

## Page 49

1   don't know?
2       MR. ACHO:  You're asking him to speculate,
3   sir.
4   BY MR. MUNGO:
5   Q.  Is your answer you don't know?
6   A.  I don't know the context.
7   Q.  All right. Well, I just want to make sure your answer
8   is you don't know, correct?
9   A.  Yes.
10  Q.  Okay. Thank you. Have you received any diversity
11  training, sir?
12  A.  Yes.
13  Q.  Since being with the Warren Police Department?
14  A.  Yes.
15  Q.  And when did you receive that diversity training?
16  A.  Normally at the beginning of the year we have annual
17  training.  I've received it during those time periods.
18  Q.  Okay. And who provided the training on diversity, sir?
19  A.  I don't remember.
20  Q.  Any of the occasions?
21  A.  There was a chaplain that maybe associated with the
22  Eastpointe Police Department that I remember that stuck
23  out in my mind.
24  Q.  Okay. And when was that?
25  A.  I don't remember.

## Page 50

1   Q.  You don't remember whether or not it was five years
2   ago, one year ago, ten years ago?
3   A.  No, I don't remember exactly when it was.
4   Q.  Okay.  So, therefore, you also don't remember what you
5   were trained in on diversity, correct?
6   A.  I remember the general idea. I remember the basic
7   outlines of the training.
8   Q.  What did this gentleman train you in?
9   A.  That any type of harassment, or any type of things like
10  that are against the law, against our policies. He
11  taught us about diversity.
12      MR. ACHO:  Do you want to go off the record?
13      MR. MUNGO:  No. Hold on a second.  Go ahead.
14  Can you read back his answer, please. My question, and
15  then his answer.
16      (Requested portion of the record was read
17      back 11:05 a.m.)
18      "QUESTION: What did this gentleman train you in?
19      "ANSWER:  That any type of harassment, or any
20      type of things like that are against the law,
21      against our policies. He taught us about
22      diversity."
23  BY MR. MUNGO:
24  Q.  So what is your understanding of diversity, sir?
25  A.  Diversity means that people come from different

## Page 51

1   backgrounds.  They have different beliefs, and ideas,
2   and identities.
3   Q.  Okay.  What about diversity in the workplace?
4   A.  I don't know what you mean.
5   Q.  What is your understanding of diversity in the
6   workplace?  What is your understanding of what that
7   means, how it would be manifested?
8   A.  I don't know what you're asking.
9   Q.  Okay.  Do you know what the word manifested means?
10  A.  Generally.
11  Q.  Okay. All right. So can you identify any diversity in
12  the Warren Police Department?
13  A.  Yes.
14  Q.  How?  Do that for the record, please.
15  A.  We have people from all different types of backgrounds
16  that I've worked with at the Warren Police Department.
17  Several females that I've worked with.
18  Q.  White or black?
19  A.  I worked with Deshelia, and then white females.
20  There's Asian people that I've worked with.
21  Q.  How many African-Americans work for the Warren Police
22  Department?
23  A.  Currently there's one.
24  Q.  Okay.  And how many have you ever experienced working
25  for the Warren Police Department since you've been

## Page 52

1   here?
2   A.  Deshelia Howlett, and then Officer Watkins, so two
3   total.
4   Q.  And how many years have you been working for the Warren
5   Police Department?
6   A.  Between 10 and 11.
7   Q.  Do you consider that that's adequate diversity with
8   regard to the presence of African-Americans in the
9   Warren Police Department?
10  A.  I don't know.
11  Q.  Why wouldn't you know that?
12  A.  I don't work in hiring, and I don't work in personnel.
13  I don't know what the applicant pool is. I don't know.
14  Q.  You just said that you understood what diversity meant,
15  right?
16  A.  Yes.
17  Q.  But you wouldn't understand what it meant in terms of a
18  having a diverse department with regards to adequate
19  presence of African-Americans working?
20  A.  Was that a question?  I didn't follow again. When you
21  go really long, it's hard for me to follow your
22  question.
23  Q.  I'll do the best I can. Okay. Do you know whether or
24  not, or is your opinion -- strike that. Is it your
25  opinion that two African-Americans working for the

13 (Pages 49 to 52)

Detective Brent Chisolm
February 21, 2018

## Page 53

1    Warren Police Department since you've been employed at
2    the Warren Police Department is adequate diversity with
3    regard to the presence of African-Americans?
4    A.  I don't know.
5    Q.  Now, the reason you don't know that is because you
6    don't understand that portion of diversity, the
7    definition of diversity?
8    A.  No.
9    Q.  Why then wouldn't you know whether or not lack of the
10   presence of African-Americans in the Warren Police
11   Department would not constitute a diverse department?
12   A.  I'm not in the hiring process. I don't take the
13   applicants. I don't know what the applicant pool is.
14   Q.  So you're not responsible for hiring?
15   A.  Correct.
16   Q.  But you are conscious about what's going on around you,
17   correct?
18   A.  Yes.
19   Q.  Okay. And, in fact, it's part of your job to be
20   conscious of what's going on around you, correct?
21   A.  Yes.
22   Q.  And do you have any personal concern that there are
23   no -- there's only one African-American police officer
24   working with the Warren Police Department?
25   A.  I don't know. I haven't thought about it.

## Page 54

1    Q.  You haven't?
2    A.  No.
3    Q.  Is that because you don't care, or because you're not
4    just aware that that's the case?
5    A.  I just haven't thought about it.
6    Q.  Well, were you aware that was the case?
7    A.  Yes.
8    Q.  And you just ignored it?
9    A.  No. I just hadn't thought about it.
10   Q.  What's the difference between having thought about it
11   and ignoring it? Is there a difference there?
12   A.  I don't know.
13   Q.  You can't answer that question?
14   A.  I don't know.
15   Q.  You don't know if you can answer the question, or you
16   can't answer the question, sir?
17   A.  I haven't thought about it.
18   Q.  You said that already.
19       MR. ACHO: He has said that already because
20   he's asked and answered this question several times.
21   You can't get blood out of a stone. He doesn't know.
22   BY MR. MUNGO:
23   Q.  Okay. So, sir, there's a requirement that your answer
24   is responsive, okay?
25       MR. ACHO: Can you please provide Mr. Mungo

