# Exhibit 38

Paul Houtos, Jr.
May 14, 2018

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESHEILA C. HOWLETT,
    Plaintiff,
vs.    Civil No. 17-11260
    Hon. Terence G. Berg
    Mag. R. Steven Whalen
CITY OF WARREN; COMMISSIONER
JERE GREEN, acting in his individual
capacity; LT. LAWRENCE GARDNER;
SHAWN JOHNSON; DAWN MCLANE;
ANWAR KHAN; DARRIN LABIN;
WILLIAM ROSS; KEVIN BARNHILL;
PAUL HOUTOS; SCOTT TAYLOR,
    Defendants.
_____

    The Deposition of PAUL HOUTOS, JR.,
    Taken at 1 City Square, Fourth Floor,
    Warren, Michigan,
    Commencing at 11:36 a.m.,
    Monday, May 14, 2018,
    Before Maureen Collier, CSR-7422.

### Page 2

1  APPEARANCES
2
3  LEONARD MUNGO P43562
4  The Mungo Law Firm, P.L.C.
5  333 West Fort Street, Suite 1500
6  Detroit, Michigan 48226
7  (313) 963-0407
8  mungo16@msn.com
9      Appearing on behalf of the Plaintiff.
10
11 JAMES R. ACHO P62175
12 ELIZABETH RAE-O'DONNELL P41529
13 Cummings, McClorey, Davis & Acho, P.L.C.
14 17436 College Parkway
15 Livonia, Michigan 48152
16 (734) 261-2400
17 jacho@cmda-law.com
18     Appearing on behalf of the Defendants.

### Page 3

1  ETHAN VINSON P26608
2  City of Warren, City Attorney's Office
3  1 City Square, Suite 400
4  Warren, Michigan 48093
5  (586) 574-4671
6  evinson@cityofwarren.org
7      Appearing on behalf of the Defendants.
8
9  ALSO PRESENT:
10 Lieutenant Dan Bradley

### Page 4

TABLE OF CONTENTS

WITNESS                PAGE
PAUL HOUTOS, JR.

EXAMINATION BY MR. MUNGO:    5

    EXHIBITS

EXHIBIT                PAGE
(Previously marked exhibits attached to transcript.)

DEPOSITION EXHIBIT 1
(Discipline - Shawn Johnson)
DEPOSITION EXHIBIT 2
(Discipline - Barbara Beyer)
DEPOSITION EXHIBIT 3
(General Order - 10 January 2003)
DEPOSITION EXHIBIT 4
(General Order - 24 July 2017)

1 (Pages 1 to 4)

Paul Houtos, Jr.
May 14, 2018

**Page 5**

1  Warren, Michigan
2  Monday, May 14, 2018
3  11:36 a.m.
4
5           PAUL HOUTOS, JR.,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10           EXAMINATION
11 BY MR. MUNGO:
12 Q.  Good morning, sir.
13 A.  Good morning.
14 Q.  My name is Attorney Leonard Mungo. I represent
15     Ms. DeSheila Howlett in a civil rights lawsuit pending
16     against the City and certain others, and this
17     deposition will be used for all reasons allowed under
18     the court rules pertaining to this particular case.
19         I'm going to ask, sir, if you would,
20     please, to state your full legal name for the record
21     and then also spell it. Give us the correct spelling
22     of your name, please.
23 A.  Okay. It's Paul, P-A-U-L, Joseph, J-O-S-E-P-H,
24     Houtos, H-O-U-T-O-S, and I am a junior.
25 Q.  Okay. Very good. Mr. Houtos, how long have you been

**Page 6**

1  with the Warren Police Department?
2  A.  Warren, almost 16 years.
3  Q.  16 years. And what have your responsibilities been
4      since you've been with the Warren Police Department?
5  A.  I'd say work midnight patrol, detention. I was a
6      field training officer for a time there. I was
7      assigned to the criminal investigation bureau and
8      promoted to sergeant. I was a patrol supervisor, and
9      then also now I'm the supervisor in special victims
10     division.
11 Q.  Did you work with DeSheila Howlett?
12 A.  Yes. I worked with her, not directly on the same
13     shift or when she was in family investigation. But
14     yes, I -- we both work for the City.
15 Q.  But you never worked with her on any cases.
16 A.  I think we might have had one case somewhere early on
17     in her time as a corporal. There were some juvenile
18     suspects and some -- an adult suspect, so we kind of
19     co-officer in charge. I don't recall the case
20     specifically.
21 Q.  Would that have been the same period of time in which
22     Mr. Shawn Johnson was acting as her assistant in terms
23     of orienting her to the detective bureau?
24 A.  It would have been probably afterwards.
25 Q.  Okay. Well, what years were you working in the

**Page 7**

1  detective bureau?
2  A.  I promoted to corporal in September 2011, and I
3      promoted to sergeant in November of 2016.
4          I also, I left -- in August of 2016, I left
5      the criminal investigation bureau and went out to the
6      Macomb Auto Theft Squad. So I was out of the building
7      during that time period.
8  Q.  So you worked for the detective bureau between 2011?
9  A.  Yes.
10 Q.  Till?
11 A.  Until November 2016.
12 Q.  So you were there during the time at which the
13     allegations were made against Mr. Shawn Johnson on the
14     basis of racially harassing Ms. Howlett.
15 A.  I was there during that time period, yes.
16 Q.  What do you recall about that time period and those
17     incidents?
18 A.  I don't recall anything about the specific incidents
19     because I was not in the same office as them.
20 Q.  You say you were -- you were what?
21 A.  I was not in the same office as them.
22 Q.  Okay.
23 A.  They were in special victims. I was in criminal
24     investigation. So there's a little bit of a
25     separation.

**Page 8**

1          I don't know if you're familiar with the
2      building. So I don't know anything about the direct
3      allegations, only what I kind of heard through the
4      rumor mill.
5  Q.  What did you hear through the rumor mill?
6  A.  That he said some things that were inappropriate.
7  Q.  Such as?
8  A.  That I would say -- I know there was some comment
9      about Gorilla Glue used to fix a clock on her desk,
10     and that's really about all I know.
11 Q.  Okay.
12 A.  Or that I heard rumors of.
13 Q.  That you heard rumors of. Okay. Did you think that
14     that was a form of -- constitute a form of racial
15     harassment?
16 A.  Do I think that was a form of harassment? I don't
17     know if I would see it as harassment. I think it's
18     inappropriate if it was meant in a racial tone.
19 Q.  How so?
20 A.  Well, if he was saying it specifically to be, you
21     know, to offend her, then yeah, it's very
22     inappropriate. If he's giving her guidance on how to
23     fix a piece on her desk, then Gorilla Glue is a
24     product and -- if that's what he was saying.
25 Q.  How would you distinguish between the two?

