## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **DESHEILA HOWLETT**, | 4:17-CV-11260-TGB |
| Plaintiff, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DISMISSING CERTAIN INDIVIDUAL DEFENDANTS** |
| **CITY OF WARREN, LAWRENCE GARDNER, SHAWN JOHNSON, DAWN MCLANE, MICHAEL SAUGER, ANWAR KHAN, JERE GREEN, DARRIN LABIN, WILLIAM ROSS, KEVIN BARNHILL, PAUL HOUTOS, SCOTT TAYLOR,** | |
| Defendants. | |

## I.    Introduction

In 2006, DeSheila Howlett became the first African-American ever hired as a police officer for the City of Warren, and she remained the only black officer in the Warren Police Department until she left her position in 2017. Now the Plaintiff in this civil action, Howlett alleges that throughout her employment with the Warren Police Department she endured racial and sex-related discrimination, abuse, and harassment by

fellow officers, supervisors and employees in the Department. She alleges that she was the victim of a racially and sexually hostile work environment and that the City of Warren violated her civil rights by failing to provide adequate training to prevent the injuries she allegedly incurred. Defendants include the City of Warren, as well as several individually-named defendants. The individually-named defendants include police officers for the City of Warren, the then-Police Commissioner, and a member of the support staff for the Warren Police Department.

Plaintiff's Amended Complaint (ECF No. 4) alleges six counts:

| | |
|---|---|
| Count I: | Discrimination Based on Race and Gender—Hostile Work Environment (pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*) |
| Count II: | Violation of Fourteenth Amendment right to Equal Protection (pursuant to 42 U.S.C. § 1983) |
| Count III: | Violation of Fourteenth Amendment right to Due Process (pursuant to 42 U.S.C. § 1983) |
| Count IV: | City of Warren *Monell* Liability (pursuant to 42 U.S.C. § 1983) |
| Count V: | Conspiracy Invidious Racial Animus (pursuant to 42 U.S.C. § 1985) |
| Count VI: | Violation of the Right to Make and Enforce Contracts (pursuant to 42 U.S.C. § 1981). |

Defendants filed a Motion for Summary Judgment on all counts. ECF No. 66. Plaintiff filed a Motion for Partial Summary Judgment on

Count IV (*Monell* liability) only. ECF No. 69. Both parties filed oppositions. ECF Nos. 70 (Plaintiff's Response) & 74 (Defendants' Response). The Court held a hearing on June 12, 2019. *See* June 12, 2019 Minute Entry.

At the hearing, Plaintiff agreed to voluntarily dismiss the following individual defendants: Scott Taylor, Paul Houtos, Kevin Barnhill, William Ross, Darrin Labin, and Dawn McLane. Barbara Beyer was previously dismissed by a stipulated order. ECF No. 21. Plaintiff also agreed that Arthur Gill, though mentioned in the body of Plaintiff's Amended Complaint, was neither named in the caption as a defendant nor served in the lawsuit and therefore should not properly be considered a defendant. *See* Plaintiff's Amended Complaint, ECF No. 4, PageID.52. Additionally, Michael Sauger was named in the initial complaint (ECF No. 1), but his name was not included among the defendants in the Amended Complaint. As such, Michael Sauger is not an individual defendant in this case. After these voluntary dismissals, the remaining defendants are the City of Warren and four individual defendants: Jere Green, Lawrence Gardner, Shawn Johnson, and Anwar Khan.

For the reasons outlined below, Defendant's Motion for Summary Judgment will be **DENIED** as to Count I, (Discrimination Based on Race and Gender—Hostile Work Environment—Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.), **DENIED IN PART and**

**GRANTED IN PART** as to Count II (Violation of Fourteenth Amendment right to Equal Protection—42 U.S.C. § 1983), **DENIED** as to Count IV (City of Warren *Monell* Liability—42 U.S.C. § 1983), but **GRANTED** as to Count III (Fourteenth Amendment Due Process—42 U.S.C. § 1983), Count V (Civil Rights Conspiracy—42 U.S.C. § 1985) and Count VI (Violation of Right to Make Contracts—42 U.S.C. § 1981). Plaintiff's Motion for Partial Summary Judgment as to Count IV will be **DENIED**.

## II. Background

The extensive record in this case consists of numerous depositions and records gathered during the discovery process. This summary draws upon the evidence from that record as it relates to the allegations in the Amended Complaint, which are essentially that Plaintiff endured extensive racial and sexual harassment during her 11-year employment with the Warren Police Department. Plaintiff's Amended Complaint, ECF No. 4, PageID.50.

Significantly, Howlett alleges that this harassment occurred in part due to "customs, practices and policies of unlawful racial and sexual discrimination" that exist in the City of Warren and its municipal departments. *Id.* Because this allegation is key to Count IV of the complaint, seeking to impose *Monell* liability on the City of Warren, as well as Count I of the complaint, alleging the City of Warren created a hostile work environment, the Court will discuss the historical precedents cited by Plaintiff. As an example of this alleged longstanding culture, Howlett

4

cites a 1986 lawsuit against the City of Warren brought by the United States Department of Justice, which alleged that the City's hiring practices illegally discriminated against African American applicants to police and fire department positions, and that the City failed to eliminate the effects of these discriminatory practices in job recruitment. Plaintiff's Motion for Summary Judgment, ECF No. 69, PageID.6077; *see also United States v. City of Warren*, 138 F.3d 1083, 1088-90 (6th Cir. 1998). In that litigation, the court found Warren's "residency requirement" for municipal positions had a disparate impact on African American applications to police and fire positions. *See City of Warren*, 138 F.3d at 1088-89; ECF No. 69, PageID.6077–78. The City of Warren agreed to address the problem by providing equal employment opportunity training to the police and fire departments. ECF No. 69, PageID.6077.

In 1991, the United States again sued the City of Warren for its hiring practices, alleging that the City failed to correct the issue in its police and fire departments, and that the problem had spread to other departments. ECF No. 69, PageID.6077–78 (citing *United States v. City of Warren*, 138 F.3d 1083 (6th Cir. 1998)). The Sixth Circuit Court of Appeals found that the City of Warren's recruitment practices for *all* municipal positions had a disparate impact on African American applicants. *City of Warren*, 138 F.3d at 1094. In response, the City entered into a formal agreement with the United States in which it agreed to provide

equal employment opportunity hiring for department heads and supervisors of municipal departments, as well as other training and recruitment measures. 2002 Agreement and Order, ECF No. 69-4, PageID.6156-57.

On August 10, 2006, fifteen years after the federal government sued over the City of Warren's discriminatory hiring practices, the Warren Police Department hired DeSheila Howlett as its first African American police officer. ECF No. 69, PageID.6078. Howlett worked as a police officer for the Warren Police Department for the next 11 years. ECF No. 4, PageID.49.

Howlett asserts she began experiencing harassment and discrimination almost immediately. *Id.* at PageID.50. When Howlett was first hired into the department, like all new officers, she had to complete "field training"[1] before she was permitted to work as a patrol officer on her own. *See* Khan Deposition, ECF No. 66-13, PageID.4208. During this training, one of her Field Training Officers, William Ross, allegedly told her she would pass her training regardless of her performance because she was black. ECF No. 4, PageID.51. Officer Ross denies he ever made this statement. *See* Ross Deposition, ECF No. 66-17, PageID.4281.

---

[1] Field training is a four-month long process that includes Phase I, Phase II, Phase III, and a "shadow" phase in which the trainee is on the road but supervised closely by an established officer. Khan Deposition, ECF No. 66-13, PageID.4208–09.

Howlett also alleges that a different Field Training Officer, Anwar Khan, told her that women do not have a right to work or be police officers. ECF No. 4, Page ID.51. Plaintiff also alleges that Khan said, "America was better off prior to 1940, 1941, when all the men went off to war and then the women started working jobs, and basically, our society declined due to the women entering the workforce, so now there's nobody to tend to the children." Howlett Deposition, ECF No. 66-2, PageID.3724.

Khan failed Plaintiff at Phase III of field training, forcing her to retake the phase. Plaintiff claims he failed her without justification, because she was a woman. ECF No. 4, PageID.51. The City denies that Plaintiff was failed without justification and claims she was failed for deficiencies in her job performance. ECF No. 66, PageID.3675. The City claimed at the hearing that Plaintiff then retook the course under Khan, who ultimately passed her. Plaintiff denied this, saying that she retook the course under a different Field Training Officer. Khan admitted in his deposition that Howlett was later passed by a different officer. ECF No. 66-13, PageID.4219.

Plaintiff also reports that much later in her career Khan pulled Howlett over in 2016 while she was driving to a crime scene in an unmarked car. Khan Deposition, ECF No. 66-13, PageID.4217. Plaintiff claims Khan falsely alleged that she was "driving recklessly" and she attempted to file a complaint against Khan, but her supervisor, Sergeant Eidt, did not appear to take the complaint seriously. Howlett Deposition,

ECF No. 66-2, PageID.3730. At the time, Howlett was a Detective Sergeant, outranking Khan. ECF No. 4, PageID.52–53. Plaintiff alleges this was further evidence of Khan's animus against her based on her sex. Khan claims that Plaintiff was speeding in an unmarked car, and that after he pulled her over he simply advised her to slow down. ECF No. 66-13, PageID.4217–18. Khan claims that Plaintiff told him she was late for a meeting but did not mention that she was responding to a report of criminal sexual conduct. ECF No. 66-13, PageID.4217–18; PageID.4232; PageID.4237. Khan also testified that he did not give her a ticket, but he did report the incident to her supervisor. ECF No. 66-13, PageID.4236–37. Khan explained that he believed informing her supervisor was the same thing as "documenting" the incident. ECF No. 66-13, PageID.4236–37.

Howlett further alleges that Sergeant Scott Taylor—who trained Plaintiff during the first phase of field training—told her that after she had received five complaints from African American citizens, she would be nominated for a "hood award." ECF No. 4, PageID.56. Plaintiff interpreted this comment to be a reference to the white sheet and hood traditionally associated with the Ku Klux Klan. Howlett Deposition, ECF No. 69-10, PageID.6344. In Taylor's deposition, Plaintiff's counsel misquoted the allegation from the Amended Complaint, asking Taylor if he remembered telling Howlett she would receive a "KKK award," rather than a "hood award". ECF No. 66-16, PageID.4276. As a result, while Taylor

firmly denied referring to any "KKK award," he was never asked to comment on the "hood award" allegation. ECF No. 66-16, PageID.4276.

Plaintiff also alleges that Officers Paul Kelly and Dale Malesh repeatedly asked Plaintiff out on dates using "extreme sexual overtones." ECF No. 4, PageID.52. However, Plaintiff did not specify what "extreme sexual overtones" means in this context, nor how many times either Kelly or Malesh allegedly asked her out using such language. Plaintiff also failed to identify any particular occasion or specific date on which one of these interactions took place.

