# EXHIBIT A

00774725-1

# HOWLETT v. CITY OF WARREN, ET AL.

# DESHEILA HOWLETT

December 27, 2017

*Prepared for you by*



US Legal Support
The Power of Commitment.

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

DESHEILA HOWLETT
December 27, 2017

**Page 1**

```
 1       UNITED STATES DISTRICT COURT
 2       EASTERN DISTRICT OF MICHIGAN
 3             SOUTHERN DIVISION
 4
 5   DESHEILA C. HOWLETT,
 6        Plaintiff,
 7   vs.              Case No. 17-11260
 8                    Hon. Terence G. Berg
 9   CITY OF WARREN, COMMISSIONER   Mag. R. Steven Whalen
10   JERE GREEN, acting in his
11   individual capacity, LT. LAWRENCE
12   GARDNER, SHAWN JOHNSON, DAWN
13   McLANE, BARBARA BEYER, ANWAR KHAN,
14   DARRIN LABIN, WILLIAM ROSS, KEVIN
15   BARNHILL, PAUL HOUTOS, SCOTT TAYLOR,
16        Defendants.
17   _____
18
19
20   The Videotaped Deposition of DESHEILA HOWLETT,
21   Taken at 333 West Fort Street, 15th Floor,
22   Detroit, Michigan,
23   Commencing at 10:09 a.m.,
24   Wednesday, December 27, 2017,
25   Before Alison C. Webster, CSR-6266, RPR.
```

**Page 2**

```
 1   APPEARANCES:
 2
 3   LEONARD MUNGO
 4   The Mungo Law Firm, P.L.C.
 5   333 West Fort Street
 6   Suite 1500
 7   Detroit, Michigan 48226
 8   313.963.0407
 9   mungol16@msn.com
10   Appearing on behalf of the Plaintiff.
11
12   JAMES R. ACHO
13   ELIZABETH RAE-O'DONNELL
14   Cummings, McClorey, Davis & Acho, P.L.C.
15   17436 College Parkway
16   Livonia, Michigan 48152
17   734.261.2400
18   jacho@cmda-law.com
19   erae@cmda-law.com
20   Appearing on behalf of the Defendants.
```

**Page 3**

```
 1   ETHAN VINSON
 2   City of Warren, City Attorney's Office
 3   One City Square
 4   Suite 400
 5   Warren, Michigan 48093
 6   586.574.4671
 7   evinson@cityofwarren.org
 8   Co-counsel appearing on behalf of the Defendants.
 9
10   ALSO PRESENT:
11   Justin Dloski, Video Technician
12   Mark Simlar
```

**Page 4**

```
             TABLE OF CONTENTS

Witness                                    Page
DESHEILA HOWLETT

EXAMINATION
BY MR. ACHO:                                  8
EXAMINATION
BY MR. MUNGO:                               217
RE-EXAMINATION
BY MR. ACHO:                                272

                EXHIBITS

Exhibit                                    Page

(Exhibits attached to transcript.)

DEPOSITION EXHIBIT 1                         31
DEPOSITION EXHIBIT 2                         50
DEPOSITION EXHIBIT 3                         54
DEPOSITION EXHIBIT 4                         66
DEPOSITION EXHIBIT 5                         66
DEPOSITION EXHIBIT 6                         76
```



US LEGAL SUPPORT
The Power of Commitment™

Pages 1 to 4

DESHEILA HOWLETT
December 27, 2017

Page 177

1  A. No.
2  Q. You and Roland Bell would joke with each other; right?
3  A. Roland Bell would bring me diapers for my Goddaughter.
4  Q. Right. For -- in fact, he brought you diapers and
5     formula when he thought you were adopting that child,
6     did he not?
7  A. Yes, and I also gave him money when his son died.
8  Q. Five to ten times, though, he and his wife brought you
9     diapers and formula, did they not?
10 A. Yes.
11 Q. And Roland Bell coaches an all-black football team,
12    doesn't he?
13 A. Yes.
14 Q. So this isn't like a white guy that dislikes black
15    people, is it?
16 A. It comes from the people that are closest to you. The
17    people who you talk to are the ones that are doing
18    these things.
19 Q. But he was joking around with you, wasn't he?
20        MR. MUNGO: Objection, assumes a fact not
21    in evidence.
22 BY MR. ACHO:
23 Q. Let me ask you this: This guy brings diapers and
24    formula to your house five to ten times.
25 A. Not to my house, but...

