# EXHIBIT A

00774725-1

# HOWLETT v. CITY OF WARREN, ET AL.

# DESHEILA HOWLETT

December 27, 2017

*Prepared for you by*



US Legal Support
The Power of Commitment.

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

DESHEILA HOWLETT
December 27, 2017

### Page 1

```
 1         UNITED STATES DISTRICT COURT
 2         EASTERN DISTRICT OF MICHIGAN
 3               SOUTHERN DIVISION
 4
 5   DESHEILA C. HOWLETT,
 6        Plaintiff,
 7     vs.              Case No. 17-11260
 8                      Hon. Terence G. Berg
 9   CITY OF WARREN, COMMISSIONER   Mag. R. Steven Whalen
10   JERE GREEN, acting in his
11   individual capacity, LT. LAWRENCE
12   GARDNER, SHAWN JOHNSON, DAWN
13   McLANE, BARBARA BEYER, ANWAR KHAN,
14   DARRIN LABIN, WILLIAM ROSS, KEVIN
15   BARNHILL, PAUL HOUTOS, SCOTT TAYLOR,
16        Defendants.
17   _____
18
19
20       The Videotaped Deposition of DESHEILA HOWLETT,
21       Taken at 333 West Fort Street, 15th Floor,
22       Detroit, Michigan,
23       Commencing at 10:09 a.m.,
24       Wednesday, December 27, 2017,
25       Before Alison C. Webster, CSR-6266, RPR.
```

### Page 2

```
 1   APPEARANCES:
 2
 3   LEONARD MUNGO
 4   The Mungo Law Firm, P.L.C.
 5   333 West Fort Street
 6   Suite 1500
 7   Detroit, Michigan 48226
 8   313.963.0407
 9   mungol16@msn.com
10   Appearing on behalf of the Plaintiff.
11
12   JAMES R. ACHO
13   ELIZABETH RAE-O'DONNELL
14   Cummings, McClorey, Davis & Acho, P.L.C.
15   17436 College Parkway
16   Livonia, Michigan 48152
17   734.261.2400
18   jacho@cmda-law.com
19   erae@cmda-law.com
20   Appearing on behalf of the Defendants.
21
```

### Page 3

```
 1   ETHAN VINSON
 2   City of Warren, City Attorney's Office
 3   One City Square
 4   Suite 400
 5   Warren, Michigan 48093
 6   586.574.4671
 7   evinson@cityofwarren.org
 8   Co-counsel appearing on behalf of the Defendants.
 9
10   ALSO PRESENT:
11   Justin Dloski, Video Technician
12   Mark Simlar
```

### Page 4

```
                TABLE OF CONTENTS

Witness                                     Page
DESHEILA HOWLETT

EXAMINATION
BY MR. ACHO:                                   8
EXAMINATION
BY MR. MUNGO:                                217
RE-EXAMINATION
BY MR. ACHO:                                 272

                  EXHIBITS

Exhibit                                     Page

(Exhibits attached to transcript.)

DEPOSITION EXHIBIT 1                          31
DEPOSITION EXHIBIT 2                          50
DEPOSITION EXHIBIT 3                          54
DEPOSITION EXHIBIT 4                          66
DEPOSITION EXHIBIT 5                          66
DEPOSITION EXHIBIT 6                          76
```



US LEGAL SUPPORT
The Power of Commitment™

Pages 1 to 4

DESHEILA HOWLETT
December 27, 2017

**Page 65**

1  regarding Ross?
2      MR. ACHO: I -- I don't know offhand,
3  but --
4      MS. RAE-O'DONNELL: Paragraph 13.
5      MR. MUNGO: 13?
6      MR. ACHO: Yeah, 13 is where the bulk of
7  the claims are.
8      MR. MUNGO: It was at 13 what? I should be
9  able to find it.
10     MS. RAE-O'DONNELL: (C).
11     MR. ACHO: (C), yep.
12     VIDEO TECHNICIAN: Off the record, 11:17.
13     (Off the record at 11:17 a.m.)
14     (Back on the record at 11:40 a.m.)
15     VIDEO TECHNICIAN: Back on the record,
16  11:40.
17  BY MR. ACHO:
18  Q. When we left off, I had asked you about William Ross
19     and we discussed the comment and I asked you if you
20     had complained to HR or anyone about Ross, and you
21     indicated you had not; is that correct?
22  A. Yes.
23  Q. All right. You did sign acknowledging that you
24     received training on departmental rules prohibiting
25     discrimination and sexual harassment in the rules of

**Page 66**

1  conduct and procedure; correct?
2  A. Yes.
3      MR. ACHO: Okay. I'm going to mark two
4  orders as Exhibits 4 and 5.
5      MARKED FOR IDENTIFICATION:
6      DEPOSITION EXHIBIT 4-5
7      11:40 a.m.
8      MR. MUNGO: Was the Complaint 3, Counsel?
9      MR. ACHO: Good question. Yes.
10  BY MR. ACHO:
11  Q. Exhibit 4 is an Order dated January 10, 2003. It's a
12     City of Warren Police Department Order on
13     Discrimination and Sexual Harassment and the
14     Prohibition of same, do you see that?
15  A. Yes.
16  Q. And you received this as part of your training;
17     correct?
18  A. Yes.
19  Q. You were advised that the City of Warren does not
20     tolerate or condone harassment of any sort or
21     discriminatory behavior of any sort; correct?
22  A. Yes.
23  Q. You were advised that, as an employee, you had a
24     responsibility to report these matters to management's
25     attention; correct?

