# EXHIBIT A

00774725-1

2019 WL 6223750
United States Court of Appeals, Sixth Circuit.

Peter HUDSON, Plaintiff-Appellant,
v.
CITY OF HIGHLAND PARK, MICHIGAN; Derek Hillman; Makini Jackson, Defendants-Appellees.

No. 19-1036
|
Argued: October 23, 2019
|
Decided and Filed: November 22, 2019

**Synopsis**
**Background:** Former firefighter brought action against city, fire chief, and city human resources director asserting First Amendment retaliation and due process claims under § 1983, as well as Title VII claims alleging he was subjected to a hostile work environment and terminated due to his Christian faith. United States District Court for the Eastern District of Michigan, Stephen J. Murphy, J., 2017 WL 2831701, granted judgment on the pleadings in part and, 2018 WL 6268870, granted summary judgment to defendants on the remaining claims. Firefighter appealed.

**Holdings:** The Court of Appeals, Sutton, Circuit Judge, held that:

[1] firefighter did not state First Amendment retaliation claim against human resources director;

[2] firefighter stated claim that fire chief fired him because of his protected speech;

[3] firefighter did not establish that city violated his due process property interest in his employment;

[4] firefighter failed to show that city's proffered legitimate, non-discriminatory reason for terminating him, that he falsified his time-sheets, was pretextual; and

[5] the periodic rude comments firefighter received from his co-workers about his religious practices did not support a hostile work environment claim.

Affirmed in part and reversed in part.

Kethledge, Circuit Judge, filed opinion concurring in part and dissenting in part.

Stranch, Circuit Judge, filed opinion concurring in part and dissenting in part.

West Headnotes (29)

[1]    **Federal Courts**
       ⚼Judgment on the pleadings
       **Federal Courts**
       ⚼Judgment or dismissal on the pleadings

       Court of Appeals reviews the district

court's decision to grant judgment on the pleadings against plaintiff with fresh eyes, accepting plaintiff's plausible allegations as true and drawing all reasonable inferences in his favor.

[2] **Civil Rights**
⮕Government Agencies and Officers
**Civil Rights**
⮕Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

In qualified immunity cases, the court asks whether the claimant (1) established a constitutional violation (2) that was clearly established.

[3] **Constitutional Law**
⮕Retaliation in general

Public employers may not retaliate against employees based on their protected speech. U.S. Const. Amend. 1.

[4] **Constitutional Law**
⮕Retaliation in general
**Constitutional Law**
⮕Causation; substantial or motivating factor

To bring a First Amendment retaliation claim, a public employee has to plead three things: that he engaged in protected speech; that he suffered an adverse employment action; and that employer took that action because of his speech. U.S. Const. Amend. 1.

[5] **Constitutional Law**
⮕Firefighters and paramedics
**Municipal Corporations**
⮕Grounds for removal
**Public Employment**
⮕Protected activities

Firefighter's complaints about poor administration of fire department were protected speech, as required to establish First Amendment retaliation claim that he was fired because of his speech. U.S. Const. Amend. 1.

[6] **Constitutional Law**
⮕Firefighters and paramedics

**Municipal Corporations**
⬥Grounds for removal
**Public Employment**
⬥Causal connection; temporal proximity

Firefighter did not plausibly allege that city human resources director fired him because of his protected speech complaining about the poor administration of the fire department, and thus he did not state First Amendment retaliation claim; firefighter's complaint placed human resources director in the firehouse but made no allegations she knew about his comments. U.S. Const. Amend. 1.

[7] **Constitutional Law**
⬥Firefighters and paramedics
**Municipal Corporations**
⬥Grounds for removal
**Public Employment**
⬥Protected activities

Firefighter's allegations, that fire chief objected to firefighter's Christian convictions and wanted to stop his outspokenness, over five-year period, against the immorality of the chief and other firemen, who were allegedly watching pornography in communal spaces and engaging in extra-marital affairs at the fire station, which caused some of them to miss calls to respond to fires, that chief knew firefighter had complained to Occupational Safety and Health Administration (OSHA) that such cavorting led to deficiencies in the station's equipment, and that chief fired him for falsifying his timecard even though he knew another firefighter had done the same thing, were sufficient to state First Amendment retaliation claim. U.S. Const. Amend. 1.

[8] **Federal Courts**
⬥Pleading

Firefighter preserved for appeal his challenge to district court's grant of judgment on the pleadings on his First Amendment retaliation claim against fire chief, which alleged he was fired for his outspokenness about his Christian faith, where firefighter challenged the district court's decision in two motions, saying there were important other facts supporting causation and the district court did not consider his argument that the free speech claim sufficiently pled causation. U.S. Const. Amend. 1.

