# EXHIBIT B

*In The Matter Of:*

**Desheila C. Howlett v. City of Warren**

**Gregory Murray**

**January 29, 2018**



Carroll
Court Reporting and Video

Gregory Murray
January 29, 2018

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESHEILA C. HOWLETT,
    Plaintiff,
  vs.     Civil No. 17-11260
        Hon. Terence G. Berg
        Mag. R. Steven Whalen
CITY OF WARREN; COMMISSIONER
JERE GREEN, acting in his individual
capacity; LT. LAWRENCE GARDNER;
SHAWN JOHNSON; DAWN MCLANE;
ANWAR KHAN; DARRIN LABIN;
WILLIAM ROSS; KEVIN BARNHILL;
PAUL HOUTOS; SCOTT TAYLOR,
    Defendants.

_____

The Deposition of GREGORY MURRAY,
Taken at 333 West Fort Street, Suite 1500,
Detroit, Michigan,
Commencing at 10:17 a.m.,
Monday, January 29, 2018,
Before Maureen Collier, CSR-7422.

---

**Page 2**

1  APPEARANCES
2
3  LEONARD MUNGO P43562
4  The Mungo Law Firm, P.L.C.
5  333 West Fort Street, Suite 1500
6  Detroit, Michigan 48226
7  (313) 963-0407
8  mungol16@msn.com
9    Appearing on behalf of the Plaintiff.
10
11  JAMES R. ACHO P62175
12  ELIZABETH RAE-O'DONNELL P41529
13  Cummings, McClorey, Davis & Acho, P.L.C.
14  17436 College Parkway
15  Livonia, Michigan 48152
16  (734) 261-2400
17  jacho@cmda-law.com
18    Appearing on behalf of the Defendants.
19
20
21
22
23
24
25

---

**Page 3**

1  ETHAN VINSON P26608
2  City of Warren, City Attorney's Office
3  1 City Square, Suite 400
4  Warren, Michigan 48093
5  (586) 574-4671
6  evinson@cityofwarren.org
7    Appearing on behalf of the Defendants.
8
9  MICHAEL J. SHARPE P37633
10  Law Office of Michael J. Sharpe
11  535 Griswold Street, Suite 1320
12  Detroit, Michigan 48226
13  (313) 961-3681
14  mjsharpe2003@yahoo.com
15    Appearing on behalf of Gregory Murray.
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1        TABLE OF CONTENTS
2
3  WITNESS          PAGE
4  GREGORY MURRAY
5
6  EXAMINATION BY MR. MUNGO:    17
7
8        EXHIBITS
9
10  EXHIBIT         PAGE
11  (Exhibits attached to transcript.)
12
13  DEPOSITION EXHIBIT 1    6
14  (January 27, 2018 E-mail)
15  DEPOSITION EXHIBIT 2    6
16  (Discipline - Shawn Johnson)
17  DEPOSITION EXHIBIT 3    6
18  (Discipline - Barbara Beyer)
19  DEPOSITION EXHIBIT 4    6
20  (General Order No. 17-09)
21  DEPOSITION EXHIBIT 5    6
22  (Affidavit of Gregory A. Murray)
23  DEPOSITION EXHIBIT 6    6
24  (October 24, 2017 Letter RE:
25  Resignation Consideration)

---

Gregory Murray
January 29, 2018

| Page 5 | | |
|---|---|---|
| 1 | DEPOSITION EXHIBIT 7 | 54 |
| 2 | (Agreement and Order) | |
| 3 | DEPOSITION EXHIBIT 8 | 105 |
| 4 | (General Order No. 03-01) | |

**Page 7**

1  having first been duly sworn to testify to the truth,
2  the whole truth and nothing but the truth, was
3  examined and testified as follows:
4        MR. MUNGO:  Let the record reflect that we
5  are here today for a deposition that has been duly
6  noticed for the case of DeSheila Howlett versus the
7  City of Warren, Commissioner Jere Green, and several
8  other defendants, Case Number 17-11260v, currently
9  pending before Judge Berg, Terence Berg, Federal
10  Court, Eastern District.  And the deponent today is
11  Mr. Gregory Murray, former diversity coordinator for
12  the City of Warren.
13        I think there is some housekeeping items
14  that opposing counsel, Mr. Acho, as well as myself --
15  did I do that right?  Acho?  Acho?
16        MR. ACHO:  Doesn't matter.  Acho.  Thanks.
17        MR. MUNGO:  Okay.  Both want to put on the
18  record relative to the deposition today.
19        I want the record to reflect that on the --
20  this deposition was noticed up -- do you have a copy
21  of that, please?  Is that your deposition notice?
22        This deposition was -- notice was sent out
23  on -- served upon opposing counsel on January 18th of
24  this year.  Today is the 29th of January.  That is the
25  notice of the deposition that we're currently sitting

**Page 6**

1  Detroit, Michigan
2  Monday, January 29, 2018
3  10:17 a.m.
4
5        MARKED FOR IDENTIFICATION
6  DEPOSITION EXHIBIT 1
7  (January 27, 2018 E-mail)
8        MARKED FOR IDENTIFICATION:
9  DEPOSITION EXHIBIT 2
10  (Discipline - Shawn Johnson)
11        MARKED FOR IDENTIFICATION:
12  DEPOSITION EXHIBIT 3
13  (Discipline - Barbara Beyer)
14        MARKED FOR IDENTIFICATION:
15  DEPOSITION EXHIBIT 4
16  (General Order No. 17-09)
17        MARKED FOR IDENTIFICATION:
18  DEPOSITION EXHIBIT 5
19  (Affidavit of Gregory A. Murray)
20        MARKED FOR IDENTIFICATION:
21  DEPOSITION EXHIBIT 6
22  (October 24, 2017 Letter
23  RE:  Resignation Consideration)
24        GREGORY MURRAY,
25  was thereupon called as a witness herein, and after

**Page 8**

1  for for Mr. Gregory Murray.
2        And on Saturday, January the 27th, I
3  received an e-mail from opposing counsel, Mr. James
4  Acho, indicating that I, counsel for Ms. Howlett, lead
5  counsel for Ms. Howlett, spoke with a Kathy Miller,
6  who was a one-time employee, police officer employee
7  with the City of Warren Police Department, who had
8  retired some -- in excess of four, five years ago.
9  And in opposing counsel's e-mail, he indicates or
10  makes statements that are actually not accurate
11  relative to my conversation, the conversation that I
12  had with Ms. Kathy Miller.
13        It should be important to note that, first,
14  that Kathy Miller was and at the time that she did
15  so --
16        MR. ACHO:  Counsel, we're here for the
17  deposition of Greg Murray.
18        MS. RAE-O'DONNELL:  Yeah.
19        MR. ACHO:  I don't know why you're rambling
20  on about Kathy Miller.  You can address that e-mail
21  another time.  We're here about Greg Murray.  You can
22  discuss what I told you about Mr. Murray in my e-mail,
23  but we're not here about Kathy Miller.
24        MR. MUNGO:  Okay.  All right.  That's duly
25  noted for the record.  So I'm going to continue to

2 (Pages 5 to 8)

Gregory Murray
January 29, 2018

Page 9

1  make my record.
2       That I had conversations -- represented by
3  opposing counsel that I had conversations with
4  Ms. Miller.
5       MR. ACHO: Conversation. One.
6       MR. MUNGO: A conversation with Ms. Miller.
7  Okay. Is that right? Let me double-check. It
8  says --
9       MR. ACHO: I wrote it. I'm telling you
10  it's right.
11       MR. MUNGO: In fact, I'm going to make this
12  an exhibit to this deposition today because it has a
13  reference to Mr. Murray as well. But it indicated
14  that I had called Kathy Miller by phone and that I
15  spoke with her, and she advised that she is an
16  employee of the City; as such is not comfortable
17  speaking with me. But that's not true. She never,
18  ever said that.
19       MR. ACHO: We can ask her at her
20  deposition.
21       MR. MUNGO: His e-mail goes on to state
22  that you continue to ask her questions on the phone,
23  questions of a probing nature. Ms. Miller is
24  represented by my office and is a City of Warren
25  employee. And after she advised you of such, you

Page 10

1  should have terminated the conversation. Please do
2  not attempt to contact her again.
3       And I just want to make the record clear
4  that Ms. Miller, as far as we knew here in my office,
5  was retired from the police department. And she did
6  retire from the police department.
7       MR. ACHO: Counsel, why are you doing this
8  now? Send me a letter in response. This has nothing
9  to do with this deposition. Why don't you talk about
10  everybody else in the city right now? It doesn't
11  matter. This is about Mr. Murray.
12       MR. MUNGO: Okay, Counsel. And that's
13  duly --
14       MR. ACHO: Send me a letter in response to
15  that.
16       MR. MUNGO: Duly noted for the record. And
17  actually the way the conversation took course was that
18  I had conversations with her; and at the end of that
19  conversation, she indicated that she was now working
20  for some sort of committee or commission --
21       MR. ACHO: Commission.
22       MR. MUNGO: -- for the City. And that --
23  and I told her at that time that since she's still an
24  employee of the City, that we probably should cease
25  this discussion.

Page 11

1       MR. ACHO: All right.
2       MR. MUNGO: And I will go through, I will
3  go through the city attorney as it relates to any
4  matters pertaining to the pending lawsuit.
5       MR. ACHO: Fair enough. That is not what
6  was relayed to me, but that's fine.
7       MR. MUNGO: That is exactly what occurred.
8       MR. ACHO: All right.
9       MR. MUNGO: And it should be noted for the
10  record that Ms. Miller was the retired police officer,
11  retired at the time, that actually reported the sexual
12  harassment and assault upon Ms. Howlett by Shawn
13  Johnson; that was confirmed in terms of his commission
14  and violation of Ms. Howlett's civil rights, and he
15  was -- and he was disciplined.
16       MR. ACHO: I have to object to this entire
17  soliloquy. It's completely irrelevant to the
18  deposition of Mr. Murray, which is our stated purpose
19  here today.
20       MR. MUNGO: So it should be -- there should
21  be no question that upon my discovery that Ms. Miller
22  was still an employee of the City of Detroit, I --
23  with the City of Warren, I terminated my conversation
24  with her and have not contacted her since. So counsel
25  did not need to tell me not to contact her.

Page 12

1       MR. ACHO: That's your position.
2       MR. MUNGO: I do my homework very, very
3  well.
4       MR. ACHO: That's your position.
5       MR. MUNGO: And I know what contact I am to
6  make and what contact I'm not to make.
7       MR. ACHO: Okay. Fair enough. Can we move
8  on?
9       MR. MUNGO: So now, the second part of
10  opposing counsel's e-mail related to Mr. Murray, when
11  he indicated that Mr. Murray was the former director
12  of diversity -- and this will be attached as an
13  exhibit to this deposition, Exhibit Number 1.
14       And as such, even though he is an
15  ex-employee, you technically -- and this is opposing
16  counsel writing, Mr. Acho, to me in an e-mail -- you
17  technically are ethically precluded from speaking with
18  him.
19       At this point that milk is out of the
20  bottle. I know you have spoken with him and his
21  deposition is Monday. I will advise you, however,
22  that I will be placing an objection on the record at
23  the start of the deposition. And my objection is
24  twofold: One, the communication that went on with you
25  and Mr. Murray is out of bounds. Some of what

3 (Pages 9 to 12)

Gregory Murray
January 29, 2018

Page 13

1  Mr. Murray will testify to may well be privileged
2  and/or subject to covenant of nondisclosure.
3  Moreover and more importantly, his
4  testimony is irrelevant and not reasonably calculated
5  to lead to discoverable evidence. Mr. Murray did not
6  even know DeSheila Howlett, much less have any
7  decision-making authority regarding her employment.
8  As such, this will be subject to a motion to strike,
9  motion in limine. I will be placing said objection on
10  the record at the outset.
11  And Counsel, you're certainly entitled to
12  do so. And it should be noted --
13  MR. ACHO: Well, you just read it for me.
14  But I will again.
15  MR. MUNGO: Well, as I said, this is going
16  to be an exhibit.
17  MR. ACHO: You realize as a former
18  director, you are not supposed to talk to him. So
19  there's nothing inaccurate about what I said. But
20  again, that milk is out of the bottle. I do object --
21  MR. MUNGO: Well, we disagree on that,
22  Counsel.
23  MR. ACHO: Send a letter in response, but
24  I'd like to --
25  MR. MUNGO: Well, no --

Page 14

1  MR. ACHO: I didn't ask you to read my
2  letter to you into the record. I said I want to place
3  an objection on the record.
4  MR. MUNGO: Okay. And that's fine.
5  MR. ACHO: Your entire last 15 minutes has
6  been a waste of our time and irrelevant. So I am
7  going to place an objection now on the record.
8  MR. MUNGO: All right.
9  MR. ACHO: My father Ron Acho is also
10  counsel on this case representing the City of Warren
11  and all the employees in DeSheila Howlett's case. He
12  has spoken at length to Mr. Murray. Ethan Vinson,
13  city attorney for the City of Warren, has also spoken
14  at length to Mr. Murray. As a result, the subject of
15  those conversations is subject to attorney-client
16  privilege.
17  The City of Warren does not waive its
18  privilege in any form or fashion related to
19  communications with Mr. Murray regarding the City of
20  Warren and/or DeSheila Howlett specifically. As such,
21  Mr. Murray is precluded from testifying regarding
22  anything involving DeSheila Howlett.
23  Having said that, should Mr. Murray decide
24  to testify regarding DeSheila Howlett and the City of
25  Warren, we would object on the basis of relevance

Page 15

1  considering Mr. Murray did not know DeSheila Howlett,
2  nor have any dealings with DeSheila Howlett or the
3  police department at large.
4  Finally, we would place an objection on the
5  record that Mr. Murray may have signed a nondisclosure
6  document in his contract when he became an employee
7  with the City of Warren, which would further preclude
8  testimony today.
9  For the reasons set forth, so that I don't
10  have to continually object during your deposition and
11  throw you off track or be disruptive, I'm placing a
12  standing objection as to all three objections that
13  I've stated. And they will be preserved throughout
14  the entirety of this deposition, and we will move to
15  strike the testimony and file a motion in limine
16  accordingly. Thank you.
17  MR. MUNGO: Okay. Now, first I want to
18  make it clear that -- and Mr. Murray is here today,
19  and he has his attorney, his counsel representation.
20  Attorney Michael Sharpe is present as well.
21  And I want to ask Mr. Murray. Mr. Murray,
22  have you had any conversations with me pertaining to
23  any -- and disclosing any conversations that you've
24  had with any city attorneys for the City of Warren?
25  THE WITNESS: No.

