# EXHIBIT C

# HOWLETT v. CITY OF WARREN, ET AL.

## GREGORY MURRAY

II

## February 26, 2018

*Prepared for you by*



USLEGAL SUPPORT

The Power of Commitment™

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

GREGORY MURRAY
February 26, 2018

## Page 115

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                SOUTHERN DIVISION
 4
 5   DESHEILA C. HOWLETT,
 6            Plaintiff,
 7      vs.            Case No. 17-11260
 8                   Hon. Terence G. Berg
 9                   Mag. R. Steven Whalen
10   CITY OF WARREN; COMMISSIONER JERE
11   GREEN, acting in his individual capacity;
12   LT. LAWRENCE GARDNER; SHAWN
13   JOHNSON; DAWN McLANE; BARBARA
14   BEYER; ANWAR KHAN; DARRIN LABIN;
15   WILLIAM ROSS; KEVIN BARNHILL;
16   PAUL HOUTOS; SCOTT TAYLOR,
17            Defendants.
18
19   VOLUME II
20
21
22
23
24
25
```

## Page 116

```
 1      The Continued Deposition of GREGORY MURRAY,
 2   Taken at 645 Griswold Street, Suite 4100,
 3   Detroit, Michigan,
 4   Commencing at 2:37 p.m.,
 5   Monday, February 26, 2018,
 6   Before Wendy M. Taylor, CSR-6922.
 7
 8
 9   APPEARANCES:
10
11   LEONARD MUNGO
12   The Mungo Law Firm, P.L.C.
13   333 West Fort Street
14   Suite 1500
15   Detroit, Michigan 48226
16   (313) 963-0407
17   mungol16@msn.com
18      Appearing on behalf of the Plaintiff.
19
20
21
22
23
24
25
```

## Page 117

```
 1   RONALD G. ACHO
 2   Cummings, McClorey, Davis & Acho, P.L.C.
 3   17436 College Parkway
 4   Livonia, Michigan 48152
 5   (734) 261-2400
 6   racho@cmda-law.com
 7      Appearing on behalf of the Defendants, City of Warren,
 8      Jere Green, Lawrence Garner, Shawn Johnson, Dawn
 9      McLane, Anwar Khan, Darrin Labin, William Ross, Kevin
10      Barnhill, Paul Houtos and Scott Taylor.
11
12   ETHAN VINSON
13   City of Warren
14   1 City Square
15   Suite 400
16   Warren, Michigan 48093
17   (586) 574-4671
18   evinson@cityofwarren.org
19      Appearing on behalf of the Defendants, City of Warren,
20      Jere Green, Lawrence Garner, Shawn Johnson, Dawn
21      McLane, Anwar Khan, Darrin Labin, William Ross, Kevin
22      Barnhill, Paul Houtos and Scott Taylor.
23
24
25
```

## Page 118

```
 1   JONATHAN R. MARKO
 2   Ernst & Marko Law
 3   645 Griswold Street
 4   Suite 4100
 5   Detroit, Michigan 48226
 6   (313) 965-5555
 7   jon@ernstmarkolaw.com
 8      Appearing on behalf of the Witness.
 9
10   ALSO PRESENT:
11   Dan Bradley
12   Mark Simlar
13
14
15
16
17
18
19
20
21
22
23
24
25
```



US LEGAL SUPPORT

The Power of Commitment™

Pages 115 to 118

GREGORY MURRAY
February 26, 2018

## Page 119

TABLE OF CONTENTS

WITNESS                          PAGE
GREGORY MURRAY

EXAMINATION BY MR. ACHO:           137
RE-EXAMINATION BY MR. MUNGO:       340

EXHIBITS

EXHIBIT                          PAGE
(Exhibits attached to transcript.)

DEPOSITION EXHIBIT 1             308
DEPOSITION EXHIBIT 2             324
DEPOSITION EXHIBIT 3             339
DEPOSITION EXHIBIT 4             339
DEPOSITION EXHIBIT 5             339
DEPOSITION EXHIBIT 6             339
DEPOSITION EXHIBIT 7             339
DEPOSITION EXHIBIT 9             339

## Page 120

Detroit, Michigan
Monday, February 26, 2018
2:37 p.m.

MR. MUNGO:  So this is Attorney Leonard Mungo.  I represent Ms. Howlett and I have a question with regard to who the additional parties are here?

MR. ACHO:  There are no additional parties here.

MR. MUNGO:  So why are two individuals here from the City and neither one are parties?

MR. ACHO:  They're representatives of the City.  They're representatives of the City and representatives of the police department.

MR. MARKO:  Why do we have two representatives for the City.

MR. ACHO:  No, one for the City, one for the police.

MR. MARKO:  No.  No, can we just have everybody identify themselves?

MR. ACHO:  Sure.  Also, just so we know, we're are going to take four full hours, which will not include things like this or objections or breaks, okay, because I want to be sure, because if we don't finish, you know, then we'll have to continue it, so

## Page 121

like this is taking time.

First of all, you came in later than 2:30.  We were supposed to start at 2:30.  I just want to be sure, this is taking time away from the deposition, which is why we need to keep track of this.  We'll be happy to answer any questions you have.

MR. MUNGO:  Let the record reflect, first of all, that we came in at about 2:35 so that you're -- we came in late doesn't be interpreted as being beyond five minutes, and secondly, it is our position, my position as plaintiff, that you are only entitled to have one representative from the City, sir.

MR. ACHO:  That's up to you.  Let's start.

MR. MARKO:  Well, I think I would concur with Mr. Mungo.  I don't understand, and maybe you can give a legal basis for how you can have two representatives, but my understanding is you're only allowed to have one representative, sir, and I don't think we can go forward with the deposition until the judge rules.  If you can provide a basis for why you need two representatives from the City -- you're only allowed to have one rep.

MR. ACHO:  That's not true.  Do you see how

## Page 122

many defendants there are?

MR. MUNGO:  Well, first of all, there's a problem that I have with Mr. Simlar being here and Lieutenant Bradley being here.  Lieutenant Bradley was a representative of the City when we deposed several police officers from the City at Warren City Hall.

Mr. Simlar is going to be deposed on Wednesday of this week, the 28th, which is -- we have the 27th, tomorrow, and then the 28th.  Mr. Murray's deposition, I'm assuming, is of utmost interest to Mr. Simlar in preparation for his deposition on the 28th, Wednesday.

MR. ACHO:  That's your assumption.  His deposition will not go forward if I don't finish his.

MR. MUNGO:  Then who will you leave here as representative for the City, sir?

MR. ACHO:  I have both.

MR. MARKO:  Are you named defendants in this case?

MR. MUNGO:  No.

MR. MARKO:  Sir, are you a named defendant in this case?

MR. VINSON:  I'm an attorney of record in the case.

MR. MARKO:  You are an attorney of record



GREGORY MURRAY
February 26, 2018

Page 123

1    in this case?
2         MR. VINSON:  Yes, I am.
3         MR. MUNGO:  City of Warren.
4         MR. MARKO:  Are you a named defendant in
5    this case?
6         MR. SIMLAR:  No.
7         MR. MARKO:  Are you a named defendant in
8    this case?
9         MR. BRADLEY:  So.
10        MR. MARKO:  So who is the representative
11   for the City?
12        MR. ACHO:  Mr. Simlar.
13        MR. MARKO:  So then I would agree with
14   Mr. Mungo that --
15        MR. ACHO:  How many defendants are there
16   that --
17        MR. MARKO:  I see a lot of defendants.
18        MR. ACHO:  Sure.  He's representing the
19   police.
20        MR. MARKO:  Who represents the police?
21        MR. BRADLEY:  I am.
22        MR. ACHO:  Now, I have to tell you
23   something, I'm here, we had a hard time getting this
24   man's deposition because of his illness.
25        MR. MARKO:  And I accommodated you guys.

Page 124

1         MR. ACHO:  It's his illness, not ours.
2         MR. MARKO:  I accommodated you as soon as
3    we got involved so you could get this deposition.
4         MR. ACHO:  You didn't do us any favors,
5    nothing, it was your client that was unavailable.
6    Now, I want to proceed, if not, I'll tell you what,
7    I'm going to go into court with a show cause, if
8    that's what you want to do and we will not go forward
9    with the other deposition.
10        MR. MUNGO:  We can just call the court
11   right now because the court prefers us to have a
12   conference --
13        MR. ACHO:  Then you --
14        MR. MARKO:  -- a leave of the court to file
15   a motion to compel.
16        So let's call the court and let the court
17   rule on this right now.
18        MR. ACHO:  That's your choice.
19        MR. MUNGO:  Okay.  Good.
20        MR. MARKO:  I'd just like to know a legal
21   basis for having more than one representative, it's
22   highly irregular?
23        MR. ACHO:  I'm not --
24        MR. MARKO:  I know you have been practicing
25   a lot longer than I have so --

Page 125

1         MR. ACHO:  45 years.
2         MR. MARKO:  45 years.
3         MR. ACHO:  You know what, this is the first
4    time I've had someone raise this so, you know what, if
5    you want to call the court, that's up to you.  I'm
6    ready to go forward.  If we don't go forward, no
7    depositions will go forward and I will file a motion
8    and, of course, I'll call the court and tell them I'm
9    going to file a motion and I'm sure that Judge Berg
10   won't be happy.
11        MR. MUNGO:  Well, first of all, before a
12   motion to compel or any kind of motion is filed, we
13   have to get leave of the court and the court requires
14   us to have a conference prior to that in order to get
15   leave, so let's just call the court and let the court
16   rule on it and then we can move forward, okay, one way
17   or another?
18        Can someone get Judge Berg's number?  I
19   don't have that number handy.
20        (Mr. Marko left the deposition room at
21        2:24 p.m.)
22        MR. ACHO:  His phone number is (810) --
23        MR. MUNGO:  Let's wait.
24        MR. ACHO:  I gave you his number.  Let's
25   type it in.  Please call.

Page 126

1         MR. MUNGO:  I'll write it down but I'm not
2    going to call until Mr. Marko gets back.
3         MR. ACHO:  I'm sorry.  If you're waiting
4    for him --
5         MR. MUNGO:  (810) --
6         MR. ACHO:  341-9760.  No, I don't have a
7    problem with that, of course not.  I just don't like
8    having to do this, it's a waste of time.
9         MR. MUNGO:  I'm not sure what you don't
10   have a problem with me zealously representing my
11   client though, right?
12        (Mr. Marko entered the deposition room at
13        2:43 p.m.)
14        MR. MUNGO:  Okay.
15        MR. ACHO:  The next deposition will be at
16   my office.  If this does not go forward today, the
17   next will be at my office.
18        MR. MARKO:  We're not agreeing to that.
19        MR. ACHO:  Well, we'll bring it up with the
20   court.
21        MR. MARKO:  You know that --
22        MR. ACHO:  We'll bring it up with the
23   court.
24        MR. MUNGO:  Yes, this is Attorney Leonard
25   Mungo and --



GREGORY MURRAY
February 26, 2018

---

**Page 127**

1    MR. ACHO:  Put it on speaker phone, please?
2    MR. MUNGO:  -- I'm calling regarding the
3    Howlett vs. City of Warren matter, and we're here at a
4    deposition and we have a question that we need the
5    magistrate to help us resolve regarding the parties,
6    two individuals from the City of Warren attending the
7    deposition, one of which whose deposition is going to
8    be heard a couple days from now, neither one of them
9    are parties and we just need the court to help us
10   resolve this so we can -- I'll put you on
11   speakerphone.
12   MR. ACHO:  Wait.  Not we, you have the
13   problem.  Tell them you have the problem.
14   Hi, this is Ron --
15   MR. MUNGO:  Hold on.  Hold on.  One second.
16   Hello, ma'am, so this is Attorney Leonard
17   Mungo representing the plaintiff and --
18   MR. ACHO:  Hi, this is Attorney Ron Acho.
19   The parties are not requesting this call.  This is
20   Mr. Mungo requesting this call.  I have tried to
21   schedule this deposition for a long time.  We finally
22   have it and now they don't want to proceed because the
23   company has a representative from the City and a
24   representative from the police department and they
25   don't want to go forward.

---

**Page 128**

1    MR. MARKO:  That's not entirely accurate.
2    This is Attorney Jon Marko.  I represent the deponent,
3    Greg Murray.  The reason why we --
4    TELEPHONE:  Counsel, I need to interrupt
5    you for a moment.  I'm familiar with the case you're
6    talking to me about, but I don't have a case number so
7    I can't pull up the docket or anything.
8    MR. MUNGO:  Yes, ma'am, I've got it right
9    here, it's 17-11260.
10   TELEPHONE:  Okay.
11   MR. MUNGO:  And that's DeSheila Howlett vs.
12   City of Warren and others.
13   TELEPHONE:  Okay.  Do we have all parties
14   on the line currently?
15   MR. MUNGO:  We do, ma'am, yes.
16   TELEPHONE:  Okay.  It sounds to me like
17   you're in the middle of a deposition and you're having
18   issues, which you are requesting --
19   MR. MARKO:  That's correct.
20   MR. ACHO:  The deposition has not started.
21   They will not proceed.
22   MR. MARKO:  We're all present in the
23   deposition conference room.  We have a dispute as to
24   who's allowed to attend the deposition.  This is
25   Jonathan Marko, I have a limited appearance on behalf

---

**Page 129**

1    of the deponent, Mr. Greg Murray.
2    MR. MUNGO:  And this is Leonard Mungo, I
3    represent the plaintiff.
4    TELEPHONE:  Okay.  Hold on just a moment.
5    I have to see if Judge Berg is available.  He's just
6    finishing up another matter so just a moment, please.
7    MR. MUNGO:  Yes, ma'am.  Thank you.
8    TELEPHONE:  Counsel, this is Amanda with
9    the court.
10   MR. MUNGO:  Yes.
11   TELEPHONE:  I just wanted to let you know
12   that Judge Berg will be available in a few moments, it
13   will probably be about five minutes until he's on the
14   line.  If it's all right, I'll keep you on hold until
15   then?
16   MR. MARKO:  That's fine.  Thank you.
17   JUDGE BERG:  Hello.  Good afternoon.  This
18   is Judge Terry Berg.  I don't know entirely what
19   you're calling about, but who would like to fill me in
20   on it?
21   MR. ACHO:  Your Honor, this is Ron Acho.
22   We've been trying for two weeks to get the deposition
23   of this witness concluded that was started by
24   plaintiff's counsel.  We finally got it.  We came all
25   the way to downtown Detroit at 2:30 to accommodate

---

**Page 130**

1    this witness, so I'm here with the city attorney of
2    Warren and with the representative from the city and
3    the representative of the police department.
4    We're ready to go and now they don't want
5    to go forward.  They said, oh, no, you can't have two
6    people.  I said why not, one is representing the City
7    of Warren and the other is representing the police
8    department.  This is a complete waste of time and a
9    delay, Your Honor.
10   JUDGE BERG:  Okay.  Hold on.  Everybody,
11   let's not try to engage in any advocacy.  I'm just
12   trying to understand what the facts are.  Who is the
13   witness?
14   MR. MUNGO:  The witness is Mr. Murray, the
15   former diversity coordinator for the City of Warren,
16   Judge, and he's the deponent here today and he has
17   separate counsel representing him, Mr. Marko.
18   MR. MARKO:  Good afternoon, Judge, this is
19   Jonathan Marko and I have a limited appearance on
20   behalf of Mr. Murray.
21   I think the only issue we have is we
22   accommodated -- defense counsel says they accommodated
23   us and, in my opinion, we accommodated them.  I
24   cleared my schedule after finding out about this
25   deposition late last week.

---



GREGORY MURRAY
February 26, 2018

## Page 131

1      Anyway, we're at my office in downtown
2 Detroit, a block from Your Honor's chambers and the
3 issue that we have is the defendants have brought, in
4 addition to their attorney who is sitting across from
5 me, three separate representatives --
6      MR. ACHO: No. No. No. No.
7      MR. MARKO: -- two separate
8 representatives, as well as the city attorney.
9      Mr. Mungo lodged an objection because, I
10 believe, one of the representatives is being deposed
11 on Wednesday. Mr. Mungo lodged an objection to having
12 multiple representatives present. I concurred in that
13 objection and we've called the court for guidance
14 moving forward so we can get this done today.
15      MR. ACHO: Your Honor, Ron Acho. There are
16 10 defendants, okay, and the fact that Mr. Simlar is
17 going to be deposed in a couple days makes no
18 difference. He's the HR director, the acting HR
19 director, and that's why he's here. The lieutenant is
20 here from the police department.
21      Counsel says to you that he accommodated
22 our schedule, that's not true. His former attorney,
23 Mr. Murray, dropped out.
24      Isn't that what happened, someone dropped
25 out, that's why you stepped in?

## Page 132

1      MR. MARKO: Mr. Acho, all that I know is
2 that I was contacted late last week and we
3 accommodated you. We moved things around to get the
4 deposition in but that's irrelevant. Let's talk about
5 the representatives that are here today so we can move
6 forward with this deposition.
7      MR. ACHO: No. No, Your Honor, we drove
8 down today and this is -- this is -- it doesn't make
9 any sense. We came down to downtown Detroit for this
10 deposition as an accomodation to this witness and it's
11 been delayed because of his illness. We're here and
12 ready to go and now -- you know, we have four hours to
13 get this deposition done and now I don't think we are
14 going to be able to get it done but at least we want
15 to start, Your Honor.
16      MR. MUNGO: Judge, the deposition has not
17 been delayed. In fact, this deposition is taking
18 place two days earlier than what it was scheduled
19 before Mr. Marko took on representing Mr. Murray. I
20 want to make that clear.
21      JUDGE BERG: All right. Let me just ask,
22 who is the representative for the City of Warren?
23      MR. ACHO: Mark Simlar, the acting human
24 resources director, Your Honor, and this is an
25 employment case involving the police department.

## Page 133

1      JUDGE BERG: So we know, we have one
2 representative for the City of Warren and that's the
3 HR director, Mr. Simlar. Who is the other
4 representative you're talking about?
5      MR. ACHO: It's Lieutenant Dan Bradley,
6 Your Honor, who has been coordinating things involving
7 the defense for these 10 individual officers,
8 including the former police commissioner.
9      JUDGE BERG: Okay. All right. Let me ask,
10 counsel for Ms. Howlett -- and I'm not sure, who is
11 counsel for the plaintiff again?
12      MR. MUNGO: Attorney Leonard Mungo, Your
13 Honor, and Jonathan Marko is counsel for the deponent
14 today.
15      JUDGE BERG: Okay. So, Mr. Mungo, are you
16 objecting to the two representatives?
17      MR. MUNGO: I am, Your Honor, and the City
18 of Warren and individual officers are defendants in
19 this case, not the police department.
20      MR. ACHO: Well, the former police
21 commissioner --
22      JUDGE BERG: Hold on, Mr. Acho. Don't say
23 anything until I ask you. I'm still asking Mr. Mungo.
24      So, Mr. Mungo, why are you saying that you
25 object to having the two representatives?

## Page 134

1      MR. MUNGO: Your Honor, the two
2 representatives at these depositions have either been
3 Mr. Simlar or Lieutenant Bradley. Mr. Simlar is going
4 to be deposed on Wednesday, the day after tomorrow,
5 and Mr. Murray's deposition is a key deposition with
6 regard to Mr. Simlar's deposition as well, and insofar
7 as the parties, Your Honor, neither one of these
8 individuals are parties, they are representatives of
9 the City.
10      The police department is not a party. We
11 have individuals who work for the police department
12 that are parties, Your Honor, and so based upon the
13 fact that the police department is not a party but the
14 City is and individual police officers, that's the
15 basis of my objection.
16      JUDGE BERG: All right. Well, thank you
17 very much for explaining that. I appreciate it. Hold
18 on one second, okay?
19      MR. MUNGO: Yes, Judge.
20      JUDGE BERG: All right. Thank you very
21 much. Here's what I'm going to tell you, I think it's
22 reasonable to have both of these representatives be
23 there and so to the extent that -- Mr. Mungo, your
24 objection to that, I'm going to overrule that until
25 you find it's not permissible for both of them to be



GREGORY MURRAY
February 26, 2018

Page 135

1   there.
2           Having said that, let's keep this limited
3   to no more than two representatives in a case like
4   this and if anybody wants to bring any more than
5   that -- I mean, the police department may not be sued,
6   but you have a bunch of individual police officers and
7   certainly we're not going to withdraw them from being
8   there, so it's okay to have a person from the police
9   administration and the City is a defendant and the
10  City has the right to be present.
11          Let's just stop focusing on the small
12  things and just focus on getting this deposition done
13  and if you run into any more difficulties where
14  someone is bringing an unreasonable number of
15  representatives, give me a call, but I don't think
16  that this is unreasonable and I want you all to focus
17  on the actual -- you know, the actual issues within
18  the matter and not the smaller things, all right?
19          MR. MUNGO:  Very well, we appreciate it.
20          MR. ACHO:  Your Honor, there's one other
21  matter, since we have you on the phone.  I was advised
22  that Mr. Murray has health issues, which is why this
23  deposition has been delayed and brought up at this
24  late hour --
25          MR. MARKO:  That's not true.

Page 136

1           MR. ACHO:  -- so I need the full four hours
2   for this deposition and I'm concerned that they're
3   going -- because of objections and delays, that we're
4   not going to get the four hours in today.
5           I just want to alert the court that we may
6   have to break because of his health or whatever issues
7   and we may have to continue.  We'll start it now but
8   we may not be able to finish the four hours reasonably
9   today.
10          MR. MUNGO:  Your Honor, first of all, the
11  deposition, there were 3 hours and 45 minutes that's
12  remaining in terms of the 7 hours allowed under the
13  Rules, it's not 4 hours, and secondly, Mr. Murray is a
14  witness and it's my understanding that Mr. Murray
15  would like to conclude this today and he's willing, is
16  that correct, sir?
17          MR. MURRAY:  Yes.
18          MR. MUNGO:  He's willing to sit for however
19  long but he needs this to be done today because he
20  does have to go into the hospital for a procedure, is
21  that correct?
22          MR. MURRAY:  Yes, that is correct and I
23  will have to move around.  I can't sit on my right --
24          MR. ACHO:  That's not a problem, don't
25  worry about that.

Page 137

1           MR. MARKO:  Judge, we're willing and ready
2   to move forward.  Thank you for your ruling on this
3   and we'll make sure we get it done tonight.
4           MR. ACHO:  Well, you took all that time for
5   his deposition, we didn't.
6           JUDGE BERG:  Hold on.  Mr. Acho, stop.  I
7   don't need to be on the phone for this.  You will
8   complete the deposition today.  Thank you.
9           MR. MARKO:  Thank you.
10          MR. ACHO:  Thank you.
11          MR. MUNGO:  Thank you.
12          MR. MARKO:  Before we get started, Madam
13  Court Reporter, do you have a way to time the
14  deposition as it's going on?
15          (Discussion off the record at 3:03 p.m.)
16          (Back on the record at 3:05 p.m.)
17          MR. MARKO:  All right.  Counsel, I think
18  we're ready to proceed and we'll mark the time as
19  beginning now.  Thank you.
20                  GREGORY MURRAY,
21  was thereupon called as a witness herein, and after
22  having first been duly sworn to testify to the truth,
23  the whole truth and nothing but the truth, was
24  examined and testified as follows:
25                  EXAMINATION

Page 138

1   BY MR. ACHO:
2   Q.  Are you an honest person?
3   A.  Yes.
4   Q.  Have you ever lied?
5   A.  Yes.
6   Q.  So you have lied on multiple occasions, right?
7   A.  No.
8   Q.  Well, you said you lied?
9   A.  When I was a child and I didn't want to get in
10      trouble, things like that.
11  Q.  And in the last 25 years you've never given a lie,
12      right?
13  A.  That's correct.
14  Q.  Let me understand something, you're not a shy person,
15      are you?
16          MR. MARKO:  Objection, vague.
17  A.  What do you mean by shy?
18  BY MR. ACHO:
19  Q.  Do you know what the word shy means?
20  A.  Explain it to me, your definition of shy so I answer
21      the question accurately.
22  Q.  Hesitant, afraid to speak up.  Are you afraid to speak
23      up?
24  A.  No.
25  Q.  In fact, you've been in public service for a long



Pages 135 to 138

GREGORY MURRAY
February 26, 2018

Page 139

1      time --
2   A. Correct.
3   Q. -- and you've never been afraid to speak up, have you?
4   A. No.
5   Q. And, in fact, whenever you've seen discrimination or
6      something wrong, you spoke up, didn't you?
7   A. Some occasions.
8   Q. Most of the time you did, right?
9   A. On some occasions.
10  Q. There are other times you didn't, is that what you're
11     saying?
12  A. Yes.
13  Q. Why?
14  A. Because it may have been something I would have no
15     impact over.
16  Q. So you would see something wrong and not speak up when
17     you were working in public service?
18  A. I would see where others would speak up, I would not
19     have to.
20  Q. I see.
21        MR. MARKO:  One second.  Wait until he's
22     finished with the question and take a breath and
23     then -- because we need a clear record so wait.
24  BY MR. ACHO:
25  Q. So you would speak up if you felt something was

Page 140

1      discriminatory, unless someone else was going to speak
2      up, is that correct?
3        MR. MARKO:  Objection to form.
4      Go ahead.
5   A. The way the question was phrased is wrong.  I do speak
6      up.
7   BY MR. ACHO:
8   Q. Good.  In fact, when you got hired by Mayor Fouts for
9      the City of Warren you told him I will speak up
10     whenever I see any injustice, if I see anything wrong
11     I will speak up, you told Mayor Fouts that before he
12     even hired you, correct --
13  A. I don't recall making that statement, sir.
14  Q. -- or words to that effect?
15  A. I don't recall making that statement.
16  Q. Well, when the mayor asked you to take the job he
17     wanted you to give him feedback, honest feedback,
18     correct?
19        MR. MARKO:  Objection, foundation.
20  A. Yes.
21  BY MR. ACHO:
22  Q. Okay.  And you did agree to give him honest feedback
23     whenever you saw discrimination or anything improper,
24     you gave him that feedback, correct?
25        MR. MARKO:  Objection to form.

Page 141

1   A. You asked me two questions there.
2   BY MR. ACHO:
3   Q. We'll read it -- well, do you understand the question?
4   A. No.
5   Q. You don't understand it?
6   A. No, I don't.
7   Q. Okay.  You did tell Mayor Fouts you would give him
8      honest feedback, correct?
9   A. Yes.
10  Q. And you did give him honest feedback, correct?
11  A. Yes.
12  Q. So whenever you saw discrimination you reported it to
13     him, correct?
14  A. In what context are you asking?
15  Q. In any context at all?
16  A. No.
17  Q. So you did not always tell him when you saw
18     discrimination, correct?
19  A. I'm confused by your question, sir.
20  Q. Okay.  Did you -- were you always -- hold on.  Didn't
21     you say to other people that you like Mayor Fouts, you
22     did say that?
23  A. Yes.
24  Q. You said that to several people including Mr. Simlar
25     and others?

Page 142

1   A. Yes.
2   Q. And you did like the mayor?
3   A. Yes.
4   Q. Other than when you asked for a raise and he refused,
5      you stopped liking him?
6        MR. MUNGO:  Assuming facts not in evidence.
7   A. No.
8   BY MR. ACHO:
9   Q. So you still like him?
10        MR. MARKO:  Whenever someone makes an
11     objection, let them make it, wait until they're done
12     and you can answer it.
13  BY MR. ACHO:
14  Q. So you still like Mayor Fouts?
15        MR. MARKO:  As we sit here today?
16        MR. ACHO:  Yes.
17  A. I have no animus against the mayor.
18  BY MR. ACHO:
19  Q. Did you hear my question?
20  A. Yes.
21        MR. MARKO:  He answered it.
22  BY MR. ACHO:
23  Q. I didn't ask whether you had animus.  I asked if you
24     like him?
25        MR. MARKO:  Objection, asked and answered.



GREGORY MURRAY
February 26, 2018

Page 143

1  BY MR. ACHO:
2  Q.  What is the answer?
3  A.  There are things I like about him, things I'm
4       disappointed about.
5  Q.  But you still like him even though you're
6       disappointed?
7            MR. MARKO:  Asked and answered.
8            MR. MUNGO:  He just answered the question.
9  BY MR. ACHO:
10  Q.  Answer anyway.
11            MR. MUNGO:  Objection, asked and answered.
12  A.  I don't have a different answer.
13  BY MR. ACHO:
14  Q.  Just so I'm clear, how many different people did you
15      tell you liked Mayor Fouts?
16  A.  I have no idea.
17            MR. MARKO:  Objection, asked and answered.
18  BY MR. ACHO:
19  Q.  5, 10, 1, how many?
20  A.  I have no idea, sir.
21  Q.  But you told a lot of people, didn't you?
22  A.  I don't know what you mean by a lot.
23  Q.  Well, more than 5?
24            MR. MUNGO:  Objection, asked and answered.
25  A.  I may have.

Page 144

1  BY MR. ACHO:
2  Q.  And you've even told Mayor Fouts to his face, multiple
3       times, I like working with you, true?
4  A.  Up to a certain point, yes.
5  Q.  Up until the time you asked for a $21,000 raise and he
6       refused?
7            MR. MUNGO:  Objection, assuming facts not
8       in evidence.
9  A.  No.
10  BY MR. ACHO:
11  Q.  Did you ask for a $21,000 raise?
12  A.  No.
13  Q.  How much did you ask for?
14  A.  I asked for compensation for assuming an altogether
15       different set of responsibilities that required full
16       time and attention.
17  Q.  How much did you ask for?
18  A.  Comparable with other directors.
19  Q.  How much more money were you asking to be paid by the
20       City of Warren?
21            MR. MUNGO:  Objection, asked and answered.
22  A.  I asked to be compensated at the same rate as other
23       directors.
24  BY MR. ACHO:
25  Q.  I don't know what that is.  How much money would that

Page 145

1  have been for you?
2  A.  It varied, sir.
3  Q.  Give me a ballpark?
4  A.  It could have been as little as $7,000 and as much as
5       21.
6  Q.  Well, are you testifying under oath that you didn't
7       ask for $21,000?
8            MR. MARKO:  Objection, he answered that
9       question.
10  A.  I've answered that question.
11  BY MR. ACHO:
12  Q.  No, I want you to answer what I just asked you.
13  A.  Okay.  Ask me again.
14  Q.  Are you denying under oath you asked the mayor for a
15       $21,000 increase to your pay?
16            MR. MARKO:  Asked and answered.
17  A.  Yes.
18  BY MR. ACHO:
19  Q.  You're denying that?
20  A.  Yes.
21  Q.  So if people come forward and say I was there and he
22       wanted between 20 and 30,000 more and then he said
23       I'll take 21,000, you would say that's make believe?
24  A.  I would say they are lying.
25  Q.  By the way, how many times did you meet with Plaintiff

Page 146

1       DeSheila Howlett when you were employed by the City of
2       Warren?
3  A.  Never.
4  Q.  How many times did you speak with Plaintiff DeSheila
5       Howlett when you were employed by the City of Warren?
6            MR. MUNGO:  Objection, relevance.
7  A.  None.
8  BY MR. ACHO:
9  Q.  Did DeSheila Howlett ever make any complaints to you
10       about the City of Warren in any nature while you were
11       employed at the City of Warren?
12  A.  No.
13  Q.  How many times have you met with Plaintiff DeSheila
14       Howlett since you left the City of Warren?
15  A.  None.
16  Q.  How many times have you spoken with Plaintiff DeSheila
17       Howlett since you left your employment with the City
18       of Warren?
19  A.  None.
20  Q.  So you really didn't know her, did you?
21  A.  No.
22  Q.  You never met her, did you?
23  A.  That's correct.
24  Q.  So everything you know about her is hearsay?
25            MR. MARKO:  Objection, that's a legal



Pages 143 to 146

GREGORY MURRAY
February 26, 2018

Page 147

1    conclusion that he's not capable of answering.  If you
2    want to ask it in a different form then --
3        MR. ACHO:  He knows what hearsay is.
4    BY MR. ACHO:
5    Q.  You've been involved in court cases, haven't you?
6    A.  To some extent.
7    Q.  You know what hearsay is, don't you?
8        MR. MARKO:  All right.  Counsel --
9    BY MR. ACHO:
10   Q.  Do you know what hearsay is, yes or no?
11       MR. MUNGO:  You are badgering the witness.
12   A.  I am uncertain as to the definition.
13   BY MR. ACHO:
14   Q.  What's your -- what is your belief, because you've
15       been -- I went through your bio, you've got 20, 25
16       years dealing with litigation, complaints, all these
17       kinds of things, isn't that true?
18       MR. MARKO:  Well, objection to form, all
19       these kinds of things.  Counsel, I don't even know
20       what that means.
21       MR. MUNGO:  What's the relevance of that?
22       Objection, relevance, badgering the witness.
23   BY MR. ACHO:
24   Q.  Go ahead.
25   A.  Not from a legal perspective, no.

Page 148

1    Q.  You've never been involved in any legal matter,
2        whether it's a grievance, a charge, an EEOC charge,
3        you have not -- civil rights, you have not been
4        involved in those?
5    A.  Yes, I have.
6    Q.  Aren't those legal-type things, yes or no?
7    A.  I define them as advocacy.
8    Q.  Okay.  You've been involved in advocacy, correct?
9    A.  Yes.
10   Q.  And you know what hearsay is and you know what
11       personal knowledge is, correct, you do, don't you?
12       MR. MUNGO:  Objection, assuming facts not
13       in evidence.
14   A.  I know what -- you said knowledge -- would you
15       rephrase what you said?
16   BY MR. ACHO:
17   Q.  I'd be happy to.  You know what personal knowledge is,
18       don't you?
19   A.  Yes.
20   Q.  And you know what hearsay is, don't you?
21   A.  That I'm uncertain of.
22   Q.  Do you know the difference or are you sitting here
23       today -- and how many years have you been involved in
24       advocacy and all these things, how many years?
25   A.  Nearly 25 years.

Page 149

1    Q.  In 25 years, as you sit here today, you are telling
2        the court, I don't know what hearsay is?
3        MR. MUNGO:  Counsel, you are badgering this
4        witness.
5        MR. MARKO:  And it mischaracterizes the
6        testimony and judges can't even agree on the legal
7        definition of hearsay as it applies in different
8        contexts.
9        Do you understand the question?
10       THE WITNESS:  I don't understand the
11       question.
12   BY MR. ACHO:
13   Q.  Okay.  I will try to help you.
14       MR. MARKO:  Well, let's not be demeaning,
15       Counsel, because that's the way that I just took what
16       you said.
17       MR. ACHO:  Well, I'm sorry that you took it
18       that way.  I'm speaking respectfully to this man.
19       MR. MARKO:  I don't think so.
20       MR. MUNGO:  That is not true.  You have
21       been nasty from the very beginning.
22       MR. ACHO:  Have I been respectful?
23       MR. VINSON:  Respectful, of course.
24   BY MR. ACHO:
25   Q.  You said you know what personal knowledge is, correct?

Page 150

1    A.  Correct.
2    Q.  You have no personal knowledge about DeSheila Howlett,
3        do you?