## Page 55

1    an answer for a fourth time.
2    BY MR. MUNGO:
3    Q.  In federal court, that is required. And I'm willing to
4    accept your answer, sir. I just need one. That's all.
5    And if you want to add anything to it, feel free to do
6    that, too, okay? I just simply want to know is I asked
7    you the question whether or not you haven't thought
8    about it and ignoring, is there a difference between
9    the two, and you said that you don't know. And I asked
10   you whether or not is it that you don't know, or is it
11   that you can't answer the question, or you just don't
12   know?
13   A.  I don't know. I haven't -- I don't know.
14   Q.  Is that the way you want to leave your record on that
15   question, sir?
16   A.  Yes.
17   Q.  Okay. If you have anything to add to that later, let me
18   know, okay? Do you know what the African-American
19   population is in the City of Warren?
20   A.  I've heard estimates, but I don't know for certain.
21   Q.  What have you heard?
22   A.  Ten percent.
23   Q.  Ten percent. Do you think that the Warren Police
24   Department reflects the African-American population in
25   terms of its employment of African-Americans?

## Page 56

1    A.  I don't know the applicant pool. I'm not in hiring.
2    Q.  You know that wasn't what I asked you, correct?
3        MR. ACHO: He was responsive.
4        MR. MUNGO: Do you want her to ask the
5    question again?
6        MR. ACHO: Would you, please.
7        MR. MUNGO: Read the question back.
8        MR. ACHO: For the record, you have asked
9    him this about 10 minutes ago, and he answered it.
10       MR. MUNGO: About the number of
11   African-Americans?
12       MR. ACHO: Yes. And he told you he doesn't
13   know the applicant pool. Those are his exact words.
14       MR. MUNGO: I didn't ask him about the
15   applicant pool.
16       MR. ACHO: He's not privy to it.
17       MR. MUNGO: Go ahead, ma'am. Read the
18   question back to him.
19       (Requested portion of the record was read
20       back 11:13 a.m.)
21   "QUESTION: Do you think that the Warren Police
22   Department reflects the African-American
23   population in terms of its employment of
24   African-Americans?"
25   BY MR. MUNGO:

Carroll Court Reporting
586-468-2411

Detective Brent Chisolm
February 21, 2018

## Page 57

1    Q.  Answer the question, please.
2    A.  I don't know. I don't know about the applicant pool.
3    Q.  Okay. Now, you realize that this has nothing to do with
4        the applicant pool, or don't you understand that?
5    A.  No, I think you're presupposing something. I think when
6        you look at it, you have to look at the applicant pool,
7        and I'm not privy to who applies to be a police
8        officer.
9    Q.  Okay. Do you believe it's appropriate for the Warren
10       Police Department to employ at least 10 percent to
11       reflect the African-American population within the
12       city?  In other words, that 10 percent of the Warren
13       Police Department should be African-American?  Do you
14       believe that's reasonable and appropriate?
15   A.  I don't know.
16   Q.  Okay. Is that because you don't understand what
17       diversity is, or is there some other reason that you
18       don't know?
19   A.  I don't know the applicant pool. I don't know who
20       applies to be a police officer.
21   Q.  Okay. Is that the way you want to answer this question,
22       for the record?
23   A.  Yes.
24           MR. ACHO:  If it wasn't, he wouldn't have
25       answered it. You're being very argumentative with him.

## Page 58

1    BY MR. MUNGO:
2    Q.  All right. So would you expect and/or support that 10
3        percent of the Warren Police Department be
4        African-Americans?
5    A.  I don't know.
6    Q.  Okay. Do you think it would be good to have 10 percent
7        of the Warren Police Department African-Americans?
8    A.  I'm not in hiring. I don't know what the applicant pool
9        is.
10   Q.  In your opinion, do you think that would be good or not
11       good?
12   A.  I think any qualified person could be a police officer,
13       could be hired by the police department.
14   Q.  Okay. So are you saying yes to my question, or no to my
15       question?
16   A.  I don't think it's a yes or no.
17           MR. ACHO:  He's not answering it yes or no.
18   BY MR. MUNGO:
19   Q.  So do you believe that there are enough
20       African-Americans that are qualified to constitute 10
21       percent of the police department of the City of Warren?
22           MR. ACHO:  Objection. Speculation. There's
23       no possible way he could know that.
24   BY MR. MUNGO:
25   Q.  He can't testify for you.

## Page 59

1    A.  I understand.
2    Q.  You're under oath.  Answer the question, please.
3    A.  I am not privy to the applicant pool. I don't know who
4        applies to be a police officer here, so I don't know.
5    Q.  I asked do you believe that African-Americans are
6        capable of passing the test?
7           MR. ACHO:  That's not what you asked him.
8        This is a different question entirely.
9    BY MR. MUNGO:
10   Q.  You have to answer.  You have to listen to my question,
11       and answer my question at all times, okay?
12   A.  Okay.
13   Q.  Do you believe that African-Americans are capable of
14       passing the test and background check to became police
15       officers in the City of Warren?
16   A.  Yes.
17   Q.  You believe they're capable of it?
18   A.  Yes.
19   Q.  Do you believe that the City of Warren is exercising
20       diligent efforts enough to recruit African-Americans?
21   A.  I don't know.
22   Q.  You don't know. Is that something you care about?
23   A.  It's not something — since I'm not in hiring, and I
24       don't control that, I don't think about that.
25   Q.  Okay. My question is do you care about that?

## Page 60

1           MR. ACHO:  He answered your question. Asked
2        and answered.  Don't answer it again. You keep asking
3        the same questions because you don't get the answers
4        you want.
5           MR. MUNGO:  That's not responsive.
6           MR. ACHO:  It is responsive.
7           MR. MUNGO:  And you're directing him not to
8        answer?  You just directed him not to answer the
9        question?
10          MR. ACHO:  I'm going to let you answer it one
11       more time. Answer it one last time.
12   BY MR. MUNGO:
13   Q.  Do you care whether or not Warren is exercising
14       diligence to recruit African-Americans?
15   A.  I'm not part of the hiring process.
16   Q.  I didn't ask you if you were part of the hiring
17       process, did I?  I asked you do you care whether or not
18       diligence is being exercised to hire African-Americans?
19   A.  Yes, it should be.
20   Q.  Okay. Thank you.
21          MR. ACHO:  Do you have much more?  Because
22       I'm going to need a restroom break, if you don't mind.
23          MR. MUNGO:  Do you need to do it now?
24          MR. ACHO:  Are you going to use all the same
25       exhibits from yesterday?