Paul Houtos, Jr.
May 14, 2018

Page 9

1  A. I guess on the way that she -- I guess based on their
2     history and if, you know, she had told him in the past
3     that he shouldn't, you know, say comments like that.
4     Excuse me. My phone's buzzing. He shouldn't say
5     comments like that, then he shouldn't have said it.
6  Q. Okay. So I guess that really didn't answer my
7     question.
8  A. Can you repeat the question then?
9         MR. MUNGO: Go ahead. Read it back.
10        (The requested portion of the record was
11        read by the reporter at 11:41 a.m.)
12        THE WITNESS: On whether it was a racially
13    motivated comment or it was just a comment?
14 BY MR. MUNGO:
15 Q. How would you distinguish that it was racially
16    motivated?
17 A. I guess the intent of, from the person delivering the
18    message. That I don't know, what the intent was.
19 Q. Does there have to be intent to be inappropriate and
20    constitute racial harassment?
21 A. I think maybe there has to be someone who's offended
22    by the comment, too.
23 Q. There has to be someone who was offended --
24 A. Sure.
25 Q. -- by the comment. Okay. But on the component of it

Page 10

1     being -- constituting racial harassment, your answer,
2     if I understand it correctly, is that it would be
3     considered -- no matter how inappropriate it is, it
4     would be considered racial harassment only if the
5     person who was receiving the information or who was
6     the target or subject of the information would feel
7     harassed; correct?
8  A. I guess, you know, it's the way that the message was
9     received or the statement was received by the person
10    who heard it and how they took it to mean.
11 Q. Whether it was racially derogatory or not, it depends
12    upon how the person took it; correct?
13 A. Yes.
14 Q. Okay. I see. I see. So it's okay to use racially
15    derogatory language and comments as long as the person
16    who is the receiver of the racially derogatory
17    comments is not offended.
18 A. No, that's not at all the case. But again, in a
19    comment such as Gorilla Glue, which is a legitimate
20    product, if the person receiving that took offense by
21    it, then they should make it known that they're
22    offended by it. And, you know, see if it can be
23    remedied that way.
24 Q. So again, the question is -- I'm not talking
25    specifically about Gorilla Glue. I'm speaking to any

Page 11

1     racially demeaning and derogatory comments or words
2     being spoken to DeSheila Howlett. It's okay to do
3     that as long as DeSheila Howlett is not offended?
4         MR. ACHO: I'm going to object. Asked and
5     answered. He just answered you.
6         MR. MUNGO: No, he did not.
7         MR. ACHO: Yes, he did.
8         MR. MUNGO: Are you going to instruct him
9     not to answer?
10        MR. ACHO: I'm not going to instruct him
11    not to answer, but he answered your question.
12 BY MR. MUNGO:
13 Q. Answer my question, sir.
14        MR. ACHO: In fact, what he said
15    specifically was no, that is absolutely not the case.
16    Those were his words verbatim. She could read it back
17    to you.
18 BY MR. MUNGO:
19 Q. Okay. Answer the question, please.
20 A. Okay. Can I get the question repeated to me?
21        MR. MUNGO: Repeat the question.
22        (The requested portion of the record was
23        read by the reporter at 11:44 a.m.)
24        THE WITNESS: No, absolutely not.
25 BY MR. MUNGO:

Page 12

1  Q. Why not?
2  A. One, it lacks tact and is inappropriate in the
3     workplace.
4  Q. And do you think that should constitute racial
5     harassment?
6  A. I don't know. I don't know if that's for me to
7     decide.
8         I think the decision for me personally
9     would be on whether making the comment is appropriate
10    or not, and racial harassment is a decision made by
11    the courts or the lawyers.
12 Q. Well, I'm asking you, sir, your opinion. Do you think
13    doing that would be a form of racial harassment to
14    DeSheila Howlett?
15 A. Doing -- just any context that are demeaning or any --
16        MR. MUNGO: You want to read my question
17    back?
18        (The requested portion of the record was
19        read by the reporter at 11:45 a.m.)
20        THE WITNESS: Yes.
21 BY MR. MUNGO:
22 Q. Okay. Even though she's not offended.
23 A. I don't think racial harassment matters whether the
24    person is offended or not. It's either inappropriate
25    or it's appropriate.

3 (Pages 9 to 12)

Carroll Court Reporting and Video
586-468-2411

**Page 13**

1  Q. Okay. Have you ever heard any of your fellow
2     detectives or officers in the Warren Police Department
3     use racial derogatory terms or expressions toward
4     African Americans or regarding African Americans?
5  A. I have not.
6  Q. You've never ever heard anyone in the Warren Police
7     Department, no white officers ever use any racially
8     inappropriate or derogatory or demeaning comments or
9     words regarding African Americans?
10 A. No.
11 Q. Let the record reflect we're going to use the same
12    exhibits here. Let the record reflect I'm about to
13    show the deponent Deposition Exhibit Number 3.
14       Take a look at that document. Tell me if
15    you're able to -- if you recognize it.
16 A. It's the general order specifically saying that
17    discrimination and sexual harassment for the Warren
18    Police Department.
19 Q. Okay. Have you ever seen that document before?
20 A. I have.
21 Q. And on what occasion have you seen that document?
22 A. During my introduction, two weeks of in-house training
23    when I first came here.
24 Q. When you first came?
25 A. Came to the Warren Police Department, through my

**Page 14**

1     in-house training. And also throughout the years,
2     we've had training. I couldn't tell you exactly when,
3     but I've seen the document before.
4  Q. Well, I know you said that you saw it when you first
5     came in.
6        Do you need to get that? You can go ahead
7     and get that if you want.
8  A. No. I'm sorry. I'm just turning it off so it
9     wouldn't vibrate.
10 Q. Okay. I understand that you saw it when you first
11    came.
12 A. Yes.
13 Q. And your employment began with the Warren Police
14    Department. I got that. I want to know when else did
15    you see that document.
16 A. Like I said, throughout the years during different
17    training blocks.
18 Q. Throughout different training blocks.
19 A. Right.
20 Q. What kind of training blocks would you have occasion
21    to see that document?
22 A. During cultural training that we've had over the
23    years. Typically during a 40-hour training block, we
24    would have, you know, speakers from different
25    communities, whether it was African American. We've

**Page 15**

1     had Hmong trainers. We've had someone from the, I
2     believe the Arab American community. I'm trying to
3     think of some of the other groups that have come in
4     over the years. So that would be introduced as part
5     of that training.
6  Q. Okay. Do you remember that particular document being
7     used in conjunction with the diversity training that
8     you just described?
9  A. I do. Like I said, I couldn't tell you specifically
10    which instance. But it would not be uncommon as part
11    of that training for that to be presented to us.
12 Q. Okay. Do you remember any specific training sessions
13    in which that document was used?
14 A. Specifically, no.
15 Q. So you can't describe for the record any particular
16    occasion other than when you first came to the
17    department that you actually saw and/or reviewed that
18    document, Deposition Exhibit 3; correct?
19 A. No, that's not correct. Over the course of my
20    16 years, we've had different training, typically in
21    the wintertime, in which this document has been
22    presented to us. However, I'm unable to tell you the
23    specific dates or times of that training.
24 Q. Do you know what years you actually received diversity
25    training?

**Page 16**

1  A. Not specifically what years.
2  Q. Not specifically. Since 2011 how many years have you
3     received -- of diversity training have you received?
4  A. I would guess three, maybe four.
5  Q. Three or four diversity training since 2011?
6  A. Again, that's a guess.
7  Q. The answer to my question is that you really don't
8     know; correct?
9        MR. ACHO: Object. That's not what he
10    said. That is not the answer to your question. You
11    can't do that.
12 BY MR. MUNGO:
13 Q. Would that be a fair assessment?
14 A. I really don't know what dates I've had this training;
15    that's correct.
16 Q. Yeah, you don't know.
17 A. I don't know the dates that I've had this training,
18    yes.
19 Q. Therefore, you cannot particularly -- you cannot tell
20    me what years you had diversity training; correct?
21 A. Not specifically which years, but I've had diversity
22    training.
23 Q. Okay. So --
24       MR. ACHO: Counsel, what are you doing?
25    Don't do that, please.