Further, Howlett alleges that, because of her race, the police department routinely failed to provide backup when she was responding to official police calls. Howlett Deposition, ECF No. 66-2, PageID.3738. She alleges dispatch failed to send her backup—or failed to send backup as quickly as was the standard for other officers—on 45 different occasions in 2007, and 43 occasions in 2013. ECF No. 69, PageID.6093.

Plaintiff cites to numerous specific pages of Warren Police Department Dispatch Records from 2007 and 2013. ECF No. 69, PageID.6093 n.40; Exhibit 6: Backup Chart, ECF No. 69-7; Exhibit 12: 2007 Dispatch Records, ECF No. 83 (*sealed*). Plaintiff alleges that these records show the Warren Police Department failing to provide backup in a timely or safe manner—or at all—on 45 and 43 occasions, respectively. Unfortunately, these records are not self-explanatory, and no witness appears to

have been shown these documents to explain or authenticate them during deposition testimony. Defendants also filed similar dispatch records[2] as an attachment to their response to Plaintiff's motion, and they included a document called "Key Codes" that includes explanations for some—but not all—of the fields in the record. *See* Exhibit 32: Key Codes, ECF No. 77, PageID.8578–80 (*sealed*); Exhibits 32-1–32-44: Dispatch Records, ECF No. 77, PageID.8581–8747 (*sealed*). This document likewise lacks explanation and is somewhat inscrutable. The parties appear willing to leave it to the Court to decipher the meaning of various unexplained acronyms and police lingo—but the Court cannot speculate as to the meaning of records that are not clear on their face.

Plaintiff does not present logs for the years 2014-17. However, she asserts it was well known in the department that she did not receive adequate backup. ECF No. 4, PageID.54. She states that her partner, then-patrol officer Brent Chisholm, at one time told her that some co-workers told him to be careful because being partnered with Howlett meant he would not receive adequate backup. ECF No. 4, PageID.54. She states Chisholm was told by other officers that he should be worried. Howlett

---

[2] The records filed by Defendants appear to be duplicates of the records filed by Plaintiff, with the difference being that Plaintiff's records are presented in portrait orientation, and Defendants' are in a landscape orientation. Defendants' attached records also do not have the Bates numbers that are present on Plaintiff's version, so the Court cannot determine whether the two versions are identical versions. Defendants' records also all include a following page called a "Case Report" which appears to be a summary and narrative of the call in a more readable format, but Plaintiff's exhibits do not include these pages at all.

Deposition, ECF No. 66-2, PageID.3744. She also alleges that in 2015, while en route on a call with Chisholm, backup was so delayed that Chisholm had to request backup on his personal cellphone. Howlett Affidavit, ECF No. 69-8, PageID.6263. Chisholm denies being warned by other officers to be concerned for his safety when working with Howlett. Chisholm Deposition, ECF No. 66-27, PageID.4520-21. He testified that he was never fearful working with Howlett and believed that Howlett received adequate backup. *Id.* The City denies Howlett failed to receive proper backup and claims she was never in danger. Defendants' Response to Plaintiff's Motion for Partial Summary Judgment, ECF No. 74, PageID.7517; Bradley Affidavit, ECF No. 74-5, PageID.7586.

The City alleges Howlett admitted that no one told her directly that she was not being given backup, and that she never heard anyone tell Chisholm his life was in danger. Defendants' Motion for Summary Judgment, ECF No. 66, PageID.3681. Howlett identified several individuals whom she believed could corroborate her allegation, but when asked, most of these witnesses either denied her allegation or stated that they thought it was untrue. *See* Howlett Affidavit, ECF No. 69-8 (identifying Officer Nichols, Officer Booton, Officer Scott, Dispatcher Broach, and Corporal Chisolm as having personal knowledge of her backup allegation); *see also* Nichols Deposition, ECF No. 69-9, PageID.6317 (claiming Howlett never mentioned it to him); Scott Deposition, ECF No. 69-32,

PageID.6883 ("I would not know [whether or not she had problems getting adequate timely backup.]"); Chisolm Deposition, ECF No. 69-16, PageID.6487 ("I don't believe [Howlett] didn't get adequate backup."). One witness, Dispatcher Broach, did confirm that Howlett voiced her concerns about backup. Broach Deposition, ECF No. 69-28, PageID.6798 ("[Howlett] says, 'I don't think the officers are backing me up as fast as they should,' but we did not go any further in the conversation[.]"). Broach stated that she did not report Howlett's concern and did not know whether she had a responsibility to report it. *Id.* She did, however, state that she never told Howlett she personally believed officers were late responding to her calls for backup. Broach Affidavit, ECF No. 74-6, PageID.7591.

At some point in 2010 or 2011,[3] Howlett complained to the then-Labor Relations Manager for the City of Warren, Mark Simlar,[4] about a dispatcher, Dawn McLane, who allegedly failed to provide Howlett with the physical description of an armed suspect while she was responding to a run, even after Howlett asked repeatedly. Plaintiff's Motion for Partial Summary Judgment, ECF No. 69, PageID.6092; Howlett Deposition, ECF No. 66-2, PageID.3726. Howlett alleges that Police Commissioner

---

[3] Howlett does not remember when she specifically made the complaint, indicating in her deposition that she believed it was "2010 or 2011, somewhere in there." ECF No. 66-2, PageID.3726.

[4] Simlar was promoted to Director of Human Resources for the entire city in 2017. Simlar Deposition, ECF No. 69-6, PageID.6223–24.

Jere Green and Deputy Commissioner Louis Galasso interviewed Howlett about her complaint against McLane, but that they never spoke with McLane. ECF 69, PageID.6092. In her deposition, McLane confirms Howlett's allegation that the complaint was never addressed with her. ECF No. 69-25, PageID.6663. An internal affairs complaint form also establishes that Howlett was interviewed by Green, Galasso, and Simlar in 2013 about an incident involving McLane and that no discipline was recommended because the issue had been "resolved at intake." *See* ECF No. 66-19. However, Green testified that he has no recollection of this event, and Deputy Commissioner Galasso was not asked about it during his deposition. Green Deposition, ECF No. 66-10, PageID.4179–80; Galasso Deposition, ECF No. 69-21. The City alleges the complaint was unfounded because there was no description of the suspect to give and Howlett conceded in her deposition that she did not believe McLane withheld the information because of her race or gender but rather due to a "personality conflict." ECF No. 66, PageID.3699; Howlett Deposition, ECF No. 66-2, PageID3726.

In 2011, Howlett was injured in an off-duty incident. Howlett Deposition, ECF No. 66-2, PageID.3732. She alleges she requested to be reassigned to light-duty work while she recovered but was denied that opportunity. *Id.* The City responds that preference for light-duty reassignment is given to *on*-duty injuries, and that they did not have any light-duty positions available at that time, so Howlett would have to remain

off duty until she recovered and could work full-time. *Id.* Howlett alleges that though the policy lists a preference for injuries occurred in on-duty accidents, in practice it is not applied in this way as several of her fellow officers had been allowed light-duty assignments even when they were injured off-duty. Howlett Deposition, ECF No. 66-2, PageID.3732–34. She believes she was denied a light-duty reassignment because she is African American. Howlett Dep. ECF No. 66-2, PageID.3734. Ultimately, Howlett returned to full-time work a month later than anticipated because she was denied light-duty assignment. Howlett Dep. ECF No. 69-10, PageID.6356.

Howlett further alleges being harassed by various co-workers in the department on different occasions throughout her career. She says coworker Kevin Barnhill routinely spoke to her in an offensive fashion, mocking her and using stereotypical depictions of African Americans. Plaintiff's Amended Complaint, ECF No. 4, PageID.51; Howlett Deposition, ECF No. 66-2, PageID.3734. The City alleges that Howlett and Barnhill had a friendly relationship, and that when she asked him to stop making offensive comments, he did. ECF No. 66, PageID.3677.

Howlett alleges another co-worker, Roland Bell, asked her why she was walking "gingerly" after having a minor procedure, and despite her having provided him with an explanation, Bell said "No, it's because of all that big black dick in you." ECF No. 4, PageID.52. Bell denies this allegation and claims that the two got along very well. Bell Deposition,

ECF No. 66-25, PageID.4466 ("Never made that comment."); ECF No. 66, PageID.3680. Howlett also alleges that Khan and Officer Darrin Laban approached Officer Nichols asking him if he and Howlett were engaged in a sexual relationship. Howlett Deposition, ECF No. 66-2, PageID.3730–31. In response, the City claimed that Howlett admitted Laban did not engage in any harassment and that she never complained about Khan or Laban asking this question. ECF No. 66, PageID.3676. Howlett alleges former Sergeant Arthur Gill, a superior to Howlett at the time, removed her from the day shift and replaced her with a white officer even though she had higher seniority than the white officer. ECF No. 4, PageID.52. The City has not responded directly to this allegation. And Plaintiff also alleges that an "Officer Dean" allegedly asked her how much education she has, so he "would know how to speak with her." ECF No. 4, PageID.56. It is not clear whether Plaintiff believes this comment was derogatory of her race, her sex, or both.

At the end of March 2015, Howlett began working as a Detective in the Special Victims Department where she worked with four other Detectives, including Shawn Johnson. Howlett Deposition, ECF No. 66-2, PageID.3753; Eidt Deposition, ECF No. 69-22, PageID.6581; Johnson Deposition, ECF No. 69-15, PageID.6430. Sergeant Robert Eidt, the supervisor for this department, assigned Detective Shawn Johnson to assist Howlett in becoming acquainted with the department. Johnson Deposi-

tion, ECF No. 69-15, PageID.6430. Howlett alleges Johnson sexually harassed her, including suggesting she was his "slave girl", sniffing her suggestively, and rubbing his hands through her hair. ECF No. 4, PageID.54; Howlett Dep. ECF No. 69-10, PageID.6377. Johnson acknowledges that he sniffed Howlett, but claims she was wearing a new perfume and he simply smelled the perfume and wanted to compliment her on it. Johnson Deposition, ECF No. 69-15, PageID.6438. He also denies rubbing his hands through her hair and claims he never touched her. ECF No. 69-15, PageID.6439.

Howlett also alleges Johnson made racist remarks toward her, including comparing her to the gorilla depicted on the label for "Gorilla Glue" and making derogatory comments about the foods Howlett brought for lunch, insinuating they were stereotypically African American. ECF No. 4, PageID.55; *see, e.g.*, Johnson Deposition, ECF No. 69-15, PageID.6436-37 (chicken and ribs), PageID.6439 ("Atlanta" comment), PageID.6446 (color coordinated clothing), PageID.6450-51 (stealing accusation and "slave" comment). In his deposition, Johnson claims he did not intend to liken Howlett to the image on the "Gorilla Glue label", but simply suggested she use "Gorilla Glue" to fix a clock on her desk that was broken. ECF No. 69-15, PageID.6434. Johnson also claims his comments about the food Howlett brought for lunch were meant to be friendly comments about food generally. ECF No. 69-15, PageID.6437. He claims the two spoke often about cooking and what food they each cooked at

home. *Id.* Howlett also alleges Johnson frequently suggested she was stealing items from his desk.[5] ECF No. 4, PageID.55. Johnson claims he was only joking when he made these comments. ECF 69-15, PageID.6449.