Page 178

1  Q. I'm sorry, to you. Because the understanding in the
2     department was that you were adopting a child. Do you
3     believe that his comment to you was anything other
4     than a joke?
5  A. First and foremost, working in the jail, I needed the
6     guys to know that I wasn't fully fit, that I was
7     hurting that day, so I let them know that I had had
8     the procedure done to make sure that they are extra
9     aware and pay attention to me on the floor for that
10    day.
11        So in saying that, it's a personal female
12    thing, but if I'm not walking fully brisk and all of
13    that, so then just leave it at that. Why do I have to
14    be getting banged up by a big, black dick to be
15    walking tenderly when I just told you I just had a
16    medical procedure.
17 Q. Because he was making a joke, wasn't he?
18 A. Okay.
19 Q. Didn't you and Bell used to joke with each other all
20    the time?
21 A. Not in an offensive manner.
22 Q. Didn't you and Bell used to joke with each other all
23    the time?
24 A. We had a casual relationship.
25 Q. So you may have interpreted it as offensive, but I'm

Page 179

1     just driving at, he was just joking with you, wasn't
2     he?
3  A. Okay.
4        MR. MUNGO: You -- you -- you --
5  A. I said --
6        MR. MUNGO: He's asking you a question.
7     You have to answer.
8  A. I said that I was offended and I said that it wasn't a
9     joke to me.
10 BY MR. ACHO:
11 Q. All right. Did you say, Roland, I'm offended by that?
12 A. No.
13 Q. If you had such a relationship with him, why wouldn't
14    you have said that to him if you were, in fact,
15    offended?
16 A. I had become in habit of being offended and not
17    addressing it all the time, just allowing things to
18    kind of roll off so that I wouldn't hinder the few,
19    you know, occasions that I had to talk with certain
20    people.
21 Q. Was anyone else present when Bell allegedly made that
22    comment?
23 A. No.
24 Q. Isn't it true that after that comment, you and Bell
25    continued on to be friends and joke with each other?

Page 180

1  A. Yes.
2  Q. And he brought you diapers and formula after that.
3  A. Yes.
4  Q. And you never complained to HR or anyone else about
5     this alleged comment from Roland Bell; correct?
6  A. No.
7  Q. He's a good guy, you would agree?
8  A. He has his problems, but he's fine.
9  Q. 13(h), "Defendant Arthur Gill, white male, former
10    sergeant, removed plaintiff from her day shift in
11    favor of a similarly situated white female officer,
12    despite the fact that the white female officer had
13    less seniority than plaintiff who was entitled to fill
14    that position based upon her higher seniority."
15        Now, you say Defendant Arthur Gill is a
16    former sergeant. Was he removed as a sergeant or is
17    he retired? Do you know?
18 A. I don't know his status, if he fired or quit or
19    retired, but he's just not there at this time.
20 Q. Okay. And how long ago did Arthur Gill leave the
21    Warren Police Department?
22 A. It's been a couple of years.
23 Q. Okay. This specific allegation, can you tell me about
24    this incident?
25 A. That's when I was hit by the drunk driver.