**Page 67**

1  A. Yes.
2  Q. Okay. Exhibit 5 is another general order from the
3     City of Warren Police Department, and this is dated
4     February 28, 2014, and it is titled Rules of Conduct.
5     You received and reviewed this policy, as well;
6     correct?
7  A. Yes.
8  Q. These are the conduct standards and the code of ethics
9     for the City of Warren Police Department; correct?
10 A. Yes.
11 Q. On page 5, it discusses conduct toward fellow
12    employees, and it discusses, under subsection 4,
13    accountability, responsibility and discipline. And it
14    states, under section 4, "that any complaints against
15    any member of the department are to be reported to a
16    supervisor"; correct?
17 A. Yes.
18 Q. All right. You signed for this order, as well; is
19    that right?
20 A. Yes.
21 Q. All right. And if we look, going back to Exhibit 2,
22    which is your personnel file on page 4, there is a
23    page where you signed and initialed for the receipt
24    and review and training on numerous departmental
25    policies. Do you see that?

**Page 68**

1  A. Yes.
2  Q. Okay.
3      MR. MUNGO: I'm sorry, Counsel, what page
4  was that?
5      MR. ACHO: That was page 4 of the personnel
6  file.
7      MR. MUNGO: Of the personnel file. You
8  haven't marked that as an exhibit?
9      MR. ACHO: I did.
10     MR. MUNGO: Which one?
11     MR. ACHO: Exhibit 2.
12     MR. MUNGO: Exhibit 2. And that was
13  page 5, you said?
14     MR. ACHO: Page 4.
15     MR. MUNGO: Did you see that?
16     THE WITNESS: Uh-huh.
17 BY MR. ACHO:
18 Q. All right. So you were passed on from step 1 of the
19    FTO program to step 2; correct?
20 A. Yes.
21 Q. And you passed step 2 of the FTO program with no
22    issue; is that correct?
23 A. Yes.
24 Q. You're not making any allegations of discrimination at
25    the step 2 level of the FTO, are you?



DESHEILA HOWLETT
December 27, 2017

## Page 73

1 right?
2 A. Yes.
3 Q. Okay. But I asked you earlier why you didn't
4    complain, and you said that that's not something that
5    you do in order to, sort of, protect your job.
6 A. Saying that you like a food that you don't like is a
7    lie, but complaining against other officers is a
8    different type of offense --
9 Q. Okay.
10 A. -- that suffers a different type of, you know...
11 Q. Even if it means not complying with orders that say
12    you have to report complaints about other officers?
13 A. It's just not done.
14 Q. By you.
15 A. By anyone, really.
16 Q. So nobody -- so it's your testimony that nobody
17    complains to HR or supervisors about conduct of other
18    officers?
19 A. Hardly ever.
20 Q. And what do you base that on?
21 A. Different examples of seeing when a person did
22    complain, the things that happened to that person. It
23    just doesn't fare very well. And the times that I've
24    complained, nothing better. If anything, it just
25    makes everything worse.

## Page 74

1 Q. Okay. Well, give me some examples of officers who
2    have complained to supervisors or HR about other
3    officers' behavior and it didn't fare well for them.
4 A. John Adams.
5 Q. Okay. Who's John Adams?
6 A. He was a police officer with the City of Warren.
7 Q. Okay. And is he still?
8 A. No.
9 Q. Okay. Tell me about what you know about
10    Officer Adams.
11 A. His issue or complaint was about officers being
12    heavy-handed.
13 Q. Okay.
14 A. And he went into command staff to report it, and then
15    it got back to the people that he was complaining
16    about, and then they started calling him a P word and
17    a snitch and nobody wanted to work with him.
18 Q. When was this?
19 A. I'm not exactly sure.
20 Q. Was it around the time you were hired? Was it in the
21    last couple of years?
22 A. He and I were hired on together, so it would have been
23    quite a few years ago, because he left to go to law
24    school and stuff like that, so I don't remember
25    exactly.

## Page 75

1 Q. So he may have intended to leave and go to law school
2    anyway; right?
3 A. I guess so.
4 Q. Have you spoken to him?
5 A. No.
6 Q. Okay. Give me some examples, though, where officers
7    complained about the treatment of them by fellow
8    officers where it didn't go well.
9 A. Khan punched another officer in the head and command
10    had heard about it, and then they asked him if he
11    wanted to file a complaint, and the officer said no,
12    because you can't. The general rule is, you don't
13    complain on one another. So even though the command
14    knows about it, they don't do anything unless you make
15    an actual complaint against another officer.
16 Q. Who was the officer that you allege Officer Khan
17    punched?
18 A. Twardesky.
19 Q. Do you know the first name of Officer Twardesky?
20 A. Jim.
21 Q. Okay. Is Officer Twardesky still in the department?
22 A. He's a detective, yes.
23 Q. Do you know the type of relationship that Khan and
24    Twardesky had?
25 A. He was his FTO at one point.