**[9]    Constitutional Law**
⚖Conduct and Control;
Deprivations and Adverse
Employment Actions

While a short passage of time between the protected speech and the adverse public employment action sometimes helps a First Amendment retaliation claim, the opposite is not necessarily true. U.S. Const. Amend. 1.

**[10]    Federal Courts**
⚖Pleading

Firefighter did not waive or forfeit his challenge to district court's grant of judgment on the pleadings on his First Amendment retaliation claim against fire chief, which alleged he was fired for his outspokenness about his Christian faith, when his counsel responded to question, during oral argument before Court of Appeals, about firefighter's claim that district court separately violated his due process rights by dismissing the First Amendment claim sua sponte without notice, separate briefing, a hearing, or a request at the time from chief that the court dismiss it; in answering that question and in reiterating his due process claim, firefighter could not have conceded that his First Amendment claim had no legs, as the interest

protected by the Due Process Clause was his prematurely dismissed First Amendment claim. U.S. Const. Amends. 1, 14.

**[11]    Federal Courts**
⚖Summary judgment

Court of Appeals reviews district court's summary judgment decisions with fresh eyes.

**[12]    Federal Civil Procedure**
⚖Absence of genuine issue of fact in general
**Federal Civil Procedure**
⚖Presumptions

To proceed to trial in response to a summary judgment motion, claimant must show that his evidence creates a genuine issue of material fact over each claim after giving the claimant the benefit of reasonable inferences from the record.

**[13]    Constitutional Law**
⚖Protections Provided and

Deprivations Prohibited in General

To establish a due process claim, plaintiff must show that the State (1) deprived him of a protected liberty or property interest (2) without the process required. U.S. Const. Amend. 14.

[14]   **Constitutional Law**
&#10148;Labor Relations; Labor Organizations and Collective Bargaining
**Municipal Corporations**
&#10148;Proceedings
**Public Employment**
&#10148;Property rights and interests

Firefighter had a property interest, protected by the Due Process Clause, in his employment, arising from the collective bargaining agreement (CBA) between the city and the firefighters' unions. U.S. Const. Amend. 14.

[15]   **Constitutional Law**
&#10148;Source of right or interest

The Constitution does not create property interests protected by the Due Process Clause. U.S. Const.

Amend. 14.

[16]   **Constitutional Law**
&#10148;Source of right or interest

Property interests protected by the Due Process Clause arise from sources of law other than the Constitution, sometimes state law, sometimes contracts. U.S. Const. Amend. 14.

[17]   **Constitutional Law**
&#10148;Labor Relations; Labor Organizations and Collective Bargaining
**Labor and Employment**
&#10148;Actions for Breach
**Labor and Employment**
&#10148;Procedure in general
**Municipal Corporations**
&#10148;Proceedings

Firefighter failed to show that the remedies available under Michigan law for city's alleged violations of grievance procedures set forth in collective bargaining agreement (CBA) with firefighters' union prior to and after his termination, such as bringing a breach of contract action, an unfair labor practice claim under

Michigan's Public Employees Relations Act (PERA), or filing a charge with Michigan Employment Relations Commission, were inadequate to help him, and thus he did not establish that city violated his due process property interest in his employment; firefighter did not explain why he never invoked these remedies and why they would not have corrected his process objections. U.S. Const. Amend.; Mich. Comp. Laws Ann. 423.201 et seq.

[18] **Constitutional Law**
⬦Notice and Hearing

The Fourteenth Amendment's Due Process Clause generally requires that the state provide a person with notice and an opportunity to be heard. U.S. Const. Amend. 14.

[19] **Constitutional Law**
⬦Termination or discharge

Before firing an employee, the Due Process Clause requires that a government body must provide a hearing, though the hearing need not be elaborate, and the nature of it depends on the importance of the interests involved and the nature of the subsequent proceedings. U.S. Const. Amend. 14.

[20] **Constitutional Law**
⬦Labor, Employment, and Public Officials
**Constitutional Law**
⬦Contracts

The Due Process Clause does not fix every breach of contract or violation of state labor law. U.S. Const. Amend. 14.