Page 16

1  MR. MUNGO: All right. Make that clear.
2  And then of course Mr. -- Mr. Acho.
3  MR. ACHO: Yes, sir.
4  MR. MUNGO: By the way, you indicated that
5  Mr. Murray had signed a nondisclosure document with
6  the City of Warren?
7  MR. ACHO: Sir, I'm not going to discuss
8  anything further with you. I placed my objection on
9  the record. You and I can talk off the record after
10  the deposition. Let's move forward with the dep,
11  please. I don't want to have discussions on the
12  record with you.
13  MR. MUNGO: Well, Counsel, the only problem
14  with that, in due regard for the court rules and the
15  law, if Mr. Murray is under some kind of contractual
16  obligation based on a signed document that you've
17  represented under oath here today -- well, you're not
18  under oath, but on the record here today that he
19  signed obligating him not to testify here today, I
20  think his attorney is entitled to take a look at that
21  and advise him accordingly.
22  MR. ACHO: Are you giving Mr. Sharpe
23  advice? Because Mr. Sharpe's a good lawyer on his
24  own, Number 1; and Number 2, you made no request to
25  such document; Number 3, I have not seen such

Carroll Court Reporting and Video
586-468-2411

Gregory Murray
January 29, 2018

Page 17

1  document.
2  MR. MUNGO: Okay.
3  MR. ACHO: I'm preserving my objection.
4  Move forward.
5  MR. MUNGO: That answers my question.
6  Okay. Very good.
7  MR. SHARPE: Used the word may.
8  MR. ACHO: Appreciate it.
9  MR. MUNGO: With that done, we're going to
10  proceed.
11  EXAMINATION
12  BY MR. MUNGO:
13  Q. So Mr. Murray, could you state and spell for the
14  record your full legal name, please.
15  A. Gregory Allen Murray. G-R-E-G-O-R-Y, A-L-L-E-N,
16  M-U-R-R-A-Y.
17  Q. Thank you, sir. And Mr. Murray, I want to start out
18  just with a little background information with regard
19  to you, sir, your education and your profession as a
20  professional. Could you provide that for us, sir, for
21  the record.
22  A. Actually, I've been involved in several professions,
23  but my most recent one as advocacy for diversity,
24  particularly within Macomb County Government and
25  Macomb County proper.

Page 18

1  Q. Okay.
2  A. I am the former first vice president of the Macomb
3  County NAACP. I am also the former project manager
4  for the Macomb County Ministry Alliance, which is a
5  multi-denominational faith-based advocacy organization
6  located in Macomb County.
7  I am a former school board president of the
8  Mt. Clemens Community School District. I have been
9  involved and helped to bring about a federal mediation
10  regarding diversity with the Department of Justice and
11  the City of Mt. Clemens over diversity-related issues.
12  Q. Okay.
13  A. I worked with -- advocated for and worked with the
14  Macomb County Board of Commissioners, particularly
15  under the leadership of Nancy White, to address issues
16  related to diversity, hiring practices, et cetera,
17  which resulted in the County revising their hiring
18  practices towards the end of 2003.
19  And so as it relates to diversity, I've
20  been very much involved in researching and addressing,
21  articulating and negotiating around issues of
22  inclusion and diversity. I also have --
23  Q. So how many years -- I apologize for interrupting you.
24  But can you associate those different experiences,
25  sir, and projects with a period of time for the

Page 19

1  record?
2  A. Yes. Approximately 17 years.
3  Q. 17 years. You've been involved in --
4  A. In Macomb County alone 17 years.
5  Q. In working in the area of --
6  A. Working in the area of diversity and inclusion, hiring
7  practices, racism, discrimination, et cetera.
8  Q. Okay. Very good. And sir, for the record, what is
9  your race?
10  A. I'm African American.
11  Q. And your gender.
12  A. Male.
13  Q. Male. Okay. So do you have any additional
14  information, anecdotal experiences with regard to your
15  work with diversity and inclusion in dealing with
16  racism and employment and discriminatory practices in
17  city government or in any other capacity that you'd
18  like to add to the record?
19  A. It's primarily focused within Macomb County. I have a
20  background as a journalist. I'm a published editorial
21  columnist, a former military journalist, having been
22  trained formally in the United States Air Force where
23  I was the editor of the newspaper in Nellis Air Force
24  Base in Las Vegas, Nevada.
25  And I advocated for people of color when I

Page 20

1  was employed with Cable Atlanta. I founded an
2  organization called Minorities in Cable to help
3  facilitate inclusion of minorities in the cable
4  industry. And I was also the former president of the
5  National Association of Black Journalists, the Atlanta
6  Chapter, which was an advocacy-related position as
7  well.
8  Q. Okay. Now, what period of time did that occur, sir?
9  A. That was 1980 through '81. There is something that I
10  omitted. I worked in January of 2016 to help
11  facilitate diversity training for Macomb County proper
12  for its department heads, deputy department heads,
13  supervisors, et cetera.
14  It was an eight-day diversity training, at
15  which I consulted with the County of Macomb and its
16  human resource director on the structure of the
17  training to be conducted and participated during that
18  entire eight-day period.
19  Q. Thank you, sir. And then if anything else comes to
20  your recollection, you can stop me, and we can add
21  that as well.
22  A. All right.
23  Q. Have you ever signed any nondisclosure agreements with
24  the City of Warren?
25  A. No.

5 (Pages 17 to 20)

Gregory Murray
January 29, 2018

## Page 21

1  Q.  Did you ever sign a contract with the City of Warren
2  for the work that you did there as the diversity
3  coordinator?
4  A.  I signed an appointment letter, some other documents
5  regarding internet usage, things of that nature but --
6  yeah.
7  Q.  Okay. In fact, can you tell us about your employment
8  with the City of Warren as the diversity coordinator.
9  How did that come about?
10  A.  An associate of mine brought to my attention the
11  posting for the diversity coordinator for the City of
12  Warren. I read it, saw what I thought were
13  deficiencies in it, relayed that to the person who
14  brought it to my attention. He referred me to the
15  human resource director, who was Phil Easter.
16      I knew Mr. Easter during my service as
17  president of the Board of Education for the Mt.
18  Clemens School District. I contacted Mr. Easter and
19  shared my assessment of the job description as
20  written. We had several different conversations of
21  which we talked about what would make a very strong
22  diversity coordinator.
23      He called me one day after several
24  conversations and asked me to accompany him to a
25  meeting with the mayor so that I might articulate why

## Page 22

1  those revisions might be proper.
2  Q.  Revisions to what, sir?
3  A.  To the job description as posted.
4  Q.  Which was?
5  A.  For the diversity coordinator.
6  Q.  Thank you.
7  A.  Uh-huh. And I never applied for the job, was not
8  interested in the job. I was retired.
9      Went to the meeting, shared what my
10  observations were relative to the job description of
11  the diversity coordinator. And at the end of this --
12  it was nearly 90 minutes -- the mayor offered me the
13  job, and I turned it down. I rejected it.
14  Q.  Why did you reject it?
15  A.  Well, because I was retired, having fun with my
16  grandbabies, et cetera, et cetera.
17      But then the mayor shared with me some of
18  the things he would do to demonstrate his commitment
19  to diversity, asked me to go home and think about it.
20      I went home, talked to the boss, talked to
21  my wife about it, and then I decided to take the
22  challenge on. Called him back, let him know that I
23  would accept the position. And I started on January
24  6th.
25  Q.  Of?

## Page 23

1  A.  2017.
2  Q.  2017. And while you were there -- well, first of all,
3  let me strike that.
4      Let me ask you this: You're no longer
5  employed as diversity director for the City of Warren.
6  A.  That's correct. I'm no longer employed as the
7  diversity coordinator.
8  Q.  Were you terminated, sir?
9  A.  I believe so, yes.
10  Q.  You believe. Okay. Did you at any point in time
11  offer to resign?
12  A.  Yes, I did.
13  Q.  And did you put your offer to resign in writing?
14  A.  Yes, I did.
15  Q.  And so even though you have a resignation letter, your
16  testimony here today is that you were terminated.
17  A.  Yes.
18  Q.  And why do you represent that you were terminated even
19  though you had previously written a letter of
20  resignation?
21  A.  The mayor rejected my letter of resignation, asked me
22  to stay on; that was on or about November 9th, because
23  November 10th was the date in my resignation letter as
24  would be my last day if he could not demonstrate a
25  recommitment to diversity.

## Page 24

1      So he rejected my resignation letter on
2  November 9th, thereabouts, November 9th. And I
3  considered that matter closed. However, on December
4  8th, he called me in and indicated that he was
5  releasing me. And I went back to my office and that
6  was it.
7  Q.  So why do you believe that he released you or
8  terminated you?
9  A.  I believe he released me because of the
10  recommendations that I made to bring about diversity
11  within the City of Warren. I believe he released me
12  because I refused to receive, purchase, sell, tickets
13  to his fundraiser; and that enraged him. I believe
14  that -- for the purposes of not having someone walking
15  around, an appointee who refused to do that type of
16  bidding, that he released me.
17  Q.  Okay. So just to make sure I have your testimony
18  clear, you believe it was a combination or one of the
19  other -- his resistance of you doing the diversity
20  work or your resistance to selling tickets and doing
21  other political things for the mayor?
22  A.  It was a combination.
23  Q.  It was a combination.
24  A.  It was a combination of not fully being committed to
25  diversity and my pressing him to do that, and also the

6 (Pages 21 to 24)

Gregory Murray
January 29, 2018

## Page 25

1    fundraising activity.
2  Q.   So Mr. Murray, for the record, could you provide us
3       with some of the incidents and events that led up to
4       your being terminated by Mayor Fouts as diversity
5       coordinator for the City of Warren that was based on
6       his refusal or resistance to your doing diversity
7       work?
8            MR. ACHO:  Before he answers, I just want
9       to place an objection on the record as to your use of
10      the word terminated.
11           It is our position that
12      Mr. Murray resigned.  Mr. Murray can testify to
13      whatever he wants, but I would request that you do not
14      use the word terminated.  The record will reflect
15      otherwise.
16           MR. MUNGO:  And I would request that you
17      don't request that.
18           MR. ACHO:  Please continue.
19  BY MR. MUNGO:
20  Q.   Go ahead.
21  A.   The mayor came into my office on at least three
22      occasions and shared with me that I would have to put
23      diversity on the back burner until after the 2019
24      election because he was concerned about a white voter
25      backlash if he were to aggressively pursue diversity.

## Page 26

1            I attempted to have a conversation with him
2       about that, attempted to get on his schedule, was not
3       able to get on his schedule.  On October 24th I put my
4       resignation letter in his hand at a staff meeting.
5  Q.   Okay.
6  A.   Principally because my primary purpose for coming to
7       the City of Warren was to advance diversity, identify
8       best practices, and find ways to incorporate that into
9       the fabric of the city.
10  Q.  Sir, was that your principal purpose or only purpose
11      for coming to the City of --
12  A.   Actually, it was my only purpose for coming to the
13      City.
14  Q.   Okay.
15  A.   Because again, my history with diversity and
16      advocating for diversity.  Also the mayor wanted me to
17      take on the duties of the liaison for the City of
18      Warren in the census bureau, which is all together a
19      different range of activities, completely inconsistent
20      with my job description and why I came there.
21           And I thought that he wanted me to tread
22      water performing these other duties, eliminating focus
23      on diversity until after the 2019 election.  And
24      again, that wasn't a part of my job description, had
25      nothing to do really with my primary duties as

## Page 27

1    diversity coordinator.
2  Q.   Okay.  Mr. Murray, at any point in time prior to your
3       hiring in as diversity coordinator for the City of
4       Warren or any time thereafter, was it ever represented
5       to you, sir, that your job would vary from one task to
6       another and that you may be asked to do things
7       completely unrelated to the purpose for which you were
8       hired, that is, diversity coordinator?
9  A.   No, no.
10  Q.  Okay.  And so you had expectations that your job would
11      be strictly focused on diversity; is that correct?
12  A.   Yeah, that's correct.
13  Q.   Okay.  And it turned out not to be what actually
14      transpired with regard to the mayor's expectations of
15      you?
16  A.   Yes, that's correct.
17  Q.   So you tendered this letter of resignation.  And I
18      want to take you back to your testimony where you
19      indicated that you had, I believe you had a
20      conversation with the mayor, and he rejected the
21      letter when you presented it to him, your letter of
22      resignation.  And you continued to work in the
23      capacity of a diversity coordinator or in some other
24      capacity?
25  A.   No.  I continued on November 9th at a meeting where we

## Page 28

1    discussed my letter.  Subsequent to that he asked me
2       to stay on and I did until December 8th, working in
3       the capacity as a diversity coordinator and continuing
4       my work as a diversity coordinator.
5  Q.   So you continued your work as a diversity coordinator
6       after November 9th; is that correct?
7  A.   That's correct.
8  Q.   Okay.  But later, subsequent to that, to November 9th,
9       you were actually terminated by the mayor?
10  A.   Yes.  In-between November 9th and December 8th, I
11      attempted to continue my duties as diversity
12      coordinator, made recommendations to the mayor.  And
13      then on December 8th, he called me into his office and
14      released me.
15  Q.   Okay.  So we need to know for the record what
16      specifically took place between November 9th and the
17      time, the date that the mayor terminated your
18      employment as diversity coordinator that led to the
19      mayor's termination of your employment with the City
20      of Warren?
21  A.   Well, I put together a list of recommendations to the
22      mayor based on him having said that he would recommit
23      to diversity.  I put to those to him in writing.
24      Those were rejected.
25           I also did not attend his fundraiser, and

Gregory Murray
January 29, 2018

---

Page 29

1  the issue was brought up.  He was very adamant about
2  the need for loyalty and that he considers that to be
3  a sign of loyalty.  And I shared with him that I had
4  never sold fundraising tickets for anyone throughout
5  all of my advocacy in Macomb County and that I never
6  would, at which he became even further enraged.
7  Q.  And what occurred that caused you to believe that part
8      of the reason for your termination as a diversity
9      coordinator for the City of Warren by Mayor Fouts was
10     based on your continued work in the area of diversity?
11 A.  Well, the recommendation that I made that he fully
12     fund the Office of Diversity and Inclusion, that he
13     properly staff it and resource it, which were promises
14     that he had made -- commitments he had made at the
15     onset of our engagement with each other.  Those were
16     summarily rejected and --
17 Q.  After November 9th?
18 A.  After November 9th, yes.
19 Q.  Okay.
20 A.  After November 9th.
21 Q.  And would that be in close proximity to his expression
22     about desiring loyalty from you?
23 A.  Yes.
24 Q.  Okay.  So I'm going to show you Deposition, what's
25     been marked as Deposition Exhibit Number 6.  And can

---

Page 30

1  you take a look at that document, please.  And after
2  you've taken a look at that document, sir, could
3  you --
4          MR. ACHO:  I'm sorry.  This is marked
5  exhibit what?
6          MR. MUNGO:  Exhibit 6.  Is that six on
7  there?
8          THE WITNESS:  Yes.
9          MR. ACHO:  What were the first five?  I
10 know the first one was my e-mail.  Do we have 2
11 through 5?
12         MR. MUNGO:  Yeah.  2 is -- well, I haven't
13 gotten to three yet, but we do have 2 through 6.
14         MR. ACHO:  So you're just doing it out of
15 order.
16         MR. MUNGO:  Yeah.  It's a little out of
17 order.  I apologize for that.
18         MR. ACHO:  That's all right.
19         THE WITNESS:  Okay.
20 BY MR. MUNGO:
21 Q.  Do you recognize Deposition Exhibit Number 6,
22     Mr. Murray?
23 A.  Yes, I do.
24 Q.  And what is that document for the record, sir?
25 A.  This is my letter of resignation.