4        MR. MARKO:  I'm going to object to form.
5        Go ahead, to the extent that you can.
6    A.  I know about the lawsuit.
7    BY MR. ACHO:
8    Q.  Sir --
9        MR. MARKO:  Let him finish.
10       MR. ACHO:  No.  No, we're go to stay on my
11       question, not yours.
12       MR. MARKO:  Hold on.  You get to ask the
13       questions but you have to take the answer.
14       MR. MUNGO:  You're badgering the witness.
15       MR. MARKO:  And you're talking over him.
16       Let him answer.
17   BY MR. ACHO:
18   Q.  Sir, let me help you.  Personal knowledge is when you
19       know something for a fact, that you're there or you've
20       seen something.  Do you understand that?
21   A.  Yes.
22   Q.  You did not see anything regarding DeSheila Howlett,
23       did you?
24   A.  No.
25       MR. MUNGO:  Objection, you are assuming



GREGORY MURRAY
February 26, 2018

Page 151

1  facts not in evidence.
2  BY MR. ACHO:
3  Q. You had no involvement with her, personally, her, did
4  you?
5  A. No.
6  Q. You never investigated any claims she made to you, did
7  you?
8  A. Yes.
9  Q. She -- I thought you told us under oath she never made
10  any claims to you? Either she made claims to you or
11  she didn't.
12      MR. MARKO: What's the question? Did she
13  make a claim to him?
14      MR. ACHO: Yes.
15      MR. MARKO: I'm now confused by your
16  question.
17      MR. ACHO: Do you want me to help you now?
18      MR. MARKO: Well, we might need you to.
19  BY MR. ACHO:
20  Q. Sir, didn't you tell us under oath 10 minutes ago --
21      MR. MARKO: The record speaks for itself,
22  Counsel.
23  BY MR. ACHO:
24  Q. Didn't you tell us 10 minutes ago under oath that
25  DeSheila Howlett never made a complaint to you?

Page 152

1  A. Yes.
2  Q. Okay. So you had no personal knowledge of what
3  happened to DeSheila Howlett where you were present or
4  you were involved?
5  A. I was involved to the extent that I had to investigate
6  and help determine a discipline for Ms. Beyer.
7  Q. Okay. Ms. Beyer. You were dealing with Ms. Beyer?
8  A. Yes.
9  Q. Okay. Now, just so we're clear, you're not talking
10  about DeSheila Howlett, you're talking about
11  investigating Ms. Beyer, correct?
12      MR. MUNGO: Objection, you're
13  mischaracterizing his testimony.
14  BY MR. ACHO:
15  Q. Did you hear my question?
16      MR. MARKO: Let him answer.
17  BY MR. ACHO:
18  Q. Did you hear my question?
19      MR. MARKO: Counsel, he's attempting to
20  answer.
21      MR. ACHO: Hold on. Repeat the question.
22      MR. MARKO: No. No. No, what's happening
23  is he's starting to answer your question and you're
24  cutting him off and you're inserting new questions so
25  he cannot give an answer.

Page 153

1      Go ahead.
2      MR. ACHO: Read the question back.
3      MR. MARKO: Go ahead.
4      MR. ACHO: This is my deposition. Read the
5  question back.
6      MR. MARKO: He's giving an answer. You
7  can't cut him off.
8      MR. ACHO: I want it read back.
9      MR. MARKO: Let her read it and you give
10  your answer.
11      (The following requested portion of the
12      record was read by the reporter at
13      3:18 p.m.:
14      Q. Okay. Now, just so we're clear, you're
15      not talking about DeSheila Howlett, you're
16      talking about investigating Ms. Beyer,
17      correct)
18      MR. MARKO: Go ahead, give an answer.
19  A. Ms. Beyer's behavior with Ms. Howlett.
20  BY MR. ACHO:
21  Q. Okay. I understand. But you didn't do the primary
22  investigation, that was done by others in the City of
23  Warren, not you, correct?
24  A. That's correct.
25  Q. You were just present during the discussions, correct?

Page 154

1  A. Yes, and tasked -- yes, and tasked with helping to
2  identify an appropriate discipline for Ms. Beyer based
3  on Ms. Howlett's representation of her.
4  Q. Okay. But you had no personal knowledge of
5  Ms. Howlett, you were just dealing with what you were
6  advised by other people, correct?
7  A. I was dealing with what was shared with me by other
8  people.
9  Q. Which is hearsay, isn't it, based upon your
10  experience?
11      MR. MARKO: Objection, that calls for a
12  legal conclusion.
13  BY MR. ACHO:
14  Q. Go ahead.
15  A. I was presented with information that Ms. Beyer had
16  admitted to using the N word in the presence of
17  DeSheila Howlett.
18  Q. Yeah. So you didn't really have to investigate that,
19  she admitted it, correct?
20  A. There's still some aspect that would need to be
21  investigated.
22  Q. She admitted it.
23      MR. MUNGO: Objection, argumentative.
24      MR. MARKO: There's no question there.
25      THE WITNESS: Okay.



GREGORY MURRAY
February 26, 2018

Page 155

1  BY MR. ACHO:
2  Q.  Okay.  Just so I'm clear, this individual who was
3      disciplined, who made the admission, and then it was
4      up to the City to decide what the discipline would be,
5      correct?
6  A.  Correct.
7  Q.  Did you recommend termination?
8  A.  No.
9  Q.  What discipline did you recommend?
10 A.  Two weeks unpaid suspension.
11 Q.  That's what you recommended?
12 A.  Yes.
13         MR. MARKO:  Asked and answered.
14 BY MR. ACHO:
15 Q.  What did the City do --
16 A.  Yes.
17 Q.  -- didn't they give her two weeks unpaid suspension,
18     yes or no?
19 A.  Eventually, yes.
20 Q.  Thank you.  Now, have you ever made a complaint to the
21     United States Department of Justice about any action,
22     activity or conduct by the City of Warren?
23 A.  No.
24 Q.  Have you ever made a complaint to the United States
25     Department of Justice about any action, activity or

Page 156

1      conduct by the City of Warren Mayor Fouts?
2  A.  No.
3  Q.  Have you ever made a complaint to the United States
4      Department of Justice about any action, activity or
5      conduct by the City of Warren's former police
6      commissioner, Green?
7  A.  No.
8  Q.  Have you ever made a complaint to the United States
9      Department of Justice about any action, activities or
10     conduct by any employee of the City of Warren?
11 A.  No.
12         MR. MARKO:  Objection to form and use of
13     the word complaint and calls for a legal conclusion.
14 BY MR. ACHO:
15 Q.  Have you ever contacted the United States Department
16     of Justice about any action, activity or conduct by
17     the City of Warren?
18 A.  No.
19 Q.  Have you ever contacted the United States Department
20     of Justice about any action, activity or conduct by
21     the City of Warren Mayor Fouts?
22 A.  No.
23 Q.  Have you ever contacted the United States Department
24     of Justice about any action, activities or conduct by
25     the City of Warren's former police commissioner,

Page 157

1      Green?
2  A.  No.
3  Q.  Have you ever contacted United States Department of
4      Justice about any action, activity or conduct by any
5      employee by the City of Warren?
6  A.  No.
7  Q.  Have you ever made a complaint to the United States
8      Equal Employment Opportunity Commission about any
9      action or activity or conduct by the City of Warren?
10 A.  No.
11 Q.  Have you ever made a complaint to United States Equal
12     Employment Opportunity Commission about any action,
13     activity or conduct by the City of Warren Mayor Fouts?
14 A.  I've never made no such complaint.
15 Q.  Have you ever made a complaint to the United States
16     Equal Employment Opportunity Commission about any
17     action, activity or conduct by the City of Warren's
18     former police commissioner, Green?
19 A.  I've made no such complaint.
20 Q.  Have you ever made a complaint to the United States
21     Equal Employment Opportunity Commission about any
22     action, activities or conduct by any employee of the
23     City of Warren?
24 A.  I've made no such complaint.
25 Q.  Have you ever contacted, even contacted, the United

Page 158

1      States Equal Employment Opportunity Commission about
2      any action, activities or conduct by the City of
3      Warren?
4  A.  Yes.
5  Q.  When?
6  A.  I would think it would be somewhere around, I believe,
7      the second week in August.
8  Q.  Of what year?
9  A.  Of 2017.
10 Q.  Okay.  Have you ever contacted the United States Equal
11     Employment Opportunity Commission about any action or
12     activity or conduct by the City of Warren Mayor Fouts?
13 A.  No.
14 Q.  Have you ever contacted the United States Equal
15     Opportunity Commission about any action, activities or
16     conduct by the City of Warren's former police
17     commissioner, Green?
18 A.  No.
19 Q.  Have you ever contacted the United States Equal
20     Employment Opportunity Commission about any action,
21     activity or conduct by any employee of the City of
22     Warren?
23 A.  Yes.
24 Q.  When?
25 A.  It would be that same time period.



GREGORY MURRAY
February 26, 2018

---

Page 159

1  Q.  Okay.  Have you ever made a complaint to the United
2     States Department of Labor about any action, activity
3     or conduct by the City of Warren?
4  A.  No.
5  Q.  Have you ever made a complaint to United States
6     Department of Labor about any action, activity or
7     conduct by the City of Warren Mayor Fouts?
8  A.  No.
9  Q.  Have you ever made a complaint to the United States
10    Department of Labor about any action, activity or
11    conduct by the City of Warren's former police
12    commissioner, Green?
13 A.  No.
14 Q.  Have you ever made a complaint to the United States
15    Department of Labor about any action, activity or
16    conduct by any employee of the City of Warren?
17 A.  No.
18 Q.  Have you ever contacted the United States Department
19    of Labor about any action, activity or conduct by the
20    City of Warren?
21 A.  No.
22 Q.  Have you ever contacted the United States Department
23    of Labor about any action, activity or conduct by the
24    City of Warren Mayor Fouts?
25 A.  No.

---

Page 160

1  Q.  Have you ever contacted the United States Department
2     of Labor about any action, activities or conduct by
3     the City of Warren's police commissioner, former
4     commissioner, Green?
5  A.  No.
6  Q.  Have you ever contacted the United States Department
7     of Labor about any action, activity or conduct by any
8     employee of the City of Warren?
9  A.  No.
10 Q.  Have you ever made a complaint to any federal elected
11    official or employee about any action, activity or
12    conduct by the City of Warren?
13 A.  I've made no such complaint.
14 Q.  Have you ever made a complaint to any federal elected
15    official, employee, about any action, activity or
16    conduct by the City of Warren Mayor Fouts?
17 A.  No.
18 Q.  Have you ever made a complaint to any federal elected
19    official or employee about any action, activity or
20    conduct by the City's former police commissioner,
21    Green?
22 A.  No.
23 Q.  Have you ever made a complaint to any federal elected
24    official or employee about any action, activity or
25    conduct by any employee by the City of Warren?

---

Page 161

1  A.  No.
2  Q.  Have you even contacted any federal elected official
3     or employee about any action, activity or conduct by
4     the City of Warren?
5  A.  Yes.
6  Q.  Who?
7  A.  Lolita Davis.
8  Q.  And when?
9  A.  During that same time period that I referenced
10    earlier, around the first or second week of August.
11 Q.  Okay.  Have you ever contacted any federal elected
12    official or employee about any action, activity or
13    conduct by the City of Warren Mayor Fouts?
14 A.  Yes.
15 Q.  When?
16 A.  That same time period.
17 Q.  Have you ever contacted any federal elected official
18    employee about any action, activity or conduct by the
19    City of Warren's former police commissioner, Green?
20 A.  No.
21 Q.  Have you ever contacted any federal elected official,
22    employee, about any action, activity or conduct by any
23    employee of the City of Warren?
24 A.  Would you repeat that question again, please?
25 Q.  Sure.  Have you ever contacted any federal elected

---

Page 162

1     official or employee about any action, activity or
2     conduct by any employee of the City of Warren?
3  A.  If you consider the mayor an employee, yes, that same
4     time period.
5  Q.  So you only made one complaint, is that right, just
6     one or is it more than one?
7        MR. MARKO:  To the people that you've
8     enumerated?
9  BY MR. ACHO:
10 Q.  Just answer my question.
11       You can ask him later.
12       MR. MARKO:  Objection, vague, ambiguous and
13    objection to form.
14 A.  Complaint, as in formal complaint?
15 BY MR. ACHO:
16 Q.  Yes, you didn't do any?
17 A.  I've not filed any formal complaints.
18 Q.  Ever?
19 A.  Ever.
20 Q.  Against --
21 A.  Anyone.
22 Q.  -- the City of Warren?
23 A.  That's correct, but any of the agencies that you --
24 Q.  Okay.  We have more.  Have you ever made a complaint
25    to any federal agency about any action, activity or

---



GREGORY MURRAY
February 26, 2018

**Page 163**

1 conduct by the City of Warren, any federal agency?
2 MR. MARKO: Other than he's already
3 testified to? Objection.
4 A. I shared that with you. I have in certain instances.
5 BY MR. ACHO:
6 Q. But no complaints you've said?
7 A. Yes.
8 Q. No complaints?
9 A. Correct.
10 Q. We'll have more and then we'll get back to that.
11 Okay. So you've never made any formal complaints
12 about Warren's Mayor Fouts, have you --
13 A. That's correct.
14 Q. -- or of former Police Commissioner Green, you've
15 never made any formal complaints --
16 A. That's correct.
17 Q. -- while you were at the City of Warren or since,
18 correct?
19 A. That's correct.
20 Q. Okay. Have you even contacted any federal agency
21 about the City of Warren?
22 A. During my --
23 Q. Employment?
24 A. Yes.
25 Q. In August?

**Page 164**

1 A. Yes.
2 Q. And who was it you contacted?
3 A. Lolita Davis.
4 Q. From where?
5 A. EEOC.
6 Q. And was this dealing with racial discrimination or no?
7 Was it racial or no?
8 A. No.
9 Q. So I'm going to ask you a lot more questions. I just
10 want to make sure I understand, you have never made
11 any formal complaint to any federal agencies about
12 Mayor Fouts, any employee of the City of Warren,
13 including Green, about racial discrimination, correct?
14 A. That's correct.
15 Q. And no complaints about anything at all, you've only
16 made a contact, you never made a formal complaint to
17 any federal agency, correct?
18 MR. MUNGO: Objection.
19 MR. MARKO: Objection to form.
20 BY MR. ACHO:
21 Q. Is that correct?
22 A. Yes.
23 Q. Now. Let's go to the State level. I'll ask you the
24 same questions of the various State agencies, okay --
25 A. Okay.

**Page 165**

1 Q. -- so you'll see where I'm going.
2 A. Uh-huh.
3 Q. You have to say yes.
4 A. Yes.
5 Q. Have you ever made a complaint to the Michigan
6 Attorney General about any action, activity or the
7 conduct by the City of Warren?
8 A. No.
9 Q. Have you ever made a complaint to the Michigan
10 Attorney General about any action, activity or conduct
11 by the City of Warren Mayor Fouts?
12 A. No.
13 Q. Have you ever made a complaint to the Michigan
14 Attorney General about any action, activity or conduct
15 by the City of Warren's former police commissioner,
16 Green?
17 A. No.
18 Q. Have you ever made a complaint to the Michigan
19 Attorney General about any action, activity or conduct
20 by any employee of the City of Warren?
21 A. No.
22 Q. Have you even contacted the Michigan Attorney General
23 about any action, activity or conduct by the City of
24 Warren?
25 A. No.

**Page 166**

1 Q. Have you even contacted the Michigan Attorney General
2 about any action, activity or conduct by the City of
3 Warren Mayor Fouts?
4 A. No.
5 Q. Have you even contacted the Michigan Attorney General
6 about any action, activity or conduct by the City of
7 Warren's former police commissioner, Green?
8 A. No.
9 Q. Have you ever contacted the Michigan Attorney General
10 about any action, activity or conduct by any employee
11 of the City of Warren?
12 A. No.
13 Q. Have you ever made a complaint to the Michigan
14 Department of Civil Rights about any action, activity
15 or conduct of the City of Warren?
16 A. No.
17 Q. Have you ever made a complaint to the Michigan
18 Department of Civil Rights about any action, activity
19 or conduct by the City of Warren Mayor Fouts?
20 A. No.
21 Q. Have you ever made a complaint to the Michigan
22 Department of Civil Rights about any action, activity
23 or conduct by the City of Warren's former police
24 commissioner, Green?
25 A. No.



GREGORY MURRAY
February 26, 2018

Page 167

1   Q. Have you ever made a complaint to the Michigan
2      Department of Civil Rights about any action, activity
3      or conduct by any employee of the City of Warren?
4   A. No.
5   Q. Have you even contacted the Michigan Department of
6      Civil Rights about any action, activity or conduct by
7      the City of Warren?
8   A. Yes.
9   Q. When?
10  A. That same time period, that same time period of
11     August, it was like --
12  Q. And you contacted this Lolita?
13  A. No, that would have been another -- Anthony Lewis.
14  Q. Okay.  And this was not racial discrimination,
15     correct?
16  A. No.
17  Q. What discrimination or what was it, what was the
18     claim, just the basis of the claim?
19  A. I'm sorry, you asked if I contacted them and I did
20     contact them to facilitate a training.
21  Q. Oh, for training?
22  A. To facilitate setting up a training.
23  Q. Let's change the question.  Have you ever contacted
24     the Michigan Department of Civil Rights about any
25     improper action, activity or conduct by the City of

Page 168

1      Warren?
2   A. No.
3   Q. Have you even contacted the Michigan Department of
4      Civil Rights about any improper action or activity or
5      conduct by the City of Warren Mayor Fouts?
6   A. No.
7   Q. Have you even contacted the Michigan Department of
8      Civil Rights about any improper action, activity or
9      conduct by the City of Warren's former police
10     commissioner, Green?
11  A. No.
12  Q. Have you even contacted the Michigan Department of
13     Civil Rights about any improper action, activity or
14     conduct by any employee of the City of Warren?
15  A. No.
16  Q. Have you ever made a complaint to the Michigan
17     Department of Labor about any action, activity or
18     conduct by the City of Warren?
19  A. No.
20  Q. Have you ever made a complaint to the Michigan
21     Department of Labor about any action, activity or
22     conduct on the part of the City of Warren Mayor Fouts?
23  A. No.
24  Q. Have you ever made a complaint to the Michigan
25     Department of Labor about any action, activity or

Page 169

1      conduct by the former police commissioner of Warren,
2      Green?
3   A. No.
4   Q. Have you ever made a complaint to the Michigan
5      Department of Labor about any action, activity or
6      conduct by any employee of City of Warren?
7   A. No.
8   Q. Have you ever contacted, even contacted, the Michigan
9      Department of Labor about any action, activity or
10     conduct by the City of Warren?
11  A. No.
12  Q. Have you even contacted the Michigan Department of
13     Labor about any action, activity or conduct about the
14     City of Warren Mayor Fouts?
15  A. No.
16  Q. Have you even contacted the Michigan Department of
17     Labor about any action, activity or conduct by the
18     City of Warren's police commissioner, Green?
19  A. No.
20  Q. Have you even contacted the Michigan Department of
21     Labor about any action, activity or conduct by any
22     employee of the City of Warren?
23  A. No.
24  Q. Okay.  Have you ever made a complaint to any elected
25     official of the State of Michigan or an employee about

Page 170

1      any action or activity or conduct of the City of
2      Warren?
3   A. No.
4   Q. Have you ever made a complaint to any elected official
5      of the State of Michigan or an employee about any
6      actions, activity or conduct by the City of Warren
7      Mayor Fouts?
8   A. No.
9   Q. Have you ever made a complaint to any State of
10     Michigan elected official or employee about any
11     action, activity or conduct on the part of the former
12     police commissioner, Green?
13  A. No.
14  Q. Have you ever made a complaint to any State of
15     Michigan elected official or employee about any
16     action, activity or conduct by any employee of the
17     City of Warren?
18  A. No.
19  Q. Have you ever contacted any State of Michigan
20     official, elected, or employee, about any action,
21     activity or conduct by the City of Warren?
22  A. No.
23  Q. Have you even contacted any Michigan state elected
24     official, employee, about any action, activity or
25     conduct by the City of Warren Mayor Fouts?



GREGORY MURRAY
February 26, 2018

Page 171

1    A. No.
2    Q. Have you ever contacted any Michigan elected official,
3       employee, about any action, activity or conduct by the
4       City of Warren's former police commissioner, Green?
5    A. No.
6    Q. Have you even contacted the Michigan -- any Michigan
7       elected official or any employee about any action,
8       activity or conduct by any employee of the City of
9       Warren?
10   A. No.
11   Q. Have you ever made a complaint to the Warren Police
12      and Fire Civil Service Commission about any action,
13      activity or conduct by the City of Warren?
14   A. No.
15   Q. Have you ever made a complaint to the Warren Police,
16      Fire and Civil Service Commission about any action,
17      activity or conduct by the City of Warren Mayor Fouts?
18   A. No.
19   Q. Have you ever made a complaint to the Warren Police,
20      Fire and Civil Service Commission about any action,
21      activity or conduct by the City's former police
22      commissioner, Green?
23   A. No.
24   Q. Have you ever made a complaint to the Warren Police,
25      Fire and Civil Service Commission about any action or

Page 172

1       activity or conduct by any employee of the City of
2       Warren?
3    A. No.
4    Q. So you've never filed any complaints with anybody, not
5       a -- any federal agency, no State agency, no federal
6       elected officials, no federal employees, no State
7       elected employees, no State elected officials, no
8       State employees, about the City of Warren Mayor Fouts,
9       former commissioner, Green, or any employee of the
10      City of Warren?
11          MR. MARKO: Objection to form, compound,
12   ambiguous.
13          Did you understand the question?
14          MR. MUNGO: And also it mischaracterizes
15   his testimony. The deponent has clearly said --
16          MR. ACHO: Okay. Here we go. Here we go.
17   Put this on the record. What he's trying to do is tip
18   off the witness. Let's save time and --
19          MR. MUNGO: Sir. Sir, in his previous
20   sitting in this deposition he clearly said that he
21   went to Mayor Fouts --
22          MR. ACHO: Okay. You know what --
23          MR. MUNGO: -- to complain --
24          MR. ACHO: That's not my question. You
25   know what --

Page 173

1           MR. MUNGO: It assumes facts not in
2    evidence. You're mischaracterizing his testimony,
3    sir.
4    BY MR. ACHO:
5    Q. We know what you said. All right. We know what you
6       said. Do you know what you said?
7    A. Yes.
8    Q. You've never filed any complaints, did you?
9    A. Not with any federal, State --
10          MR. MARKO: Let him answer and not --
11   A. Not any federal agency, representative of any federal
12      agency, nor with the State, nor with the Michigan
13      Department of Civil Rights, nor with the EEOC, I've
14      never filed any formal complaints with any of those
15      agencies about any activities with the City of Warren.
16   BY MR. ACHO:
17   Q. Now, the only thing you did is on one of them you
18      contacted them, is all you said?
19          MR. MARKO: Objection, that
20   mischaracterizes his testimony.
21   BY MR. ACHO:
22   Q. Go ahead. Correct me if I'm wrong, you contacted, not
23      complained, you contacted the EEOC in August of 2017?
24   A. Yes.
25   Q. Okay. Tell us about that.

Page 174

1    A. I contacted them to apologize for the behavior of the
2       mayor at the EEOC training where, in a disparaging
3       way, he mocked persons with Tourette's syndrome.
4    Q. That's it, that's all your involvement in federal or
5       State agencies or the Civil Service Commission, that's
6       it, correct?
7    A. From a complaint standpoint, yes, sir.
8    Q. Or even contact, because this was not a complaint, you
9       said this was a contact, correct?
10          MR. MARKO: Objection, that
11   mischaracterizes his testimony.
12          MR. ACHO: We got it.
13          MR. MARKO: You said formal complaint.
14   A. I contacted --
15   BY MR. ACHO:
16   Q. You told us --
17          MR. MARKO: Let him answer.
18   A. I contacted the agency to set up training for the
19      City.
20   BY MR. ACHO:
21   Q. Thank you. All right. We're good. Now, I just want
22      to understand something, you told us you're not a shy
23      person so you speak up when you see anything, right?
24          MR. MARKO: That's asked and answered.
25   BY MR. ACHO:



GREGORY MURRAY
February 26, 2018

Page 175

1   Q. True?
2   A. Within discretion, yes.
3   Q. Well, I guess I'm just kind of puzzled about
4      something. You and the mayor spoke almost daily when
5      you came in, right?
6   A. Yes.
7   Q. You spoke daily, you could tell him whatever you
8      wanted, couldn't you?
9          MR. MARKO: Objection to form.
10  A. Yes, I was honest with him.
11         MR. ACHO: Read the question back to the
12     witness. I don't think he understood it.
13  A. I didn't understand the context.
14         MR. ACHO: Okay. Read it back to him.
15         (The following requested portion of the
16         record was read by the reporter at
17         3:40 p.m.:
18         Q. You spoke daily, you could tell him
19         whatever you wanted, couldn't you?)
20  A. No.
21  BY MR. ACHO:
22  Q. You couldn't speak your mind to him, yes or no? Yes
23     or no?
24         MR. MARKO: No. No. No. No.
25         MR. MUNGO: You're badgering the witness.

Page 176

1          MR. MARKO: You don't have to -- you had
2      answered the question fully and completely and
3      truthfully. Don't let him dictate what your answers
4      are, okay?
5          THE WITNESS: Okay.
6          MR. ACHO: But I will get my answer to my
7      question.
8          MR. MARKO: Maybe not to your liking.
9          MR. MUNGO: Wait a minute. Mr. Acho, I
10     object. You are attempting to intimidate and badger
11     this witness, sir, and your tone is clearly reflective
12     of that.
13         MR. ACHO: You're raising your voice.
14         MR. MUNGO: Well, I am expressing outrage
15     at what you're trying to do to this witness. You have
16     to stop doing that, sir. You cannot do that.
17         Mr. Murray, I'd speak up if you feel you're
18     being demeaned by this man.
19         MR. MARKO: I concur.
20         MR. ACHO: Hold on. He's not an attorney.
21         MR. MARKO: I concur with Mr. Mungo's
22     characterization.
23         MR. ACHO: Oh, you do? How come you didn't
24     say anything?
25         MR. MARKO: I've been objecting the whole

Page 177

1      time.
2          MR. ACHO: How many objections so far in
3      the first hour?
4          LIEUTENANT BRADLEY: There's been several.
5          MR. MARKO: They're not allowed to
6      participate in this deposition. They can sit there
7      and watch pursuant to Judge Berg's order, but you're
8      not going to be asking them questions on the record
9      and you're not going to have them participating in any
10     manner or form.
11  BY MR. ACHO:
12  Q. Let me ask you something, didn't you tell the mayor, I
13     enjoy working with you?
14         MR. MARKO: Asked and answered.
15  A. Yes.
16  BY MR. ACHO:
17  Q. You did?
18  A. Yes.
19  Q. And you could speak freely with the mayor, you could
20     tell him what you thought, what you thought?
21  A. You can't just pop off with a spontaneous response.
22     I'm a little bit more deliberate in how I approach
23     responding to people in front of me.
24  Q. I'm not talking about responding. I didn't ask you
25     about responding. I said you could speak your mind to

Page 178

1      the mayor, you could tell him what you thought, right?
2   A. Speaking my mind, to me -- or maybe I need to get your
3      definition of candid, speaking my mind and candid, how
4      does that differ?
5   Q. Same thing.
6          MR. MARKO: Don't --
7   BY MR. ACHO:
8   Q. It's the same thing, sir. Do you understand my
9      question now?
10         MR. MARKO: Objection to form and --
11  BY MR. ACHO:
12  Q. Can you answer it now or do you need help?
13  A. I could not spontaneously speak to the mayor without
14     some degree of forethought.
15  Q. Well, you knew you were going to see the mayor almost
16     every day, right?
17  A. No.
18  Q. Most days, frequently?
19  A. No.
20  Q. How often did you see the mayor during the week?
21  A. Quite often.
22  Q. How many times during the week did you see him?
23  A. Three or four times a week.
24  Q. So if you're going to see him three to four times a
25     week, you could think about what you wanted to say to


US LEGAL SUPPORT
The Power of Commitment™

GREGORY MURRAY
February 26, 2018

Page 179

1  him the next time you saw him, couldn't you?
2      MR. MARKO:  Objection
3  A.  No.
4      MR. MARKO:  Objection, form and vague and,
5  you know, Counsel, this demeaning and disrespectful
6  behavior has got to stop, this is crazy, sir.
7      MR. ACHO:  Sir, what you said,
8  respectfully, is incredulous.  I asked him a simple
9  question.
10      Read the witness back the question and I
11  want to see how it is that --
12      MR. MARKO:  I have a problem with your
13  disrespectful and demeaning behavior during the
14  deposition, that's what I was --
15      MR. ACHO:  And I don't like --
16      MR. MARKO:  It's your choice of words.
17      MR. ACHO:  Mr. Vinson, how do you feel?
18      MR. VINSON:  I think you are proceeding
19  with the cross examination.
20      MR. ACHO:  Read the question back, please,
21  to the witness.
22      (The following requested portion of the
23      record was read by the reporter at
24      3:44 p.m.:
25      Q.  So if you're going to see him three to

Page 180

1  four times a week, you could think about
2  what you wanted to say to him the next time
3  you saw him, couldn't you?)
4  A.  Possibly, yes.
5  BY MR. ACHO:
6  Q.  Why do you say possibly?
7  A.  Because you never know what the mayor is going to say
8  and usually the conversations are predominantly one
9  way, the mayor speaking and you receiving.
10  Q.  But you could have prepared a memorandum of what you
11  wanted to talk to the mayor about and give it to him,
12  couldn't you?
13  A.  Yes, I did do that.
14  Q.  When you were resigning, correct?
15  A.  All throughout my tenure there.
16  Q.  All right.  Just so I'm clear, so you have given the
17  mayor quite a few memorandums?
18  A.  Yes.
19  Q.  Okay.  So we are clear, you were free to express
20  anything you wanted to the mayor about what you
21  observed or your beliefs or your feelings, correct?
22  A.  After forethought, yes.
23  Q.  So in the 11 months that you were there, okay,
24  you had every opportunity to describe any areas that
25  you believe were discriminatory in the City of Warren,

Page 181

1  you could have put it in a memo but you did not,
2  correct?
3      MR. MARKO:  Objection to the form of the
4  question.
5  BY MR. ACHO:
6  Q.  Is that true?
7  A.  That's so broad, the circumstance would be so broad
8  and so, no, I -- once it took me three weeks to talk
9  to him about a particular subject.
10  Q.  I didn't ask you that, that's not my question.  My
11  question is real simple.  You said you talked to the
12  mayor about three to four times a week, correct?
13  A.  Yes.
14  Q.  And I asked you whether you could express your
15  feelings, your beliefs, your impressions, to him.  Do
16  you remember that?
17  A.  Yes.
18  Q.  And you said, well, sometimes I need to collect my
19  thoughts, words to that effect, correct?
20  A.  Yes.
21  Q.  So I said, well, you could put it in writing and you
22  said, I have done that?
23  A.  Yes.
24  Q.  Okay.  Now, out of all the memos that I have seen, I
25  did not see one memorandum before your date, memo of

Page 182

1  resignation --
2  A.  Uh-huh.
3  Q.  -- that said there was racial discrimination in the
4  City of Warren, I didn't see one memo.
5      MR. MARKO:  Objection, there's no question.
6  BY MR. ACHO:
7  Q.  You didn't write one, did you, before your letter of
8  resignation, true?
9  A.  True.
10  Q.  Now, and you said DeSheila Howlett, she has no case,
11  you told that to five people, all she's trying to do
12  is get some money, she has no case.  You are not
13  denying under oath that you said that, are you?
14  A.  I did not say all of what you said.
15  Q.  We'll break it up.  You said to multiple people, I
16  counted like six, maybe there's more, DeSheila
17  Howlett, she has no case.  You have said that to
18  multiple people, correct?
19  A.  Yes.
20  Q.  Okay.  Now, you also said she is just trying to get a
21  payday?
22  A.  That's not correct.
23  Q.  Okay.  Now, we've established that you had no personal
24  knowledge about DeSheila Howlett, correct?
25  A.  Other than reading in a report the complaint and



GREGORY MURRAY
February 26, 2018

Page 183

1    responding to information given to me by other city
2    officials.
3    Q.  And after you did that you told them she has no case,
4    correct?
5    A.  Yes.
6    Q.  Okay.  Now, aren't employees supposed to follow the
7    rules?
8    A.  Yes.
9    Q.  Is it important for employees to follow the rules of
10   their employer?
11   A.  Yes.
12   Q.  And doesn't the City of Warren have a right to expect
13   their employees to follow the rules?  Yes or no?
14   A.  I can't give an answer.
15            MR. MARKO:  Objection.
16   BY MR. ACHO:
17   Q.  Okay.  So you are saying, I don't know whether the
18   City of Warren has a right to expect their employees
19   to follow the rules they set?
20            MR. MARKO:  Objection, that
21   mischaracterizes the testimony.
22            Go ahead.
23   A.  Some rules are inappropriately applied and, as such,
24   they should not be followed.
25   BY MR. ACHO:

Page 184

1    Q.  I didn't ask you about the application, you didn't
2    hear that word in my question, did you?
3    A.  It was in my answer.
4    Q.  Did you hear it in my question?
5    A.  In order for me to answer your question I had to use
6    the words that I did.
7    Q.  You're saying how the rules are applied.  I'm talking
8    about rules that a city sets, a city has a right to
9    set rules, correct?
10   A.  Yes.
11   Q.  The City of Warren has a right to set rules, correct?
12   A.  To the extent they were not discriminatory, et cetera.
13   Q.  Okay.  Identify one rule where the City's rule in
14   Warren was discriminatory, give me one rule that you
15   can identify?
16   A.  In terms of the application of the rule --
17   Q.  I didn't ask you about --
18            MR. MARKO:  Go ahead.  Answer the question.
19   A.  You can have a rule and it can be applied in such a
20   way where discrimination occurs, it's called disparate
21   impact, it's disparate impact where you can have rules
22   that on their face do not appear to be discriminatory
23   but can have a disparate impact.
24   BY MR. ACHO:
25   Q.  Identify any rule of the City of Warren that you put

Page 185

1    in a memorandum that said this rule has to be changed
2    because it has disparate impact, you identified one
3    rule?
4    A.  I did not.
5    Q.  And you were there 11 months?
6    A.  Yes.
7    Q.  And you -- by the way, am I wrong, I read something
8    where within the first two months of your hire you
9    wanted a raise?
10   A.  That's not correct.
11   Q.  You didn't go to the mayor within the first two months
12   and say I want $5,000 more?
13   A.  No, sir, the mayor offered me a raise and put it in
14   writing himself.
15   Q.  Within the first two months?
16   A.  Yes, sir.
17   Q.  Did you take it?
18   A.  No, sir.
19   Q.  You declined it?
20   A.  It was never put into affect.
21   Q.  Okay.  So you're saying the mayor of Warren just said
22   I'm going to give you $5,000 more and didn't do it?
23   A.  I don't know anything about $5,000.
24   Q.  Well, how much?
25   A.  I don't know.  I don't recall.  It may have been -- it

Page 186

1    was substantially less than that but I don't recall
2    and I never asked the mayor, the mayor offered it to
3    me.