Carroll Court Reporting
586-468-2411

Detective Brent Chisolm
February 21, 2018

| Page 61 | Page 63 |
|---|---|
| 1       MR. MUNGO: Yes. | 1  A. I don't remember. |
| 2       MR. ACHO:  So you probably have another half | 2  Q. Okay. So would it be fair to say that your knowledge of |
| 3  hour to go. | 3     diversity is minimal? |
| 4       MR. MUNGO:  Let's see. Let's see. I'm going | 4  A. No. |
| 5  to take a five minute break. | 5  Q. No?  You have a vast knowledge of diversity? |
| 6       MR. ACHO:  Go ahead. | 6  A. No. |
| 7       (Break at 11:18 a.m.) | 7  Q. Well, how would you rate your knowledge of diversity, |
| 8       (Back on the record at 11:24 a.m.) | 8     five being kind of 50 percent, 10 being 100 percent, |
| 9  BY MR. MUNGO: | 9     one, two? |
| 10  Q. Back on the record. So, Dt. Chisolm, we were talking | 10  A. I've never thought about it in that context. |
| 11     about your having received diversity training. | 11  Q. Well, try to think about it like that today, unless you |
| 12  A. Yes. | 12     have another way of quantifying or giving us some idea |
| 13  Q. And do you have any other information to disclose for | 13     of how rich your knowledge of diversity is? |
| 14     the record as to any additional diversity training that | 14  A. I think I have a normal amount of diversity. |
| 15     you've ever had since being a police officer with the | 15  Q. What's normal? |
| 16     City of Warren Police Department other than what you've | 16  A. A normal. |
| 17     put in the record already? | 17  Q. On that scale I just gave you. |
| 18  A. There is more diversity training. I believe we have it | 18  A. I don't think I would assign it a number. |
| 19     every year. I'm not sure. But that's the one that stuck | 19  Q. So you don't have any way of quantifying it or giving |
| 20     out more in my mind when you asked me about it. | 20     us any idea of your level of knowledge of diversity, |
| 21  Q. Just the one training? | 21     for the record, other than what you've told us already? |
| 22  A. Yes. | 22  A. Not on the scale that you provided. |
| 23  Q. That was when you first came on as a police officer? | 23  Q. On any scale, sir, other than what you've put in the |
| 24  A. No. | 24     record, do you have any way of describing how rich your |
| 25  Q. That was when? | 25     knowledge is of diversity? |

| Page 62 | Page 64 |
|---|---|
| 1  A. Later on. | 1  A. I think it comes from general life experience and |
| 2  Q. Later on how long? | 2     interactions with people. |
| 3  A. I don't remember exactly the year the training was. | 3  Q. Anything else? |
| 4  Q. But it was only one more, one.  It was only one, right? | 4  A. I think that forms the foundation. So I don't think you |
| 5  A. That I recall from memory while I'm here talking to | 5     can quantify knowledge like that in a number. |
| 6     you. | 6  Q. Any other information that would help us understand how |
| 7  Q. Having diversity training? | 7     much information or knowledge you have about diversity |
| 8  A. Yes. | 8     other than what you've put in the record?  If you don't |
| 9  Q. Okay.  I just want to make sure we're on the same page | 9     have anything, we'll move on. |
| 10     with the subject, okay?  All right. So you only recall | 10  A. I mean, it's the general orders.  The things I've |
| 11     having diversity training once since being with the | 11     learned in classes when I went to college. Just normal |
| 12     Warren Police Department? | 12     everyday life. |
| 13  A. I recall that there have been other diversity | 13  Q. I'm talking about since you've been with the Warren |
| 14     trainings, but specifically I remember that one. | 14     Police Department. |
| 15  Q. Specifically you remember that one. So you have no | 15  A. Diversity is something that we're supposed to do |
| 16     recollection of the others? | 16     everyday in everyday life, so I don't think you can |
| 17  A. I remember having the training. I don't remember what | 17     quantify it with a number. |
| 18     was said specifically. | 18  Q. I'm talking about your understanding of what diversity |
| 19  Q. Okay.  So you had other training, but you don't | 19     is.  That's what we're talking about. |
| 20     remember when you had it, or what was taught, correct? | 20  A. Okay. I don't think you can quantify it with a number. |
| 21  A. Yes. | 21  Q. I didn't ask you that. |
| 22  Q. Okay. So you can't provide any testimony on when you | 22  A. Okay. |
| 23     had it, what was taught in those classes, correct? | 23  Q. Do you have any other information other than what you |
| 24  A. Correct. | 24     put in the record, sir, to provide us with any |
| 25  Q. Okay. Or who conducted the classes, correct? | 25     information as to how in depth your knowledge of |

16 (Pages 61 to 64)

Detective Brent Chisolm
February 21, 2018

Page 65

1  diversity is other than what you've testified to?
2          MR. ACHO:  I'm going to object at this
3  point.  This man is not here about diversity.  He's not
4  in a hiring capacity.  He's not the diversity director.
5  I know you know the diversity director, or the former
6  diversity director.  This entire line of questioning
7  really is inappropriate, and I've let it go on for
8  about 15 minutes.  Please make this your last question
9  regarding diversity.  This man is a detective.  He is not
10  qualified to render an opinion as to diversity.  He's
11  not here for that purpose.
12  BY MR. MUNGO:
13  Q.  Do you remember the question, sir?  She can read it
14  back if you don't.
15  A.  I don't know is the answer.
16  Q.  Thank you.  Okay.
17          MARKED BY THE REPORTER:
18          DEPOSITION EXHIBIT 2
19          Rules of Conduct - General Order
20          11:29 a.m.
21  BY MR. ACHO:
22  Q.  What is that document, sir?
23  A.  Rules of conduct.
24  Q.  Rules of conduct, and it's effective date is what?
25  A.  22 January 2003.