Page 17

1  MR. MUNGO: There are appropriate
2  objections. I appreciate it if you stick with those.
3  MR. ACHO: I would appreciate it if you
4  don't try to intimidate the witness by --
5  MR. MUNGO: This man is not intimidated by
6  me. Okay?
7  BY MR. MUNGO:
8  Q. Go ahead, sir. You can answer the -- ask the question
9  again.
10  (The requested portion of the record was
11  read by the reporter at 11:51 a.m.)
12  THE WITNESS: I said that's -- I couldn't
13  tell you specifically which year I've had which
14  diversity training, but I have had diversity training.
15  BY MR. MUNGO:
16  Q. Well, now, you got to listen to my question now.
17  Okay? You're making this too complicated.
18  I said you cannot tell me which years you
19  had diversity training. That was my question.
20  A. And that's what I just answered, I thought, that I
21  can't tell you which years.
22  MR. ACHO: He did answer it, Counsel.
23  Twice.
24  BY MR. MUNGO:
25  Q. Yes. You cannot tell me which years. So you don't

Page 18

1  know what years you actually had the training.
2  A. Yes.
3  Q. Correct?
4  A. I don't know what years I had the training.
5  Q. Okay. Thank you.
6  A. Okay.
7  Q. Thank you. Let the record reflect the deponent is
8  looking at Deposition Exhibit Number 4.
9  Take a look at that document, sir, and tell
10  me whether or not you recognize it.
11  A. That is the 2017 general order regarding
12  discrimination and sexual harassment with the Warren
13  Police Department.
14  Q. And it is dated 2017; correct?
15  A. Yes. July 24th of 2017.
16  Q. 2017. And the Deposition Exhibit Number 3 is dated
17  2003; correct? January 2003; correct?
18  A. That is correct.
19  Q. Okay. All right. So now I want you to take a look at
20  the Deposition Exhibit Number 4. And once you've done
21  that, I want to -- I'm going to ask you some questions
22  regarding that document.
23  A. Okay.
24  Q. You've had an opportunity to review it.
25  A. Yes.

Page 19

1  Q. And what is Deposition Exhibit Number 4, sir, for the
2  record?
3  A. It's, again, the discrimination and sexual harassment
4  policy for the Warren Police Department.
5  Q. That is dated?
6  A. July 24th of 2017.
7  Q. 2017. Okay. And have you ever seen that document
8  before?
9  A. Yes.
10  Q. The one that's dated 2017.
11  A. Yes.
12  Q. And when did you have occasion to see that document?
13  A. It probably would have been about July 24th of 2017.
14  Typically when a new general order is put
15  into place, it's immediately e-mailed to the entire
16  department. And we're obligated to review it at that
17  point in time.
18  Q. And you remember reviewing it.
19  A. I read it, yes.
20  Q. What's the difference between read and review?
21  A. I don't know.
22  Q. So when you read it, tell me what you did.
23  A. I read it and tried to look for any changes from the
24  previous policy and then -- I made -- at the time in
25  July of 2017, I was a patrol supervisor. I would have

Page 20

1  read the changes off in roll call. We don't have time
2  during shift roll call to read an entire general
3  order; however, I would have made note of the changes
4  to my shift.
5  Q. Did you notice that there were any changes between
6  Deposition Exhibit Number 3 and Number 4?
7  A. Yes, where Mr. McMurray (sic) was added to the
8  complaint procedure on the -- specifically cite Greg
9  McMurray's name, who was the EOC for the City.
10  Q. He was the what for the city?
11  A. He would be the -- was it the EEOC? Equal -- see
12  where his title is. Equal employment opportunity
13  officer for the City of Warren.
14  Q. Do you know what that meant?
15  A. Yes.
16  Q. Can you tell us?
17  A. If you can say what that meant. His position?
18  Q. That's what you just read, yes.
19  A. Okay. That would be the -- well, I know he was also
20  the diversity coordinator for the City, and he was to
21  see that these situations were handled appropriately.
22  Q. Did you know Mr. Murray?
23  A. I met him once, I believe.
24  Q. You met him once. Have you had any discussions with
25  him regarding diversity?

Paul Houtos, Jr.
May 14, 2018

Page 21

1  A. No, I have not.
2  Q. Never?
3  A. No.
4  Q. Has your supervisor ever had any discussions with you
5     regarding Mr. Murray and his work as diversity
6     coordinator?
7  A. My supervisor being specifically whom?
8  Q. Well, did you have a supervisor at that time that
9     we're talking about this document?
10 A. That, at that point in time, would have been
11    Lieutenant Christian Bonet (ph). And I believe he did
12    say he met Mr. McMurray, and they did speak. I don't
13    know what they spoke about.
14 Q. So again my question: Did you ever have any
15    conversations with your supervisor regarding
16    Mr. Murray and his work as diversity coordinator?
17 A. No.
18 Q. And you had occasion to communicate with Ms. Howlett
19    from time to time while she worked in the detective
20    bureau; correct?
21 A. Yes.
22 Q. She worked in the special victims unit, and you were
23    working in the --
24 A. Criminal investigation.
25 Q. Criminal investigation unit. And at some point in

Page 22

1     time, Mr. Johnson came over to your side of the unit
2     to join you guys; correct?
3  A. Yes.
4  Q. Do you remember when that occurred?
5  A. Not specifically. I couldn't --
6  Q. But you know that it occurred.
7  A. I do.
8  Q. And you were there when it occurred.
9  A. I was actually in the office when he was moving his
10    desk from one side to the other, yes.
11 Q. Okay. And you were there also when Ms. Howlett was
12    moved into that unit, into the criminal investigation
13    unit where Shawn was moved into; correct?
14 A. I was not. I believe I was at Macomb Auto Theft Squad
15    at that time.
16 Q. So you left the unit, the criminal investigative unit
17    I thought in November of 2016.
18 A. I was promoted to sergeant in November of 2016, I was
19    assigned out from criminal investigations to the
20    Macomb Auto Theft Squad sometime in August of 2016,
21    and I did the next three months in a separate office.
22 Q. So where were you up through, up through July -- up
23    through July of -- you were promoted in November of
24    '16, and you were moved to another unit.
25 A. When I was promoted in November of '16, I went back to

Page 23

1     patrol as a patrol supervisor.
2  Q. Patrol supervisor. Right. Right. That's right. And
3     so you weren't there when Ms. Howlett was returned or
4     sent to work in the criminal investigative unit.
5  A. If I remember correctly, I think my leaving criminal
6     investigation and going to Macomb Auto Theft Squad
7     created the position in criminal investigation that
8     she filled.
9  Q. That she filled.
10 A. I would have been leaving the office as she was coming
11    into the office.
12 Q. I see. And so she would have taken your desk;
13    correct?
14 A. She would take an available desk. And again,
15    specifically mine, I was one of the more senior
16    detectives in the back of the room. It's kind of, I
17    guess, choice real estate. So the next seniority
18    detective will get offered it until -- you know, we
19    get a big shuffle of desks across the room.
20 Q. I see. I see. So at the time you left the criminal
21    investigative unit, that position became open that she
22    filled? Is that your understanding?
23 A. Based on the number of corporals assigned to criminal
24    investigation, yes. That would have created a
25    shortening or -- I believe it was 12 corporals in

Page 24

1     criminal investigation. When I left, there was 11.
2         The next senior corporal from -- the
3     opportunity would come from special victims or one of
4     the other bureaus to fill that spot. And I'm guessing
5     that she was, she did.
6  Q. So you don't know whether or not she filled your
7     position or not?
8  A. Not my position but the vacancy created by --
9  Q. The vacancy. You don't know that.
10 A. I can't say for sure --
11 Q. I'm sorry. Go ahead.
12 A. I can't say for sure, but I believe that's the way it
13    worked out.
14 Q. And you don't know whether or not there were any other
15    vacancies created, correct, that she may have filled?
16 A. I don't -- no, I don't know if -- I can't say for
17    sure.
18 Q. Okay. And so you left there in November -- you left
19    the criminal investigative unit in November of 2016.
20 A. Yes. I was promoted as sergeant.
21 Q. And was there any construction going on anywhere
22    within the building during that time?
23 A. November of '16?
24 Q. Yeah, at the time you left or prior thereto.
25 A. I believe -- I can't say for sure. I know the