Detective Johnson recounted an occasion during which Plaintiff discussed how her father's dog liked to sleep under the bed, and when she tried to get the dog out from under the bed, it bit her. ECF No. 66-20, PageID.4323. In response, Detective Johnson made a comment along the lines of, "Oh, he likes to be under there because of all the action that's going on," an apparent reference to sexual activity occurring in Plaintiff's father's bed.[6] Detective Johnson testified that this type of statement could be sexually harassing or demeaning, but repeatedly defended his actions as lacking any intent to harass, and said that he thought his various comments were acceptable repartee between co-workers who had a friendly rapport. ECF No. 66-20, PageID.4323-25.

At a retirement party for Officer Galasso in 2015, Plaintiff told Kathy Miller (now a retired detective) about Detective Johnson's continuing behavior toward her. ECF No. 69-10, PageID.6378. Sometime thereafter, Plaintiff was contacted by Sergeant Eidt, who informed her "that

---

[5] Howlett believed his accusation was made against her specifically, and none of the other officers, because of her race.
[6] This phrase was read aloud by Plaintiff's counsel during the deposition of Detective Johnson. ECF No. 66-20, PageID.4323. Detective Johnson admitted making the statement and did not contest it as inaccurate.

[Kathy Miller] had gone over to City Hall and filed a third-party complaint" on behalf of Plaintiff. ECF No. 69-10, PageID.6378. Sergeant Eidt launched an investigation and discovered that not only did Johnson make some of these offensive remarks, but that three other detectives heard them and failed to report the incidents. ECF No.69-22, PageID.6597; ECF No. 69, PageID.6088–89. At the end of the investigation, Johnson took responsibility for his behavior and Howlett's formal complaint—that Johnson racially harassed Howlett—was sustained. Johnson Deposition, ECF No. 69-15, PageID.6432. The department took disciplinary action against Johnson, issuing a warning and placing a written note of discipline in his file, which was to be removed after one year if there were no further incidents. ECF No. 69, PageID.6089. Johnson was moved out of the Special Victims Department to the Criminal Investigations Division and was required to attend diversity training. ECF No. 69-15, PageID.6460. Even though the complaint was sustained in 2015 and the training was intended to be a curative part of his punishment, Johnson did not receive any diversity training until 2017, after Howlett left the department because of her claims of mistreatment. ECF No. 69-15, PageID.6460. Notably, Johnson attested that, "I would tell you that after having to go through this and having talked to Mr. Murray [his trainer] that my behavior and comments that I would make now has drastically changed." ECF No. 66-20, PageID.4341 (referring to the 2017 training).

The City provides no explanation for why two years elapsed before Johnson received the training required by his discipline.

In 2016, Howlett was given a promotion requiring her to work in the same division as Johnson once again, after he had been moved in 2015. Howlett Deposition, ECF No. 69-10, PageID.6379. Howlett claims that before accepting the position she asked whether she could continue working in a different physical office from Johnson because of their past. *Id.* She claims Sergeant Eidt and Sergeant Mills assured her she could. *Id.* However, two weeks later, Lieutenant Lawrence Garner, the supervisor at the time, moved Howlett to the same side of the office with Johnson. *Id.* Garner had allegedly asked Howlett if the problems with Johnson were still ongoing, and even though Howlett indicated they were continuing, Garner moved her to Johnson's side of the office. Howlett Deposition, ECF No. 69-10, PageID.6383. Howlett alleges that from October to December 2016, while working near each other again, Johnson would glare at her, holler at her, and refuse to share work. ECF No. 69, PageID.6079; Howlett Deposition, ECF No. 66-10, PageID.6383. Police Commissioner Green testified that Howlett was only moved back into the same area as Johnson because the office was being renovated and there was nowhere else for her to sit. Green Deposition, ECF No. 66-10, PageID.4186.

Howlett also alleges that her co-workers used the "n-word" in her presence and in the presence of other white officers during her time with the Warren Police Department. ECF No. 4, PageID.56; ECF No. 69, PageID.6087. In depositions, two Warren Police Department employees—one a police officer—indicated they were unfamiliar with the history of the "n-word" and did not know it was considered particularly offensive or inappropriate. Beyer Deposition, ECF No. 66-24, PageID.6644, Laban Deposition, ECF No. 69-29, PageID.6833. Officer Laban also testified he believed there were situations in which it was okay for him to use the "n-word"; for example, if it were in a song or movie. Laban Deposition, ECF No. 69-29, PageID.6832.

In one incident, on February 1, 2017, Special Victims Department Secretary Barbara Beyer, in a conversation with Howlett, used the "n-word" word to refer to an African American man. ECF No. 69, PageID.6089; Beyer Deposition, ECF No. 66-24, PageID.6644. Beyer admits she used the words "that nigger" to refer to the African American man. Beyer Deposition, ECF No. 66-24, PageID.6644. Immediately after hearing Beyer's comment, Howlett reported the incident to her supervisor, Sergeant Mills. Mills Deposition, ECF No. 69-23, PageID.6623. Sergeant Mills notified Lieutenant Gardner and Commissioner Green and the three then met with Howlett. *Id.* at PageID.6625. Mills also informed Sergeant Eidt, Beyer's supervisor, of the incident. Howlett Deposition, ECF No. 69-10, PageID.6380. After the meeting with Mills, Gardner, and

Green, Howlett met with Mark Simlar. ECF No. 69-23, PageID.6626. On route to the meeting with Simlar, Howlett called Matt Nichols, the Deputy Commissioner, and recounted to him the event with Beyer and the other incidents that had occurred over the previous 11 years. ECF No. 69-10, PageID.6380. Howlett stated that during her meeting with Simlar, he got very emotional and stated that he believed that racism and sexism were "institutional" issues within the police department. *Id.* at PageID.6388. Simlar was questioned about this exchange, and based on what he heard from Howlett, he agreed that the situation appeared to be "institutional." Simlar Deposition, ECF No. 69-6, PageID.6250 ("At the time she was describing it to me, she made it sound like it was institutional, yes.").

Beyer admitted to making the comment. She received a 10-day suspension and was required to watch diversity-related videos. ECF No. 69, PageID.6090. In her deposition, Beyer acknowledges she used the "n-word", but did not believe it was inappropriate to do so:

> Q: Well, you know "nigger" was one of the words you used right? "That nigger", right, you said that right?
> A: Right
> Q: And you said that to Ms. Howlett in her face, correct?
> A: Yes.
> Q: Knowing, knowing that you were saying that to her, correct?
> A: Yes.
> Q: Okay, and you felt that was okay, correct?

A:     Yes.

Q:     Okay, why did you feel that was okay?

A:     Because we were friends. I thought I could vent.

ECF No. 69-24, PageID.6644. Beyer claimed she does not see her use of the "n-word" in that context to be a form of racial harassment. ECF No. 69-24, PageID.6645. Howlett alleges this incident with Beyer was the final push that sent her into a nervous breakdown, preventing her from returning to work as a police officer. ECF No. 69-10, PageID.6380-81. Howlett stopped working for the Warren Police Department immediately after this incident. ECF No. 69, PageID.6089.

Howlett alleges the City of Warren allowed this hostile work environment to exist because it did not provide adequate diversity training to police officers within the department. ECF No. 4, PageID.69. The City alleges the Police Department held various training sessions for its employees on the topic of diversity, pointing to the following sessions as proof:

- "*Cultural Diversity with course objectives on Racial Profiling and Cultural Awareness*" (2005),[7]
- "*Cultural Diversity from outside expert Kretzschmar*" (2006),
- "*Cultural Diversity from outside expert Nehr*" (2007),
- "*Operational Spanish for Police Officers and Employee Assistance/Care Worklife Solutions*" (2008),
- "*Cultural Awareness by Chaplain Friedman*" (2009),
- "*Hmong American Community and Diabetic Emergencies*" (2010), and

---

[7] This training occurred prior to Howlett being hired by the department.

- *"Cultural Diversity by Rev Friedman, Diabetes Awareness, Mental Health Tactical Communication and Workplace Solutions – Harassment Awareness"* (2017).[8]

Reichling Affidavit, ECF No. 66-9, Page ID.3895-96. The City alleges that all the officers listed in this suit received the 2009 training but provided no information concerning officer attendance at any of the other trainings. Bradley Affidavit, ECF No. 74-5, PageID.7585. The City provided descriptions of the subject matter taught at each session, and Sergeant Reichling attached copies of the PowerPoint slides from each listed training. Reichling Affidavit, ECF No. 66-9. In reviewing the slides, it is evident that the only trainings having anything to do with diversity are the four sessions from 2005, 2006, 2007 and 2009.[9] The 2008 and 2010 trainings—*"Operational Spanish for Police Officers and Employee Assistance/Care Worklife Solutions"*, and *"Hmong American Community and Diabetic Emergencies"*—do not appear to address race and gender discrimination, and the City does not explain how they relate to the general culture of discrimination of which Plaintiff complains.[10]

---

[8] This training occurred after Howlett left the department.

[9] "Cultural Diversity with course objectives on Racial Profiling and Cultural Awareness" (2005), "Cultural Diversity from outside expert Kretzschmar" (2006), "Cultural Diversity from outside expert Nehr" (2007), "Cultural Awareness by Chaplain Friedman" (2009).

[10] Defendants also suggest that "tactical communication" training in 2015 and 2016 was related to racial and sexual harassment. Reichling Affidavit, ECF No. 66-9, PageID.3895. Upon reviewing those training materials, they appear wholly unrelated to racial and sexual diversity training.

Defendants provide no documentation for training sessions on the topic of diversity for the five-year period from 2013 until 2017 when Plaintiff left the department. Reichling Affidavit, ECF No. 66-9, Page ID.3895. In deposition testimony, Police Commissioner Jere Green states that diversity training was provided to all department employees on an annual basis along with other "annual requirements" like "CPR, blood-borne pathogens, [and] shootings," however, Defendants do not provide any documentation of such annual cultural diversity training for the years 2013-2017.[11] Green Deposition, ECF No. 69-5, PageID.6190-91. Other Warren Police Department employees agreed with Green that officers received annual training that included a diversity training block. *See* Barnhill Deposition, ECF No. 74-11, PageID.7777 ("We have yearly training for that."); Dwyer Affidavit, ECF No. 66-36, PageID.4668 ("The City's Police Department conducts annual training on police department policies and procedures including all policies prohibiting discrimination and harassment."); Walny Deposition, ECF No. 66-21, PageID.4356 (explaining that she receives cultural diversity training on a "mandatory like yearly basis"). But other officers disputed receiving annual diversity training. *See* Houtos Deposition, ECF No. 66-39, PageID.4690-91 (ex-

---

[11] The record shows there was one 3-hour session of cultural diversity training in 2012 (ECF No. 66-9, PageID.4100), however the summary of the training session states that its focus was on "religious practices and beliefs" and did not suggest that it discussed race or gender harassment in the workplace.

plaining that he received no diversity training regarding African Americans from 2013-16); Bell Deposition, ECF No. 66-25, PageID.4459 ("We have sexual harassment training I believe every four to two years."); Mills Deposition, ECF No. 66-24, PageID.4451 (confirming detectives in the criminal investigative section did not receive diversity training from 2013-16).