US LEGAL SUPPORT
The Power of Commitment™

Pages 177 to 180

DESHEILA HOWLETT
December 27, 2017

### Page 181

1  Q.  In 2011?
2  A.  5-5 of 2011, Cinco de Mayo, and then I ended up being
3      off for the four months, and when I came back, I got
4      put on midnight shift, but Krystal Gill, who used to
5      be Krystal Gogo, his wife, who has a year less
6      seniority than me, was allowed to have the day shift
7      position.
8  Q.  Could it have been simply a case of nepotism and not
9      anything to do with race?
10         MR. MUNGO:  Objection, assuming facts not
11     in evidence.
12 A.  I'm not sure.
13 BY MR. ACHO:
14 Q.  Do you have any evidence that Gill made that shift
15     change because of your sex or race?
16 A.  No.  I just know that after I was put on the night
17     shift I got hit by a drunk driver, and I would never
18     have been on my way to work if I wasn't bumped off my
19     proper shift.
20 Q.  So did you complain to Art Gill about that?
21 A.  No, I talked to Mike Sauger.
22 Q.  Sauger, S-a-u-g-e-r?
23 A.  Yes.
24 Q.  And who is Mike Sauger?
25 A.  Union president.

### Page 182

1  Q.  And what did Mike Sauger say?
2  A.  That, basically, even though the language states that
3      we're carried to and from, that there was really
4      nothing he could do for me at the time because the
5      City -- we didn't have a contract with the City at
6      that time, so he really didn't want to, like, go to
7      them and bother them in my defense.
8  Q.  How long were you on that shift?
9  A.  Before I got hit, probably about two or three weeks.
10 Q.  Okay.  Did you ever complain to HR or any supervisor
11     about the shift change?
12 A.  No.
13 Q.  Okay.  Speaking of shifts, around the time that you
14     were or the City thought that you were going to adopt
15     a child, didn't command officers reduce your workload
16     and your shift time to allow you to spend more time
17     with the child?
18 A.  Reduce my workload?
19 Q.  Or adjust your shift time to allow you to spend more
20     time with the child.
21 A.  My times of coming and going may have been different,
22     but it still was an eight-hour shift.
23 Q.  Okay.  But they adjusted your going and coming time as
24     an accommodation to you; correct?
25 A.  Yes.

### Page 183

1  Q.  It was a magnanimous thing for them to do?
2  A.  Yes.
3  Q.  It was a generous thing for them to do?
4  A.  Yes.
5  Q.  And it's because they knew that you were dealing with
6      this situation with this child.
7  A.  Yes.
8  Q.  Do you know whose call that was?
9  A.  No.
10 Q.  Did you ever thank anyone for that?
11 A.  I don't recall.
12 Q.  Dawn McLane is listed in your Complaint as a
13     defendant.  There are no specific allegations in the
14     Complaint as to Dawn McLane, but I see her listed
15     individually.  Can you tell me what your specific
16     allegations are against Dawn McLane?
17 A.  That was just the first time that I had talked to
18     Mr. Simlar in regards to hostile work environment.
19 Q.  Okay.  Can you give me a little more?  Because I still
20     don't know what --
21 A.  That was the situation with the man with the gun run
22     where she didn't give me any information and I made
23     the complaint.
24 Q.  Okay.  But that wasn't necessarily based on race, you
25     said.

### Page 184

1  A.  I was asked if I thought it was based on race, and I
2      said at the time that, no, I didn't.
3  Q.  Okay.  So is there any other reason Ms. McLane is
4      listed here as a defendant?
5  A.  No.
6  Q.  Speaking of Mr. Simlar, he has always been pleasant to
7      deal with, has he not?
8  A.  Yes.
9  Q.  And has always been willing to do the right thing on
10     behalf of the City and the department; correct?
11 A.  From my experience.  I have met him twice, so yes.
12 Q.  Okay.  But both times, he asked you if you wanted
13     things done; correct?
14 A.  Yes.
15 Q.  And both times you told him you did not; correct?
16 A.  In a crying, fearful manner, yes.
17 Q.  Okay.  And who were you afraid of?
18 A.  Retribution.
19 Q.  Do you remember a time when Mr. Simlar set up an
20     appointment for you with a psychologist and you did
21     not show up?
22 A.  Yes.
23 Q.  Okay.  Why didn't you show up?
24 A.  The psychiatrist that he had call me, or psychologist,
25     she was talking to me over the phone, and she said