## Page 76

1 Q. Do you know if they were friends or are friends?
2 A. No, I'm not sure.
3 Q. Okay. I have what I'll mark as Exhibit 6, your
4    Answers to Interrogatories.
5       MARKED FOR IDENTIFICATION:
6       DEPOSITION EXHIBIT 6
7       11:52 a.m.
8 BY MR. ACHO:
9 Q. And without belaboring it and going through all of it,
10    I ask -- Ms. O'Donnell and I ask, on a number of
11    occasions, to provide any type of written
12    documentation or any documentation supporting any of
13    your allegations, and your response was that you don't
14    possess any documentation; is that right?
15 A. Yes.
16 Q. Is that because you didn't file any type of complaint?
17 A. The only complaints that I recall, I made one with
18    Mark Simlar regarding a dispatcher and the final
19    complaint with Barb Beyer.
20 Q. Okay. The Complaint that you made with Mark Simlar
21    regarding a dispatcher, who was that dispatcher?
22 A. Dawn.
23 Q. Dawn?
24 A. McLane.
25 Q. Okay. And when was this complaint to Mark Simlar?



DESHEILA HOWLETT
December 27, 2017

Page 77

1  A. I believe 2010 or '11, somewhere in there.
2  Q. All right. Now, Mr. Simlar is present here today;
3     correct?
4  A. Yes.
5  Q. What is his position, if you know?
6  A. Human resources department.
7  Q. And you believed he was the individual to complain to?
8  A. Well, they had me meet with him, so...
9  Q. Who's "they"? Let -- I'll tell you what. Let's
10    back -- backtrack a little bit. Tell me about the
11    incident with Dawn McLane and then take me from there.
12 A. I was sent to a man with a gun run, and there was no
13    information given, no description of the person, no
14    vehicle, no information regarding the gun, no color of
15    clothing, and I was in very close proximity to where
16    that run was, so the odds of me getting there first
17    were very great. So I waited for her to give more
18    information, and at the point that no more information
19    came through, I went on the air and asked for further
20    information, if there was any, and she was just very
21    belligerent and never give me any further information.
22    So after I finished the run, I came into the station
23    and I decided to make a complaint.
24 Q. Okay. And what was your complaint, that officer --
25    that Dispatcher McLane was difficult or didn't provide

Page 78

1     more information?
2  A. On a serious run, yes.
3  Q. Okay. Since you are familiar with the police culture,
4     would you agree with me that sometimes things get
5     heated between dispatchers and officers?
6  A. Sure.
7  Q. Dispatchers have a highly, highly stressful job?
8  A. Yes.
9  Q. Especially in a city the size of Warren.
10 A. Yes.
11 Q. Okay. What did Mr. Simlar do with the complaint
12    regarding Ms. McLane?
13 A. I have no idea.
14 Q. Okay. Who was it that told you to meet with
15    Mr. Simlar? Who did you complain to initially?
16 A. It would have been whoever was in the office at that
17    time, but I don't -- I don't remember.
18 Q. All right. But you didn't have any reason to believe
19    that Ms. McLane withheld information from you because
20    of your race or your gender, did you?
21 A. No.
22 Q. Okay. It was just butting heads, a personality
23    conflict with another employee; right?
24 A. Yes.
25 Q. I mean, it's nothing that gives rise to your lawsuit;

Page 79

1     correct?
2  A. In the fact that you're not given the proper
3     information and that it shows that when I did complain
4     nothing happened, so...
5  Q. How do you know nothing happened?
6  A. Because they usually type it up on a memo and they put
7     it in an email to everyone of discipline that's been
8     given.
9  Q. So other officers that have been disciplined, that
10    memo is disseminated to everybody in the department?
11 A. Yes.
12 Q. Can you give some examples of officers that have been
13    disciplined where it was disseminated to everybody?
14 A. If people get days off or get suspended or something
15    like that, they'll put an email out.
16 Q. For officers?
17 A. Yes.
18 Q. Can you give some examples?
19 A. So many.
20 Q. There's "so many" because Warren takes a lot of
21    disciplinary action against officers?
22 A. From time to time.
23 Q. If things are reported, they'll take action; right?
24 A. From time to time. It depends on who it is.
25 Q. Do you think they're selective?

Page 80

1  A. Yes.
2  Q. And what is the selectivity based on?
3  A. If you are on special teams, special assignments, like
4     the special response team, things like that. If
5     you're in different units, the rules don't apply to
6     everyone the same.
7  Q. Were you ever on any special units?
8  A. No.
9  Q. Okay. Getting back to Dawn McLane, you don't know for
10    certain that she did or did not receive any
11    disciplinary action; correct?
12 A. No.
13 Q. Also, when I asked you about how do you know when
14    officers were disciplined, you said, when police
15    officers received discipline, there's usually a memo
16    and it goes out to the department. But Dawn McLane is
17    not a police officer; correct?
18 A. Correct.
19    THE WITNESS: There it goes.
20    MR. MUNGO: That's okay. That's okay. No
21    problem, no problem, no problem. No biggie. No
22    problem. Got it. We got it. No, no, no, I got it. I
23    got it. I got it. It's okay.
24    MR. ACHO: All right. No biggie because
25    your copies are good, so we've got them in.