[21] **Civil Rights**
⬦Disparate treatment

If a claimant uses circumstantial evidence to prove his Title VII discrimination claim, claimant initially must make out a threshold claim of disparate treatment: that he (1) belonged to a protected class, (2) suffered an adverse employment action, (3) met the qualifications for his position, and (4) was treated differently from a similar employee who does not belong to his protected class. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

[22]    **Civil Rights**
⬅Effect of prima facie case;  shifting burden

If a claimant succeeds in making a threshold claim of disparate treatment under Title VII, the employer must offer a legitimate, non-discriminatory explanation for its action, which puts the ball back in claimant's court to show that the employer's justification amounts to a pretextual excuse to hide discrimination. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

[23]    **Civil Rights**
⬅Disparate treatment

That firefighter criticized the behavior of his co-workers, who allegedly watched pornography in communal spaces and engaged in extra-marital affairs at the fire station, due to his Christian religious convictions, as opposed to moral grounds stemming from secular convictions, did not permit the alleged disparate treatment firefighter received from his co-workers, fire chief, and city,

which resulted in his termination, and thus, the contention that firefighter was "not a hapless victim of religious harassment" was not a defense to his Title VII claims. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

[24]    **Civil Rights**
⬅Discharge or layoff

Firefighter's falsifying his time-sheets was legitimate, non-discriminatory reason under Title VII for city to fire him. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

[25]    **Civil Rights**
⬅Motive or intent;  pretext

Firefighter failed to show that city's proffered legitimate, non-discriminatory reason under Title VII for terminating him, that he falsified his time-sheets while other firefighters did not, was pretext for discrimination based on his outspoken Christian faith; firefighter did not offer any evidence to support his assertion that an atheist firefighter who also worked at the

department had also falsified his time sheets and yet was not fired, and he did not point to anything in the record that, unlike him, anyone ever reported the atheist firefighter for "double-dipping" by reporting that he had worked a shift for two different employers for the same hours, or that any city employee even believed atheist firefighter had overreported his hours. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

[26]   **Civil Rights**
⚮Harassment; work environment

The periodic rude comments firefighter received from his co-workers about his religious practices, in response to his criticisms for conduct he thought immoral, including watching pornography in communal spaces and engaging in extra-marital affairs at the fire station, did not unreasonably interfere with firefighter's work performance, and thus did not support a hostile work environment claim under Title VII; firefighter admitted that he never received fewer assignments or worse assignments because of his religious beliefs, nor did he ever stop going on fire runs because of the way his colleagues treated him, and he never complained to his supervisor about

the harassment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[27]   **Civil Rights**
⚮Harassment; work environment

To establish a cognizable hostile work environment claim under Title VII based on religious harassment, plaintiff must show that (1) he was a member of a protected class, (2) he faced unwelcome harassment, (3) he suffered the harassment because of his religion, (4) the harassment created a work environment that unreasonably interfered with his work performance, and (5) the employer was responsible for the harassment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[28]   **Civil Rights**
⚮Hostile environment; severity, pervasiveness, and frequency

Teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment that would give rise to a hostile work environment claim under Title VII.

Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[29]   **Civil Rights**
&#9096;Practices prohibited or required in general;  elements

Title VII does not serve as a general civility code for the American workplace. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.  No.  2:16-cv-12369—Stephen  J. Murphy, III, District Judge.

**Attorneys and Law Firms**

ARGUED: Robert L. Levi, ROBERT L. LEVI, P.C., West Bloomfield, Michigan, for Appellant. James W. McGinnis, Detroit, Michigan, for Appellees City of Highland Park and Derek Hillman. Paul R. Bernard, BERNARD APPELLATE LAW GROUP, Plymouth, Michigan, for Appellee Makini Jackson. ON BRIEF: Robert L. Levi, ROBERT L. LEVI, P.C., West Bloomfield, Michigan,  for  Appellant.  James  W. McGinnis, Detroit, Michigan, for Appellees City of Highland Park and Derek Hillman. Paul R. Bernard, BERNARD APPELLATE

LAW GROUP, Plymouth, Michigan, for Appellee Makini Jackson.

Before:  SUTTON,  KETHLEDGE,  and STRANCH, Circuit Judges.

SUTTON, J., delivered the opinion of the court in which KETHLEDGE and STRANCH, JJ., joined in part. KETHLEDGE, J. (pg. ——), delivered a separate opinion concurring in part and dissenting in part. STRANCH, J. (pp. —— – ——), delivered a separate opinion concurring in part and dissenting in part.

**OPINION**

SUTTON, Circuit Judge.

**\*1** Peter Hudson fought fires for the Highland Park Fire Department for close to thirteen years. During that time, he became a person of faith. For five years, he criticized other firefighters at the station for conduct he thought immoral and harmful to their work, and they responded by criticizing his faith and belittling him in other ways. In 2015, Hudson's supervisor discovered that he had overreported his hours and discharged him. Hudson sued the city, Fire Chief Derek Hillman, and city Human Resources Director Makini Jackson, on a number of different theories. The district

court dismissed some of Hudson's claims on the pleadings and most of them at summary judgment. We affirm in part and reverse in part.