---

Page 31

1  Q.  Okay.  And in that letter of resignation, does it
2      contain pretty much all of your representations for
3      why you chose to resign and later why the mayor
4      terminated you?
5  A.  Yes, except for the issue of the fundraising tickets.
6  Q.  Okay.  That's not in there?
7  A.  Right.
8  Q.  That's not in there, what you're saying.
9  A.  That's correct.
10 Q.  Okay.  I want to draw your attention to the second
11     page and the second full paragraph on the second page.
12         MR. SHARPE:  This is a two-page document.
13         MR. MUNGO:  It's a two-page document, yes.
14 Thank you, Mr. Sharpe.
15         THE WITNESS:  Yes.
16 BY MR. MUNGO:
17 Q.  Okay.  The second full paragraph, there you address
18     the mayor's statements to you regarding his desire
19     that you not pursue the purpose for which you were
20     employed, and that is as diversity coordinator doing
21     the work of diversity for the City of Warren.  Do you
22     see that paragraph?
23 A.  Yes.
24 Q.  Okay.  Do you want to take a moment to read that or
25     are you pretty much familiar with the content therein?

---

Page 32

1  A.  I'm pretty familiar with it.
2  Q.  Okay.  In that paragraph you indicated that the mayor
3      told you two weeks ago from the date of this letter
4      that he intended to put diversity on the back shelf
5      until after the election in 2019.  Had the mayor made
6      that statement to you only once, Mr. Murray, or was
7      that a repeated statement?
8  A.  It was a repeated statement.
9  Q.  Approximately how many times -- I know you can't come
10     up with a specific number accurately, but was it like
11     more than three times, four times, five times?
12 A.  Three times.
13 Q.  About three times at least?
14 A.  Yeah.  At least three times, yes.
15 Q.  Okay.  So until after the election in 2019.  Is that
16     when he's next up for re-election?
17 A.  Yes.
18 Q.  And so that puts you quite a bit of time, a period
19     into the future without doing any diversity work at
20     all; correct?
21 A.  That's correct.
22 Q.  And then you indicated that -- in that second
23     paragraph at the top of the second page of Deposition
24     Exhibit Number 6, that based purely -- the mayor had
25     based this statement and instruction purely on

---

8 (Pages 29 to 32)

Gregory Murray
January 29, 2018

## Page 33

1  political considerations. You also go on to say that
2  the mayor expressed his belief that the climate was
3  not quite ready for diversity. Did he ever explain
4  that to you, what he meant by that?
5  A. He stated to me that he did not feel that the white
6  voters of Warren were prepared for diversity. He did
7  not want to suffer a backlash because there are other
8  things that were going on too that related to people
9  of color including LAM, which is Life Application
10 Ministries, and issues he was having there with that
11 black congregation. He talked about Dean Berry, who
12 is someone who he had a conversation with regarding
13 the lack of a need for diversity.
14 Q. Was this person African American or Caucasian?
15 A. Caucasian, Caucasian.
16 Q. And what is this person's position in the community?
17 A. He was explained to me as a community activist.
18 Q. But he was a white community activist.
19 A. He was a white, in the mayor's wording, racist
20 community activist who raised concerns about there
21 being the need for diversity coordinator or for
22 diversity-related initiatives.
23 Q. Okay. And so this white citizen, was he an employee
24 of the City of Warren?
25 A. No, he wasn't.

## Page 34

1  Q. He was, as you said, a community activist?
2  A. Yes.
3  Q. And he was white.
4  A. Yes.
5  Q. And he was opposed to diversity.
6  A. Yes.
7  Q. Okay. And did this person, this person tend to have a
8  history of promoting racial division within the Warren
9  community?
10 A. According to the mayor, yes.
11 Q. That's what the mayor told you.
12 A. Yes.
13 Q. And the mayor told you that because this particular
14 citizen, who I'm assuming the mayor believed he had a
15 lot of influence in the city?
16 A. To some extent.
17 Q. To some extent.
18 A. Yeah.
19 Q. And that he didn't feel that white people were ready
20 to relinquish attitudes and overcome attitudes and
21 practices of racial discrimination within city
22 government?
23 A. Yes.
24 Q. Okay. And tell us a little bit about why you would
25 say yes to answering that question.

## Page 35

1  A. I would say yes because the mayor relayed to me, and
2  actually put Mr. Berry on speakerphone —
3  Q. Now, Mr. Berry's the Caucasian gentleman.
4  A. Yes.
5  Q. Okay. Who didn't want diversity.
6  A. Yes.
7  Q. And so he was put on the speakerphone by the mayor?
8  A. I was in the mayor's office.
9  Q. Okay.
10 A. He called Mr. Berry, put Mr. Berry on speakerphone,
11 introduced Mr. Berry to me via phone, and Mr. Berry
12 proceeded to say that we did not need diversity in the
13 City of Warren, that it was an unnecessary expense,
14 that if there were problems, people could go to court,
15 et cetera. And the mayor ended the conversation and
16 asked me to go — to call Mr. Berry back.
17      I called Mr. Berry back. He was very
18 confrontational. He ended up hanging up on me. And
19 that was my last contact with Mr. Berry, except that
20 Mr. Berry submitted a Freedom of Information Act
21 request to get information regarding my job
22 description, my — I guess my personnel file, et
23 cetera; and that was the last of my involvement in
24 matters associated with Mr. Berry.
25 Q. Did Mayor Fouts take a stand against the attitudes and

## Page 36

1  thoughts and position advanced by this white
2  Caucasian? What's his name again?
3  A. Berry. Dean Berry.
4  Q. Berry.
5  A. Not in my presence.
6  Q. Okay. So his first name is Dean.
7  A. Dean.
8  Q. Last name is Berry.
9  A. Berry.
10 Q. Do you know how to spell that name?
11 A. D-E-A-N, B-E-R-R-Y.
12 Q. And he's just a citizen in the community.
13 A. Yes.
14 Q. Considered a community activist —
15 A. Yes.
16 Q. — that seemed to be partial to advancing white
17 supremacists' attitudes and notions?
18 A. To the exclusion of people of color, yes.
19      MR. ACHO: Just for the record, five times
20 now you've indicated the man's Caucasian and that he
21 supports white — we got it. You don't have to keep
22 restating it. It's in the record very clearly five
23 times. Go ahead.
24      MR. MUNGO: Okay. So I shouldn't say
25 that —

Gregory Murray
January 29, 2018

Page 37

1    MR. ACHO: I would hope you wouldn't.
2    MR. VINSON: I'm wondering what does this
3  have to do with --
4    MR. ACHO: It has nothing to do with,
5  anything to do with this case. But that's all right.
6    MR. VINSON: I know.
7    MR. MUNGO: You two will find out soon
8  enough.
9    MR. VINSON: Can't wait.
10   MR. VINSON: I'm just amazed that you know
11 about all these incidents like with Mr. Berry,
12 Counsel, given that you haven't communicated with
13 Mr. Murray. I just find it surprising. You are
14 clairvoyant. Go ahead though.
15 BY MR. MUNGO:
16 Q. So Mr. Murray, you further noted that the mayor told
17   you that that might create a political backlash should
18   you aggressively promote diversity.
19       Do you recall any other conversations
20   around that statement that you had with Mayor Fouts?
21   Again, we're referencing, for the record, we're
22   referencing the second paragraph at the top of Page 2
23   of Deposition Exhibit 6.
24 A. **Only that he shared that sentiment on three different**
25   **occasions at least, and then within the same**

Page 38

1    conversation would talk about me being the -- assuming
2    the duties of the liaison for the census bureau.
3  Q. Okay. You mentioned earlier that there was a position
4    description or job description for diversity
5    coordinator.
6  A. Yes.
7  Q. Director. I'm sorry. Can you recall any of those,
8    any portions of those different duties and
9    responsibilities of that job description, Mr. Murray?
10 A. Uh-hmm. **To identify best practices, to promote**
11   **diversity within the municipal workforce -- within the**
12   **City and the municipal workforce, you know, through**
13   **the City, to investigate issues involving issues of**
14   **discrimination or alleged discrimination, allegations**
15   **of discrimination within the City as well. Primarily**
16   **those were the -- my duties: To promote diversity,**
17   **identify best practices, to incorporate them within**
18   **the policies, to investigate issues of alleged**
19   **discrimination, recommend discipline with respect to**
20   **those -- the outcome of those investigations and to**
21   **allegations of racial discrimination.**
22 Q. Okay. And the set of recommendations that you
23   discussed earlier, you put into the record that you
24   made to the mayor and the mayor rejected, would any of
25   those measures be a part of those or be among the

Page 39

1    recommendations that you actually submitted to the
2    mayor and he rejected?
3  A. Yes.
4  Q. Any or all of them?
5  A. **Well, that was just a grouping of them. There were**
6    **more recommendations to come based on ideally a**
7    **follow-up to the initial recommendation that I made**
8    **after November 9th.**
9  Q. And you did have a chance to actually submit those to
10   the mayor.
11 A. **Yes, in writing.**
12 Q. And when you submitted those to the mayor, what was
13   his response?
14 A. **He would not do them.**
15 Q. Okay.
16 A. **Said I won't do this. I won't do that. I won't do**
17   **that.**
18 Q. Okay. He just blatantly stated overtly that he was
19   not going to do --
20 A. **He was not going to do it.**
21 Q. Or fulfill or carry out the recommendations that
22   you've had.
23 A. Yes.
24 Q. Okay. I notice also on the second page of Deposition
25   Exhibit Number 6, Mr. Murray, in the fifth paragraph

Page 40

1    that is bold, in bold type.
2  A. Yes.
3  Q. You indicate with regard to my work -- and this is
4    your resignation letter to the mayor -- with regard to
5    my work environment, I also have a choice. And I am
6    stating to you directly that absent an irrevocable
7    reset and a doubling down of your stated commitment to
8    diversity, our work relationship will soon end. You
9    recall writing that.
10 A. Yes.
11 Q. Okay. And again, all of that was submitted with the
12   rest of the content of the Deposition Exhibit Number 6
13   to the mayor, and he rejected the letter and allowed
14   you to continue diversity work and later terminated
15   you for continuing the work; correct?
16 A. Yes.
17 Q. All right. So let me ask you this: Have you filed a
18   lawsuit against the City for wrongful termination?
19 A. No.
20 Q. Had you contemplated doing so at all?
21 A. No.
22 Q. And is it your intent to do so?
23 A. **I have not determined what my course of action, you**
24   **know, will be as it relates to that. I'll take the**
25   **advice of my counsel in regards to that.**

10  (Pages 37 to 40)

Gregory Murray
January 29, 2018

Page 41

1  Q.  Okay. Are you embittered or angry with anyone in the
2      City of Warren as a result of your being terminated?
3  A.  No, no.
4  Q.  Can you explain for the record why you're able to
5      maintain a nontoxic or hostile attitude toward the
6      mayor or anyone in the City of Warren after having
7      been terminated for attempting to do the work that you
8      were hired to do?
9          MR. ACHO:  Again, I'll restate the
10     objection.  Mr. Murray resigned.  He was not
11     terminated.  Go ahead.
12         THE WITNESS:  I have throughout my
13     experiences with diversity come to adopt a philosophy
14     and a mindset that allows me to buffer myself from or
15     to compartmentalize attitudes like this.  It's the
16     only way that I've been able to continue to sit down
17     at a negotiating table and try to work through issues
18     with people.
19         So it's not my mindset or my practice to
20     demonize people, even when I believe that they are
21     very much incorrect.  I have sat down across the table
22     with people that I consider to be bigots and still
23     negotiated with the idea in mind of advancing the
24     issues and causes of diversity.  And so I'm not
25     letting that overwhelm me to the point where hatred

Page 42

1      and resentment, those kind of things steal my spirit
2      and my energy.  I'm not that kind of person.
3          So in that respect, I don't hate anyone
4      there.  I enjoyed working with a whole host of people
5      there.  Mr. Fouts is a very colorful person.  I don't
6      hate him.  I don't hate Ethan.  I don't hate anyone at
7      the City of Warren.
8          It was -- it just revealed itself to be an
9      environment where the mayor I believe was not
10     generally -- genuinely committed to diversity.  It was
11     a political calculation, I believe.  And after nine or
12     ten months of the mayor coming into my office almost
13     every day for 10 to 15 minutes sharing his
14     perspectives and things of this nature, I came to the
15     conclusion that I needed to write this letter in order
16     to again share with him not only his commitment to
17     diversity but my commitment with respect to my job
18     duties.  So no, I hold no animus, you know, towards
19     people.  But the situation is what it is.
20 Q.  Okay.  And so your position -- in fact, you came out
21     of retirement you said earlier.
22 A.  Yes.
23 Q.  Correct?  And you rejected the offer of the job to
24     begin with; correct?
25 A.  Yes.