4    Q.  Now, you've just puzzled me by something, I read
5    something, and bear with me -- do you remember how
6    much more money more you wanted in October and
7    November of 2017?
8    A.  I wanted my compensation to be commensurate with --
9            MR. MARKO:  Asked and answered.
10   BY MR. ACHO:
11   Q.  I didn't get the number.
12            MR. MARKO:  You wrote it down, Counsel, and
13   I saw it.
14   BY MR. ACHO:
15   Q.  I didn't get the number so can you help me with that?
16            MR. MARKO:  Asked and answered.
17   BY MR. ACHO:
18   Q.  How much money did you want before you would revoke
19   your resignation?
20   A.  I asked to be made commensurate with the other
21   directors within the City government.
22   Q.  I'm looking for a number.
23            MR. MARKO:  Asked and answered.
24            MR. MUNGO:  That's been asked and answered
25   some while back.



Pages 183 to 186

GREGORY MURRAY
February 26, 2018

Page 187

1   BY MR. ACHO:
2   Q.  You must know how much money you wanted, didn't you,
3       or are you telling us under oath, I didn't know how
4       much I wanted?
5           MR. MARKO:  Objection, that
6       mischaracterizes his testimony and it's been asked and
7       answered.
8           MR. MUNGO:  And argumentative.
9   BY MR. ACHO:
10  Q.  I want you to answer.
11  A.  I had no idea how much the mayor might determine my
12      job responsibilities to be and I asked that it be made
13      commensurate with other directors on the City's
14      payroll.
15  Q.  How much were the other directors making?
16  A.  Anywhere from 75 and up.
17  Q.  So if I am to understand you correctly, if the mayor
18      would have agreed to give you $4,000 more you would
19      have stayed at the City?
20  A.  No, sir.
21  Q.  If the mayor offered you $10,000 more would you have
22      stayed at the City?
23  A.  No, sir.
24  Q.  If the mayor offered you 20,000 would you have stayed
25      at the City?

Page 188

1   A.  No, sir.
2   Q.  If the mayor offered you 25,000 would you have stayed
3       at the City?
4   A.  No, sir, because there were other things associated
5       with it.  You will read in my resignation letter that
6       I asked the mayor to provide the appropriate staffing
7       and resources so it was never about -- never about the
8       money, it was about --
9           MR. MARKO:  Counsel, you're laughing and
10      that's so inappropriate.
11          MR. ACHO:  I'm covering my mouth.  I'm not
12      laughing.  No, I don't think it's funny.
13  BY MR. ACHO:
14  Q.  You're saying it was never about the money?
15  A.  That's correct.
16  Q.  So if witnesses come forward and say that is exactly
17      what you said --
18  A.  They would be lying and I expect them to lie because
19      they're City employees.  Why would they -- why would
20      they refute whatever the mayor's position is?
21  Q.  Okay.  By the way --
22  A.  It doesn't make sense.
23  Q.  You were brought in as a diversity coordinator?
24  A.  Yes.
25  Q.  Does any other city in Michigan have a diversity

Page 189

1       coordinator that you're aware of?
2   A.  Yes.
3   Q.  Where?
4   A.  Grand Rapids.
5   Q.  Okay.  Is there any in the Detroit region that has a
6       diversity coordinator?
7   A.  Not that I'm aware of.
8   Q.  Just so I'm clear, the City of Warren hires you to be
9       the diversity coordinator for them, correct --
10  A.  Yes.
11  Q.  -- to attract minorities, right?
12  A.  As one element.
13  Q.  Sure.  Please give me the names of all of the
14      minorities you referred to the City of Warren Police
15      Department, how many, give me their names?
16  A.  I can't possibly answer that question, sir, because I
17      spoke with people all through my employment period, on
18      the street, elsewhere.  I cannot give you names.
19  Q.  Listen to me, please.
20  A.  You asked --
21  Q.  This is very specific.  You referred no minority
22      person to the City of Warren Police Department while
23      you were employed there for 11 months, correct?
24          MR. MARKO:  That mischaracterizes his
25      testimony.

Page 190

1   A.  No.
2   BY MR. ACHO:
3   Q.  You can't think of one person, one person's name, that
4       you referred to the City of Warren Police Department?
5   A.  That's correct.
6   Q.  Okay.  How many people -- how many people do you
7       believe you referred that were minorities?
8   A.  I would speak to people.
9   Q.  That's not my question.
10  A.  That's a referral.
11  Q.  Reread the question.  Sir, do you know what referral
12      means?
13  A.  Yes.
14  Q.  What?
15  A.  You talk to someone and encourage them to go and to
16      apply for a position.
17  Q.  No.  No, sir, that's not what I mean by referral.  Let
18      me give you --
19          MR. MARKO:  Explain to him what you mean
20      when you ask a question that's vague.
21  BY MR. ACHO:
22  Q.  A referral is when you get a person's name and you
23      submit it to the City of Warren Police Department or
24      the Police and Fire Civil Service Commission, you
25      didn't give the Police and Fire Civil Service



GREGORY MURRAY
February 26, 2018

Page 191

1    Commission even one minority name, did you?
2        MR. MUNGO:  Objection, assuming a fact
3    that's not in evidence.
4    A.  That is not the protocol for -- for -- that is not the
5    protocol for that.
6    BY MR. ACHO:
7    Q.  I didn't ask you about the protocol.  I asked you, did
8    you give the Police and Fire Civil Service Commission
9    the names of any candidates who were minorities for
10   the police department, yes or no?
11       MR. MARKO:  Objection.
12   A.  I'm not allowed to do that because of the civil
13   service process.
14   BY MR. ACHO:
15   Q.  Okay.  So how many people did you refer, using your
16   words, to the Police and Fire Civil Service
17   Commission, for the police department, how many?
18   A.  I spoke to people to encourage them to apply for the
19   police and fire department.
20   Q.  I'm only talking about the police.
21   A.  To the police department?
22   Q.  How many applied?
23   A.  I have no idea.
24   Q.  Because you didn't know, because you did no follow up,
25   did you?  Did you call these people up and ask them,

Page 192

1    hey, did you apply?  Did you do any follow up, yes or
2    no?
3    A.  No.  No.
4    Q.  Okay.  You could have followed up with them, couldn't
5    you --
6    A.  Yes.
7    Q.  -- but you chose not to?
8    A.  I did not.
9    Q.  Okay.  So you don't know whether any people even
10   applied to the police department because of your
11   efforts as diversity coordinator?
12   A.  I did not know because it would have been
13   inappropriate for me to ask the human resource
14   department to give me the names of applicants.
15   Q.  But you could have called the applicants because you
16   spoke to them --
17   A.  True.
18   Q.  -- but you didn't?
19   A.  That's true.
20   Q.  And you didn't facilitate them, you could have said,
21   hey, I'll try to help you, you could have tried to
22   help them?
23   A.  No, sir.
24   Q.  You couldn't have helped them?
25   A.  That would have been inappropriate.  There are civil

Page 193

1    service guidelines that have to be adhered to.  I
2    can't interfere on behalf of an applicant with either
3    the civil service commission, the police and fire
4    commission or the human resources department itself --
5    Q.  Have you ever read --
6    A.  -- it's called cronyism.
7    Q.  Have you ever read the City of Warren's Civil Service
8    Commission Police and Fire Department's rules and
9    regulations?  Have you ever read this?
10   A.  I've given it a cursory review, yes.
11   Q.  So you've not read the full document?
12   A.  Yes.
13   Q.  You don't know, as you sit here, even though you've
14   been in the city for 11 months, you don't know there's
15   a prohibition from assisting applicants to make
16   application, do you, you're not aware of it, are you,
17   as you sit here today?
18   A.  Of a prohibition?
19   Q.  Yes.
20   A.  Yes, it's called cronyism.
21   Q.  So the civil service commission referrals would be
22   cronyism, is that what you're saying?
23   A.  No, you asked me follow up, which means get involved
24   in that person's potential hiring, which is -- which
25   is inappropriate.

Page 194

1    Q.  Sir, I didn't ask you to get involved in their hiring
2    but assisting them in making application.  You did not
3    assist them in making the application to try to boost
4    the number of minorities in the police department, did
5    you?
6        MR. MARKO:  That's been asked and answered.
7    BY MR. ACHO:
8    Q.  You didn't, did you?
9    A.  I have encouraged people to apply.
10   Q.  That's not my -- read the question back to the
11   witness.
12       (The following requested portion of the
13       record was read by the reporter at
14       4:00 p.m.:
15       Q.  Sir, I didn't ask you to get involved
16       in their hiring but assisting them in
17       making application.  You did not assist
18       them in making the application to try to
19       boost the number of minorities in the
20       police department, did you?)
21   A.  I encouraged the applicants, I encouraged them to
22   apply.
23   BY MR. ACHO:
24   Q.  But that's all you did?
25   A.  Yes, sir.



GREGORY MURRAY
February 26, 2018

Page 195

1  Q. You did no follow up, did you?
2  A. Yes, sir.
3  Q. You did no facilitation, did you?
4  A. Yes, sir.
5  Q. You did nothing else other than encouraging them,
6     that's all you did?
7  A. That's correct.
8           (Mr. Vinson left the deposition room at
9           4:01 p.m.)
10 BY MR. ACHO:
11 Q. Have any minorities been hired while you were there?
12 A. One person.
13 Q. In the police department?
14 A. Yes.
15 Q. You had nothing to do with that, did you?
16 A. Correct.
17 Q. So the City of Warren hired a minority applicant --
18 A. Yes.
19 Q. -- with no involvement by you?
20 A. That's correct.
21 Q. Okay. Now, you don't have any proof that the City of
22    Warren would not have hired someone because they're
23    African-American, correct, you have no proof of that?
24 A. No.
25 Q. Isn't it true that it is hard to get minorities to

Page 196

1     apply for police department positions?
2  A. Yes.
3  Q. How do you know that?
4  A. I know that from attending ALPAC (phonetic) meetings
5     where other police departments from across the state
6     express the same difficulty.
7  Q. As the City of Warren, correct?
8  A. Yes.
9  Q. And the City of Warren hired you to help change that,
10    didn't they?
11 A. That's correct.
12 Q. And the mayor said to you, I want you to get more
13    minorities in our police department, he told you that
14    when he hired you, right?
15 A. Yes.
16 Q. And he paid you, what, $70,000?
17 A. 71.
18 Q. 71,000?
19 A. Uh-huh.
20 Q. What were you making previous to that?
21 A. My last place of employment, about 58.
22 Q. Weren't you making about $18 an hour?
23 A. I'm speaking of --
24 Q. Your previous position?
25 A. Yes.

Page 197

1  Q. The City of Warren hired you for $71,000 --
2  A. Yes.
3  Q. -- and in your last employment you were making $18 an
4     hour, correct?
5  A. Yes, I was retired and working part time.
6  Q. But you were working for $18 an hour?
7  A. Part time, yes.
8  Q. Okay. The Warren Police and Fire Civil Service
9     Commission, how many times have you met with them?
10 A. None.
11 Q. None?
12 A. None, I wasn't prepared to meet with them.
13          (Mr. Vinson entered the deposition room at
14          4:03 p.m.)
15 Q. You were -- we have to take 20 seconds.
16          (Off the record at 4:03 p.m.)
17          (Back on the record at 4:04 p.m.)
18 BY MR. ACHO:
19 Q. You worked for the City of Warren for 11 months --
20 A. Yes.
21 Q. -- as a diversity coordinator?
22 A. Yes.
23 Q. And the hiring in the police is not by Mayor Fouts, is
24    it?
25 A. No.

Page 198

1  Q. He has nothing to do with that, does he?
2  A. I can't answer that question.
3  Q. So the hiring is by the Police and Fire Civil Service
4     Commission, correct?
5  A. Yes.
6  Q. And in the 11 months, even though the mayor besieged
7     you to get more minorities in the police and fire
8     department, you never met with the group that's
9     charged with the hiring in the police department,
10    correct?
11 A. That's correct.
12 Q. Now, did you ask for something -- first of all, wasn't
13    your office right by human resources?
14 A. Yes.
15 Q. Okay. By the way, you like Mark Simlar, don't you?
16 A. Yes.
17 Q. You always got along with him?
18 A. I've always respected him and he respects me.
19 Q. Sure. And the same thing with the previous person,
20    he's acting, right, in human --
21 A. I believe so.
22 Q. The previous person in that position, you got along
23    well with him too?
24 A. Yes.
25 Q. You got along well with the mayor as well, so you got



GREGORY MURRAY
February 26, 2018

Page 199

1 along with people, correct?
2 A. Yes.
3 Q. Now, you never went to the human resources director at
4 that time or the acting human resource director and
5 said, there are some things I need because I really
6 want to meet with the civil service commission for
7 police and fire, you never asked for something you
8 didn't get from him, did you?
9 A. I -- you've asked me a couple questions. The first of
10 which is yes, I did ask the human resources director
11 and the acting human resource director for information
12 in order to prepare me to help approach them, that
13 would have been the contracts, as you know, that I
14 requested, to get a look at contracts from those
15 parties to determine whether or not the contracts were
16 written as such where they would be exclusionary to
17 people of color.
18 Q. And you got the contracts?
19 A. Yes.
20 Q. You found the contracts were not exclusionary,
21 correct?
22 A. I was not able to complete my assessment.
23 Q. Well, here's the contract.
24 A. Yes.
25 Q. I read this. I read this contract -- I read this

Page 200

1 contract in 45 minutes, that's all it takes, right?
2 MR. MARKO: Objection, no foundation.
3 A. No, sir.
4 BY MR. ACHO:
5 Q. Well, here, it's 50-pages long.
6 A. What you're showing me, sir, is not the contract.
7 Q. I'm sorry. Here, I apologize, it's right here. It
8 is -- it would take about an hour, hour and a half to
9 read, right?
10 MR. MARKO: Objection, foundation and
11 speculation.
12 BY MR. ACHO:
13 Q. True?
14 A. No, sir.
15 Q. Did you read the contract?
16 A. Yes, I did.
17 Q. When did you read it, the first month you were there,
18 I assume?
19 A. No, sir.
20 Q. How come you didn't read it the first month you were
21 there?
22 A. Because when you come on board a position like that
23 you have to do your due diligence, you have to look
24 for certain basic policies as to whether or not they
25 exist or not and are properly published and being

Page 201

1 adhered to, that would be the EEOC statement, that
2 would be the ADA policy, the LEP policy and the Title
3 7 policy, those are the things that you would first
4 look at to make sure, one, that the City is aware of
5 them, two, that they're properly posted, and three,
6 whether or not that language is included, any of that
7 language is included on the City's website, et cetera,
8 so there is a process that was not completed during my
9 11 months because it is a multifaceted position.
10 Q. Okay. So it's your sworn testimony that you didn't
11 complete your job duties even in the first 11 months,
12 is that right, is that correct?
13 A. No, sir.
14 Q. Well, you said you didn't review everything?
15 MR. MARKO: Objection, mischaracterizes his
16 testimony.
17 BY MR. ACHO:
18 Q. You didn't -- didn't you just say, I didn't complete
19 it, yes or no?
20 MR. MARKO: Complete what?
21 A. Complete what?
22 BY MR. ACHO:
23 Q. What you just said, you have to look at this, this,
24 this, this?
25 A. True.

Page 202

1 Q. You said I didn't complete it?
2 A. There are stages.
3 Q. Wait. Did you say that?
4 MR. MARKO: No. No, the record speaks for
5 itself. Did he say what? I'm going to object to
6 form.
7 You go ahead and you give the answer.
8 A. To the extent that there are stages of activity that
9 must be phased in after you've done your due diligence
10 with respect to the current environment first. You
11 can't go in there charging.
12 BY MR. ACHO:
13 Q. Did you finish it, yes or no?
14 MR. MARKO: Finish what?
15 A. Did I finish what?
16 BY MR. ACHO:
17 Q. We'll go on. Now, so I'm clear, you know that the
18 mayor wants you to get more minorities in the police
19 department, correct?
20 A. He stated that.
21 Q. That can only be done through the civil service
22 commission, correct?
23 A. Not necessarily.
24 Q. Well, they're the ones in charge of getting the
25 applicants and screening them, correct?



GREGORY MURRAY
February 26, 2018

---

Page 203

1   A. Uh-huh. Yes.
2   Q. So they're the ones that get everything ready for the
3      hiring, correct? Yes or no?
4   A. Yes.
5   Q. And you, in 11 months, never even met with them, did
6      you?
7   A. That's correct.
8   Q. And you didn't write them a letter saying, I would
9      like to meet with you, or a memo, you never did that,
10     did you? Yes or no?
11  A. With whom?
12  Q. With the civil service commission and police and fire?
13  A. I did with the police commissioner but I didn't do it
14     with the civil service commission.
15  Q. That's what I'm talking about.
16  A. It would be inappropriate for me to do so and be so
17     unprepared to have a conversation.
18  Q. You know what, how about beginning the dialog, you
19     could have begun the dialog and say, here's what I'm
20     here to do, how can you help me get -- you could have
21     done that?
22     MR. MARKO: Objection, argumentative.
23  A. I had the conversation with the police commissioner,
24     Jere Green.
25  BY MR. ACHO:

---

Page 204

1   Q. Sir, listen to me, police commissioner is not the same
2      as the civil service commissioner, is it? Yes or no?
3   A. No.
4   Q. Okay. We're only talking about the Warren Civil
5      Service Commission Police and Fire, correct?
6   A. Yes.
7   Q. You never wrote them a letter or an e-mail or a note
8      saying, I would like to meet with you to have a
9      preparatory meeting to see how I can help you get more
10     applicants that are minorities, you never did it, did
11     you?
12     MR. MARKO: Objection, asked and answered.
13  A. It would be inappropriate.
14  BY MR. ACHO:
15  Q. Now, so we're clear, no one prohibited you from
16     reaching out to the Police and Fire Civil Service
17     Commission, no one said you could not?
18  A. The mayor instructed me not to have any direct
19     engagement with any of his department heads, et
20     cetera, without his prior approval.
21  Q. Sir, why do you do this?
22     MR. MARKO: Objection. Counsel, why do you
23     do this?
24  BY MR. ACHO:
25  Q. Why do you do this? We're --

---

Page 205

1      MR. MARKO: This is what you reported to --
2   BY MR. ACHO:
3   Q. We're talking about the civil service commission, not
4      department heads. We're not talking about department
5      heads, do you understand the difference? Yes or no?
6      MR. MARKO: Objection, let him answer the
7      question.
8      Go ahead.
9   BY MR. ACHO:
10  Q. Do you understand the difference between a commission
11     and a department head, yes or no?
12     MR. MARKO: You don't have to answer yes or
13     no to any questions he's asking. Go ahead.
14  A. Both are appointed positions and --
15  BY MR. ACHO:
16  Q. I didn't ask you that. I didn't ask you that.
17     MR. MARKO: Go ahead.
18  BY MR. ACHO:
19  Q. I did not ask you that question. My question is
20     simple, do you know the difference between the
21     department head and the civil service commission, yes
22     or no?
23  A. Yes.
24  Q. Okay. What is the difference?
25  A. Both are appointed by the mayor.

---

Page 206

1   Q. What's the difference?
2      MR. MARKO: He's trying to tell you.
3   BY MR. ACHO:
4   Q. I don't want the similarities?
5      MR. MARKO: Go ahead.
6   A. I understand now. I got this. While both are
7      appointed and answer to the mayor, a department head
8      supervises the activities of other civil servants.
9      The civil service commission is a policy-making board
10     where the department heads don't make policy, per se,
11     so they're both appointed by the mayor, they answer
12     directly to the mayor but at the same time they do
13     have different responsibilities and, in any case, the
14     mayor -- the mayor tells me, don't talk to any more of
15     my appointees, which is what he said to me --
16  BY MR. ACHO:
17  Q. You said --
18     MR. MARKO: Go ahead. Go ahead.
19  A. -- the civil -- the civil department heads and --
20     MR. MARKO: Let him finish his answer.
21  BY MR. ACHO:
22  Q. Are you changing --
23     MR. MUNGO: Objection, argumentative.
24     MR. MARKO: Go ahead and complete your
25     answer before you were rudely interrupted. Go ahead.

---



GREGORY MURRAY
February 26, 2018

Page 207

1  A.  The mayor told me not to speak to any of his
2      appointees or department heads.  He gave me that
3      explicit instruction after an incident occurred
4      regarding my engagement with Sergeant -- then Sergeant
5      Bradley around a -- services provided to the deaf and
6      the mayor told me with Police Commissioner Dwyer
7      present, not to have any contact with his appointees
8      or department heads.
9  BY MR. ACHO:
10 Q.  When was that?
11 A.  July -- June or July.  June, I think it was in June.
12 Q.  Of 2017?
13 A.  Right, well after I was hired.
14 Q.  Okay.  But just so I'm clear, so between January and
15     June of 2017 you had no prohibition on contacting the
16     Police and Fire Civil Service Commission, you had no
17     prohibitions, no?
18 A.  Yes and no.
19          MR. MARKO:  Counsel, you are raising -- you
20     know, you are clapping your hands, raising your hands
21     up like you are in dismay.  Let him answer.
22          MR. ACHO:  I am in dismay and I'll tell you
23     why --
24          MR. MARKO:  Don't --
25          MR. ACHO:  -- this witness is not being

Page 208

1      candid.
2          MR. MUNGO:  Objection, Counsel, you are
3      intimidating this witness, you are harassing this
4      witness, you're doing physical things, getting up out
5      of your chair, walking around like you're frustrated
6      with this particular witness and you are not even
7      giving him a chance to answer your questions.  I
8      object to your conduct.
9          MR. MARKO:  Don't let his theatrics
10     influence your answer.
11 BY MR. ACHO:
12 Q.  Sir --
13 A.  There's a protocol.
14 Q.  I'm going to ask you questions that deal with your
15     answers that you just gave under oath.
16 A.  Sure.
17 Q.  Now, you said I didn't speak to the civil service
18     commission ever, right?
19 A.  Correct.
20 Q.  Okay.  I said, well, you were there 11 months, and you
21     said, well, I wasn't ready and all that, do you
22     remember saying that?
23          MR. MUNGO:  Objection to the recitation of
24     the record.
25 BY MR. ACHO:

Page 209

1  Q.  Do you remember saying that?
2          MR. MARKO:  The record speaks for itself
3      and asked and answered.
4          MR. MUNGO:  It mischaracterizes his
5      testimony.
6  A.  There's a protocol to be followed I said.
7  BY MR. ACHO:
8  Q.  What's the protocol for contacting the City of Warren
9      Police and Fire Civil Service Commission in January of
10     2017 when you were hired, what was the protocol?
11 A.  In January I was just getting my feet wet with the
12     City.
13 Q.  I did not ask you that.
14 A.  I did not know the protocol completely in January.
15 Q.  Did you know the protocol in February?
16 A.  No.
17 Q.  Did you know it in March?
18 A.  I began to learn about it.
19 Q.  Okay.  So in March did you contact the civil service
20     commission?
21 A.  No, I did not.
22          MR. MUNGO:  Asked and answered.
23 BY MR. ACHO:
24 Q.  Did you contact them in April?
25 A.  No.

Page 210

1  Q.  Did you contact them in June?
2  A.  No.
3  Q.  You were not given any prohibition by the mayor until
4      you said June of 2017, correct?
5  A.  That's correct.
6  Q.  So why didn't you contact them before June of 2017?
7  A.  Because it would have been inappropriate to contact
8      them without having done my due diligence and my
9      research with respect to the implication of the civil
10     service rules.  There was an assessment period that
11     needed to be conducted.
12 Q.  Did you ever advise the Warren Police and Fire Civil
13     Service Commission that their hiring practices were
14     discriminatory?
15 A.  No.
16 Q.  Did you ever advise the Warren Police and Fire Civil
17     Service Commission that their hiring practices had a
18     disparate impact on minorities, did you ever do that?
19 A.  Not the civil service commission, no.
20 Q.  Okay.  Please tell us, since you were diversity
21     coordinator, did you study the application process for
22     the police department over the last two years, did you
23     know what it was?
24 A.  Yes.
25 Q.  Did you find it, the application process, in any way



GREGORY MURRAY
February 26, 2018

Page 211

1   discriminatory?
2   A.  I found it to have a disparate impact, yes.
3   Q.  Do you have anything in writing where you expressed
4       that in any memorandum prior to you asking for a raise
5       in October or November 2017?
6       MR. MUNGO:  Objection, mischaracterizes his
7       testimony.  He didn't say he asked for --
8   A.  No.
9   BY MR. ACHO:
10  Q.  Can you tell us, in your due diligence, whether you
11      found any minority applicant that was qualified and
12      was turned down because they were minorities?
13  A.  No.
14  Q.  Now, the Police and Fire Civil Service Commission are
15      charged with creating policies dealing with hiring,
16      aren't they?
17  A.  Yes.
18  Q.  Did you make any recommendations to them that would
19      enhance the hiring of minorities in the police
20      department or anywhere else?
21  A.  Not at that time, no.
22  Q.  At any time?
23  A.  No.
24  Q.  In your 11 months?
25  A.  No, it would have been inappropriate for me to have

Page 212

1   that conversation.
2   Q.  Okay.  We're not talking about conversations, we're
3       talking about you putting something in writing.
4   A.  It would be inappropriate for me to put that in
5       writing when I haven't conducted my due diligence.
6   Q.  Okay.  Did you tell the mayor in any memo that, Mayor,
7       you know, I haven't been able to do my due diligence,
8       did you tell him that?
9   A.  Due diligence is an ongoing process.
10  Q.  Did you tell him you couldn't do your due diligence?
11  A.  No.
12  Q.  Yet, after 11 months you wanted a raise, correct?
13  A.  I wanted an increase in compensation based on me being
14      given the duties of the liaison for the City of Warren
15      in addition to my other duties.
16  Q.  Would you have been the only employee of the city who
17      was given additional duties without additional
18      compensation?
19  A.  I have no way to know that.
20  Q.  Well, yeah, you could have asked certain people,
21      right?
22  A.  I have no way to know that, sir.
23  Q.  Wait a minute.  Didn't you work right by Mr. Simlar?
24  A.  Yes.
25  Q.  Didn't you see him carry on and accept the

Page 213

1   responsibilities of Mr. Easter (phonetic) as well as
2   his own?
3   A.  I assumed he did, yes.
4   Q.  Are you aware whether he demanded a raise?
5   A.  I'm not aware of that.
6   Q.  Are you aware whether he was given any more money?
7   A.  Yes.
8   Q.  Really?
9   A.  I believe he was compensated at the rate of the human
10      resource director on an interim basis.
11  Q.  What do you base that on, is that just conjecture on
12      your part?
13  A.  Okay.
14      MR. MARKO:  Go ahead.  Answer the question.
15      Go ahead.
16  BY MR. ACHO:
17  Q.  Is it a conjecture, a guess, on your part?
18  A.  I looked at the budget and saw the position and the
19      salary and my assumption is that he did receive that
20      increase.
21  Q.  That's an assumption on your part?
22  A.  Yes.
23  Q.  You don't know whether that's true?
24  A.  That's true.
25  Q.  That's hearsay, right?

Page 214

1   A.  I wouldn't consider that hearsay.
2   Q.  Well, you're guessing?
3       MR. MARKO:  That calls for a legal
4       conclusion and asked and answered.  He just answered
5       that question.
6   BY MR. ACHO:
7   Q.  Aren't you guessing?
8       MR. MARKO:  Mischaracterizes his testimony.
9   A.  I was shown the department budget and the department
10      budget --
11  BY MR. ACHO:
12  Q.  It doesn't have Simlar's name on it, did it?
13  A.  Well, the budget doesn't have any individual's name on
14      it.
15  Q.  So you don't know whether he got a raise?
16  A.  That's correct.
17  Q.  So would you call him a beast of burden because he was
18      given all these extra jobs?
19      MR. MARKO:  Objection to form.
20  BY MR. ACHO:
21  Q.  Would you call him a beast of burden?
22  A.  I don't know that he got all these extra jobs.  You
23      would have to share with me what that means.
24  Q.  Yeah, he took on more jobs than he had previously?
25  A.  He took on a position.



GREGORY MURRAY
February 26, 2018

Page 215

1  Q. Well, doesn't a position require responsibilities?
2  A. Yes.
3  Q. So he took on, Mr. Simlar, more responsibilities,
4     would you then call him a beast of burden?
5        MR. MARKO: Objection to form.
6  A. I can't answer that question.
7  BY MR. ACHO:
8  Q. Would you ever use that expression, beast of burden?
9  A. Yes.
10 Q. And you felt that because you were given additional
11    responsibilities that you were a beast of burden,
12    right?
13 A. I felt that --
14 Q. Yes or no?
15       MR. MARKO: Let him answer the question.
16 A. I felt that someone else thought me to be a beast of
17    burden buy giving me five additional duties, four of
18    which were inside of the human resource director's job
19    duties and then one other, which was completely
20    outside of the scope of my appointment.
21 BY MR. ACHO:
22 Q. Isn't part of the reason why you didn't get your jobs
23    done because you took off so much time from work?
24 A. No.
25       MR. MARKO: Objection, that

Page 216

1     mischaracterizes his testimony and that assumes facts
2     not in evidence.
3  A. No, sir.
4        MR. MARKO: There's no establishment that
5     he didn't get his jobs done.
6        MR. ACHO: Counsel, do you realize on at
7     least a half-dozen occasions you've interrupted me
8     before I even finish my question?
9        MR. MARKO: Not that one, Counsel.
10       MR. ACHO: You did. You most certainly
11    did.
12       MR. MARKO: No, I did not.
13       MR. ACHO: Absolutely.
14       MR. MUNGO: That is not true.
15 BY MR. ACHO:
16 Q. I'll ask you again. You took a lot of time off from
17    work, didn't you?
18 A. No, sir.
19       MR. MARKO: Same objection.
20 BY MR. ACHO:
21 Q. Didn't you exhaust your time off from work?
22 A. For the calendar year, work year?
23 Q. Yeah.
24 A. I believe I may have, yes.
25 Q. And you even took time off due to a miscarriage for

Page 217

1     two or three days?
2  A. Two days.
3  Q. It wasn't the death of a live child, was it? Yes or
4     no?
5  A. That does not matter.
6  Q. Yes or no?
7  A. I'm not going to answer that question yes or no. That
8     does not matter. This was a grandchild of mine and I
9     took days that I was entitled to.
10 Q. Bereavement?
11 A. I did not exceed days.
12       MR. MARKO: Let him finish. Counsel, you
13    just made a big speech about cutting people off.
14    Don't cut off the witness. Let him answer the
15    question.
16 BY MR. ACHO:
17 Q. Did you take bereavement, yes or no?
18 A. No.
19 Q. How many days did you take off?
20 A. Two.
21 Q. And didn't you take a mental health day too or more
22    than one?
23 A. I took a sick day, it was attributed to a sick day.
24 Q. Did you call it a mental health day?
25 A. Yes, sir.

Page 218

1  Q. What mental health are you talking about?
2  A. There was so many things coming at me.
3  Q. When was this, by the way?
4  A. I don't --
5  Q. I don't --
6        MR. MARKO: Don't interrupt.
7  BY MR. ACHO:
8  Q. I don't want to get --
9        MR. MARKO: Wait until he answers and then
10    you can ask.
11 BY MR. ACHO:
12 Q. When --
13 A. I don't recall when that occurred. You'd have to
14    check the City's records and it was charged to a sick
15    day.
16 Q. Let me ask you, but do you recall what it was for?
17 A. Yes, I had to clear my head.
18 Q. From what?
19 A. From the bombardment of people coming at me because I
20    was new and that -- at that point it became, to some
21    degree, overwhelming and I took a day off to clear my
22    head.
23 Q. Did you write a note to the mayor that this job was
24    becoming too much for you in March, April, May, June,
25    July?



GREGORY MURRAY
February 26, 2018

Page 219

1  A. No.
2      MR. MARKO: Objection to form.
3  BY MR. ACHO:
4  Q. So that bombardment that caused you to need to clear
5     your head only happened once?
6  A. At the early onset of my employment.
7  Q. Okay. Early onset?
8  A. Yes, sir.
9  Q. That's before you really got your feet wet, true?
10 A. No, getting your feet wet was a process from the
11    day -- from January 6th forward.
12 Q. Well, didn't the mayor let you work part time for full
13    pay the first few weeks you worked, didn't he do that?
14 A. No, sir.
15 Q. By the way, you were talking about the
16    collective-bargaining agreement. Did you ever read
17    the collective-bargaining agreement?
18 A. Yes, sir.
19 Q. The whole thing?
20 A. Yes, sir.
21 Q. I assume after you read it you then contacted the
22    union executive board to meet with him, didn't you?
23 A. I made an appointment with Mark Sauger, who is the
24    president of the Detroit Police Union, and met with
25    him and --

Page 220

1  Q. Well --
2      MR. MARKO: Wait. Stop. Stop. Stop.
3     Stop. Stop. You're cutting the witness off.
4     Go ahead.
5  A. -- and met with him --
6      MR. ACHO: That's not my question.
7      MR. MARKO: You go ahead.
8  BY MR. ACHO:
9  Q. I'm going to ask my question because I think you
10    misspoke.
11     MR. MARKO: Okay.
12 BY MR. ACHO:
13 Q. I think you misspoke.
14 A. I met with Mark Sauger to discuss diversity. Mark
15    Sauger is the president of the Police Officer's
16    Association. I met with him to discuss diversity.
17 Q. Do you know what you just said in your testimony?
18 A. What's that?
19 Q. City of Detroit, you didn't mean that, did you?
20 A. No.
21 Q. That's why I was trying to interrupt. I do not want
22    to waste the time for something --
23     MR. MARKO: Let him finish.
24 A. I misspoke.
25 BY MR. ACHO:

Page 221

1  Q. That's fine. We're just trying to get the facts,
2     that's all. Now, you met with the union president?
3  A. Yes.
4  Q. How many times?
5  A. Once.
6  Q. Okay. At any time do you remember when that was, what
7     month?
8  A. It would have been possibly in March or April.
9  Q. Now, did you say to the union president that there was
10    anything about the union contract that in any way
11    discriminated against minorities?
12 A. No.
13 Q. Did you find the union contract fine?
14 A. I saw no instance of a diversity statement or a
15    diversity policy within the contract and that is
16    something that was missing from that contract.
17 Q. Okay. Show me the memorandum that you wrote to the
18    mayor or to human resources and to the union where you
19    recommend that that be put in, can I see that memo?
20 A. That does not exist.
21 Q. You didn't prepare one?
22 A. I prepared a City of Warren diversity policy that
23    would have then been included in subsequent contracts.
24 Q. I didn't ask you that. I want to know whether you did
25    your job, you said, I identified that something was

Page 222

1     missing from the union contract --
2  A. Yes.
3  Q. -- correct, and I asked you then produce a memorandum
4     to the mayor and to human resources and to the union
5     officials saying this is something that needs to be
6     addressed in the contract and you never prepared such
7     a thing, did you?
8  A. I helped prepare a policy to be submitted to the mayor
9     to give permission to present it to these other
10    bodies.
11 Q. Sir, you didn't present a memo saying, the union
12    contract needs to get this put in?
13 A. No.
14     MR. MARKO: Asked and answered.
15 BY MR. ACHO:
16 Q. In addition, you met with the attorney who does the
17    labor for the City, correct?
18 A. Which one?
19 Q. Howard Schiffman?
20 A. Yes.
21 Q. And did you give him a memorandum saying, here's
22    something that has to go into the contract, yes or no?