Page 66

1  Q.  Okay.  Have you ever seen that document before?
2  A.  Yes.
3  Q.  Have you been trained in that document?
4  A.  Yes.
5  Q.  Or the contents of that document?
6  A.  Yes.
7  Q.  And when?
8  A.  When I was first hired as a police officer.
9  Q.  Any since then?
10  A.  Again, this may have been one of the general orders
11  that I had to review to promote to detective.  I don't
12  remember.  But I've seen it before.
13  Q.  So your answer to my question is you don't know,
14  correct?
15  A.  I saw it when I was first hired, and I don't know if
16  I've seen it since then.
17  Q.  Thank you, sir.
18          MARKED BY THE REPORTER:
19          DEPOSITION EXHIBIT 3
20          Discipline - Shawn Johnson
21          11:30 a.m.
22  BY MR. MUNGO:
23  Q.  Let the record reflect we are showing the defendant
24  Deposition Exhibit Number 3.  Take a look at that, sir.
25  You tell me if you're able to identify the content.  You

Page 67

1  may not have ever seen the document before.  And if you
2  have, let me know that.  But if not, I want to know if
3  you're familiar with the content of that document.
4          MR. ACHO:  While Dt. Chisolm is reading,
5  I'll just place a standing objection, so I don't have
6  to object multiple times.  This document is not
7  something to which Dt. Chisolm is privy, so any
8  questions regarding the discipline of Shawn Johnson and
9  this document are not only irrelevant, but call for
10  speculation, and he does not have personal knowledge to
11  testify to this.
12  A.  Do you want me to go through the whole document, sir?
13  BY MR. MUNGO:
14  Q.  You can just skim it.  Once you figure out that you have
15  the gist of what the document is addressing, that's
16  sufficient, okay?  Can you determine right now what the
17  document addresses?
18  A.  Dt. Howlett being racially harassed by Dt. Johnson.  Is
19  that sufficient to proceed?
20  Q.  I think it might be, detective, because you're
21  knowledgeable that this incident took place, and that
22  there was an investigation, and that ultimately Shawn
23  Johnson was disciplined for it, correct?  I mean, you
24  have knowledge directly or indirectly as to what I just
25  stated, correct?

Page 68

1  A.  The indirect knowledge that I have about this
2  particular incident is what Dt. Howlett told me.
3  Q.  Exactly.  So you are aware of the incident?
4  A.  Yes.
5  Q.  Okay.  Very good.  So what I want to do is take you to
6  the very bottom of those pages, sir, are little small
7  numbers.
8  A.  Bates.
9  Q.  Bates numbers.  You got it.  And I want to take you to
10  page five, sir.  Start at the top there.  Let me know
11  once you're there.
12  A.  Okay.  I'm there.
13  Q.  All right.  So if you notice, Dt. Chisolm, it is
14  itemized one through 10, and 10 goes into the top of
15  the page six.  And there are incidents here in which
16  Shawn Johnson had related, that item number one,
17  comparing Desheila Howlett to a gorilla, referencing
18  Gorilla Glue.  Did Ms. Howlett ever share that incident
19  with you?
20  A.  Yes.
21  Q.  And number two about her heating up leftovers, and
22  Shawn said, "What you got for lunch today - some
23  chicken and ribs?"  Did Ms. Howlett ever share that
24  with you?
25  A.  Yes.

17 (Pages 65 to 68)

Detective Brent Chisolm
February 21, 2018

## Page 69

1  Q.  That Shawn Johnson said that?

2  A.  Well —

3  Q.  I'm sorry. Go right ahead.

4  A.  No. She did not share that Shawn Johnson said that.

5  Q.  Okay. She said that someone else said that?

6  A.  Yes. Well, she said someone said that, but I don't

7     remember her attributing that specifically to Shawn

8     Johnson.

9  Q.  So your understanding is that someone else said that,

10    and not Shawn Johnson?

11  A.  No. My understanding is she was just complaining about

12     it, and I don't remember if she attributed that remark

13     to somebody. I don't remember exactly if she attributed

14     it to somebody, or attributed it to nobody.

15  Q.  Well, she said here, it says here, that I was heating

16     up leftovers for lunch which smelled like butter

17     garlic. Shawn said, "What you got for lunch today -

18     some chicken and ribs?" So you're saying that you

19     don't remember her saying Shawn said that. You just

20     remember her saying someone said; is that correct?

21  A.  Yes.

22  Q.  Okay. All right. So someone possibly other than Shawn

23     said that?

24  A.  Yes.

25  Q.  Okay. All right. Very good. Were there any other

## Page 70

1     African-Americans in the police department at that

2     time?

3  A.  No.

4  Q.  Okay. All were Caucasian other than Desheila?

5  A.  Gene Reid's Asian. We have Officer Rodriguez is

6     Hispanic. There are some others, but there are no other

7     African-Americans that work for the police department.

8  Q.  Okay. Okay. Very good. So other than maybe two or three

9     other racial minorities, everyone else was Caucasian?

10  A.  Yes.

11  Q.  Okay. And do you know the number of the police force in

12    the City of Warren? Does 250 sound about right to you,

13    somewhere in that ballpark?

14  A.  I think it's around 200.

15  Q.  It's about 200. And out of those, only one

16     African-American that you knew of, Desheila Howlett was

17     a police officer, and was the only African-American

18     police officer, correct?

19  A.  Yes.

20  Q.  Was that, by the way, a satisfactory state of affairs

21    to you, in your opinion?

22       MR. ACHO: You know what, I'm going to

23     object. You've asked him this question 10 different

24     times 10 different ways, Leonard. He's answered it

25     already. If I instruct him not to answer then, you

## Page 71

1     know, you're going to make a stink about it. But how

2     many times -- at what point does it become badgering or

3     harassing when you ask him the same question?

4  BY MR. MUNGO:

5  Q.  Okay. All right. Answer the question, sir.

6  A.  I didn't think about it.

7  Q.  Okay. Item number three, it says, "Shawn walked past my

8     disk which is directly behind his. Once he passed me,

9     he doubled back and leaned forward. I was sitting in

10    my chair with my back to him. He sniffed me. I heard

11    the sniffing sound. I said, 'thank God I showered this

12    morning.'" Did she ever share that occasion with you,

13    that incident with you?