6 (Pages 21 to 24)

Paul Houtos, Jr.
May 14, 2018

Page 25

1 dispatch center was -- they rebuilt their dispatch
2 center sometime, but I don't -- I think that started
3 later than then. So I can't say for sure if there was
4 any construction going on in the building.
5 Q. That involved the special victims unit.
6 A. Well, I know when they were preparing for the dispatch
7 center to be redone, they were making room in the
8 records bureau for a temporary dispatch center, which
9 resulted in them moving records into special victims,
10 which created a -- everything kind of got condensed in
11 that room.
12 Q. But --
13 A. And those shelves are still here, still there to this
14 day.
15 Q. But the special victims units were still there;
16 correct?
17 A. In their office, yes.
18 Q. Okay. So it didn't displace the special victims unit;
19 correct?
20 A. No, sir.
21 Q. You've had conversations with Ms. Howlett over the
22 period of time in which you knew her and prior to your
23 leaving in November of 2016; correct?
24 A. Yes.
25 Q. Leaving the criminal investigative unit.

Page 26

1 A. That's correct, yes.
2 Q. And you've had occasion to discuss with Ms. Howlett
3 different -- you've had different discussions with
4 her, correct, about different subjects and matters;
5 correct?
6 A. Yes. I've spoken with her throughout the years.
7 Q. Throughout the years. Okay. And you had a
8 conversation with Ms. Howlett in which you had
9 inquired of her certain things about the African
10 American race; correct? Something along those lines;
11 right?
12 A. Yes.
13 Q. And share for the record what you recall those
14 conversations were.
15 A. We're talking about the specific language from the
16 lawsuit?
17 Q. No, no, no. I'm talking about the -- I'm talking
18 about the conversations, any and all conversations
19 that you may have had with Ms. Howlett.
20 A. I didn't know her well enough that we would have
21 discussed race.
22 Q. Well --
23 A. Throughout the years.
24 Q. -- to the extent that we just said that you had
25 conversations with her.

Page 27

1 A. Yes, we've had conversations. I don't recall any
2 conversations that were specific about race.
3 Q. But you had conversations. Like you said earlier,
4 you've had conversations with Ms. Howlett regarding
5 things that pertained to race. You just said that.
6 (The requested portion of the record was
7 read by the reporter at 12:11 p.m.)
8 BY MR. MUNGO:
9 Q. Okay. So now you can answer that question. Share for
10 the record what you recall those conversations were.
11 A. That was a mistake when I said yes originally, because
12 I don't think Ms. Howlett and I ever had a
13 conversation directly involved race, involving race.
14 Q. Anything pertaining to race or touching upon race?
15 A. Nothing that I recall.
16 Q. Nothing that you recall. Ms. Howlett says that you
17 did. Would she be in that assertion mistaken?
18 A. I don't know that she's mistaken. I just don't recall
19 any of the conversations.
20 Q. You never had a conversation with Ms. Howlett wherein
21 referencing how black people talk with one another
22 and, like well, what's up, anything like that?
23 A. Not that I recall.
24 Q. Did you ever have a conversation with Ms. Howlett in
25 which you asked her what's up with this blue, black

Page 28

1 thing? You ever heard that?
2 A. I did have a conversation with her regarding that.
3 I'd like to --
4 Q. Go ahead. I'm sorry.
5 A. It was during an investigation. I had someone, a
6 witness to a crime describe someone, an African
7 American as being blue black. It's a term I'd never
8 heard. I asked several detective in the criminal
9 investigation side if they'd ever heard that term.
10 Nobody had.
11 I'd gone over to family investigation and I
12 asked Ms. Howlett that, as well as I think whoever
13 else was in the room. And I don't recall who was in
14 the room.
15 Q. And why were you curious? Why were you not able to
16 make out what blue black meant?
17 A. I never heard the term before.
18 Q. Who used the term?
19 A. A witness to a crime.
20 Q. A witness to a crime.
21 A. Right.
22 Q. What did the witness to the crime say?
23 A. He described the suspect in the crime who was African
24 American as being blue black. His skin complexion as
25 being blue black.

Paul Houtos, Jr.
May 14, 2018

Page 29

1  Q. Did you ever come to learn what that meant?
2  A. I did. I ended up Googling it.
3  Q. And what did you learn?
4  A. Very dark-skinned African American. Their skin
5     pigmentation has blue on their tongues.
6  Q. And then you asked her is it similar to redbone;
7     right?
8  A. As in -- and I was trying to put it in context for
9     her. Redbone's another way of describing someone who
10    has reddish undertones. Or high yellow is another way
11    of doing that.
12        I've been in law enforcement for 20 years.
13    I've heard so many different ways of African American
14    skin tone being described. Like I said, blue black
15    was a new term for me. I never heard it before.
16 Q. But you knew what redbone was.
17 A. I did, being someone who has reddish undertones in
18    their African American skin.
19 Q. And so the actual term redbone, how did you come
20    across that?
21 A. I just heard it over the years. And again, someone
22    who has reddish hair, reddish, you know, skin tone.
23 Q. You've heard it over the years from where, what
24    sources?
25 A. Witnesses to crimes, victims of crimes typically

Page 30

1     giving suspect descriptions.
2  Q. And so do you consider the use of the word redbone to
3     be a form of a racially derogatory or demeaning
4     reference to African Americans?
5  A. I don't know. No, I don't know that it is that. Like
6     I said, I was using it -- I would use it to describe
7     someone's skin tone. And again, that's more what I'm
8     getting from the witnesses or suspects. I would never
9     refer to someone as being a redbone or even a blue
10    black or anything like that.
11 Q. Okay. Even though you would not, do you consider the
12    term redbone to be a form of a racial slur or racially
13    derogatory term?
14 A. No, I don't.
15 Q. You don't. Okay. And why wouldn't you?
16 A. Like I said, I thought it was a way of describing
17    someone's skin tone.
18 Q. I see. I see. So how many skin tones do you think
19    African Americans have?
20       MR. ACHO: Come on. I'm going to object at
21    this point. This man is not here as some sort of
22    scientist. He's not an expert on the skin tones of
23    African Americans.
24       THE WITNESS: I'm sorry?
25 BY MR. MUNGO:

Page 31

1  Q. When he's done, you have to answer.
2        MR. ACHO: How many types of skin tones do
3     you think black people have, if you know --
4        MR. MUNGO: No. Read my question back.
5        MR. ACHO: Oh, it's not?
6        MR. MUNGO: Read my question back.
7        MR. ACHO: That is the question.
8        (The requested portion of the record was
9        read by the reporter at 12:16 p.m.)
10       THE WITNESS: Numerous.
11 BY MR. MUNGO:
12 Q. Can you articulate any of them?
13 A. I mean, if you're trying to describe someone
14    specifically, you would say they have caramel colored
15    skin or an olive, olive tone. There's hundreds of
16    different ways of describing people's skin complexion.
17 Q. And redbone is one.
18 A. Again, it's the way it's been described to me in the
19    past, yes.
20 Q. I'm just asking if redbone is one of them.
21       MR. ACHO: You've asked him multiple times.
22 BY MR. MUNGO:
23 Q. Is that correct?
24       MR. ACHO: Can we move on from redbone?
25 BY MR. MUNGO:

Page 32

1  Q. Is that correct?
2  A. Yes. Redbone would be one of them.
3        MR. ACHO: Mr. Mungo, you've got to get off
4     your phone, please. You keep taking calls. You keep
5     texting. It's rude. I've never seen anybody do this.
6     It's beyond rude. It's disconcerting for the witness.
7     It's disconcerting for me. You just left two minutes
8     ago.
9        You can glare at me all you want. You keep
10    taking calls and texting. It's rude, improper.
11       MR. MUNGO: Tell me when you're done.
12       MR. ACHO: I'm done, but please stop doing
13    it or I'm going to discontinue these deps.
14       MR. MUNGO: You do what you feel --
15       MR. ACHO: If that's what you keep doing.
16    And just so you know, Redbone was the name of a group
17    that had a Number 1 hit in 1969 called Come and Get
18    Your Love. Go ahead.
19       MR. MUNGO: Putting your testimony in the
20    record.
21       MR. ACHO: It ain't my testimony. Letting
22    you know. I'm educating you.
23       MR. MUNGO: Okay. All right. Read my last
24    question back, please.
25       (The requested portion of the record was

8 (Pages 29 to 32)

Paul Houtos, Jr.
May 14, 2018

Page 33

1    read by the reporter at 12:18 p.m.)
2  BY MR. MUNGO:
3  Q. Okay. Answer that question.
4  A. Yes.
5  Q. What was Ms. Howlett's response when you asked her?
6  A. I don't even recall.
7  Q. You don't even recall.
8  A. I had forgotten about the conversation till I read it
9     in the allegations.
10 Q. Oh, I see. So who did you talk to prior to this
11    deposition at all?
12 A. Just my attorneys.
13 Q. Just your attorneys. You hadn't talked to anyone else
14    about your deposition?
15 A. No.
16 Q. No one other than your attorneys? You're sure?
17 A. I mean, specifically about the deposition and what was
18    going to happen here, just my attorneys.
19 Q. So did you talk to anybody about the case?
20 A. My wife knows I'm being deposed, if I can put that in.
21 Q. Have you talked to anyone about the case?
22 A. No, I have not.
23 Q. You have not. Discussed the case at all? Anyone ask
24    you any questions about your deposition other than
25    your lawyer?

Page 34

1  A. No.
2  Q. Okay. So you've not talked to one soul at all about
3     your deposition or about this case other than your
4     attorneys. Is that your testimony?
5  A. Other than my wife. Other than the fact that she
6     knows that I'm being deposed, yes.
7  Q. What did you tell your wife?
8  A. That I was being deposed in this matter today.
9  Q. And how much conversation did you guys have about this
10    deposition?
11 A. Just basically, you know, she asked what was going on
12    at work, and I told her that I was being deposed. And
13    it was just a very general conversation.
14 Q. Tell me how general. Tell me what was discussed.
15 A. She would ask me what do you have going on at work
16    today. I said well, I've got the deposition involving
17    the Howlett dep case. And I'm going to be glad to get
18    this over and done with.
19 Q. Okay. Is she familiar with the Howlett case?
20 A. Just what she read in the newspaper.
21 Q. Just what she read in the newspaper. Did she ask any
22    more questions of you?
23 A. No. She doesn't ask a whole lot of questions about
24    work.
25 Q. Did you review any documents prior to this deposition?

Page 35

1  A. No.
2  Q. Not one document.
3  A. No.
4  Q. You obviously reviewed the Complaint.
5  A. Well, I reviewed the Complaint when it was -- gosh,
6     over a year ago, when it came -- when it was first
7     filed.
8  Q. When it was first filed. And other than that
9     conversation regarding the blue black and the redbone,
10    you hadn't had any conversation with Ms. Howlett
11    regarding any subjects or any matters that pertain to
12    African Americans; correct?
13 A. That's correct.
14 Q. African American culture, nothing like that. It was
15    strictly about --
16 A. Not that I recall.
17 Q. Not that you recall. So that means, sir, that it's
18    possible that there may have been additional
19    conversations?
20 A. And it's also possible there may not have been, yes.
21 Q. Okay.
22 A. Like I said, I don't recall.
23 Q. Now, listen. Listen. You can, you can say whatever
24    else you want to say, but I need you to answer my
25    question. Okay? And I'm not sure what your last

Page 36

1     answer was.
2           Read the question back, please.
3           Sir, you can add whatever you want to add,
4     but answer my question, please.
5  A. Okay.
6           (The requested portion of the record was
7           read by the reporter at 12:22 p.m.)
8           THE WITNESS: My answer would be yes to
9     your question.
10 BY MR. MUNGO:
11 Q. That it is possible that there may have been other
12    conversations. Thank you. About race with
13    Ms. Howlett. Thank you.
14          So I want to reference you to -- I want you
15    to reference Deposition Exhibit Number 4, sir.
16 A. Okay.
17 Q. The last three pages of that exhibit contains a
18    training schedule. I want you to go through there and
19    tell me whether or not you attended any training,
20    diversity training during the years of 2013, '14, '15
21    and '16.
22 A. Let me start 2017 and work my way backwards. Yes. I
23    was in the class with James Friedman. In fact, he
24    gave me a hug in that class. I remember specifically.
25    And we were disappointed that it was only a two-hour

9 (Pages 33 to 36)

Carroll Court Reporting and Video
586-468-2411

Paul Houtos, Jr.
May 14, 2018

Page 37

1. block. It may have been a three-hour block. But that
2. would have been a great class to have a full day on.
3. Q. Why do you say that?
4. A. I just, I like Reverend Friedman. He's a good guy.
5. Q. So because you like him, not the subject.
6. A. He's an interesting man to listen to talk to, and he
7. does make me think.
8. Q. So not the subject as much as the reverend, right,
9. that you should have -- you wished you would have had
10. a full day?
11. A. Like I said, the subject was interesting also.
12. Q. Oh, I see. I see. It was primarily you wanted a full
13. day -- or it would have been okay to have a full day
14. because you liked the reverend and also the subject
15. was interesting; is that correct?
16. A. Yeah. Yes.
17. Q. Okay. Go ahead. Did you receive any diversity
18. training in the year 2016?
19. A. If I remember correctly, the tactical communication
20. block, it's more -- it's not tactical as in like
21. swat-type tactical. I believe it is more speaking to
22. people with tact. I don't recall the specific content
23. but --
24. Q. So are you answering my question about whether or not
25. you received any diversity training in 2016?

Page 38

1. A. I'm going through each training class that --
2. Q. Well, I just want you to address diversity training.
3. A. I believe there was some -- specifically I was in the
4. class in 2017.
5. Q. And that took place between February and May of 2017;
6. correct?
7. A. Yes.
8. Q. Okay. Was Ms. Howlett still there when that took
9. place? Was she still working for the Warren Police
10. Department?
11. MR. ACHO: If you know.
12. THE WITNESS: I don't know. I don't know
13. when she left.
14. BY MR. MUNGO:
15. Q. Okay. But you do know she left in 2017; correct?
16. A. Yes. Yeah, I don't -- I just don't recall which month
17. specifically.
18. Q. Which month did you receive the training from James
19. Friedman?
20. A. That would be documented in the training log that I
21. would have signed in for. I don't recall what month.
22. It would have been sometime during that time period.
23. Q. You have a training log of your training?
24. A. The department keeps track of all of our training,
25. yes.