The 2017 training program—*"Cultural Diversity by Rev Friedman, Diabetes Awareness, Mental Health Tactical Communication and Workplace Solutions – Harassment Awareness"*—appears very relevant to Plaintiff's complaints. This session discussed examples of overt and subtle racial and sexual harassment in the workplace and explained what constitutes a "hostile work environment", how to identify such behaviors, and what obligations employees and supervisors have when faced with this behavior. Reichling Affidavit, ECF No. 66-9, PageID.4126-30. However, this training session occurred *after* Howlett met with Simlar about the incident with Beyer and *after* she left the department

Howlett claims that the harassment and discrimination she endured in the Warren Police Department was part of a pervasive culture of discrimination in the City of Warren. ECF No. 69, PageID.6077. She alleges that this culture was engendered by the behaviors, words, and actions of the City's leaders, up to and including its Mayor, James Fouts. ECF No. 69, PageID.6085-87. Although the Mayor is not named as a defendant in this lawsuit, one of the Mayor's official duties is to appoint the

Warren Police Department Commissioner, the Human Resources Director, and the Diversity Coordinator. City of Warren Administrative Appointments, ECF No. 66-34, PageID.4589. The City alleges that despite the Mayor's official role in appointing the heads of these departments, he has no influence on the policies or day-to-day operations of the Police Department or Human Resources Department. Defendants' Motion for Summary Judgment, ECF No. 66, PageID.3683. According to the City, the departments monitor themselves. ECF No. 29, PageID.613. Plaintiff alleges that the Mayor is heavily involved in the management of these departments, and further that the Mayor's personal beliefs and attitudes are reflected in the people he appoints. ECF No. 69, PageID.6085-87.

In 2010, Mayor Fouts appointed Jere Green as Commissioner of the Warren Police Department. Green Deposition, ECF No. 69-5, PageID.6174. The Commissioner is the highest-ranking person in the police department, reporting directly and only to the Mayor, and overseeing and running the entire police department. *Id.* Green remained Commissioner until he left the position in July 2017. *Id.*

In January 2017, Mayor Fouts hired Gregory Murray as the Diversity Coordinator for the City of Warren. Murray Affidavit, ECF No. 69-12, PageID.6414. Murray submitted his letter of resignation just 10 months later in October 2017. *Id.* Murray alleges that on three separate occasions during his short tenure as Diversity Coordinator, Mayor Fouts instructed him to put diversity training on the "back burner" until after

the 2019 election for fear of backlash from white supporters if there was too great a focus on diversity. *Id.* at PageID.6413. Murray stated his purpose for taking on the role of Diversity Coordinator was to advance diversity practices in the city. Murray Deposition, ECF No. 28-2, PageID.487. Murray alleges he made recommendations for how to improve diversity in the department after he gave the Mayor his resignation letter, all of which were rejected by the Mayor. ECF No. 28-2, PageID.488. Murray alleges he was released by Mayor Fouts on December 8, 2017, ECF No. 28-2, PageID.488, but the City alleges Murray voluntarily left his position, ECF No. 29, PageID.614. Murray was replaced by George Anthony as the new Diversity Coordinator. ECF No. 69-6, PageID.6225.

## III. Standard of Review

### Summary Judgment

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evi-

dence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The movant has the initial burden to show that there is no genuine issue of material fact and that they should prevail as a matter of law. *Selby v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets that burden, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (explaining that a non-movant "may not rest upon its mere allegations or denials of the adverse party's pleadings"). The non-moving party must present more than "a scintilla of evidence." *Anderson,* 477 U.S. at 252. If the disputed evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50. The Court must determine whether the evidence presents a factual disagreement sufficient to require submission of the claims to a jury, or whether the moving party prevails as a matter of law. *Id.* at 252.

## Statute of Limitations

Defendants assert that many of Plaintiff's claims fall outside the applicable statute of limitations. To address this argument the Court will consider both the statute of limitations relating to claims under Title VII, which allows the application of a "continuing violation" theory, and under

§ 1983 claims, which normally does not. Whether a complaint was filed within the relevant statute of limitations is a question of law. *Wolfe v. Perry,* 412 F.3d 707, 713 (6th Cir. 2005).

Defendants argue that Plaintiff's Title VII claims are untimely as a matter of law, asserting that "[a]n EEOC charge must be filed 'within 300 days after the alleged unlawful employment practice occurred, 42 U.S.C. §2000e-(5)(e)(1), and the Courts recognize that the filing of a timely charge with the EEOC is a prerequisite to a Title VII action.'" ECF No. 66, PageID.3683 (citing *Sherman v. Optical Imaging Systems, Inc.*, 843 F. Supp. 1168 (E.D. Mich. 1994)); *Block v. Meharry Medical College*, 723 F. App'x 273 (6th Cir. 2018)).[12] Therefore, according to Defendants, no acts occurring more than 300 days before Plaintiff's filing of this lawsuit should be considered by the Court. In response, Plaintiff argues she was subjected to a "continuing violation" under Title VII because she alleges acts that occurred at various times throughout the entirety of her tenure

---

[12] *Sherman v. Optical Imaging Systems* is about violations of the Americans with Disabilities Act, the Michigan Handicappers' Civil Rights Act, and the Age Discrimination in Employment Act. It holds that the court "has jurisdiction to decide Plaintiffs' ADA claim on the merits as well as procedurally, even though Plaintiffs did not file a charge with the EEOC or receive a right-to-sue letter." *Sherman v. Optical Imaging Sys., Inc.*, 843 F. Supp. 1168, 1179 (E.D. Mich. 1994). *Block v. Meharry Medical College*, 723 F. App'x 273 (6th Cir. 2018) is unpublished and holds no precedential value. There are several published cases and clear precedent on the topic of Title VII claims, so the Court does not see the need to consider *Block* in its analysis.

with the Warren Police Department. The Sixth Circuit employs the continuing violation doctrine[13] most commonly in Title VII cases, but rarely extends it to § 1983 claims. *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) (citing *LRL Properties v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1106 n.3 (6th Cir. 1995)).

Under the continuing violation doctrine, "a plaintiff is entitled to have the court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred.'" *Sharpe*, 319 F.3d at 267 (quoting *Alexander v. Local 496, Laborers' Int'l Union of North America,* 177 F.3d 394, 408 (6th Cir. 1999)). But "when an employee seeks redress for discrete acts of discrimination or retaliation, the continuing violation doctrine may not be invoked to allow recovery for acts that occurred outside the filing period." *Sharpe*, 319 F.3d at 267 (citing to *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, (2002)). This is because discrete acts—such as termination, refusal to hire, or failure to promote—are easily identifiable.

---

[13] The Sixth Circuit previously recognized two categories of continuing violations: those (1) alleging serial violations and (2) identified with a longstanding and demonstrable policy of discrimination. *Sharpe v. Cureton,* 319 F.3d 259, 266 (6th Cir. 2003). The "serial violation" category is no longer recognized by the Supreme Court. See *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002).

Hostile work environment claims under Title VII, on the other hand, "involve unlawful employment practices that cannot be said to occur on any particular day but, occur over a series of days or years." *Nat'l Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993)).

Plaintiff filed her complaint with the EEOC and received a right to sue letter dated April 4, 2017. ECF No. 66-8. She filed suit on April 21, 2017, well within the 90 days allowed by the letter. ECF No. 1. Her complaint alleges a continuing violation of her rights under Title VII, so the Court will consider all relevant actions in its consideration of her Title VII claims, not just those that occurred within 300 days of her EEOC complaint. *See Kovacevich v. Kent State Univ.*, 224 F.3d 806, 829 (6th Cir. 2000) (explaining that the 300-day time period for filing a charge with the EEOC may be subject to equitable tolling under the continuing violations doctrine where at least one alleged event falls within the 300-day period).

Regarding actions under § 1983, Congress did not adopt a specific statute of limitations, so courts "must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought." *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003). This case was brought in Michigan, and "the appropriate statute of limitations to be borrowed for § 1983 actions arising in Michigan is the state's three-year limitations period for personal injury claims."

*Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005).[14] Though state law determines *what* the statute of limitations period is, federal law determines *when* the statutory period begins to run. *Harrison v. Michigan*, 722 F.3d 768, 772–73 (6th Cir. 2013) (citing *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996)).

The City of Warren argues the statute of limitations period began running when Plaintiff knew or had reason to know that the acts constituting the basis of her complaint occurred. ECF No. 66, PageID.3684 (quoting *Harrison v. Michigan*, 722 F.3d 768, 773 (6th Cir. 2013) ("[T]he statute of limitations period begins to run when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred.")). As the Court understands it, the City argues each individual incident complained of in Plaintiff's suit set off its own three-year clock, and after the three years elapsed, Plaintiff would be barred by the statute of limitations from asserting a claim based on that incident. Because Plaintiff knew about the injury when it occurred—it was occurring to her—the clock started at that moment. The City's position is that only incidents occurring within the three years immediately preceding Plaintiff's filing of this lawsuit should be considered. The Court concludes that

---

[14] The original Complaint in this case was filed on April 21, 2017. If a three-year statute of limitations were to apply, then only claims arising after April 21, 2014 could be brought.

Defendants' position is consistent with Sixth Circuit precedent: the statute of limitations begins to run when the Plaintiff becomes aware of the act providing the basis for the claim. The initial complaint in this case was filed on April 21, 2017; therefore, only incidents occurring on or after April 21, 2014[15] may be considered for Plaintiff's § 1983 claims.

Accordingly, Plaintiff's hostile work environment claims (Count I: Violation of Title VII – Discrimination Based on Race and Gender – Hostile Work Environment) may be based on all of the alleged incidents of discrimination, but Plaintiff's § 1983 claims may be supported only by incidents occurring after April 21, 2014.

## IV. Analysis

### Count I – Violation of Title VII – Hostile Work Environment (42 U.S.C. § 2000e, et seq.)

Section 2000e of Title 42 of the United States Code states:

> It shall be an unlawful employment practice for an employer –
>
> (1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which

---

[15] Defendants argue in their motion that the cut-off date is April 21, 2013, but that appears to be a simple mathematical mistake on their part. ECF No. 66, PageID.3683 ("All of Plaintiff's claims preceding April 21, 2013 [sic], are untimely as a matter of law under both 42 U.S.C. §1983 and Title VII, because those alleged actions occurred between ten (10) and twelve (12) years ago.")

> would deprive or tend to deprive any individual of
> employment opportunities or otherwise adversely
> affect his status as an employee, because of such
> individual's race, color, religion, sex or national
> origin.