DESHEILA HOWLETT
December 27, 2017

Page 173

1  A. Yes.
2  Q. More than three years?
3  A. Yes.
4  Q. Did you ever go to HR or any supervisor and complain
5     about Jason Booms' comments?
6  A. No.
7  Q. Barbara Beyer. Barbara Beyer is no longer a defendant
8     in this lawsuit; is that correct?
9         MR. MUNGO: That's correct.
10 BY MR. ACHO:
11 Q. Okay. Do you know why that is?
12 A. No.
13 Q. You initially sued her; correct?
14 A. She was named as a defendant, yes.
15 Q. Right. And why did you name Barbara Beyer as a
16    defendant?
17 A. Because she was screaming, that nigger, that nigger,
18    at me.
19 Q. At you, or out loud within your earshot?
20 A. Out loud within my earshot.
21 Q. All right. Can you tell me the context of that
22    situation, why the woman used that word?
23 A. I was going around the corner to ask her a question.
24    I had come back from vacation and I couldn't find
25    certain documents, so I didn't know if they ever log

Page 174

1  things or do they just randomly place them on a desk.
2  So when I turned the corner, she looked at me and she
3  started screaming, that nigger, that nigger.
4        So being in police mode, I decide to look
5  out the glass because I'm assuming there's some type
6  of threat or something that needs to be addressed. I
7  look out the glass and there's no one standing there.
8  Her office, besides it being encased in glass, there's
9  a glass door. I look out of the glass door, there's
10 nobody in the hallway. So whatever she's talking
11 about is not current for her level of agitation or
12 whatever you want to call it.
13       So when she screams out, that nigger, that
14 nigger would have killed me if the glass wasn't there,
15 it threw me, so I kind of fell back. She grabbed a
16 hold of my arm so I don't, like, fall all the way
17 back, and then she goes, I didn't mean you, not you.
18 I was going to tell you the story anyway.
19 Q. And did she tell you the story?
20 A. Yeah.
21 Q. Okay. Because you and Barb Beyer were friends; right?
22 A. I thought. We were friendly. We would bring each
23    other lunch sometimes and go out.
24 Q. Right. So she wasn't using that word against you, was
25    she?

Page 175

1  A. She was talking about another black man, though.
2  Q. Okay.
3  A. Appropriate?
4  Q. I'm going to ask you the questions.
5  A. Okay. Go ahead.
6  Q. You guys were friends. Did you have lunch together?
7  A. Uh-huh, yes.
8  Q. Did you make a complaint to HR or anyone else about
9     Barb Beyer?
10 A. I talked to Sergeant Mills and Matt Nichols about it.
11 Q. Okay. And was a complaint lodged? There was a formal
12    complaint against Barb Beyer; correct?
13 A. Yes.
14 Q. Who is no longer a defendant in this case; correct?
15 A. Based on you telling me that today, yes.
16 Q. Based on your attorney confirming that she is not;
17    correct?
18 A. Okay. Yes.
19 Q. But you don't know why she is not.
20 A. No.
21 Q. Okay. Do you know what happened to Ms. Beyer as a
22    result of the complaint?
23 A. No.
24 Q. Do you know that she was given discipline action?
25 A. No.

Page 176

1  Q. You've never been told that?
2  A. No.
3  Q. If she was, in fact, handed disciplinary action, you
4     would agree that would be the right approach for the
5     City of Warren Police Department to take for her using
6     those epithets.
7  A. Yes.
8  Q. 13(f), you discuss Officer Roland Bell. You know
9     Officer Roland Bell?
10 A. Yes.
11 Q. You make allegations that, "He asked plaintiff why she
12    was walking gingerly after having a fibroid removed,
13    and when plaintiff explained to her" -- "when
14    plaintiff" -- strike that, let me start over.
15        "Roland Bell, white male, asked plaintiff
16    why she was walking gingerly after having a fibroid
17    removed, and when plaintiff explained, he told her,
18    'no, it's because of all that big, black dick in
19    you.'"
20        Do you see that?
21 A. Yes, sir.
22 Q. Did he make that comment?
23 A. Yes.
24 Q. And he made that to you in a total joking fashion, did
25    he not?



DESHEILA HOWLETT
December 27, 2017

Page 177

1   A. No.
2   Q. You and Roland Bell would joke with each other; right?
3   A. Roland Bell would bring me diapers for my Goddaughter.
4   Q. Right. For -- in fact, he brought you diapers and
5       formula when he thought you were adopting that child,
6       did he not?
7   A. Yes, and I also gave him money when his son died.
8   Q. Five to ten times, though, he and his wife brought you
9       diapers and formula, did they not?
10  A. Yes.
11  Q. And Roland Bell coaches an all-black football team,
12      doesn't he?
13  A. Yes.
14  Q. So this isn't like a white guy that dislikes black
15      people, is it?
16  A. It comes from the people that are closest to you. The
17      people who you talk to are the ones that are doing
18      these things.
19  Q. But he was joking around with you, wasn't he?
20          MR. MUNGO: Objection, assumes a fact not
21      in evidence.
22  BY MR. ACHO:
23  Q. Let me ask you this: This guy brings diapers and
24      formula to your house five to ten times.
25  A. Not to my house, but...