## I.

Hudson worked for the Highland Park Fire Department from 2002 to 2015. Over time, he developed a reputation for two things: being an effective firefighter and being outspoken about his Christian faith. According to Hudson, the other firefighters had reputations too—for watching pornography in communal spaces and engaging in extra-marital affairs at the fire station. All of this created tension. He criticized their behavior, and they responded with disrespectful comments about his religious practices and sexual orientation. The back and forth went on for five years.

Things changed in 2015, when Hudson's supervisors, Chief Derek Hillman and Human Resources Director Makini Jackson, learned that he had claimed extra "Fire Engine Operator" hours on his time sheet. Hudson responded that any misreporting was a mistake. The department suspended Hudson without pay pending an investigation.

Hudson sought help from his union representatives. At the time, the Highland Park firefighters had a two-layer collective bargaining agreement with the city. They had allowed the Police Officers Association of Michigan, a much larger union, to bargain on their behalf with the city. But the agreement gave the station rights to elect local officers who would be responsible for day-to-day management of union affairs. Both levels initially came to Hudson's aid. A local union officer attended Hudson's suspension meeting. And the statewide union filed a grievance with the city challenging Hudson's suspension. Hillman denied the grievance.

The denial triggered the next phase of the grievance procedure, a "Step 2" meeting in which the employer, employee, and union discuss the issue. Minutes into the meeting, the city added a claim of wrongdoing. Hillman learned that Hudson had not just overreported his hours but had engaged in "double-dipping"—reporting that he had worked a shift for two different employers for the same hours. Hudson conferred with his union representatives who told him to invoke his right not to incriminate himself. Hudson took their advice, and Jackson fired him then and there.

Shortly after Hudson's termination, the union amended its grievance to account for Hudson's discharge. The union contacted Jackson and scheduled another "Step 2" meeting to discuss Hudson's status.

*2 As Hudson tried to keep his job, bad luck intervened and the Highland Park firefighters and the statewide union had a falling out. Some firefighters disliked the local union officers and wanted to hold a new election. The statewide union objected and threatened to withdraw if the firefighters went ahead. This did not deter the firefighters. They elected a new slate of

local representatives. Two days later, the statewide union notified the mayor that it no longer represented the firefighters. Hudson's "Step 2" meeting was cancelled.

Hudson took matters into his own hands. He emailed the local union, asking it to escalate his grievance to "Step 3"—arbitration—and to let him know when the parties selected an arbitrator. The local officials went ahead anyway and scheduled another "Step 2" meeting to "settle" Hudson's grievance along with any other outstanding grievances. No one notified Hudson about the meeting until the day before it. Hudson responded that he could not attend on such short notice and insisted that the union arbitrate his case.

The local union and the city went ahead with the meeting, and the local union opted not to go forward with Hudson's grievance. Hudson sought help from the Equal Employment Opportunity Commission, to no avail. He then sued the city, Hillman, and Jackson on an assortment of federal claims. As pertinent here, the district court dealt with the claims in two phases. It dismissed the First Amendment retaliation claims on the pleadings. And it granted summary judgment to the defendants on the rest.

## II.

[1] [2] [3]*First Amendment retaliation.* We review the district court's decision to grant judgment on the pleadings against Hudson on this claim with fresh eyes, accepting Hudson's plausible allegations as true and drawing all reasonable inferences in his favor. *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008). In qualified immunity cases like this one, we also ask whether the claimant (1) established a constitutional violation (2) that was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 227, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In this case, only one question matters. We have repeatedly held—we have repeatedly clearly established—that employers may not retaliate against employees based on their protected speech. *Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019); *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 579–80 (6th Cir. 1997). All that concerns us today is the constitutional question.

[4]To bring a First Amendment retaliation claim, Hudson had to plead three things: that he engaged in protected speech; that he suffered an adverse employment action; and that the fire department fired him because of his speech. *Buddenberg*, 939 F.3d at 739.

[5]Hudson readily meets the first two requirements. He complained about the poor administration of the fire department, surely protected speech. And the fire department fired him, surely an adverse employment action.

[6]What's harder is whether the fire department fired him because of his speech. More specifically, did Hudson allege sufficient plausible facts that his speech caused Jackson and Hillman's decision to fire him? *Handy-Clay v. City of Memphis*, 695 F.3d 531, 545 (6th Cir. 2012).

The district court didn't think so. Characterizing Hudson's pleadings as conclusory and suggesting he had only offered one allegation to sustain his burden, it thought Hudson had not met his pleading burden.