Page 43

1  Q.  But you ultimately took the job.
2  A.  Yes.
3  Q.  So what would have been -- what happened to cause you
4      to come out of retirement that you weren't interested
5      in coming out of retirement to take that job?
6  A.  Well, Number 1, it was the challenge to help a city
7      with a storied history come into the 21st century as
8      it related to diversity.  It was that challenge and
9      the commitments that the mayor made initially which
10     also helped convince me to come on board.  Because I
11     assumed erroneously that I would have his full and
12     genuine support.  So those two things were my
13     motivating factors.
14 Q.  Okay.  And based on your testimony, after you saw
15     that, then you indicated, you used the word that the
16     mayor was disingenuous about doing -- improving
17     diversity, the state of diversity in the city, that
18     that motivated you to leave.
19 A.  Yes.
20 Q.  Okay.
21 A.  To draft my letter.
22 Q.  You gave him the letter.
23 A.  Yes.
24 Q.  And I just want to be clear for the record, even
25     though you gave him that letter, and I asked you this

Page 44

1      earlier, resignation letter, he rejected the letter,
2      and you continued to work.  And then later on, he
3      actually terminated you.  You didn't voluntarily
4      leave.  He terminated you.  Correct?
5  A.  I believe so, yes.  That's my --
6          MR. ACHO:  Counsel, just so we're clear,
7      this is not a deposition for Mr. Murray's employment
8      action, is it?  Because I'm confused about this entire
9      line of questioning.
10         This case is called the DeSheila Howlett
11     versus Warren, a police officer who filed a lawsuit.
12     I don't know what any of these questions have to do
13     with anything or why we're even here.
14         MR. MUNGO:  You guys going to do two
15     objections or you're going to just do one?
16         MR. VINSON:  I was talking to Jim.
17         MR. MUNGO:  I'm sorry?
18         MR. VINSON:  I was talking to Jim.
19         MR. MUNGO:  Yeah, but when you do that,
20     Counsel, you should write him a note or something or
21     we should take a break.  Because that's really not
22     appropriate.  That's not orderly.
23         Let the record reflect I'm about to show
24     the deponent Deposition Exhibit Number 5.  And I'm
25     sorry, Mr. Ethan, Mr. Vinson, I only have three of

11 (Pages 41 to 44)

Gregory Murray
January 29, 2018

Page 45

```
1    these.
2         MR. ACHO:  Can you make a couple copies for
3    us so that Mr. Vinson has it before you question him?
4         MR. MUNGO:  Absolutely.
5         MR. VINSON:  Thank you.
6         (Off the record at 11:09 a.m.)
7         (Back on the record at 11:20 a.m.)
8    BY MR. MUNGO:
9    Q.  So Mr. Murray, can you for the record, sir, share with
10   us what the employment workforce in the City
11   government for the City of Warren was by race and
12   gender as best you can?
13   A.  Yes.  City of Warren has approximately a little more
14   than 900 full-time and part-time employees.  Based on
15   the information provided to me by Mark Simlar, he was
16   the human resource, active human resource director,
17   approximately 6 percent of those employees are people
18   of color.
19   Q.  Are any of those people of color -- were any of those
20   people of color, we're talking about the year
21   2017 or going back as far as you're able to recollect
22   just based upon your knowledge when you went in and
23   you assessed the record and the current state of
24   employment practices in the City of Warren government,
25   were any of those positions within the police
```

Page 46

```
1    department, City of Warren Police Department occupied
2    by any persons of color?
3    A.  Yes.  There was one African American female who is
4    DeSheila Howlett.  She had been the lone African
5    American law enforcement officer for a period of at
6    least ten years.
7    Q.  Okay.  And as far as you know, in the history of
8    Warren they've never -- an African American has never
9    worked as a police officer in the City of Warren
10   throughout its entire history as far as you know?
11   A.  Right.  With the exception of Ms. Howlett, yes.
12   Q.  Okay.  And with regard to the chief at the time that
13   Ms. Howlett was employed there, who was the police
14   chief?  I think they call him the police commissioner.
15   A.  Police Commissioner Jere Green.
16   Q.  Jere Green.  Okay.  Did you have an opportunity to
17   meet Jere Green?
18   A.  Yes, I did.
19   Q.  And can you, for the record, share that experience
20   with us, please.
21   A.  Approximately three weeks or so after I came on board,
22   I scheduled a meeting with Commissioner Green.  I went
23   over, introduced myself to him, shared with him what
24   some of my goals were, expressed an interest in
25   collaborating with him regarding identifying processes
```

Page 47

```
1    that would lead to the police department better
2    reflecting the demographics of the city as well, which
3    was my overall goal.
4    Q.  Which would have resulted in what ideally had that
5    occurred?
6    A.  A broadened applicant pool from which qualified people
7    of color would rise through the civil service process
8    and eventually become Warren police officers.
9    Q.  Okay.
10   A.  So it was a long-term -- I expressed a strategy for a
11   long-term diversification, knowing that something like
12   this does not happen overnight or even in the space of
13   two or three years.
14   Q.  And what would have been a representation of the
15   demographics racially speaking, the demographics in
16   the City of Warren community with regard to the police
17   department had it accumulated and secured a
18   representative portion in its police force of the
19   community as it relates to African Americans?
20   A.  According to the 2010 census, the African American
21   population of Warren was roughly at about 13,
22   14 percent.  That was 2010.  And the 2016 census
23   estimate put it somewhere around 16 percent or so.
24   Given the undercount, it's probably around 17 to
25   18 percent based on my history of working with census
```

Page 48

```
1    data.
2         And so with 200 and -- roughly 204 sworn
3    law enforcement officers, if it were somewhat
4    proportionate, there would have been at least 20 to 25
5    people of color inside the police department.
6    Q.  Okay.  So there were a total of about 240 --
7    A.  204, I believe.
8    Q.  204 police officers.
9    A.  Sworn police officers.
10   Q.  Sworn police officers.  And the only African American
11   at that time was --
12   A.  Ms. Howlett.
13   Q.  -- Ms. Howlett.  Or at any point in time in the
14   history of the police department.
15   A.  To my knowledge, was Ms. Howlett.
16        MR. ACHO:  Counsel, if I may, because you
17   and Mr. Murray have interchangeably used the word
18   people of color and African American, are we saying
19   that people of color is just African Americans?  Or
20   are we referring to Arabs and Hispanics as people of
21   color?
22        MR. MUNGO:  Well, you can get that
23   clarification --
24        MR. ACHO:  Well, because you used it
25   interchangeably as well; that's why I'm asking.
```

Gregory Murray
January 29, 2018

## Page 49

1        MR. MUNGO: Don't worry about me.
2        MR. ACHO: I'm not worried about you. I
3    just want the record clear what people of color means.
4        MR. MUNGO: My record is clear.
5        MR. ACHO: All right.
6        MR. MUNGO: If you want it clearer, you'll
7    have the opportunity.
8    BY MR. MUNGO:
9    Q.   Okay. So I want to reference you to your affidavit,
10       sir, Deposition Exhibit Number 5. Could you take a
11       look at that; and after you have done so, indicate
12       that you have. And I have some questions for you
13       regarding that exhibit.
14   A.   Yes.
15   Q.   Okay. And what is Deposition Exhibit Number 5 for the
16       record, Mr. Murray?
17   A.   It's my statement regarding my experience as the
18       diversity coordinator for the City of Warren, and it
19       also reflects conversations that I had with the mayor.
20       It also reflects my participation in developing a
21       disciplinary response to behaviors that to me
22       reflected discriminatory practices.
23   Q.   So it's your affidavit. You signed this over the
24       signature of a notary?
25   A.   Yes, I did.

## Page 50

1    Q.   And I'm going to come back to this in just a moment.
2        But you indicated earlier, I think just before we
3        broke, that you had a conversation with Jere Green,
4        the then police commissioner --
5    A.   Yes.
6    Q.   -- regarding your vision and the work that you were
7        intending to do in promoting diversity --
8    A.   Yes.
9    Q.   -- within the department. Within the city, but
10       particularly and specifically the department, the
11       police department; correct?
12   A.   Yes.
13   Q.   Okay. And you've already stated for the record what
14       that conversation consisted of, Mr. Murray, and I'm
15       not going to go over that. But what I would like for
16       you to share with us on the record is did you ever
17       receive any feedback from Commissioner Jere Green, who
18       was the police commissioner of the City of Warren at
19       that time, during the time DeSheila Howlett was
20       working for the City of Warren Police Department, had
21       you ever gotten any feedback from him regarding that
22       meeting?
23   A.   Not directly. But through his deputy police
24       commissioner, yes.
25   Q.   And who was the deputy police commissioner?

## Page 51

1    A.   Matt Nichols.
2    Q.   Matt Nichols. And you just indicated that all the
3        sworn police officers for the City of Warren were
4        white. Jere Green was white; correct?
5    A.   Yes. Correct.
6    Q.   And you said his -- was that his deputy --
7    A.   Commissioner.
8    Q.   -- commissioner?
9    A.   Matt Nichols.
10   Q.   Was?
11   A.   Matt Nichols.
12   Q.   Matt Nichols. And was Matt Nichols white as well?
13   A.   Yes.
14   Q.   Okay. So you got indirect feedback from your meeting
15       with Commissioner Jere Green regarding your plans for
16       aggressively pursuing diversity and implementing
17       diversity within the City of Warren Police Department
18       indirectly through Matt Nichols.
19   A.   Yes. It was immediately -- well, the same day after I
20       met with the commissioner.
21   Q.   And what happened?
22   A.   Matt shared with me that the police commissioner went
23       into a meeting with his command staff and shared with
24       the command staff that he told that nigger, me, to
25       stay the fuck out of his house.

## Page 52

1        MR. ACHO: I object at this point to
2    complete hearsay. Please continue.
3    BY MR. MUNGO:
4    Q.   Okay. And that was --
5    A.   Conveyed to me.
6    Q.   That was conveyed to you.
7    A.   Yes.
8    Q.   And that was the only feedback that you got from Jere
9        Green regarding your meeting.
10   A.   Yes.
11   Q.   Okay. You have some references to Jere Green in your
12       affidavit relative to his attitude towards diversity
13       and African Americans; correct?
14   A.   Yes.
15   Q.   In fact, what we can do is take your affidavit one at
16       a time, paragraph at a time, and discuss pertinent
17       aspects of it. Okay? For clarification and
18       amplification of your affidavit in the record.
19   A.   Yes.
20   Q.   Okay? So you indicate in paragraph 2 that you served
21       as the diversity coordinator for the City of Warren
22       from January 6th of 2017 to December 8th of 2017.
23   A.   Correct.
24   Q.   Okay. So that's accurate, approximately 11 months.
25   A.   Yes.

13  (Pages 49 to 52)

Gregory Murray
January 29, 2018

Page 53

1  Q.  And during that period of time, you said you developed
2      an opinion that the City of Warren was vulnerable to
3      federal intervention and oversight due to its history
4      of the outcomes associated with racially
5      discriminatory employment practices.
6  A.  Yes.
7  Q.  Tell us what some of those racially discriminatory
8      employment practices were as you had observed and been
9      exposed to, sir.
10 A.  I took a look at civil service process, which I
11     believe was inherently discriminatory with respect to
12     the process by which people would traverse the system
13     for employment with the police department.
14        I took a look at the contracts as well,
15     police and fire contracts as well, and noticed several
16     things:  That there were no statements of support for
17     diversity within those contracts, as well no
18     negotiations around diversity being a desired element
19     within employment within the police department.
20        I took a look at the process by which there
21     was such a narrow publication of employment
22     opportunities presented by the City of Warren.  I also
23     took a look at the previous lawsuit filed by the
24     Department of Justice in terms of what some of those
25     resolutions were supposed to include, including the

Page 54

1      wider dissemination of information about employment
2      opportunities that was not in place, was not a
3      continued practice, at least not when I got there as
4      well.
5        So in looking at disparate impact, which is
6      something that I'm somewhat familiar with in terms of
7      whether or not a policy doesn't necessarily have to be
8      discriminatory on its face in order to have a
9      disparate impact as it relates to people of color.
10 Q.  So the Justice Department had actually sued the City
11     of Warren for discriminatory employment practices
12     already?
13 A.  1986, yeah.
14 Q.  In 1986.  And how long did that lawsuit last
15     approximately?
16 A.  Until 2002.
17 Q.  Till 2002.  Approximately 15 years ago.
18 A.  Yeah.
19 Q.  And did this involve the police department,
20     discriminatory employment practices in the police
21     department?
22 A.  I believe it was inclusive of that as well, yes.
23     MARKED FOR IDENTIFICATION
24     DEPOSITION EXHIBIT 7
25     (Agreement and Order)

Page 55

1        11:34 a.m.
2        MR. MUNGO:  And let the record reflect that
3  I'm about to show the deponent Deposition Exhibit
4  Number 7.  Counsel, you can take a look at that.
5        MR. ACHO:  You don't have a copy of this?
6        MR. MUNGO:  No, I do not.  I do not.  I'm
7  just going to ask him if he's familiar with that.
8        MR. VINSON:  Is there a date on it?
9        MR. MUNGO:  The date should be at the end
10 of the document there.
11        MR. ACHO:  It's a 1986 case, when Ronald
12 Reagan was president.
13        MR. MUNGO:  Who was president in 2002?
14        MR. ACHO:  Doesn't matter.
15        MR. MUNGO:  Reagan doesn't matter either.
16        MR. VINSON:  None of this matters.
17        MR. ACHO:  This is completely irrelevant.
18 They had apartheid in 1986, too.  That doesn't exist
19 either.  I don't know why you're bringing up
20 irrelevant stuff.
21        MR. VINSON:  Can we get copies of that?
22        MR. ACHO:  Probably not because it will
23 delay the deposition further.
24        MR. MUNGO:  You gave it to me in discovery.
25        MR. VINSON:  We did?

Page 56

1        MR. MUNGO:  Yeah.  You've got it.
2        MR. VINSON:  I didn't know we were going
3  there with him.
4        MR. MUNGO:  Actually I hadn't planned on
5  using that one, Counsel.  I apologize.
6  BY MR. MUNGO:
7  Q.  Okay.  Mr. Murray, could you take a look at Deposition
8      Exhibit Number 7.  And after you've had an opportunity
9      to review it, please indicate that you've done so.
10     Tell me if you recognize that document.
11 A.  Yeah.  I recognize it as what I reviewed while
12     employed with the City of Warren.
13 Q.  Okay.  And is that the Justice Department lawsuit
14     against the City of Warren and its police and fire
15     department, sir?
16 A.  Yes.
17 Q.  That was terminated -- filed in the '80s and
18     terminated in 2002.
19 A.  Yes.
20 Q.  Okay.
21 A.  Appears to be, yes.
22 Q.  Okay.  And in that lawsuit it was alleged that the
23     city police department engaged in discriminatory
24     practices, employment practices; correct?
25 A.  That's correct.

14  (Pages 53 to 56)

Gregory Murray
January 29, 2018

Page 57

1    Q.  And so you were saying that those same discriminatory
2         employment practices or like kind are continuing
3         through today?
4    A.  Like kind, yes.
5    Q.  Okay.
6    A.  Yes.
7    Q.  And you were giving us some details in terms of how
8         it's manifested specifically today, or least as of
9         your period of employment in 2017, between January of
10        2017 and December 2017; correct?
11   A.  Yes.
12   Q.  Okay.  Are there any other details that you would like
13        to add in terms of your observations of how the
14        discriminatory employment practices are able to
15        continue to survive in the City of Warren, in
16        particular the police department?
17   A.  It was represented to me by the mayor directly that
18        Jere Green, the police commissioner, was a racist.  It
19        was represented to me by the mayor that Jere Green
20        shared with the mayor that black people could not pass
21        the test or the -- the civil service test.  Or the
22        background checks.
23           MR. VINSON:  Excuse me.  Can I get a
24        clarification?  You're saying the mayor said this or
25        he said Jere Green said that?