23 A. No.
24 Q. Okay. Yet, you're the head of diversity?
25 A. Yes.



GREGORY MURRAY
February 26, 2018

Page 223

1  Q. But you didn't even produce this memorandum for the
2     future to go into the union contract, you didn't, did
3     you?
4  A. Mr. Acho, I'm not Superman.
5  Q. Okay. I understand.
6  A. Okay.
7  Q. But even though there wasn't a discrimination, or
8     whatever you said wasn't there, you didn't say that
9     the contract was in any way discriminatory toward
10    minorities, you didn't, did you?
11 A. I did not say that to anyone.
12 Q. And you didn't believe it because you would have
13    written something if you felt there was discrimination
14    in the contract, correct?
15         MR. MARKO: Objection to form.
16 A. That's not true.
17 BY MR. ACHO:
18 Q. But you didn't tell anyone or write anything saying
19    the contract has anything discriminatory, correct?
20         MR. MARKO: Asked and answered.
21 A. I've already answered that question.
22 BY MR. ACHO:
23 Q. No, you did not. Not that question.
24 A. Yes, I have.
25 Q. You did not find anything in the union contract that

Page 224

1     was discriminatory against minorities like having
2     disparate impact, correct?
3  A. No, the execution of the contract or contracts in the
4     future led to the disparate impact that the City found
5     itself in based on a percentage of people of color in
6     the City of Warren and the City employee base in the
7     City of Warren.
8  Q. You have me confused.
9  A. I know.
10 Q. Either the union contract has something discriminatory
11    or it does not, which is it? Yes, it has
12    discrimination in it or no, it does not, what is the
13    answer?
14 A. My answer to you is that you can have rules and
15    regulations, which on their face do not appear to be
16    discriminatory but can have disparate impact on
17    certain protected classes.
18 Q. There's nothing in the contract that has anything like
19    that, does it?
20 A. I can't say that to be sure.
21 Q. But you're not aware of any because you didn't
22    identify any?
23 A. I had not gotten to the point where I would be
24    presenting this information to the mayor first because
25    everything has to be presented to the mayor first and

Page 225

1     then parsed out to other departments. I never --
2  Q. Wait a minute.
3  A. I never had the opportunity to present that.
4  Q. Wait. Wait. Wait. Wait. You said you met with the
5     union president in March?
6  A. True.
7  Q. You had the union contract?
8  A. I didn't get the union contract until well after I
9     spoke to the union president. I had requested it but
10    I didn't receive it until well after I spoke to the
11    union president.
12 Q. Hold on. When did you -- because this I got within
13    one hour. When did you request it since it's in the
14    human resources office, right, true?
15         MR. MARKO: Foundation.
16 A. I don't know where it's physically located but I did
17    ask for it and then --
18 BY MR. ACHO:
19 Q. Who did you ask?
20 A. Mark and then about a week or two later he gave me --
21    he pointed me to where it could be found or you
22    e-mailed it to me. I don't remember which, yeah.
23 Q. So you requested the union contract and you got it
24    within one or two weeks?
25 A. Yes.

Page 226

1  Q. You reviewed it and you didn't identify anything in it
2     that was discriminatory?
3  A. Not at that time.
4  Q. When you met with the union president, did you
5     identify any problems?
6  A. No, it wasn't -- the meeting wasn't for that purpose.
7  Q. Well, what was your -- what was the purpose of your
8     meeting?
9  A. To introduce myself, to share with him what my job
10    duties were, to get some sense of whether or not he
11    would be supportive of addressing the lack of
12    diversity within the police department.
13 Q. What did he say?
14 A. He said he was interested in effectuating a diverse --
15 Q. You felt good about that, didn't you?
16 A. Yes, I did.
17 Q. Okay. Because here you have the support of the union,
18    right?
19 A. I had his support.
20 Q. He was the president. Okay. Now, if you read the
21    contract you know there's a grievance procedure,
22    correct?
23 A. Yes.
24 Q. It appeared fair to you, this grievance procedure?
25 A. Yes.



GREGORY MURRAY
February 26, 2018

---

Page 227

1  Q. DeSheila Howlett didn't follow it, did she?
2  A. I have no knowledge of whether she did or didn't.
3  Q. Wait a minute. I thought you said --
4        MR. MUNGO: Objection, Counsel -- Counsel,
5  objection. Counsel, do you have a medical condition,
6  sir, that you have to keep getting up out of your seat
7  because it's very disconcerting to my client combined
8  with your demeaning tone and constant ongoing
9  harassment of the deponent.
10       MR. ACHO: I want the record to reflect --
11       MR. MUNGO: Do you suffer from a medical
12 condition, sir? You keep getting out of your seat and
13 walking around --
14       MR. ACHO: I want the record --
15       MR. MUNGO: -- it's all part and parcel of
16 your attempt to intimidate and disconcert this
17 deponent.
18       MR. ACHO: I have colitis.
19       MR. MARKO: And that's why you have to keep
20 getting out of your chair?
21       MR. ACHO: Yes. I know this is your
22 client, Mr. Murray, and --
23       MR. MARKO: Objection.
24       MR. ACHO: Well, that's what he said.
25       MR. MUNGO: No, the deponent, I misspoke.

---

Page 228

1  My client is Ms. Howlett, you know better than that.
2        MR. ACHO: No, sir.
3  BY MR. ACHO:
4  Q. Now, Mr. Murray, I told you you can get up. Is my
5  walking around affecting your truthfulness?
6        MR. MUNGO: Counselor, if you have a
7  medical condition that's fine, go ahead.
8  A. No.
9  BY MR. ACHO:
10 Q. Is it affecting your ability to answer my questions?
11 A. No.
12 Q. Thank you. If it does, then I will turn and face you,
13 okay?
14 A. Yes.
15       MR. MUNGO: Counsel, if you have a medical
16 condition, go ahead, proceed. I'm assuming that's
17 true. Go ahead, proceed. If you have a medical
18 condition, proceed.
19       MR. MARKO: My client has to take a
20 bathroom break.
21       MR. ACHO: How much time do you want? Tell
22 me -- take what time you need. I'm not here to rush
23 you.
24       MR. MUNGO: You don't need to instruct him.
25       MR. MARKO: We'll take five minutes.

---

Page 229

1        (Recess taken at 4:35 p.m.)
2        (Back on the record at 4:49 p.m.)
3  BY MR. ACHO:
4  Q. While you were working at the City of Warren, if an
5  employee in the police department had any issues with
6  their supervisors or a fellow police officer, what
7  were their options to deal with those issues?
8  A. Given it was a union environment, file a grievance.
9  Q. Can you explain that?
10 A. As a protocol for making a complaint regarding
11 management in a unionized environment, there is that
12 process and it's called a grievance.
13 Q. And that is what DeSheila Howlett should have used?
14       MR. MUNGO: Objection, foundation.
15 A. Could have used.
16 BY MR. ACHO:
17 Q. Should have used?
18 A. Could.
19 Q. When you said, what other options did she have
20 besides filing a grievance?
21 A. Based on what was shared to me by Mark, she would come
22 to him.
23 Q. Okay. So filing a grievance is an option?
24 A. Is an option.
25 Q. And another option, going to HR?

---

Page 230

1  A. Yes.
2  Q. Any other options or are those the two?
3  A. Those are the two that I'm aware of.
4  Q. Okay. Now, DeSheila Howlett didn't do either one, did
5  she?
6        MR. MUNGO: Objection. Foundation.
7  A. I'm not aware of whether or not. I am aware she spoke
8  to Mark because Mark told me she spoke to him on a
9  couple of occasions.
10 BY MR. ACHO:
11 Q. But that was after someone else complained on her
12 behalf, correct?
13 A. I'm not aware of that, sir.
14 Q. So you don't really know facts surrounding her, do
15 you? You don't really know because you did not
16 undertake your own investigation, correct?
17 A. I did not conduct my own investigation.
18 Q. You deferred to other people who did conduct the
19 investigation, correct?
20 A. That investigation was undertaken without any input
21 from me. I was only apprised of an investigation
22 after the fact.
23 Q. Okay. So as you sit here today, you have no personal
24 knowledge that DeSheila Howlett, in all those years,
25 ever filed a grievance, correct?



GREGORY MURRAY
February 26, 2018

Page 231

1  A. That's correct.
2  Q. She could have filed a grievance?
3  A. It's an option.
4  Q. Second of all, DeSheila Howlett could have gone to
5     human resources with any complaints that she had,
6     correct?
7  A. Correct.
8  Q. You're not aware that she had gone to human resources
9     to make a complaint, but only at some point you found
10    out she spoke with Mark Simlar?
11 A. Correct, she spoke to Mark Simlar.
12 Q. She never spoke to you?
13 A. That's correct.
14 Q. Now, isn't it unfair for an employee to have
15    complaints and not come forward and tell the employer
16    to correct it?
17 A. I would not say unfair. An employee might be
18    intimidated to the point where they don't report
19    things to anyone. For example --
20 Q. I understand.
21          MR. MARKO: He's speaking, he's not done.
22    Let him finish.
23          Go ahead.
24 A. For example, where there might be a safety issue
25    involved, based on retaliation of one person or

Page 232

1     persons toward them and in that they would have the
2     ability to retaliate or to jeopardize one's life or
3     whatever, in that instance, I can see where a person
4     may not come forward.
5  BY MR. ACHO:
6  Q. But you had no knowledge DeSheila Howlett was
7     intimidated, correct, no personal knowledge?
8  A. That's correct.
9  Q. So if she had -- okay. We'll move on. Now, we were
10    talking about things in the union contract about not
11    having discrimination. You said there should be
12    something in the contract, correct?
13 A. Ideally, yes.
14 Q. But wasn't there something in the police department
15    that addressed discrimination, harassment, wasn't
16    there something already in place over and above the
17    union contract?
18 A. Not that I'm aware of.
19 Q. In the 11 months that you were there didn't you read
20    the general orders 0301 and 0302?
21 A. No, sir.
22 Q. You never did?
23 A. No, sir.
24 Q. So you were unaware for all the months you were at the
25    City of Warren that there was a general order dealing

Page 233

1     with discrimination and sexual harassment?
2  A. I requested that information from then Police
3     Commissioner Jere Green and it was not given to me.
4  Q. I'll ask that question again. Please listen to my
5     question because I have a reason why I ask you certain
6     questions.
7          Please read it back and I want you to
8     answer my question.
9          (The following requested portion of the
10         record was read by the reporter at
11         4:55 p.m.:
12         Q. So you were unaware for all the months
13         you were at the City of Warren that there
14         was a general order dealing with
15         discrimination and sexual harassment?)
16 A. No.
17 BY MR. ACHO:
18 Q. You were also aware that there was a general order
19    dealing with rules of conduct in the police
20    department, were you not?
21 A. I was not.
22 Q. Did you, at any time, make any complaints to the mayor
23    that -- or to human resources, that you requested
24    general orders and they were not provided to you, did
25    you ever do that?

Page 234

1  A. No, sir.
2  Q. You could have told the mayor in your three to four
3     conversations a week, hey, you know, I'm asking for
4     some things from Green, I'm not getting them, you
5     never did that?
6  A. That's not correct.
7  Q. Did you tell him, I asked for certain things from
8     Green like general orders and I didn't get them, did
9     you? Yes or no?
10 A. I did tell the mayor and the mayor was aware that I
11    had requested documents and information from Jere
12    Green that I have not been provided.
13 Q. Can I see any memorandum that will support what you
14    just told us, is there such a thing?
15 A. There is, and you should get that from your client
16    because it's in a written memorandum to the mayor.
17 Q. When?
18 A. I want to say August -- I want to say around June or
19    July.
20 Q. And you specifically identified documents you didn't
21    receive?
22 A. To the mayor, yes.
23 Q. Well, when you didn't get them after that, what did
24    you do about it, nothing, right?
25 A. Well --



GREGORY MURRAY
February 26, 2018

Page 235

1      MR. MARKO: Objection to form.
2      Go ahead.
3   A. I believed that by speaking to the mayor about it,
4      given his telling me not to engage directly to
5      department heads, that he would take that up and he
6      didn't.
7   BY MR. ACHO:
8   Q. But you didn't follow up, did you? You didn't follow
9      up after that?
10  A. I spoke with the mayor about not receiving them, yes.
11  Q. No, after this memorandum that you say you sent, you
12     never followed up with the mayor after that, did you?
13  A. Yes, I did.
14  Q. After June and July?
15  A. After I did not receive them I shared with the mayor
16     that I did not receive them.
17  Q. We're talking subsequent to that. Subsequent to June
18     and July when you advised the mayor in a memo, did you
19     do follow up with the mayor after that, yes or no?
20  A. We did speak about it again, yes, just prior to
21     Mr. Green being let go.
22  Q. Okay. Let me ask you about Mr. Green. How many times
23     did you ever meet with him?
24  A. Privately, once.
25  Q. So in 11 months you only met with the police

Page 236

1      commissioner once?
2   A. That's correct.
3   Q. And, yet, you were charged with enhancing the number
4      of minorities in the police department?
5   A. Correct, the mayor prohibited me from speaking with
6      Commissioner Green.
7   Q. Wasn't the prohibition because you did something you
8      shouldn't have done?
9   A. No.
10  Q. Well, let me ask you, did you make some mistakes while
11     you were working at the City of Warren? Did you make
12     mistakes?
13  A. Not that I'm aware of. None that I've been notified
14     of.
15  Q. Well, didn't you go ahead and schedule things for the
16     police department without their prior concept?
17  A. No.
18  Q. Well, let me understand something, there was some
19     friction between you and the police department,
20     correct?
21  A. No. No, sir.
22  Q. No friction, no, sir?
23  A. Not between me and the police department, no, sir.
24  Q. Let me clarify it. You know what I'm talking about,
25     don't you?

Page 237

1   A. No, sir.
2   Q. You don't?
3   A. No, sir.
4   Q. Didn't you yell at this gentleman, Lieutenant, and
5      swear at him about something?
6   A. No, sir, and that's -- I want to say right now that I
7      feel very uncomfortable about Lieutenant Bradley's
8      presence here because I very well may be called on to
9      testify at -- in a formal complaint that the
10     Department of Justice is conducting regarding the
11     treatment of deaf people by the Warren Police
12     Department, and I feel very uncomfortable about his
13     presence here and you going in that direction because
14     I don't want to have to share my testimony with him
15     in advance of that being concluded.
16  Q. Sir, your credibility is at issue in this matter.
17  A. Not to me.
18  Q. Yes, it is --
19  A. Oh, okay.
20  Q. -- because I've asked you about various things --
21  A. Yes.
22  Q. -- including the Department of Justice.
23  A. Yes.
24  Q. Now, understand, I want to make sure I understand --
25  A. Yes.

Page 238

1   Q. -- the Department of Justice had gone to a number of
2      cities and got consent decrees, right?
3   A. I assume so.
4   Q. You testified to that in your first day of testimony,
5      don't you remember?
6   A. The Department of Justice does that nationwide so
7      that's why I say yes.
8   Q. Okay. And the City of Warren entered into a consent
9      decree, correct --
10  A. Yes.
11  Q. -- like other cities, right?
12  A. Yes.
13  Q. And that consent decree ended in, what, 2002?
14  A. 2002.
15  Q. Okay. Now, you are involved in diversity --
16  A. Yes.
17  Q. -- and you made some statement on television about the
18     City of Warren is not really committed to diversity,
19     correct?
20  A. I said the mayor is not committed to the -- to --
21     genuinely committed to diversity.
22  Q. Well, he's either committed or he isn't, which is it?
23  A. I don't believe he is. I believe that it's a
24     political calculation that when I began -- actually
25     beginning to deeply delve down into diversity, the



GREGORY MURRAY
February 26, 2018

**Page 239**

1 mayor told me that he wanted to keep diversity on the
2 back burner until after the 2019 election because he
3 was concerned about a white voter backlash because the
4 residents of Warren were not ready for diversity.
5 Q. But that's what you told him, you said that to him?
6 A. That's what the mayor told me.
7 Q. But he wanted to hire a black human resources director
8 and you said no, don't do it now, you know, you're
9 going to get a lot of pushback, that you're hiring too
10 many blacks. Are you denying that under oath?
11 A. Yes.
12       MR. MARKO: Assumes facts not in evidence.
13 BY MR. ACHO:
14 Q. Okay. Did the mayor talk to you about hiring an
15 African-American as a human resources director?
16 A. Yes.
17 Q. What did he say?
18 A. He asked me to try to find an African-American female
19 over the age of 60 because she would be a two-fer.
20 Q. Okay. What did you say?
21 A. And I said I'd look.
22 Q. Okay. And who did you recommend that he hire?
23 A. He has the names of those three people. I can't
24 remember them offhand but I handed him the resumes for
25 all three of them.

**Page 240**

1 Q. Okay. Give me your best recollection. I assume you
2 knew them if you were going to recommend them?
3 A. I did not know them. I met and discussed the
4 possibility of their applying to the City of Warren
5 for those positions. I did not know them.
6 Q. So you recommended people you didn't know?
7 A. I recommended people that I met and queried,
8 interviewed and -- and discussed the position with.
9 Q. What are their names?
10 A. I believe one person, his name is Paul. I'd have to
11 give it some time to remember those three names.
12 Q. How about when we finish the dep?
13 A. I'll try to remember.
14 Q. So you gave those names to the mayor?
15 A. I gave the mayor the resumes of the three people.
16 Q. When did you do that?
17 A. Probably August. Around August -- August or
18 September.
19 Q. Is that the time you told Simlar, the mayor is looking
20 to get rid of him, the mayor told him that?
21 A. No, I did not tell him that.
22 Q. Okay. So you deny that you told the mayor, don't hire
23 a black as the HR director, you deny that?
24 A. Yes.
25 Q. You deny that you told the mayor, look, you're hiring

**Page 241**

1 too many blacks, you're doing it too fast, you deny
2 that?
3 A. That part I did share with the mayor.
4 Q. Okay. Tell us what you said, because you are under
5 oath?
6 A. Okay. I shared with the mayor, based on what he had
7 shared with me about Dean Berry (phonetic) and some
8 other people, he might want to hold up on that and to
9 space it out.
10 Q. That's what he told me this morning.
11 A. Good. Good.
12 Q. You may want to hold up and space it out, that you
13 told him that, hold up, hold up.
14 A. Based on what the mayor told me.
15 Q. But that's your words?
16 A. Yes.
17 Q. Mayor, hold up, yes, you said that?
18 A. Yes.
19 Q. Don't hire more blacks right now, that's what you told
20 him?
21 A. I told the mayor to space it out, but the mayor does
22 what the mayor wants to do.
23 Q. Okay. I appreciate what you're saying now. When you
24 say hold up, hold up means stop, hold up?
25 A. No, it means delay, not stop.

**Page 242**

1 Q. Okay. Delay?
2 A. Yes.
3 Q. Delay means don't do it now, correct?
4 A. Space it out, yes.
5 Q. So you told him to delay hiring African-Americans?
6 A. In response to what he said to me.
7 Q. Okay. I'm just looking -- I'm just trying to get your
8 words.
9 A. I understand.
10 Q. You told the mayor, hold up, delay hiring of
11 African-Americans, true?
12 A. No, sir.
13 Q. Okay. Why would you say that to him?
14       MR. MARKO: Objection, he just said he
15 didn't say it.
16       MR. ACHO: No, he said he did.
17       MR. MARKO: It's an improper question.
18 BY MR. ACHO:
19 Q. You did say it, you said hold up?
20       MR. MUNGO: Objection, argumentative.
21 BY MR. ACHO:
22 Q. Didn't you say, hold up, delay?
23 A. I said delay.
24 Q. You said, hold up, you used the words, hold up, that's
25 what the mayor said?



GREGORY MURRAY
February 26, 2018

## Page 243

1  A.  Delay.
2  Q.  The mayor said you said, hold up, delay, that you used
3     both words?
4  A.  Paraphrasing, delay.
5  Q.  Why, if you're the diversity coordinator, would you
6     ever support delaying affirmative action?
7  A.  I would not support deferring or delaying affirmative
8     action.  What I would not support is the backlash that
9     the mayor said he anticipated by hiring three
10    African-Americans in a row for department heads.  He
11    wanted a -- principally females so he could have what
12    he called was two-fers and so, based on what he said
13    to me, you might want to delay this for a while
14    because of what you shared with me about Dean Berry,
15    about Scott Stevens, on the city counsel and about the
16    voters.
17  Q.  So really you were being an enabler, weren't you?
18  A.  No, sir.
19  Q.  Well, here a man says --
20  A.  It was strategic, it wasn't enabling.
21  Q.  It was -- okay.  Your advice to the mayor to delay the
22    hiring --
23  A.  I never told him not to hire a person of color.
24  Q.  You know, you shouldn't interrupt.
25  A.  I apologize.

## Page 244

1  Q.  Your advice to the mayor to delay the hiring of
2    African-Americans --
3  A.  That's not true, sir?
4  Q.  -- was strategic?
5  A.  That's not true.  What you just said is not true.
6  Q.  Your advice to the mayor was to either hold up or
7    delay the hiring of African-Americans as department
8    heads, correct?
9  A.  That's not true.  No, sir.  What I said was that you
10    might want to delay this appointment based on what you
11    shared with me and your concerns regarding the
12    backlash that it would create.
13  Q.  Okay.  So your advice to the mayor to delay the hiring
14    of an African-American woman into the position of
15    human resource director, in your view, was strategic,
16    correct?
17  A.  Yes.
18  Q.  You believe it is consistent with your job description
19    as the diversity and inclusion coordinator?
20  A.  Yes, the potential consequence of which he may not
21    been able to hire anymore after that, which to me
22    would have been a grave situation.
23  Q.  So you think it was a good idea not to hire an
24    African-American woman at that time, right?
25        MR. MARKO:  Objection, that

## Page 245

1    mischaracterizes his testimony.
2  A.  What I shared with him was based on what he said to me
3    about his concerns.  This was a conversation going
4    back and forth about his concerns regarding whether or
5    not residents in Warren would tolerate diversity, et
6    cetera.  Those were his concerns.  You might want to
7    delay that, it was in response to his statements to
8    me.
9  BY MR. ACHO:
10  Q.  But you could have spoke your mind.  Do you remember
11    you told us when you got hired you would speak your
12    mind, correct?
13  A.  I said with discretion.
14  Q.  Okay.  You could use discretion and have been polite
15    and say, Mr. Mayor, I respectfully feel you need to
16    hire that African-American woman to be the human
17    resources director, you could have done that?
18  A.  I gave him three that I recommended that he choose one
19    from to hire so I actually was promoting that, but as
20    for the timing of it, based on what he said his
21    concerns were --
22  Q.  Okay.  How long did you want him to wait?  How long
23    did you want --
24  A.  That's up to the mayor, it's not up to me.
25  Q.  How long were you recommending the mayor wait?

## Page 246

1  A.  I did not recommend a time frame.
2  Q.  But you're saying because of the backlash.  The
3    backlash could have lasted a year, two years, right?
4    True?
5  A.  I'm not aware of what the consequences of that would
6    have been.  Again, the backlash was the voters in the
7    2019 election.
8  Q.  Okay.  So I understand this right, in 2017 you are
9    recommending the mayor hold up hiring an
10    African-American woman until the 2019 election?
11        MR. MUNGO:  Objection, mischaracterization
12    of the deponent's testimony.
13  A.  No, sir.
14  BY MR. ACHO:
15  Q.  Okay.  I guess I need you to help me because I am at a
16    loss to understand where you're coming from.
17  A.  All right.
18  Q.  You're the diversity and inclusion coordinator for the
19    City of Warren?
20  A.  Correct.
21  Q.  No other city in southeast Michigan has that except
22    Warren?
23  A.  To my knowledge.
24  Q.  Okay.  And the mayor brought you in and paid you a
25    good deal of money so you could get more



GREGORY MURRAY
February 26, 2018

Page 247

1    African-Americans into the City as employees, right?
2    A.  Yes.
3    Q.  And, yet, at that time, in the summer of 2017, you
4        tell him to delay, don't hire that African-American
5        woman?
6                MR. MARKO:  Objection, asked and answered.
7    BY MR. ACHO:
8    Q.  Is that correct?  Am I correct?
9                MR. MARKO:  Go ahead.
10   BY MR. ACHO:
11   Q.  Am I correct or should I rephrase it?
12   A.  What I shared was, based on what the mayor said to me
13       was his concerns, and this was all one conversation
14       regarding Dean --
15   Q.  You've been --
16                MR. MARKO:  Wait.
17   BY MR. ACHO:
18   Q.  I'm going to ask this question again.
19   A.  I'm going to answer the same way because I want to
20       provide you with the correct answer.
21                MR. MARKO:  Go ahead.
22   A.  If you want the truth you won't interrupt me as much.
23   BY MR. ACHO:
24   Q.  I don't want the background.  It's a specific
25       question.

Page 248

1    A.  It's not a yes or no question.
2    Q.  Did you recommend to the mayor to delay hiring an
3        African-American woman, yes or no?
4                MR. MARKO:  Asked and answered.
5                MR. MUNGO:  Objection to counsel's tone as
6        it is -- it is demeaning and insulting.
7    A.  Based on what the mayor told me during that same
8        conversation, yes.
9    BY MR. ACHO:
10   Q.  Okay.  Now, as a diversity and inclusion coordinator
11       you were supposed to develop, implement and monitor
12       programs, practices and procedures that promote
13       diversity and inclusion within the City of Warren,
14       right?  Correct?
15   A.  Yes.
16   Q.  Please tell me what program did you develop for the
17       City of Warren that promoted diversity and inclusion,
18       can you show it to me?
19   A.  I can, yes.
20   Q.  It exists?
21   A.  It exists in the fact that I brought on the National
22       Organization of Black Law Enforcement Executives to
23       assist the City of Warren's police department in
24       developing a recruitment protocol that would increase
25       the number of minority applicants within the candidate

Page 249

1    pool to eventually rise up to the point where they
2    would be at the top of the civil service commission's
3    list and, thus, be hired by the City.
4    Q.  Is there a document that is a program that you
5        developed that's in writing, yes or no?
6    A.  My --
7    Q.  Yes or no?
8                MR. MARKO:  Go ahead.
9    A.  My -- my request to do that is in writing and was
10       approved by the mayor.
11   BY MR. ACHO:
12   Q.  A program, not a request?
13   A.  It's a --
14   Q.  Did you put together a program, either you did or you
15       didn't?
16                MR. MARKO:  No, go ahead answer the
17       question.
18   A.  Again, I made recommendations that I can only carry
19       out through the mayor.  I made a recommendation, and
20       you might not call this a program, that we develop a
21       diversity committee to help develop, identify best
22       practices and make recommendations on a formal basis
23       and the mayor declined and rejected that idea.
24   BY MR. ACHO:
25   Q.  Okay.  But you didn't answer my question.  Did you

Page 250

1    develop a program that we can see?  Do you have a
2    document that is a developed program, yes or no?
3                MR. MUNGO:  Objection, asked and answered.
4    He just said --
5    BY MR. ACHO:
6    Q.  Either you did or didn't?
7                MR. MUNGO:  Counsel, he just said the mayor
8        wouldn't allow him to do it, that's what he said.
9    BY MR. ACHO:
10   Q.  Is that the answer that your lawyer gave you?
11                MR. MARKO:  Come on.
12   A.  I said I make recommendations.
13   BY MR. ACHO:
14   Q.  I'm not asking --
15   A.  You don't understand.  You can't develop a program
16       without the mayor's permission.
17   Q.  You can just say no, I didn't, and then your lawyers
18       can ask you why, okay?
19                MR. MARKO:  Asked and answered.  He's
20       explained to you why he wasn't able to do that.
21   BY MR. ACHO:
22   Q.  Did you develop a program for diversity and inclusion,
23       yes or no?  Do you have a program?
24                MR. MUNGO:  Objection, asked and answered.
25   He said the mayor wouldn't allow him to do it,



Pages 247 to 250

GREGORY MURRAY
February 26, 2018

**Page 251**

1    Counsel.
2  BY MR. ACHO:
3   Q.  Then you can answer that yes or no?
4         MR. MARKO:  Asked and answered.
5   A.  I answered your question.
6  BY MR. ACHO:
7   Q.  No, you didn't.
8   A.  I'll answer the same way.  You can't initiate a
9       program without the mayor's permission that --
10   Q.  So you didn't?
11   A.  That he made --
12   Q.  All you do is say you didn't --
13   A.  He prohibited me --
14         MR. MUNGO:  No, objection, asked and
15      answered.  He said the mayor prohibited him.
16  BY MR. ACHO:
17   Q.  Did you implement any program of diversity and
18      inclusion, did you implement any, yes or no?
19         MR. MUNGO:  Objection, asked and answered.
20         MR. ACHO:  It's a different question.
21         MR. MUNGO:  It's the same question.
22   A.  I did develop and implement the All Access Warren
23      project --
24  BY MR. ACHO:
25   Q.  Okay.

**Page 252**

1   A.  -- which dealt with persons with disabilities, which
2       is a part of the diversity community --
3   Q.  Okay.
4   A.  -- and that is in writing.
5   Q.  Okay.
6   A.  It is in existence now, I hope, and the mayor has
7       numerous memos from me regarding that.
8   Q.  Okay.  Well, that's all we're asking for.  I just want
9       to see what you actually accomplished and so that's
10      one of them, right?
11   A.  I needed to understand what you meant by --
12   Q.  Okay.  Now, how many programs did you monitor and
13      practices and procedures that you monitored that
14      promoted diversity and inclusion, how many programs
15      did you monitor?
16   A.  What is your definition of programs?  I want to answer
17      your question.
18   Q.  Is it in your job description?
19         MR. MUNGO:  Let him see the job
20      description.
21   A.  As I said before --
22         MR. MUNGO:  Let's make a copy of that so we
23      can see it.
24         Can you make a copy?
25         MR. MARKO:  Then we have to stop.

**Page 253**

1         (Recess taken at 5:16 p.m.)
2         (Back on the record at 5:19 p.m.)
3  BY MR. ACHO:
4   Q.  I want to ask you something, Mr. Murray, when did you
5       begin talking to Mr. Mungo about DeSheila Howlett?
6   A.  I was subpoenaed and someone knocked on my door,
7       served me with a subpoena to arrive -- to come to the
8       deposition to be deposed and that day --
9   Q.  Yeah, but you talked to him because you prepared an
10      affidavit?
11   A.  I did not talk to him.
12   Q.  Who did you speak with?
13   A.  His -- Desiree Turner, I believe is her name.
14   Q.  Does she work for him?
15         MR. MARKO:  Foundation.
16  BY MR. ACHO:
17   Q.  Who's Desiree Turner?
18   A.  She was an investigator that came to me and --
19   Q.  From Mr. Mungo's office --
20         MR. MARKO:  Foundation.
21  BY MR. ACHO:
22   Q.  -- right?
23   A.  I assume so, yes.
24   Q.  Sure.  She told you, she gave you her card, didn't
25      she?

**Page 254**

1         MR. MUNGO:  Objection, assuming a fact
2       that's not in evidence.  She is not from my office.
3  BY MR. ACHO:
4   Q.  Go ahead.
5   A.  Yes.
6   Q.  Okay.  So she asked for this affidavit?
7   A.  Yes.
8   Q.  And she prepared it for you and you signed it?
9   A.  Yes.
10   Q.  So we're clear, how did you happen to talk to her?
11   A.  She showed up at my house.
12   Q.  Well, do you talk to everybody who shows up at your
13      house?
14   A.  That's a ridiculous question.
15   Q.  No, do you --
16   A.  The majority of the people, yes.
17   Q.  You didn't know this woman?
18   A.  She identified herself to me.
19   Q.  And she just knocked on your door, she didn't call you
20      in advance?
21   A.  That's right, she just showed up at my door.
22   Q.  And you invited her in?
23   A.  Yes, sir.
24   Q.  What did she say to you?
25   A.  That she was working on a case and wanted to ask me



US LEGAL SUPPORT
The Power of Commitment™

GREGORY MURRAY
February 26, 2018

Page 255

1     some questions regarding my tenure there at the City
2     of Warren.
3   Q. Who did she say she was working for?
4   A. I believe she said she was working on the case. She
5     didn't tell me she was working for Mr. Mungo. She
6     told me she was working on the case.
7   Q. Well, didn't you ask her?
8   A. No, why? Why do I have to ask? She answered my
9     question.
10  Q. How do you know that she was legitimate?
11  A. She showed me a card.
12  Q. What was on the card? What was on the card?
13  A. The card was her name, investigator, and the name of
14    the agency. I recognized the name of the agency
15    because, back in the day, I had hired the person who
16    owned the agency, Julianne Cuneo, and I knew her from
17    when I hired her when I was at the Detroit Free Press
18    so I was aware of the agency itself.
19  Q. What was the name?
20  A. Sunshine Investigations.
21  Q. Do you know who hired Sunshine Investigations?
22  A. No.
23  Q. But did you tell this investigator that DeSheila
24    Howlett's case was bullshit or --
25  A. No.

Page 256

1   Q. But you told us earlier that you told multiple people
2     that DeSheila Howlett did not have a case?
3   A. Based on my limited expertise, yes.
4   Q. How come it's not in your affidavit? Your affidavit
5     didn't say that, did it?
6   A. She didn't ask me.
7   Q. Okay. So your affidavit is incomplete, correct?
8         MR. MARKO: Objection, assumes facts not in
9     evidence.
10  A. I wouldn't say that, no.
11  BY MR. ACHO:
12  Q. If she would have put in, I, Gregory Murray, fully
13    sworn deponent, say that I believe DeSheila Howlett
14    has no case, you would have signed it?
15        MR. MARKO: Objection, speculation and that
16    calls for a legal conclusion.
17  BY MR. ACHO:
18  Q. True, you would have?
19  A. No, I probably would not have said that to her.
20  Q. Why, that would have been the truth, right? You said
21    you tell the truth.
22  A. She didn't solicit that response from me.
23  Q. I didn't ask you that.
24  A. I answered it.
25  Q. Wait. Wait. Wait. You have to listen to my

Page 257

1     question.
2   A. Uh-huh.
3   Q. The truth is, your opinion has been, because you've
4     told multiple people beyond this room, that DeSheila
5     Howlett doesn't have a case, correct, you said that
6     under oath?
7         MR. MARKO: Objection, that is a legal
8     conclusion.
9   BY MR. ACHO:
10  Q. Go ahead.
11  A. As I said before, I'm not an attorney. Based on what
12    limited information I had, I drew that conclusion.
13  Q. Okay. And if she would have put that, this woman, the
14    investigator, in the affidavit, if she would have put
15    that in, you would have signed the affidavit?
16        MR. MARKO: Objection.
17  A. I would have asked her to take it out.
18  BY MR. ACHO:
19  Q. You would have asked her to take it out?
20  A. Yes, sir.
21  Q. But it was the truth, right?
22        MR. MUNGO: Objection, argumentative,
23    Counsel.
24        MR. MARKO: And it calls for a legal
25    conclusion.

Page 258

1   BY MR. ACHO:
2   Q. You said you tell the truth, don't you?
3   A. I do.
4   Q. And the truth is you believed, and do believe now,
5     DeSheila Howlett doesn't have a case?
6         MR. MUNGO: Objection, mischaracterizes his
7     testimony, Counsel.
8         MR. MARKO: And it calls for --
9         MR. MUNGO: You are badgering this witness.
10        MR. MARKO: And it calls for a legal
11    conclusion.