14  A.  I don't remember that.

15  Q.  You don't remember her ever sharing that?

16  A.  Correct.

17  Q.  Did anyone ever share that with you, that incident with

18     you?

19  A.  No.

20  Q.  Number four it says, "On another occasion, he brushed

21     his hand across my head, touching my hair." Did she

22     ever share that with you?

23  A.  No.

24  Q.  "He asked me, why do all your people move to Atlanta,

25     do they not want to be around white people." Did she

## Page 72

1     ever share that with you?

2  A.  No.

3  Q.  Okay. What about item six? "He asked me on several

4     occasions what's up with all the ghetto names and the

5     spellings, i.e., Destinee, Honey Brown, or Bentley,

6     etc." Did she ever share that with you?

7  A.  I don't remember.

8  Q.  Okay. What about the one about the clothing, generally

9     color coordinated. He announces almost daily

10    Desheila's color choice for the day, and in a black

11    voice, or comments on how the matching theme is a black

12    thing. Did she ever mention that to you?

13  A.  No.

14  Q.  Okay. What about the item eight, the dog under her

15    bed. She tried to move, and he bit her. And Shawn said

16    that -- she showed Shawn her hand. He said he likes to

17    be under there cause of all the action that's going on.

18    Did she ever share that with you?

19  A.  No.

20  Q.  Do you consider that a form of sexual harassment if, in

21    fact, it did happen? I know you said you didn't hear

22    this, or she never shared that with you. But if that

23    did occur, would you consider that a form of sexual

24    harassment of Shawn against Desheila Howlett?

25  A.  Maybe.

18  (Pages 69 to 72)

Detective Brent Chisolm
February 21, 2018

## Page 73

1   Q.   Maybe. Okay. And then number nine, every time he comes
2        back from training or an extended leave, he basically
3        thinks that Desheila stole something from him, or took
4        something from him. Did she ever share that with you?
5   A.   No.
6   Q.   And then Barb was on vacation. The front door was
7        unlocked, should be unlocked by 07:30 hours. And she
8        started to work at 09:00 hours, and was unlocking the
9        door, and Shawn commented, "They're just going to make
10       you a slave around here." Did Ms. Howlett ever share
11       that with you?
12  A.   No.
13  Q.   Do you consider those items that we have covered that
14       Ms. Howlett did share with you, do you consider those
15       statements made, if they were made, to be a form of
16       racial harassment?
17  A.   Yes.
18  Q.   Okay. And you're saying that -- okay. I want you to
19       take a look at page 17, sir. I want you to read that
20       paragraph there, please, and tell me whether or not it
21       is your understanding that that paragraph does state
22       that the investigation concluded that Dt. Shawn Johnson
23       did racially harass Dt. Howlett?
24  A.   What was the question?
25  Q.   Yeah. Whether or not your conclusion from reading that

## Page 74

1        is that there was a determination by the department
2        that Dt. Shawn Johnson did, in fact, racially harass
3        Desheila Howlett?
4   A.   Yes.
5   Q.   Okay. You did read that already?
6   A.   Yes.
7   Q.   And that is your understanding?
8   A.   Yes.
9   Q.   Do you have any reason to believe that that should not
10       have been sustained as racial harassment against
11       Desheila Howlett?
12  A.   Against Shawn Johnson?
13  Q.   I'm sorry. I'm sorry. Thank you, sir. Do you have any
14       reason to believe that the finding that Shawn Johnson
15       did racially harass Desheila Howlett would be -- strike
16       that. Let's do it over again.
17            Do you have any reason to believe that what
18       you just read on page --
19            MR. ACHO: 17.
20  BY MR. MUNGO:
21  Q.   Page 17, sir, where it was concluded that Shawn Johnson
22       did, in fact, racially harass Desheila Howlett was not
23       an accurate finding?
24            MR. ACHO: I would object as to a lack of
25       personal knowledge and standing. The document speaks

## Page 75

1        for itself. A document, by the way, which he did not
2        author or prepare.
3            MR. MUNGO: He's not testifying.
4            MR. ACHO: I know he's not testifying.
5   BY MR. MUNGO:
6   Q.   Okay. So do you have any reason to believe that that is
7        not an accurate finding?
8   A.   I don't have any information that would lead me to
9        believe that.
10  Q.   Thank you, sir. All right. Do you know who Gregory
11       Murray is?
12  A.   Yes.
13  Q.   Who is he?
14  A.   He was the diversity coordinator or director.
15  Q.   How did you come to learn that?
16  A.   I'm not sure. I don't remember.
17  Q.   Okay. All right. Did you ever receive any information
18       from your supervisors regarding the work that Gregory
19       Murray was doing with the Warren Police Department as a
20       diversity coordinator?
21  A.   I don't know.
22  Q.   Okay. Did you ever receive any memos or any
23       instructions from the police department or your
24       supervisors regarding diversity work that Gregory
25       Murray was engaged in for the Warren Police Department?

## Page 76

1   A.   I don't know.
2   Q.   Okay. Now, when you say you don't know, that basically
3        means not that you recall?
4   A.   Right.
5   Q.   Or that you did not?
6   A.   I don't know. I don't know if I received it or not. I
7        don't know if the supervisor sent it.
8   Q.   Got it. So nothing comes to your memory that you did,
9        in fact, receive the information, correct?
10  A.   Yes.
11  Q.   Okay. Got it. Okay. Are you familiar with the Barbara
12       Beyer incident with Desheila Howlett?
13  A.   From what Desheila told me.
14  Q.   What did Desheila tell you?
15  A.   Barb Beyer, she's a secretary that works for the police
16       department, and she was having an issue with somebody
17       trying -- at the counter for some reason. And that Barb
18       said something to Desheila with the N word.
19  Q.   What was Ms. Beyer's race? What is her race?
20  A.   White.
21  Q.   Okay. And she used the N word?
22  A.   Yes.
23  Q.   And just for the record, I'm going to say it, okay, and
24       only for that purpose, because we have people that will
25       need to know for certain what we're talking about.