Page 39

1. Q. Okay. And you didn't bring that with you today;
2. correct?
3. A. No, I did not.
4. Q. Did anybody tell you you needed to bring it?
5. A. No. I was unaware that I needed to bring something
6. like that.
7. Q. Go ahead. In 2016 did you receive any diversity
8. training?
9. A. No.
10. Q. In 2015 did you receive any diversity training?
11. A. No.
12. Q. In 2014 did you receive any diversity training?
13. A. Nope.
14. Q. In 2013 did you receive any diversity training?
15. A. No.
16. Q. Did you receive diversity training in this humanity's
17. comparative religions and international studies?
18. A. Yes. I believe it was geared to different religions
19. that are out there.
20. Q. Did you receive any diversity training in 2011?
21. A. No.
22. Q. What about 2008?
23. A. No.
24. Q. What about 2007?
25. MR. ACHO: Mr. Mungo, I think you skipped

Page 40

1. one.
2. THE WITNESS: 2007? The training on
3. dealing with vulnerable adults and autism did touch on
4. a population within our society that we needed to
5. learn about.
6. BY MR. MUNGO:
7. Q. Which ones?
8. A. Autistic, which is handicapped for lack of a better
9. term.
10. Q. Okay. What about African American diversity training?
11. A. There was nothing specific in there, no.
12. Q. All right.
13. A. The 2009 cultural awareness with Dr. Friedman or
14. Reverend Friedman --
15. Q. Did I ask you about that one?
16. A. No.
17. MR. ACHO: But he's supplementing his
18. answer. He can do that. You've told him repeatedly
19. he can say whatever he wants as long as he gives you
20. your answer.
21. Go ahead. Finish.
22. MR. MUNGO: But you're pointing stuff out
23. to him.
24. MR. ACHO: I'm not pointing anything out to
25. him.

10 (Pages 37 to 40)

Paul Houtos, Jr.
May 14, 2018

Page 41

1  MR. MUNGO: You just pointed --
2  MR. ACHO: I'm not pointing --
3  BY MR. MUNGO:
4  Q. Sir, did he not point out to you something on that
5     document?
6  MR. ACHO: Uh-uh.
7  BY MR. MUNGO:
8  Q. Sir.
9  A. Actually --
10 Q. Did your attorney just point out something to you on
11    that document?
12 MR. ACHO: Sir, I grabbed his document to
13    look at it.
14 THE WITNESS: He said that you missed a
15    couple of years or you skipped over a couple years.
16 BY MR. MUNGO:
17 Q. And he pointed to something on that document, didn't
18    he?
19 MR. ACHO: Not true, sir.
20 THE WITNESS: I was engaged speaking with
21    you when -- I didn't see him point.
22 MR. ACHO: Sir, I didn't point at --
23 BY MR. MUNGO:
24 Q. You didn't see him point --
25 A. No.

Page 42

1  Q. -- at that document?
2  A. I did not.
3  Q. Either one of --
4  MR. ACHO: Because I didn't point at it.
5  BY MR. MUNGO:
6  Q. Keep in mind, sir, you're under oath.
7  MR. ACHO: He knows that.
8  BY MR. MUNGO:
9  Q. All right. So you did not receive any diversity
10    training regarding African Americans in the year 2013,
11    '14, '15, or '16; correct?
12 A. Correct.
13 Q. And 2015 and '16 were the years that you worked with
14    Ms. Howlett, or at least you were in the detective
15    bureau with Ms. Howlett between 2015 and 2016;
16    correct?
17 A. Yes. I believe she was in the detective bureau during
18    that time period, and I was also.
19 Q. And this is the time in which she alleged that you had
20    made inappropriate racial comments to her according to
21    the Complaint; correct?
22 A. I don't have the specific date of the comment that she
23    was offended by was made.
24 Q. You don't have a specific date, sir. But you do know
25    that you worked there with her in 2015 -- she didn't

Page 43

1  come to the unit till 2015; right?
2  A. Like I said, I don't recall her promotion day and all
3     that. But yes.
4  Q. Did you have conversations with her outside of the
5     period of 2015 and 2016?
6  A. There was one I recall.
7  Q. Only one?
8  A. I mean, the one that I specifically recall. I mean,
9     I've spoken with her throughout the years but --
10 Q. You know what I mean when I say conversations versus
11    speaking to someone; right? You know the difference
12    between that; right?
13 MR. ACHO: Do you know the difference?
14 THE WITNESS: Yes. I know the difference
15    between saying hello to someone and actually sitting
16    down and speaking with someone, yes.
17 BY MR. MUNGO:
18 Q. So I'm talking about actually speaking with
19    Ms. Howlett.
20 A. Yeah. Yes.
21 Q. You spoke with her -- I'm sorry, sir.
22 A. Prior to 2015, when she was promoted, yes, I do recall
23    a specific conversation at length with her.
24 Q. Sir, but you've got to let me finish asking my
25    question.

Page 44

1  A. Okay.
2  Q. I understand what you're doing but -- and that's not
3     unusual in these settings. Okay? But you got to let
4     me finish my question; otherwise, later on, a month
5     from now people won't know what question you were
6     answering.
7  A. Okay.
8  Q. So you had conversations with Ms. Howlett in 2015 and
9     2016, more than just a hello, how are you; right?
10 A. Not much more. Maybe a -- you know, small talk during
11    a lunch or something like that.
12 Q. Okay. But you did have conversations with her; right?
13 A. Yes, I did.
14 Q. And your conversations with her, other than that one
15    occasion that you referenced when she was not part of
16    the detective unit, those were the times in which you
17    had your conversations with her, were between the
18    period of 2015 and 2016; correct?
19 A. Can you --
20 MR. MUNGO: Read the question back.
21    (The requested portion of the record was
22    read by the reporter at 12:32 p.m.)
23 THE WITNESS: Sir, are you asking me if
24    I've had conversation with her only between 2015 and
25    2016? I'm not clear on the question.

11 (Pages 41 to 44)

Carroll Court Reporting and Video
586-468-2411

### Page 45

1  BY MR. MUNGO:
2  Q. Yes.
3  A. Yes, I've had -- I've spoke with her. I can't say for
4     a fact that I had conversations with her.
5  Q. Between 2015 and 2016.
6  A. Yes.
7  Q. And you don't know how long those conversations were
8     is what you're saying; correct?
9  A. That's correct.
10 Q. Okay. But you did have conversations with her.
11 A. I'm sure that I spoke with her more than hello and
12    good morning, yes.
13 Q. And you said you had, other than hello and good
14    morning, you've had one other conversation with her
15    outside of that time period of 2015 and 2016; is that
16    correct?
17 A. Yes.
18 Q. And what occasion was that and what years --
19 A. It would have been in, I want to say sometime during
20    the study period for her corporal's examination. I
21    believe it -- she took that test in 2013, 2014.
22       I had done well in the previous test. She
23    caught me as we were walking out to the parking
24    structure and was asking me for some guidance on how
25    to study. I gave her some pointers. I probably

### Page 46

1     talked to her for 45 minutes or an hour standing by
2     the parking structure.
3  Q. Okay. Very good. Very good.
4        Let the record reflect I'm about to show
5     the deponent Deposition Exhibit Number 1. Take a look
6     at that document, sir. And once you're done, let me
7     know, please.
8  A. Okay.
9  Q. All right. So what is Deposition Exhibit Number 1,
10    sir?
11 A. Exhibit Number 1 is the discipline of Shawn Johnson.
12 Q. Shawn Johnson. And those are the allegations -- did
13    you see page -- those are the allegations that Ms. --
14    well, this investigation and discipline of Shawn
15    Johnson was based upon the allegations that
16    Ms. Howlett made that he had racially harassed her, is
17    that correct, according to that document?
18 A. Yes.
19 Q. And if you look at Page 15, I think would be there.
20    Page 15. I'm sorry, sir. I'm so sorry. I forgot to
21    point out to you at the bottom we have Bates stamp
22    numbers.
23 A. Okay. I just want to make sure. Starts with .1
24    Gorilla Glue; is that correct?
25 Q. Yes.