42 U.S.C. § 2000e-2(a); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999).

Plaintiff's first count alleges a Title VII violation against all "Defendants." *See* Plaintiff's Amended Complaint, ECF No. 4, PageID.59-60. However, Title VII only imposes liability on an "employer," which is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such person." *Wathan v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997) (quoting 42 U.S.C. § 2000e(b)). While other courts have interpreted the phrase "and any agent of such person" as "incorporating respondeat superior liability into the statute," *Miller v. Maxwell's Intern. Inc.*, 991 F.2d 583, 587 (9th Cir. 1993), the Sixth Circuit has concluded that Congress did not intend for individual employees or agents to face liability under Title VII, even those employees operating in a supervisory capacity. *Wathen*, 115 F.3d at 405-06 ("We now hold that an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII."). Accordingly, the Court will only consider Plaintiff's Title VII claim against the City of Warren as Plaintiff's "employer."

The remaining defendants, Jere Green, Lawrence Gardner, Shawn Johnson, and Anwar Khan are not alleged to be Plaintiff's "employer" as defined in Title VII. Further, Plaintiff's first count encompasses hostile work environment claims both on the basis of sex and race. Because the facts necessary to show a hostile work environment claim based on sex are different than those for race, the Court will consider them separately.

### a.    On the basis of sex

A plaintiff may establish a violation of Title VII by proving that the discrimination occurred based on sex and created a hostile or abusive work environment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir. 1997), *cert. denied,* 522 U.S. 865 (1997). A hostile work environment is one in which "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (citations and internal quotation marks omitted). While individual instances of harassment usually do not create a hostile work environment on their own, "the accumulated effect of such incidents may result in a Title VII violation." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999). As such, use of a "totality-of-the-circumstances" test is "the most basic tenet of the hostile-work-environment cause of action." *Id*. The Court must consider "'all of the circumstances,' including 'the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance.'" *Jackson v. Quanex Corp.,* 191 F.3d 647, 658 (6th Cir. 1999) (quoting *Harris v. Forklift Sys.,* 510 U.S. 17, 23 (1993)). The conduct is judged on both an objective and a subjective standard. That is, "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id.* at 658 (quoting *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir. 1997)).

In the Sixth Circuit, to establish a *prima facie* case of sexually hostile work environment, a plaintiff must show the following elements by a preponderance of the evidence,

> (1) that she was a member of a protected class;
> (2) that she was subjected to unwelcome sexual harassment;
> (3) that the harassment was based on sex;
> (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and
> (5) that there is a basis for employer liability.

*Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008) (citing *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999)). It is undisputed that Plaintiff, an African American woman, is a member of a protected class. Defendants dispute the next three elements, arguing that the alleged harassment was not unwelcome, was not based on sex, and did not

create a hostile work environment. ECF No. 66, PageID.3686. The Defendants do not appear to contest that there would be a basis for employer liability if the other elements of the prima facie case were present.

As to the elements of the prima facie case, it is undisputed that Plaintiff is a member of a protected class, and therefore meets the first element. The second element is that she was subject to "unwelcome harassment." Defendants dispute this by claiming that because Plaintiff was "friends" with some of her alleged harassers, their conduct could not be unwelcome. Specifically, Defendants argue, "Plaintiff has admitted that she frequently joked with Bell, that she believes Bell is a 'good guy.' A solitary, alleged crude comment, (denied in full by Bell, ¶ 33 herein), if made, was not unwelcome." ECF No. 66, PageID.3686. At best, this defense applies only to the allegations against Bell. At worst, it suggests that a person can become inoculated against ever being subject to workplace harassment claims simply by befriending one's co-workers. Plaintiff testified to numerous incidents that she felt were harassing and unwelcome. That she may at one time have had a friendly rapport with someone who participated in the alleged harassment does not mean such harassment was welcome. The evidence in the record is sufficient to raise an issue of fact as to the second element of her prima facie case.

The third element is that the alleged harassment was based on sex. Defendants argue Plaintiff has not shown that the alleged harassment was "based on sex." They assert that her allegations against Officers

Kelly and Malesh were simple misunderstandings, and that those officers were only inviting her to friendly outings. ECF No. 66, PageID.3686. They say that her allegations regarding Officer Khan failing her in field training cannot be boiled down to simple discrimination on the basis of sex because he also failed similarly-situated white male officers. ECF No. 66, PageID.3689–90. They point to James Twardesky and James Huron, who took the field training course around the same time as Plaintiff and were also failed at Phase III by Khan. ECF No. 66, PageID.3689–90.

Defendants' point is that if Khan also failed otherwise similarly-situated white male officers, then he could not have failed Plaintiff on the basis of her sex (or race). But Plaintiff does not allege that Khan only failed women, always failed women, only passed men, or always passed men. Rather, she alleges that Khan failed *her* because she is a woman, and that his concerns about her performance were mere pretext. In support of this, she testified that Officer Khan made statements to her demonstrating a regressive view of women in general and specifically an enmity against women participating in the workforce. These statements allow a fair inference that Officer Khan held her sex against her when assessing her performance. A reasonable jury might conclude that Khan failed Plaintiff at Phase III on the basis of her sex. Defendants do not address whether the allegations that pertain to Detective Johnson or Detective Bell meet this element. When taken altogether, a reasonable jury

could find that some of these incidents of alleged harassment were motivated by Plaintiff's sex. This is sufficient to conclude that Plaintiff has presented sufficient facts to raise an issue on the third element of her prima facie case.

Defendants next dispute whether Plaintiff has presented facts capable of establishing the fourth element of her prima facie case—that the harassment created a hostile work environment. They argue that even if Plaintiff's allegations were taken as true, these few events, when considered against Plaintiff's whole eleven-year career, do not rise to the level of creating a sexually-hostile work environment. They further argue that Plaintiff has failed to show "that the claimed harassment was sufficiently 'severe or pervasive.'" ECF No. 66, PageID.3686–87.

Defendants acknowledge that Detective Johnson was disciplined "for a sexually crude comment he made to Plaintiff," but also claim that "Plaintiff testified in deposition that she was satisfied with the Department's action." ECF No. 66, PageID.3688. Defendants imply that Plaintiff felt the department handled the discipline of Johnson appropriately and adequately. They do so to support their argument that "when measuring the hallmark of whether a work environment is objectively hostile, Courts examine employers' remedial measures to determine if the measures put an end to further complaints of harassment by the offending individual." ECF No. 66, PageID.3688 (citing *Vermett v. Hough*, 627

F. Supp. 587, 607 (W.D. Mich. 1986)). But Plaintiff explained in her deposition and alleges in her complaint that the department's remedial measures did not put an end to Johnson's harassment of Plaintiff, nor her harassment by other people, including Barbara Beyer. Indeed, this is evidence that the work place was objectively hostile. Plaintiff has set forth sufficient facts to establish the fourth element of her prima facie case.

Defendants do not dispute the fifth element, that there is a basis for employer liability. While they dispute whether the City should be liable under *Monell v. Dep't of Soc. Svcs. of City of New York,* 436 U.S. 658, 691 (1978) for damages pursuant to § 1983, that is unrelated to whether the City, as Plaintiff's employer, is liable for potential Title VII claims.

Plaintiff has sufficiently alleged the prima facie elements of her hostile work environment claim as it pertains to her sex. There are genuine issues of material fact—namely, whether she was failed at Phase III because of her sex, whether various officers and detectives made the comments she alleges they made, and whether the City forced her to work with someone they should have known was sexually harassing her. A jury could reasonably find that the totality of circumstances at the Warren Police Department constituted a hostile work environment for Plaintiff on the basis of her sex.

Consequently, Defendants' Motion for Summary Judgment will be denied as to Count I – Hostile Work Environment on the Basis of Sex.

### b.    On the basis of race

The fundamental underlying rationale for a claim of hostile work environment on the basis of race is the same for a claim on the basis of sex. *See Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008) (citing *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999)).

Plaintiff makes numerous allegations about how she was discriminated against and harassed on the basis of race, which are thoroughly summarized in the background section above. Plaintiff is a member of a protected class, and she sufficiently alleges that she was subjected to harassment on the basis of her race that created a hostile work environment and interfered with her work. The conduct attested to—from making statements involving racial stereotypes about food and clothing, degrading Plaintiff's appearance, and using the "n-word" around her, to failing to provide adequate backup, among other allegations—is the type that a jury could find sufficient to constitute an unreasonably abusive or offensive work environment that adversely affected Plaintiff's ability to do her job.

Defendants' Motion for Summary Judgment will therefore be denied as to Count I – Hostile Work Environment on the Basis of Race.

## Count II – Fourteenth Amendment Equal Protection
## (42 U.S.C. § 1983)

Plaintiff alleges that "[a]s a direct and proximate result of the unconstitutional acts of the Defendants as alleged herein, Plaintiff has sustained a violation of her right to equal protection of the law[.]" ECF No. 4, PageID.61. The relevant statute of limitations for Plaintiff's § 1983 claims, as discussed above, is three years. *Wolfe,* 412 F.3d at 714. The three-year period began running at the time of each alleged injury. *Harrison v. Michigan*, 722 F.3d 768, 773 (6th Cir. 2013). The only incidents allegedly violating Plaintiff's right to equal protection that fall within the statute of limitations are those that occurred within three years of Plaintiff's filing of the first complaint in the instant action.

The following incidents fall within the statutory period because they occurred after April 21, 2014: (1) Detective Shawn Johnson's conduct in harassing Plaintiff, (2) Officer Khan's conduct in pulling Plaintiff over as she was driving in an unmarked police vehicle responding to a call, (3) Barbara Beyer's use of the n-word,[16] (4) Commissioner Jere Green's alleged conduct in failing to adequately discipline Johnson by ensuring that he promptly take diversity training, (5) Lieutenant Lawrence Garner's alleged conduct in requiring Plaintiff to work near Johnson after he had been disciplined for misconduct toward her and she expressed concern

---

[16] Because Barbara Beyer was previously dismissed as an individual defendant by stipulated order, ECF No. 21, the Court will not discuss the incident involving her as a basis for liability under § 1983.

that such conduct might continue, and (6) the City's ongoing conduct in failing to provide diversity training during this time period.

The Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from discrimination on the basis of sex or race. *See Poe v. Hayden*, 853 F.2d 418, 429 (6th Cir. 1988) (on the basis of sex); *see also Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977) (on the basis of race). To state a claim here, Plaintiff need only to allege sufficient facts to show "that a state actor intentionally discriminated against her because of membership in a protected class." *Brand v. Motley*, 526 F.3d 921, 924 (6th Cir. 2008) (quoting *Henry v. Metro. Sewer Dist.,* 922 F.2d 332, 341 (6th Cir. 1990)).