Page 178

1   Q. I'm sorry, to you. Because the understanding in the
2       department was that you were adopting a child. Do you
3       believe that his comment to you was anything other
4       than a joke?
5   A. First and foremost, working in the jail, I needed the
6       guys to know that I wasn't fully fit, that I was
7       hurting that day, so I let them know that I had had
8       the procedure done to make sure that they are extra
9       aware and pay attention to me on the floor for that
10      day.
11          So in saying that, it's a personal female
12      thing, but if I'm not walking fully brisk and all of
13      that, so then just leave it at that. Why do I have to
14      be getting banged up by a big, black dick to be
15      walking tenderly when I just told you I just had a
16      medical procedure.
17  Q. Because he was making a joke, wasn't he?
18  A. Okay.
19  Q. Didn't you and Bell used to joke with each other all
20      the time?
21  A. Not in an offensive manner.
22  Q. Didn't you and Bell used to joke with each other all
23      the time?
24  A. We had a casual relationship.
25  Q. So you may have interpreted it as offensive, but I'm

Page 179

1       just driving at, he was just joking with you, wasn't
2       he?
3   A. Okay.
4           MR. MUNGO: You -- you -- you --
5   A. I said --
6           MR. MUNGO: He's asking you a question.
7       You have to answer.
8   A. I said that I was offended and I said that it wasn't a
9       joke to me.
10  BY MR. ACHO:
11  Q. All right. Did you say, Roland, I'm offended by that?
12  A. No.
13  Q. If you had such a relationship with him, why wouldn't
14      you have said that to him if you were, in fact,
15      offended?
16  A. I had become in habit of being offended and not
17      addressing it all the time, just allowing things to
18      kind of roll off so that I wouldn't hinder the few,
19      you know, occasions that I had to talk with certain
20      people.
21  Q. Was anyone else present when Bell allegedly made that
22      comment?
23  A. No.
24  Q. Isn't it true that after that comment, you and Bell
25      continued on to be friends and joke with each other?

Page 180

1   A. Yes.
2   Q. And he brought you diapers and formula after that.
3   A. Yes.
4   Q. And you never complained to HR or anyone else about
5       this alleged comment from Roland Bell; correct?
6   A. No.
7   Q. He's a good guy, you would agree?
8   A. He has his problems, but he's fine.
9   Q. 13(h), "Defendant Arthur Gill, white male, former
10      sergeant, removed plaintiff from her day shift in
11      favor of a similarly situated white female officer,
12      despite the fact that the white female officer had
13      less seniority than plaintiff who was entitled to fill
14      that position based upon her higher seniority."
15          Now, you say Defendant Arthur Gill is a
16      former sergeant. Was he removed as a sergeant or is
17      he retired? Do you know?
18  A. I don't know his status, if he fired or quit or
19      retired, but he's just not there at this time.
20  Q. Okay. And how long ago did Arthur Gill leave the
21      Warren Police Department?
22  A. It's been a couple of years.
23  Q. Okay. This specific allegation, can you tell me about
24      this incident?
25  A. That's when I was hit by the drunk driver.



DESHEILA HOWLETT
December 27, 2017

Page 209

1  A. Yes.
2  Q. And you're aware that the City has made attempts to
3     become more culturally diverse? Yes?
4  A. I would assume so.
5  Q. In fact, didn't Mayor Fouts publicly acknowledge you
6     at a dinner or luncheon?
7  A. Yes, with explanation.
8  Q. Okay.
9  A. It's like a dog and pony show when you have your one
10    black employee stand up and say, look at how diverse
11    we are. One doesn't equal diversity. So I asked my
12    supervisors if I could not continue to have to go to
13    these things to be announced because it's taking from
14    my work, and they pay the $25 or 50 or whatever it was
15    for dinner. He had me sitting with senators and such
16    so that when the TV Warren thing is scanning across,
17    I'm in front, and all my coworkers of higher rank and
18    stature are sitting over there snarking and making
19    comments that this is garbage that I'm over here being
20    paraded.
21 Q. The mayor was complimentary of you, though, was he
22    not?
23 A. Yes.
24       MR. ACHO: Give me a couple of minutes.
25       VIDEO TECHNICIAN: Off the record at 3:06.