As to Jackson, we agree. Hudson's complaint places Jackson in the firehouse but makes no allegations she knew about his comments. That's not enough to make out a plausible case that Jackson fired him for his speech. *Cf. Ctr. for Bio-Ethical Reform, Inc., v. Napolitano*, 648 F.3d 365, 377–78 (6th Cir. 2011).

**\*3** [7]As to Hillman, Hudson's claim stands on firmer ground. While the question is close, his amended complaint contained enough plausible allegations to move to the discovery stage of the case. For five years, Hudson openly criticized his co-workers' behavior because he felt it hampered their ability to fight fires. Hillman knew about these comments (some concerned his behavior) and tolerated other firefighters' dereliction of duty (some of them missed calls to respond to fires). As time passed, Hudson put his complaints into action. A year before his discharge, he filed a complaint with the Occupational Safety and Health Administration, alleging that the firefighters' cavorting led to deficiencies in the station's equipment. Hillman, at some point, told another firefighter that he had grown tired of Hudson's complaints. Hillman eventually found a way to get rid of Hudson: He had falsified his timecard. Hillman fired him on that basis, even though he knew another firefighter had done the same thing. Hudson tells us why: "[Hillman] objected to Hudson's religious convictions and wanted to stop Hudson['s] outspokenness against the immorality of Hillman and the firemen." *Id.* at 15. Considering these allegations as a whole, it's fair to say that they meet the notice pleading requirements of plausible allegations that Hillman fired Hudson because of his speech.

[8]Hillman counters this conclusion on several grounds, each unconvincing. He believes we lack jurisdiction over the claim because Hudson did not preserve the issue for appeal. But Hudson raised the issue when he challenged the district court's decision in two motions, saying "there are important other facts supporting causation" and "[t]he Court did not consider ... Hudson's argument that the free speech claim sufficiently pled causation." R.73 at 6; R.85 at 7. He thus "identif[ied] the issue" and "provid[ed] some minimal level of argumentation in support of it." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331 (6th Cir. 2009).

[9]Hillman separately argues that Hudson lacks sufficient allegations tying the discharge decision to his speech. He notes that over five years passed between when Hudson started speaking and when he lost his job. While a short passage of time between the protected speech and the adverse action sometimes helps a retaliation claim, the opposite is not necessarily true. Our conventional view is to be skeptical that timelines alone prove anything. Hillman does not point to any case in which the mere passage of time dooms a retaliation claim. More to the point, Hudson has more than a timeline, short or long, to show causation. He alleges that Hillman expressed

frustration with his complaints—"he was tired of Hudson's complaints"—and knew that Hudson reported the firefighters to a government agency for their misbehavior. R.61 at 9; *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

Hillman adds that we should not count the fact that he scrutinized Hudson's conduct over other firefighters' conduct because his investigation did not concern Hudson's free-speech rights but at most his free-exercise rights (and right to be of free of discrimination based on faith). But this would not be the first time that the federal courts dealt with faith-based speech that implicated free-exercise and free-speech rights. *Compare Minersville Sch. Dist. v. Gobitis*, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940), *with W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). At any rate, the point, at least at the pleading stage, is one of inferences—that Hillman fired Hudson for reasons other than violating the fire station's payroll polices. Not every allegation has to substantiate a plaintiff's claim directly. *Paige v. Coyner*, 614 F.3d 273, 282–83 (6th Cir. 2010). That's why we have circumstantial evidence.

Hillman invokes other evidence, discovered during the summary judgment proceedings on other claims, which is neither here nor there. Only the pleadings bear on the viability of this claim. *See Sensations, Inc.*, 526 F.3d at 295.

[10]Nor can we affirm the dismissal of this claim on a ground not raised by Hillman or the district court—that Hudson conceded it should be dismissed. In his appellate briefs,

Hudson raised the argument that he had plausibly alleged sufficient facts to support the First Amendment claim. Appellant's Br. 20–21, 37; Reply Br. 8–10. Hillman thought he had preserved the argument. Appellees' Br. 40–42. In his appellee brief he stated "[o]n appeal, Plaintiff raises two issues. First ... he was denied procedural due process ... Second, Plaintiff argues his free speech claim was improperly dismissed based on the merits." *Id.* at 35. The appellees then responded to the argument on the merits, never hinting that it was waived or forfeited. *Id.* at 40–42. At oral argument, the defendants' counsel (after Hudson's counsel had argued) made the same point: "[Hudson] did not adequately allege the elements of causation ... If you apply the standard from *Twombly* [his complaint is] too conclusory." Or. Arg. 32:34. At oral argument, it is true, Hudson's counsel was asked about the "due process" nature of this argument—namely Hudson's claim that the district court separately violated his due process rights by dismissing the First Amendment claim sua sponte without notice, separate briefing, a hearing, or a request (at the time) from the defendants that the court dismiss it. Or. Arg. 10:30–11:35. In answering that question and in reiterating his due process claim, Hudson did not concede—could not have conceded—that his First Amendment claim had no legs. *Id.* The interest protected by the Due Process Clause after all was his prematurely dismissed First Amendment claim. If the Fifth Amendment protects anything in this case, it would protect Hudson's chance to present a plausible First Amendment claim, not an interest in pressing a frivolous claim. All of this explains why our court has rejected Hudson's similar First Amendment claim