Page 58

1           THE WITNESS:  The mayor said this to me
2         about what Jere Green shared directly with him.
3           MR. VINSON:  Okay.
4           MR. ACHO:  So I would just place another
5         objection on the record as to hearsay.  Go ahead.
6    BY MR. MUNGO:
7    Q.  Okay.  You're fine, sir.
8    A.  Okay.
9    Q.  They have a right, and they will be placing objections
10        on the record for purposes of preserving their
11        objections that later on they would lose the effect of
12        if they don't say it today.  But it doesn't mean that
13        you don't continue to testify.
14   A.  All right.
15   Q.  Okay.  And did the mayor ever explain to you why Jere
16        Green felt like that, believed that?
17   A.  Well, beyond the mayor describing him as a racist, no.
18   Q.  And if -- and you have a history of diversity work.
19        If a policy maker or head of the department, which in
20        many cases in city government are policy makers,
21        believe that a particular race, in this case African
22        Americans, are not -- African Americans are not able
23        to pass the test -- I'm assuming the civil service
24        exam?
25   A.  Uh-hmm.

Page 59

1    Q.  And successfully pass a background check, then that
2         would apply to all African Americans, it seems to me
3         from the way you indicate the mayor made that
4         statement about Jere Green.
5    A.  That's correct.
6    Q.  Okay.  So he didn't say that Jere Green said that
7         African Americans without a high school education
8         can't passion the test or the background check.
9    A.  No.
10   Q.  He didn't say African Americans who have a history of
11        imprisonment can't pass the background check.
12   A.  No.
13   Q.  He just said all African Americans.  Was that the
14        effect of his statement insofar as what you heard,
15        that all African Americans cannot pass the civil
16        service test and/or the background check to become
17        police officers?
18   A.  He used the word blacks without any distinction.
19   Q.  Okay.  And what effect did that kind of statement have
20        upon you in terms of your belief and/or opinion about
21        Jere Green being open and receptive to employing
22        African Americans in the police department?
23   A.  I took the mayor at his word, with him having had more
24        contact with Mr. Green than I; and what that meant to
25        me was that if the boss doesn't support it, the rank

Page 60

1         and file won't either.
2            I've been in enough situations -- I'm also
3         a former union executive vice president.  And I know
4         that sometimes if the policy is not supported
5         genuinely at the top, rank and file members and
6         whatnot adopt that same attitude towards it.  So it
7         would seem to me, based upon my professional
8         observations, that that would prohibit and eliminate
9         any efforts to diversify.
10   Q.  And in the police department, exactly how did the
11        hiring process take place, if you were to give like a
12        30-second flowchart of who would be involved in making
13        the selection decisions?
14           MR. ACHO:  If he knows.  I don't think
15        we've established that he has that personal knowledge.
16        But go ahead and answer.
17           THE WITNESS:  Well, from what I understand,
18        police command can project retirements, identify what
19        the staffing needs will be.  They communicate that to
20        the human resource department.  They begin the process
21        of initiating the protocol for announcing the opening
22        of the list.  There's a publication of that, of those
23        opportunities.  And then respondents bring in their
24        information, evaluate it, initially at the human
25        resource level for the requisite documentation, et

15  (Pages 57 to 60)

Gregory Murray
January 29, 2018

## Page 61

1  cetera.
2        And then there's a civil service process
3  that involves testing, background, certification,
4  credentialing, et cetera. Then based on a person's
5  score, aggregate score, they're put on a list; and
6  that list is worked through until a person rises to
7  the top or within the range of officers that are going
8  to be brought on.
9  Q. Had you had an opportunity to examine whether or not
10  the exam that's given to African Americans, have you
11  had the chance to examine or at least view even at a
12  distance or peripherally the exam that's given to
13  police candidates for the police department?
14  A. No, that was the next phase. I spent the first couple
15  of months conducting my own internal research, doing
16  my due diligence to get some idea of what existed.
17        And then the second phase, and I would have
18  been to review those -- and that was a part of my job
19  description, too, is to review those policies and then
20  make a recommendation as to whether or not they might
21  need revising, et cetera. But it didn't get to that
22  point.
23  Q. As well as the post-test selection criteria that's
24  used --
25  A. Yes.

## Page 62

1  Q. -- by the police department. Okay. Had anyone ever
2  indicated to you that either the test, the written
3  test that's taken to become a police officer for the
4  City of Warren and/or the post-test selection criteria
5  had ever been validated?
6  A. No.
7  Q. By any studies?
8  A. No, no.
9  Q. Okay. And so it was your position, and consistent
10  with paragraph 3, that if the Justice Department did a
11  review of the hiring and selection practices for
12  police officers in the City of Warren, that they would
13  be subject to and vulnerable to federal intervention
14  again?
15  A. Yes.
16  Q. And that's the current state that you left it at when
17  you left in -- when you were terminated in December of
18  2017.
19  A. Yes, yes.
20  Q. As the diversity director for the City of Warren.
21  A. Yes.
22  Q. I just wanted to add that for the record. Okay.
23        Next, in paragraph 4 you indicated that the
24  mayor, Mayor Fouts was tone deaf and disingenuous;
25  that is, that he wasn't genuinely interested in

## Page 63

1  adopting practices necessary to address racial
2  diversity within city government and was afraid to and
3  would not take necessary steps to reverse racially
4  discriminatory employment practices within the city.
5        Now, you spoke to that an awful lot here,
6  and I don't want to rehash anything that you've
7  already testified to. But there's one aspect of this
8  particular paragraph that I'm particularly interested
9  in.
10        You seem to know in this particular
11  paragraph by stating that the mayor was aware that
12  there were racially discriminatory employment
13  practices within the city government. Can you expand
14  on that? Can you amplify on that why you came to that
15  conclusion?
16  A. The mayor did say to me that he suspected that there
17  were practices within the City's employment process
18  that excluded opportunities for people of color.
19  Q. He did tell you that.
20  A. Yes. And as it relates to the police department in
21  particular, he shared with me that he needed to
22  continue to garner the endorsement of the police
23  department, campaign endorsements for the police
24  department, and that he did not want to jeopardize
25  that by moving too aggressively in terms of changing

## Page 64

1  policies that would result in the diversification of
2  the police department.
3  Q. So it seemed then that he was promoting and
4  maintaining and even cultivating a custom and policy
5  of employment discrimination against African
6  Americans. Does that seem to --
7  A. I think he was -- he supported maintaining the status
8  quo.
9  Q. Okay.
10  A. Again, with the consideration of 2019 elections and
11  getting re-elected again and not upsetting the
12  applecart, so to speak.
13  Q. In paragraph 5 of your affidavit, Deposition Exhibit
14  Number 5, you indicated that in your opinion Jere
15  Green, the police commissioner, was not an advocate of
16  diversity and was comfortable with the lack of
17  diversity within the ranks of the Warren Police
18  Department.
19        You've already talked quite a bit about
20  Jere Green. Is there anything you want to add to that
21  that would support why you came to that conclusion
22  that you write in paragraph 5 of your affidavit,
23  Deposition Exhibit Number 5?
24  A. Well, I put in writing to Commissioner Green requests
25  for certain documents and policies that were never

16 (Pages 61 to 64)

Gregory Murray
January 29, 2018

Page 65

1 responded to. And it was my intent to review those to
2 get some sense of whether or not any of those policies
3 or protocols or training records or whatever would
4 reflect a lack of effort to diversify or the ability
5 to revise some of those processes to result in
6 diversification.
7 Q. Okay. Was part of that analysis you were attempting
8 to do would be to determine whether or not there were
9 any built-in —
10 A. Biases, complicit bias or archaic institutional
11 impediments to diversity.
12 Q. So how long had you been waiting on this feedback or
13 to receive these documents, requested documents from
14 Commissioner Jere Green?
15 A. Roughly a month or so.
16 Q. A month or so? Did he finally give them to you?
17 A. No, they weren't provided to me. And Commissioner
18 Green was released from his appointment before I could
19 get them, and I never received them.
20 Q. Never received them.
21 A. No.
22 Q. Okay. And the City — the mayor knew that you had
23 made requests for those documents; correct?
24 A. Yes.
25 Q. And did he ever respond positively to making sure that

Page 66

1 you got those documents or respond at all to your
2 request?
3 A. No.
4 Q. Is that part of what you meant when you say the mayor
5 is deaf tone as it relates to — or was that tone deaf
6 as it relates to diversity matters and concerns?
7 A. Yeah. It has everything to do with a lack of support
8 for the efforts I was making.
9 Q. Okay. Now, you indicated the City of Warren has a
10 history — in paragraph 6 of Deposition Exhibit 5,
11 your affidavit, has a history of taking delayed
12 disciplinary action after its employees engaged in
13 racially discriminatory and otherwise racially
14 inappropriate conduct.
15 Can you amplify on that, please. Give us
16 some examples.
17 A. I can give you three examples.
18 Q. Okay.
19 A. The first example is the incident involving Barbara
20 Beyer and Ms. Howlett. There was no immediate
21 disciplinary action. In fact, I advocated for the
22 suspension that she ultimately received.
23 They were going to put a one-day unpaid
24 suspension in her file. This is what was shared with
25 me by Mark Simlar. And I protested that and indicated

Page 67

1 that at the minimum, that she should receive a
2 two-week unpaid suspension and ultimately that became
3 part of her disciplinary response. However, that was
4 delayed until such time — it was delayed for
5 approximately four to five weeks until such time as
6 she received her longevity check.
7 The second instance was the situation
8 involving Shawn Johnson, where a disciplinary response
9 had been fashioned which also included diversity
10 training, which was never provided or required of him.
11 And I shared the need to have that done.
12 The third was an incident involving a fire
13 department lieutenant who had used the N word to
14 describe a firefighter.
15 Q. Now, when you say the N word, what does —
16 A. A nigger.
17 Q. Okay.
18 A. And his participation in diversity as part of the
19 disciplinary response was not weeded out until such
20 time as I conducted an all-day diversity training for
21 all three of them, three of the people that I just
22 indicated. And so that to me seemed to reflect a
23 pattern of delayed disciplinary response to these
24 incidents.
25 Q. With regard to the fire department, the incident that

Page 68

1 you just described, what was said in use of the N word
2 and to whom was it said?
3 A. The firefighter, his name is Jose Suarez. He was
4 called the firehouse nigger because he was adept at
5 dealing with or fixing or taking care of things within
6 the department. So he was the overall firehouse
7 nigger.
8 Q. I see.
9 A. And that was the comment directed to him by the
10 lieutenant.
11 Q. I see. Like someone in servitude —
12 A. Yes.
13 Q. — to the whites.
14 A. Yes.
15 Q. I see.
16 MR. MUNGO: Let the record reflect I'm
17 about to show the deponent Deposition Exhibit Number
18 2. And I'm sorry again. That's all I have. But you
19 guys gave this to —
20 MR. ACHO: That's not really the point
21 though. The point is you're using it today so — I'm
22 not saying we don't have it.
23 MR. MUNGO: I apologize. I really —
24 MR. ACHO: I know, but you're qualifying
25 your apologies.

17 (Pages 65 to 68)

Gregory Murray
January 29, 2018

Page 69

1    MR. MUNGO: I really didn't expect you to
2 come here with two other lawyers. Okay?
3    MR. ACHO: They were here for your client's
4 deposition. Mr. Vinson's the City of Warren attorney.
5 Did you expect he wasn't going to be here?
6    MR. MUNGO: Next time let me know, and I'll
7 make sure we have enough copies.
8 BY MR. MUNGO:
9 Q. So Mr. Murray, once you're able to review that
10 document, please indicate that you have for
11 identification purposes. And then I have a few
12 questions to ask you.
13 A. Okay. Yes. I've looked through it peripherally.
14 Q. Are you able to identify that document, sir?
15 A. I have never seen this.
16 Q. Does the document contain any information that you are
17 familiar with describing any incidents or events that
18 you're familiar with? You can take your time and look
19 through it.
20 A. Okay.
21 Q. Does it involve Shawn Johnson?
22 A. Yes, it does.
23 Q. Okay. And the document is -- on the front page there
24 I think it gives a description of what the document
25 is?

Page 70

1 A. Yes.
2 Q. At the first page?
3 A. Yes.
4 Q. Discipline of Shawn Johnson?
5 A. It's a personnel complaint.
6 Q. Personnel complaint against Shawn Johnson on behalf of
7 whom?
8 A. DeSheila Howlett.
9 Q. Okay. Go ahead. You can review that, sir. And tell
10 me if you are you able to identify any events
11 identified in this document that pertains to Shawn
12 Johnson.
13    MR. ACHO: Just for the record, I'm going
14 to place an objection. Number 1, he said he's not
15 familiar with the document. Number 2, this is two
16 years prior to Mr. Murray's employment with the City.
17 He has no personal knowledge.
18    I would object to any line of questioning
19 regarding this document. But go ahead.
20    THE WITNESS: I'm sorry. What was your
21 question?
22 BY MR. MUNGO:
23 Q. I think if you look at, I think if you look at the --
24 let's see. The first -- well, just skim it. Just
25 skim it and see how many of the statements and

Page 71

1 sections of the different comments and data in this
2 report that you may recollect having been exposed to
3 or having been shared with you regarding Shawn Johnson
4 and DeSheila Howlett.
5 A. There's a page called inter-departmental
6 communication, and it says supplemental, and it's Item
7 Number 1. And it's a reference to Gorilla Glue.
8 Q. Okay. At the very bottom of the page, Mr. Murray,
9 about in the middle of the page, you'll see the
10 inscription DEFS then a hyphen and there's a number.
11 A. 000005.
12 Q. Okay. Let the record reflect that --
13 A. WPD Form 50.
14 Q. Okay. That Mr. Murray's referencing Deposition
15 Exhibit Number -- what was that number? Number 2,
16 Page 5.
17    Okay. And so you specifically recall that
18 particular incident between Shawn Johnson and DeSheila
19 Howlett, the Plaintiff herein; correct?
20 A. Yes, based on my conversation with Detective Johnson
21 at the onset of the diversity training. That's the
22 only incident that I'm -- I can see.
23 Q. And for the record, when you say at the onset of the
24 diversity training, tell us for the record what
25 diversity training you're referencing as it pertains

Page 72

1 to Shawn Johnson.
2 A. Okay. Detective Johnson participated in an all-day
3 diversity training that I conducted for Ms. Beyer, for
4 Detective Johnson, and for the fire department
5 lieutenant. It was meant to give them a broader
6 insight into the value of diversity and inclusion.
7 And he was a participant in that training.
8 Q. And during the time in which you had an opportunity to
9 provide this diversity training for Shawn Johnson,
10 were there any references or statements made by Shawn
11 Johnson with regard to his use or calling Ms. Howlett
12 a name that is considered racially derogatory and
13 demeaning?
14 A. Well, part of that involved me talking individually
15 with each of them. And during my conversation with
16 Detective Johnson, he admitted to using a bad choice
17 of words by calling -- by saying rather that she
18 looked like the image on the Gorilla Glue bottle.
19 Q. And were there any admissions made by Beyer, Barbara
20 Beyer, as it relates to the incident for which you
21 provided diversity training for her?
22 A. No, she never did. But the police -- excuse me. The
23 fire lieutenant did and apologized profusely.
24 Q. Okay. What did he admit to?
25 A. He admitted to using the word nigger. We met after