12  A. No.
13  BY MR. ACHO:
14  Q. No, what?
15  A. No.
16  Q. No, what?
17  A. You put so many things inside of that question that I
18    have to answer, no. If she had put that in the
19    affidavit I would have had her strike it because it's
20    just a nonlegal opinion on my part.
21        (Mr. Mungo left the deposition room at
22    5:24 p.m.)
23  BY MR. ACHO:
24  Q. Wait a minute. But you got on television --
25  A. Yes.



GREGORY MURRAY
February 26, 2018

## Page 259

1  Q.  -- and said she was a victim of discrimination, right?
2        MR. MARKO:  Objection, mischaracterizes his
3    testimony, assumes facts not in evidence.
4  A.  I've never said that on television or to any reporter.
5  BY MR. ACHO:
6  Q.  So you're not backing up DeSheila Howlett, are you?
7        MR. MARKO:  Objection to form.
8  A.  I don't understand what you mean.
9  BY MR. ACHO:
10  Q.  You're not supporting her allegations, are you?
11        MR. MARKO:  Objection to foundation as to
12    what her allegations are and it calls for a legal
13    conclusion.
14  A.  That's for a finder of fact to determine.
15        (Mr. Mungo entered the deposition room at
16        5:25 p.m.)
17  BY MR. ACHO:
18  Q.  Well, aren't your opinions about Mayor Fouts not
19    genuinely interested in adopting practices, that's for
20    a legal conclusion, isn't it?
21  A.  Not that I'm aware of, sir.  There are no legal
22    consequences to my making that statement.
23  Q.  No legal consequences?
24  A.  Not that I'm aware of.
25  Q.  By the way, why did you go on television, can you tell

## Page 260

1    me?
2  A.  I was asked why I resigned.
3  Q.  Why did you go on television?
4  A.  I was asked why I resigned and there had been
5    statements made in the press disparaging my integrity
6    and --
7  Q.  Let me understand, we're going to talk about your
8    integrity -- by the way, were you ever fired?
9  A.  Yes.
10  Q.  You were?
11  A.  Yes.
12  Q.  How many times?
13  A.  Once.
14  Q.  By who?
15  A.  A hospital.
16  Q.  Why did they fire you?
17  A.  Because everyone on the shift was held responsible for
18    not processing a patient in emergency properly.
19  Q.  Did you believe it was discriminatory?
20  A.  That had nothing to do with discrimination.
21  Q.  Did you believe it was discriminatory?
22  A.  No, not that case, at Riverview Hospital.
23  Q.  Did you do anything about it?
24  A.  Yes, I sued.
25  Q.  You did file a lawsuit?

## Page 261

1  A.  Yes.
2  Q.  What happened with that lawsuit?
3  A.  It was dismissed.
4  Q.  You got paid?
5  A.  No, sir.
6  Q.  It was dismissed that your allegations were not
7    supportable, correct?
8        MR. MARKO:  Objection, that calls for a
9    legal conclusion and foundation.
10  BY MR. ACHO:
11  Q.  Go ahead.
12  A.  I lost the lawsuit.
13  Q.  Who was your attorney?
14  A.  That was so long ago.  You'd have to give me some time
15    to remember that.
16  Q.  Okay.  So we need two things.  Let's make a note.  Do
17    you remember the names of those three women, by the
18    way?
19  A.  The people on the -- on the nightshift?
20  Q.  No, I'm sorry, the --
21  A.  What three women?
22  Q.  The three women that you recommended to the mayor?
23  A.  Not yet.
24  Q.  Okay.  Now, you say the mayor was not committed to
25    diversity, correct?

## Page 262

1  A.  Correct.
2  Q.  Now, that's based upon your 11 months there, correct?
3  A.  It's based on the statement by the mayor to me
4    directly that he wanted me to put diversity on the
5    back burner until after the 2019 election because he
6    was fearful of a backlash by white voters.
7  Q.  Just so I'm clear, your sole opinion that Mayor Fouts
8    was not committed to diversity was based upon the 2019
9    election, deferring things?
10  A.  No, sir.
11  Q.  Well, was there anything else?
12  A.  His behavior, his statements to me, his not -- not
13    allowing me to do certain things like create a
14    diversity committee, et cetera, those were the primary
15    reasons that I came to the conclusion that the mayor
16    was not genuine about diversity but, most importantly,
17    that he told me he intended to put diversity on the
18    back burner until the 2019 election and he wanted me
19    to take up being the liaison between the City of
20    Warren and the census bureau, which is an altogether
21    different job, well outside the scope of my job
22    description.
23  Q.  Mayor Fouts, you told us earlier you liked him,
24    correct?
25  A.  Yes, I did.



GREGORY MURRAY
February 26, 2018

Page 263

1  Q.  And he was always kind to you and respectful to you,
2      wasn't he?
3  A.  Yes.
4  Q.  And, personally, you enjoyed working with him,
5      correct?
6  A.  Yes.
7  Q.  Okay.  Now, were you aware when you made the public
8      comments that the mayor is not committed to diversity
9      of these following things -- I'm going to ask you one
10     after another to see if you're aware of it.
11 A.  Okay.
12 Q.  Were you aware that he appointed the first
13     African-American fire commissioner in Macomb County,
14     were you aware of that?
15 A.  Yes.
16 Q.  And you still feel that he isn't committed to
17     diversity, correct?
18 A.  I now understand that these were political
19     calculations being played out.
20 Q.  Okay.  So, in other words, if Mayor Fouts hired or
21     promoted African-Americans or Arab-Americans or women,
22     the sole purpose, in your mind, is political, correct?
23 A.  I would not say, sole.
24 Q.  Primarily political, that's what you're telling us
25     now?

Page 264

1  A.  What I'm telling you now is, is that I believe that
2      the mayor has appointed people of color as a political
3      calculation.
4  Q.  Okay.  Now, how do you know -- because I'm going to go
5      through a whole list of these --
6  A.  That's fine.
7  Q.  -- and I'm going to ask you for each one, how do you
8      know it's a political calculation, okay?
9          (Mr. Vinson left the deposition room at
10             5:30 p.m.)
11 BY MR. ACHO:
12 Q.  Let's take the first one, how do you know hiring the
13     first African-American fire commissioner in Macomb
14     County was a political calculation, how do you know
15     that or is that your guess?
16 A.  That's my assessment.
17 Q.  That's your guess?
18 A.  That's my assessment.
19 Q.  Your assessment based on what?
20 A.  My assessment based on what the mayor's behavior, as
21     demonstrated to me, has revealed to me during the time
22     I worked there.
23 Q.  Even though you say you personally liked him, enjoyed
24     working with him, despite that behavior?
25 A.  I've worked with bigots and racists and a whole host

Page 265

1      of other people.
2  Q.  But you didn't like them, you worked with them but you
3      didn't like them?
4  A.  You can like a person's idiosyncrasies without liking
5      what they do.
6  Q.  Okay.  Did you know he appointed the first, second,
7      third, fourth and fifth and sixth African-American
8      members of the planning commission, did you know that?
9  A.  Yes.
10 Q.  Now, let me ask you this, is your opinion that these
11     appointments were all political expediency, yes or no?
12        MR. MARKO:  Asked and answered.
13 A.  You're asking me my opinion, my opinion is some of
14     them, yes.
15 BY MR. ACHO:
16 Q.  But the other is not, it wasn't political?
17        MR. MARKO:  That mischaracterizes his
18     testimony.
19 BY MR. ACHO:
20 Q.  What do you mean?
21 A.  Some of them possibly were.
22 Q.  And some possibly were not?
23 A.  True.
24 Q.  All right.  Let's go with this, do you know that
25     currently a majority of the planning commission are

Page 266

1      nonwhite and that includes Muslims, did you know that?
2  A.  Yes, sir.
3  Q.  Are you alleging that is strictly political, yes or
4      no?
5  A.  It's not a yes or no answer.  Some of it, yes, some of
6      it, no.
7  Q.  Okay.  Do you know that Mayor Fouts has appointed
8      several women of all ages to different positions
9      throughout the City of Warren, did you know that?
10 A.  Yes.
11 Q.  Do you say that that's political?
12 A.  Some possibly would be, yes.  Any appointment is
13     political.
14 Q.  Wait a minute.  You're suggesting political means --
15     okay, fine, I'll go on.  You know he appointed, the
16     mayor, Greg Jackson to downtown development authority
17     and became the first African-American to sit on the
18     downtown development authority board, which is
19     prestigious, did you know that?
20 A.  Yes.
21 Q.  Are you alleging this somehow was not the act of a
22     good person?
23 A.  I wouldn't make that characterization.  I would say it
24     was political.  Greg Jackson owns five or six
25     dealerships, it's political.



GREGORY MURRAY
February 26, 2018

Page 267

1  Q. But he's black?
2  A. It's a political appointment nonetheless.
3  Q. Okay. They're political appointments, that's not what
4     I'm getting at. You're saying he's not committed to
5     diversity, isn't that what you told the media, yes or
6     no?
7  A. With respect to changing city government, yes, that's
8     correct.
9  Q. And here I've identified, what, 10 or 11 so far and
10    we're not even near done and you're still standing by
11    your guns, right?
12 A. Yes, sir.
13 Q. Okay. Did you know he appointed Ethan Vinson as the
14    first African-American city attorney in the history of
15    Warren?
16 A. Yes, after I recommended Ethan to the mayor.
17 Q. But he hired him, he didn't have to hire an
18    African-American, did he?
19 A. He was looking to present, I believe, the facade of
20    being inclusive and to the --
21 Q. That's just your perception?
22 A. You asked my opinion.
23 Q. But it's only your perception that's a facade?
24 A. It's my assessment.
25 Q. Your assessment. Do you know Ethan Vinson's

Page 268

1     background?
2  A. Yes.
3  Q. It is very impressive, isn't it?
4  A. Yes.
5  Q. You don't believe that Ethan Vinson was hired because
6     he happened to be the best person for the job?
7  A. I believe Ethan Vinson was hired because he was black
8     and a qualified person.
9  Q. Is there anything wrong with that?
10 A. To some extent it could be, it depends what your
11    ulterior motives might be.
12 Q. How about the motive of being -- having more
13    African-Americans in the City's employment, is that a
14    proper and good motivation?
15 A. Yes, if it's genuine.
16 Q. Well, are you saying, as you sit here today, the
17    hiring of Ethan Vinson, who's a prominent black
18    attorney, was not a proper motivation?
19 A. It was a political appointment that had a positive
20    consequence, yes.
21 Q. But weren't you supposed to bring in African-Americans
22    as a positive consequence, yes or no?
23 A. The answer to that is yes but --
24 Q. Okay.
25 A. -- for the purpose of genuine diversity.

Page 269

1  Q. Well, didn't Ethan Vinson being the city attorney
2     promote genuine diversity?
3  A. It gave the appearance of diversity.
4  Q. Either he was an enhancement of diversity or not,
5     which is it?
6         MR. MARKO: Objection.
7         MR. MUNGO: Objection.
8         MR. MARKO: Objection to form.
9         You don't have to answer that.
10 BY MR. ACHO:
11 Q. Yes, you do.
12        MR. MARKO: It's been asked and answered.
13        MR. ACHO: You know what, I'll go to court
14    if I have to. When we finish this deposition --
15        MR. MARKO: Do you have a different answer?
16        MR. ACHO: -- I will go into court.
17        THE WITNESS: No, I don't have a different
18    answer.
19 BY MR. ACHO:
20 Q. Did it enhance diversity, yes or no?
21        MR. MARKO: Asked and answered.
22 A. It was a number on a chart.
23 BY MR. ACHO:
24 Q. But didn't the mayor want you to get a number higher
25    on the chart than what the city had, true?

Page 270

1  A. For political purposes, yes.
2  Q. Okay. So you're standing by your ground that all of
3     these hires were for political purposes?
4  A. I never said that, sir.
5  Q. What about appointing Brittany Dallas as the human
6     resources assistant?
7  A. I have no knowledge as to what was involved in that
8     appointment.
9  Q. He appointed Amanda Mika executive assistant, the
10    first Arab-American employee in the mayor's office?
11 A. I really have no knowledge of what the motivation was
12    of hiring Amanda Mika.
13 Q. What about Richard Sabaugh, public service director,
14    who's also an Arab-American, do you think that doesn't
15    support or undermine your statement that the mayor is
16    not committed to diversity?
17 A. I believe that's incidentally consequential to the
18    political perspective.
19 Q. Incidental, you have a department head, one of the
20    most important public services, you feel that's
21    incidental?
22 A. Yes, what I understand is that Mr. Sabaugh ran Mayor
23    Fouts' campaign and that that was one of the primary
24    reasons for bringing him on board in the capacity he's
25    in. I don't think it was --


US LEGAL SUPPORT
The Power of Commitment™

Pages 267 to 270

GREGORY MURRAY
February 26, 2018

Page 271

1    MR. MARKO: Go ahead.
2    A.  I don't think it was because of diversity, it was
3        because he had other skill sets and just happened to
4        turn out to be Arabic.
5            (Mr. Mungo left the deposition room at
6            5:38 p.m.)
7    BY MR. ACHO:
8    Q.  Who told you what you just said or is that your
9        assessment?
10   A.  That's my assessment.
11   Q.  Okay.  Now, are you aware that Mayor Fouts approved
12       the promotion of two African-Americans in human
13       resources?
14   A.  Yes.
15   Q.  Isn't that a sign of commitment to diversity?
16   A.  It's a sign of political patronage.
17   Q.  Okay.  He appointed Hazel Rivers to the crime
18       commission, what about that?
19   A.  I have no knowledge as to why that appointment was
20       made.
21   Q.  He appointed Doug Williams as senior housing
22       assistant?
23   A.  Who, himself, had his own issues with race in that
24       department and he spoke to the mayor about that.
25   Q.  You know, you seem to know a lot of things without

Page 272

1        having personal knowledge.  Is this what someone tells
2        you?
3            MR. MARKO: Objection to form and
4        mischaracterizes his testimony.
5    BY MR. ACHO:
6    Q.  That's what someone told you, is that correct?
7            (Mr. Mungo entered the deposition room at
8            5:38 p.m.)
9    A.  That's what Mr. Williams told me.
10   BY MR. ACHO:
11   Q.  Yeah, it's not your own knowledge, is it?
12   A.  Well, the party had shared that with me, yes.
13   Q.  So you really don't know what hearsay is, do you?
14            MR. MARKO: Objection, Counsel.
15   BY MR. ACHO:
16   Q.  Did you know the mayor started the annual Dr. Martin
17       Luther King Day ceremony day at Warren City Hall?
18   A.  Yes, sir.
19   Q.  Now, did you know it's the only city in Macomb County
20       to have such an event, did you know that?
21   A.  I'm not aware of that.  I think the county also does
22       something on Martin Luther King Day.
23   Q.  Did you hear what I said?
24   A.  Yes.
25   Q.  It's the only city in the county?

Page 273

1            MR. MARKO: Asked and answered.
2    BY MR. ACHO:
3    Q.  Do you hear what I just said?
4    A.  Yes.
5    Q.  Does that now -- you still stand by no commitment to
6        diversity, right?
7    A.  I think what you're confusing, sir, commitment of
8        diversity as it relates to singular appointments and
9        actual practices and policies, that's what you're not
10       understanding, and that's the framework within which
11       I'm answering your questions.
12   Q.  Okay.  Also, the mayor sponsored having a large photo
13       of Dr. Martin Luther King at the entrance of the Civic
14       Center Library, did you know he did that?
15   A.  Yes, sir.
16   Q.  It's a good thing, isn't it?
17   A.  Yes, sir.
18   Q.  That doesn't sound political to me.  Does it sound
19       political to you?
20   A.  Yes, sir.
21   Q.  Bernice King, do you know who she is?
22   A.  Yes, sir.
23   Q.  Are you aware of the letter she sent to the mayor --
24   A.  Yes.
25   Q.  -- commending him about his diversity?

Page 274

1    A.  Yes, sir.
2    Q.  So here you have Dr. Martin Luther King, Jr.'s
3        daughter commending the mayor for his diversity and
4        you are saying, no, he really doesn't, is that right?
5    A.  No, I'm saying the mayor's commitment to diversity was
6        not genuine.
7    Q.  And he changed the image from Fortress Warren from the
8        previous administration, didn't he?
9    A.  I believe that there are enough people out there who
10       still believe that Warren is Fortress Warren.
11   Q.  But you haven't done anything to change it, have you?
12   A.  Within my limitations, no.
13   Q.  All right.  The mayor has more employees at city hall
14       who are African-American than ever before, true?
15   A.  That would be numerically correct.
16   Q.  Well, more than numerically correct, it shows
17       diversity effort on the part of the mayor, correct?
18            MR. MARKO: Objection to foundation.
19            Go ahead.
20   A.  It shows that there are a larger number of people of
21       color working in the City of Warren than in previous
22       administrations.
23   BY MR. ACHO:
24   Q.  Okay.  So Mayor Fouts was responsible for that,
25       correct?



GREGORY MURRAY
February 26, 2018

Page 275

1  A. Yes.
2  Q. Okay.
3  A. Yes.
4  Q. So that shows a commitment to diversity, doesn't it?
5  A. It shows an understanding of how that would be
6     perceived.
7  Q. Perceived to something good, right?
8  A. By some perceived as nothing but tokenism.
9  Q. So in your world, if you hire African-Americans it's
10    tokenism?
11 A. No, sir.
12 Q. Well, either it's a good thing or it's tokenism, which
13    is it?
14 A. It could be both.
15 Q. In all these instances I've given you so far, we're
16    not done, are you saying these were all tokenism?
17    MR. MARKO: Objection, that
18    mischaracterizes his testimony.
19 A. No, sir.
20 BY MR. ACHO:
21 Q. So some of these were commitments to diversity, right?
22    MR. MARKO: Foundation.
23 A. I'm not able to discern that from these appointments.
24 BY MR. ACHO:
25 Q. But you can't discount them either, can you?

Page 276

1  A. Obviously not.
2  Q. Pardon me? Oh, obviously not?
3  A. Yeah.
4  Q. So the mayor's efforts you cannot discount, as you sit
5     here today?
6  A. The mayor's motivation I can discount.
7  Q. Well, what's more important, motivation or results,
8     you brought in no one of color to the city?
9  A. That's not true, sir.
10    MR. MARKO: Objection to the form of the
11    question.
12 BY MR. ACHO:
13 Q. Who did you bring in to the City, who did you actually
14    bring in of color?
15 A. I made the recommendation for Ethan, I'm not saying
16    that it was the only recommendation he got from me but
17    I made that initial recommendations for Ethan. I made
18    the initial recommendation for Clarissa Cayton, who is
19    now the director of the communications department and
20    I gave him the three resumes, as he asked me, of three
21    African-American females for the position of human
22    resource director.
23 Q. If I understand your testimony correctly, the two
24    recommendations of department-level positions that you
25    made, the mayor supported you and the three that you

Page 277

1  were recommending you told him to delay, is that
2  correct?
3  A. Based on what the mayor told me was his concern about
4     the backlash that he anticipated.
5  Q. But I'm just trying to understand --
6  A. Yes.
7  Q. You've only made five recommendations, two you asked
8     to be done and he did them, doesn't that show you a
9     commitment to diversity, which is different than what
10    you told the media?
11 A. It shows an intent to showcase isolated incidences of
12    hiring minorities.
13 Q. Okay. Well, I've already gone through 16 with you and
14    I'm going to go through more.
15 A. Sure.
16 Q. So 16 is not isolated, is it?
17    MR. MARKO: Objection to form.
18 A. Over a 10-year period, yes.
19 BY MR. ACHO:
20 Q. Okay. And isn't it true that in all of the State of
21    the City speeches diversity and inclusiveness has been
22    a highlight in all of Mayor Fouts' speeches or you
23    just don't know, correct?
24 A. I can say all of the speeches, no.
25 Q. But you don't know?

Page 278

1  A. I'm not privy to all of the speeches.
2  Q. Well, you were if you would have listened to them,
3     right?
4     MR. MARKO: Objection.
5  BY MR. ACHO:
6  Q. If you heard them, right?
7  A. Now, that was uncalled for, Mr. Acho.
8  Q. No, if you would have heard the speeches --
9  A. That's not what you intended by --
10 Q. That's exactly what I intended. You're being
11    overly-sensitive.
12    MR. MARKO: That's argumentative.
13 BY MR. ACHO:
14 Q. Let's back up. I asked you, isn't it significant that
15    in all of the State of the City speeches diversity
16    inclusiveness has been a highlight, that is important,
17    isn't it?
18 A. It's important to say.
19 Q. Okay. And then, on top of that, he hired you as the
20    only diversity coordinator in the history of Warren
21    and the only one in southeast Michigan, right?
22 A. That was a ruse.
23 Q. Okay.
24 A. I came to find, to understand, that it was a ruse and
25    that his interest in diversity was not genuine.



GREGORY MURRAY
February 26, 2018

Page 279

1    Q.  So here I've now identified 17 --
2    A.  Yes.
3    Q.  -- including department heads, like Mr. Vinson, and
4        those were all ruses?
5    A.  Over a 10-year period, 2 a year, that's a good quota.
6    Q.  Okay.  He appointed George Anthony to be diversity
7        coordinator, that's a commitment to diversity, right?
8    A.  Mr. Anthony has absolutely no credentials in diversity
9        or advocacy for diversity.  He has law enforcement
10       credentials and they're impressive, and I know George
11       and I like George and I hope George can do a better
12       job, but George has no experience in negotiating
13       issues of diversity with units of government.
14   Q.  But you, you were there 11 months and you really
15       didn't accomplish much, did you?
16          MR. MARKO:  Objection, argumentative.
17   A.  I accomplished some things, yes.
18   BY MR. ACHO:
19   Q.  Some things?
20   A.  Yes, sir.
21   Q.  He also appointed Melody Magee to the housing
22       commission.
23   A.  Yes, sir.
24   Q.  That's a good thing, isn't it?
25   A.  I don't know what her credentials are and --

Page 280

1    Q.  So what, she's a minority?
2    A.  That's the problem.
3    Q.  What is the problem?
4    A.  That it doesn't matter as long as you have a black
5        face positioned somewhere.  What you just said
6        reveals -- it doesn't matter, it does matter.
7    Q.  Sir --
8    A.  It does matter.
9    Q.  You don't know her credentials?
10   A.  I do know her credentials.
11   Q.  What are they?
12   A.  She was a former buyer -- a diversity buyer for, I
13       believe, GM.
14   Q.  So you don't think she was qualified?
15   A.  For the housing commission, I don't know that she is
16       or isn't.
17   Q.  So you're not in a position to say?
18   A.  Correct.
19   Q.  But having more diversity is a good thing, right?
20   A.  Just having black people in spaces and faces is not
21       enough for diversity.
22   Q.  Okay.  What is enough in your mind?
23   A.  Genuine diversity would seem to imply that your
24       workforce is representative of your City's
25       demographics, that's what it would mean to me and that

Page 281

1        would mean taking a look at all of your protocols to
2        make sure that, one, that they're placed at their best
3        practice and that people are excluded based on
4        practices and policies that on its face are not racist
5        but have disparate impact.
6    Q.  Okay.  You say that you really -- you don't know if
7        you did a good job, do you?
8    A.  Oh, I did a good job.
9    Q.  Okay.  Please tell me this, since you did a good job,
10       how many African-Americans applied for police officer
11       positions in Warren in the last four years?
12   A.  I'm not aware of that, sir.
13   Q.  How many African-Americans were offered positions as
14       police officers?
15   A.  I'm not aware of that, sir.
16   Q.  How many African-Americans apply for positions, were
17       offered positions, and declined?
18   A.  I'm not aware of that, sir.
19   Q.  You don't think that matters?
20   A.  I think what matters is that you have a police force
21       of 204 sworn law enforcement officers and you only
22       have one black -- black police officer with the City
23       having at least 16 percent African-American and the
24       surrounding metropolitan area having a predominance of
25       African-American persons, that there is something

Page 282

1        there that seems to be institutional and, to some
2        extent, intentional.
3    Q.  But you're a diversity coordinator and you didn't even
4        bother to find out what happened in the last four
5        years --
6    A.  That's not correct.
7    Q.  -- with regard to the police department?
8    A.  I requested that information from the police
9        department and you need to ask Mark and the mayor to
10       give you the memo that I wrote requesting that
11       information.
12   Q.  When did you --
13   A.  Your clients aren't being upfront with you.
14   Q.  When did you request it?
15   A.  I requested that information in about June or so,
16       yeah.
17   Q.  So since --
18   A.  June, July.
19   Q.  You've never followed up after that, did you?
20   A.  I followed up with the mayor.
21   Q.  You didn't follow up with the civil service
22       commission?
23   A.  That would be inappropriate for me to do so.
24   Q.  Well, that's what you say.
25   A.  Yes.



Pages 279 to 282

GREGORY MURRAY
February 26, 2018

Page 283

1  Q.  Didn't you tell us it was a national problem and a
2     statewide problem that not enough African-Americans
3     were applying to be police officers?
4  A.  Absolutely, yes, sir, but I also chaired that Grand
5     Rapids, Kalamazoo and other cities and Dearborn, in
6     particular, have been in the same situation and I
7     encouraged the mayor to reach out to those
8     municipalities so that he can get an understanding of
9     how diversity is introduced into an environment like
10    Warren, but black people are still being hired all
11    across the state but not in Warren.
12 Q.  In Warren, you know, two were offered positions and
13    declined, did you know that?
14 A.  No, sir.
15 Q.  Wouldn't that make a difference, the number would have
16    spiked by a thousand percent, right?
17 A.  No. No. No.
18 Q.  Well, yeah, to go from 1 to 3.
19 A.  The City of Warren has a reputation that a lot of law
20    enforcement officers have issues with and that also
21    helps to inform people's decisions to accept
22    employment from the City of Warren.
23        MR. ACHO:  Could you read the question
24    back?
25        I want you to answer my question, not

Page 284

1     yours, okay?
2        (The following requested portion of the
3        record was read by the reporter at
4        5:51 p.m.:
5        Q.  Wouldn't that make a difference, the
6        number would have spiked by a thousand
7        percent, right?)
8  A.  You said make a difference, it would not have made
9     that much of a difference.
10 BY MR. ACHO:
11 Q.  And were you aware that the mayor appointed Gus
12    Ghanam, a sanitation director, who's Arab-American?
13        (Mr. Mungo left the deposition room at
14        5:51 p.m.)
15 A.  Yes.
16 BY MR. ACHO:
17 Q.  He appointed Michelle Nard, the first African-American
18    to be appointed to the beautification commission?
19 A.  I'm not aware of that at all.
20 Q.  He appointed Ben Lazarus, the first Asian-American,
21    and later helped him get elected to the local school
22    board?
23 A.  I'm not familiar with that.
24 Q.  What about Clarissa Cayton, first female
25    African-American communications director in Warren's

Page 285

1     history, were you aware of that?
2  A.  Yes, sir.
3  Q.  What do you think of that, isn't that promoting
4     diversity?
5  A.  I think it's manipulating diversity, although she is
6     well-qualified.
7  Q.  And then Gena Benson, an African-American, to the
8     crime commission?
9  A.  I'm not aware of that.
10        (Mr. Mungo entered the deposition room at
11        5:52 p.m.)
12 BY MR. ACHO:
13 Q.  Okay.  So here I've listed a whole long list of things
14    and what you're telling the court, I don't care about
15    all of these appointments, African-American, women,
16    Arab-Americans, to my mind none of that makes any
17    difference at all about my opinion, correct?
18        MR. MARKO:  Objection to the form,
19    mischaracterizes his testimony.
20 A.  I never said, don't care.  I never used those words
21    and I do understand how initiatives can be manipulated
22    for political purposes.
23 BY MR. ACHO:
24 Q.  Well, answer my question.  You're telling us under
25    oath, I don't care about all these hires and all these

Page 286

1     initiatives, that doesn't change my opinion, my
2     assessment, is that right?
3  A.  I'm sharing with you that my assessment of a number of
4     those were politically motivated and not under or
5     within a genuine interest in diversity.
6  Q.  Not all of them, you're not saying all of them were,
7     are you?
8  A.  No, sir.
9  Q.  Okay.  Now, Jere Green, you didn't like him, did you?
10 A.  I had no feeling one way or another for Mr. Green.
11    He'd never done anything to me, except for that one
12    comment that he made and I didn't even respond to
13    that.
14 Q.  Why didn't you?  You should have gone up to him, since
15    you're a man who's not shy and reticent, and say,
16    hey --
17 A.  The man carries a gun.
18 Q.  Are you telling us under oath you're afraid for your
19    life?
20 A.  The man carries a gun.
21        MR. ACHO:  Could you read the question back
22    to the witness?
23 A.  I'm not telling you that.  The man carries a gun.
24 BY MR. ACHO:
25 Q.  So he carries a gun, so does the lieutenant, okay, so



GREGORY MURRAY
February 26, 2018

**Page 287**

1  do some people in this room.
2      MR. MARKO:  Objection, argumentative.
3  BY MR. ACHO:
4  Q.  Is that the reason you didn't go up to him and
5  confront him because he carries a gun?
6  A.  He never -- Lieutenant Bradley has never spoken to me,
7  to my knowledge, as being a nigger.
8  Q.  But you heard it from a third party, correct?
9  A.  I heard it from someone who I assumed -- who I granted
10  credibility.
11  Q.  Okay.  Did you know that that man and Green did not
12  get along, did you know that, because if you really
13  knew that man, he told me he didn't get along with
14  him?
15      MR. MARKO:  Objection to form.  I don't
16  understand the question.
17  BY MR. ACHO:
18  Q.  You understand what I'm saying, don't you?
19  A.  Would you repeat that?
20  Q.  Sure.  Oh, by the way, I have to ask you something,
21  you are telling the court that Jere Green carries a
22  gun, right, that's what you told us?
23      MR. MARKO:  Asked and answered.
24  BY MR. ACHO:
25  Q.  This is a foundation.  Is that right?

**Page 288**

1  A.  Yes.
2  Q.  Do you know he hasn't carried a gun in 10 years?
3      MR. MARKO:  Assumes facts not in evidence.
4  A.  I do not know that.
5  BY MR. ACHO:
6  Q.  Okay.  So, basically, you're speaking on something
7  like you know what you're talking about but you really
8  don't, about Jere Green?
9      MR. MARKO:  Argumentative, mischaracterizes
10  his testimony.
11  A.  The police chiefs that I have had interactions with
12  all carry weapons so I don't think it was out of the
13  ordinary that Jere Green would carry a weapon.
14  BY MR. ACHO:
15  Q.  But he doesn't, but you still didn't go up to him?
16  A.  No, sir.
17  Q.  You could have gone up to him and say, is this true
18  what this man said you said?
19  A.  That's your opinion, that was not my opinion, no.
20  Q.  Are you saying something prohibited you after you
21  talked to Nichols, right?
22  A.  Uh-huh.  Yes.
23  Q.  There was nothing that prevented you from going to
24  talk to Green and have a face to face with him?
25  A.  I'll share with you that I did not go confront him

**Page 289**

1  because the man carries a gun.
2  Q.  If he didn't carry a gun would you have gone up to
3  him, would you?
4  A.  I have no way to answer that question.  I would not go
5  up to a person that carries a gun.
6  Q.  Let's back up.  I said if he didn't have a gun, would
7  you have gone up to him?
8      MR. MARKO:  He answered.  Asked and
9  answered.  He answered that question.
10  A.  I can't speculate on that.
11  BY MR. ACHO:
12  Q.  Why?
13  A.  Because the difference is a gun.
14  Q.  I said if he did not have a gun?
15  A.  I have no way to know that.
16  Q.  But you could have asked Nichols, does he carry a gun,
17  you could have asked him, right?
18  A.  As I said, every police chief that I have had contact
19  with --
20      MR. ACHO:  Read the question back to him.
21  See, you have to answer my question.
22  Listen to my question.
23      (The following requested portion of the
24  record was read by the reporter at
25  5:57 p.m.:

**Page 290**

1      Q.  But you could have asked Nichols, does
2  he carry a gun, you could have asked him,
3  right?)
4  A.  Anything is possible.
5  BY MR. ACHO:
6  Q.  But you didn't?
7  A.  I did not ask him that question.
8  Q.  By the way, did you ever keep any notes about anything
9  pertaining to the City of Warren or the mayor or Jere
10  Green?
11  A.  They were all left in my office when I departed.  I
12  did keep notes.
13  Q.  About what, what is contained in those notes?
14  A.  Our recounting of conversations that I may have had
15  with others, policies that I wanted to explore, things
16  that I needed to verify, all those things were left in
17  my credenza behind my chair.
18  Q.  Was there anything derogatory about Mayor Fouts?
19  A.  I wouldn't have written anything derogatory about him.
20  Q.  Was there anything derogatory about Jere Green?
21  A.  I wouldn't have written anything derogatory about Jere
22  Green.
23  Q.  You could have, according to you, according to your
24  affidavit, I mean, you wrote something derogatory
25  here, didn't you?



GREGORY MURRAY
February 26, 2018

Page 291

1    A. What are you referring to?
2    Q. Your whole affidavit is derogatory, right?
3        MR. MARKO: Objection, mischaracterization.
4    A. No.
5   BY MR. ACHO:
6    Q. It's not derogatory?
7    A. I would say that some of the behavior is derogatory,
8      yes.
9    Q. Okay. So you told us you kept notes but I didn't keep
10     anything derogatory on Fouts or Green, correct?
11    A. Correct.
12    Q. But you put derogatory comments about Fouts and Green
13     in your affidavit?
14        MR. MARKO: Mischaracterizes his testimony.
15   BY MR. ACHO:
16    Q. Didn't you, yes or no?
17    A. I put comments in there regarding my assessment of the
18     mayor and I need you to show me where I said something
19     about Jere Green.
20    Q. Well, we're going to go -- I'm going to ask you first,
21     foundation, did you, in your affidavit, put anything
22     derogatory about Mayor Fouts?
23    A. May I have a copy of that?
24    Q. No, I'm going to ask you from your own -- I want to
25     see how your recollection is because this affidavit

Page 293

1    Q. Okay.
2    A. In regards to the mayor, I shared what the mayor said
3     to me.
4    Q. Okay. So when you said this is of my own knowledge,
5     that is not true as to Green, is it?
6    A. May I have a copy of this?
7        MR. MARKO: You're questioning him about
8     it, let him see the affidavit.
9   BY MR. ACHO:
10    Q. Do you want to read it and I'm going ask you a few
11     questions.
12        MR. MARKO: Go ahead and read it.
13        MR. ACHO: So let's take some -- we're
14     going to take a break and this not taking -- this is
15     not taking off our time. You take a look at it.
16        MR. MARKO: What do you mean, not taking
17     off your time?
18        THE WITNESS: You can ask me as I read it.
19        MR. MARKO: It is off your time too.
20   BY MR. ACHO:
21    Q. Then we'll keep going. Okay. The comments about
22     Green underlined there is not your personal knowledge,
23     it's what you say the mayor said to you, is that
24     correct?
25        MR. MARKO: There's multiple things

Page 292

1     was only done about a month ago, January 17th, so I
2     want to test your recollection. Did you write
3     anything derogatory about the mayor?
4        MR. MARKO: Objection to form and the use
5     of the term derogatory.
6    A. I shared my assessment of the mayor's lack of genuine
7     commitment to diversity.