19 (Pages 73 to 76)

Detective Brent Chisolm
February 21, 2018

Page 77

1      MR. ACHO: I would object that you don't
2  need to use the word. It's inflammatory. Everybody on
3  the planet knows what the N word is.
4  BY MR. MUNGO:
5  Q. She used the word nigger, correct?
6  A. Yes.
7  Q. And how did Desheila Howlett articulate to you that
8  Ms. Barb Beyer used that word?
9  A. In a complaint about the person that was at the
10  counter.
11  Q. Okay.
12  A. In some kind of rant is what Desheila Howlett told me.
13  Q. And did Desheila Howlett tell you that she used that
14  word repeatedly?
15  A. Yes.
16  Q. Okay. All right. And did Desheila explain to you she
17  was disturbed by that incident?
18  A. Yes.
19  Q. Okay. How did Desheila explain to you that she was
20  disturbed?
21  A. She was upset by it. She was upset in how she related
22  it to me, how she told me it.
23  Q. Okay. All right. Do you believe that if Mr. Murray,
24  Gregory Murray, had aggressively pursued diversity work
25  for the City of Warren Police Department, and other

Page 78

1  governmental units, and I'm asking your opinion about, do
2  you believe had he aggressively pursued diversity work
3  and initiatives within the city government, that the
4  white citizens would have given the mayor a backlash
5  for doing so?
6  A. I don't know. I don't know the answer to that question.
7  Q. Okay. Do you believe that there is any racism being
8  practiced and was being practiced at the time
9  Ms. Howlett was employed? Do you believe there was any
10  racism being practiced in the Warren Police Department?
11  A. You brought up the two examples that I know about.
12  Other than that, no.
13      MR. MUNGO: Okay. I don't think I have
14  anything further at this time.
15      EXAMINATION
16  BY MR. ACHO:
17  Q. Describe Desheila Howlett as a police officer in terms
18  of a scale of one to 10 like Mr. Mungo used.
19  A. I don't like to use scales but --
20  Q. You don't have to use scales.
21      MR. MUNGO: Thank you for being an equal
22  opportunity witness.
23  BY MR. ACHO:
24  Q. Just describe it.
25  A. In working with her, she was a substandard police

Page 79

1  officer in her report writing abilities. We work hand
2  in hand with people a lot.
3  Q. She couldn't write a report on her own, could she?
4  A. She had difficulties writing concise reports on her
5  own, and deciding which actions to take in cases. She
6  would usually talk about her cases from start to
7  finish, and then ask what do you think I should do?
8  What should I do? I have my own cases to worry about,
9  and I would try to guide her when I can, but those
10  things as a police officer is to try to interact -- try
11  to be able to make decisions on cases like that, and to
12  determine the proper course of action.
13  Q. It's possible that you probably had the greatest amount
14  of experience in working with her out of any police
15  officer here, is that fair to say, given all the runs
16  that you went on?
17  A. Yes.
18  Q. And you would describe her as a substandard police
19  officer?
20  A. Yes.
21      MR. ACHO: Okay. I have nothing further.
22      RE-EXAMINATION
23  BY MR. MUNGO:
24  Q. Okay. So are you aware of what her performance
25  evaluations were?

Page 80

1  A. No. Not at all.
2  Q. Okay.
3  A. I don't believe we have performance evaluations.
4  Q. So you are never evaluated with regard to your
5  performance as a police officer at the Warren Police
6  Department?
7  A. We don't have performance evaluations. I'd say that our
8  performance is continually evaluated, but I've never
9  had an evaluation like a document that is filled out.
10  Q. Okay. But you are evaluated?
11  A. In general, yes.
12  Q. In general. And do you have any reason to believe that
13  Desheila Howlett was not evaluated in her work?
14  A. Do I have -- double negative. Do I have any reason to
15  that believe that Desheila Howlett has not been -- can
16  you say it again?
17  Q. Do you have any reason to believe that Desheila Howlett
18  was not evaluated as a police officer while at the
19  Warren Police Department?
20  A. I don't know that. I don't know what you're asking.
21  Q. All right. So was Desheila Howlett ever evaluated with
22  regard to her performance as a police officer?
23  A. I don't know.
24      MR. ACHO: I would object as to speculation.
25  Lack of personal knowledge.

20 (Pages 77 to 80)

Detective Brent Chisolm
February 21, 2018

| Page 81 |
| --- |

BY MR. MUNGO:

1   Q.   Okay. So you have no idea whether or not her report
2       writing was considered adequate by her supervisor, do
3       you?
4   A.   She told me one time she had to go to report writing
5       training. But I never talked to any of her supervisors,
6       or anything like that.
7   Q.   So your answer is that you don't know how her
8       supervisors evaluated her report writing?
9   A.   Other than she went to report writing training.
10  Q.   No. That wasn't my question about whether she went to
11      report writing training.
12         MR. ACHO:  No, that is his answer.
13  BY MR. MUNGO:
14  Q.   My question was do you have any information as to how
15      her supervisors evaluated her report writing?
16  A.   The information that I have is that she told me she had
17      to go to a report writing class. That's what I have.
18  Q.   Did she tell you her supervisor sent her there?
19  A.   I don't remember.
20  Q.   So you don't know how her supervisors evaluated her
21      writing, do you?
22  A.   No.
23  Q.   Thank you. And insofar as her indecisiveness, did her
24      supervisor ever share with you that she was indecisive

| Page 82 |
| --- |

1       about, or wasn't able to make decisions?
2   A.   No.
3   Q.   Well, you have to let me finish my question, sir.
4   A.   Sure.
5   Q.   Did you ever come across any knowledge, any information
6       that her supervisors considered her incapable of making
7       decisions regarding her cases?
8   A.   No.
9   Q.   Okay. Have you ever had to attend any training for
10      anything, or were you just okay in every area of your
11      performance as a police officer?
12  A.   I've had to attend mandatory annual training. I've
13      attended optional training that we put in for. So I've
14      attended a lot of training during my time as a police
15      officer.
16  Q.   So you've elected to do training?
17  A.   Yes.
18  Q.   Okay. And do you know whether or not Desheila Howlett
19      had elected to attend report writing training?
20  A.   I don't know.
21  Q.   So you have no clue whether or not she elected to do
22      it, or whether she was forced to do it?
23  A.   Correct.
24  Q.   Okay. All right. So why would you make a point about
25      her report writing? Well, let me strike that. How