### Page 47

1  A. Okay. Yes.
2  Q. You heard about that; right? Shawn Johnson talking to
3     Ms. Howlett about Gorilla Glue; right?
4  A. Yes. I heard rumors of it.
5  Q. And you know why that was offensive to Ms. Howlett;
6     correct?
7  A. I could see where it could be taken offensively, yes.
8  Q. How could you see? How could you see that could --
9  A. Because the history of African Americans being
10    compared to monkeys or gorillas or that whole --
11 Q. In fact, you've heard things in the news about the
12    Mayor, Mayor Fouts, and his mimicking and associating
13    African Americans with being gorillas, correct,
14    monkeys?
15       MR. ACHO: I'm going to object.
16       MR. MUNGO: When he finishes, you got to
17 answer the question unless he tells you not to.
18       MR. ACHO: You're assuming facts not in
19 evidence, Number 1. 2, you're not asking him a
20 question. You're making a statement.
21       Go ahead, sir, Sergeant Houtos, if you can
22 answer it.
23       THE WITNESS: I'm aware of the allegations
24 against Mayor Fouts, yes.
25 BY MR. MUNGO:

### Page 48

1  Q. That he compared African Americans to monkeys. You've
2     heard that; right?
3  A. Yeah, just I'm trying to think of specifically. I'm
4     aware of, yes, that's one of the allegations, yes.
5  Q. Which you said -- because I'm not sure we're tracking
6     each other. That that's one of the allegations of
7     Mayor Fouts being what, what is the allegation? That
8     he's compared African Americans to monkeys?
9  A. That's -- I'm sorry. The question that you're asking
10    me is am I aware of Mayor Fouts doing that? Yes, I am
11    aware. I've read the news articles at least.
12 Q. All right. And that's another reason why you can
13    associate and understand why the use of Gorilla Glue
14    by Shawn Johnson with Ms. Howlett being offensive;
15    correct?
16 A. Yes.
17 Q. And you consider him doing that to be a form of racial
18    harassment?
19 A. Yes. I would see that as being that way.
20 Q. I want to look at Item 2, where it says heating up
21    leftovers for lunch from Benihana's which smelled like
22    butter garlic. Shawn said what do you have for lunch
23    today, some chicken and ribs? Do you see the
24    connotations in there of being racially demeaning?
25 A. Yes.

Page 49

1  Q.  And how so?
2  A.  There's the history associated with African Americans
3      with certain foods, specifically chicken and ribs. I
4      could see that being offensive.
5  Q.  Why? Why would chicken and ribs be specific to
6      African Americans in a derogatory way the way it's
7      couched and used here?
8  A.  Well, because the history of people saying they -- you
9      know, that African Americans eat chickens, ribs,
10     watermelons. There are certain food groups that have
11     been associated with that negatively throughout the
12     years. And so I can see where it --
13 Q.  You've heard that being used negatively regarding
14     African Americans throughout the years?
15 A.  Yes, I guess.
16 Q.  Yes?
17 A.  I believe so.
18 Q.  You're not sure.
19 A.  Well, I've heard, you know, culture, music, things
20     like that. I mean, I know -- I understand the
21     connotation of that, yes. I could see where DeSheila
22     would have been offended by that.
23 Q.  All right. And she said that Shawn passed by her desk
24     and he double backed and leaned forward and he sniffed
25     her. Heard a sniffing sound -- she heard a sniffing

Page 50

1      sound. Do you recall that incident being complained
2      of or spoken of by anyone directly or indirectly?
3  A.  No. I've never heard of that one.
4  Q.  Never heard of that one.
5  A.  That's bizarre.
6  Q.  That's bizarre. Okay. Do you consider that conduct
7      as described in paragraph three to be a form of sexual
8      harassment?
9  A.  Yes, I would say that.
10 Q.  And then Item Number 4: She indicated that he brushed
11     his hand across her head touching her hair. Do you
12     consider that a form of sexual harassment by Shawn
13     Johnson of Ms. Howlett?
14 A.  Yeah. If it was not accidental, yes, that would be
15     inappropriate.
16 Q.  You've not heard these, other than the Gorilla Glue,
17     you've not heard of any of these other incidents?
18 A.  I've not, no.
19 Q.  You've not? Number 5, where he says why do you people
20     move -- why do all you people move to Atlanta? Do
21     they not want to be around white people? You've never
22     heard that being said directly or indirectly?
23 A.  No, that's -- no. Sir, these are the first times I've
24     read any of this.
25 Q.  Okay. Do you consider that to be a form of racial

Page 51

1      harassment as couched in this sentence being said by
2      Shawn Johnson to DeSheila Howlett?
3  A.  Anytime you use -- towards any group say you people,
4      your people, that's highly offensive.
5  Q.  Do you see Number 6 where he talks about ghetto names,
6      what's up with all the ghetto names, spellings,
7      Destinee and Honey Brown or Bentley, et cetera? Do
8      you see that?
9  A.  Yes.
10 Q.  Do you consider African Americans to have ghetto
11     names?
12 A.  Do I consider that they have ghetto names? They have
13     names.
14 Q.  Okay.
15 A.  Parents can name children whatever they want to be --
16     it's their child.
17 Q.  Go ahead. I'm sorry.
18 A.  No. The parent can name the child whatever they want.
19     If they want to call you this is my son, Tree. Call
20     him Tree. I don't care. It doesn't affect me.
21 Q.  Do you consider that to be a form of racial harassment
22     coming from Shawn Johnson as couched in this
23     particular item?
24 A.  Yes.
25 Q.  Okay. But you don't consider African Americans to

Page 52

1      have per se any ghetto -- any of the names of African
2      Americans --
3          MR. ACHO: Counsel, he's already --
4  BY MR. MUNGO:
5  Q.  Ghetto names?
6          MR. ACHO: Counsel, what you're doing is
7      you're getting -- you're asking questions out of your
8      own inquisitiveness out of white witnesses. I know
9      exactly what you're doing. It's got nothing to do
10     with this lawsuit. I know what you're doing. I don't
11     think it's appropriate.
12 BY MR. MUNGO:
13 Q.  Answer the question.
14 A.  No, I don't feel that African Americans have ghetto
15     names. They have the names that their parents give
16     them, and I don't care what someone names their child.
17 Q.  Very good. Thank you.
18         Item Number 7 talks about Shawn Johnson
19     referenced her clothing color, generally color
20     coordinated. And she announces almost daily my color
21     choice for each day in -- he announces that in a black
22     voice and comments on how matching -- a matching thing
23     is a black thing.
24         Do you believe that that statement as
25     couched there in Item Number 7, a comment made by

Paul Houtos, Jr.
May 14, 2018

## Page 53

1  Shawn Johnson to DeSheila Howlett to be a form of
2  racial harassment, sir?
3  A. Those comments, yes. Sure.
4  Q. Okay. And you've never heard Shawn Johnson make any
5  of these kind of comments to Ms. Howlett?
6  A. I have not. Although if I may, Ms. Howlett dressed
7  ten times better than I ever did so -- she was always
8  very well and professionally dressed so --
9  Q. She's a female and you're a male.
10 A. Yes. We are both --
11 Q. And for the record, you're a white male? Your race is
12 white; correct?
13 A. My race is white, yes.
14 Q. Okay. Thank you. All right. And do you consider
15 African Americans to dress -- be better dressers than
16 whites?
17 A. Some do. Some don't. I mean, you know. We all
18 have -- I consider myself to be a bit of a slob.
19 Q. You may be being a little hard on yourself. You don't
20 look like one today. So do you believe that some
21 white people dress better than some black folk?
22 A. Sure. I'm sure some white people do. Some black
23 people do. That's it.
24 Q. Very good.
25 A. Some people pay more attention to those things.