### a.) *Detective Shawn Johnson*

Plaintiff has alleged sufficient facts showing Detective Shawn Johnson intentionally discriminated against her on the basis of her race and sex. This is evidenced by the number of incidents she alleges from the time she began working with Johnson in 2015 to when she left the department in 2017. This time-frame was during the statutory period. Johnson pleaded as an affirmative defense that he was entitled to qualified immunity. ECF No. 7, PageID.112. However, Defendants did not argue that Johnson was entitled to qualified immunity in their motion for summary judgment, ECF No. 66, or their reply brief in support of that motion, ECF No. 76. The Court considers that defense abandoned at this

time. *Larry v. Powerski*, 184 F.Supp.3d 584, 602 (E.D. Mich. 2015) (holding defendant abandoned qualified immunity defense where defendant did not argue or mention qualified immunity in her motion for summary judgment or reply brief, even though she pled the defense in her answer); *see also Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) (explaining that courts may entertain renewed motions for qualified immunity during trial).

### b.)    *Officer Anwar Khan*

Plaintiff states Officer Anwar Khan intentionally discriminated against her and is not entitled to qualified immunity because he "harassed Plaintiff[] and knew or should have known that [his] conduct violated her constitutional rights." Plaintiff's Response to Defendants' Motion for Summary Judgment, ECF No. 70, PageID.6929. Defendants assert Khan is entitled to qualified immunity because the evidence is "uncontroverted" that Khan failed similarly-situated men during Phase III of field training and because Plaintiff "admitted" she was having problems performing the tasks in Phase III. ECF No. 66, PageID.3699. But because they occurred prior to April 21, 2014, Khan's actions during field training are not considered for purposes of Plaintiff's § 1983 claim. Rather, the incident where Khan pulled Plaintiff over in an unmarked police vehicle while responding to a call is at issue. Defendants do not argue why Khan is entitled to qualified immunity for that act. *See* Defendants' Motion for Summary Judgment, ECF No. 66, PageID.3699. While "it is

the plaintiff's burden to convince the court that the law was clearly established at the time of the offensive conduct[,]" *Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996), *Defendants* moved for summary judgment on Plaintiff's § 1983 claim and failed address the relevant conduct that allegedly did not violate a clearly established constitutional right.

The Court will not *sua sponte* grant summary judgment on behalf of Khan where he has failed to argue that his conduct did not violate clearly established federal law. *See Larry*, 184 F.Supp.3d at 602 (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (observing that "[i]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," and reiterating that "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones") (quotations and alterations omitted)). Therefore, Khan is not entitled to qualified immunity at this time. *Ortiz*, 562 U.S. at 184. However, Plaintiff has alleged sufficient facts to demonstrate that Khan intentionally discriminated against her on the basis of her sex during this encounter where he allegedly pulled her over in her unmarked police vehicle, harassed her, and attempted to file a complaint against her.

### c.)  Commissioner Jere Green

Plaintiff also argues Police Commissioner Jere Green violated her constitutional rights in his individual capacity when he failed to adequately discipline Johnson, monitor activities in the department, ensure that Johnson complete a diversity training course in a timely manner, and provide diversity training to the department as a whole. ECF No. 70, PageID.6929. Defendants assert Green is entitled to qualified immunity. Defendants' Motion for Summary Judgment, ECF No. 66, PageID.3696-97.

Qualified immunity protects state actors from liability unless they violate "clearly established" federal law at the time they acted. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is usually a two-fold question. The Court first determines whether a plaintiff has shown the defendant violated a constitutional right, and if so, whether that right was "clearly established" at the time the defendant acted. *Id.* Plaintiffs bear the burden of persuasion once defendants properly raise the defense. *Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996).

Taking the second qualified immunity question first, Plaintiff had a clearly established constitutional right under the Equal Protection Clause not to be discriminated against by the City on the basis of race or sex. *See Washington v. Davis*, 426 U.S. 229, 239-41 (1976) (on the basis of race); *Poe v. Haydon*, 853 F.2d 418, 430 (6th Cir. 1988) (on the basis of sex). The objective question is whether the "contours of the [asserted]

46

right were sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Poe*, 853 F.2d at 423 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Because the basis of Green's alleged § 1983 liability cannot be premised on a theory of respondeat superior, Plaintiff must demonstrate that Green *personally* violated her rights. *See Lynn v. City of Detroit*, 98 Fed.Appx. 381, 385 (6th Cir. 2004). According to the record, Green's conduct consisted more in acts of omission rather than commission: at the individual level, he failed to ensure that Johnson completed his disciplinary punishment by promptly attending diversity training; and, at the department-wide level, he failed to order that the department conduct any diversity training from 2014-17.

In the context of such supervisory liability, the Sixth Circuit has held that "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)); *see also Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998) (concluding that § 1983 liability cannot be based upon a "mere failure to act"). Notably, merely "neglectful" conduct

is not sufficient for § 1983 liability. *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 513 (6th Cir. 1996) (stating that knowing acquiescence implies more than "sloppy, reckless, or neglectful" execution of duties). Therefore, the Court must determine whether Green's conduct rises to the level of encouragement or knowing acquiescence.

Turning to Green's specific actions, the record demonstrates that he authorized Johnson's discipline and ordered Johnson receive diversity training but failed to follow up on whether that training ever occurred. When Lieutenant Lawrence Garner approached Green requesting to physically relocate Plaintiff to a workspace near Johnson, Green testified that he had a meeting with Garner, labor relations employee Mark Simlar and Plaintiff about the move. ECF No. 66-10, PageID.4186. While it appears Simlar confirmed that no additional incidents had been reported, Green did not inquire whether Johnson's discipline had been completed by his having attended the mandated diversity training. *Id.* Garner testified that Green told him "everything [with the discipline] was done" and "[t]here was nothing to prevent them [Johnson and Plaintiff] from being in the same room together." ECF No. 66-22, PageID.4378. Green testified that he remembered meeting with Plaintiff to discuss this decision, but according to Garner, Green did not participate in the meeting with Plaintiff. Green Deposition, ECF No. 66-10, PageID.4186; Garner Deposition, ECF No. 66-22, PageID.4409. Plaintiff testified that she discussed the matter with Garner, and specifically told Garner that she did not wish to

48

be returned to the same work-space with Johnson, but she was never asked whether she participated in any discussion with Green. ECF No. 69-10, PageID.6383. Green then approved placing Plaintiff back into the same room with Johnson. ECF No. 66-10, PageID.4186.

As for Plaintiff's allegation that Green failed to implement *any* diversity training from 2013-16, the record is unclear whether Green was *personally* tasked with designing and implementing this training.[17] It cannot be said, on the record before the Court, that Green "personally had a job to do, and he did not do it" when he failed to monitor Johnson and failed to provide department-wide diversity training from 2014-17 before Plaintiff left the department. *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992), *cert. denied*, 509 U.S. 903 (1993) (finding supervisor liability where plaintiff alleged that supervisor abandoned the specific duties of his position—reviewing and responding to inmate medical complaints—"in the face of actual knowledge of a breakdown in the proper workings of the department"); *see also Gregory v. City of Louisville*, 444 F.3d 725, 751-52 (6th Cir. 2006) (explaining that supervisor was entitled to qualified immunity where plaintiff only alleged sufficient facts showing that supervisors "failed to review their subordinates' work" and did not present evidence that it was the *active performance* of the supervisor's

---

[17] While several witnesses testified that yearly training of some kind was provided that allegedly included information on diversity issues, none of the materials documenting this yearly training was provided, and the Court has carefully examined all of those materials that were provided. *See* Analysis *supra* at 23-24.

individual job function that caused the plaintiff's constitutional injury). Because the evidence does not show that Green abandoned a specific duty to provide diversity training to the department in the face of actual knowledge that racial and sexual harassment was a problem in the department, the record does not support a finding of implicit authorization, approval or knowing acquiescence on Green's part that would be sufficient under the case law to impart supervisory liability.

The same analysis applies to the question of whether Green was directly responsible for following up on Johnson's requirement of completing diversity training. Green was aware that Johnson was required to undergo diversity training as part of his discipline, but he never monitored the progress of that decision to ensure that Johnson took the training. *See* Green Deposition, ECF No. 70-5, PageID.7129-30 ("I never followed up on it. . . . If [training] didn't occur, I would assume that it would have been reported to me as the police commissioner. So it never was."). Without question, this would appear to be negligent supervision, but imposing supervisory liability requires implicit authorization, approval or knowing acquiescence in a violation of constitutional rights, not merely "neglectful" behavior. *Doe*, 103 F.3d at 513.

Finally, with respect to the decision to allow Plaintiff to return to work in the same office with the person who was harassing her, the record is likewise insufficient to overcome qualified immunity as to Commis-

sioner Green. Green says that he checked with the labor relations manager, Simlar, to make certain there were no new incidents before approving Plaintiff's relocation. Green Deposition, ECF No. 66-10, PageID.4186; Garner Deposition, ECF No. 66-22, PageID.4378. Plaintiff is clear that she told *Garner* she did not want to be forced to co-locate again with Johnson, but there is nothing in the record indicating that *Green* was told of Plaintiff's objection. Howlett Deposition, ECF No. 69-10, PageID.6383; Green Deposition, ECF No. 66-10, PageID.4186. On this subject, Green's knowledge is distinguishable from Garner's. As to Green, there is no allegation of fact that *he* was aware that the decision to allow Plaintiff and Johnson to work together in the same office again would subject her to harassment. In the absence of evidence that Green "possessed information revealing a 'strong likelihood' of unconstitutional conduct by subordinate officers but did nothing to prevent the misconduct, thereby causing harm to the plaintiffs," see *Lynn v. City of Detroit*, 98 Fed. Appx. 381, 385 (6th Cir. 2004) (quoting *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002)), the record is insufficient to impose supervisory liability and Green is entitled to qualified immunity.

### d.) *Lieutenant Lawrence Garner*

Plaintiff argues that Lieutenant Lawrence Garner violated her constitutional rights following her 2016 promotion when he placed Plaintiff back in the same office space as Johnson even though Plaintiff indicated that her problems with Johnson were ongoing. ECF No. 70, PageID.6929.

51

Plaintiff testified she was only willing to take the promotion because she had been promised she would *not* have to move to an office space near Johnson. Howlett Deposition, ECF No. 66-2, PageID.3759. Because of the move, Plaintiff alleges Johnson was able to continue to harass her from October to December 2016. Defendants allege Garner is also entitled to qualified immunity. ECF No. 66, PageID.3697. They assert Garner only moved Plaintiff to the same office space after she stated she had "no problem" moving to a seat closer to Johnson because of remodeling in the building. Defendants' Motion for Summary Judgment, ECF No. 66, PageID.3698; Garner Deposition, ECF No. 66-22, PageID.4379-80. That characterization conflicts with Plaintiff's testimony. She stated that she told Garner her issues with Johnson were still ongoing and summarized some of those problems for him. ECF No. 66-2, PageID.3759.