Page 210

1       (Off the record at 3:06 p.m.)
2       (Back on the record at 3:29 p.m.)
3       VIDEO TECHNICIAN: Back on the record at
4     3:29.
5  BY MR. ACHO:
6  Q. Ms. Howlett, I just want to go back and clear up one
7     area, and that is with Shawn Johnson. When he was
8     moved away from you, and then he was moved back,
9     didn't you have a discussion with Sergeant Mills about
10    the reason that Shawn Johnson was going to be moved
11    back with you?
12 A. No. It was a conversation with Lieutenant Gardner.
13 Q. Okay. But do you remember Lieutenant Gardner asking
14    you if you had a problem with it and you saying you
15    did not?
16 A. No, sir. I specifically asked not to be put back with
17    him. I wasn't going to take the promotion, the
18    position, if we had to sit together. So after I was
19    told that we didn't have to be back together, a couple
20    of weeks later, we were put back together.
21 Q. I understand. But a couple weeks later, wasn't there
22    a reconfiguration of the building where they were
23    remodeling and Sergeant Mills said to you, listen,
24    this remodeling is going on, we've got to put Shawn
25    back with you, do you have a problem with that?

Page 211

1  A. No. Lieutenant Gardner told me, like on a Monday,
2     that I needed to move my desk by that Friday, is what
3     happened.
4  Q. Okay. And you were never asked if you were okay with
5     it?
6  A. Only if the problem still had continued, and I stated
7     that it was still continuing because he was still
8     hollering at me, still doing the glare/stare thing and
9     it was still -- he wasn't sharing his work with me.
10 Q. All right. So I asked you about your psychologist and
11    whether or not she feels you're ready to return to
12    work, and you indicated that she has not told you to
13    go back to work; is that right?
14 A. Yes.
15 Q. Has she given you any type of prognosis, like when you
16    might be able to return to work?
17 A. She said I can't go back into policing at all.
18 Q. At all? So what are your plans?
19 A. To start all over, try to go into a different field.
20    I'm probably going to have to get schooling because
21    all my training is in policing.
22 Q. What are you looking for from this lawsuit?
23 A. I would love for each person to be able to walk in
24    that building and literally do a good job and nothing
25    else matter. It not, you know, be about race or

Page 212

1     gender or any of that, just treat each other like
2     human beings, you know. And so I thought that if I
3     just lasted, endured, in time they would get to know
4     me for me, and it didn't happen and doesn't happen.
5     So, you know, as an officer, you're, like, on a team
6     with people. You need to feel like the team is equal.
7     And so even forgiving everybody over and over and over
8     again for all those things is because trying to
9     survive in it.
10 Q. I appreciate that, but I asked you, what do you want
11    from this lawsuit?
12 A. I want things to get better there, the City of Warren,
13    the department.
14 Q. Okay. And how do you propose that we accomplish that?
15 A. Well, first you have to acknowledge that it's
16    happening.
17 Q. That what is happening?
18 A. The hostile environment, the racist stuff, the gender
19    bias, all these things. How can you fix it if nobody
20    admits to doing it?
21 Q. Okay. So if the City of Warren took some type of
22    proactive measure whereby they say, we're taking this
23    step to ensure that these type of things don't happen,
24    you would be satisfied?
25 A. The City of Warren, from my experience, says what



US LEGAL SUPPORT
The Power of Commitment™

Pages 209 to 212

DESHEILA HOWLETT
December 27, 2017

**Page 253**

1  him being concerned for his safety, working with you?
2  A. Us not getting a backup was after he had told me that
3     that was people's questions of whether it was his
4     concern.
5  Q. Okay. Okay. But you had problems with backup before
6     you and he were working together; correct?
7  A. Yes.
8  Q. Remember counsel asked you about the backup and you
9     indicated that -- you gave an example where the
10    detectives finally showed up?
11 A. Yes.
12 Q. Okay. It's my understanding from your testimony --
13    and maybe I misunderstood -- that after you had
14    complained about not having backup, that that problem
15    was fixed, that you did get proper backup, timely
16    backup; is that true?
17 A. I didn't complain.
18 Q. You didn't complain?
19 A. No.
20 Q. Was the problem ever fixed of you -- in other words,
21    did you ever begin to receive proper, timely backup?
22 A. No.
23 Q. Okay. From your testimony earlier, it would appear
24    that that's what you were saying, is that ultimately
25    you did get proper backup.

**Page 254**

1  A. No.
2  Q. That's not -- yeah, go ahead.
3  A. Earlier, I stated that I changed how I did things.
4     Instead of getting there so promptly or so fast, I
5     took her advice and I would slow down and make sure
6     that they're out before me so that I wouldn't be
7     alone.
8  Q. Okay. You took whose advice?
9  A. Dispatcher Broach, Debbie Broach.
10 Q. Debbie Broach. What was her advice?
11 A. To slow down and not be the first one out so that I
12    wouldn't be left alone too long.
13 Q. So you were now out policing and going to calls that
14    required you to get there quicker, but you did not
15    get -- you did not -- you purposely did not get there
16    quicker -- as quick as -- as quickly as you could have
17    because of your concern for improper -- concern about
18    improper backup?
19 A. Yes, sir.
20 Q. Okay. So how often or -- on average, how much delay
21    in time would occur in your getting to a particular
22    scene that you were dispatched to because of your
23    concern for improper backup?
24 A. If I was already close to the area, I would just stay
25    parked for a while until I could kinda hear the sirens