against Jackson on the ground that it failed to meet the *Twombly* standard, not on the ground it was forfeited. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

## III.

**\*4** [11] [12]As for the court's summary judgment decisions, we also review them with fresh eyes. *Bormuth v. County of Jackson*, 870 F.3d 494, 503 (6th Cir. 2017) (en banc). To proceed to trial, Hudson must show that his evidence creates a genuine issue of material fact over each claim after giving the claimant the benefit of reasonable inferences from the record. *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007).

[13]*Due Process.* To establish a due process claim, Hudson must show that the State (1) deprived him of a protected liberty or property interest (2) without the process required. *Shoemaker v. City of Howell*, 795 F.3d 553, 558–59 (6th Cir. 2015).

[14] [15] [16]The Constitution does not create property interests. They arise from other sources of law, sometimes state law, sometimes contracts. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Hudson has a property interest in his employment, arising from the collective bargaining agreement between the city and the firefighters' unions. *Leary v. Daeschner*, 228 F.3d 729, 741–42 (6th Cir. 2000).

[17] [18] [19]As for process, the Fourteenth Amendment generally requires "that the state provide a person with notice and an opportunity to be heard." *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005). Before firing an employee, a government body must provide a hearing, though the hearing "need not be elaborate" and the nature of it depends on "the importance of the interests involved and the nature of the subsequent proceedings." *Loudermill*, 470 U.S. at 545–46, 105 S.Ct. 1487 (quotation omitted). Hudson must show that the State's procedures violate this standard or that the State's remedies fail to account for deviations from those procedures. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 907 (6th Cir. 2014); *see Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

The problem for Hudson is that we have repeatedly held that the traditional grievance procedures in a collective bargaining agreement—grievance procedures in other words like the ones at issue—satisfy due process in discharge cases like this one. *See Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 623–24 (6th Cir. 2013); *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004); *Buckner v. City of Highland Park*, 901 F.2d 491, 497 (6th Cir. 1990). Hudson acknowledges as much. Appellant's Br. 52.

[20]That forces Hudson to retreat to the argument that the application of these otherwise constitutional procedures violated due process as applied to him. More particularly, he argues that the July 8 post-discharge meeting (he was unable to attend) amounted to a "sham" and violated

his constitutional rights. Appellant's Br. 53. But due process does not fix every breach of contract or violation of state labor law. *Kaminski v. Coulter*, 865 F.3d 339, 348 (6th Cir. 2017). Before Hudson can use this federal cause of action in this way, he must show that state law remedies cannot help him. *Daily Servs., LLC*, 756 F.3d at 909–10; *Vicory v. Walton*, 721 F.2d 1062, 1063 (6th Cir. 1983).

This he has not done. Michigan affords quite a few remedies in this setting, and Hudson has not shown their inadequacy. He could have brought a breach of contract claim in Michigan courts. *Sankar v. Detroit Bd. of Educ.*, 160 Mich.App. 470, 409 N.W.2d 213, 215 (Mich. Ct. App. 1987). He could have claimed that his discharge constituted an unfair labor practice under Michigan's Public Employees Relations Act. *Demings v. City of Ecorse*, 423 Mich. 49, 377 N.W.2d 275, 283 (1985). Or he could have filed a charge with the Michigan Employment Relations Commission asking them to investigate the city's alleged misbehavior. *Taylor Sch. Dist. v. Rhatigan*, 318 Mich.App. 617, 900 N.W. 2d 699, 701 (Mich. Ct. App. 2016). Hudson does not explain why he never invoked these remedies and why they would not correct his process objections. *Jefferson v. Jefferson Cty. Public Sch. Sys.*, 360 F.3d 583, 588, 591 (6th Cir. 2004); *see also Zinermon*, 494 U.S. at 126, 110 S.Ct. 975; *Daily Servs., LLC*, 756 F.3d at 899–900; *Wilbur v. Harris*, 53 F.3d 542, 543–44 (2d Cir. 1995); *Fields v. Benningfield*, 544 F. App'x. 626, 630 (6th Cir. 2013). On this record, his claim fails as a matter of law.