18  (Pages 69 to 72)

Gregory Murray
January 29, 2018

---

**Page 73**

1    the training. He stayed behind after the training.
2    Q. Okay.
3    A. And he expressed his remorse and personal
4    disappointment in him having said that. Shared that
5    it was not -- not him, which is a traditionally used
6    phrase when people say that to say that it's not them.
7    They didn't -- yeah. But at any rate, he did admit
8    and express regret.
9    Q. Okay.
10   A. He was the only one of the three that did really.
11   Q. Did he admit to you that there was a tradition and a
12   custom and practice of using that N word in the Warren
13   police --
14   A. No.
15   Q. Or Warren Fire Department?
16   A. No, he did not.
17   Q. He said he was just -- did he indicate how he came up
18   with the use of that word?
19   A. No.
20   Q. He didn't. Okay. And how did you come to training --
21   providing diversity training for Ms. Beyer? How did
22   that come about?
23   A. That was a part of our discussions regarding what the
24   disciplinary response should be for her. And it was
25   at my insistence that they all receive this full-day

---

**Page 74**

1    training.
2    Q. Okay. Did you ever come to learn why Ms. Beyer needed
3    the diversity training?
4    A. Yes.
5    Q. And what did you understand precipitated the facts or
6    events that precipitated her need for diversity
7    training?
8    A. An African American male came to the counter, was
9    mistaken as to where he was supposed to register.
10   There was a back-and-forth exchange between Ms. Beyer
11   and this person. The person left. Ms. Beyer shared
12   with Ms. Howlett that that nigger would have killed
13   her, and I think repeated the word at least twice.
14   Yeah, at least twice. And that was relayed to me by
15   Mark Simlar, the acting human resource director.
16   Q. Did Ms. Beyer explain or make any statements relative
17   to why she used the word nigger in --
18   A. No.
19       MR. ACHO: Object at this point.
20   Mr. Murray already testified that Ms. Beyer never
21   admitted that to him. So anything Mr. Murray
22   testifies to is hearsay.
23       MR. MUNGO: Okay.
24   BY MR. MUNGO:
25   Q. But you did come to learn that it was sustained -- the

---

**Page 75**

1    investigation of whether or not Ms. Beyer had actually
2    used that word in front of Ms. Howlett more than once,
3    that was, that investigation sustained that that did
4    actually occur; is that right?
5    A. Yes, and Mark Simlar confirmed for me that Ms. Beyer
6    admitted to using the word.
7    Q. Okay. More than once.
8    A. Yes.
9    Q. And so I want to reference Deposition Exhibit
10   Number 3. Can you take a look at that document and
11   let me know if you're able to identify it, sir, the
12   content therein?
13   A. I have never seen this.
14   Q. You've never seen that? But what is deposition --
15   A. Oh, I'm sorry. I apologize. I did see the
16   DEFS-000024 and 25, the last two pages of what you
17   just handed to me.
18   Q. Okay. And those documents depict what?
19   A. Depict the finding of the investigation into the
20   incident regarding Ms. Howlett and Ms. Beyer and the
21   specified time frame within which she was originally
22   supposed to serve her suspension.
23   Q. So how long did it take between the date of the
24   incident and the date in which the disciplinary action
25   was taken against Ms. Beyer?

---

**Page 76**

1    A. Approximately four weeks.
2    Q. Approximately four weeks. And what about the
3    diversity training, the time that went -- that passed
4    between the incident between Shawn Johnson and his
5    discriminatory conduct toward Ms. Howlett and the
6    diversity training that he received?
7    A. I think that was a year and a half or so.
8    Q. Year and a half?
9    A. Or more.
10   Q. Year and a half or so.
11   A. Or more.
12   Q. I'm sorry. Go ahead.
13   A. Roughly a year and a half or so longer.
14   Q. Okay. Before he got any diversity training.
15   A. Yes.
16   Q. And did you ever come to learn what happened behind
17   Shawn Johnson engaging in this prohibited
18   discriminatory conduct toward Ms. Howlett, how that
19   matter was handled in terms of any consequences for
20   Mr. Shawn Johnson and Ms. Howlett? For example, were
21   they separated in environments or --
22   A. From what I understand, she was put back in up under
23   him or in proximity to him after she complained about
24   the incident. But other than that, I'm not aware of
25   any of the other disciplinary actions that the City

---

19 (Pages 73 to 76)

Gregory Murray
January 29, 2018

Page 77

1   took.
2   Q.  I see.  But you were aware that the City's
3       investigation of Ms. Howlett's complaints against
4       Shawn for his discriminatory, racially discriminatory
5       and demeaning conduct toward Ms. Howlett resulted in
6       him being separated in work environments from
7       Ms. Howlett.  You did learn that.
8   A.  Yes.
9   Q.  And you also came to learn that he was -- she was
10      later put right back in the environment in close
11      proximity to where he was working?
12  A.  Yes.
13  Q.  Okay.  And is that, from your experience as a
14      diversity coordinator and doing your work in diversity
15      and race relations and discriminatory practices, is
16      that a wise thing, an acceptable best practice to put
17      a victim, someone who has been sustained in terms of
18      the investigation of finding that that person was
19      victimized in the case of Ms. Howlett, being put back
20      in the work environment with Mr. Johnson?
21  A.  No.  That's wholly inappropriate to -- this again is
22      based on my nearly eight years as a union vice
23      president, based on my experience dealing with
24      discrimination in the workplace.  It's wholly
25      inappropriate to put the victim back into an

Page 78

1       environment in close proximity to the perpetrator.
2   Q.  Is there a reason for that?
3   A.  Yeah.  It creates a potential hostile work
4       environment.  It creates stress and anxiety for the
5       victim of the incident.  It can lead to castigation by
6       other employees in the general area as well.  And so
7       there are quite a few negative consequences of that.
8   Q.  So that employee should never be put back in that same
9       work environment with the employee who victimized the
10      victim?
11  A.  That's correct.
12  Q.  And back to your affidavit, Deposition Exhibit Number
13      5, looking at paragraph 6, with regard to the time --
14      the space of time between Ms. Beyer's -- the
15      disciplinary action taken against Ms. Beyer, you
16      indicated earlier that she was not terminated -- or
17      not terminated but suspended until after she received
18      some kind of bonus check?
19      MR. ACHO: I'm going to ask at this point
20      that we take a break.  You are going unbearably slow.
21      You indicated you were just going to touch on
22      pertinent parts.  You are going line by line.  You're
23      only on Number 6 out of 16, and you just -- you're
24      extremely slow.
25      MR. MUNGO: You need to take a break?

Page 79

1       MR. ACHO: So let's take a break.  And we
2   may need to adjourn the deposition if you don't finish
3   by a certain time because I was led to believe this
4   would be a quick deposition.
5       The majority of this is just irrelevant.
6   And you have -- it's your deposition.  You're entitled
7   to do what you want to do.  But we may have to
8   continue this deposition on another day if this is how
9   we're going to continue, because Mr. Vinson and I both
10  have meetings this afternoon, as does Ms. O'Donnell.
11      So with that, I don't want to speak for
12  anybody here.  Do we want to take a lunch break?  I
13  need to use the restroom.  It's a quarter after 12:00.
14      MR. MUNGO: I don't need a lunch break.  Do
15  you need a lunch break, sir?  Do you need something?
16  Mr. Sharpe, do you need anything?
17      MR. SHARPE: Whatever the majority --
18      MR. ACHO: How long do you anticipate?
19  Based on the fact you're only on Number 6 --
20      MR. MUNGO: Listen.  Listen.  You're not
21  going to narrow down my -- I've got seven hours
22  according to the court rules, and you're not going to
23  narrow down my deposition so --
24      MR. ACHO: No, no, no.  I'm not
25  attempting --

Page 80

1       MR. MUNGO: What do you need?  Tell me what
2   you want.
3       MR. ACHO: Well, it's quarter after 12:00.
4   I'm not telling you how to conduct it, but you
5   indicated this was going to be a quick deposition.
6   And you're -- you're repeating yourself, and it's
7   just, it's taking far too much time.
8       So here's what I'm going to say:  We will
9   go until -- I don't want to speak for Ethan.  Did you
10  want to take a lunch?
11      MR. MUNGO: We don't need a lunch.
12      MR. ACHO: I have a 3:30 meeting in Livonia
13  that I have to be at.  I know you have a 3:00 or 3:30
14  meeting, as does Beth.
15      MR. VINSON: We can break at 2:00.  Would
16  that --
17      MR. ACHO: Break at 2:00 and then continue
18  this next week.  Is that okay with you?
19      MR. MUNGO: Well, why didn't you indicate
20  that before --
21      MR. ACHO: Because when you and I spoke,
22  you said this was going to be a really quick
23  deposition.  And it's not.
24      MR. MUNGO: Yeah, but if you --
25      MR. ACHO: And so I planned accordingly.

20  (Pages 77 to 80)

Gregory Murray
January 29, 2018

Page 81

1       MR. MUNGO: If you had to leave at a
2   certain time, Counsel, you were obligated to inform me
3   of that.
4       MR. ACHO: Well, when we spoke on the
5   phone, you said this was going to be a really quick
6   deposition. So it's not a really quick deposition.
7   So these things happen. So I'm restating --
8       MR. MUNGO: Okay. So you're taking up
9   valuable time now. We're going to continue.
10      MR. ACHO: All right. And then we'll agree
11  to adjourn at 2:00 and continue this next --
12      MR. MUNGO: No. I'm not going to agree to
13  adjourn at 2:00.
14      MR. ACHO: Counsel.
15      MR. MUNGO: I'm not going to agree to
16  adjourn.
17      MR. ACHO: Then we're taking a break right
18  now. We're going to take a lunch break. Thanks.
19      MR. MUNGO: Let's set the time.
20      MR. ACHO: It's 12:15.
21      MR. MUNGO: How much time do you need to
22  eat?
23      MR. ACHO: We'll just go downstairs.
24      MR. MUNGO: Can you be back at 12:30?
25      MR. VINSON: No.

Page 82

1       MR. MUNGO: What about 12:40? 12:40?
2       MR. VINSON: I don't know. We'll see.
3       MR. ACHO: Just as you don't want to be
4   limited in your deposition --
5       MR. MUNGO: That's 25 minutes.
6       MR. ACHO: And we're up here on the 15th
7   floor, and we've got to get down there. We've got to
8   order. We're not being reasonable.
9       MR. MUNGO: And then you're going to leave
10  at 2:00?
11      MR. ACHO: No. If we're going to leave at
12  2:00, we wouldn't take a lunch break right now. So
13  why don't we just continue right now, take a
14  five-minute bathroom break, continue, adjourn at
15  2:00 p.m., and then just wrap this up next week or the
16  following week? That's all I was suggesting.
17      MR. MUNGO: Oh. So you're saying --
18      MR. ACHO: We'll take a five-minute break
19  right now, go till 2:00 or 2:30 max today, and then --
20      MR. MUNGO: So you're saying if you take --
21      MR. ACHO: Mike, you understand.
22      MR. MUNGO: If you take a lunch break, then
23  you're not going to cut my deposition short by saying
24  that all of a sudden today I first learned that you
25  got -- you have a meeting to go to.

Page 83

1       MR. ACHO: Not first learned. I told
2   you --
3       MR. VINSON: We thought this would be a
4   two-hour dep.
5       MR. ACHO: That's what you indicated to us.
6       MR. VINSON: I thought we'd be out of here
7   by now.
8       MR. MUNGO: How long you've been practicing
9   law, sir?
10      MR. VINSON: Long enough to know how long a
11  dep should run, man.
12      MR. ACHO: Especially this one.
13      MR. VINSON: 40 years plus. Okay? If you
14  want to know specifically.
15      MR. MUNGO: Okay. So then you know how I
16  conduct my cases.
17      MR. VINSON: No. This is my first exposure
18  to you.
19      MR. ACHO: I've never had a case with you
20  either.
21      MR. VINSON: I have no idea. I'll know in
22  the future.
23      MR. MUNGO: Do you know I have multimillion
24  dollar cases under my belt?
25      MR. ACHO: So do I, and I can do the dep in

Page 84

1   35 minutes.
2       MR. VINSON: So what? That doesn't mean
3   anything to me.
4       MR. ACHO: Come on, man. I don't care
5   about your resume.
6       MR. MUNGO: What it means is that you make
7   your decision to go get your lunch or stay here and
8   take your five-minute break.
9       MR. ACHO: All right. We're taking a
10  five-minute break --
11      MR. MUNGO: Whatever you're going to do,
12  just do it.
13      MR. ACHO: We're taking a five-minute
14  break, and we're going to conclude at 2:30. And we
15  will finish the deposition at a mutually convenient
16  day because that was the tacit understanding we had.
17  We'll be back in five or ten.
18      MR. MUNGO: Whatever you want to do.
19      MR. ACHO: Thank you, sir.
20      MR. VINSON: Okay. Thank you.
21      (Ms. Rae-O'Donnell exits the room at
22  12:15 p.m.)
23      MR. MUNGO: We'll talk to the Court -- if
24  we're going to stop at 2:30, we're going to talk to
25  the Court.

21  (Pages 81 to 84)

Gregory Murray
January 29, 2018

Page 85

1    MR. ACHO: We're not going to talk to the
2    Court. We just --
3    MR. MUNGO: Yeah, we are.
4    MR. ACHO: Now you're talking as my
5    colleague has left the room.
6    MR. MUNGO: I'm going to call the Court and
7    tell the Court what's going on.
8    MR. ACHO: As my colleagues have left the
9    room.
10    MR. MUNGO: Yeah, okay. All right. Go
11    ahead.
12    No. I'm not going to call right now. I'm
13    going to call when you get back. If I'm not done and
14    you try to leave at 2:30, I'm calling the Court.
15    MR. ACHO: Counsel, we just had an
16    agreement.
17    MR. MUNGO: No, there's no agreement. You
18    should have told me before today, long before today --
19    MR. ACHO: Counsel, on the phone --
20    MR. MUNGO: That ain't going to fly with
21    me, Counsel. That ain't going to fly with me. Okay?
22    MR. ACHO: I don't want to bother Judge
23    Berg.
24    MR. MUNGO: Whatever you want to do.
25    MR. ACHO: I don't want to bother Judge

Page 86

1    Berg.
2    MR. MUNGO: You know what I'm going to do.
3    MR. ACHO: I don't want to bother Judge
4    Berg.
5    MR. MUNGO: Okay? You know what I'm going
6    to do. So just go ahead and do -- you got your
7    choice. Five-minute break or lunch. Okay?
8    MR. ACHO: So we do have a choice. Wait a
9    minute. We do have a choice.
10    MR. MUNGO: Well, I can't make you do
11    anything.
12    MR. ACHO: No, no, no.
13    MR. MUNGO: You just told me what you're
14    going to do.
15    MR. ACHO: No, no.
16    MR. MUNGO: So make your choice so we can
17    get going.
18    MR. VINSON: Well, I've got to run to the
19    men's room.
20    MR. ACHO: So do I.
21    MR. VINSON: You battle this out.
22    MR. ACHO: No. We already had an
23    agreement.
24    MR. MUNGO: I'm not talking about it
25    anymore. I told you what I'm going to do.