8   BY MR. ACHO:
9    Q. Do you consider that complimentary or derogatory?
10    A. I consider it factual.
11    Q. Is it complimentary or derogatory?
12        MR. MARKO: Objection to form.
13        MR. MUNGO: Objection, asked and answered.
14    A. I consider it derogatory.
15        (Mr. Vinson entered the deposition room at
16     5:59 p.m.)
17   BY MR. ACHO:
18    Q. Same thing about Green, you said something derogatory
19     about him?
20    A. I shared what the mayor shared with me about Jere
21     Green.
22    Q. So your affidavit contains something that was not your
23     personal knowledge but what someone said to you, is
24     that correct?
25    A. Yes.

Page 294

1     underlined so make sure we're on the same page that
2     we're talking about.
3        MR. ACHO: It's the first page.
4        MR. MARKO: The same page, that might have
5     been unartful, that we're talking about the same thing
6     on the page.
7    A. Okay.
8   BY MR. ACHO:
9    Q. Do you see them?
10    A. I see where --
11    Q. That comment about Jere Green?
12    A. In my opinion --
13    Q. But it's not your opinion?
14    A. It is.
15    Q. You told us that's what the mayor told you?
16    A. True.
17        MR. MUNGO: Objection, argumentative,
18     Counsel.
19   BY MR. ACHO:
20    Q. That's my point, it's not your personal knowledge,
21     it's what a third party said to you about Green,
22     correct?
23    A. In concert with the fact that over 10 years no other
24     African-American person had been hired as a police
25     officer in the City of Warren, in concert with that.



Pages 291 to 294

GREGORY MURRAY
February 26, 2018

**Page 295**

1  Q. So we're clear, this comment about Green --
2  A. I need that back, sir.
3  Q. This comment about Green -- the comment about Green --
4  A. Yes.
5  Q. -- was based upon what a third party told you and
6     about the number of African-American police officers,
7     is that correct?
8  A. Within the last 10 years.
9  Q. It's not your own personal knowledge.
10 A. It's my personal opinion.
11 Q. Okay. Opinion, not knowledge?
12 A. It's my knowledge based on the fact that there were no
13    African-Americans hired during his tenure as
14    commissioner.
15 Q. But you didn't even know, as a diversity coordinator,
16    that two African-American officers were offered
17    positions but they declined?
18 A. So that's irrelevant.
19 Q. Okay. All right. Okay. Now, you also say the City
20    of Warren has a history of taking delayed disciplinary
21    action?
22 A. Yes.
23 Q. Okay. How many disciplinary actions has the City of
24    Warren had in the last 10 years?
25 A. No idea, sir.

**Page 296**

1  Q. Okay. So you don't know whether the City of Warren
2     has a history of taking delayed disciplinary actions
3     because you don't know the history, do you?
4  A. I do know three instances makes a history.
5  Q. So you're saying three instances make a history so 10
6     years wouldn't be a better history than 3 incidences?
7  A. No, sir, the three incidences where race was a factor
8     is what makes this a history.
9  Q. I see. Let me understand something, you resigned from
10    the City, didn't you?
11 A. Initially, yes.
12 Q. Well, when you say, initially, I'm going to be real
13    specific, did you withdraw your letter of resignation,
14    yes or no?
15       MR. MARKO: Objection to form.
16       Go ahead and answer however you need to.
17 A. The mayor rejected my letter of resignation.
18       MR. ACHO: Okay. Read the question back to
19    the witness.
20       Listen to the question because --
21 A. There was no need for me to --
22 BY MR. ACHO:
23 Q. Pardon?
24 A. There was no need for me to withdraw it. The mayor
25    and I came to an agreement that I would continue to

**Page 297**

1     work.
2  Q. But you stopped working. How did you come to stop
3     working?
4  A. The mayor called me in his office and told me that he
5     was accepting the resignation that we had voided and
6     that it had to be that way.
7  Q. Well, why didn't you tell the mayor, wait a minute,
8     I'd like to stay? You could have said, mayor, I'd
9     like to stay instead but you just walked out because
10    we have witnesses to that?
11       MR. MARKO: Objection, assumes facts not in
12    evidence.
13 A. I did tell the mayor that I would continue to work for
14    him as long as his commitment to diversity was genuine
15    and that was on November 9th or 10th, thereafter, I
16    put several recommendations in writing and he rejected
17    all of them, and then the mayor called me into his
18    office after I refused to purchase tickets to attend
19    his fundraiser and told me that he was accepting my
20    resignation, it was effective immediately and that's
21    the way it was going to be.
22 BY MR. ACHO:
23 Q. Let me understand something, you never withdrew your
24    letter of resignation?
25       MR. MARKO: Objection.

**Page 298**

1  BY MR. ACHO:
2  Q. I didn't see a withdraw of the letter. Did you submit
3     a withdraw, yes or no?
4        MR. MARKO: Objection, asked and answered.
5  BY MR. ACHO:
6  Q. Either you did or you didn't?
7  A. There was no need for me to put --
8        MR. MARKO: Go ahead. Go ahead. Finish.
9  A. There was no need for me to put a -- in writing
10    voiding my resignation letter because the mayor asked
11    me to stay on and I agreed to so, no, nothing was put
12    in writing, but the mayor and I discussed it and I
13    continued to work for nearly another month.
14 BY MR. ACHO:
15 Q. But you still wanted more money?
16 A. No, sir.
17 Q. Oh, so we have this under oath now --
18 A. Yes, sir.
19 Q. -- that you're testifying under oath, I would have
20    continued working for the City of Warren for my same
21    rate of pay, yes or no?
22 A. I did continue to work.
23 Q. No, you did for a month, I'm talking after, after?
24 A. After what?
25 Q. After a month?



**US LEGAL SUPPORT**
The Power of Commitment™

GREGORY MURRAY
February 26, 2018

Page 299

1   A. After a month? I think you have the timeline
2       confused, sir.
3   Q. We'll do it real slow. Help me out.
4   A. Okay.
5   Q. You issued a letter of resignation, that's what you
6       called it, resignation consideration?
7   A. Consideration.
8   Q. Okay. Now, you then worked for another month, you
9       said?
10  A. No, sir, that's where you have it confused.
11  Q. When did you stop working?
12  A. December 8th.
13  Q. Okay. Let's do it this way --
14  A. Okay.
15  Q. -- would you have continued working after December 8th
16      for the tasks you were given by the mayor at the same
17      rate of pay, yes or no?
18  A. Yes.
19  Q. Okay. Did you ever tell Mr. Vinson, who was in the
20      room with you with the mayor, that you would be
21      agreeable to continue to stay for the same rate of
22      pay?
23  A. I spoke with that -- about that with the mayor. Mr.
24      Vinson was not present when the mayor and I talked and
25      during that conversation he said to me that I really

Page 300

1       want you to stay and I said, okay, sir, I will stay.
2           The issue of the money was tied to the
3       position of liaison and once the mayor reassigned that
4       activity to someone else there was no issue of or a
5       need for an increase in pay, it was -- the pay
6       increase was only attached to if the mayor insisted
7       that I take on the position of the liaison coordinator
8       in addition to my being the diversity coordinator, the
9       EEOC officer, the Title 6 officer, the LEP coordinator
10      and the ADA coordinator, so that's what you have to
11      understand, that the request for the increase was
12      based on if he were to assign that to me as a primary
13      responsibility, that in itself is a full-time job.
14          Most municipalities are engaging in RFPs
15      and hiring firms to help them prepare for the 2020
16      census and so in addition --
17  Q. You know what, you're not answering my question.
18  A. I am.
19  Q. No. Why did Phil's eventual retirement change
20      everything, why?
21  A. Well, there were duties that were within his
22      wheelhouse that were assigned to me.
23  Q. Isn't that a good thing because then you're not just a
24      number, you're a person given added prestige and
25      responsibility?

Page 301

1   A. I don't consider that prestigious.
2   Q. Added responsibilities and human resources?
3   A. I don't see that as being prestigious.
4   Q. How do you know the mayor didn't see it as
5       prestigious?
6   A. That's not the point.
7   Q. But wait a minute, you work for the mayor?
8   A. True.
9   Q. Isn't the mayor's perception of your duties more
10      important than your perception?
11  A. To a certain extent.
12  Q. What do you mean, to a certain extent?
13  A. To an certain extent.
14  Q. Wait. Hold on.
15          MR. MARKO: Go ahead.
16  A. You asked me the question.
17  BY MR. ACHO:
18  Q. Wait. Wait. You also made a comment, you didn't hire
19      me, I agreed to work for you --
20  A. No, sir.
21  Q. -- do you remember that?
22  A. No, sir.
23  Q. You didn't say that?
24  A. Go back to my resignation letter.
25  Q. Did you say that? Did you say that to the mayor?

Page 302

1   A. I said I also -- words are important. This is what I
2       told the mayor, words are very important. I -- it
3       wasn't an either/or. I said to him, you chose to
4       offer the employment and I chose to accept it, that's
5       the only context.
6   Q. But isn't that true for everybody, isn't that true for
7       every single person?
8   A. So why is it a big deal?
9   Q. Because of your attitude.
10  A. My attitude?
11  Q. Yeah.
12          MR. MARKO: Objection, this is
13      argumentative.
14  BY MR. ACHO:
15  Q. You didn't pick me, I chose you.
16          MR. MARKO: Objection, that
17      mischaracterizes the testimony.
18  BY MR. ACHO:
19  Q. Words are important?
20  A. Yes, sir.
21  Q. You gave an ultimatum to your boss, I will reject the
22      latter option --
23  A. True.
24  Q. -- or else -- or else, with an effective date of
25      November 10th, you gave your boss an ultimatum, more



GREGORY MURRAY
February 26, 2018

| Page 303 | Page 305 |
|---|---|

**Page 303**

1    money or else?
2    A.  That not correct, sir.
3    Q.  More money and take away some of these
4    responsibilities?
5    A.  That's not correct, sir.
6    Q.  You --
7         MR. MUNGO:  Let the record reflect that --
8    objection, let the record reflect that counsel is
9    using a very demeaning and an agitated -- agitating
10   approach in his tone and his words to the deponent.
11        MR. ACHO:  Okay.  I will tell you
12   something, sir, I may file a bar grievance against you
13   for your mischaracterizations.  Okay.  I may not do it
14   but --
15        MR. MUNGO:  You have a freedom to do that.
16        MR. ACHO:  I know I do but I am getting
17   very tired because I am being respectful to this
18   gentleman.  He hasn't told me that he can't answer the
19   questions.
20   BY MR. ACHO:
21   Q.  Are there any questions that you can't answer?
22        MR. MARKO:  Objection.
23        MR. MUNGO:  Ask him about your tone.
24   A.  Some of the questions you've asked me I could not
25       answer but I can answer this last question.

**Page 304**

1    BY MR. ACHO:
2    Q.  Let me tell you this, if you find any question that I
3        ask where my tone or demeanor affects your ability to
4        answer, would you be kind enough to tell me?
5    A.  I will now going forward.
6         MR. MUNGO:  Has his tone and demeanor been
7    agitating and condescending to you?
8         THE WITNESS:  Agitating, yes.
9         MR. MUNGO:  And condescending?
10        THE WITNESS:  Some has been condescending,
11   yes.
12   BY MR. ACHO:
13   Q.  How come you didn't say anything?
14   A.  I want to get through this.
15   Q.  Until your lawyer throws those words --
16        MR. MARKO:  We've been saying it the whole
17   time, the objections.
18        MR. MUNGO:  And like you've threatened to
19   file a bar grievance against me for pointing it out,
20   you've intimidated this witness all day long, sir.
21        MR. ACHO:  You have pointed your finger at
22   my face 10, 12 times and I didn't say a word.  Can I
23   just deal --
24        MR. MUNGO:  And you've been pointing your
25   finger at this -- at the deponent --

**Page 305**

1         MR. ACHO:  I have not.
2         MR. MUNGO:  -- and raising your voice at
3    the deponent, how dare you talk about being
4    condescending and inappropriate and disrespectful,
5    sir?
6    BY MR. ACHO:
7    Q.  I will ask you this, are you aware of any other
8    employee in the City of Warren who gave their boss an
9    ultimatum like you did?
10        MR. MARKO:  Foundation.
11   BY MR. ACHO:
12   Q.  Are you aware?
13   A.  I'm not aware of anyone else.
14   Q.  Okay.  In your 25 years or more of employment, are you
15   aware of any employee that gave an ultimatum to their
16   boss like you did?
17   A.  Yes.
18   Q.  Give me the names?
19   A.  The current acting director of the FBI gave an
20   ultimatum to his boss.
21   Q.  Do you know him?
22   A.  I don't know him but you asked me for an instance.
23   Q.  No.  No, people you know, not what you read in the
24   paper.  I'm talking about your personal knowledge of
25   any employee that you ever worked with that ever gave

**Page 306**

1    their boss an ultimatum like you gave to Mayor Fouts?
2         MR. MARKO:  Objection, relevance.
3    A.  I'm not privy to everyone's interactions with their
4    employer.
5    BY MR. ACHO:
6    Q.  Okay.  Just wanted to be sure.  Now, so I'm clear, you
7    and I didn't make complaints to anyone at the federal
8    level, state level, even local level, you also had no
9    notes that were disparaging of the mayor or Jere Green
10   or anyone, of the City of Warren in your notes that
11   you kept while you were working, correct?
12   A.  I will answer the two questions that you asked me.
13   One, I never made any formal complaints to any
14   regulatory body or any municipal body, and then
15   secondly, I did not put in writing complaints
16   regarding the mayor or Jere Green or any other City of
17   Warren employee.
18   Q.  In fact, I came across a wonderful letter that you
19   wrote.  Do you remember writing a wonderful letter
20   praising the police department, do you remember that?
21        MR. MARKO:  Objection to the
22   characterization as wonderful.
23   BY MR. ACHO:
24   Q.  Well, no, I'm going to show it to you.  Do you
25   remember writing this letter shortly before you left



US LEGAL SUPPORT
The Power of Commitment™

GREGORY MURRAY
February 26, 2018

**Page 307**

1　working for the City?
2　A.　Yes.  Yes.
3　Q.　This was very -- it was to the police commissioner,
4　　　William Dwyer, correct?
5　A.　Correct.
6　Q.　And it was praising, Exhibit 1, it was praising the
7　　　Warren Police Department, correct?
8　A.　It was praising the officers whom I observed during
9　　　the situation described in my memo and they were well
10　　　deserving.
11　Q.　Good.  And so really, other than your praiseworthy
12　　　document, do you follow me, there's nothing other than
13　　　praise about the police department from you in
14　　　writing?
15　　　　　　MR. MARKO:  Are you talking about this
16　　　or --
17　A.　In general or --
18　　　　　　MR. MARKO:  I don't understand.
19　BY MR. ACHO:
20　Q.　The only document I could come up with that you
21　　　authored offering an opinion on the police department
22　　　was complimentary and nothing derogatory, right?
23　A.　That's correct.
24　Q.　Okay.  That's throughout your 11 months at the City of
25　　　Warren, correct?

**Page 308**

1　A.　This is the only instance where I observed that I
2　　　comment.
3　　　　　　MR. ACHO:  We're going to take a break.
4　　　　　　(Recess taken at 6:16 p.m.)
5　　　　　　(Back on the record at 6:43 p.m.)
6　　　　　　MARKED FOR IDENTIFICATION:
7　　　　　　DEPOSITION EXHIBIT 1
8　　　　　　6:43 p.m.
9　BY MR. ACHO:
10　Q.　We're winding down now so I want to ask you a few
11　　　things.  Did you ever do a written analysis of the
12　　　hiring process of the City of Warren, anything in
13　　　writing?
14　A.　I did it but I was not able to get it to the mayor,
15　　　it's on the City's server, it was a comparison of
16　　　hiring practices as reflected in what's called an
17　　　EEO-4 form and I went through the EEO-4 forms from
18　　　1999 and I got all the way to 2015 and that was the
19　　　day that the mayor -- December 8th, that the mayor
20　　　called me upstairs.
21　Q.　Let me ask you this, this comes from the EEO, the
22　　　reports, I mean, they have them?
23　A.　Yes.
24　Q.　Neither the Equal Employment Opportunity Commission
25　　　nor the Department of Labor, nor the Department of

**Page 309**

1　　　Justice, in the last 15 years have investigated the
2　　　City of Warren, have they?
3　A.　Not to my knowledge.
4　　　　　　MR. MARKO:  Foundation.
5　BY MR. ACHO:
6　Q.　You don't have any knowledge that any federal or state
7　　　agency has found the City of Warren was not in
8　　　compliance with the law, correct, as far as you know?
9　A.　Yes.  Correct.
10　Q.　But what happened with that Department of Justice
11　　　matter that you were referring to, can you talk to us
12　　　about that, you said there's something going on at the
13　　　Department of Justice surrounding the City of Warren?
14　A.　There is an investigation ongoing, being conducted by
15　　　the Department of Justice into whether or not there
16　　　were violations of the Americans with Disabilities Act
17　　　as it relates to the City's accommodations for deaf
18　　　persons.
19　Q.　Okay.  So that doesn't seem -- I could be wrong, it
20　　　doesn't seem like it's something that's very common,
21　　　is it?
22　A.　I would think not.
23　Q.　Were you involved in this investigation?
24　A.　To it -- yes, excuse me, the City's internal
25　　　investigation, yes.

**Page 310**

1　Q.　What did you do?
2　A.　I was made aware that several people were coming to
3　　　the police department to -- deaf people were coming
4　　　into the police department to fill out witness
5　　　statement forms, so it was my responsibility to
6　　　identify and secure a -- an interpreter who could
7　　　assist them -- who knew sign language, to assist them
8　　　in completing that task of filling out the witness
9　　　statement forms.
10　Q.　Okay.
11　A.　I got a call from one of the persons involved saying
12　　　that not everyone was being allowed to fill out the
13　　　witness statement forms, and based on that
14　　　representation, I asked them to come over to my office
15　　　where I made two more copies, they were only given one
16　　　statement form so I made two copies of the form and
17　　　with the interpreter present, had those forms
18　　　completed.  I held onto those and then Mark and I went
19　　　over the next morning and gave them to the police
20　　　commissioner, who apologized for the experience.
21　Q.　Okay.  Which commissioner was that?
22　A.　Jere Green.
23　Q.　And he apologized?
24　A.　Yeah.
25　Q.　Let me understand something, I'm a little bit puzzled.



GREGORY MURRAY
February 26, 2018

Page 311

1    I can understand assistance if someone were blind but
2    if someone can't hear, I mean, you're talking about a
3    written form?
4    A.  Yes, that's why the interpreter was there.
5    Q.  I'm at a loss.  If it's a written form, why would they
6        need an interpreter?
7    A.  The interpreter would convey the questions, I guess,
8        to them, they would communicate amongst themselves,
9        there were three people involved and I guess, to some
10       extent, the interpreter would have to receive the
11       information from the police department and convey that
12       information, instructions or whatever else to the
13       person filling out the forms, telling them how to fill
14       out the forms, et cetera.
15   Q.  Well, except -- I guess I've always been concerned
16       with an interpreter that could change something, okay,
17       isn't that something that could be a concern?
18   A.  That's exactly right, that's why this interpreter was
19       certified by the State of Michigan as an interpreter,
20       not someone who might just arbitrarily have known sign
21       language, et cetera, this person is certified and
22       recognized by the State to serve as an interpreter for
23       deaf, blind and hard of hearing people.
24   Q.  Now, is this the issue you had with Lieutenant
25       Bradley?

Page 312

1    A.  Then Sergeant, yes.
2    Q.  Why is this being investigated, I mean -- I mean, is
3        this investigation since you left the City?
4    A.  No.
5    Q.  Which was why --
6    A.  The investigation was initiated while I was there.  It
7        was not initiated by me, it was initiated by one of
8        the deaf persons and in their report that the City
9        developed, it erroneously listed me as a complainant,
10       it had my name in there --
11   Q.  Oh, but you --
12   A.  -- as a complainant.
13   Q.  Okay.  I understand.  Wasn't Sergeant, now Lieutenant
14       Bradley, an honest man with you?
15           MR. MARKO:  Objection to form, timeline.
16   A.  We did not have the kind of interaction where I could
17       assess his honesty or whatever.  I know that he did
18       have a problem with the people coming back over.  The
19       mayor had instructed me to share with the police
20       commissioner that they should just go ahead and let
21       the people make their statements and not debate the
22       merits of what would be on the statement but they
23       called and told me that they were not -- they were
24       not given the witness statement forms that they
25       needed --

Page 313

1    Q.  Okay.
2    A.  -- in order to do that and Sergeant Bradley was the
3        person who, according to them, denied them access to
4        the forms.
5    Q.  According to what I've gathered -- and I understand
6        what you're saying, Lieutenant Bradley is saying the
7        problem wasn't the information or that, but the timing
8        that things -- maybe it's because the mayor told you,
9        send them over there, that they were being scheduled
10       without a clearance as to time, didn't Sergeant
11       Bradley, Lieutenant Bradley mention that?
12   A.  No, that part was not raised.
13   Q.  He didn't tell you it was a matter of people coming at
14       5:30 or were scheduled at 5:30 but he wasn't there at
15       5:30?
16   A.  I wasn't aware that he, and only he, would be able to
17       dispense a witness statement form.
18   Q.  Let me ask you this, after you presented to Jere
19       Green -- you talked to him, right, you went there?
20   A.  Regarding what?
21   Q.  This situation?
22   A.  Yes, both Mark and I talked to him at the same time.
23   Q.  Was he polite to you and respectful?
24   A.  Yes, he was actually apologetic.
25   Q.  So why wasn't that just the end of it right there?

Page 314

1    A.  The Department of Justice had already --
2    Q.  Opened the file?
3    A.  -- opened the file apparently and I couldn't bring
4        that to any conclusion.
5    Q.  Okay.  But you're not supporting the Department of
6        Justice, you're just reporting what factually
7        happened, that's all?
8    A.  Yes.
9    Q.  Okay.  Now, but in terms of your interaction with
10       Lieutenant Bradley --
11   A.  Yes.
12   Q.  -- he's never been rude or discriminatory towards you,
13       that you're aware of?
14   A.  I think we both were rude when we were talking to each
15       other and I think we calmed down.  I believe this is
16       correct, let's calm down, let's end this conversation,
17       we ended the conversation and I have seen him when we
18       were having discussions about bringing NOBLE in and he
19       was courteous and I was courteous to him.
20   Q.  So it was a mutual respect then?
21   A.  Yeah.
22   Q.  You have no problem with Bradley?
23   A.  I have no problem with anyone in the City.
24   Q.  Let's talk about Mark Simlar.  Can you tell me what is
25       your opinion of him, your assessment of him?



GREGORY MURRAY
February 26, 2018

Page 315

1   A.  I think based on my exposure to Mark that he's an
2       honorable man.
3   Q.  Do you believe that he supports diversity?
4   A.  I do believe Mark does, yes.
5   Q.  And he is right now the acting head of human resources
6       for the City of Warren?
7   A.  That's my understanding.
8   Q.  Okay.  And the thing that I'm trying to determine, you
9       were making some assessments, I think you called them,
10      about that whole long list of people that the mayor
11      had promoted or hired and all those things, you said
12      some of those in HR were political patronage or
13      something like that, right?
14  A.  No, sir.
15  Q.  You don't -- so you don't believe any of the people
16      that were hired or promoted that were minorities got
17      those positions because of political contributions,
18      you're not aware of that?
19  A.  No, your phraseology, you're talking about
20      contributions.  No.  No.
21  Q.  You have never financially supported the mayor,
22      correct?
23  A.  That's correct.
24  Q.  And the mayor hired you in this unique position with
25      no political contributions?

Page 316

1   A.  That's correct.
2   Q.  And you stayed in your position without any political
3       contributions, did you?
4   A.  Up to a point --
5   Q.  Okay.
6   A.  -- where I refused to accept fundraising tickets.
7           In two instances I refused to take
8       fundraising tickets.  One was when Shawn Clark
9       approached me with fundraising tickets to the
10      president of city counsel's fundraiser and I shared
11      with him that I don't do that and I never have done
12      that, and I didn't do that because I don't want to
13      compromise my integrity.
14          The second instance had to do with the
15      mayor's fundraiser.  I did not attend it.  I did not
16      sell any tickets to it or accept any tickets and I was
17      called into the office and chastised about that.
18  Q.  Now, let me ask you this, do you remember you were --
19      I think, in your letter of resignation --
20  A.  Yeah.
21  Q.  -- were -- you can use the word either criticized or
22      complain, about the added responsibilities like the
23      census.
24          Do you remember that?
25  A.  I did share my concerns about that in this letter,

Page 317

1   yes.
2   Q.  Now, in that letter of resignation and dealing with
3       the request for additional pay, in part, it was due to
4       the responsibilities of the census, correct, wasn't
5       that part of it?
6   A.  Yes, the additional responsibilities of the census
7       with no cessation of my other duties.
8   Q.  But the census is only temporary, isn't it, it's a
9       temporary assignment, it's not an ongoing --
10  A.  It would have been a two-and-a-half-year assignment.
11  Q.  But the request for more money would have been
12      permanent, not for two and a half years, correct?
13  A.  It would only have been consistent with the duration
14      of performing those additional duties.
15  Q.  Now, could you have taken on those -- well, let me ask
16      you, how many hours a week did you work?
17  A.  37 and a half.
18  Q.  But you could work more hours, couldn't you, like
19      other people who were in a higher-level position,
20      couldn't you have worked, say, 40 hours a week to do
21      some of this work?
22  A.  No, sir, this type of work, being the liaison for the
23      City, involved setting up at least 18 different
24      committees and these would be standing committees that
25      you would have to identify the participants of each

Page 318

1   committee and then work with them so that they would
2   work with parties or these residents that they
3   represented in order -- that they would respond to
4   enumerators, who would come out and actually conduct
5   the census, it's quite a bit different, it's not a
6   part-time position based on the responsibilities.
7       The Census Bureau came to our office and
8   they shared with us what they wanted the liaison for
9   the City of Warren to do.  There's a packet that the
10  mayor has that you should probably get.  In that
11  packet it lays out the numerous committees that this
12  liaison would have to create and then work or manage
13  with the end result being a successful census for the
14  City of Warren so it's not something that can be done
15  on a two-hour, three-hour, four-hour basis.
16  Q.  I wasn't suggesting that.  What I'm saying is,
17      couldn't you have worked some more hours, done as much
18      as you could, and then if certain things fall back,
19      they fall back, but you tried to do whatever you
20      could?
21  A.  I'm more conscientious than that and I did understand
22      fully what the job would entail and what was riding on
23      it.  To try to perform those functions without a
24      properly resourced group would be doomed to failure
25      and I shared that with the mayor and it does say in



GREGORY MURRAY
February 26, 2018

---

Page 319

1  here, staffing and resources, and that's critically
2  important to doing anything well.
3  Q.  Weren't you given some additional staff and resource,
4  weren't you given a person?
5  A.  That person worked only on disability-related issues
6  and nothing else.
7  Q.  But didn't that help you in your performance of your
8  job because that was part of what you do?
9  A.  Yes, sir, it did, as it relates to disabilities only.
10 Q.  So the mayor did get you some help?
11 A.  Yes, diverted me away from the -- from diversity to
12 disabilities and, in that aspect, gave me someone
13 else.  The contractor who was working with us on this
14 disability project had exhausted her hours so she was
15 no longer available and rather than pay a person $75
16 an hour to continue, they brought someone in at $9 an
17 hour to provide 20 hours of work, I think it was 20
18 hours of clerical support for the disability
19 initiative.
20 Q.  Also, did you see this letter from Martin Luther King,
21 Jr.'s daughter?
22 A.  I have been shown this, yes.
23 Q.  Could you -- I'd like you to read it out loud if you
24 would, we're almost done.
25        Counsel, we're at the end now.

---

Page 320

1        MR. MARKO:  Don't you think the letter
2  speaks for itself?
3        MR. ACHO:  No, I would like him to read it
4  to see if that would change his opinion that he gave
5  in his affidavit.
6  BY MR. ACHO:
7  Q.  Can you read it out loud, nice and clear?
8  A.  Dear Mayor Fouts, I am pleased to offer words of
9  praise for you and the work you have championed in
10 Warren, Michigan in your capacity as chief executive
11 of that city.  Personally I know that it takes a
12 leader with unwavering courage to embrace noble
13 initiatives that are controversial in the minds of
14 those who do not share your same convictions.
15        I am sure that your decision to observe
16 Martin Luther King, Jr.'s birthday for the first time
17 in Warren was met with considerable angst.  However,
18 you remained undeterred in your commitment to
19 celebrating my father's legacy as a tribute to him and
20 the role he played in fighting and ultimately
21 sacrificing his life for the cause of freedom, justice
22 and equality.
23        Our theme for this year's King holiday
24 observance is remember, celebrate, act, King's legacy
25 of courage for our world.  I have no doubt that you

---

Page 321

1  will continue to lead your municipality with this
2  motto as one of your guiding principals.  Your
3  leadership certainly sets an example that politicians
4  and other persons of influence should seek to emulate
5  in a discharge of their duties.
6        Again, thank you for all that you have done
7  in Warren to honor my father.
8        With warmest personal regards, Bernice
9  King.
10 Q.  Thank you.
11        I'd like to move that in admission as the
12 second exhibit.
13        You didn't know that I met her brother or
14 her mother, did you --
15 A.  No, sir.
16 Q.  -- in that first building that was ever named after
17 him by my client?
18 A.  I met her brother.
19 Q.  You did?
20 A.  Yes.
21 Q.  The III?
22 A.  No.
23 Q.  The other brother?
24 A.  Dr. Martin Luther King.
25 Q.  Oh, you met him?

---

Page 322

1  A.  Yes, and I am a graduate of his training.
2  Q.  I saw that, yes.
3  A.  Yes.
4  Q.  I saw that.  You are a man who believes in being
5  completely honest, correct?
6  A.  Yes, sir, as honest as I can be.
7  Q.  That's why you have told us that you had believed, and
8  maintain today, that DeSheila Howlett has no case
9  against the City of Warren, is that correct, and
10 that's my last question?
11        MR. MARKO:  Objection, mischaracterizes the
12 testimony and it calls for a legal conclusion.
13 BY MR. ACHO:
14 Q.  Please answer and we're done.
15 A.  If I knew then what I know now, I never would have
16 made that statement.
17 Q.  Well, have you conducted a second investigation?
18 A.  No, sir.
19 Q.  Well, what did you -- you were involved in the
20 discipline of employees, I mean, you never met this
21 woman, you never reached out to her, have you?
22 A.  No, sir, it would have been inappropriate for me to
23 interfere with the City's investigation, the outside
24 counsel's investigation, it would have been
25 inappropriate for me to interfere and interject myself

---



GREGORY MURRAY
February 26, 2018

## Page 323

1　into that.
2　Q.　Wait a minute.  When you heard about DeSheila
3　　　Howlett's complaints you talked to Mark Simlar about
4　　　it?
5　A.　That's true.
6　Q.　Was that appropriate or inappropriate?
7　A.　Well, he came to --
8　　　　　MR. MARKO:  He has to answer the question.
9　A.　It was appropriate for Mark to come and make me aware
10　　　of that.
11　BY MR. ACHO:
12　Q.　And was it appropriate for you to make comments to him
13　　　about her?
14　A.　About the case, yes.
15　Q.　So was it was appropriate?
16　A.　It was appropriate for the two of us to talk.
17　Q.　And you have not learned anything new since you made
18　　　those comments, you've learned nothing new because
19　　　you've conducted no investigation?
20　A.　I learned the City delayed implementation of her
21　　　discipline until such time as she got her longevity
22　　　check.
23　Q.　Let me understand something, are you familiar with the
24　　　City of Warren's obligations with regard to their
25　　　employees and longevity, do you know it or do you not

## Page 324

1　know it?
2　A.　I don't know all the details of it, no.
3　Q.　Okay.  So you don't know whether the delay, as you
4　　　call it, of the discipline -- which you recommended
5　　　two weeks, right?
6　A.　Uh-huh.  Yes.
7　Q.　You don't know that that delay, if you call it a
8　　　delay, in any way impacted her collection of her
9　　　contractual longevity pay, you don't know, do you?
10　A.　Could you rephrase that because I didn't quite follow?
11　　　You lost me somewhere.
12　　　　　MR. ACHO:  Let's go off the record a
13　　　minute.
14　　　　　MARKED FOR IDENTIFICATION:
15　　　　　DEPOSITION EXHIBIT 2
16　　　　　7:05 p.m.
17　　　　　MR. MARKO:  Counsel was just saying that --
18　　　what were you saying, Counsel, put it on the record.
19　　　　　MR. ACHO:  I'm going to continue my thing.
20　　　I don't want you glaring at me or glowering or making
21　　　a face at me, sir.
22　　　　　MR. MUNGO:  Mr. Acho, hold on a minute.
23　　　　　MR. ACHO:  I'm have a --
24　　　　　MR. MUNGO:  We have 3 hours and 45 minutes,
25　　　all right, so you have the rest of that 45 minutes,

## Page 325

1　which you've used up 17 minutes, and just do what you
2　need to do, Counsel, this is your time so go ahead.
3　　　　　MR. ACHO:  I don't understand how you talk
4　to me in such a demeaning fashion.  You direct me to
5　do things all the time, it's highly inappropriate,
6　Counsel.
7　　　　　MR. MUNGO:  Counsel.  Counsel, finish your
8　exam, please, it's late and everybody wants to go.
9　BY MR. ACHO:
10　Q.　Mr. Murray, I'm trying to understand something,
11　　　someone sought you out to be a witness on behalf of
12　　　DeSheila Howlett, correct?
13　A.　No, sir.
14　Q.　No one sought you out?
15　A.　Not to speak on her behalf or her benefit, they asked
16　　　me to tell the truth.
17　Q.　But your affidavit was not the complete truth?
18　　　　　MR. MARKO:  Objection, that
19　　　mischaracterizes the testimony, assumes facts not in
20　　　evidence.
21　A.　There's a great deal outside of this deposition.  Yes,
22　　　I would agree with you.
23　BY MR. ACHO:
24　Q.　No, I'm not talking about the deposition.
25　A.　Or the affidavit, yes.

## Page 326

1　Q.　There's more, and one of the critical things is your
2　　　repeated statements to many people that DeSheila
3　　　Howlett has no case, multiple people, multiple times,
4　　　multiple dates, you don't deny that?
5　A.　I don't deny that.  I'm not -- I don't have a legal
6　　　basis for understanding everything involving that
7　　　lawsuit so with my limited information at the time, I
8　　　did make the statement.
9　Q.　Well, you, all of a sudden in the last half hour, say
10　　　at the time --
11　A.　Yes, sir.
12　Q.　-- you never said that earlier today.
13　　　　　What do you mean, at the time?
14　A.　Well, at the time that I was involved in helping to
15　　　develop the discipline for her.  I did not know, for
16　　　example, that the City, when it came to issues of
17　　　race, at least in three instances that I was aware of,
18　　　delayed the disciplinary action, and in one instance
19　　　the person said, yeah, I knew I was supposed to do it
20　　　but no one ever asked me to do it.
21　Q.　We'll go through all three then.
22　A.　Okay.
23　Q.　With regards to Beyer, you're not aware of whether any
24　　　alleged delay impacted her entitlement to longevity
25　　　pay, correct?



US LEGAL SUPPORT
The Power of Commitment™

GREGORY MURRAY
February 26, 2018

**Page 327**

1  A. When you say impacted, the answer to that, I'm not
2  aware.