| Page 83 |
| --- |

1       would you compare her electing and attending report
2       writing versus the training that you elected to attend?
3       What would be the difference?
4   A.   Report writing is perhaps a more basic skill than other
5       training that I've attended.
6   Q.   Okay. But still you needed assistance in that area.
7       You needed to develop further in the area that you
8       elected to get training in, correct?
9   A.   Yes.
10  Q.   Okay. Is there a difference between her needing to
11      develop in a particular area that you didn't need to
12      develop in, versus her not needing to develop in a
13      particular area that you needed to develop in?  Do you
14      see a difference there other than your race that you
15      would characterize her as being a poor, and you not
16      being poor?
17  A.   Can you reask the question?
18  Q.   Yeah. Were you poor in the areas you elected to -- was
19      your performance poor in the areas you elected to
20      attend training in?
21  A.   The trainings that I've elected to attend were more
22      advanced police type trainings that are not every day
23      type police activities. So that's why I would attend
24      those trainings to get those additional type skills.
25  Q.   So you were never deficient in any area of your

| Page 84 |
| --- |

1       performance as a police officer, right?
2   A.   No. I have, you know, made mistakes just like every
3       other police officer, I'm sure, and but I've never had
4       to go to a training, or anything like that, for some of
5       the basic police type training.
6   Q.   You never elected to go to the training?
7   A.   Right.
8   Q.   Okay. Because you thought that you didn't need it?
9   A.   Yes.
10  Q.   Okay. So do you consider yourself a superior in police
11      abilities and skills to Desheila Howlett?
12  A.   In comparison to Desheila?
13  Q.   Um-hmm.
14  A.   Yes.
15  Q.   Is that because of your gender or your race?
16  A.   No.
17         MR. ACHO:  Object to that.
18  BY MR. MUNGO:
19  Q.   What are you comparing that to?  Why would you draw
20      that conclusion, sir?  How are you comparing Ms.
21      Howlett to yourself?
22  A.   The ability to make decisive decisions in complex
23      situations. The ability to multitask and prioritize
24      cases. The ability to handle cases well. Eliciting
25      confessions from suspects through interrogations.

21 (Pages 81 to 84)

Detective Brent Chisolm
February 21, 2018

| Page 85 | Page 87 |
|---|---|

**Page 85**

1    Things like those measures.
2    Q. Okay. And who made those evaluations, her supervisor
3    or you?
4    A. No. You asked me why I consider my police skills
5    superior to Desheila, and that would be why, those
6    types of areas.
7    Q. So that's your evaluation of her?
8            MR. ACHO: And that's what you asked him
9    for, his evaluation.
10   A. Right.
11           MR. ACHO: Right?
12           MR. MUNGO: Put an objection on the record.
13           MR. ACHO: No, because you're being
14   argumentative.
15           MR. MUNGO: Tell me when you're done.
16           MR. ACHO: I'm done. Stop being
17   argumentative with him, please.
18           MR. MUNGO: All right. Read the question
19   back, please.
20           (Requested portion of the record was read
21   back 11:53 a.m.)
22           "QUESTION: So that's your evaluation of her?"
23   BY MR. MUNGO:
24   Q. Answer the question, please.
25   A. Yes.

**Page 86**

1    Q. Okay. Not her supervisors?
2    A. Correct.
3    Q. Okay.
4    A. I don't know what they think.
5    Q. So you perceive yourself as being superior to Desheila
6    Howlett as a police officer in skill, in the skill
7    area, correct?
8    A. Yes.
9    Q. Okay. And other than your personal evaluation of her
10   performance, the only difference between the two of you
11   is that she's a female, and she's black, and you are a
12   male and white, correct?
13           MR. ACHO: Object. That's mischaracterizing
14   his testimony. It's inflammatory. It's argumentative.
15   A. It's not even close to what I said.
16           MR. ACHO: Geez.
17   BY MR. MUNGO:
18   Q. But you are white, and she is black, correct?
19   A. Yes.
20   Q. And you are a male, and she is a female, correct?
21   A. Yes.
22   Q. Okay. And it's your opinion that you are superior in
23   skill as a police officer than Desheila Howlett,
24   correct?
25   A. Yes.

**Page 87**

1    Q. Okay. And you don't have the support of her supervisor
2    in that regard, correct?
3    A. I don't know if I do or not. I haven't asked the
4    supervisors to compare and contrast this.
5    Q. Would your answer to my question be, no, you don't have
6    it?
7    A. I don't know is the answer.
8    Q. You don't know if you have the support of her
9    supervisor in that opinion?
10   A. I don't know. I didn't talk to her supervisor about our
11   performance.
12   Q. So you don't have one then, do you? You don't have the
13   support, correct?
14   A. I don't know if I do or not.
15           MR. ACHO: He already answered that.
16   BY MR. MUNGO:
17   Q. Did you talk to him about it?
18   A. No.
19           MR. ACHO: He's answered the question.
20   BY MR. MUNGO:
21   Q. Then you don't have it. You couldn't have it if you
22   didn't talk to him about it.
23           MR. ACHO: You're testifying for him now,
24   counsel.
25   A. You're mischaracterizing what I'm trying to say.

**Page 88**

1    BY MR. MUNGO:
2    Q. So then the answer to my question is you don't know,
3    correct?
4    A. I don't even know what question you're asking me now.
5            MR. MUNGO: Read the question back. Read the
6    question back.
7            MR. ACHO: That was his answer, counsel.
8            (Requested portion of the record was read
9    back 11:55 a.m.)
10           "QUESTION: You don't know if you have the support
11   of her supervisor in that opinion?"
12   BY MR. MUNGO:
13   Q. Just answer the question, and whatever you give me I'll
14   take it and move on.
15   A. I don't know what my supervisors think of her versus
16   me.
17   Q. Okay. Was your supervisor the same as hers?
18   A. Yes. Well, for some period.
19   Q. Okay. All right.
20   A. We were on the same shift, and in the detective bureau
21   our supervisors were the same. There was a period
22   where we weren't on the same shift, so we had different
23   supervisors.
24   Q. But regardless, you have no clue of what their
25   evaluation of her performance is?