## Page 54

1  Q. Now, Deposition Exhibit Number 1, sir, the
2  investigation, the conduct of Shawn Johnson, and I
3  think you'll see it on Page 1 up front there, the
4  first page, the personnel complaint?
5  A. That's 11.
6  Q. 11 there, sir. Personnel complaint. Do you see that?
7  A. Yes.
8  Q. It says the date of the event was between -- at the
9  very top. The incidents occurred between 4/1/15 and
10 7/1/15; right?
11 A. Yes.
12 Q. Okay. And during that period, you were there during
13 that period of time; correct?
14 A. I was in criminal investigation during that time
15 period.
16 Q. And at the bottom of Page 11, it's dated 8/6/15. You
17 were still there in the criminal investigative unit at
18 that time; correct?
19 A. I'm sorry. Where is it dated, next to Sergeant Eidt's
20 signature? Is that where we're looking at?
21 Q. Yes, sir.
22 A. Yes.
23 Q. And you were still there.
24 A. Yes.
25 Q. So you were there during the time in which all of

## Page 55

1  these incidents occurred. You were there in the
2  criminal investigative unit; correct?
3  A. Yes.
4  Q. And how much interaction did you have with the special
5  victims unit?
6  A. Very little.
7  Q. How would you describe that in terms of frequency of
8  visiting or communicating with the detectives in the
9  special victims unit on average?
10 A. In a typical week, I might walk through their office
11 once or twice; that would just be to deliver a warrant
12 request to the city attorney's desk.
13    I'm trying to think who the detectives were
14 over there. I'm not really a social person, so I
15 didn't hang out with anybody. So there's -- unless
16 they needed something over there, I wouldn't have
17 stopped over there often.
18 Q. You remember seeing Shawn Johnson when you would go
19 over there from time to time?
20 A. Yes. Sometimes he would be in the office, yes.
21 Q. And you remember seeing DeSheila Howlett from time to
22 time when you would go over there; correct?
23 A. Yes.
24 Q. And at the time that Shawn Johnson was transferred
25 over from the special victims unit over to the

## Page 56

1  criminal investigative unit, you were there in the
2  criminal investigative unit; correct?
3  A. Yes.
4  Q. Okay. All right. The criminal investigative unit and
5  the special victims unit were separated by walls;
6  correct? The work areas were separated by walls and
7  doors; correct?
8  A. Walls, and there's actually some office space
9  in-between. But yes, there's doors. In fact, special
10 victims, in their off hours they keep those doors
11 locked so no one can get into the files because they
12 have information about children in there, so yes.
13 Q. So the answer to my question is yes.
14 A. Yes.
15 Q. Did anyone ever, after this incident with Shawn
16 Johnson -- who was your supervisor at that time? I
17 should ask.
18 A. Stephen Mills was my sergeant, and Robert Ahrens was
19 our captain.
20 Q. During that period of time and after, prior to your
21 leaving the unit, which was in --
22 A. August of 2016.
23 Q. You left there in November of 2016.
24 A. I promoted in November of 2016. I left and went to
25 Macomb Auto Theft Squad in August of 2016.

14 (Pages 53 to 56)

Carroll Court Reporting and Video
586-468-2411

Page 57

1  Q. Got it. So you were gone in August of 2016.
2  A. Middle of August.
3  Q. Middle of August.
4  A. Yes.
5  Q. Okay. And this report was -- or Page 11 was completed
6     on August 6th; right? So you knew this investigation
7     was going on prior to your leaving; correct?
8  A. I did not know that there was an investigation.
9  Q. So no one ever asked you any questions about whether
10    or not you heard Shawn Johnson make inappropriate
11    comments to Ms. Howlett?
12 A. No, sir.
13 Q. Nobody ever investigated that?
14 A. No.
15 Q. Did anyone ever address you? Did your supervisors or
16    the captain ever address you and your unit regarding
17    diversity and sexual and racial harassment?
18 A. No.
19 Q. Never. Okay. During this period of time. Okay.
20       Let the record reflect I'm about to show
21    the deponent Deposition Exhibit Number 2.
22       Could you take a look at that document for
23    me, please. Let me know once you have done so.
24 A. Would you like me to read through the entire document?
25 Q. Well, I'm going to ask you questions about it, and I

Page 58

1     want to know whether or not you can identify it so you
2     might want to --
3  A. Okay.
4  Q. -- at least, you know, skim through it --
5  A. Sure.
6  Q. -- enough that you can familiarize yourself and be
7     able to say I do, I am familiar with it or I'm not.
8  A. Okay. When you're ready, sir.
9  Q. I'm sorry. What did you say?
10 A. I said when you're ready, sir.
11 Q. What is Deposition Exhibit Number 1, sir?
12 A. It's --
13 Q. Exhibit Number 2.
14 A. The discipline of Barbara Beyer.
15 Q. Have you ever gotten any information directly or
16    indirectly regarding Ms. Beyer?
17 A. No.
18 Q. And her discipline?
19 A. No. I was unaware of the discipline.
20 Q. Were you aware that she was being investigated for
21    having racially harassed Ms. Howlett?
22 A. I had heard that, yes. And at the time that happened,
23    I was in patrol; so I wasn't up in the office.
24 Q. Okay. What did you hear?
25 A. I just heard she, for lack of a -- she dropped an N

Page 59

1     bomb in the office is basically what I had heard.
2  Q. And just so we're clear for the record, that N bomb
3     happened to be the racially derogatory and demeaning
4     term nigger, right, N-I-G-G-E-R? Is that correct?
5  A. Yes.
6  Q. That's what you heard.
7  A. Yes.
8  Q. And who did you hear that from?
9  A. Through the rumor mill. I don't know who
10    specifically.
11 Q. Is that all you heard?
12 A. That's all I heard, yes.
13 Q. Okay. When you heard that, did you hear about the
14    circumstances under which that occurred?
15 A. No, I did not.
16 Q. I'm going to take a quick break.
17       (Off the record at 12:58 p.m.)
18       (Back on the record at 1:09 p.m.)
19 BY MR. MUNGO:
20 Q. So Sergeant --
21 A. Houtos.
22 Q. Yes. When I was asking you earlier about the blue
23    black thing that you asked Ms. Howlett about, the blue
24    black thing and the redbone thing, and maybe it's just
25    your recollection that may be at issue here, but you

Page 60

1     don't recall telling Ms. Howlett that your wife was
2     having -- they were discussing these issues at your
3     wife's job, your wife was involved in these
4     discussions and questions being raised at her job, and
5     you wanted to ask her about the blue black thing and
6     the redbone thing?
7  A. No.
8  Q. You're sure?
9  A. Yeah.
10 Q. All right. That's it.
11       MR. ACHO: I have nothing further,
12    Sergeant. Thank you, sir.
13       (The deposition was concluded at 1:10 p.m.
14       Signature of the witness was not requested by
15       counsel for the respective parties hereto.)

Paul Houtos, Jr.
May 14, 2018

Page 61

```
 1              CERTIFICATE
 2    STATE OF MICHIGAN
 3    COUNTY OF MACOMB
 4
 5         I, MAUREEN COLLIER, a Notary Public in
 6    and for the above county and state, do hereby certify
 7    that this deposition was taken before me at the time
 8    and place hereinbefore set forth; that the witness was
 9    by me first duly sworn to testify to the truth; that
10    this is a true, full and correct transcript of my
11    stenographic notes so taken; and that I am not
12    related, nor of counsel to either party, nor
13    interested in the event of this cause.
14
15
16
17
18
19
20    _____
21    MAUREEN COLLIER, CSR-7422
22    Notary Public
23    Macomb County, Michigan
24    My commission expires: February 9, 2021
25
```

16 (Page 61)