To be sure, the right to be free from state-sponsored discrimination based on race and sex is clearly established. *See Davis*, 426 U.S. at 239-41 (on the basis of race); *Poe*, 853 F.2d at 430 (on the basis of sex). But the Court must also consider whether a reasonable official in Garner's position could have believed that placing Plaintiff in the same office space as Johnson following a sustained disciplinary action and expressly against her wishes—resulting in continued harassment by Johnson—was lawful, considering that clearly established right. *See Poe*, 853 F.2d at 423. Here, a genuine issue of material fact exists as to whether Garner

intentionally discriminated against Howlett. If Plaintiff is correct, Garner was aware of a prior sustained disciplinary action against Johnson, and also that Plaintiff was still concerned about Johnson's conduct, but nevertheless put Plaintiff in an office space close to him against her wishes.

Granted, Garner stated that he personally went to Commissioner Green to make sure that nothing in Johnson's disciplinary file prevented the move and "[he] was told there was not." ECF No. 66-22, PageID.4378. When Garner spoke with Green, the two also got confirmation from Mark Simlar that "everything was done" and "[t]here would be nothing against her being moved[.]" *Id.* But on a motion for summary judgment, the Court must credit the factual assertions of the non-moving party. *See Matsushita*, 475 U.S. at 587. And here, Plaintiff stated she told Garner she was still having problems with Johnson and did not want to be located near him because of her fear of continued harassment. ECF No. 69-10, PageID.6383. Taking this as true, it was the kind of information that would have put Garner on notice of a "strong likelihood" of unconstitutional conduct by a subordinate officer regardless of Green's authorization. And by failing to prevent the misconduct, he arguably exhibited "deliberate indifference" to violation of her rights. *Lynn*, 98 Fed. Appx. at 385. Under these circumstances, Garner is not entitled to qualified immunity. *See Crawford v. Davis*, 109 F.3d 1281, 1284 (8th Cir. 1997) (affirming district court's refusal to grant summary judgment to defendants

on basis of qualified immunity "[b]ecause significant factual disputes existed] with regard to the defendants' actions in *preventing and responding* to sexual harassment" and the court could not say, as a matter of law, that their actions did not violate the plaintiff's clearly established right to be free from sexual discrimination) (emphasis added)); *see also T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) (recognizing that it was clearly established "that a supervisor could be held liable for participating in or deliberately turning a blind eye to the equal protection violation of her subordinate").]

For the above reasons then, Defendants' Motion for Summary Judgment as to Count II is **GRANTED** in part, as to claims pertaining to events occurring before April 21, 2014 and as to all claims against Defendant Green, who is entitled to qualified immunity; and **DENIED** in part as to claims pertaining to events occurring after April 21, 2014 against Defendants Johnson, Garner, and Kahn.

### Count III – Fourteenth Amendment Due Process (42 U.S.C. § 1983)

Fourteenth Amendment due process claims can be brought as "procedural" challenges or "substantive" ones. *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017). Plaintiff does not plead that she was denied a certain process that she should have been granted or that any of the processes she accessed were somehow unfair. Nor does the Court identify any facts

that would sustain such an allegation. Though Plaintiff also does not analyze the elements of a substantive due process claim, it appears her claim that she was routinely denied backup assistance from other officers because of her race would constitute a substantive due process challenge. Amended Complaint, ECF No. 4, PageID.62.

Substantive due process "serves the goal of preventing 'governmental power from being used for purposes of oppression,' regardless of the fairness of the procedures used." *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, (1986) (internal quotation omitted)). "Substantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that '"shock the conscience."'" *Pusey v. City of Youngstown,* 11 F.3d 652, 656 (6th Cir. 1993), *cert. denied,* 512 U.S. 1237 (1994).

Plaintiff does not allege a deprivation of a particular constitutional guarantee. Therefore, the Court considers whether the actions she alleges "shock the conscience." Plaintiff alleges that she was routinely denied backup assistance from other officers because of her race. Amended Complaint, ECF No. 4, PageID.62. The City denies that Plaintiff failed to receive proper backup. If true, such an allegation would certainly shock the conscience:  the intentional, systematic, and repeated denial of needed backup to support an officer in the field—simply because of race—

would be reprehensible on a grand scale. But the support for this allegation consists primarily of the difficult-to-interpret "dispatch records" from 2007 and 2013. ECF No. 70, PageID.6912; ECF No. 69, PageID.6093 (alleging dispatch failed to send her backup—or failed to send backup as quickly as was the standard for other officers—on 45 different occasions in 2007, and 43 occasions in 2013). She does make one specific allegation about dispatcher Dawn McLane in 2010 or 2011 failing to provide a description of an armed suspect, but this single incident also occurred more than three years before the Complaint was filed.[18] ECF No. 69, PageID.6092; Howlett Deposition, ECF No. 66-2, PageID.3726. This is significant because the same three-year statute of limitations discussed above in connection with Plaintiff's § 1983 claims for Equal Protection violations applies here. That three-year statute of limitations precludes this Court from considering those acts documented in the 2007 and 2013 records, even assuming that the proffered records supported the claim that backup was delayed or denied. Plaintiff also does not allege any specific facts showing that defendants Shawn Johnson, Anwar Khan, Jere

---

[18] Howlett makes one allegation of failure to provide backup in a timely manner that occurs after April 21, 2014. That allegation involves a call for backup when Plaintiff and Detective Brent Chisolm were arresting a criminal sexual conduct suspect. ECF No. 69, PageID.6079. However, that allegation was against the *City*, and not any individual officer. *Id.* As such, it may more properly be considered in connection with Plaintiff's claim that the City is liable under *Monell.* Moreover, the Court notes that, to the extent there is evidence of a race-based failure to provide back-up during the time-frame preceding April 21, 2014, such evidence could be relevant to proving Plaintiff's hostile-work environment claim under the continuing violation theory.

Green, or Lawrence Garner routinely denied her backup assistance. Her pleadings allege that "defendants" as a whole "purposefully refused and failed to provide the necessary backup." ECF No. 4, PageID.62. This allegation is conclusory and is not supported by any facts the Court can consider for Plaintiff's claim against the remaining individual defendants.

Defendants' Motion for Summary Judgment as to Count III must therefore be **GRANTED**.

## Count IV – Municipal Liability under *Monell* (42 U.S.C. § 1983)

Both parties move for summary judgment on Count IV, Plaintiff's claim seeking to impose § 1983 liability on the City of Warren. A municipality cannot be liable under a theory of respondeat superior for the constitutional torts of its employees. *Monell v. Dep't of Soc. Svcs. of City of New York,* 436 U.S. 658, 691 (1978). Instead, municipal liability may be established either through an express municipal policy that deprives an individual of a constitutionally protected right, or by a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)); *Monell*, 426 U.S. at 694. The "policy or custom" must be the "moving force" behind the deprivation of the plaintiff's rights. *Monell*, 426

U.S. at 694. An actionable custom—as opposed to a written policy—is one that "has not received formal approval through . . . official decisionmaking channels." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007). A plaintiff may establish the existence of a custom by showing that "policymaking officials knew about and acquiesced in the practice at issue." *Id.* (citing *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis,* 361 F.3d 898, 902 (6th Cir. 2004)); *see also Doe v. Claiborne County,* 103 F.3d 495, 507 (6th Cir. 1996) ("Under *Monell*, the [defendants] cannot be found liable unless the plaintiff can establish that an officially executed policy, *or the toleration of a custom* . . . leads to, causes, or results in the deprivation of a constitutionally protected right.") (emphasis added).

Plaintiff alleges that the City of Warren knew of racial discrimination and harassment in the police department but did nothing to rectify the issue. Plaintiff must prove four elements to establish *Monell* liability premised on a theory of inaction:

> (1)    Existence of a clear and persistent pattern of violating federal rights,
> (2)    Notice or constructive notice on the part of the defendants,
> (3)    The defendants' tacit approval of the unconstitutional conduct, such that deliberate indifference in failing to act can be said to amount to an official policy of inaction; and
> (4)    That the defendants' custom was the "moving force," or direct causal link to the constitutional deprivation.

*See, e.g., Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007); *Doe v. Claiborne County,* 103 F.3d 495, 507 (6th Cir. 1996).

As summarized in greater detail above, Plaintiff alleges that the City of Warren has a notable history of racial issues, and points to two lawsuits by the United States Department of Justice in which the City was sued for racial discrimination in hiring. ECF No. 69, PageID.6077-78. Plaintiff also points to her own alleged experiences as examples of ongoing racial harassment in the Warren Police Department. Though Plaintiff personally only filed one "official" complaint during her tenure with the Warren Police Department (the complaint about Barbara Beyer in 2017), she adequately alleges that her supervisors were aware of the racial harassment and that they did nothing to stop it. For example, Mark Simlar, the labor relations manager for the City at the time, testified that Plaintiff came to him in 2017 after the Barbara Beyer incident and expressed concern that the department was not responding to her calls for backup as quickly as other officers. Simlar Deposition, ECF No. 69-6, PageID.6251. Despite these allegations that Plaintiff was being placed in danger because of racial discrimination, Simlar did not conduct an investigation. *Id.* Simlar claims it was because he did not know how to investigate when Plaintiff refused to provide any names, but he admitted she refused to provide more details because "she felt the more complaints she made, the more that the department would turn against her."

59

ECF No. 69-6, PageID.6252. Howlett's experiences, the inaction of her superiors, and the City's history as reflected in the Department of Justice lawsuits raise facts that could serve to establish the first element of the *Claborne* test.[19]

Defendants argue that Plaintiff failed to identify the policy or custom at issue, but Plaintiff clearly alleges that the failure to train Plaintiff's co-workers "in a relevant respect evidences a deliberate indifference" to Plaintiff's rights and that "such a shortcoming [can] be properly thought of as a city policy or custom that is actionable under § 1983." ECF No. 69, PageID.6083 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388– 89 (1989) (internal quotation marks omitted)). This is not a novel theory. The Sixth Circuit has held that the "systematic failure to train police officers adequately is a custom or policy which can lead to municipal liability" so long as the custom or policy actually caused the deprivation of the plaintiff's rights. *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006)); *see also City of Canton*, 489 U.S. at 391.

The City alleges the Police Department held various training sessions for its employees on the topic of diversity. Reichling Affidavit, ECF No. 66-9, Page ID.3895-96. However, the record reveals that during the

---

[19] A question still exists as to whether conduct that predated April 21, 2014, could provide a basis for liability under *Monell*. If Plaintiff believes that conduct occurring prior to April 21, 2014 may be considered as a basis for liability under *Monell*, that issue can be addressed by the Court prior to trial.

period from 2013 until 2017 when Plaintiff left the department, there were no training sessions addressing the topic of diversity in the context of racial and sex-based discrimination in employment. Defendants can only point to training sessions offered in 2005, 2006, 2007, and 2009 as being relevant to diversity. Reichling Affidavit, ECF No. 66-6, Page ID.3895. The City also seeks to rely on two training programs conducted in 2008 and 2010. But these are presentations about diabetic emergencies or "operational Spanish."[20] These examples tend to lend credence to Plaintiff's allegations and support her contention that the police department lacks adequate training in cultural diversity and racial harassment.