**Page 255**

1  or hear them coming or they saying, I'm almost out.
2  But if I was further away from a run, I would start in
3  the direction of it and then kind of just park a block
4  or two away, and then when I hear them call out, I
5  would turn the corner and --
6  Q. When you hear them call out what, Ms. Howlett?
7  A. Police officers call out on the scene.
8  Q. Okay. So when they got on the scene, that's when you
9     went there? Okay. And that delay, could that have
10    put the lives of citizens in jeopardy?
11 A. Probably.
12 Q. Probably.
13 A. Yes, sir.
14 Q. Okay. What would you say the delay in time was on
15    average? I know it would differ from situation to
16    situation, but on average, how much delay in getting
17    to a scene would occur?
18 A. I don't -- I don't know the exact time. I just know I
19    would go from going as fast as I could to slowing
20    down, so so many minutes per run.
21 Q. Okay. Okay. And your fear of getting there prior to
22    backup was what exactly, for the record? Let's be
23    clear.
24 A. When she told me that they were not coming in the most
25    direct route to me and that they would come but they

**Page 256**

1  would go the long way around or they would call out
2  for lunch, it made me feel like my life was in danger.
3  Q. Okay. How so, Ms. Howlett? We have to put this in
4     the record. And I know you already know, but we need
5     to make the record clear. How did you feel your life
6     was in danger as a result of going directly to the
7     scene when you're dispatched rather than slowing down?
8  A. Because if you're being left alone for an unnecessary
9     amount of time or extra time, the chances of something
10    happening and you not having assistance is greater.
11 Q. Okay. What could possibly happen? What are the basic
12    tenets of police rules in going to a scene that causes
13    you to be concerned about your safety, your wellbeing
14    and getting there before backup?
15 A. Serious runs, they assign a two-man car, so that's
16    physically two police officers working in one car.
17 Q. Yes.
18 A. But most of the time I was assigned an individual car.
19    So what they tried to do, if they don't have a two-man
20    available, is send two individual cars --
21 Q. Okay.
22 A. -- to handle a serious run.
23 Q. Okay.
24 A. So now if you're in your car and you're there alone,
25    until the other person comes, you're alone.


US LEGAL SUPPORT
The Power of Commitment™

Pages 253 to 256

DESHEILA HOWLETT
December 27, 2017

Page 265

1   A.  I believe it was April.
2   Q.  April of 2017?
3   A.  Yes, sir.
4   Q.  And since then, no income at all?
5   A.  No, sir.
6   Q.  No unemployment?
7   A.  No.
8   Q.  No workers' comp?
9   A.  No, sir.
10  Q.  No short-term disability benefits?
11  A.  No, sir.
12  Q.  Okay.  Did you apply for workers' comp?
13  A.  Yes.
14  Q.  And were you denied?
15  A.  Yes.
16  Q.  Okay.  Did you apply for short-term disability
17      benefits?
18  A.  Yes.
19  Q.  Were you denied?
20  A.  Yes.
21  Q.  Okay.  Is it your understanding that the City of
22      Warren has told you that since your injury was work
23      related, as counsel here today has also confirmed,
24      that because your income -- because your injury was
25      work related, that you are not entitled to a

Page 266

1       short-term disability?
2   A.  Short-term disability.  Basically, after I was denied,
3       it's now under review, I guess.  They're looking into.
4   Q.  Okay.  Did you hear counsel -- counsel gave me these
5       documents today concerning your application --
6   A.  Okay.
7   Q.  -- for disability and the -- counsel -- general
8       counsel for the City of Warren indicated that your
9       short-term disability benefits was denied because your
10      injury was work related.  Did you hear him say that
11      today?
12  A.  Yeah, I heard him say that.  That was my first time
13      hearing it.
14  Q.  I just want to know if you heard it.
15  A.  Yes.
16  Q.  Okay.  All right.  And did you agree with that
17      position?
18  A.  That my injury's work related?
19  Q.  That your short-term disability benefits are precluded
20      because your injury is work related.  Do you agree
21      with that assessment?
22  A.  I don't know what -- what the rules are on when you
23      get unemployment, short-term versus long-term
24      disability.
25  Q.  Okay.  So you're not familiar with that.  But you do

Page 267

1       understand that that's the City's position, is that
2       you're not entitled to short-term disability because
3       your injury was work related?
4   A.  Yes, sir.
5   Q.  Okay.  What was your income prior to your leaving on
6       sick -- because you were unable to work, what was
7       your -- what was your income, annual income, at the
8       City of Warren as a police officer?
9   A.  89,000.
10  Q.  89,000.  And did you also have benefits?
11  A.  Medical packages.
12  Q.  Medical package.  Do you have any idea what that
13      medical package is worth?
14  A.  Between 12- to 14,000 per employee, I believe.
15  Q.  Per employee, okay.  12- to 14,000, okay.
16      So your total including your income -- as
17      best you are able to determine, your total income,
18      including benefits, with the City of Warren as a
19      police officer -- and I think you were serving as a
20      sergeant; is that correct?
21  A.  Detective.
22  Q.  Detective.  Was what, if you were to add both your
23      annual income coupled with your benefits?
24  A.  It would have been in the 100,000 marker, 105-,
25      somewhere in there.