**\*5** [21] [22]*Title VII.* Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment" because of his membership in a protected class, which includes a religious group. 42 U.S.C. § 2000e-2(a)(1). Employees may offer direct or circumstantial evidence to prove their case. If a claimant uses circumstantial evidence to prove his case, as Hudson does, case law tells us to consider the claim in three steps. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Hudson initially must make out a threshold claim of disparate treatment: that (1) he belonged to a protected class, (2) suffered an adverse employment action, (3) met the qualifications for his position, and (4) was treated differently from a similar employee who does not belong to his protected class. *Tepper v. Potter*, 505 F.3d 508, 515–17 (6th Cir. 2007). If he succeeds, the city must offer a legitimate, non-discriminatory explanation for its action. *Id.* That puts the ball back in Hudson's court to show that the city's justification amounts to a pretextual excuse to hide discrimination. *Id.*

[23]At the outset, we must dispense with one justification raised by the city for its treatment of Hudson: that he started it. Hudson "is not a hapless victim of religious harassment," the city maintains, because he "openly criticized his co-workers' behavior," and they simply "responded" by "taunting" Hudson with "remarks that may have had religious overtones." Appellees' Br. 26. There are at least two problems with this argument. One: Employees are free to speak out about misconduct in the workplace without subjecting themselves to

discharge for rocking the boat. Two: Employees are no less free to root legitimate criticisms about the workplace in their faith than in any other aspects of their worldview. For many people of faith, their religion is not an abstraction. It has consequences for how they behave and may require them to be witnesses and examples for their faith. That reality does not permit differential treatment of them because they criticize behavior on moral grounds stemming from religious convictions as opposed to moral grounds stemming from secular convictions. "Let firemen be firemen" is not a cognizable defense to Title VII claims based on gender discrimination, race discrimination, or faith-based discrimination.

[24] [25]Even so, Hudson's disparate treatment claim fails at a minimum at the last step. He cannot show that the city's justification for his discharge amounted to a pretextual basis for discriminating against him because of his faith. The fire department put forth a legitimate, non-discriminatory reason for treating Hudson differently. He falsified his time-sheets while other firefighters did not. *See e.g.*, *Haughton v. Orchid Automation*, 206 F. App'x. 524, 533 (6th Cir. 2006).

Hudson objects to this conclusion on the ground that Paul Baetz, an atheist firefighter who also worked at the department, also falsified his time sheets and yet was not fired. But he does not offer any evidence to support this assertion. And he does not point to anything in the record that establishes anyone ever reported Baetz for double-dipping or that any city employee even believed Baetz had overreported his hours. The closest Hudson comes to offering something concrete on the second point is

testimony from a payroll director who had to determine whether Baetz should be paid for time he spent on military leave. The payroll director admitted that Baetz should not have been paid while on leave, but the director never stated Baetz had done anything wrong.

Hudson insists that no one investigated Baetz because Baetz and Hillman conspired to fraudulently overreport Baetz's time. But the only support for this theory is Hudson's testimony to the effect that Baetz had full timesheets for days he spent on military leave, that Hillman reviewed all firefighters' timesheets, and that a paystub for Baetz showed more military leave income than Hudson thinks Baetz should have received under the collective bargaining agreement. But other evidence puts these snippets in context, a context that undermines Hudson's theory. In the same deposition, Hudson admitted that he did not see Baetz fill out the timesheets, that he does not know how the sheets were processed, and that he never asked anyone in charge of payroll what the logs meant. Hudson has not established sufficient evidence to go to a jury on his disparate treatment claim.

*6 [26] [27]As for Hudson's hostile workplace environment claim, the facts are more concrete, but they do not make out a prima facie case of discrimination. To establish a cognizable hostile work environment claim, Hudson must show that (1) he was a member of a protected class, (2) he faced unwelcome harassment, (3) he suffered the harassment because of his religion, (4) the harassment created a work environment that unreasonably interfered with Hudson's work performance, and (5) the city was

responsible for the harassment. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