Page 87

1    (Off the record at 12:16 p.m.)
2    (Back on the record at 12:20 p.m.)
3    BY MR. MUNGO:
4    Q. We're back on the record. Did you answer the
5    question? I asked you a question about the space in
6    time between Beyer -- it being confirmed that Beyer
7    actually used the word nigger repeatedly in front of
8    Ms. Howlett and the time at which she got her
9    discipline. You said it was four weeks; is that
10    correct?
11    A. At least, at least four weeks.
12    MR. ACHO: Asked and answered. I'm going
13    to start placing asked and answered objections on the
14    record.
15    MR. MUNGO: Okay.
16    MR. ACHO: Because you keep repeating
17    yourself, sir. And that is the cause of the delay of
18    this dep. Go ahead, sir.
19    MR. MUNGO: You know, Mr. Acho, there's a
20    proper way to make --
21    MR. ACHO: You know, you keep
22    mispronouncing my name even though you asked me how to
23    pronounce it.
24    MR. MUNGO: Acho, Acho; right?
25    MR. ACHO: Well, is it Mungo or is it

Page 88

1    Mungo? I don't mispronounce your name.
2    MR. MUNGO: Okay.
3    MR. ACHO: I mean, you're intelligent
4    enough that you shouldn't keep repeatedly -- you
5    pronounced my name three, four different ways since
6    I've known you. I don't understand that. Is it
7    deliberate?
8    MR. MUNGO: Okay. So why don't you tell me
9    the correct pronunciation.
10    MR. ACHO: I told you multiple times. It's
11    Acho.
12    MR. MUNGO: Acho.
13    MR. ACHO: Like a nacho with no N.
14    MR. MUNGO: Okay. Thank you. I got it.
15    And I apologize.
16    MR. ACHO: You don't have to.
17    MR. MUNGO: I don't like to mispronounce
18    anybody's name.
19    BY MR. MUNGO:
20    Q. Okay. So I asked you about the difference in that
21    time frame, and you said about four weeks.
22    A. At least four weeks.
23    Q. Was there something else that occurred during that
24    period of time prior to Ms. Beyer receiving the
25    discipline?

22  (Pages 85 to 88)

Gregory Murray
January 29, 2018

Page 89

1  A.  There were meetings about her discipline.  There was
2     conversation about what some of the defenses might be,
3     which — do you want me to elaborate on that?
4  Q.  Well, did anything occur that would appear to be more
5     of a reward to Ms. Beyer than a disciplinary action
6     during that period of time?
7  A.  Well, she was continuing to work.  She was allowed to
8     continue to work and to continue to draw her paycheck.
9         And again, as I said, the actual discipline
10    was not weeded out until she received her longevity
11    check.  And the reason why I know that is I requested
12    all of her pay documents from the point that the
13    discipline was determined.  Because it had been at
14    least a month, and she was still on the job.  So I, of
15    my own, requested her pay documents; and that's how I
16    discovered it.
17 Q.  Did it appear to be a reward for her to get a bonus
18    check before she actually went out on her discipline
19    to you?
20 A.  Longevity checks are a standard part of union
21    negotiated contracts, and so that would not have been
22    a reward for her.  It's something that's contractually
23    obligated to her.
24 Q.  Okay.  It was just the timing in which she received it
25    you think?

Page 90

1  A.  Yes.
2  Q.  Received her discipline?
3  A.  Yes.
4  Q.  That made it appear to be an attempt to go easy on
5     her?
6  A.  Yes.
7  Q.  And in paragraph 13, sir, where you indicate that
8     Mayor Fouts had made disparaging comments about people
9     with Tourette's syndrome?
10 A.  Yes.
11 Q.  What happened there?  Could you amplify on that for
12    just a moment?  And he asked you to erase the tape,
13    the recording of that?
14 A.  I arranged for a training to be conducted by the EEOC
15    regarding EEOC regulations as it relates to
16    municipalities.  It was being recorded.
17        And during that training, Mayor Fouts made
18    some very disparaging comments and mockery of a person
19    with Tourette's syndrome.  Afterwards — and there
20    were quite a few witnesses to that, including the
21    person who conducted the training.
22 Q.  Okay.  Who was that, by the way?  If you recall.
23 A.  Lolita Davis from the EEOC.
24 Q.  Do you recall what the mayor said or the effect of
25    what he said?

Page 91

1  A.  He essentially talked about how people with Tourette's
2     syndrome were prone to make excited utterances,
3     uncontrolled, unfiltered utterances, profanity and
4     things of this nature.  He was waving his hands while
5     he was giving this example of people with Tourette's
6     syndrome.
7  Q.  Was there a reason why he was making that point, or
8     did he state a reason why he was making that point?
9  A.  They were talking about whether or not that kind of
10    behavior would be prohibitive behavior with respect to
11    employing the person, in that context.
12 Q.  And the mayor said that it would be prohibitive.
13 A.  He used that example.
14        MR. VINSON:  That was asking questions.
15        THE WITNESS:  He used that example.  He
16    asked — yes, he did ask that question.  But he did it
17    in such a way where it was very emphatically and
18    visually offensive not only to me but to the trainer
19    and also to other members of his staff.  Afterwards he
20    asked me to destroy the tape.
21 BY MR. MUNGO:
22 Q.  Did he say why he wanted you to destroy the tape?
23 A.  Because he was concerned that it might draw a
24    connection to the first tape that was released that
25    dealt with him describing people with disabilities as

Page 92

1     deserving of being caged and things of that nature.
2  Q.  Did you ever hear him make those comments?
3  A.  The first —
4  Q.  Yes.
5  A.  — comments?  No.
6  Q.  No.  You just heard the tapes?
7  A.  I heard the tapes.  But when I went to work with him,
8     I gave him the benefit of the doubt.
9  Q.  Did he say he was concerned with that, his comments
10    about the people with Tourette's being connected with
11    the first tape?
12 A.  Yes.
13 Q.  He did say that?
14 A.  Yes.
15 Q.  What did he say?
16 A.  Well, he said that if people were to see that, they
17    might think that he actually said what was on the
18    first tapes.
19 Q.  I see.
20 A.  So he ordered me to destroy the tapes, the tape.
21 Q.  Okay.
22 A.  Which I partially complied with.
23 Q.  Now, in your last paragraph there on page — on the
24    third page of your affidavit, Deposition Exhibit —
25    I'm sorry.  Fourth page of your affidavit.  Deposition

23  (Pages 89 to 92)

Gregory Murray
January 29, 2018

Page 93

1    Exhibit Number 5, Number 16, you render what is
2    considered to be an opinion. In fact, you start that
3    paragraph off with it is your opinion that Mayor Fouts
4    hired you as the city's diversity coordinator as
5    window dressing and merely a political calculation, to
6    give a false impression that he and the city
7    government was interested in abating discrimination
8    based on race within the city.
9        What caused you to arrive at that
10   conclusion and to evolve and develop that opinion
11   other than what you've already put in the record?
12   A.  Well, essentially that, that he reneged on his
13   commitment to diversity, informed me that he wanted to
14   put diversity on the back burner, redirecting my
15   energy and focus away from the diversity, and declined
16   to accept the recommendations that he hired me to
17   develop to bring the city into more compliance with
18   diversity and to better reflect the demographics of
19   the city within the municipal workforce.
20   Q.  I see. I see. I'm going to show the deponent
21   Deposition Exhibit Number 4. Take a look at that,
22   sir. That's the discrimination and sexual
23   harassment --
24   A.  Before we do that, can I take a break?
25   Q.  Yes, sir.

Page 94

1        (Off the record at 12:29 p.m.)
2        (Back on the record at 12:38 p.m.)
3        MR. MUNGO: Let the record reflect that
4    I've given Mr. Murray, the deponent, Deposition
5    Exhibit -- what number is on there, sir?
6        THE WITNESS: Four.
7        MR. MUNGO: Number 4.
8    BY MR. MUNGO:
9    Q.  Could you take a look at that document for
10   identification purposes and tell me whether or not you
11   recognize it.
12   A.  I have never seen this.
13   Q.  Never saw it. Okay. And what does that document
14   purport to be based on the inscriptions on it, sir?
15   A.  General order regarding discrimination and sexual
16   harassment.
17   Q.  For whom?
18   A.  For the Warren Police Department.
19   Q.  For the Warren Police Department. And have you ever
20   been shown this document or had access to this
21   document or ever even known that this document was in
22   existence during the time you served as diversity
23   coordinator for the City of Warren?
24   A.  No, but this would have been included in my request
25   for documents.

Page 95

1    Q.  Okay. Did you ever receive it?
2    A.  No.
3    Q.  Do you have any reason to believe that they actually
4    had one in existence since you had never seen one
5    after having requested it?
6    A.  No.
7    Q.  Sir, on this particular document, it has the --
8    attached to it in the back -- this document for
9    whatever reason doesn't have the numerical
10   inscriptions on the bottom. But I'm going to
11   reference you to about three pages that are attached
12   to the very back, the end of this document, the last
13   three pages.
14       That first page that's up at the top
15   there's an inscription, 2017, parenthetical, February
16   through May of 24-hour training block. What does that
17   represent, if anything, to you, sir?
18   A.  The first reference describes an in-service conducted
19   by James Friedman who is a chaplain and part-time New
20   Baltimore police officer.
21   Q.  Okay. Now, this particular time frame -- do you
22   recall when Ms. Howlett actually left the Warren
23   Police Department or the last day that she worked
24   there?
25   A.  Not specifically, but I think it was in the beginning

Page 96

1    of the second quarter of the year, I believe.
2    Q.  Which would have been?
3    A.  Around March or April.
4    Q.  March or April?
5    A.  To my recollection.
6    Q.  Yeah, no problem. And this training took place
7    between what months in 2017?
8    A.  Began in February and would have went through May,
9    yeah.
10   Q.  Okay. Are you familiar with the person who
11   apparently, based on the inscription here, conducted
12   that training, James A. Friedman?
13   A.  Yes.
14   Q.  And are you familiar with the training that he
15   conducted?
16   A.  I attended one session which was to be repeated for, I
17   think approximately 13 weeks.
18   Q.  13 weeks.
19   A.  Yeah.
20   Q.  And how much training would each police officer --
21   this was for the police department; correct?
22   A.  Yes, it was.
23   Q.  So how much training time would each police officer
24   have received had they attended this training?
25   A.  I believe this was on a rotating basis. All I know is

24  (Pages 93 to 96)

Gregory Murray
January 29, 2018

## Page 97

1  that Friedman shared with me that he would do a one
2  and a half hour orientation rotating through all of
3  the officers to include that time period so I —
4  Q. I understand.
5  A. That's the best I can answer.
6  Q. I understand. Was that supposed to be diversity
7  training?
8  A. It was supposed to be not diversity training so much
9  as an orientation or an in-service.
10  Q. Okay.
11  A. There's a difference between an in-service and actual
12  training. An in-service is primarily just a
13  presentation of information. A training involves
14  exercises, interactive processes, providing written
15  documentation that one would follow through the course
16  of the training itself.
17  Q. So then this was not diversity training of any sort;
18  correct?
19  A. Not in its genuine form, no.
20  Q. Would that have been effective in assisting police
21  officers with any potential racist attitudes, sexist
22  attitudes at all?
23  A. No, because the amount of time would not allow to go
24  in depth into those individual areas. Take, for
25  example, implicit bias, subconscious bias is a part of

## Page 98

1  diversity training, and that in and of itself, to be
2  done correctly in my opinion, a three to four-hour
3  block by itself.
4  Q. Okay. Had you known of any other training being
5  conducted or provided to the Warren Police Department
6  that dealt with addressing racially discriminatory
7  attitudes and practices?
8  A. No. I requested that information but never received
9  it.
10  Q. So as far as you were concerned, you were not aware of
11  any diversity training or any training that dealt with
12  addressing racially discriminatory attitudes and
13  practices for the Warren Police Department either
14  during '17, 2017, the year you were actually working
15  there as diversity coordinator or in the past?
16  A. No. I'm not familiar with that.
17  Q. And you actually requested information.
18  A. Yes.
19  Q. Had there been training in the past, you wanted to
20  know what that training was. You requested it, and
21  you received none.
22  A. That's correct. I requested it for a 36-month period,
23  going back 36 months.
24  Q. Okay.
25  A. But never received it.

## Page 99

1  Q. And how long had you waited for that information and
2  never received it?
3  A. Approximately four or five weeks, just before
4  Commissioner Green left.
5  Q. Okay. And you still never received it.
6  A. No.
7  Q. And so far as you're concerned, is there any evidence
8  that you detected that there was ever any training
9  provided to the Warren Police Department and its
10  executives that addressed racially discriminatory
11  attitudes and employment practices?
12  A. No.
13  Q. Have you ever come across information, sir, directly
14  or indirectly, feedback from African Americans who had
15  applied for work there at the City of Warren that had
16  negative reports on how they were treated?
17  A. Yes. I did talk to a number of people who had
18  indicated they had applied, had to apply again, had to
19  apply several times, in fact, never got response
20  letters or interviews, yes.
21  Q. Okay. Have you had an opportunity to inquire into
22  those circumstances, any particular case at all?
23  A. No. Actually, no.
24  Q. Did those sorts of reports, were they numerous or —
25  A. They were intermittent. By intermittent, I mean

## Page 100

1  occasional.
2  Q. Okay.
3  A. Yeah.
4  Q. Are you familiar with the EEO-4 report, sir?
5  A. Yes.
6  Q. Can you tell us for the record what's that report?
7  A. An EEO-4 report is a biannually required report to the
8  Equal Employment Opportunity Commission which
9  constitutes a breakdown of all municipal employees
10  both by race and gender and income category.
11  Q. Is that a required reporting?
12  A. Yes.
13  Q. By federal law?
14  A. By federal law, yes.
15  Q. And what does this — so the information you just said
16  breaks down employees by race and gender. And does it
17  also break down, provide a breakdown in terms of that
18  race and gender component per department within the
19  city?
20  A. It does group departments, but it also more
21  specifically identifies them by income categories and
22  type of profession. So yes.
23  Q. Did you ever have an opportunity to review any EEO-4
24  reports submitted, prepared by the City of Warren?
25  A. Yes, from the period of 1999 through 2017.