3  Q. Okay. So when you say, look what they did to help
4  her, you're just making an assumption that it helped
5  her, that's all you're doing, correct?
6  A. No, sir, the letter informing her of her discipline,
7  which was supposed to be immediate, was four weeks out
8  from when she actually did suffer her discipline,
9  that's indisputable, and at the same --
10  Q. So what, what difference did it make?
11  A. It makes --
12  Q. She wound up losing a lot of money, didn't she?
13  Didn't Beyer lose a lot of money?
14  A. I'm not aware of what she did except that I
15  recommended to -- I know that she got two weeks off
16  and it was supposed to be without pay but I didn't
17  check her payroll records, except to discover that her
18  two-week period coincided with her getting her
19  longevity pay, which helped to reduce the impact of
20  the discipline.
21  Q. How would it reduce the impact if a person -- here, if
22  you --
23  A. Keep it.
24  Q. If you say --
25  A. Yes, sir.

**Page 328**

1  Q. -- you have to give me $5 --
2  A. Okay.
3  Q. -- what is the difference in the impact whether I have
4  to give it to you now or I give it to you in 30 days,
5  I still have to give it up?
6  A. The idea was there was supposed to be an economic
7  consequence to her behavior and when you say, okay,
8  we're going to withhold your payroll, we're going to
9  give you $3,000, that helps to undercut the
10  discipline.
11  Q. Well, wait a minute.
12  A. The timing was suspicious.
13  Q. Hold on. That $3,000 was not a gift, was it?
14  A. No, sir.
15  Q. That $3,000 was not a bonus, was it?
16  A. Longevity is kind of a bonus.
17  Q. But by bonus, it's not a reward, it is something that
18  a person earns. It's like vacation, let's
19  say you have four-weeks vacation, the fact that you
20  choose to take your vacation, when you lose the money,
21  you still lose the money, don't you?
22  A. I don't understand the question.
23  Q. See, you're saying -- are you suggesting that someone
24  said, oh, this is going to be good for her, are you
25  saying someone at that meeting said this is what we're

**Page 329**

1  going to do to be nice to her or was she really being
2  heavily disciplined?
3  MR. MARKO: Objection to form.
4  A. I'm not privy to any conversation where someone
5  decided -- stated they would do that. The timing
6  buffered her discipline, that's indisputable. The
7  timing from the point where she got her letter to the
8  point where she had to serve out her two-week
9  discipline, it was supposed to be immediate --
10  BY MR. ACHO:
11  Q. Understand something --
12  A. -- and it was not immediate.
13  Q. Okay. Understand something --
14  A. Yes, sir.
15  Q. -- if a person's entitled to something --
16  A. Yes.
17  Q. -- the City could have given it to her in advance,
18  said, here, take this and we'll give you discipline
19  right now.
20  A. No, sir, it doesn't work that way. Longevity checks
21  are scheduled.
22  Q. That's my point. The fact that she wound up getting
23  the longevity pay at a time where her discipline
24  occurred, do you think she was happy about this, you
25  recommended two weeks off?

**Page 330**

1  A. I don't know if she was happy or not, but what I do
2  believe is that her discipline was delayed so as to
3  have this mitigating financial impact of her receiving
4  her longevity check, because in most instances when
5  discipline is determined it is immediate.
6  Q. Really? Have you handled a lot of labor relations
7  matters?
8  A. Yes.
9  Q. Really?
10  A. Yes.
11  Q. Haven't you seen some disciplines occur a year later
12  prior to an arbitration?
13  A. That doesn't make it right.
14  Q. Well, hold on a second. I'm not asking whether you
15  agree with it, I'm telling you about labor practice.
16  I'm a labor attorney. I've handled thousands of
17  cases. I will tell you that discipline is almost
18  never immediate.
19  MR. MUNGO: Is there a question in here
20  somewhere? I'll object.
21  BY MR. ACHO:
22  Q. Isn't that a fact? Most discipline is not immediate
23  unless it's a termination.
24  MR. MARKO: Asked and answered.
25  MR. MUNGO: Assuming a fact that's not in



GREGORY MURRAY
February 26, 2018

## Page 331

1     evidence, it's total speculation.
2   A.  Not to my knowledge, no.
3   BY MR. ACHO:
4   Q.  And how many disciplines that involved time off have
5     you been involved in?
6   A.  I'd say maybe 50, 60.
7   Q.  50 to 60?
8   A.  Yeah.
9   Q.  You're saying in every single one the discipline was
10    immediate, is that right?
11   A.  Every one involved a date and the disciplinary letter
12    to the employee with a start and an end date.
13   Q.  Sir, listen -- can you read the question back to the
14    witness?
15         (The following requested portion of the
16         record was read by the reporter at
17         7:14 p.m.:
18         Q.  You're saying in every single one the
19         discipline was immediate, is that right?)
20   BY MR. ACHO:
21   Q.  That's the question, were all the disciplines
22    immediate, yes or no?
23   A.  To my knowledge, based on my experience, yes --
24   Q.  Okay.
25   A.  -- because they involved letters to the employee

## Page 332

1    indicating what the discipline was for the infraction
2    and they always contained a start date and an end
3    date.
4   Q.  Which was immediate?
5   A.  Yes, immediate.
6   Q.  Let me ask you this, the discipline to her, were you
7    involved in writing it, did you proof the letter, did
8    you read the letter?
9   A.  I did read the letter, yes.
10   Q.  Did you find anything in the letter, which was April
11    4, 2017, disciplining Barbara Beyer, did you find
12    anything in the letter inappropriate?
13   A.  I'd have to read the letter again.
14   Q.  Well, do you have any evidence that you sent any
15    letter or note to Mr. Similar challenging the
16    discipline?
17   A.  No, sir.
18   Q.  Okay. But you say the problem was in the letter of
19    discipline, it didn't have a start date and an end
20    date, correct?
21   A.  No, it should have had a start date.
22   Q.  Did it have a start date?
23   A.  There are two versions of that letter.
24   Q.  Two versions?
25   A.  Two versions of it. We worked up a sample, a

## Page 333

1    discipline, and in terms of when she actually received
2    that letter and a time frame from there, I think is
3    different from when we initially talked about it. I
4    don't have the necessary documentation to -- to say
5    that that letter was given to her within the time
6    frame it was investigated. There were questions about
7    why the discipline had not been weeded out, not only
8    on my part but also when I talked to outside counsel.
9   Q.  Who?
10   A.  Howard, he said he didn't know why the discipline had
11    not been initiated so I would recommend you speak to
12    Howard Schiffman.
13   Q.  Well, I did and he said that you said that Howlett's
14    case was bullshit, that was the word that you used?
15   A.  I didn't use the word bullshit.
16   Q.  That's what he said.
17         MR. MARKO: Objection, there's no question.
18   BY MR. ACHO:
19   Q.  Are you denying that that's what you told Howard
20    Schiffman?
21   A.  I don't recall using the word, bullshit.
22   Q.  Hold on. Do you deny it or you don't recall it?
23   A.  I don't recall it.
24   Q.  All right. So you could have said Howlett's case was
25    bullshit, you could have, just don't remember,

## Page 334

1    correct?
2         MR. MARKO: Objection, speculation.
3   BY MR. ACHO:
4   Q.  You could have?
5   A.  I don't recall it.
6   Q.  You don't recall it?
7   A.  I don't recall using that word.
8   Q.  Okay. What word would you have used?
9         MR. MARKO: Objection, speculation.
10   BY MR. ACHO:
11   Q.  You used a word, what was it?
12   A.  I didn't say bullshit.
13   Q.  What word did you use?
14   A.  I don't know, sir. I don't remember, that was a --
15   Q.  You talked to Howard Schiffman?
16   A.  I understand. I talked to Howard Schiffman about the
17    delay and the implementation of her discipline.
18   Q.  And you also discussed with him the lack of merit of
19    DeSheila Howlett's case, you said it had no merit,
20    correct?
21   A.  At that time, yes, sir, I did.
22   Q.  And but for the letter of discipline, not having the
23    dates, then everything is fine, right?
24   A.  No, sir.
25   Q.  But you said that's why you changed your mind because



GREGORY MURRAY
February 26, 2018

**Page 335**

1    the letter of discipline didn't have an immediate
2    date?
3    A.    I saw a pattern of delayed implementation when the
4        issue was race-based.
5    Q.    Let's go about the other two.
6    A.    Okay.
7    Q.    Tell me about those?
8    A.    The other was Detective Sergeant Shawn Johnson and
9        from what I was told that situation occurred in 2016.
10    Q.    Hold on. Wait a minute now. So you don't have any
11        personal knowledge about this, about Shawn Johnson?
12            MR. MARKO:  Objection to form.
13    A.    I have -- I understood his discipline was to include
14        diversity training, was not executed.
15    BY MR. ACHO:
16    Q.    Sir, did you hear my question?
17            Would you read it back to the witness?
18            MR. MARKO:  He answered the question.
19            MR. ACHO:  No, he didn't.
20            (The following requested portion of the
21            record was read by the reporter at
22            7:19 p.m.:
23            Q.  Hold on. Wait a minute now. So you
24            don't have any personal knowledge about
25            this, about Shawn Johnson?)

**Page 336**

1    BY MR. ACHO:
2    Q.    Do you know what personal knowledge means?
3    A.    Yes.
4    Q.    You had no personal knowledge about Shawn Johnson,
5        personal, correct?
6            MR. MARKO:  Asked and answered.
7    A.    Except to the extent that I talked to him during the
8        training, which I conducted for him, no.
9    BY MR. ACHO:
10    Q.    Well, wait a minute, talking to him is hearsay,
11        correct, you were not involved in the disciplinary
12        process, you weren't, were you?
13            MR. MARKO:  Objection, calls for a legal
14            conclusion, compound, form.
15    A.    Not in Shawn Johnson's case, except that --
16    BY MR. ACHO:
17    Q.    Okay.
18    A.    Except that when I found out that he had not completed
19        that part of his required disciplinary discipline, I
20        did share with Mark that he should be provided
21        diversity training at the same time as the other two
22        individuals.
23    Q.    And did he get it?
24    A.    Yes, he did get in and I did do the diversity
25        training.

**Page 337**

1    Q.    So you made a recommendation to hire a black attorney,
2        who was hired?
3    A.    Not according to Amanda Mika but, yes, I did, so
4        that's ballpark -- inside the ballpark conversation
5        but go ahead.
6    Q.    Now, I understand --
7    A.    I made a recommendation that the mayor hire Ethan, but
8        at a meeting Amanda Mika said that my recommendation
9        was inconsequential, that the mayor already had him in
10        his eyesight, which he did not.
11    Q.    Well, but my point is, here you --
12    A.    I thought Ethan was a good hire.
13    Q.    Okay. And the mayor hired him?
14    A.    Yes.
15    Q.    And there was another African-American you recommended
16        and the mayor hired him?
17    A.    Yes.
18    Q.    And then there was three other candidates that the
19        mayor was looking to hire, these African-American
20        women, and you said hold up, right?
21    A.    Based on him saying to me that he was concerned about
22        the backlash based on Dean Berry showing himself, and
23        maybe you know who Dean Berry is, and Scott Stevens on
24        the city counsel, all of that, within that
25        conversation, I did say that, yeah.

**Page 338**

1    Q.    But here you make a recommendation on the discipline
2        to the woman who offended DeSheila Howlett and that
3        was followed, correct?
4    A.    It was partially implemented.
5    Q.    You said two weeks, they did it, right?
6    A.    It's when they did it.
7    Q.    They did it, forget the when, they did it?
8    A.    They did it.
9    Q.    Okay. Then you recommended that this man get
10        training, he's got to get it, and the City said yes,
11        you're right, they did that too?
12    A.    That's correct.
13    Q.    Okay. Let's talk about the third one.
14    A.    The third one would be a lieutenant from the fire
15        department, I can't remember his name. I can't
16        remember his name.
17    Q.    When did it happen?
18    A.    That had happened in 20 -- I believe, 2016.
19    Q.    Again, you had no personal knowledge, again, did you?
20    A.    Until it was brought to my attention.
21    Q.    Sir, something coming to your attention is not the
22        same as personal knowledge, it's when you are
23        involved, you're there, you see things. You had no
24        personal knowledge in that, did you?
25            MR. MARKO:  Asked and answered.



GREGORY MURRAY
February 26, 2018

---

**Page 339**

1    A.  No.
2            MR. ACHO:  We're done.
3            MR. MARKO:  Okay.
4            MARKED FOR IDENTIFICATION:
5            DEPOSITION EXHIBITS 3-7, 9
6            7:24 p.m.
7            (Recess taken at 7:24 p.m.)
8            (Back on the record at 7:29 p.m.)
9            MR. ACHO:  The time is exhausted but
10   counsel is now going to ask questions of his witness
11   and so what I'm going to do is I'm going to do
12   follow-up questions as necessary, and I think
13   counselor is not going to allow me to do that, in
14   which case we'll take it up with the court tomorrow.
15           MR. MARKO:  Yeah, we've exhausted all the
16   time here.  My client has a medical condition.  He's
17   exhausted.  It's now 7:30 p.m.  As courtesy to
18   plaintiff's counsel, I'm going to allow him to ask
19   some questions and then I'll give you five minutes to
20   ask what you need to ask since I think we've went
21   around and around here, Counsel, and I understand your
22   position and you understand mine and you guys can take
23   it up with the judge, okay?
24           MR. ACHO:  Yeah, I understand what you're
25   saying.  I don't know what he's going to ask and so I

---

**Page 340**

1    can't limit myself so we have to see what comes up
2    that's different, new, some shading, so we'll have to
3    deal with it.
4            MR. MARKO:  I understand.
5            MR. MUNGO:  Let the record reflect I'm
6    showing the deponent Deposition Exhibit Number 4.
7            MR. ACHO:  What happened to 3?
8            MR. MUNGO:  Is it 3 on there?
9            MR. ACHO:  4.
10           MR. MUNGO:  Didn't I say 4?
11           MR. ACHO:  You did and I said what happened
12   to Number 3?
13           MR. MUNGO:  3 is the discipline.
14           MR. ACHO:  You're not introducing 3 yet?
15           MR. MUNGO:  No, sir, I'm doing 4.
16           Let the record reflect that the deponent is
17   examining Deposition Exhibit 4.
18           RE-EXAMINATION
19   BY MR. MUNGO:
20   Q.  Mr. Murray, could you take a moment and examine that
21   document, sir, and then after you have concluded your
22   examination of that document, please let me know, I
23   have a few questions for you.
24   A.  I'm -- some of this seems repetitive.  Okay.  There's
25   more.  Okay.  I've read it.

---

**Page 341**

1    Q.  So, sir, have you ever seen that document before?
2    A.  No.
3    Q.  Okay.  Are you familiar with the incidents that are
4        described in that document?
5            MR. ACHO:  Okay.  Wait.  I'm going to
6        object.  This witness has never seen this exhibit.  He
7        has no personal knowledge and I strenuously object to
8        the admission of this document into evidence based on
9        those two objections.
10           MR. MARKO:  Go ahead.
11   BY MR. MUNGO:
12   Q.  Are you familiar with the events that are described in
13       that document?
14   A.  I'm familiar with the complaints that were made, yes.
15   Q.  And for the record, what were those complaints, you
16       don't have to be word for word?
17   A.  The complaints are that Ms. Howlett was the subject of
18       racially insensitive comments expressed to her by
19       Shawn Johnson.
20   Q.  Okay.  Was Shawn Johnson a coworker of Ms. Howlett's?
21   A.  Yes.
22   Q.  Okay.  At the Warren Police Department?
23   A.  Yes.
24   Q.  He was a white male?
25   A.  Yes.

---

**Page 342**

1    Q.  And the charge was, the allegation was racial
2        harassment, correct?
3    A.  Yes.
4    Q.  If you look at page 17, in those small numbers at the
5        very bottom in the middle of the page, sir, does that
6        particular document sustain the finding that Shawn
7        Johnson actually engaged in racial harassment of
8        Ms. Howlett?
9    A.  That's what it does reflect.
10   Q.  You indicated earlier in response to counsel's
11       questions, you were -- you had -- in part of your
12       response you indicated that you had trained Shawn
13       Johnson or conducted diversity training for Shawn
14       Johnson, correct?
15   A.  Yes.
16   Q.  Was that diversity training related at all to the
17       events that are described in Deposition Exhibit Number
18       4 --
19   A.  Yes.
20   Q.  -- where Shawn Johnson -- was it was sustained that
21       Shawn Johnson engaged in racial harassment of
22       Ms. Howlett?
23   A.  That's correct.  Yes.
24   Q.  When you trained Shawn Johnson did you get any direct
25       personal knowledge as to what Shawn Johnson did to Ms.

---



GREGORY MURRAY
February 26, 2018

---

**Page 343**

1      Howlett that constituted racial harassment?
2           MR. ACHO:  I'm going to object, no personal
3      knowledge and hearsay, it should be not allowed.
4 **A.  I spoke to Shawn Johnson, as I did to the other two**
5 **participants in the training, either during the break**
6 **or at the conclusion of the training, yes.**
7 BY MR. MUNGO:
8 Q.  Okay.  And did Shawn Johnson tell you what he did to
9      Ms. Howlett to constitute the racial harassment?
10           MR. ACHO:  Same objection, hearsay.
11 **A.  He did share with me that he made the gorilla remark**
12 **but he did not mean to offend her.**
13 Q.  Okay.  But was she offended?
14 **A.  Yes, based on what I have here in front of me, yes.**
15 Q.  And during your diversity training were you able to
16      help Shawn Johnson understand that that was racially
17      offensive?
18 **A.  Yes.**
19 Q.  Okay.  Did he accept that fact that that was racially
20      offensive?
21 **A.  At the training -- the conclusion of the training,**
22 **yes.**
23 Q.  Okay.  And Shawn Johnson was, as a result of his
24      racially -- his racial harassment of Ms. Howlett, were
25      there also any allegations that you're aware of that

---

**Page 344**

1      constituted sexual harassment of Ms. Howlett by Shawn
2      Johnson?
3 **A.  I'm aware there was a discussion regarding whether or**
4 **not she had any sexual involvement with any of the**
5 **officers in the complaint.**
6           MR. ACHO:  I'm going to have a continuing
7      objection, can I have that, Counsel, based on -- a
8      continuing objection to all this inquiry of which he
9      has no personal knowledge.
10           MR. MUNGO:  You don't have to ask me.  You
11      can just put it on the record.
12           MR. ACHO:  No.  No, a continuing objection
13      has to be stipulated to.
14           MR. MUNGO:  Fine.
15 BY MR. MUNGO:
16 Q.  So, sir, you have had an opportunity to read the
17      complaint that Ms. Howlett has filed against the City
18      of Warren?
19 **A.  Yes.**
20 Q.  And in that complaint did she allege, based on your
21      recollection, sexual harassment in addition to racial
22      harassment?
23 **A.  I believe so, yes.**
24 Q.  And you do recall, as part of your examination of
25      documents and/or conversations with others at the City

---

**Page 345**

1      of Warren, that Shawn Johnson was separated from
2      DeSheila Howlett, physically, in terms of his work
3      location?
4 **A.  Yes.**
5 Q.  Okay.  And did you come to learn whether or not Shawn
6      Johnson was relocated in the physical presence of
7      Ms. Howlett and her location?
8 **A.  Yes.**
9 Q.  And was that something that based on your analysis and
10      your understanding of -- as a diversity coordinator
11      and with the history that you have, is something that
12      is appropriate to do?
13 **A.  No, it's completely inappropriate.**
14           MR. ACHO:  Okay.  I'm going to object,
15      which is why I'm going to go to court to continue this
16      because this was all brought up in the initial
17      testimony, okay, so now that you're bringing it up,
18      again, I'm going to inquire into it, okay?
19           MR. MARKO:  Well, I'm going to object.  I
20      think that if it was brought up in initial testimony
21      you were on notice today and were able to deal with it
22      in your --
23           MR. ACHO:  I've had sufficient, but now
24      there's other things pertaining to it so I'm just
25      telling you that I am going to continue.

---

**Page 346**

1           MR. MARKO:  These are no new areas of
2      inquiry and you were already on notice of all of them.
3           MR. ACHO:  Well, I'll do what I have to do,
4      it's not a problem.
5 BY MR. MUNGO:
6 Q.  Okay.  And are you familiar also -- let the record
7      reflect I'm about to show the deponent Deposition
8      Exhibit Number 3.
9      Are you familiar with that document, sir?
10      Take a moment and examine that document, Mr. Murray,
11      and once you're done and if you could indicate that
12      you've done so, I'd appreciate it?
13 **A.  Yes.**
14 Q.  Okay.  What is that document, Deposition Exhibit
15      Number 4, for the record, sir?
16 **A.  This is a document reflecting --**
17 Q.  I'm sorry, Number 3?
18 **A.  This is a document reflecting an internal discussion**
19 **regarding Ms. Howlett's response to comments by**
20 **Barbara Beyer, and it also includes the original**
21 **letter detailing her discipline with specified periods**
22 **of time for the discipline to occur, noticeably March**
23 **8th, 2017 continuing through March 21st, 2017.**
24 Q.  And when was her discipline actually implemented?
25 **A.  Sometime after April, I believe.**

---



GREGORY MURRAY
February 26, 2018

## Page 347

1  Q.  After April?
2  A.  Yes.
3  Q.  Almost 30 days after the date in which the
4  instructions from the City and her disciplinary
5  regimen was actually memorialized in that document?
6  A.  That's correct, March 6th was the date in which this
7  letter was written to be conveyed to her, which
8  details her discipline beginning on Wednesday, March
9  8th and concluded on March 21st.
10  Q.  You indicated earlier that the City of Warren has a
11  history of delayed disciplinary action when it
12  involves race discrimination and racially offensive
13  conduct by its police officers, correct?
14  A.  Yes.
15        MR. ACHO:  Objection to this line of
16  inquiry of which he has no personal knowledge.
17  Continuing objection given?
18        MR. MUNGO:  Yes.
19  A.  Yes, this would be an example of that.
20  BY MR. MUNGO:
21  Q.  And what did Barb Beyer do to Ms. Howlett that
22  resulted in her discipline?
23  A.  She used a derogatory racial slur by referring to an
24  African-American male as a nigger.
25  Q.  Okay.  Did she say it more than once?

## Page 348

1  A.  Yes.
2  Q.  Okay.  And did Ms. Howlett hear her say that?
3  A.  Yes.
4  Q.  Was Ms. Howlett offended at that?
5  A.  Yes.
6  Q.  Was Ms. Howlett affected in her ability to work as a
7  result of hearing Ms. Beyer repeatedly use the N word?
8        MR. ACHO:  This is still all hearsay, no
9  personal knowledge.  By the way, when you talk
10  about delaying a deposition, this was covered numerous
11  times at the beginning so I don't want any complaints
12  that we're going to go a while after you're done.
13        MR. MARKO:  We're not, we're --
14        MR. ACHO:  Oh, we are.
15        MR. MARKO:  I'm terminating the deposition.
16        MR. ACHO:  Then you'll have to do that.
17  A.  Yes.
18  BY MR. MUNGO:
19  Q.  I'm sorry?
20  A.  Your question had to do with the impact on DeSheila --
21  Q.  Yes.
22  A.  -- by the use of the word nigger.
23  Q.  Yes, did it impact her ability to work as a police
24  officer at the City of Warren Police Department?
25  A.  Yes.

## Page 349

1  Q.  In what way?
2  A.  From the standpoint that when racial slurs are
3  bantered about and directed to a person of color it
4  can have a long-term impact on their psyche with what
5  respect to -- what's that word -- connotes and also
6  its impact on the person who is on the hearing end of
7  that.
8        MR. ACHO:  I'm going to object.  Not only
9  is it hearsay, it's speculation and I'm going to ask
10  it be stricken.  This gentleman never spoke to this
11  woman so this is why I have to recross on this.
12  BY MR. MUNGO:
13  Q.  So, now, Mr. Murray, you indicated that you trained
14  Ms. Beyer or you provided diversity training for Ms.
15  Beyer to deal, specifically, with her racially
16  discriminatory, hostile verbal conduct toward Ms.
17  Howlett, correct?
18  A.  Yes.
19  Q.  And you did also Shawn Johnson --
20  A.  Yes.
21  Q.  -- based on his racially discriminatory, hostile
22  conduct toward Ms. Howlett, correct?
23  A.  Yes.
24  Q.  And do you know that Mr. Shawn Johnson's racially
25  hostile, discriminatory, verbal conduct and other

## Page 350

1  conduct towards Ms. Howlett affected her ability to
2  work as a police officer as well?
3  A.  Yes.
4  Q.  And you trained another person, correct, diversity
5  training, correct, at the time you trained those two?
6  A.  Yes.
7  Q.  Go ahead.
8  A.  The lieutenant from the fire department.
9  Q.  Okay.  Why did you have to train him, what kind of
10  racially discriminatory and inappropriate comments did
11  he make regarding race?
12        MR. ACHO:  Same objection, no personal
13  knowledge, no foundation, it's all hearsay.
14  A.  He used the word --
15        MR. ACHO:  Continuing objection.
16  A.  He used the word nigger to describe a firefighter by
17  the name of Jose Suarez.
18  BY MR. MUNGO:
19  Q.  And what did he -- did he use any other words to
20  describe him in addition to the word nigger?
21  A.  It was that he was the house nigger of the firehouse
22  is what I recall Lieutenant -- the lieutenant stating
23  to him, that's what the lieutenant shared with me
24  after the training.
25  Q.  So all three of these individuals admitted to you that


US LEGAL SUPPORT
The Power of Commitment™

GREGORY MURRAY
February 26, 2018

**Page 351**

1  they used racially hostile language that's insensitive
2  and condescending and demeaning to African-Americans
3  and in this particular case I think he was Hispanic,
4  Cuban?
5  A. He claimed to be Cuban.
6  Q. All right. All right. Sir, at the time you testified
7  earlier when counsel asked you a question when you
8  said Ms. Howlett didn't have a case, did you have the
9  kind of information about Ms. Beyer's conduct,
10  racially discriminatory and hostile conduct and Shawn
11  Johnson's racially discriminatory and hostile conduct,
12  did you have those details at the time that you made
13  that statement?
14  A. No, sir.
15  Q. Okay. But now considering that you have that
16  information, you have the documentation where they --
17  both of the racially hostile and discriminatory
18  demeaning conduct of each one of these individuals
19  toward Ms. Howlett has been sustained, do you now have
20  an opinion as to whether or not Ms. Howlett has a good
21  case?
22  A. Yes.
23  Q. Okay. Go ahead.
24  A. I would say that based on the information that I've
25  been -- that's been shared with me that her case is

**Page 352**

1  much stronger than it was when I didn't have this
2  information.
3  Q. Okay. Thank you. All right. And any statements that
4  you made to counsel relative to any statements you may
5  have made in the past that Ms. Howlett didn't have a
6  good case, is no longer -- no longer holds water for
7  you, correct?
8  A. That's correct.
9      MR. ACHO: I'm going to -- objection,
10  leading, suggestive, speculative. He said he -- he
11  didn't have personal knowledge. He doesn't know the
12  law and he can't offer a legal opinion and now he
13  does.
14      MR. MUNGO: Okay. All right. Excuse me.
15  Let the record reflect I'm about to show
16  the deponent Deposition Exhibit Number 6.
17  BY MR. MUNGO:
18  Q. Take a look at that and tell me once you've had an
19  opportunity to read that document, sir?
20  A. Yes.
21  Q. Okay. Counsel showed you this document earlier,
22  correct?
23  A. Yes.
24  Q. Does this document and what you penned in this
25  document, sir, did you have the intent of conveying

**Page 353**

1  that the City of Warren did not have a problem with
2  racial discrimination and racially hostile attitudes
3  and created a racially hostile environment towards
4  African-Americans?
5  A. No.
6      MR. ACHO: Objection, leading and
7  suggestive.
8  BY MR. MUNGO:
9  Q. It does not mean that, sir?
10  A. That's right, this was an isolated incident where I
11  saw some officers respond to a woman in distress
12  across the street from Warren City Hall and they acted
13  both professionally and humanely and this is what I
14  witnessed. The officers, the two or three officers
15  that were there and that was the extent of what I
16  reflected in this.
17      MR. ACHO: I need a five-minute break.
18      MR. MARKO: Whatever you need, Counsel.
19      (Recess taken at 7:49 p.m.)
20      (Back on the record at 7:59 p.m.)
21      MR. MUNGO: Let's go back on the record.
22  So we just took a quick break at the
23  request of Mr. Acho --
24      MR. ACHO: Well, wait. I was back within
25  five minutes. You guys were another six, seven

**Page 354**

1  minutes so don't put that on me.
2      MR. MARKO: Well, we're back from the
3  requested break, bathroom break, and what time are we
4  at here? It's 8:00. Okay.
5      MR. MUNGO: So let the record reflect that
6  I've given the deponent Deposition -- is that
7  Number --
8  A. 7.
9  BY MR. MUNGO:
10  Q. Exhibit 7. Take a look at that document, sir, and
11  examine it for purposes of identification and when
12  you've done so if you can let me know, I'd appreciate
13  it?
14  A. This is my job description and my job duties.
15  Q. Your job description and job duties as what, sir?
16  A. As a diversity coordinator for the City of Warren.
17  Q. And just before we get into this document, sir, Shawn
18  Johnson, what is his race and gender?
19  A. White male.
20  Q. Barbara Beyer, what is her race and gender?
21  A. White female.
22  Q. What is the lieutenant from the fire department that
23  you had provided diversity training that called the
24  Cuban-American the house nigger?
25  A. A white male.



US LEGAL SUPPORT
The Power of Commitment™

GREGORY MURRAY
February 26, 2018

## Page 355

1    Q.   A white male. Okay. We're going to look at
2      Deposition Exhibit Number 7, this is your complete job
3      description as diversity coordinator, sir?
4    A.   Yes.
5    Q.   Okay. Do you remember that counsel asked you a lot of
6      questions earlier about whether or not you went to the
7      civil service and met with them, whether you met with
8      this organization, HR, all these different
9      organizations within the City departments?
10   A.   Yes.
11   Q.   Take a look at your description and I want you to tell
12      me whether or not the things that counsel asked you
13      earlier were actually a part of your job description
14      and you were responsible for, okay --
15   A.   Yes, sir.
16   Q.   -- and then part two I'm going to ask you is whether
17      or not the mayor allowed you to do it, okay?
18   A.   Yes, sir.
19   Q.   Let's take a look at very first paragraph, it says in
20      part, that as a diversity and inclusion coordinator,
21      will be appointed by and serve at the pleasure of the
22      mayor of the City of Warren. Was that your
23      understanding and was that exactly the nature of your
24      relationship, diversity coordinator?
25   A.   That was my understanding.

## Page 356

1    Q.   Did the mayor terminate you?
2    A.   Yes.
3    Q.   It says the department -- that this was a departmental
4      level manager. Were you a departmental level manager?
5    A.   I was led to believe so, but was told just before my
6      termination that I was not.
7    Q.   Okay. Well, when you first started working were you,
8      in fact, a departmental manager and treated as a
9      departmental manager?
10   A.   Initially, yes.
11   Q.   And then later the mayor -- would that be considered
12      the demotion that you were no longer a departmental
13      manager?
14           MR. ACHO: I'm going to object. All these
15      are leading and suggestive.
16   A.   The mayor shared with me that I was a division head
17      and not a department level manager.
18   BY MR. MUNGO:
19   Q.   How long after signing your employment contract did
20      the mayor tell you that?
21   A.   7, 8, 9, that was in November, 10 months.
22   Q.   About 10 months. Okay.
23   A.   Yes.
24   Q.   After you were hired?
25   A.   Yes.

## Page 357

1    Q.   The second paragraph says, the diversity and inclusion
2      coordinator will be responsible for creating programs
3      aimed at enhancing community awareness and addressing
4      community concerns and engagement and then it goes on
5      to articulate some other details. Were you able to
6      actually engage in executing the responsibilities
7      contained in that paragraph, sir?
8    A.   No, I was told by the mayor to put diversity on the
9      back burner until after the 2019 primary election.
10   Q.   Okay. And then the third paragraph, diversity and
11      inclusion coordinator shall also make recommendations
12      to the mayor's office that will include
13      diversity-oriented programs and initiatives,
14      specifically addressing interaction between city
15      employees and members of the public. Were you able to
16      execute those responsibilities?
17   A.   In a limited fashion but, generally, no, because the
18      mayor routinely rejected my recommendation.
19   Q.   Okay. Going down to the central function section of
20      Deposition Exhibit 7, the first paragraph there says,
21      the essential function of the diversity and inclusion
22      coordinator will be to work effectively with
23      employees, department heads, administrators, city
24      offices, city business and religious leaders,
25      representatives of state and federal government and

## Page 358

1      other appropriate stakeholders to achieve the greatest
2      extent reasonably possible the following, and we'll go
3      into the following in a moment. Were you able to
4      execute those responsibilities, sir?
5    A.   To some extent, yes, but, no, I was told by the mayor
6      that I could not train certain City employees.
7    Q.   Okay.
8    A.   That being employees of the clerk's office and the
9      treasurer's office, that I was not to have any
10      communication with them and that I was not to train
11      them or to have any discussions about diversity
12      training.
13   Q.   And what about the police department?
14   A.   The police department, no. I would say no, he did not
15      expressly forbid me to put together diversity training
16      for the police department.
17   Q.   Did Jere -- did the commissioner, Jere Green, assist
18      you and/or inhibit you from conducting training in the
19      police department?
20   A.   He inhibited me from the standpoint that he did not
21      respond to my request for information because I,
22      specifically, asked for information regarding any
23      trainings that were conducted within a 36-month period
24      and any trainings expressly dealing with diversity,
25      but he did not respond to my requests.

GREGORY MURRAY
February 26, 2018

Page 359

1  Q.  And without him responding were you able to pursue
2      fulfilling your responsibilities for training in the
3      police department?
4  A.  No, sir.
5  Q.  Did you inform the mayor of Jere Green's reluctance to
6      assist you in diversity training for the police
7      department?
8  A.  Yes, sir.
9  Q.  What did the mayor tell you in response?
10 A.  The mayor said he didn't want to agitate the police
11     unions because he counted on the police unions and the
12     fire unions for endorsements and he did not want to
13     agitate them.
14 Q.  Did he express any sentiment in terms of Jere Green
15     being receptive to diversity?
16 A.  He shared with me, he said Jere Green was a racist,
17     stayed in the bar, was constantly drunk and no
18     interest whatsoever in diversifying the City police
19     force.
20 Q.  Very good.  Let's look at the different ways in which
21     you were to execute your essential functions toward
22     the bottom of the first page of Deposition Exhibit
23     Number 7, it says, to promote diversity and inclusion
24     in the City of Warren work force, including the police
25     department, fire department, and all other city

Page 360

1      departments and functions by developing and enforcing
2      policies and programs to attract, retain and promote a
3      diverse workforce in which employees value and respect
4      differences in workplace and in interactions with the
5      public.  Were you able to execute those
6      responsibilities, sir?
7  A.  No, I was not allowed to promote diversity within --
8      for city employees working in the treasurer's office
9      and in the city clerk's office and to that extent I
10     was prevented from providing training to them as city
11     employees.
12 Q.  Okay.  And the mayor specifically prohibited you from
13     doing so?