22 (Pages 85 to 88)

Detective Brent Chisolm
February 21, 2018

Page 89

1   MR. ACHO:  Asked and answered.
2   BY MR. MUNGO:
3   Q.   Correct?
4           MR. ACHO:  Five times.
5   A.   I don't know what their evaluation is.
6   BY MR. MUNGO:
7   Q.   Okay. Thank you. All right. So do you believe that
8       Desheila Howlett was racially harassed while she was a
9       police officer at the City of Warren Police Department?
10  A.   Based on the documents that you provided me with those
11      two people, yes.
12  Q.   Okay. But other than that, you don't see any racist
13      animus or attitudes toward Desheila Howlett as far as
14      your experience and recollection goes?
15  A.   Correct.
16  Q.   Okay. Okay. There are no racist attitudes in the Warren
17      Police Department, in your opinion?
18  A.   Correct.
19  Q.   Okay. Everybody there has embraced and accepted
20      African-Americans?
21  A.   Yes.
22          MR. MUNGO:  Okay. I have nothing further.
23          RE-EXAMINATION
24  BY MR. ACHO:
25  Q.   I have a question, and then my co-counsel, Ms.

Page 90

1       O'Donnell will have a question or two for you. Are you
2       aware that Desheila had been fired by two other police
3       departments?
4   A.   No.
5   Q.   She never shared that with you?
6   A.   She characterized leaving a police department before,
7       but she never told me she was fired.
8   Q.   So you --
9   A.   I'm sorry. I take that back. I do remember there were
10      two police departments.  She talked to me about Detroit
11      and another police department, suburban police
12      department, Royal Oak maybe. And she characterized
13      leaving those departments to me. That's what I
14      remember.
15  Q.   Is the general consensus or opinion in the City of
16      Warren Police Department that Desheila was a
17      substandard or even incompetent police officer?
18  A.   Yes.
19  Q.   Do you think it's because of her race or her gender?
20  A.   No.
21          MR. ACHO:  I believe Ms. O'Donnell has some
22      questions.
23          EXAMINATION
24  BY MS. RAE-O'DONNELL:
25  Q.   Just a question, sir.  Did Ms. Howlett ever bring any

Page 91

1       complaint to you that you felt that you should take to
2       management that she was being racially or sexually
3       discriminated against or harassed?
4   A.   No. She would tell me about things after the complaint
5       process.  After things had already happened, after she
6       had already told people about them.
7   Q.   Did you ever witness anything that occurred to Ms.
8       Howlett that you felt that you should take to
9       Ms. Howlett?  In other words, was she being
10      discriminated against on the basis of her race or sex?
11  A.   No.
12          MS. RAE-O'DONNELL:  Thank you.
13          MR. ACHO:  I think that's all.
14          RE-EXAMINATION
15  BY MR. MUNGO:
16  Q.   And it is not your testimony that Desheila Howlett was
17      not racially harassed in other ways while she was at
18      the Warren Police Department, correct?
19  A.   That double negative gets me every time.  Can you ask
20      it straight, ask the question straight to me?
21  Q.   Okay. So it is not your testimony --
22  A.   It is not my testimony.
23  Q.   In other words, you're not testifying that Desheila
24      Howlett was not discriminated against while she was at
25      the Warren Police Department, correct?  That is not

Page 92

1       what you're testifying here?
2   A.   The two examples you gave me were the examples of that.
3   Q.   Okay. So my question is outside of those two examples,
4       are you saying that no other discrimination occurred?
5   A.   Yes.
6   Q.   To Desheila Howlett while she was with the Warren
7       Police Department?
8   A.   To my knowledge, yes.
9   Q.   To your knowledge. Okay. So you can't exclude the
10      possibility they had occurred?
11          MR. ACHO:  Object as to speculation.
12  BY MR. MUNGO:
13  Q.   In other instances, correct?
14  A.   I don't know.
15          MR. MUNGO:  Very good. That's good enough.
16          RE-EXAMINATION
17  BY MR. ACHO:
18  Q.   So the two incidents that Mr. Mungo pointed out, Shawn
19      Johnson, Barb Beyer, are you aware that the City of
20      Warren Police Department took disciplinary action
21      immediately against both of those individuals for the
22      harassment?
23  A.   Yes.
24  Q.   Or discrimination?
25  A.   Yes.

23  (Pages 89 to 92)

Detective Brent Chisolm
February 21, 2018

Page 93

1  Q. And that's what you would have expected a police
2     department to do, correct?
3  A. Yes.
4              **RE-EXAMINATION**
5  BY MR. MUNGO:
6  Q. Are you aware of an instance with the fire department
7     where the lieutenant alleged that a Cuban was the
8     department nigger?
9  A. No.
10 Q. And you never heard that?
11 A. No.
12        MR. MUNGO: Okay. All right. I'm done.
13        MR. ACHO: I'm done, too. Thank you.
14        MARKED BY THE REPORTER:
15        DEPOSITION EXHIBIT 5
16        Affidavit of Gregory A. Murray
17        12:00 p.m.
18        MARKED BY THE REPORTER:
19        DEPOSITION EXHIBIT 6
20        Resignation Letter from Gregory A. Murray
21        12:00 p.m.
22        (The Deposition was concluded at 12:00 p.m.
23     Signature of the witness was not requested by
24     counsel for the respective parties hereto.)
25

Page 94

1         CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN  )
3             ) SS
4  COUNTY OF WAYNE   )
5
6         I, JOANNE MARIE BUGG, certify that this
7  deposition was taken before me on the date hereinbefore
8  set forth; that the foregoing questions and answers
9  were recorded by me stenographically and reduced to
10 computer transcription; that this is a true, full and
11 correct transcript of my stenographic notes so taken;
12 and that I am not related to, nor of counsel to, either
13 party nor interested in the event of this cause.
14
15
16
17
18
19
20  JOANNE MARIE BUGG, CSR-259?
21
22  Notary Public
23  Wayne County, Michigan
24  My Commission expires: 2-26-2019
25

24 (Pages 93 to 94)

Carroll Court Reporting
586-468-2411