Plaintiff alleges that everyone above her—from her direct supervisors to the human resources department to the police commissioner and even the Mayor himself—were aware of the racial harassment and either did nothing at all to stop it, or actively interfered with efforts to correct it. Greg Murray, the Diversity Coordinator, alleges the Mayor told him to put "diversity issues" on the "back burner" until after the next election, for fear of backlash from white residents. Murray Affidavit, ECF No. 69-12, PageID.6413. Murray states he resigned because the Mayor refused

---

[20] Training in operational Spanish and diabetic emergencies does nothing to raise awareness of the problem of race and sex-based discrimination in the workplace, nor is it focused on increasing understanding of cultural differences or appreciating individuals from diverse backgrounds and experiences. That Defendants cite such presentations as relevant examples of "diversity" training may be more revealing of the underlying problem alleged by Plaintiff than of any genuine effort to address it.

to address diversity issues in the city and treated Murray's position as merely a "window dressing." ECF No. 69-12, PageID.6414. Plaintiff asserts this tacit approval is evidenced by the City's failure to train Shawn Johnson until 2017, ECF No. 69, PageID.6079, as well as Deputy Police Commissioner Galasso's and Sergeant Nichols' failure to report multiple instances of hearing the "n-word" used in the department, ECF No. 69, PageID.6088; Galasso Deposition, 69-21, PageID.6565-66; Nichols Deposition, ECF No. 69-9, PageID.6320. In response, the City asserts Howlett did not follow the appropriate channels to complain about her disparate treatment in the department. ECF No. 74, PageID.7513. The City relies on the Police Department's General Orders and Rules of Conduct to establish that, contrary to Plaintiff's assertions, the City has policies in place to prevent a custom or policy of racial harassment and Plaintiff's "failure to report any and all complaints negates her recent complaints." ECF No. 74, PageID.7518, Defendants argue the City cannot be penalized for failing to investigate allegations that were never brought to light. The City also disputes Murray's assessment of his job as Diversity Coordinator for the City and denies Murray's allegation that the mayor told him to put diversity on the "back burner." ECF No. 74, PageID.7516. Plaintiff asserts she did not file formal complaints because she felt "[i]t would be worse for [her] if [she] spoke out." Howlett Deposition, ECF No. 74-8, PageID.7647. However, the evidence of the City's failure to provide diversity training until after Plaintiff left the department, combined with

the lack of supervisory action in response to Plaintiff's informal complaints could allow a jury to find that the City had notice or constructive notice of the violation of Plaintiff's rights and that it acted with deliberate indifference amounting to a tacit approval of the conduct, and an official policy of inaction.

The fourth element of *Claiborne* is perhaps the hardest to prove: that the Defendants' custom was the "moving force," or a direct causal link to Plaintiff's constitutional deprivation. In considering this element, the testimony of Detective Shawn Johnson is on point. After speaking to Detective Howlett at a retirement party, Kathy Miller filed a complaint against Detective Johnson on Howlett's behalf. Sergeant Eidt investigated the complaint and learned that not only were the allegations true, but other detectives were aware of the conduct as well. The complaint was therefore sustained, and Detective Johnson was disciplined. As part of his discipline, Detective Johnson eventually attended a training by Greg Murray on the topic of diversity in 2017. In his deposition, Detective Johnson said that, if he had had that training earlier in his career, he would not have made the comments that he made to Plaintiff:

> Q. Had you had that training in 2013, '14 and '15, do you think you would have perhaps been more prepared to recognize that those statements constituted racial harassment that you made to Ms. Howlett?
>
> A. I don't know because at the time I didn't believe that I was racially harassing her. […] I don't know.

> I would tell you that after having to go through this and having talked to Mr. Murray that my behavior and comments that I would make now has drastically changed.

ECF No. 66-20, PageID.4341 (Transcript pg. 151–52, lines 15–20, 24–25, 1–2).

> THE WITNESS: […] I know with my training with Mr. Murray and having to go through this it really hit home with me and, you know, it changed my behavior in regards to my coworkers.

ECF No. 66-20, PageID.4342 (Transcript pg. 156, lines 1–4).

Detective Johnson's own account allows an inference that appropriate training could change behavior and correct the allegedly discriminatory policy of indifference within the department. However, to demonstrate that a municipality's custom or practice amounted to deliberate indifference, "it is not enough for [a plaintiff] to show that his injury could have been avoided if the officer had more or better training." *Mayo v. Macomb County*, 183 F.3d 554, 558 (6th Cir. 1999). Rather, deliberate indifference can be established where a plaintiff alleges a particular area where there is a clear need for training in order to avoid constitutional violations. *Miller*, 606 F.3d at 255. Plaintiff has made this allegation and supported it with evidence of the City's lack of diversity training. Here, Defendants dispute the causal connection between the training that was provided and the deprivation of Plaintiff's rights under the Equal Protection Clause. The dispute rests on whether the previous training (and the subsequent lack of training) provided to Johnson and the other officers

amounted to a conscious avoidance of racial diversity training and therefore amounted to a deliberate indifference of Plaintiff's rights. As the Ninth Circuit has stated, "the deliberate-indifference inquiry should go to the jury if any rational factfinder could find [the municipality acted with] this requisite mental state." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011). On the record before the Court, if Plaintiff's testimony and that of other certain other witnesses are credited, there is a genuine issue of material fact as to whether the City could be held liable under *Monell*; consequently, neither Defendant nor Plaintiff is entitled to summary judgment on Count IV.

The Court hereby **DENIES** Defendants' Motion for Summary Judgment as to Count IV and **DENIES** Plaintiff's Motion for Partial Summary Judgment as to Count IV.

## Count V – Conspiracy Invidious Racial Animus (42 U.S.C. § 1985)

Plaintiff alleges Defendants violated her rights under 42 U.S.C. § 1985 when they "agreed and conspired to violate the Plaintiff's rights secured by the Thirteenth and Fourteenth Amendments to the United States Constitution . . . and the actions undertaken pursuant to this agreement and conspiracy, were so done based upon an invidious racial animus directed at the Plaintiff[.]" ECF No. 4, PageID.65-66.

To state a claim under § 1985(3), a plaintiff must allege four factual elements:

> (1) a conspiracy; (2) for the purpose of depriving,
> either directly or indirectly, any person or class of
> persons of the equal protection of the laws, or of
> equal privileges or immunities of the laws; (3) an
> act in furtherance of the conspiracy; (4) whereby a
> person is either injured in his person or property
> or deprived of any right or privilege of a citizen of
> the United States.

*Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003) (quoting *United Bhd. of C & J v. Scott,* 463 U.S. 825, 828–29 (1983)). A plaintiff must make "specific factual allegations" that tend to show the formation of a conspiracy, including "allegations that defendants acted with specific intent to deprive a plaintiff equal protection or privileges and immunities[.]" *Pahssen v. Merrill County Sch. Dist.*, 668 F.3d 356, 368 (6th Cir. 2012). Importantly, "a plaintiff must allege a sufficient factual basis to establish a 'meeting of the minds' on the part of the alleged conspirators." *Amadasu v. The Christ Hospital*, 514 F.3d 504, 507 (6th Cir. 2008).

The Amended Complaint contains little or no specifics in the substantive counts describing the conduct of any individually identified defendants. It tends to speak in the collective—saying "the Defendants" did this or that. There are no allegations of any specific facts showing the existence of a conspiracy, nor which of the defendants joined the conspiracy. Plaintiff does not allege how any conspirators "acted with specific intent," nor does she state that there was some "meeting of the minds" between those conspirators. The most charitable way to read Plaintiff's claims here is that *all* of the defendants must have been involved in a

conspiracy to violate her Thirteenth[21] and Fourteenth Amendment rights, and that they were motivated by racial animus. *See* ECF No. 4, PageID.65. But such an allegation is conclusory and unsupported by any facts. Instead, Plaintiff's general factual allegations describe individual acts of harassment and discrimination, but do not describe a "meeting of the minds" or a jointly agreed-to scheme entered into by two or more specific defendants. In a rather vague and conclusory fashion, Count V asserts that "Defendants agreed and conspired to violate Plaintiff's rights secured by the Thirteenth and Fourteenth Amendments," but it does not say specifically who entered this conspiracy, how we know they entered it, or what specifically the conspirators agreed to do.

Plaintiff fails to plead any facts that would tend to show the formation of a conspiracy against her by any of the defendants. Because formation of a conspiracy is a threshold event for any claim under § 1985, the Court will not address any of the other factors from *Vakilian v. Shaw*, 335 F.3d 509 (6th Cir. 2003). Defendants' Motion for Summary Judgment as to Count V is **GRANTED**.

### Count VI – Violation of Right to Make and Enforce Contracts (42 U.S.C. § 1981)

Plaintiff alleges that her right to make and enforce contracts, established in 42 U.S.C. § 1981, was violated by Defendants, whose actions

---

[21] It is not clear from the Amended Complaint how Plaintiff's right to be free from involuntary servitude, as guaranteed by Thirteenth Amendment, is implicated by the alleged conduct of the Defendants.

or inactions prevented her from enjoying the various elements of her employment with the City of Warren to the same degree as white persons also employed there. ECF No. 4, PageID.67.

But in the Sixth Circuit, "a plaintiff cannot use § 1981 to sue a state actor in his or her official capacity." *McCormick v. Miami Univ.*, 693 F.3d 654, 659–60 (6th Cir. 2012); *Grinter v. Knight,* 532 F.3d 567, 577 (6th Cir. 2008) ("§ 1983 provides an exclusive remedy for violations against state actors sued in their official capacities. An official capacity lawsuit against ... a state actor[ ] for constitutional violations, such as race discrimination, cannot be brought under § 1981."); *see also Arendale v. City of Memphis,* 519 F.3d 587, 598–99 (6th Cir. 2008) ("[T]he express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.") (quoting *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 733 (1989)). A plaintiff also cannot bring a § 1981 claim against an individual state actor in his or her individual capacity. *McCormick v. Miami Univ.*, 693 F.3d 654, 659–60 (6th Cir. 2012).

Plaintiff attempts to find relief in § 1981, but the appropriate statutory vehicle for her claims is § 1983, which she employs in Counts II, III, and IV. For this reason, Defendants' Motion for Summary Judgment as to Count VI (42 U.S.C. § 1981) is **GRANTED**.

## V. Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment is **DENIED** as to Counts I and IV, **GRANTED** as to Counts III, V, and VI, and **GRANTED IN PART and DENIED IN PART** as to Count II. Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

Based on Plaintiff's statements in open court and in accordance with the rulings set forth in this opinion and order, the following Defendants are **DISMISSED WITH PREJUDICE**: Jere Green, Scott Taylor, Paul Houtos, Kevin Barnhill, William Ross, Darrin Labin, Dawn McLane, and Michael Sauger. Defendant Barbara Beyer remains dismissed pursuant to this Court's prior order.

**IT IS SO ORDERED.**

Dated: September 16, 2019

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

### Certificate of Service

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on September 16, 2019.

s/A. Chubb
Case Manager