Page 268

1   Q.  $105,000 a year, okay.  And how old are you now?
2   A.  44.
3   Q.  44.  And what was the retirement age there at the City
4       of Warren?  The earliest you could retire?
5   A.  You have to be -- they do 30 and out there, so -- I
6       mean, I'm sorry, 25 and out.  So 25 plus whatever age
7       you hired in at.  You know, you could be finished
8       after 25 years.
9   Q.  Okay.  And so how many more years would you have had
10      to work there at Warren before you were able to
11      retire?
12  A.  15.
13  Q.  Another 15 years, okay.  Okay.  And so how have you
14      survived without any income up to this point since --
15      since April of 2017?
16  A.  My wife's income.
17  Q.  Okay.  And counsel asked you a question earlier, do
18      you recall as to your ability -- your ability to
19      return to work, and you answered the question -- and I
20      don't want to -- I'm not even sure if I can repeat
21      your answer exactly, but I want the record to be
22      clear.  Are you able to return to work?
23  A.  Not in policing, no.
24  Q.  Not in policing.  And why is that, as best as you can
25      explain for the record.



Pages 265 to 268

DESHEILA HOWLETT
December 27, 2017

Page 269

1  A. The way she's explaining to me is like --
2  Q. The way "she" who?
3  A. My -- the way my doctor is explaining it is because it
4     happened --
5  Q. Which doctor?
6  A. Valivonis. That so many things happened over such a
7     period of time from so many different people, that the
8     working environment for me has pretty much been
9     sullied as far as being in policing where you also
10    have to trust, respect one another and know that
11    they're going to be there for your safety, so...
12 Q. Okay. Did she ever indicate that you were able to
13    return to work at all in any profession?
14 A. She said probably with six months to a year or more of
15    therapy, and if I stayed on medication.
16 Q. Have you began to explore alternative careers?
17 A. I'm looking into potentially just completely getting
18    out of law enforcement and going into, like, interior
19    design.
20 Q. Okay. Are you working with any particular
21    professionals to assist you with that transition?
22 A. Yes, I have a work coach.
23 Q. Okay. And who is that?
24 A. I can't remember his name offhand. Is it Ancell?
25 Q. Dr. Ancell?

Page 270

1  A. Ancell.
2  Q. Okay. He's an occupational therapist or --
3  A. Yes.
4  Q. Okay. Occupational. Yeah, I think that's the term
5     for it. That helps you with selecting a career and
6     planning for transition from one career to another.
7        And by the way, do you have an expert to
8     help you determine what your exact economic losses
9     would be as a result of the discriminatory acts of the
10    City of Warren and the police department?
11 A. Yes, sir.
12 Q. Okay. And who would that expert be?
13 A. I haven't met with him yet.
14 Q. Okay. But you do have an expert?
15 A. Yes.
16 Q. Okay. Had you complained to anyone other than those
17    that you've gone on the record here today as having
18    complained to who are members of the Warren Police
19    Department, whether in command or not, about the
20    discriminatory and demeaning treatment that you have
21    received while working at the Warren Police
22    Department?
23 A. Other than the people that I've already mentioned
24    related to work, it would just be my friends and
25    family.

Page 271

1  Q. Your friends and family. Have you -- have you -- you
2     have complained to them --
3  A. Yes, sir.
4  Q. -- about that? Okay. And then just for a moment, can
5     you tell me, generally, how this has affected your
6     life, the quality of your life? What is your life
7     like now compared to what it was before you had
8     experienced this discrimination and it had culminated
9     into this landslide of avalanche of emotional
10    dishevelment in your life in requiring--
11       MR. ACHO: Is there any other colorful
12    adjective you wish to editorialize with? I mean,
13    goodness, I've been giving --
14 BY MR. MUNGO:
15 Q. You can -- you can describe the difference. Do you
16    need the question again?
17 A. No.
18 Q. Okay.
19 A. When you lose your profession and it's something that
20    you've done your entire adult life and my ability to
21    provide for my family, you know, and so it's a sense
22    of kind of bewilderment because you haven't done
23    anything wrong, you. Followed all the rules, you go
24    to school, you don't commit a crime, you get into your
25    career and it's supposed to end in some type of

Page 272

1     retirement/pension kind of thing. And so to have to,
2     first of all, get myself together mentally and
3     emotionally and heal from all of this and move
4     forward, and then start over back in school trying to
5     get into a whole other field, it's just -- it's too
6     much to fathom for me, you know.
7        And so living in a city that I can no
8     longer work for, but I can't even move out of it, to
9     feel a peace of mind -- imagine cutting your grass or
10    going to the mailbox and always looking over your
11    shoulder. It's just -- it's bad. My blinds are
12    closed. I don't go out a lot because people are
13    continuously like, oh, well, what's next? Well, I'm
14    still trying to survive this, you know.
15       So my schedule is opposite everybody's.
16    You know, I try to be at home on the weekends when my
17    neighbor go up north and just be opposite of
18    everybody. So pretty much just sedentary and going to
19    these appointments for counseling.
20       MR. MUNGO: Okay. I think that's it for
21    me.
22       MR. ACHO: I do have some followup.
23          RE-EXAMINATION
24 BY MR. ACHO:
25 Q. You just said, you know, it's hard because you haven't



Pages 269 to 272