[28] [29]Missing is sufficient evidence to support the fourth element. "[T]easing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quotation omitted). All Hudson can show are periodic rude comments from his co-workers, which generally do not suffice. *Cf. Tepper*, 505 F.3d at 516 (holding no discrimination as a matter of law where plaintiff "accused a handful of employees of occasionally making comments about his ... observance of the Jewish Sabbath"); *Hafford*, 183 F.3d at 514 (holding no hostile work environment as a matter of law where co-workers told a Muslim employee "that he was preparing for a holy war" and mocked him for observing certain Muslim practices). It's easy to be critical of the comments—and we have to wonder, if Hudson's allegations are true, who is running the station and what their theory of leadership is. But the reality remains that Title VII does not serve as a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Hudson has not presented sufficient evidence that these remarks unreasonably interfered with his work performance. Hudson admits that he never received fewer assignments or worse assignments because of his religious beliefs. Nor did he ever stop going on fire runs because of the way his colleagues treated him. Hudson never

complained to Hillman, his supervisor, about the harassment, even though he was plenty willing to tell the leaders of the station about other conduct of the firefighters—namely their intimate affairs. Hudson's confidante at the station, Eric Hollowell, also a religious man, heard similar comments directed at him but interpreted them as a joke. Hollowell noted, too, that the firefighters had a practice of saying grace together before meals, a practice that hardly conveys hostility based on faith. While Hudson's colleagues at times did not extend to him the civility and respect that should be the norm in the workplace, that doesn't mean their conduct violated Title VII.

For these reasons, we affirm in part and reverse in part.

## CONCURRING IN PART AND DISSENTING IN PART

KETHLEDGE, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the court's thoughtful opinion except as to its reversal of the First Amendment claim against Hillman. Hudson expressly conceded at oral argument that, as to that claim, he has argued in this appeal only that the district court somehow violated

due process when it dismissed the claim. Nor, in this court, has Hudson made any developed argument that he actually stated a First Amendment claim against Hillman in the complaint. I therefore would not reverse the district court on that ground. Instead I would affirm across the board.

## CONCURRING IN PART AND DISSENTING IN PART

STRANCH, Circuit Judge, concurring in part and dissenting in part.

**\*7** I concur in the court's opinion save the determination that Hudson fails to make a prima facie case of discrimination based on hostile work environment. Rather than a mere showing of "periodic rude comments from his co-workers," I think the record shows a genuine dispute of material fact over whether the harassment Hudson suffered created a work environment that unreasonably interfered with his work performance.

Making a prima facie case is not a heavy burden. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) ("The prima facie requirement for making a Title VII claim 'is not onerous.' " (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d

207 (1981))). Our opinion acknowledges that Hudson has shown the first three elements of a prima facie case of unwanted harassment based on religion. We also recognize that Hudson openly complained (including filing an OSHA complaint) that his fellow firefighters were derelict in their duties, including failing to maintain the firehouse and firefighting equipment, and missing calls to respond to fires. As a result of both, evidence shows that the firefighters generally treated Hudson "like an outcast"; they left when he entered a room and did not respond when he spoke to them. Management was aware of this. Chief Hillman told a new firefighter to stay away from Hudson or risk being ostracized too.

Although some of the mockery in the record might be considered mere teasing, "the real social impact of workplace behavior often depends on a constellation of the surrounding circumstances, expectations, and relationships." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The constellation here is best captured by the evidence that Hudson's colleagues refused to acknowledge or talk to him. This evidence is more relevant to the hostile work environment inquiry than the evidence that Hudson's coworkers mocked him for saying grace and wearing a cross and taunted him regarding his faith.

Drawing all reasonable inferences in his favor, the record reflects that Hudson's outcast status interfered with his work performance. Hudson testified that the work environment caused him "anticipatory anxiety on the way to work, wondering what might happen that day," and led him to be in

Hudson v. City of Highland Park, Michigan, --- F.3d ---- (2019)
2019 IER Cases 450,655

"a general state of fear." He explained: "I didn't feel safe" because "if we had fires, I questioned if they would have my back." In most work environments communication with colleagues is important, but it is crucial in a firehouse where the work involves life and death. The record shows that Hudson was concerned about the consequences his outcast status might have on his ability to rely on his team while fighting fires. Such harassment may create "an environment that a reasonable person would find hostile or abusive," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), because of its "frequency," and because it could appropriately be considered "physically threatening or humiliating" rather than "a mere offensive utterance," *id.* at 23, 114 S.Ct. 367.

Nor does this case founder on pretext. A jury may ultimately conclude that Hudson's colleagues ostracized him, not based on his religion, but because they grew frustrated by his moralizing directives. But considering the entire situation, a jury might also decide that his coworkers' responses to his religiosity led to a workplace that unreasonably interfered with Hudson's work performance. I therefore respectfully dissent as to the conclusion that Hudson failed to make out his hostile workplace environment claim.

## All Citations

--- F.3d ----, 2019 WL 6223750, 2019 IER Cases 450,655

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.