25  (Pages 97 to 100)

Gregory Murray
January 29, 2018

## Page 101

1  Q.  Okay.  Do you recall, sir, the percentage -- and I
2      know you probably can't recollect the exact numbers.
3  A.  Right.
4  Q.  But do you have an idea based upon your review of
5      those EEO-4 reports as to the percentage of minorities
6      that were employed by the City of Warren for those
7      periods?
8  A.  Right.  In no instance did it rise above 7.5 percent.
9  Q.  In no instance.
10  A.  Right.
11  Q.  And you did testify earlier that you're not aware of
12      any African Americans in the police department ever
13      other than DeSheila Howlett.
14  A.  That's correct.
15  Q.  Did you file any EEO-4 reports for the City of Warren?
16  A.  Yes.
17  Q.  How many?
18  A.  One.
19  Q.  One.  And that was for --
20  A.  2017.
21  Q.  2017.  Do you recall whether or not that number of
22      African Americans being employed by the City of Warren
23      had increased, decreased, or stayed the same on the
24      report that you filed?
25  A.  It was roughly about six point -- I want to say

## Page 102

1      6.8 percent.  I recall that number as a percentage.
2      So it pretty much stayed consistent after I want to
3      say 2003 in terms of ratio.  You have people leaving,
4      people coming, people being hired, people leaving, et
5      cetera so --
6  Q.  Do you ever recall any complaints being filed against
7      the Warren Police Department by any African Americans,
8      whether they were disabled or not?
9  A.  Yes.
10  Q.  Can you tell us for the record what that was, sir?
11  A.  A complaint was filed with me as the Americans with
12      Disability Act coordinator against the Warren Police
13      Department regarding alleged mistreatment of people
14      who were deaf, deaf, blind, or hard of hearing.
15  Q.  Okay.  Do you recall what became of that complaint?
16  A.  A formal complaint was filed with the Justice
17      Department, and an internal investigation was
18      conducted by the City.
19  Q.  Okay.  And was that complaint and the complainants
20      treated with dignity and respect in your opinion?
21  A.  I would say in one instance, no; and that was an
22      instance where two deaf persons were denied the
23      opportunity to receive witness statement forms when
24      they presented themselves to the Warren Police
25      Department to complete those forms.

## Page 103

1          I had to stay behind at work so that they
2      could come to my office.  I reproduced the witness
3      statement forms.  And in the presence of an
4      interpreter that I had secured for them, allowed them
5      to complete the forms, which they did.
6          The following day myself and Mark Simlar,
7      again the acting human resource director, personally
8      walked the forms over and handed them to Commissioner
9      Green.
10  Q.  And did Commissioner Green treat those complaints,
11      those forms appropriately?
12  A.  He apologized for the incident that occurred.  I don't
13      know what happened after that with respect to the
14      outcome of him having received those forms.
15  Q.  Okay.
16  A.  But I do know that an investigation was conducted, a
17      report was generated which contained inaccuracies, and
18      the matter is now under litigation.
19  Q.  Okay.  I don't recall your mentioning what happened,
20      the incident that Jere Green apologized for.
21  A.  Oh.  There had been quite a bit of conversation about
22      the right of those individuals to come to the police
23      station and fill out these statements.  And I had
24      conversations directly with Mr. Green, Jere Green,
25      Commissioner Green, and a Sergeant Bradley wherein I

## Page 104

1      shared with them that they should facilitate the deaf
2      person's ability to complete the forms, just get them
3      in and out, not necessarily debate the content of what
4      they were going to put on the forms.
5          As I understood it, that was what was going
6      to happen.  But when they arrived, they were refused
7      the other witness forms to fill out.  They contacted
8      me via phone while they were there at the police
9      department, and I instructed them to come over.  I
10      made the copy -- they were only given one blank copy.
11      There were three individuals.  They were only given
12      one blank copy, and I made two more copies of that.
13          But Mr. Green had, Commissioner Green had
14      initially indicated that he would facilitate that and,
15      in fact, was going to stay until that had happened.
16      But he left.  So that when they arrived, they were
17      being serviced so to speak by Sergeant Bradley, who
18      ultimately denied the other two deaf persons the
19      witness state forms, blank witness state forms.
20  Q.  I see.
21  A.  Statement forms.
22  Q.  And did you happen to mention the race of these
23      disabled, deaf --
24  A.  They were African American.
25  Q.  All of them were African Americans.

26  (Pages 101 to 104)

Gregory Murray
January 29, 2018

## Page 105

1  A.  Yes.
2  Q.  And I don't recall whether we actually put in the
3      record Mr. Murray, Commissioner Jere Green, is he
4      white?
5  A.  Yes, he is.
6  Q.  Okay.  And Barbara Beyer is white.
7  A.  Yes.
8  Q.  Okay.  And Shawn Johnson is white.
9  A.  Yes.
10 Q.  And the lieutenant from the fire department was white.
11 A.  Yes.
12 Q.  We're going to take a break.  I think I'm done, but I
13     need to take a break real quickly, please.
14         (Off the record at 12:56 p.m.)
15         MARKED FOR IDENTIFICATION
16         DEPOSITION EXHIBIT 8
17         (General Order No. 03-01)
18         1:24 p.m.
19         (Back on the record at 1:25 p.m.)
20 BY MR. MUNGO:
21 Q.  We're back on the record.  So Mr. Murray, in
22     Deposition Exhibit Number 4, which is discrimination
23     of sexual harassment dated July 24th, 2017, you have
24     that one before you, sir?
25 A.  Yes, I do.

## Page 106

1  Q.  Okay.  Sir, I want you to take a look at that
2      document.  And in particular I want to refer you to
3      Page 4, Page 4, C subpart 2.  Take a look at that
4      paragraph, sir, and tell me if there's anything there
5      that is -- that you're familiar with.
6  A.  No.  Actually, I'm unfamiliar with the entire
7      document.  And I'm surprised to see my name in bold
8      print in C subpart 2.
9  Q.  C subpart 2.
10 A.  Right.  Because I've never seen this document.
11 Q.  Okay.  This document is dated July 24th, 2017.  Among
12     the documents that you said you requested but never
13     received, would this be a document that would be
14     included among the sort of documents that you
15     requested from the City of Warren?
16 A.  Yes.
17 Q.  Okay.  But you never received it.
18 A.  That's correct.  I never received it.
19 Q.  Would you expect to have received it particularly
20     since your name was typed in bold --
21 A.  Yes.
22 Q.  -- as a person to bring complaints to?
23 A.  Yes.
24 Q.  Did anyone ever tell you this document was in
25     existence?

## Page 107

1  A.  No.
2  Q.  And then I want to refer you to Deposition Exhibit
3      Number 8.  It's dated January 10, 2003, which is
4      discrimination of sexual harassment.
5          Oh.  By the way, before we delve into
6      Deposition Exhibit Number 8, which is January 10th,
7      2003, Deposition Exhibit Number 4 -- it shows on
8      the first page at the bottom toward the left that it
9      rescinds the document that was dated -- I guess it
10     would be a similar document that would have been
11     dated -- what would that be, March of 2001?
12 A.  That would be January of 2003.
13 Q.  January of -- where it says rescinds?
14 A.  Yes.
15 Q.  Okay.
16 A.  Which is actually Exhibit Number 8.
17 Q.  Is that the way you would read that?
18         MR. SHARPE:  He's referring to this.
19 BY MR. MUNGO:
20 Q.  Would that be March 2001?  It's hard to tell.  It
21     seems based upon the Deposition Exhibit Number --
22 A.  Well, maybe the dates don't --
23 Q.  It rescinds 87 of 2012, it looks like; right?  Or
24     87 -- December of 1987.
25 A.  Yes.  I think that's the way it works.

## Page 108

1          MR. ACHO:  I'm going to object as to
2  speculation.  He doesn't know.  We don't know.  You
3  don't know.
4          THE WITNESS:  Yeah.
5          MR. ACHO:  It's completely up to
6  speculation.
7  BY MR. MUNGO:
8  Q.  Okay.  So what was your answer to that question, sir?
9  A.  Well, my answer would be that the year is indicated by
10     the first date and the second numeral is the month.
11 Q.  Is the month.  Okay.
12 A.  This is consistent with military nomenclature in terms
13     of the date.
14 Q.  The year is first, then the month.
15 A.  Yes.
16 Q.  Okay.  Which would be consistent because then this one
17     would have replaced 2003 in the month of January,
18     which is Deposition Exhibit Number 8.  So Deposition
19     Exhibit Number 4 would have replaced Deposition
20     Exhibit Number 8.
21         So Deposition Exhibit Number 8, which is
22     the January 2003 discrimination of sexual harassment
23     policy for the City of Warren, does not have reference
24     to your name in it; correct?
25 A.  That's correct.

27 (Pages 105 to 108)

Gregory Murray
January 29, 2018

Page 109

1  Q. Okay. So it would appear, it would appear that there
2     was some changes made to the Deposition Exhibit Number
3     8 as though there were some deficiencies that needed
4     to be corrected that were attempted in Deposition
5     Exhibit Number 4.
6        MR. ACHO: I'm going to object to your
7     editorializing as to, quote, appears that a document
8     was changed. You don't know, and I don't know.
9     You're speculating, mischaracterizing, and
10    editorializing. There's not a question on the table.
11       I ask that you give a question to
12    Mr. Murray as opposed to making your own general
13    statements.
14  BY MR. MUNGO:
15  Q. He has to do that, but focus on what I'm saying. Do
16    you see a difference?
17  A. Yes.
18  Q. And if so, what does it appear that difference was
19    done to accomplish?
20  A. It specifically identifies me as the coordinator. And
21    I think to the extent that I can look at both of
22    these, the language is pretty consistent except for
23    that addition.
24  Q. So if we were to compare Part C in Deposition Exhibit
25    8 to Part C in Deposition Exhibit Number 4, what would

Page 110

1     appear to be the differences there?
2  A. The difference would be that the Equal Employment
3     Opportunity officer is named in 4, is not named in
4     Exhibit 8, C2.
5  Q. Okay. Notwithstanding, you've never seen either one
6     of these documents, Deposition Exhibit Number 4 or 8,
7     even though you requested them; correct?
8  A. That's correct.
9        MR. MUNGO: Okay. All right. I think with
10    that, Mr. Acho —
11       MR. ACHO: All right.
12       MR. MUNGO: I am done, sir.
13       MR. ACHO: I thank you. I spoke to
14    Mr. Murray's attorney, Mr. Sharpe, who is present.
15    And what we are going to do at this time is adjourn
16    the deposition.
17       I'm going to reserve my right to continue
18    our portion of examination of Mr. Murray at a mutually
19    convenient time which will be before the end of the
20    month. We'll do it very soon. We'll do it at
21    Mr. Sharpe's office in the Buhl Building. Because
22    there isn't enough time for us today for me to
23    continue my line of questioning.
24       So with that, I will thank Mr. Murray for
25    his time today. Mr. Sharpe, I'll be in touch with you

Page 111

1     shortly. Obviously, Mr. Mungo, we'll do it at a
2     convenient time for you as well.
3        We're not going to have time to set the dep
4     schedules today, but I will follow up with you and
5     Mr. Lazano (ph) in the next 24 to 48 hours. I do have
6     the dates of February 20th, 21st, and 28th set aside
7     for you for the City of Warren employees.
8        MR. MUNGO: Oh, yeah. We need to finalize
9     that.
10       MR. ACHO: We will do that. But for now I
11    just — I'll tell you on the record we have February
12    20, 21, and 28 set aside for you.
13       MR. MUNGO: Let me call Mr. Lazano in here
14    because —
15       THE WITNESS: I have a surgical procedure
16    for the morning —
17       MR. MUNGO: No, sir.
18       MR. ACHO: These are for different
19    individuals related to the case.
20       THE WITNESS: I thought you were talking
21    about rescheduling.
22       MR. ACHO: No. I'm not even going to
23    attempt to do that. I'll reach out to Mr. Sharpe.
24       MR. SHARPE: Thank you.
25       MR. MUNGO: I'm going to have Mr. Lazano

Page 112

1     come in so we can schedule the rest of those. We're
2     off the record.
3        (Off the record at 1:34 p.m.)
4        (Back on the record at 1:35 p.m.)
5        MR. MUNGO: Let's go back on the record.
6     Mr. Acho, I've got a question for you.
7        MR. ACHO: Yes, sir.
8        MR. MUNGO: Acho. I've got a question for
9     you, man.
10       MR. ACHO: All right.
11       MR. MUNGO: Tell me, what is your reason
12    for needing to continue Mr. Murray?
13       MR. ACHO: Counsel, I'm not going to get
14    into that here. We have an agreement with
15    Mr. Murray's attorney. I will reset the deposition
16    with you.
17       I've already explained to you the
18    rationale, and you told me the dep was going to be
19    quick. It was not. I don't have enough time to
20    finish the questioning. So we will continue it on a
21    mutually convenient day very soon.
22       MR. SHARPE: Let me say —
23       MR. MUNGO: We only get seven hours with —
24       MR. SHARPE: This is not — I did not
25    notice this deposition. Certainly Mr. Acho and I

28 (Pages 109 to 112)

Gregory Murray
January 29, 2018

Page 113

1   spoke about him making it convenient for me and my
2   client. I'm fine with that. But I'm not calling the
3   shots though in terms of --
4           MR. ACHO: No, I understand that.
5           MR. SHARPE: Yeah.
6           MR. ACHO: There is a time limit pursuant
7   to the court rule.
8           MR. SHARPE: Sure.
9           MR. ACHO: I understand that. And much of
10  it has been exhausted. But I do have a right to ask
11  some follow-up questions, and we'll do that. We just
12  don't have the time today.
13          MR. SHARPE: Sure.
14          MR. ACHO: So I promise within the next
15  48 hours, I will reach out to Mr. Sharpe and
16  Mr. Mungo, and we will reset a date and time
17  convenient for Mr. Murray. And we plan on wrapping it
18  up in short order. Thank you.
19          MR. MUNGO: Okay.
20          (The deposition was adjourned at 1:36 p.m.
21  Signature of the witness was not requested by
22  counsel for the respective parties hereto.)
23
24
25

Page 114

1                   CERTIFICATE
2   STATE OF MICHIGAN
3   COUNTY OF MACOMB
4
5           I, MAUREEN COLLIER, a Notary Public in
6   and for the above county and state, do hereby certify
7   that this deposition was taken before me at the time
8   and place hereinbefore set forth; that the witness was
9   by me first duly sworn to testify to the truth; that
10  this is a true, full and correct transcript of my
11  stenographic notes so taken; and that I am not
12  related, nor of counsel to either party, nor
13  interested in the event of this cause.
14
15
16
17
18
19
20  _Maureen Collier_
21  MAUREEN COLLIER, CSR-7422
22  Notary Public
23  Macomb County, Michigan
24  My commission expires: February 9, 2021
25

29 (Pages 113 to 114)