14 A.  Yes, there's correspondence from the clerk's -- from
15     the treasurer's office on at least three occasions
16     raising that as an issue.
17 Q.  Okay.  And the -- with regard to the training,
18     counsel -- do you recall counsel -- strike that.
19         Do you recall counsel asking you earlier
20     whether or not you had contacted the civil service
21     department?
22 A.  Yes.
23 Q.  Were you allowed to contact the civil service
24     department?
25 A.  No.

Page 361

1  Q.  Why not?
2  A.  The mayor expressly forbade it.
3  Q.  Were you allowed to contact and communicate with the
4      human resource department for the purpose of diversity
5      training?
6  A.  Yes.
7  Q.  Okay.  What happened with that contact?
8  A.  All of my contact with the human resource department,
9      in particular Mark Simlar, was positive when it came
10     to supporting diversity.
11 Q.  Okay.  What did Mark Simlar do to support diversity?
12 A.  Well, he participated in the trainings and we had
13     numerous conversations about the value of diversity
14     but I feared it didn't go beyond him.
15 Q.  Okay.  Was he responsible for the other -- in terms of
16     facilitating training for the other departments?
17 A.  Yes.
18 Q.  Okay.  Did he attempt to bring training diversity
19     training to the other departments?
20 A.  No.
21 Q.  He did not?
22 A.  No.
23 Q.  So it seems that his particular interest and/or energy
24     level and initiatives were lacking in terms of
25     promoting diversity, is that correct, based on what he

Page 362

1      did not do?
2          MR. ACHO:  I'm going to object, this has
3      constantly been leading and suggestive, that's why he
4      is your lawyer without a doubt, this is just --
5          MR. MARKO:  Objection, Counsel.
6          MR. ACHO:  This is just a sham, that's all
7      this is --
8          MR. MARKO:  I'll object to that.
9          MR. ACHO:  -- and this communication has
10     been going on with counsel through this third party,
11     it's highly inappropriate and we'll bring it up in the
12     court at the right time.
13         MR. MARKO:  I object, all your questions in
14     this case were leading and I --
15         MR. ACHO:  I can do that for cross-exam
16     purposes.  This was not my deposition.
17         MR. MARKO:  This is my client.
18         MR. ACHO:  This is not my deposition, it's
19     his.
20         MR. MARKO:  It's really my client.  You
21     requested the deposition here today so --
22         MR. ACHO:  Wait a minute.  It is a
23     continuation.  You know what, I've made my objection.
24     Just so we know, we're going on and on and on and on
25     and I will get this deposition done pursuant to the



GREGORY MURRAY
February 26, 2018

Page 363

1    judge's direction.
2            MR. MARKO:  As far as I'm concerned, it's
3    coming to a close.
4            MR. ACHO:  Okay.  You're going to terminate
5    it after he's done, you're not cutting him off.
6            MR. MARKO:  I'm allowing Mr. Mungo some
7    follow up based on your -- we started at 2:30 and
8    we --
9            MR. ACHO:  No, we didn't.
10            MR. MARKO:  Yes, we did.
11            MR. ACHO:  Wait.  Wait.  Wait, that's not
12    true.
13            MR. MARKO:  At 2:35, approximately, when we
14    came in and we've been here so let's finish.  If you
15    keep making these objections it's going to be longer.
16            MR. ACHO:  Well, I have to tell you
17    something, there hasn't been that many objections.
18    There were like 101 objections made by you and your
19    brother counsel, 101.
20            MR. MARKO:  Okay.
21    BY MR. MUNGO:
22    Q.  Okay.  Mr. Murray, do you know whether or not Mark
23    Simlar did all that he could have done to promote
24    diversity training and implementation of diversity for
25    the City of Warren's various departments?

Page 364

1            MR. ACHO:  Objection, speculation.
2    A.  I would say -- based on my contact with him, I would
3        say yes.
4    BY MR. MUNGO:
5    Q.  That he did everything that he could do?
6    A.  Everything that I asked of him.  I don't know exactly
7        because he was wearing two hats, labor relations
8        director and interim human resource director.
9    Q.  Okay.  Okay.  Okay.  Now, did you understand my
10        question?  It's very important.  Do you know whether
11        or not he did everything that he was supposed to do to
12        promote diversity within the City of Warren?
13            MR. ACHO:  What are you doing?  You're
14        impeaching your witness.
15    A.  No.
16    BY MR. MUNGO:
17    Q.  You don't know?
18    A.  I don't know.
19    Q.  And why wouldn't you know?  For the record, why
20        wouldn't you know whether or not Mr. Simlar did
21        everything he could have done to promote diversity?
22    A.  Because as labor relations director he could have
23        certain language put into the contracts that would
24        further promote diversity, that was not in the
25        contracts and so there are other things he possibly

Page 365

1        could have done.
2    Q.  So that was not your responsibility to put that
3        language in the contracts, correct?
4    A.  No.
5    Q.  Okay.  You didn't have authority to put that language
6        in the contracts, correct?
7    A.  Correct.
8            MR. ACHO:  Objection, lack of foundation.
9    BY MR. MUNGO:
10    Q.  That you did not have --
11    A.  I did not have the authority to do so.
12    Q.  Counselor asked you that earlier, whether or not you
13        had authority to interject into the bargain for
14        agreement language that deals with --
15    A.  Yes.
16            MR. ACHO:  I never asked that.
17    BY MR. MUNGO:
18    Q.  -- diversity, correct?
19    A.  I believe so.
20    Q.  In any event, you did not have any authority to do so,
21        correct?
22    A.  That's correct.
23    Q.  All right.  I want to take a look at the next
24        paragraph, it says -- and that would be the third --
25        well, the second bullet item beneath the first

Page 366

1        paragraph on the essential functions where it says,
2        the diversity and inclusion coordinator shall support
3        a culture of inclusion in which every individual is
4        valued, respected and supported and where the right
5        conditions are in place for each person to achieve his
6        or her full potential.  Do you see that paragraph
7        there?
8    A.  Yes.
9    Q.  Was that part of your job description?
10    A.  Yes.
11    Q.  Okay.  Were you able to implement and achieve and
12        execute those responsibilities in that area?
13    A.  No.
14    Q.  Okay.  Why not, sir?
15    A.  Because to -- part of the process of doing this is to
16        engage others in the community and I attempted to do
17        that through the diversity committee and the mayor
18        shut that down and told me to -- don't go any further
19        with engaging around developing the diversity
20        committee.
21    Q.  And the next paragraph says, development support
22        policies and practices with which promote and foster
23        an inclusive culture where uniqueness of beliefs,
24        background, talents, capabilities and ways of living
25        are welcomed and leveraged for learning and informing



GREGORY MURRAY
February 26, 2018

Page 367

1  better decisions in the workplace and in the
2  interaction between City employees and members of the
3  public.  Were you able to execute those
4  responsibilities, sir?
5  A.  No.
6  Q.  And why not, sir?
7  A.  Because, again, the mayor shut down my ability to work
8  with members of the culture or members of the
9  community on establishing best practices that could be
10  implemented within city government.
11  Q.  Go to the second page, sir, the top of the second
12  page, determine and recommend appropriate diversity
13  initiatives, particularly focusing on the interaction
14  of employees with other employees, and on the
15  interaction and relationship of city employees with
16  residents of the city and members of the public to
17  create a culture of respect for and appreciation of
18  differences in ethnicity, gender, age, national
19  origin, disability, sexual orientation, education and
20  religion, including those persons with activity or
21  ability impairments.  Were you able to execute those
22  responsibilities?
23  A.  Only one of that set, which is in the area of
24  disability.  Again, the mayor prevented me from or
25  forbade me from developing the diversity committee,

Page 368

1  which covers a lot of that paragraph but he did have
2  me focus on disability.
3  Q.  Did he have you ever focus on race?
4  A.  No.
5  Q.  Okay.  Did he tend to avoid race?
6      MR. ACHO:  Objection, leading and
7  suggestive.
8  A.  The recommendations that I made in order to engage the
9  race as a representative of the city's demographics
10  were always shot down.
11  BY MR. MUNGO:
12  Q.  By whom?
13  A.  By the mayor.
14  Q.  And the next paragraph, develop training schedules to
15  educate employees and manager on how to recognize,
16  accommodate and appreciate individual differences and
17  how these can be bridged back to assist in meeting
18  city business and service plans.  Were you able to
19  execute those responsibilities, sir?
20  A.  Yes, to the extent that I was allowed to secure
21  training from both the Equal Employment Opportunity
22  Commission and the Michigan Department of Civil
23  Rights, but only to selectively train certain city
24  employees, to the extent that I was not allowed to
25  educate or train City employees in those two

Page 369

1  department in the clerk's office and the treasurer's
2  office on any of this, on any diversity training
3  whatsoever, I was prohibited from doing so.
4  Q.  By who?
5  A.  By the mayor.
6  Q.  The next paragraph, it says, create and implement
7  communication strategies and content management for
8  training web resources for internal and external
9  audiences and print materials to support diversity and
10  related initiatives.  Were you able to execute in
11  those responsibilities?
12  A.  I was allowed to secure training, materials, diversity
13  training materials and, in fact, it's that material
14  that I used for the three persons that I conducted --
15  the employees that I conducted the diversity training
16  in but not any further.
17  Q.  When you say, not any further, can you elaborate,
18  please?
19  A.  With the exception of the EEOC training and the
20  Michigan Department of Civil Rights training, I was
21  not able to go further with training.
22  Q.  Okay.  And who was trained in the City, which
23  department?
24  A.  All of the City departments except -- excuse me, all
25  appointees and department heads, I never got to where

Page 370

1  I was able to train the actual employees within the
2  department.
3  Q.  Why?
4  A.  My training was restricted to appointees and managers.
5  Q.  Well, that's inconsistent with your job description
6  though, isn't it?
7  A.  It is, yes.
8  Q.  And why were you not able to train the employees?
9  A.  Again, because the City -- the mayor indicated that he
10  wanted the training to be at that level and I put
11  forward a recommendation to him to do some additional
12  training but that was never acted on by the time that
13  I was dismissed.
14  Q.  Okay.  And did this kind of training take place prior
15  to or subsequent to the mayor telling you to put
16  diversity on hold?
17  A.  It was -- actually, it was afterwards, it was after a
18  meeting with the -- that I convened with the Michigan
19  Department of Civil Rights and the EEOC in which the
20  mayor asked them how was the City doing and they
21  replied that the City was doing dismally, failing
22  miserably, which was the comment from Lolita Davis
23  from the EEOC.
24  Q.  Is that in the area of race relations?
25  A.  Yeah, race relations, employment practices, yeah --



GREGORY MURRAY
February 26, 2018

Page 371

1      MR. ACHO: I'll object as to hearsay.
2  A.  -- and in the -- in the same meeting where myself, the
3      mayor and several other people were, the Michigan
4      Department of Civil Rights representative was asked,
5      well, how are we doing in comparison to everyone else
6      and Anthony Lewis shared with the mayor that the City
7      was not doing well enough to try to compare
8      themselves, in comparison to other municipalities.
9  BY MR. MUNGO:
10 Q.  Who is Anthony Lewis?
11 A.  Anthony Lewis is the community director and lead
12     trainer for the Michigan Department of Civil Rights.
13 Q.  So it was after that that you said was subsequent to
14     that meeting and that series of training that the
15     mayor told you to put diversity training on hold?
16 A.  Yes, it was the third instance of him saying that,
17     this was during those training periods.
18 Q.  So, sir, are you saying that Mayor Fouts told you on
19     three separate occasions to put diversity training on
20     the back burner?
21 A.  Yes, sir.  Yes.
22 Q.  All right.  Let's look at the next paragraph, it says,
23     to obtain slash create diversity training, materials
24     and prevent, coordinate appropriate training
25     opportunities for employees of the police department

Page 372

1      and fire department and other City departments as may
2      be directed by the mayor.  Was that accomplished, sir?
3  A.  I did obtain training materials and was not able to
4      present them to the police department or the fire
5      department due to the timing.  It was my goal to begin
6      training of the police and fire department in 2018.
7  Q.  So was this at a point in time in which Jere Green,
8      the police commissioner at that time, had refused to
9      cooperate with you in giving you what you needed in
10     order to actually implement the training?
11 A.  That information was required so that I could, one,
12     confirm the type of training, that it had been
13     provided, and then to determine what other training
14     would be necessary.
15 Q.  Did you ever get that information?
16 A.  No, I did not.
17 Q.  So you weren't able to do the training?
18 A.  That's correct, for the police and fire department.
19 Q.  All right.  The next one, the paragraph says,
20     investigate and assist in the investigation of
21     appropriate -- inappropriate and improper activities
22     that impair diversity and inclusion in the police
23     department, the fire department and other City
24     departments and functions and where appropriate
25     recommend necessary remedial actions.  Were you able

Page 373

1      to execute on those responsibilities?
2  A.  Only to a limited extent where I participated in
3      conversations regarding recommended, necessary
4      remedial actions.  The investigations of the persons
5      that I trained began, in one instance, in 2015 and
6      then another in 2016 and then with Ms. Howlett in
7      2017.
8  Q.  Okay.  So were you, overall, able to effect and
9      complete the execution and responsibilities as
10     enumerated in that paragraph?
11 A.  No.
12 Q.  And why not?
13 A.  Again, as I said, these investigations were already in
14     process or had been completed.
15 Q.  All right.  Very good.  Thank you.  The next
16     paragraph, develop and implement metrics for measuring
17     the effectiveness of diversity initiatives and prepare
18     quarterly reports for the administration on the value
19     of the initiatives.  Were you able to accomplish that?
20 A.  I did provide the mayor with a weekly update for a
21     sustained period of time on all the -- of the
22     initiatives I was proposing and engaging in.
23 Q.  And then I think we're looking at the last bullet
24     item, keep current on diversity programs and
25     developments by maintaining contact with others in the

Page 374

1      field, and then it goes into your qualifications and
2      is there any reason to believe that you did not
3      satisfy, meet all of those qualifications named at the
4      bottom of the second page going into the last page
5      there, sir?
6  A.  No, sir, I did meet them.
7  Q.  Okay.  Very good.  So if we were to sum it all up,
8      sir, your duties and responsibilities as outlined in
9      your job description, diversity and inclusion
10     coordinator, were you -- if I understood your
11     testimony correctly, you were not able to fulfill
12     these responsibilities because the mayor, Mayor Fouts,
13     would not allow you to --
14     MR. ACHO:  Objection, leading and
15     suggestive.
16 BY MR. MUNGO:
17 Q.  -- would that be a fair summary?
18     MR. ACHO:  The testimony stands as it is,
19     that suggests feeding this man testimony, that's all
20     it is.
21 BY MR. MUNGO:
22 Q.  Would that be a fair assessment, sir?
23 A.  Yes.
24     MR. MUNGO:  Let the record reflect I'm
25     about to show the deponent Deposition Exhibit -- hold



GREGORY MURRAY
February 26, 2018

Page 375

1    on a second -- Exhibit Number 9, Deposition Exhibit
2    Number 9.  There you go, sir?
3              MR. ACHO:  Don't throw things at me.
4    Please, don't throw it anymore.  Don't do that.  Don't
5    do that.
6              MR. MUNGO:  That was not meant to --
7              MR. ACHO:  I don't appreciate it.
8              MR. MUNGO:  I didn't mean to throw anything
9    at you.  I've been doing that all night.
10             MR. ACHO:  No, you've handed it to me.  I
11   don't like you doing stuff like that.
12             MR. MUNGO:  You misread reality.
13             MR. MARKO:  I think that --
14             MR. MUNGO:  You're not in touch with
15   reality.
16             MR. MARKO:  -- we're at nine-plus hours of
17   deposition and --
18             MR. ACHO:  You know what, you've gone way
19   beyond your time.
20             MR. MUNGO:  I want to go on with my exam,
21   please.
22   BY MR. MUNGO:
23   Q.  Sir, are you able to identify that document?
24   A.  Yes.
25   Q.  What is that document?

Page 376

1    A.  This is the -- my resignation consideration to the
2    mayor.
3    Q.  Okay.  I want to draw your attention to paragraph
4    number 1.  You indicate in this first paragraph, this
5    is your letter to the mayor where you indicated that
6    you were going to resign because the mayor refused to
7    allow you to do diversity work, correct?
8              MR. ACHO:  That's not what he said -- wait
9    a minute -- misleading, not what it says.
10   BY MR. MUNGO:
11   Q.  It's consistent with -- consistent with your job
12   description, correct?
13   A.  Yes, what I shared with him, with regard to my work
14   environment and absent an irrevocable reset and
15   doubling down of his stated commitment to diversity,
16   that was my primary reason for this letter and the
17   primary reason for the letter itself was because,
18   again, as I said, the mayor said on three different
19   occasions, he wanted me to hold off on diversity, put
20   it on the back burner until after the 2019 election
21   and he was trying to give me busy work, which I
22   thought was the census liaison work until that time
23   and the census liaison was completely outside of my
24   job description.
25   Q.  And this letter is dated -- this memo is dated October

Page 377

1    24, 2017, correct?
2    A.  Yes.
3    Q.  And when were you actually terminated by the mayor?
4    A.  December 8, 2017.
5    Q.  And in the -- the ideas and the thoughts that you
6    expressed in this letter dated -- resignation
7    consideration letter dated October 24th, contains the
8    same ideas and thoughts that you have conveyed in your
9    deposition, your previous deposition as well as today,
10   correct?
11   A.  Yes.
12             MR. ACHO:  Objection, leading and
13   suggestive constantly, highly inappropriate.
14   BY MR. MUNGO:
15   Q.  And the second page, sir, the second paragraph, you
16   indicate -- oh, I'm sorry, take the first paragraph,
17   which is very important, in the second -- the first
18   paragraph of the second page you say, I almost feel
19   like someone here thinks me -- thinks of me as an
20   albeit skilled beast of burden, that the more I
21   produce, the more I should produce without genuine
22   recognition.  The situation is akin to be considered
23   an indentured servant when someone here thinks has no
24   other option than to take on these other uncompensated
25   responsibilities, many of which could divert me from

Page 378

1    my primary responsibility here, and when you said your
2    primary responsibility here, what were you
3    referencing?
4    A.  Diversity related.
5    Q.  And I think you tend to say that as it goes on.  You
6    say, perhaps that is the strategy of distraction to
7    avoid strongly focusing on diversity?
8    A.  That is correct.
9    Q.  So, sir, you expressed this concern and this idea back
10   in October of 2017, correct?
11   A.  Yes.
12   Q.  And this is long before Ms. Howlett filed her
13   complaint, correct, if she filed her complaint in 2017
14   this letter was drafted way before that, correct?
15             MR. ACHO:  Wait.  Objection, leading,
16   suggestive.
17   A.  No.
18             MR. ACHO:  This is a perfect example of
19   this dishonesty in this deposition by counsel.
20             MR. MUNGO:  Okay.  Great.  You may have a
21   point there for the first time all day long, okay,
22   Mr. Acho.
23             MR. ACHO:  Don't laugh at me, sir.  I don't
24   think it's funny.  Laughing at me is highly
25   inappropriate, it really is wrong.



GREGORY MURRAY
February 26, 2018

Page 379

1        MR. MUNGO:  I am an American and I have a
2   constitution, don't tell me not to laugh.  You don't
3   intimidate me.  I'll continue my exam.
4   BY MR. MUNGO:
5   Q.  Okay.  So you express this sentiment, sir, long before
6       you were contacted to draft that affidavit, to sign
7       your affidavit, correct?
8   A.  Yes.
9   Q.  Okay.  And also in the second paragraph there, sir,
10      you indicate that, in your statement to me two weeks
11      ago, you indicated intent to put diversity on the back
12      shelf until after the election of 2019 based purely on
13      political consideration, you expressed to me your
14      belief -- you express your belief that the climate was
15      not quite ready for diversity.  You mentioned the
16      problems of LAM and Dean Berry, Kelly Colegio, et
17      cetera, might serve to create a political backlash
18      should you aggressively promote diversity.
19          More, Mr. Mayor, I am repulsed at being
20      asked to tread water for two years.  There are things
21      we can do now incrementally to advance diversity
22      without shelving it, it is a matter of political will.
23          You penned those words long before you
24      signed your affidavit that we're going to use here
25      today as an exhibit too, correct?

Page 380

1   A.  Yes.
2   Q.  And then I want you to look down at the third to the
3       last paragraph, sir --
4   A.  Yes.
5   Q.  -- where it says with regard to my work environment,
6       I'm also -- have also -- I also have a choice and I'm
7       stating to you directly that absent and irrevocable
8       reset and doubling down on your stated commitment to
9       diversity, our work relationship will soon end?
10  A.  Yes.
11  Q.  So it was your intent to use this letter to get Mayor
12      Fouts' attention to focus on diversity that he was
13      delaying and avoiding, right?
14          MR. ACHO:  Objection, leading and
15      suggestive, you're putting words in this man's mouth,
16      which is why we're going to have a number of questions
17      going into this.
18  A.  Yes.
19  BY MR. MUNGO:
20  Q.  Okay.  All right.  Very good.  Okay.  Deposition
21      Exhibit Number 5, I'm now showing it to the deponent.
22          Could you take a look at that, sir, and
23      tell me whether or not you recognize that document?
24  A.  Yes.
25  Q.  Sir, before we move on into that document, counsel

Page 381

1   showed you a letter from the late Dr. Martin Luther
2   King's daughter, Bernice King.  Do you recall that?
3   A.  Yes.
4   Q.  Does that letter to you indicate that and also mean
5       that you were able to do your work, your diversity
6       work, that you were hired to do within the City of
7       Warren?
8   A.  No, there has been -- bears no statements in there.
9   Q.  Do you see any relationship of that letter to your
10      being allowed to execute your duties as diversity
11      coordinator?
12  A.  No, sir.
13  Q.  And can you elaborate on that briefly?
14  A.  Even though the letter was written by Bernice King, I
15      think the environment on the ground is altogether
16      different from what he was being praised in the letter
17      for doing.  Ms. King has no knowledge of the
18      environment that I came in and endured during my
19      employment with the City and, certainly, that letter
20      was written before the mayor shared with me that
21      diversity was to be put on the back burner until after
22      the election for political considerations because he
23      felt that white voter backlash.
24  Q.  And you recall the question that counsel asked you
25      about, I think he used the term that you requested the

Page 382

1   mayor to delay hiring a human resource -- an
2   African-American human resource director?
3   A.  Yes.
4   Q.  You do remember that question?
5   A.  I do remember the question.
6   Q.  Okay.  Is that true that you -- that you told the
7       mayor to hold off or delay hiring a director of human
8       resources?
9   A.  Yes, I did but, again, within the context of the
10      discussion that we were having because this was,
11      again, another instance of where he shared his
12      concerns about that backlash, et cetera, and so from a
13      strategic standpoint it would be better to delay, not
14      eliminate, the hiring of that person but to delay it
15      so it didn't create a backlash, create an environment
16      where no more could be hired or no more could be done
17      because of the backlash.
18  Q.  Let me ask you this, sir, was that your preference and
19      did you come up with this whole original notion of not
20      aggressively pursuing diversity, including the hiring
21      of a -- African-American human resources director?
22          MR. ACHO:  Objection, leading, suggestive.
23  A.  The mayor shared with me his concerns about how that
24      could create a backlash, and I certainly did not want
25      anything to happen that would shut down the ability to



GREGORY MURRAY
February 26, 2018

---

**Page 383**

1   further diversify the city due to a backlash of white
2   voters and residents of the city.
3   BY MR. MUNGO:
4   Q.   Did you believe that there would be a white backlash
5        of citizens for pursuing diversity?
6   A.   I have no idea.  I know what his concern was as
7        repeatedly expressed to me.
8   Q.   And is that the reason you made that suggestion about
9        gradually making that change?
10  A.   Yes.
11            MR. ACHO:  Objection, leading and
12       suggestive.  Never used the word, gradually, never
13       even used it.  This is typical, this is becoming
14       really absurd and I am going to present it to the
15       court.
16  A.   It would have been a strategic delaying so as to
17       further create the environment in which the
18       appointment of that African-American female director
19       would not have caused a backlash to -- to choke off
20       the ability to continue to diversity.
21  BY MR. MUNGO:
22  Q.   So you were trying to operate within the narrow
23       freedom that the mayor gave you to do diversity work,
24       would that be a fair assessment?
25  A.   Yeah, I tried the best I could.

---

**Page 384**

1   Q.   But that was not your preference to gradually hire
2        African-Americans, correct?
3   A.   No, that was not my preference.
4   Q.   Was it your preference, in any way, to delay the
5        hiring of African-Americans in the City of Warren?
6            MR. ACHO:  Objection, leading and
7        suggestive.  He's already testified that --
8   A.   It was not my preference to do so but, again, faced
9        with the mayor's fear and the reaction that the mayor
10       said he might experience from a strategic standpoint,
11       I did not say, don't do it.  I did say, delay until we
12       can get the environment right.
13  BY MR. MUNGO:
14  Q.   And was that out of a fear, sir, out of a certain
15       fear?
16  A.   It was out of a fear that the backlash would close
17       down the opportunities altogether.
18  Q.   For what?
19  A.   For further diversifying the City.
20  Q.   Thank you.  Sir, I want to direct your attention to
21       the last exhibit there.  Do you see that one?  I want
22       you to -- do you recognize that document, sir?
23  A.   The deposition -- I mean, the affidavit?
24  Q.   Yes, sir.
25  A.   Yes, I do.

---

**Page 385**

1   Q.   And I want to direct your attention to certain
2        paragraphs.
3            MR. MARKO:  Which page?
4            MR. MUNGO:  Well, the first -- well, it
5        would be the second page, right after the caption
6        page.
7   BY MR. MUNGO:
8   Q.   You indicate in paragraph four that in your opinion
9        the mayor of the City of Warren, Mayor Fouts, is tone
10       deaf and disingenuous, that is, not genuinely
11       interested in adopting practices necessary to address
12       racial diversity within City government and you've
13       testified today a lot in terms of Mayor Fouts'
14       reluctance to pursue and affect diversity within the
15       City of Warren and the reasons why he indicated that
16       he did not want to pursue diversity within the City of
17       Warren.
18            Is there anything else you want to add to
19       this paragraph after having sat at least through one
20       and almost another deposition?
21  A.   It is that I do believe that the mayor was not genuine
22       in his commitment to diversity, to the extent that he
23       would allow practices and engagement with various
24       parts of the community in order to bring that forward
25       and, again, I have to go back to him saying that he

---

**Page 386**

1        wanted to put diversity on the back burner.
2            The mayor admitted such in his own words in
3        an interview with the Macomb Daily that I was to
4        pursue disabilities and then later on get to
5        diversity, and that's in the Macomb Daily article and
6        so he, himself, shared that he did not want me to
7        focus on diversity but rather disabilities, and that
8        was not why I came to the City of Warren.
9   Q.   Okay.  Sir, earlier you were asked whether or not you
10       were personally aware of any African-Americans that
11       had applied to become police officers in the City of
12       Warren and were not successful.  Do you recall counsel
13       asking you that question --
14  A.   Yes.
15            MR. ACHO:  I didn't say that.  I never
16       asked that question.
17  BY MR. MUNGO:
18  Q.   -- or some question to that effect?
19            MR. ACHO:  Say it right.
20            MR. MARKO:  Go ahead.
21  A.   Okay.
22  BY MR. MUNGO:
23  Q.   Don't listen to him.
24  A.   I understand that I was asked whether or not I had
25       developed policies or whatever regarding and

---



GREGORY MURRAY
February 26, 2018

Page 387

1  submitting programs in writing to the mayor as it
2  relates to diversity for the police department. I
3  did, again, doing my --
4      MR. ACHO: That's not what he asked you.
5      MR. MARKO: Go ahead.
6  A. In my due diligence, I went out and spoke to Police
7  Chief Craig, I met with the president of the Retired
8  Detroit Police Officers Association, and all of this
9  is a part of doing your due diligence, getting your
10  information together. I met with the president of the
11  Hispanic Police Officers Association and --
12      MR. ACHO: That's not what he asked you.
13  A. So I was, to a certain extent, doing my research and
14  whatnot in order to provide the mayor with the best
15  type of recommendations for diversifying the City, all
16  to no avail.
17  BY MR. MUNGO:
18  Q. Do you recall counsel asking you questions, Mr.
19  Murray, as to whether or not you had gone out and
20  asked and sought out individual African-Americans to
21  apply to become police officers for the City of
22  Warren?
23  A. I do remember that.
24  Q. Okay. Was that your responsibility as the diversity
25  coordinator?

Page 388

1  A. Not mine solely alone, no.
2  Q. Not yours solely alone?
3  A. That's correct.
4  Q. Go ahead.
5  A. I can -- I would promote diversity by engaging in the
6  public, which I did continuously and asking them to
7  consider coming to work for Warren, finding out the
8  process for becoming a police officer because those
9  are very stringent requirements and you cannot just --
10  not just anyone can apply and so I did promote the
11  idea of seeking employment with the City and the
12  police department, which is why I brought NOBLE in,
13  the National Organization of Black Law Enforcement
14  Executives, NOBLE.
15  Q. Let me ask you this way, Mr. Murray, if you look at
16  your --
17      MR. ACHO: Counsel, excuse me, we're almost
18  at 9:00. You still are not going to tell me how much
19  longer you're going to be because I'll tell you this,
20  this attorney over an hour ago said he wouldn't allow
21  me to ask questions and yet, you don't even tell us
22  how long you're going to be because you're way beyond
23  the time limits. Will you tell me how much longer you
24  are going to be, yes or no?
25  BY MR. MUNGO:

Page 389

1  Q. Mr. Murray, let me ask you --
2      MR. ACHO: Will you, sir, please, I'm
3  asking you a question.
4  BY MR. MUNGO:
5  Q. Mr. Murray, I'm going to ask you in this way, sir, if
6  you look at your job description is it your
7  responsibility to go out and individually recruit
8  individuals, African-Americans, to apply to become
9  police officers for the City of Warren or was it your
10  responsibility to change the institutional process for
11  recruiting?
12  A. It was not my responsibility to go out and
13  individually recruit and, yes, it was my
14  responsibility to help develop policies and practices,
15  including recruitment strategies, to bring blacks into
16  the police force.
17  Q. Now, let me ask you a question, Mr. --
18      MR. ACHO: Sir, will you answer my
19  question? Sir. Sir. Sir. Mr. Mungo, with all due
20  respect --
21  BY MR. MUNGO:
22  Q. On the second page of --
23      MR. ACHO: With all due respect --
24      MR. MUNGO: I'm not going to answer your
25  question.

Page 390

1      MR. ACHO: You still won't? An hour ago I
2  asked you.
3      MR. MUNGO: This is very rude.
4      MR. ACHO: No, you're being rude by not --
5  it's almost 9:00 p.m. and you won't tell us. All
6  these people have to get home too and you won't even
7  have the --
8      MR. MUNGO: What you're doing is absolutely
9  ridiculous, Mr. Acho.
10      MR. ACHO: You won't give us the
11  courtesy --
12      MR. MUNGO: I'm going to continue. Tell me
13  when you're done.
14  BY MR. MUNGO:
15  Q. Okay. Mr. Murray, look at the second page of your
16  affidavit, sir -- actually -- actually, the third
17  page, sir, paragraph 8, it's paragraph 8. I have a
18  question, here you write, Mayor Fouts stated to me
19  that Police Commissioner Jere Green was not interested
20  in diversity and that Commissioner Green told Fouts
21  that blacks couldn't pass necessary tests or
22  background investigations in order to become police
23  officers with the City of Warren.
24      Do you believe that that had an impact on
25  the inability for the City of Warren to hire



GREGORY MURRAY
February 26, 2018

## Page 391

1 African-Americans and, if so, how much?
2 MR. ACHO: Objection, pure speculation.
3 A. I would say yes, given that their recruitment
4 strategies were not tailored toward being inclusive of
5 communities of color and if you don't recruit in that
6 community you won't get applicants from that
7 community.
8 BY MR. MUNGO:
9 Q. Okay. Okay. Okay. And then there's this one other
10 question I have for you, Mr. Murray, then I'm going to
11 turn it over to counsel.
12 In your affidavit you make a statement
13 regarding the mayor's mocking of individuals who have
14 Tourette's syndrome --
15 A. Yes.
16 Q. -- and he asked you to erase that section, it's
17 paragraph 13, see that?
18 A. Yes.
19 Q. The mayor asked you to erase his derogatory comments
20 toward those who had the disability of Tourette's
21 syndrome?
22 A. Yes.
23 Q. Do you have anything to add to that, sir?
24 A. I did go over to the communications department and was
25 able to delete some of the files and that's why I say

## Page 392

1 I partially completed it. There are still copies of
2 that tape or I -- when I left there there was still
3 copies of the tape on the City communications server.
4 Q. Did the mayor tell you why he wanted you to erase that
5 tape, sir?
6 A. He was concerned that it might be linked to the
7 comments on the first tape where he made, allegedly
8 made disparaging remarks about people with
9 disabilities saying those are, they're like animals, they should
10 be caged, et cetera.
11 Q. Have you ever heard that tape?
12 A. Yes.
13 Q. Did it sound like the same --
14 MR. ACHO: Oh, my gosh, objection,
15 irrelevant, speculative, lack of foundation, lack of
16 knowledge, this is a travesty.
17 BY MR. MUNGO:
18 Q. Did it sound like the same voice to you on both tapes?
19 MR. ACHO: I want the same objection, it is
20 lack of foundation, hearsay, it is an absolute
21 travesty to suggest that this man knows this answer.
22 A. Based --
23 MR. MUNGO: Well, you wanted this
24 deposition, didn't you?
25 BY MR. MUNGO:

## Page 393

1 Q. Go ahead.
2 A. Based on my --
3 MR. ACHO: Oh, please, and stop laughing at
4 me.
5 A. -- exposure to the mayor --
6 MR. ACHO: Please stop laughing.
7 MR. MARKO: Go ahead.
8 Counsel, we're stopping at 9:00 so go ahead
9 and --
10 A. Based on my continuous exposure to the mayor and based
11 on some of the comments that he shared with me during
12 that time period, I'm now of the conclusion that that
13 is the mayor's voice.
14 MR. ACHO: I'll ask that that be stricken.
15 MR. MUNGO: I'm done.
16 MR. ACHO: I have about an hour and a
17 half --
18 MR. MARKO: Nope, under Federal Rule 30
19 it's limited to 7 hours. I looked at the first
20 deposition and it was three hours, it started at 10:17
21 and it ended at 1:36 p.m., it was just over three
22 hours and that was Mungo's questioning.
23 Today's deposition has gone six-and-a-half
24 hours, which was both you and Mr. Mungo, so we are
25 over nine hours.

## Page 394

1 MR. ACHO: Mr. Mungo had way more time.
2 MR. MARKO: At 9:00 I'm terminating the
3 dep. Go ahead and ask whatever questions you want
4 until that time. I'm not subjecting this poor man to
5 anymore deposition. Under Federal Rule 30 you have to
6 get a court order and that's --
7 MR. ACHO: I'm not going to spend 10
8 minutes. I am going to go to court because if you're
9 going to cancel, that is absurd.
10 MR. MARKO: Nine-and-a-half hours of
11 deposition, that is --
12 MR. ACHO: No. No, I will go to court.
13 (The deposition was concluded at 8:50 p.m.
14 Signature of the witness was not requested by
15 counsel for the respective parties hereto.)
16
17
18
19
20
21
22
23
24
25

