# EXHIBT E

# HOWLETT v. CITY OF WARREN, ET AL.

# GREGORY MURRAY

III

August 6, 2018

*Prepared for you by*



**USLEGAL SUPPORT**
The Power of Commitment.

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

GREGORY MURRAY
August 6, 2018

| Page 396 |

```
 1        IN THE DISTRICT COURT OF THE UNITED STATES
 2           FOR THE EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5   DESHEILA C. HOWLETT,
 6           Plaintiff,
 7      vs.          Case No. 17-11260
 8                   Hon. Terence G. Berg
 9                   Mag. R. Steven Whalen
10   CITY OF WARREN; COMMISSIONER
11   JERE GREEN, acting in his
12   individual capacity; LT. LAWRENCE
13   GARDNER; SHAWN JOHNSON; DAWN McLANE;
14   BARBARA BEYER; ANWAR KHAN; DARRIN
15   LABIN; WILLIAM ROSS; KEVIN BARNHILL;
16   PAUL HOUTOS; SCOTT TAYLOR,
17           Defendants.
18   _____
19       The Continued Deposition of
20       GREGORY MURRAY, Volume III,
21       Taken at 645 Griswold Street, Suite 4100,
22       Detroit, Michigan,
23       Commencing at 10:26 a.m.,
24       Monday, August 6, 2018,
25       Before Kathryn L. Janes, CSR-3442, RMR, RPR.
```

| Page 397 |

```
 1   APPEARANCES:
 2   LEONARD MUNGO
 3   The Mungo Law Firm, PLC
 4   333 West Fort Street
 5   Suite 1500
 6   Detroit, Michigan 48226
 7   313.963.0407
 8   caseaction@mungoatlaw.com, mungol16@msn.com
 9       Appearing on behalf of the Plaintiff.
10
11   RONALD G. ACHO
12   Cummings, McClorey, Davis & Acho, PLC
13   17436 College Parkway
14   3rd Floor
15   Livonia, Michigan 48152
16   734.261.2400
17   racho@cmda-law.com
18       Appearing on behalf of the Defendants.
19
20
21
22
23
24
25
```

| Page 398 |

```
 1   ETHAN VINSON
 2   City of Warren, City Attorney
 3   1 City Square
 4   Suite 400
 5   Warren, Michigan 48093
 6   586.574.4671
 7   evinson@cityofwarren.org
 8       Appearing on behalf of the Defendants.
 9
10   RAECHEL M. BADALAMENTI
11   Kirk, Huth, Lange & Badalamenti, PLC
12   19500 Hall Road
13   Suite 100
14   Clinton Township, Michigan 48038
15   586.412.4900
16   rbadalamenti@khlblaw.com
17       Appearing on behalf of the Non-Party Defendants.
18
19   JONATHAN R. MARKO
20   Ernst & Marko Law, PLC
21   645 Griswold Street, Suite 4100
22   Detroit, Michigan 48226
23   313.965.5555
24   jon@ernstmarkolaw.com
25       Appearing on behalf of the Witness.
```

| Page 399 |

```
 1              TABLE OF CONTENTS
 2
 3   WITNESS                            PAGE
 4   GREGORY MURRAY
 5
 6   CONTINUED EXAMINATION
 7   BY MR. ACHO:                        401
 8   EXAMINATION
 9   BY MR. MUNGO:                       517
10
11              EXHIBITS
12
13   EXHIBIT                            PAGE
14   (Exhibits attached to transcript.)
15
16   DEPOSITION EXHIBIT 1                488
17   DEPOSITION EXHIBIT 2                492
18   DEPOSITION EXHIBIT 3                495
19   DEPOSITION EXHIBIT 4                508
20   DEPOSITION EXHIBIT 5                511
21   DEPOSITION EXHIBIT 6                511
22   DEPOSITION EXHIBIT 7                511
23   DEPOSITION EXHIBIT 8                518
24   DEPOSITION EXHIBIT 9                519
25   DEPOSITION EXHIBIT 10               519
```



US LEGAL SUPPORT
The Power of Commitment™

Pages 396 to 399

GREGORY MURRAY
August 6, 2018

Page 400

| 1 | DEPOSITION EXHIBIT 11 | 519 |
| 2 | DEPOSITION EXHIBIT 12 | 519 |
| 3 | DEPOSITION EXHIBIT 13 | 519 |

Page 402

1  A.  He did not tell me that he had it planned, he told me
2      that he understood the value of it, yes.
3  Q.  But he said he was going to do it?
4  A.  Oh, yes, after we talked, yes.
5  Q.  Okay.  But you never heard his speech when he first
6      started and he mentioned training in the police
7      department?
8  A.  I don't -- I don't recall that, but...
9  Q.  Okay.  Were you there?
10  A.  Yes.  Well, there when?  I'm sorry.
11  Q.  When he first started.
12          MR. MARKO:  Started what, his speech?
13  BY MR. ACHO:
14  Q.  Were you there for his speech on his first day, yes or
15      no?
16  A.  I don't recall.
17  Q.  Okay.  So you don't know whether he talked about
18      training before you ever spoke to him, do you?  You
19      don't know?
20  A.  Well, actually I spoke to him before he came on board
21      with the city.
22  Q.  Okay.  And he also told you the mayor wanted more
23      minorities in the police department, he told you that?
24  A.  Yes.
25  Q.  And he said he supported that?

Page 401

1   Detroit, Michigan
2   Monday, August 6, 2018
3   10:26 a.m.
4
5              GREGORY MURRAY,
6   was thereupon called as a witness herein, and after
7   having first been duly sworn to testify to the truth,
8   the whole truth and nothing but the truth, was
9   examined and testified as follows:
10             CONTINUED EXAMINATION
11  BY MR. ACHO:
12  Q.  Mr. Murray, William Dwyer became the police
13      commissioner the last three months of your employment,
14      correct?
15  A.  Yes.
16  Q.  And you always got along with Police Commissioner
17      Dwyer, correct?
18  A.  Yes.
19  Q.  And you spoke to him about training, did you not?
20  A.  Yes.
21  Q.  And he said he agreed with you?
22  A.  Yes.
23  Q.  In fact, he said he already had that planned and it
24      was in his first speech about training and the police
25      officer including diversity, he told you that, right?

Page 403

1   A.  Yes.
2   Q.  And you believed him?
3   A.  Yes.
4   Q.  Okay.  And you don't have any evidence that the police
5       department rules adversely affected the plaintiff, do
6       you?  You don't have any evidence of that, do you?
7   A.  I don't have any personal evidence of that.
8   Q.  Okay.
9   A.  But let me ask you, what do you mean by evidence?
10  Q.  You know, knowledge.
11  A.  Okay.
12  Q.  You don't have any, do you, any knowledge that any of
13      the rules of the police department adversely affected
14      the plaintiff?
15  A.  No.
16  Q.  Okay.  And isn't it true that the police department
17      has been responsive and active in establishing rules
18      prohibiting harassment within the police department?
19  A.  I wouldn't say -- no.
20  Q.  You don't know, you don't know?
21          MR. MARKO:  No, that's not what he said.
22  A.  I would say no.
23  BY MR. ACHO:
24  Q.  You would say no, they didn't have those rules?
25  A.  Yes.



GREGORY MURRAY
August 6, 2018

Page 404

1   Q.  Oh, okay.  Tell us about General Order 3-01 that was
2        regarding discrimination and sexual harassment that
3        was promulgated January 10, 2003, tell us about that
4        order?
5   A.  I was -- I do not recall the order.  I was not there
6        in 2003.  And despite my requesting documentation like
7        that from then Commissioner Jere Green, it was not
8        provided to me.
9   Q.  Okay.  So you are telling us that you worked for 11
10       months in Warren and never read the order that the
11       police department issued and established about
12       discrimination and sexual harassment, you never read
13       it?
14  A.  It was never provided to me, sir --
15  Q.  So you never read it?
16  A.  -- to read it.
17  Q.  Okay.  And that you were not aware that the police
18       department does not condone and will not tolerate any
19       harassment or discriminatory behavior, you're not
20       aware of that?
21  A.  No, what are you reading from?
22  Q.  Okay.  And that harassment that is forbidden by that
23       policy, that included race as well, correct, or you
24       don't know?
25             MR. MARKO:  Objection, foundation.  He said

Page 405

1        he didn't -- wasn't able to read it.
2   BY MR. ACHO:
3   Q.  Go ahead.
4   A.  I did not read it, have not -- would not -- would have
5        to read it in order to try to infer its meaning.
6   Q.  But if you don't know the policy, then you don't know
7        what it contains?
8   A.  Well, harassment is different from discrimination and
9        so as such, because there is a differentiation between
10       the two, it wouldn't nec -- not necessarily mean
11       antidiscrimination.
12  Q.  But that policy refers to discrimination, doesn't it?
13             MR. MARKO:  Same objection.
14  A.  I don't know, sir, I've never seen it.
15  BY MR. ACHO:
16  Q.  Okay, make an assumption for me that there is a
17       General Order 03-01 that says, "The department does
18       not condone and will not tolerate any harassment or
19       discriminatory behavior."  Does that sound like a good
20       thing?
21  A.  Yes.
22  Q.  Okay.  And so you don't know whether Warren's Police
23       Department had that --
24  A.  That's correct.
25  Q.  -- correct?

Page 406

1              And if the policy said the department will
2        take direct and immediate action to prevent such
3        behavior and to remedy all reported incidents of
4        harassment, that would be good, wouldn't it?
5   A.  It would be.
6   Q.  Yeah, that would be a good policy to have, right?
7   A.  It would be, but that was not the practice.
8   Q.  Well, sir, let me ask you this.
9   A.  And I can give you examples of that.
10  Q.  Sir, I'm asking you a question.
11  A.  I'm trying to answer --
12  Q.  But no, you're not.
13  A.  -- fully.
14  Q.  I want you to answer my question, please.
15             MR. MARKO:  Let's not evolve, Mr. Acho,
16       like last time into personal attacks, let's all try to
17       stay on track, okay?
18  BY MR. ACHO:
19  Q.  So you weren't aware that policy existed,
20       correct?
21  A.  That's correct.
22  Q.  And you don't know whether the investigation into the
23       plaintiff's complaint was conducted under this policy?
24       You wouldn't know that, would you?
25  A.  That's correct.

Page 407

1   Q.  But if it had such a policy, the city, that would be a
2        good thing, correct?
3   A.  Yes, sir.
4   Q.  And that would be beneficial for the plaintiff,
5        correct, this policy?
6   A.  For all employees, yes.
7   Q.  Okay.  And this policy would not injure the plaintiff,
8        it would help her, wouldn't it, correct, this policy?
9   A.  Yes.
10  Q.  Okay.
11  A.  Yes.
12  Q.  Now, did you become aware that the police department
13       also issued and established a general order on rules
14       of conduct in January 22, 2003?
15  A.  No, sir.
16  Q.  Okay.  And so you were not aware that it prohibited
17       sexual harassment, correct?
18  A.  Yeah, that's correct.
19  Q.  And you would not even know as diversity coordinator
20       that the rules of conduct referred to the earlier
21       policy we discussed on discrimination and sexual
22       harassment, correct?  You wouldn't know?
23  A.  I requested it and was denied the information.
24  Q.  Okay.  And you didn't contact anyone beside former
25       Police Commissioner Green?



GREGORY MURRAY
August 6, 2018

**Page 408**

1    A. Yeah, it would have been inappropriate for me to, so
2       you're right, I did not contact anyone else other than
3       him and shared that request with the administration.
4    Q. So you didn't approach anyone else?
5    A. No one in the police department?
6    Q. No one else.
7    A. Oh, the mayor, I approached the mayor.
8    Q. You approached the mayor?
9    A. Yes.
10   Q. Can I see your memo where you approached the mayor?
11   A. Sir, I did not leave my employment with any property
12      owned by the City of Warren and that would include all
13      memos.
14   Q. Is it your sworn testimony that I gave the mayor a
15      memo saying there are policies and rules of conduct
16      that I sought and never received, are you saying
17      you --
18   A. I wrote a memo and talked to the mayor letting him
19      know that I had not received the information that I
20      requested from former Commissioner Jere Green, yes.
21   Q. So you do -- there is such a document?
22   A. Yes.
23   Q. Okay. And I assume you also contacted the Police and
24      Fire Civil Service Commission to make them aware of
25      this, correct?

**Page 409**

1    A. No, no, sir.
2    Q. Did you ask the Police and Fire Civil Service
3       Commission for copies of these rules?
4    A. No, sir.
5    Q. Did you ask anyone else in the police department for
6       those rules --
7    A. No, sir.
8    Q. -- yes or no?
9    A. No, I expressly --
10          MR. MARKO: Let him finish.
11   A. I was expressly prohibited from the mayor -- by the
12      mayor from making contact with other either department
13      heads or commissions.
14   BY MR. ACHO:
15   Q. Do you have anything in writing to that effect?
16   A. No, sir, I don't.
17   Q. And who did you tell this, what you're just telling
18      us, which is --
19   A. I'm sorry.
20   Q. Who did you tell --
21   A. Uh-huh.
22   Q. -- that you were forbidden?
23      Who did you tell that you were forbidden by
24      the mayor? Anyone?
25   A. Yes. In one instance, the city clerk, I told the city

**Page 410**

1       clerk that I had been instructed by the mayor not to
2       provide diversity training for his department.
3    Q. That's not what I asked you.
4    A. I think it is.
5    Q. Sir. My question is real simple.
6    A. All right.
7    Q. Who did you tell --
8    A. Yes.
9    Q. -- that the mayor forbade you to get policies --
10          MR. MARKO: Other than what he said?
11   BY MR. ACHO:
12   Q. -- from the police department?
13          MR. MARKO: Other than that city clerk that
14      he just testified?
15   BY MR. ACHO:
16   Q. You told the city clerk you wanted rules of the police
17      department and didn't get them?
18   A. No, no, no.
19   Q. You didn't ask for them, did you?
20   A. Again, I was forbidden to communicate except by
21      express permission of the mayor with other department
22      heads based on certain lines of inquiry.
23   Q. Okay. So even though you were at the city for 11
24      months --
25   A. Uh-huh.

**Page 411**

1    Q. -- you never saw the rules of conduct that requires
2       officers to conduct themselves in a manner that
3       fosters cooperation, showing respect, courtesy and
4       professionalism in their dealing with one another; you
5       never saw such a thing?
6    A. That's correct.
7    Q. If it exists, this policy, would that be a good thing?
8    A. Yes, sir.
9    Q. Why?
10   A. It would be a good thing because it would protect --
11      if enforced, it would protect employees from harm.
12   Q. Okay. And you say enforced?
13   A. Yes, sir.
14   Q. But in order for something to be enforced, there has
15      to be a communication by the aggrieved person,
16      correct?
17   A. Generally, yes.
18   Q. Well, not generally, how would the -- wouldn't the
19      police department have to have notice and knowledge
20      that a police officer was aggrieved, yes or no?
21   A. Yes.
22   Q. Are you aware of whether the plaintiff ever availed
23      herself of that general order or the policy, yes or
24      no?
25   A. No, I'm not aware.



GREGORY MURRAY
August 6, 2018

Page 412

1  Q. Not aware. But she should have, correct?
2      MR. MARKO: Foundation.
3  A. It depends on the circumstances.
4  BY MR. ACHO:
5  Q. Well, sir, wait a minute. You are and have been a
6     social activist, correct?
7  A. Yes.
8  Q. And when you see wrong, you report it, correct?
9  A. Yes.
10 Q. That's what you advise people to do?
11 A. Yes, but I never advised her.
12 Q. But you would have advised her if you knew her,
13    correct?
14 A. Yes, if I knew the situation, yes.
15 Q. Yeah. And the fact that she didn't complain is her
16    failing, isn't it?
17 A. I can't speak to that, sir.
18 Q. Okay. That's because all your testimony about the
19    plaintiff is speculative, isn't it?
20     MR. MARKO: Objection, that calls for a
21    legal conclusion.
22 BY MR. ACHO:
23 Q. True?
24 A. I'm not qualified to make those kind of assessments,
25    sir.

Page 413

1  Q. So you're not making any assessment about the
2     plaintiff's claim, yes or no?
3      MR. MARKO: Objection.
4  A. I can't answer that question yes or no.
5      MR. MARKO: Argumentative.
6  BY MR. ACHO:
7  Q. Can you give an opinion about the plaintiff's claim,
8     yes or no?
9  A. Yes.
10 Q. You can?
11 A. Yes.
12 Q. And you can do it, not based on personal knowledge,
13    right, because you don't even know her?
14 A. That's correct.
15 Q. Okay. And you didn't even know the policies that were
16    afforded the plaintiff, correct?
17 A. That's correct.
18 Q. But if the policies existed, the policies of the
19    Warren Police Department were for the benefit of
20    officers like the plaintiff, correct?
21 A. Ostensively so, yes.
22 Q. Okay. And the police officers, including the
23    plaintiff, were required to make a report, it was
24    mandatory, right?
25 A. I have no knowledge that it was mandatory, but it

Page 414

1     makes sense.
2  Q. Well, isn't it true that in order for a policy to mean
3     something --
4  A. Uh-huh.
5  Q. -- it has to be enforced?
6  A. That's correct.
7  Q. And you can't enforce it unless you're made aware of
8     any violation of it, correct?
9  A. Correct. Or you can create a culture that does that
10    as well.
11 Q. Sir, let's listen to my question.
12     MR. MARKO: He's answering it.
13 BY MR. ACHO:
14 Q. The plaintiff never made any complaints under these
15    policies as far as you know, correct?
16 A. As far as I know, that's correct.
17 Q. Okay. And you know as a diversity coordinator and a
18    social activist, she should have made those, any
19    complaints at all, during her ten years, correct?
20 A. That could have been one step taken, yes.
21 Q. Okay. And she did not?
22 A. I have no knowledge of whether she did or didn't.
23 Q. Now, if the plaintiff was under the policy of the
24    Warren Police Department, she would be obligated to
25    follow that policy, correct?

Page 415

1  A. Yes.
2  Q. Otherwise, she would be in violation of that policy,
3     correct?
4  A. Circumstantially, yes.
5  Q. Okay. Isn't it true on top of that, there was another
6     general order that was issued on February 28, 2014,
7     that deals with rules of conduct, correct?
8  A. I'm not aware of that, sir.
9  Q. If I advised you that the police department had rules
10    of conduct that dealt with sexual harassment, that
11    would be a good thing, right?
12 A. Yes, sir.
13 Q. And if that rule of conduct referred to the
14    department's policy on discrimination and sexual
15    harassment, that would be a good thing, right?
16 A. Yes, sir.
17 Q. And if the policy was in effect in 2014, the plaintiff
18    was working there, correct?
19 A. I assume so --
20 Q. I'm sorry, I'm sorry, yes. Correct?
21 A. I assume so.
22 Q. Okay. And isn't it true that these police department
23    policies were beneficial to the plaintiff?
24     MR. MARKO: Well, I object, foundation.
25 A. To any employee in the police department.



GREGORY MURRAY
August 6, 2018

Page 416

1  BY MR. ACHO:
2  Q.  The policies that we're discussing were beneficial to
3      all police officers, including the plaintiff?
4  A.  Yes.
5  Q.  Okay.  Now, and if officers were supposed to report a
6      violation, then they should have reported it, correct,
7      if they were, if it were?
8  A.  It depends on the circumstance, sir.
9  Q.  Okay.  Well, how can the police department remedy a
10     violation of a policy if it's not made aware of the
11     violation?
12 A.  You asked me how, so I'll share with you how.  You
13     might talk to an immediate superior before formally
14     filing a complaint to seek resolution on that level.
15 Q.  I see, okay.  Well, let me ask you this.  Are you
16     aware that the plaintiff did this, do you have any
17     personal knowledge?  Yes or no, personal knowledge?
18 A.  No, sir.
19 Q.  Okay.  Now, isn't it true that the police department
20     general orders and rules prohibiting discrimination
21     only apply to the police department?
22 A.  Yes, I would think so, yes.
23 Q.  Okay.  And the police department general orders and
24     rules prohibiting discrimination do not apply to
25     administrative employees of the city, correct?

Page 417

1  A.  If -- well, if there's a general policy --
2  Q.  No, no, listen to my question.
3  A.  Okay.
4  Q.  Okay.  Police department has general orders and rules?
5  A.  Yes.
6  Q.  The police department.
7  A.  Okay.
8  Q.  That doesn't apply to the general population, correct?
9  A.  Correct.
10 Q.  All right.  Isn't it true that the policies of the
11     city are separate and distinct from the policies of
12     the police department?
13 A.  No, sir.
14 Q.  They're not?
15 A.  No, sir.  Not in all cases.
16 Q.  I didn't say all cases.  Typically?
17 A.  I have to -- I have to still answer no.
18 Q.  Okay.  Were you aware of the police department rules?
19 A.  No, sir.  I requested the material and never got it.
20 Q.  Okay.  So basically, you knew virtually nothing about
21     the police department how it operated?
22 A.  I read its contracts.  I read its contracts.
23 Q.  Uh-huh.
24 A.  And had discussions with numerous police department
25     officials, including Jere Green, Matt Nichols,

Page 418

1      Commissioner Dwyer, Captain Ahrens.  I had numerous
2      conversations with them --
3  Q.  Okay.
4  A.  -- about issues affecting the police department.
5  Q.  Okay.  Did you ask Dwyer for the policies?
6  A.  No, sir.
7  Q.  You could have?
8  A.  Oh, yes, sir.
9  Q.  You could have asked him for the general orders too,
10     correct?
11 A.  Oh, yes, sir.
12 Q.  But you didn't?
13 A.  I was planning to because my --
14 Q.  Sir, sir, sir.
15 A.  No, I did not.
16 Q.  Okay.  You could have, but you didn't, true?
17 A.  True.
18 Q.  And when you had these numerous discussions about the
19     police department, you didn't ask them to reference
20     any general order or rule, did you?
21 A.  That's correct.
22 Q.  Okay.  You could have asked them, let me see in your
23     conversations, let me see the general order that
24     dictates how things go, you didn't do that, did you?
25 A.  I really didn't understand that question.  Can you

Page 419

1      elaborate?
2  Q.  Yeah.
3  A.  Okay.
4  Q.  You had these numerous conversations --
5  A.  Yes.
6  Q.  -- like with Nichols?
7  A.  Right.
8  Q.  And Nichols, you got along with well?
9  A.  Yes, yes.
10 Q.  Okay, you could have said to Nichols, how does the
11     department operate, right?  You could have asked him?
12 A.  And I did.
13 Q.  You did?
14 A.  Generally phrased it.
15 Q.  And did you ask him about the general orders or the
16     rules?  Did you ask him?
17 A.  No, he shared with me that there are general orders.
18 Q.  Okay.
19 A.  So he did share that information.
20 Q.  And did you ask him to see them, yes or no, just yes
21     or no?
22 A.  No.
23 Q.  Okay.  Now, do you know how discipline is leveled
24     within the various departments of the city?
25 A.  To some extent.  I'm sorry.  Let me turn this off.



GREGORY MURRAY
August 6, 2018

## Page 420

1   **I'm trying to make sure I don't get a ticket**
2   **downstairs at the parking meter.**
3      MR. MARKO:  Where, where's your car?  I'll
4   have someone run down and put money in it.
5      THE WITNESS:  It's around the corner and
6   it's a gray 2014 Chrysler 300.
7      MR. MARKO:  Which corner is it at?
8      THE WITNESS:  If you go out the back
9   entrance -- or the side entrance, not the --
10      MR. MARKO:  Or the --
11      COURT REPORTER:  You want to go off the
12   record?
13      MR. ACHO:  No.  No, I want to show this.
14      MR. MARKO:  You want to go to Ford Street.
15      MR. VINSON:  You want this on?
16      MR. ACHO:  I want to show this, this will
17   show time should not be included.
18      THE WITNESS:  If you go out the back
19   entrance, you will make a right on the first street
20   and it's right along there, so is that Congress?
21      MR. MARKO:  Go ahead.
22      MR. ACHO:  You know, go off the record.
23      MR. EVANS:  Go off.
24      MR. MARKO:  Off.
25      MR. MUNGO:  Off.

## Page 421

1      (Recess taken at 10:46 a.m.)
2      (Back on the record at 10:47 a.m.)
3   BY MR. ACHO:
4   Q.  Do you know how discipline is leveled within the
5     various departments of the city?
6   **A.  To some degree, yes.**
7   Q.  Doesn't it vary from department to department?
8   **A.  Yes, it does.**
9   Q.  And how many Collective Bargaining Agreements were
10     there in the city?
11   **A.  Oh, quite a few.**
12   Q.  Okay.  And are all city workers entitled to a
13     grievance procedure?
14   **A.  No.**
15   Q.  And are civilian employees of the police department
16     entitled to a grievance procedure?
17   **A.  I'm sorry, say it again, please.**
18   Q.  Are civilian employees of the police department
19     entitled to a grievance procedure?
20   **A.  I can't say for sure.**
21   Q.  And wouldn't the application of the grievance
22     procedure affect the imposition of discipline?
23   **A.  It could, yes.**
24   Q.  Isn't it true, you are not aware of how discipline is
25     leveled in the police department?  You're not aware,

## Page 422

1   are you?
2   **A.  That's correct.**
3   Q.  And so you were not involved in any disciplines and so
4     you have no personal knowledge of the process?
5   **A.  That's not correct.  I was involved in discipline**
6     **regarding two officers in the police department as it**
7     **relates to required diversity training.**
8   Q.  Sir, but you're not aware of the process of
9     discipline?
10   **A.  No.**
11   Q.  Okay.  Isn't it true that the Warren city charter
12     states that the police commissioner shall organize and
13     conduct the department in a manner that he or she sees
14     fit; isn't that true?
15   **A.  I have no knowledge of that.**
16   Q.  So you don't know who formulated or created the
17     general orders prohibiting discrimination or sexual
18     harassment in the police department, do you?
19   **A.  That's correct, no, I don't.**
20   Q.  Isn't it true that the police department for at least
21     the last 15 years has been conducting its own training
22     on diversity separate and apart from the general
23     employee workforce?
24   **A.  No, sir.**
25   Q.  You're not aware one way or the other?

## Page 423

1   **A.  That did not happen.**
2   Q.  There was no training on diversity in 15 years, yes or
3     no?
4   **A.  No.**
5   Q.  Okay.
6   **A.  And may I explain why?**
7      MR. MARKO:  Go ahead, go ahead.
8      MR. ACHO:  No, no, no.
9   **A.  I need to explain why.**
10      MR. MARKO:  Go ahead.
11      MR. ACHO:  You can -- his attorney can.
12   BY MR. ACHO:
13   Q.  So I'm clear, you reviewed all the records of the
14     police department and checked their training on
15     diversity?
16   **A.  No, sir.**
17   Q.  So you have no personal knowledge of what diversity
18     training occurred in the 15 years?
19   **A.  Diversity training?**
20   Q.  Yeah.  You don't know?
21   **A.  Yes, I do know.  It did not happen.**
22   Q.  How would you know if you didn't look at the training
23     records?
24   **A.  I'm familiar with the in-services that were conducted,**
25     **which is all together different from diversity**



GREGORY MURRAY
August 6, 2018

Page 424

1   training.
2   Q.  Hold on.  In-service you say doesn't mean anything; is
3       that right?
4   A.  I did not say that.
5   Q.  Does in-service training mean something?
6   A.  Yes.
7   Q.  So in-service diversity training is a good thing?
8   A.  It's inadequate.
9   Q.  Sir.  I didn't ask you --
10  A.  It's not a training, it's not a training, no, sir, an
11      in-service is not a training.  It's a cursory exposure
12      to a topic.
13  Q.  Let me ask you this.
14  A.  Yes, sir.
15  Q.  You have no personal knowledge of the contents of the
16      diversity training that occurred in-house, do you?
17  A.  Yes.
18  Q.  No personal knowledge?
19  A.  Yes, I do.
20  Q.  What did you review?
21  A.  I attended an in-service which was billed as diversity
22      training, but which was not, conducted by James
23      Friedman.
24  Q.  Okay, let me understand something.
25  A.  Yes.

Page 425

1   Q.  We're talking about the last 15 years.
2   A.  So am I.
3   Q.  You're only there 11 months.
4   A.  Yes, sir.
5   Q.  What about the other 14 years?
6   A.  I've spoke with the person who provided the
7       in-service, who had been engaged in providing
8       in-services for a number of years prior to my arrival,
9       so I spoke directly to Mr. Friedman.
10  Q.  Okay, did you see the contents of what he produced at
11      the training sessions, yes or no?
12  A.  Yes.
13  Q.  Did you see the documents?
14  A.  I saw some of his training materials.
15  Q.  I mean all of his training material?
16  A.  No, sir, I did not see them all.
17  Q.  So you don't have full knowledge --
18  A.  That's correct.
19  Q.  -- of the training; is that correct?
20  A.  That's correct.
21  Q.  Okay.
22  A.  And it's an in-service, not a training.
23  Q.  Now, let me ask you something.  Does diversity
24      training necessarily affect a person, how they're
25      going to act?  Yes or no?

Page 426

1   A.  It could, yes.
2   Q.  Does it necessarily affect how they will act?
3   A.  It should.
4   Q.  It should, but it doesn't always?
5   A.  Correct.  That's correct.
6   Q.  Because you could have diversity training --
7   A.  Uh-huh.
8   Q.  -- and the person ignore it, right?
9   A.  Yes, that's correct.
10  Q.  You had diversity training?
11  A.  Yes, sir.
12  Q.  You've given diversity training?
13  A.  Yes, sir.
14  Q.  And you've ignored it?
15  A.  No, sir.
16  Q.  Well, haven't you, in fact, made demeaning and
17      derogatory remarks about black people?
18  A.  No, sir.
19  Q.  Never?
20  A.  Derogatory?  What do you mean derogatory and
21      demeaning?
22  Q.  You don't know what those words mean?
23  A.  I asked you to please explain what it means to you so
24      that I can answer your question.
25  Q.  Something that evidences a discrimination or

Page 427

1       demeaning?
2   A.  I've never discriminated against black people.
3   Q.  How about white people, have you?
4   A.  No, sir.
5   Q.  Don't you believe it is inexcusable for people to
6       advance bigotry?
7   A.  Yes, sir.
8   Q.  Prejudice is wrong whether it be on race or sex or
9       ethnicity; isn't that right?
10  A.  Yes, sir.
11  Q.  So you feel it is wrong for an individual to favor an
12      American over non-American, correct?
13  A.  Yeah, in certain circumstances, yes, sir.
14  Q.  That would be wrong, wouldn't it?
15  A.  A citizen is entitled to certain rights that a
16      non-citizen isn't, and so if you deny a non-citizen a
17      right that the American citizen would be eligible for,
18      that's not necessarily discrimination.
19  Q.  I didn't use the word "citizenship."
20  A.  I did, I did, as an example.
21  Q.  I did not.
22  A.  Yeah.
23  Q.  My question --
24  A.  Yeah.
25  Q.  -- I will ask you again, please listen to it.



GREGORY MURRAY
August 6, 2018

Page 428

1        You feel it would be wrong for an
2    individual to favor an American over a non-American,
3    correct?
4    A. I can't answer that question the way you want it.
5    Q. Wouldn't that be bigotry?
6    A. No, sir.
7    Q. It wouldn't be bigotry?
8    A. Not necessarily, no, sir. It depends on the
9       circumstances, as I just explained to you.
10   Q. You mean if I -- if you said I want to deal with an
11      American, not a non-American, you say that's okay?
12   A. Now that would be an example I think of bigotry if
13      both parties were able to deliver or respond to you,
14      yes, that would be.
15   Q. Can you explain that to me?
16   A. Yes.
17   Q. How is it not bigotry for an individual like
18      Mr. Marko, if he says I really prefer I want to deal
19      with Americans, that's not bigotry?
20   A. That's a preference, it's not bigotry. He hasn't
21      created -- he has not established a behavior
22      associated with that. If he just says that he wants
23      to do that, that's a prejudicial statement, yes.
24   Q. That would be --
25           MR. MARKO: Let the record reflect that

Page 429

1    assumes facts not in evidence.
2    BY MR. ACHO:
3    Q. That would be prejudicial?
4    A. Everyone's prejudiced. So you, you're prejudiced,
5       that's why you wore that gray suit --
6    Q. So you --
7    A. -- instead of a different color.
8    Q. So you -- you believe that having a favorite color or
9       something is prejudice?
10   A. What I'm saying is that --
11   Q. No, that's my question. Answer that question.
12   A. Pardon me?
13   Q. Do you equate favoring a color as being evidence of
14      prejudice?
15   A. It could be, yes. You have to understand, I don't
16      know what definition of prejudice you're working with.
17   Q. What are you working with?
18   A. I'm working with a preference is sometimes
19      prejudicial. If you take that prejudice and inflict
20      it on someone else, then it rises to a level of -- of
21      again, prejudice. If you impede someone from
22      exercising a right or an option, then that goes to
23      perhaps bigotry. And then if you can systematically
24      inflict harm on a group, then that is the definition
25      of racist.

Page 430

1        So you have to understand that there are
2    various levels, some things we do as a result of human
3    nature, and that in itself is not harmful. But then
4    when you apply a behavior that affects another person,
5    then you rise to those other levels of bigotry and
6    racism.
7    Q. Okay.
8    A. Bigotry, discrimination and racism.
9    Q. So your -- so your definition, unless a person is
10      affected by another person, it's not prejudice; is
11      that right?
12           MR. MUNGO: Objection.
13   A. A person -- a person can hold a prejudicial viewpoint
14      and that does not mean that they will act on that
15      belief.
16   BY MR. ACHO:
17   Q. Oh, it's the action that matters?
18   A. It's an action, yeah.
19   Q. Okay. So if a --
20   A. Or inaction.
21   Q. Okay. So if a person says or acts in a way that
22      prefers Americans over non-Americans, that would be
23      bigotry, wouldn't it?
24   A. Oh, no sir, again, I think --
25   Q. It would be prejudice then? Yes or no?

Page 431

1    A. There are different definitions, it would be
2       prejudicial, yes, but not necessarily bigoted.
3    Q. Okay.
4           MR. MUNGO: Objection, I will have to
5       object, sir.
6    BY MR. ACHO:
7    Q. So it would be prejudicial.
8           MR. MUNGO: This line of questioning is not
9       relevant to this action, and you've asked that same
10      question, so asked and answered. You have asked him a
11      number of times that same question and this simply is
12      not relevant, sir.
13   BY MR. ACHO:
14   Q. I just want to be clear. That what I described,
15      American versus non-American would be prejudicial,
16      correct?
17   A. Yes.
18   Q. Okay. Now, have you -- you said you've never been
19      accused of saying or writing something that's racist?
20   A. I have not, no, sir.
21   Q. Okay. Didn't you call a prominent and well-respected
22      black man "spoiled chocolate pudding"?
23   A. No, sir, no, sir.
24   Q. You never wrote such a thing --
25   A. No, sir.



GREGORY MURRAY
August 6, 2018

Page 432

1    Q. -- about mayor, a friend of mine, Mayor Bing, in
2       the -- in your magazine that you wrote for?
3    A. Spoiled chocolate pudding?  No, sir.
4    Q. You deny that under oath?
5    A. Yeah, yeah.
6    Q. Okay.  And did you call another prominent and
7       well-respected white man "creamy coconut cake," Mayor
8       Duggan, are you denying that under oath?
9    A. Yes, sir, I am denying that under oath.  Yes, sir.
10   Q. So are you familiar with the Muckraker?
11   A. Yes.
12   Q. Tell us about the Muckraker?
13   A. That is --
14   Q. What's it called?  What's the full name?
15   A. I believe it's the Muckraker Report.  It was developed
16      by Steve Neavling, a former Detroit Free Press
17      reporter.
18   Q. And you wrote for it for several months, you wrote --
19   A. Two or three months, yes.
20   Q. -- commentary.  You did?
21   A. Yes.
22   Q. But you've been involved in it longer than that?
23   A. No, sir.
24   Q. And you wrote editorials, didn't you?
25   A. I wrote two columns, yes, I believe, two or three.

Page 433

1    Q. And you're denying under oath you made those
2       statements in your writing?
3    A. That's correct.
4    Q. Okay.  Let me ask you something.  If someone wrote
5       something like that, that would be wrong, wouldn't it?
6    A. It would be their opinion, yes, I believe it would be
7       wrong.
8    Q. It would be prejudice, wouldn't it?
9    A. Yes, sir.
10   Q. It would be bigotry, wouldn't it?
11   A. No, sir.  Because no action has been taken.
12   Q. What about defaming someone, if someone's called
13      creamy coconut cake, doesn't that demean the
14      individual?
15   A. I don't know the definition, legal definition of
16      defamation, so I can't answer your question.
17   Q. So you've never seen this in writing?
18   A. Not written by me.
19   Q. Was it written by your cohort?
20   A. I don't recall those phrases.
21   Q. So you deny anyone at the Muckraker, including you,
22      ever used those terms?
23   A. No, sir, I'm not denying that.  I'm saying I have no
24      knowledge of it.
25   Q. Well, I don't understand.  How can you say you have no

Page 434

1    knowledge and not deny it?
2    A. Well, I couldn't -- I can't say that those phrases
3       were used because I've never read them, to the best of
4       my knowledge or recollection.
5    Q. Okay.  Let me ask you, Mayor Fouts never discussed
6       general orders in the police department with you, he
7       never discussed it with you?
8    A. That's correct.
9    Q. Okay.  And he never discussed the policies, the
10      written policies of the police department, he never
11      discussed that with you?
12   A. That's correct.
13   Q. And you're not aware that Mayor Fouts had any
14      responsibility for implementing training within the
15      police department, you're not aware of that, are you?
16   A. No, he does have a responsibility.
17   Q. Is there something in the charter that says that?
18   A. He's the mayor of the city.
19   Q. Did you hear my question?
20   A. Yes.
21   Q. What did I ask you?
22   A. You asked me something about the charter.
23   Q. Yeah, please listen to my question.  Is there anything
24      in the city charter that gives the mayor that
25      authority, yes or no?

Page 435

1    A. I'm not aware of it.
2    Q. Okay.  And you're not aware of the police
3       commissioners' authority under the charter, are you?
4    A. No, sir.
5    Q. Okay.  So you never sat down with either Commissioner
6       Green or Commissioner Dwyer to go over general orders,
7       rules or policies prohibiting discrimination of the
8       police department, did you?
9    A. No, sir.
10   Q. Okay.  Let me ask you, tell me the positive things
11      that Mayor Fouts has done in promoting diversity
12      within the city of Warren?
13   A. He has hired a number of executives or appointees in
14      his department and in his cabinet, so to speak.  He
15      did allow me to facilitate an EEOC training and a
16      Michigan Department of Civil Rights training in terms
17      of things that he himself is responsible for with
18      respect to diversity.  I'll have to think and reflect
19      on that.
20   Q. Well, let me just help you.
21   A. Okay.
22   Q. Weren't there about 25 initiatives that the mayor
23      launched or was actively involved in that promoted
24      diversity?
25   A. I'm not aware that 25 initiatives.



GREGORY MURRAY
August 6, 2018

**Page 436**

1  Q.  But we went through a long list at your other
2      deposition, correct?
3  A.  You mentioned the word 25.
4  Q.  And he hired you?
5  A.  Yes, sir.
6  Q.  And am I correct, you were an older African
7      underemployed individual when he hired you, yes or no?
8  A.  No.  You used the word "underemployed."
9  Q.  You were part time, weren't you?
10 A.  And?
11 Q.  That's what I mean by underemployed.
12 A.  Oh, well, if that's what you mean by --
13 Q.  Underemployed.
14 A.  -- underemployed that I worked part time somewhere,
15     then my answer to you would have to be yes.
16 Q.  Okay, let me -- I'll rephrase the question --
17 A.  Okay.
18 Q.  -- so I have it clear, so you understand, you weren't
19     unemployed, I wasn't suggesting --
20 A.  No.
21 Q.  So let's start the question.  The mayor hired you who
22     was an older African-American gentleman who was
23     underemployed and he hired you, correct?
24 A.  I was not underemployed.  I was employed doing what I
25     wanted to do, how many hours I wanted to because I was

**Page 437**

1      retired from the City of Detroit and I could work
2      however many hours I wanted at what pay scale I
3      wanted, so that to me does not mean underemployed.
4  Q.  Okay.  Let me -- I thought we cleared it up before,
5      but apparently we didn't.
6  A.  Okay, okay.
7  Q.  Let me change the question.
8  A.  Uh-huh.
9  Q.  But he hired you.
10 A.  Yes.
11 Q.  An older African-American gentleman who was known to
12     be a long-standing social activist?
13 A.  That's correct.
14 Q.  Okay.  So now, even though he could have hired a
15     younger person, he didn't, right?
16 A.  That's correct.
17 Q.  He could have hired a white person, he didn't?
18 A.  Yes.
19 Q.  He could have someone with more experience than
20     you?
21 A.  Yes.
22 Q.  He could have hired someone with municipal experience,
23     which you didn't have, correct?
24 A.  Actually, I do have experience negotiating diversity
25     related issues with municipalities.

**Page 438**

1  Q.  But not running a city or I mean running a department,
2      correct?
3  A.  That's correct, that's correct.
4  Q.  Okay.  He could have hired someone like that and he
5      didn't.
6  A.  Yes.
7  Q.  He hired you.
8  A.  Yes.
9  Q.  And he could have hired someone who wasn't an
10     activist, correct?
11 A.  That's correct.
12 Q.  So he knew you were an activist when he hired you?
13 A.  Yes, sir.
14 Q.  Okay.  Now, wouldn't you agree that that was a very
15     significant thing that he did?
16 A.  Oh, yes, sir.
17 Q.  Okay.  And in fact, there was no diversity
18     coordinators in the entire state of Michigan except
19     Grand Rapids, nothing in southeast Michigan except
20     you?
21 A.  For municipalities, yes.
22 Q.  Yeah, and the mayor did this, right?
23 A.  Yes.
24 Q.  And in fact, you gave a speech on Martin Luther King
25     Day, okay?  And you praised the mayor, right?

**Page 439**

1  A.  I did not give a speech.  The mayor introduced me.  I
2      stood up and sat down --
3  Q.  Oh, okay.  Then --
4  A.  -- on Martin Luther King Day.
5  Q.  Okay.  So I am clear --
6  A.  Uh-huh.
7  Q.  -- you are denying under oath that you spoke at the
8      Martin Luther King Day in 2017, you're denying that?
9  A.  Yes, sir.  Yes, sir.
10 Q.  Okay.  Let me read something to you and see if --
11 A.  Sure.
12 Q.  -- it refreshes your recollection.
13 A.  Okay.
14 Q.  "Good afternoon.  My name is Greg Murray and I'm
15     honored to have been appointed by Mayor Fouts to be
16     Warren's diversity coordinator.  As the mayor
17     mentioned, I have nearly a two-decade history of
18     advocacy related to diversity inclusion."  Does that
19     sound familiar?
20 A.  No, sir, it does not.
21 Q.  Let me help you more.
22 A.  Okay.
23 Q.  "After numerous discussions with Mayor Fouts, I have
24     come to the conclusion that his vision and desire for
25     a more diverse and inclusive Warren is both admirable



Pages 436 to 439

GREGORY MURRAY
August 6, 2018

Page 440

1  and legitimate." Does that refresh your recollection?
2  A. No, sir, it doesn't. There's a video, I would have to
3  see it.
4  Q. Do you agree with those comments, though? Let's say
5  you never said that, did you agree with those
6  comments?
7  A. Basically, yeah, yes, I did agree with those comments.
8  Q. Okay. Okay.
9  A. Okay.
10 Q. And that you always tell the truth, you said?
11 A. Everyone lies, every human being lies.
12 Q. Okay. So you could be lying in this deposition,
13 potentially, we don't know?
14 A. No, sir.
15 Q. Well, you said everybody lies.
16 A. You know that's true, Mr. Acho. I've told my children
17 about a fat guy in a red costume coming down the
18 chimney of our house and putting gifts up under a
19 tree. I've told my kids about a bunny rabbit that
20 delivers eggs.
21 Q. Well, but you lied, did you not, about the mayor
22 wanting you to buy a ticket, you didn't tell him the
23 truth there?
24 A. No, sir, that is correct.
25 Q. So let me ask you something.

Page 441

1  A. That's correct.
2  Q. How many years have you known the mayor?
3  A. Maybe a year, a little more -- little less than a
4  year.
5  Q. Well, before he hired you --
6  A. Uh-huh.
7  Q. -- did you buy tickets to any of his things?
8  A. No, sir.
9  Q. Okay. And you don't have any proof, any letter that
10 you received --
11 A. Uh-huh.
12 Q. -- asking you to buy a ticket, do you?
13 A. No, sir. You'd have to speak with Shawn Clark.
14 Q. I'm asking you.
15 A. You would have to speak to Shawn Clark.
16 Q. Do you have any such proof, yes or no?
17 A. No.
18 Q. Okay. Now, you didn't resign because of window
19 dressing, you resigned because you didn't like being
20 assigned more work and you felt you were a beast of
21 burden; isn't that right?
22 MR. MARKO: Objection, that
23 mischaracterizes his testimony.
24 A. That's incorrect. That's incorrect.
25 BY MR. ACHO:

Page 442

1  Q. Well, let me understand something. You say you don't
2  recall all the mayor's diversity initiatives, correct?
3  A. That's correct.
4  Q. Okay. Now, at the end of the deposition, I'm going to
5  show them to you.
6  A. Okay.
7  Q. Okay?
8  A. Uh-huh.
9  Q. And you say under oath, you have no recollection of
10 ever giving a speech on Martin King Day, that's
11 something someone should remember, right?
12 A. Yes.
13 MR. MARKO: Objection to form.
14 BY MR. ACHO:
15 Q. Okay, all right.
16 A. I spoke to reporters, but I mean I did not -- I was
17 not invited up to the podium to speak, there is a
18 videotape of that.
19 Q. In terms of hiring black officers, when you were
20 diversity coordinator, no African-American joined the
21 Warren Police Department, correct?
22 A. That's correct.
23 Q. However, after you left and were replaced by another
24 diversity coordinator, then several African-Americans
25 joined the Warren Police Department; isn't that true?

Page 443

1  A. That's my understanding.
2  Q. Okay. And can you show us in writing all of the
3  programs and initiatives that you presented to Mayor
4  Fouts in writing or anyone for getting
5  African-Americans to apply to the Warren Police
6  Department, do you have any such document?
7  A. I do not have the documents, but they do exist.
8  Q. Okay. Okay. And you prepared these on your computer,
9  you say?
10 A. Yes, I did. And I always introduced the city to
11 NOBLE, National Organization of Black Law Enforcement
12 Executives.
13 Q. I'm having a problem understanding something.
14 A. Yeah.
15 Q. You didn't put on any job fairs, did you, to get
16 African-American police officers?
17 A. No, sir, that was not within my requirements or
18 duties.
19 Q. So what? You could have done it anyway, you could
20 have said, "Mayor Fouts, I want to put on a job fair
21 so we can get African-Americans," you never did that,
22 did you?
23 A. No, I did not do that specifically, no.
24 Q. Okay. Okay. And you didn't go to any colleges and
25 speak to African-Americans to join the Warren Police



GREGORY MURRAY
August 6, 2018

Page 444

1    Department, did you?
2    A. No, sir. That too was not my responsibility.
3    Q. Well, you know, you talked about being a beast of
4       burden, correct?
5    A. Yes, sir.
6    Q. How many hours a week did you work?
7    A. 50, 60.
8    Q. 50 or 60?
9    A. I worked --
10   Q. People say you worked 35 hours.
11          MR. MARKO: Objection, assumes facts not in
12       evidence. It's not a question. There's no question.
13   A. Okay.
14          MR. MARKO: There's no question.
15   A. Okay.
16   BY MR. ACHO:
17   Q. So you're testifying under oath you worked how many
18       hours a week?
19          MR. MARKO: Asked and answered.
20   A. Same, same answer.
21   BY MR. ACHO:
22   Q. What was it, 50?
23   A. 50, sometimes 60.
24   Q. Okay, and you couldn't get your work done in 50 to 60
25       hours, correct?

Page 445

1    A. Oh, yes, sir, that was just part of the job, when
2       you're an advocate, you don't stop at the end of the
3       clock.
4    Q. Sir, did you hear my question?
5    A. Yes.
6    Q. You didn't answer it.
7    A. Well, ask it again.
8    Q. Okay. Are you testifying you couldn't get your work
9       done in 50 to 60 hours?
10   A. No.
11   Q. You could get it done?
12   A. Yes.
13   Q. Okay. So whatever the mayor assigned you --
14   A. Uh-huh.
15   Q. -- you were able to do because you're such a hard
16       worker, right?
17   A. No, sir.
18   Q. Well, are you telling us you couldn't do the work that
19       was assigned to you?
20   A. I could do the work of a diversity coordinator.
21       That's what I attempted to do.
22   Q. But the mayor asked you to take on additional
23       responsibilities, correct?
24   A. Yes.
25   Q. Yes or no?

Page 446

1    A. Yes.
2    Q. And, sir, were you able to undertake those, yes or no?
3    A. No.
4    Q. Okay. Do you think you could have undertaken them if
5       you didn't take off so much time from work?
6    A. No, sir.
7    Q. Do you know how much time you took off?
8    A. Uh-huh, I have a general idea. The time to which I
9       was entitled, yes.
10   Q. Well, I'm not asking about entitlement.
11   A. Oh, okay.
12   Q. Couldn't you have gotten more done if you had shown up
13       for work more often?
14   A. As it's a general question, I guess the answer would
15       be yes.
16   Q. Yeah. But you took time off for all kinds of things,
17       like for instance, have you ever heard of a mental
18       health day in the City's policies, yes or no?
19   A. In the City's policies, no.
20   Q. But yet you asked the mayor for a mental health day
21       and he gave it to you?
22   A. Yes, sir.
23   Q. Okay. But there is no such thing as a mental health
24       day, there is no such a thing, is there?
25   A. Okay, yes, but not within the policies.

Page 447

1    Q. You created it?
2    A. I did not create it.
3    Q. Well, you made -- you told the mayor that's what you
4       wanted off, right?
5    A. I explained to him that I needed a mental health day.
6    Q. And for what reason?
7    A. Because I needed to clear my head and develop a
8       strategy to address a number of issues that I was
9       seeing being revealed to me.
10   Q. Back when? Isn't that early in your tenure?
11   A. What's the date of that?
12   Q. No, no, I'm asking. When did you ask for a mental
13       health day?
14   A. I don't recall.
15   Q. So you're telling us under oath you couldn't do that
16       at the office?
17   A. I couldn't do what at the office?
18   Q. Clear your head.
19   A. Oh, no, sir. Oh, no, sir. No, sir, absolutely not.
20   Q. Why couldn't you clear your head?
21   A. Because with the mayor coming into my office every
22       day.
23   Q. Yeah.
24   A. And generally it was me listening and him talking, and
25       trying to gather information because there was a



GREGORY MURRAY
August 6, 2018

Page 448

1    process for due diligence with respect to
2    investigating the policies of the city as it relates
3    to diversity. You just don't come in and start
4    changing things, you have to get the lay of the land
5    and with the municipality as large as Warren, that
6    could take six seven to eight months.
7    Q.  But, sir, you didn't get the lay of the land of the
8        police department because you never got the policies?
9    A.  That I requested, yes.
10   Q.  Okay.
11   A.  Right.
12   Q.  Okay. You requested, but you didn't get it, so you
13       never got the lay of the land of the biggest
14       department in the city, correct?
15   A.  No, sir.
16   Q.  And that was part of your job to get the lay of the
17       land of the police department, yes or no?
18   A.  At some point.
19   Q.  Yes or no?
20   A.  At some point, that is the best answer I can give you.
21       MR. MUNGO:  He answered, he answered.
22   BY MR. ACHO:
23   Q.  Okay. Let me ask you this, Warren has a black fire
24       chief, right?
25   A.  Yes, sir.

Page 449

1    Q.  Did you ever talk to him?
2    A.  Yes, sir.
3    Q.  Did you get along with him?
4    A.  Yes, sir.
5    Q.  Did you ever ask him about the policies of the city?
6    A.  Yes, sir.
7    Q.  Did he provide you whatever you wanted, yes or no?
8    A.  Conversationally, yes.
9    Q.  Did he provide you the documents you requested?
10   A.  I never requested documents -- I never requested
11       documents from the fire commissioner or from the fire
12       department.
13   Q.  Okay. So you're telling us under oath you never
14       requested the policies or any documents from the fire
15       department, but you did in the police department?
16   A.  Yes, sir.
17   Q.  Okay.
18   A.  There's a sequence of how things are supposed to be
19       done.
20   Q.  I understand. But in terms of taking time off, you
21       wanted to see your son off in the military, correct?
22   A.  Yes, sir.
23   Q.  That's fine. But why didn't you make up the time as
24       opposed to taking time off? Why didn't you make up
25       the time?

Page 450

1    A.  I make up -- I make up the time by doing things on
2        Saturdays and Sundays and evenings. Although I don't
3        charge the city and they could have not paid me for
4        that time, they always had that option and I would
5        have been okay.
6    Q.  Who would know the hours that you say you worked
7        because no one that I talked to said you worked beyond
8        your clock time?
9    A.  Well, I can --
10   Q.  That's what I've been told.
11   A.  I can appreciate that city employees beholding to the
12       mayor would tell you -- would tell you that, so what
13       about oh, say going to the disability commission
14       meetings, which are held after business hours, I
15       routinely attended those.
16   Q.  But if you did all these things that you say, why
17       didn't you recruit any African-Americans to the police
18       department, if you did all these things?
19   A.  It was not my job to do recruiting, the police
20       department has a recruitment division and it was my --
21       my role was to help them develop protocols and means
22       by which they could better recruit. Recruiting was
23       never a part of my job description or
24       responsibilities.
25   Q.  But you didn't do what you just said.

Page 451

1    A.  Pardon me?
2    Q.  To help the recruiting division, you never produced
3        any document to them on how to better recruit?
4    A.  You said I never helped the police department,
5        recruiting department and that is not true.
6    Q.  Do you have any documents that support you did?
7        Because I couldn't find any.
8    A.  I know, I know, because I could only provide you so
9        much, Mr. Acho.
10   Q.  So you have more?
11   A.  There is a contract that the City of Warren entered
12       into with NOBLE, the National Organization of Black
13       Law Enforcement Executives, they were brought on by
14       me, they were introduced by me to the police
15       department so that they could possibly better recruit.
16   Q.  Sir, you did not produce anything to the recruiting
17       division. You didn't give them any documentation.
18   A.  That's true.
19   Q.  You didn't do it.
20   A.  That's true.
21   Q.  For all the time you were there.
22   A.  That's true.
23   Q.  And even though, you know, the city needed more black
24       officers, correct, true?
25   A.  They do.



GREGORY MURRAY
August 6, 2018

### Page 452

1            MR. MARKO: Objection.
2       A. The city, yeah.
3       BY MR. ACHO:
4       Q. Let me ask you this, did you get time off for
5          attending evening meetings, yes or no?
6       A. Yes.
7       Q. So when you're talking about oh, I spent all this time
8          at night, you got comp time for it?
9       A. That's not -- that's not the question that you asked
10         me.
11      Q. Okay. Now, the mayor hired you knowing you were a
12         social activist and knowing that you never purchased
13         tickets for him, correct?
14      A. Yes.
15      Q. Okay. Now, you met with the mayor every single day?
16      A. The mayor came to my office practically every day as
17         one of the first stops along his daily walk-through of
18         the floors in City Hall.
19      Q. When you say daily walk-throughs, the mayor went and
20         met with a lot of people every day?
21      A. The mayor walked through each department. I don't
22         know what he did in terms of engagement with other
23         folk, but when he came into the human resource
24         department, when he walks down that aisle, my office
25         is right in front and that's where he would go, he

### Page 453

1          would come practically every morning.
2       Q. I didn't ask you that question.
3       A. Yes.
4       Q. That's not what I asked you. Please, I'm trying to
5          get this done.
6       A. Yeah.
7       Q. The mayor did a walk-through and talked to a lot of
8          people, not just you, right?
9       A. I don't know.
10      Q. So you're saying under oath you worked there for 11
11         months.
12      A. Yes.
13      Q. And you didn't know the mayor went and talked to other
14         people other than you, you have no knowledge of that?
15         That's what you're telling me?
16      A. You're speaking of the walk-through, you asked me
17         about the walk-through.
18      Q. Yes, yes, yes.
19      A. I don't have personal knowledge except by recounting,
20         Ethan would tell me that the mayor came to him, would
21         come to him.
22      Q. I understand.
23      A. So in that context, I would know that he spoke to
24         other people.
25      Q. Okay.

### Page 454

1       A. Okay.
2       Q. All right. So he didn't single you out?
3       A. Oh, no.
4       Q. No. He talked to a bunch of people in the
5          walk-through?
6       A. Yes.
7       Q. So during the walk-through --
8       A. Uh-huh.
9       Q. -- so you had his ear every single day essentially
10         that you worked there?
11      A. To a degree, yes, sir.
12      Q. And I believe you told us in a prior testimony that
13         you got along well with the mayor?
14      A. Up to a point, yes.
15      Q. He was always treating you with dignity and respect
16         you told us, correct?
17      A. Yes.
18      Q. And it wasn't until the end when you tendered your
19         resignation that you became annoyed with the mayor,
20         correct?
21      A. Annoyed?
22      Q. Well, okay.
23      A. Disappointed. Disappointed, that was several months
24         earlier when he told me that he wanted me to put
25         diversity on the back burner until after the 2019

### Page 455

1          election.
2       Q. We're talking about your relationship with the mayor.
3       A. Yes.
4       Q. Was your relationship with the mayor always good?
5       A. No, sir.
6       Q. Okay. When did it change?
7       A. It changed after he walked into my office and told me
8          that he'd have to find something else for me to do.
9          That was followed up by in the next day or so, with
10         the comment regarding not advancing diversity because
11         it would upset -- it could possibly upset white
12         voters. He also told me to lay back on the police
13         department because he needed their endorsement for the
14         next election.
15      Q. Well, I'm trying to understand something. If he was
16         going to have you do other things, that's what you're
17         telling us, right? I'm going to have you do other
18         things?
19      A. He said, "We need to find you something else to do."
20      Q. Okay. So he was going to replace what you were doing
21         with other things, correct?
22      A. Ostensibly, yes.
23      Q. But yet you told us under oath last time we were here,
24         he was loading us up on top of what you were already
25         doing, that you were becoming a beast of burden; is



GREGORY MURRAY
August 6, 2018

Page 456

1  that right?
2  MR. MUNGO:  Objection, mischaracterizing
3  the evidence.
4  A.  That was what I just referred to, sir, to you.
5  BY MR. ACHO:
6  Q.  I don't understand.  Either he took a responsibility
7  away or he didn't.  Are you saying he took a
8  responsibility away from you?
9  A.  No, sir.
10  Q.  Oh, so you still had that responsibility?
11  A.  Yes, sir.
12  Q.  Okay.  So he never took it away from you?
13  A.  No, sir.  Have you read my job description, Mr. Acho?
14  Q.  Let me understand something.  Do you believe you were
15  a token?
16  A.  No, sir.
17  Q.  You wanted a lot more money than what you were
18  getting, didn't you?
19  A.  No, sir.
20  Q.  Well, how much more money were you seeking?
21  A.  The same amount of money that the mayor authorized for
22  me to get several months earlier and rescinded.
23  Q.  How much was that?
24  A.  About $2,300 or something.
25  Q.  23 what?

Page 457

1  A.  $2,300, somewhere in that area, I don't know.
2  Q.  2,300 for what?
3  A.  Pardon me?
4  Q.  2,300 per year or per month, what?
5  A.  2,300 in addition to my salary because the mayor said
6  he was impressed with my progress, Phil Easter, he
7  directed Phil Easter, the human resource director, to
8  draft a letter authorizing an increase.
9  Q.  Of 2,300 a year?
10  A.  Roughly.  Roughly.
11  Q.  So before you left, you never met with Ethan Vinson
12  and the mayor and asked to be paid the same as
13  department heads?
14  A.  Oh, no -- yes, I did that, because --
15  Q.  Okay.  And how much money were you seeking, give us a
16  dollar amount or a range?
17  A.  I did not provide a dollar amount to the City when we
18  had that conversation.
19  Q.  So you're swearing under oath the amount of money was
20  never discussed, is that what you're telling us?
21  A.  Essentially, yes.
22  Q.  No, not essentially.
23  A.  I would have to answer it essentially because it would
24  have been within the mayor's purview given the range
25  of pay for department head positions.  In fact, the

Page 458

1  mayor --
2  Q.  I didn't ask you all that, please.  We're limited, no.
3  A.  I'm trying to answer the question.
4  Q.  You're saying the dollar amount or range was never
5  discussed, is that your sworn testimony?  Yes or no?
6  MR. MARKO:  Asked and answered.
7  A.  I can't answer any other way, sir.
8  BY MR. ACHO:
9  Q.  So you asked for $2,300?
10  A.  No, sir, the mayor increased or wrote a letter --
11  excuse me, the mayor or the human resource director,
12  Phil Easter, drafted a letter authorizing --
13  Q.  You already told us that, okay, that was earlier in
14  your career.
15  A.  Yes, sir, and I didn't quit after it was denied me.
16  Q.  So you didn't get a raise?
17  A.  No, sir.
18  Q.  Ever?
19  A.  No, sir.
20  Q.  Well, since you talked to the mayor every day --
21  A.  Uh-huh.
22  Q.  -- did you ask him about it?
23  A.  No, sir.  Did I ask him about what, sir?
24  Q.  The raise, that 2,300 you didn't get?
25  A.  Oh, he told me he authorized it.

Page 459

1  Q.  Well, when you didn't get it --
2  A.  Yes, sir.
3  Q.  -- are you saying you never brought it up to him?
4  A.  No, sir, I didn't.
5  Q.  Why?
6  A.  Because I was told that it had been killed, I did not
7  know by whom, and that wasn't material to my
8  completing my job, my work.  I continued on with my
9  work.
10  Q.  Hold on a second.
11  A.  My work was more important than the money.
12  Q.  Hold on.  You're saying, you were expecting to get
13  $2,300 more?
14  A.  Uh-huh.
15  Q.  You didn't get it?
16  A.  Yep.
17  Q.  And you never breathed a word to the mayor about it?
18  A.  The human --
19  Q.  Is that correct, yes or no?
20  A.  Yes.
21  Q.  Okay.  Now, by the way, do you have any expertise in
22  voice recognition?
23  A.  No, sir.
24  Q.  You didn't go to school or anything?
25  A.  No, sir.



GREGORY MURRAY
August 6, 2018

---

**Page 460**

1  Q.  Okay.  In that tape recording that you referred to of
2      the mayor, do you have any proof it wasn't altered?
3  A.  In which tape recording?
4  Q.  Whatever tape you referred to with Mr. Mungo,
5      remember?
6  A.  Which tape is that?
7  Q.  Whatever it was your lawyer asked you, you said yeah,
8      I think that's --
9          MR. MARKO:  Wait, wait, wait, wait, wait, I'm his
10     lawyer.
11 BY MR. ACHO:
12 Q.  Mr. Mungo asked you.  Do you remember that?
13         MR. MARKO:  Plaintiff's lawyer.
14 BY MR. ACHO:
15 Q.  No, no, sir, look at me.  Look at me.
16 A.  Well, I'll have to try to -- try to remember that.
17     You asked me --
18         MR. MARKO:  Well, I don't know what the
19     question is.
20 BY MR. ACHO:
21 Q.  Well, let me ask you something.
22         MR. MARKO:  And I think there's a
23     misstatement, so go back.
24 BY MR. ACHO:
25 Q.  Okay.  Let me just go over this.

---

**Page 461**

1  A.  Okay.
2  Q.  You said I think that's the mayor's voice on that
3      tape; do you remember that?
4  A.  Yes.
5  Q.  But you don't have any expertise in voice recognition,
6      you don't know --
7  A.  No.  Just exposure to the mayor.
8  Q.  I'm not talking about exposure, I'm talking about --
9  A.  I know what I hear, Mr. Acho.
10 Q.  You know what you hear?
11 A.  Yes, sir.  I've spoken to the mayor for hundreds of
12     hours.
13 Q.  Okay.  Well, let me ask you this.  Did you get a copy
14     of that tape from the Muckraker because he gave it to
15     you, didn't he?
16 A.  No, sir.
17 Q.  Because that's --
18 A.  No, sir, he did not.
19         MR. MARKO:  Objection to form.
20 BY MR. ACHO:
21 Q.  But you got it from someone?
22 A.  No, sir.
23 Q.  So you've never had your hands on the tape or CD or
24     whatever it was, you never had a copy?
25 A.  That's correct.

---

**Page 462**

1  Q.  So when have you ever heard it?
2  A.  Well, I've heard it played over the air.
3  Q.  That's it?
4  A.  That's it.
5  Q.  But haven't you -- don't you have a relationship with
6      the head of the Muckraker Magazine?
7  A.  No, sir, I don't.
8  Q.  When's the last time you talked to them?
9  A.  Three years ago, two or three years ago.  No, I'm
10     sorry, back up.  At some point last year, he
11     interviewed me around the fact that I was no longer
12     with the City of Warren, yeah.
13 Q.  Okay.
14 A.  And there should be a tape of that, but I never asked
15     for a copy of it or anything.
16 Q.  And did you tell him that you wanted a lot more money?
17 A.  No, sir.
18 Q.  You don't think that was material to the decision of
19     the City to accept your resignation, you don't know
20     whether it was or not?
21 A.  I don't -- I was not -- I was terminated, sir.  I
22     wasn't -- I did not resign, so I don't think -- I
23     don't know if that was material or not.  You'd have to
24     ask the mayor.
25 Q.  Well, I guess I'm trying to find out, the mayor didn't

---

**Page 463**

1      ask for your resignation, did he?
2  A.  No, sir.
3  Q.  You volunteered it?
4  A.  Yes, sir.
5  Q.  And you put in a condition?
6  A.  Yes, sir.
7  Q.  As to -- I didn't finish.
8  A.  I'm sorry.
9  Q.  You didn't -- strike that.
10         You put in a condition of your continued
11     employment, correct?
12 A.  Yes, sir.
13 Q.  And that condition was not honored, was it?
14 A.  No, sir, he rejected it and asked me to stay on.  And
15     I stayed on.
16 Q.  But then he accepted your resignation, right?
17         MR. MARKO:  Objection, that calls for a
18     legal conclusion and misstates the evidence.
19 BY MR. ACHO:
20 Q.  Didn't he tell you that?
21 A.  No, sir.
22 Q.  He said I'm going to accept your resignation?
23 A.  No, sir, no sir -- I'm sorry, he did tell me that.  He
24     did say that.
25 Q.  Okay.



GREGORY MURRAY
August 6, 2018

Page 464

1  A. Yes, sir.
2  Q. And isn't it true you have told various people that
3     you do not believe it was Mayor Fouts' voice on the
4     tape? There are certainly people that are going to
5     say that's what you told them.
6         MR. MARKO: Objection, that assumes facts
7     not in evidence.
8  BY MR. ACHO:
9  Q. You're not going to deny that, are you?
10        MR. MARKO: Going to deny what?
11        Do you understand the question?
12 A. He's saying -- your question is, did I tell people
13    that I believed it was not his voice. No, sir. I've
14    never told anyone that.
15 BY MR. ACHO:
16 Q. But you told several people that Howlett had no case,
17    right?
18 A. Based on my limited knowledge at the time, yes, sir.
19 Q. Tell us the names of people that you told?
20 A. That I told who?
21 Q. Name the people that you told that plaintiff had no
22    case?
23 A. I can't generate -- I can't recall that. Perhaps you
24    have a list. I can't recall that.
25 Q. Well, let's take your time.

Page 465

1  A. Okay.
2  Q. Let's just think about it.
3  A. Yeah.
4  Q. Did you tell the mayor that? You talk to him every
5     day.
6  A. I may have, yes. I may have.
7  Q. Did you tell the city attorney that?
8  A. I may have.
9  Q. Did you tell the labor attorney that?
10 A. I may have, yes.
11 Q. Did you tell me that?
12 A. I don't know. Did I tell you that, Mr. Acho?
13 Q. Well, use your own recollection.
14 A. Okay. Based on what I knew at the time, and I think I
15    shared that in my response to you when you asked me
16    that question, yeah.
17 Q. Okay.
18 A. That's what I knew at the time, yes, sir.
19 Q. Who else did you tell that she had no case? Just
20    think about it, we've already identified three or
21    four.
22 A. I can't recall, sir.
23 Q. Now, you really never complained to the mayor that you
24    were prevented from performing your job duties?
25 A. In a way I did.

Page 466

1  Q. Not directly, you didn't, did you, never?
2  A. I --
3  Q. You never directly -- okay, do you want me to start
4     the question all over again? Let me do that.
5         You never directly complained to the mayor,
6     even though you saw him virtually every day, that you
7     were prevented from performing your job duties,
8     correct?
9  A. I did tell him that.
10 Q. When? Give us the date?
11 A. When we were -- I can't give you a date.
12 Q. Approximation.
13 A. But I can share with you that it was probably in June
14    or July. I wanted to put together -- no, actually it
15    was -- yeah, May or June. I wanted to put together a
16    diversity committee and the mayor expressly prevented
17    me from doing that.
18 Q. Okay. So --
19 A. And that was part of my job.
20 Q. Okay. Other than the diversity committee, there was
21    nothing else that you directly said to the mayor that
22    prevented you from doing your job duties, correct?
23 A. Well, I wanted to go and speak with the diversity
24    coordinator in Grand Rapids and was denied the
25    opportunity to do that, to get some sense of how a

Page 467

1     large municipality introduced diversity into an
2     environment like that.
3  Q. And why did you need that? You've been in the field
4     for 20 years, and you feel you were deficient that you
5     had to go out to someone else, is that --
6         MR. MUNGO: Objection, mischaracterizes his
7     testimony, sir.
8  BY MR. ACHO:
9  Q. Well, why couldn't you do it without going out to
10    Grand Rapids?
11 A. Why reinvent the wheel?
12 Q. Sir.
13 A. Yes.
14 Q. They hired you because you had experience and
15    expertise.
16 A. And relationships with people in that field. And so
17    it did not seem to be out of place for me to say
18    I want to go and consult with a person in my field
19    who's worked in an environment like this to get some
20    sense of how they introduced diversity into that
21    environment. That doesn't mean that I'm deficient,
22    there are different ways to do things and just because
23    they are different doesn't mean there's a deficiency.
24 Q. When did you make that request?
25 A. In May or June.



GREGORY MURRAY
August 6, 2018

**Page 468**

1    Q.  Okay. So you're on the job --
2    A.  Uh-huh.
3    Q.  -- for six months almost --
4    A.  Uh-huh.
5    Q.  -- before you thought of this idea, correct?
6    A.  Incrementally, no, sir, that was when I introduced it.
7        You can't bombard your employer or the mayor or
8        overload him to the extent that he'll not listen to
9        anything that you say.  And so the mayor -- there is a
10       process that I developed, a protocol to introduce
11       ideas into an environment that never had those ideas
12       introduced.
13   Q.  And let me just ask something.  It is your sworn
14       testimony that you're on the job for six months before
15       you --
16            MR. MUNGO:  Let the record reflect that
17       Ms. Badalamenti is showing Mr. Acho some notes on her
18       pad which, in my opinion, in spirit is contrary to
19       what the judge suggested her participation would be.
20            THE WITNESS:  I have to take a bathroom
21       break.
22            MR. ACHO:  Sure, of course, let's figure
23       out the time.
24            MR. MARKO:  We will do five minutes.
25            (Recess taken at 11:37 a.m.)

**Page 469**

1            (Back on the record at 11:46 a.m.)
2    BY MR. ACHO:
3    Q.  So, sir, if I understand what you're saying correctly,
4        you waited six months before you sought to get advice
5        and consultation with the diversity coordinator in
6        Grand Rapids; is that correct?
7    A.  No, sir, I had spoken to her, but had discussed my
8        possibly coming there to get some sense of how they
9        incorporated it and that was -- that opportunity was
10       denied to me.
11   Q.  Well, why didn't you just speak to her on the phone,
12       you could have done that, correct? Yes or no?
13   A.  Yes.
14   Q.  You could have Skyped her, you could have done that
15       too?
16   A.  Yes, but I spoke to her.
17   Q.  Okay. So you had alternatives to your requests, yes
18       or no?
19   A.  Yes.
20   Q.  Okay. Now, remember you told us under oath you never
21       brought up the subject of how much money you were
22       looking for when you were tendering your resignation;
23       do you remember you said that?
24   A.  I think I did say that commensurate with department
25       level pay.

**Page 470**

1    Q.  You said you never discussed how much, that's what you
2        said?
3    A.  Not actual dollar amounts.
4    Q.  So you never said between 85,000 and $92,000; is that
5        correct?
6    A.  I may have said that because that was the general
7        range of department heads.
8    Q.  Oh, so you may have brought up --
9    A.  Yes, sir.
10   Q.  -- specific dollar amounts; is that correct?
11   A.  That's correct, I may have.
12   Q.  Okay.  Now, in addition, you tendered a letter of
13       resignation which I will get into the exhibits and
14       admit them at the end of the deposition, I'm not going
15       to do it now.  Would you have stayed with Warren if
16       you got no raise?
17   A.  Yes, sir.
18   Q.  Then why did you ask for the raise?
19   A.  I did stay without getting a raise, I did stay.
20   Q.  That's not my question.
21   A.  Yes, sir.
22   Q.  Why did you ask for a raise if you were going to stay
23       regardless?
24   A.  If you'll read my resignation letter a little more
25       closely, the increase was tagged to the duties of a

**Page 471**

1        liaison between the City of Warren and the Census
2        Bureau.  Absent that responsibility, there was no need
3        or request for a raise.
4    Q.  Let me understand something.
5    A.  Uh-huh.
6    Q.  You said the mayor said he didn't want you to conduct
7        diversity training, right?
8    A.  No, sir, I did not say that.
9    Q.  Well, did the mayor approve diversity training?
10   A.  Yes, sir.
11   Q.  How many times?
12   A.  Twice.  Actually, three times.
13   Q.  Over the time you were there?
14   A.  Yes, sir.
15   Q.  And who were the people that he approved diversity
16       training?
17   A.  His department heads and the three employees who had
18       exposure to diversity inside of the discipline that
19       was meted out to them, the three employees:  Barbara
20       Beyer, Shawn Johnson, I believe his name is, and the
21       lieutenant from the fire department.
22   Q.  Okay.  Just so I'm clear, the mayor has approved the
23       delivery of diversity training for senior staff and
24       appointees, right?
25   A.  Yes, sir.



GREGORY MURRAY
August 6, 2018

### Page 472

1  Q.  Okay. So when you talk about he didn't support
2     diversity training, that's not really correct, is it?
3  **A.  I did not say that. What I said was the mayor was not**
4     **genuine about diversity.**
5  Q.  Sir, you told us that he wasn't in favor of diversity
6     training, didn't you say that, yes or no?
7  **A.  No, sir, I don't recall -- I don't recall saying that**
8     **to you.**
9  Q.  So the mayor was in favor of diversity training --
10         MR. MARKO: Objection.
11         MR. MUNGO: Objection.
12  BY MR. ACHO:
13  Q.  -- correct? Yes or no?
14  **A.  I believe --**
15  Q.  Yes or no, was he --
16  **A.  I can't answer that question.**
17  Q.  Okay. So you're sitting here today, you met with the
18     mayor every day and you don't know whether he was in
19     favor of diversity training; is that correct?
20         MR. MARKO: Objection, that
21     mischaracterizes his testimony.
22     Go ahead.
23  **A.  When you say favor or approved, those are two**
24     **different things.**
25  BY MR. ACHO:

### Page 473

1  Q.  Okay. Let me rephrase it to make you feel better.
2  **A.  Okay.**
3  Q.  Didn't the mayor support diversity training?
4  **A.  He approved it.**
5  Q.  Okay. When someone approves something, that suggests
6     support, doesn't it, yes?
7  **A.  It also could suggest other things.**
8  Q.  Sure.
9  **A.  Not necessarily.**
10  Q.  Well, you always want to attribute something negative
11     to the mayor.
12  **A.  It's not negative.**
13  Q.  It's not negative?
14         MR. MARKO: That's not a question. That's
15     not a question.
16  BY MR. ACHO:
17  Q.  He approved the diversity training for what purpose?
18  **A.  Because he had been told by the EEOC representative,**
19     **Lolita Davis, that the city was failing miserably when**
20     **it came to diversity. Based on that comment, he**
21     **approved diversity training.**
22  Q.  So that was a good thing, right?
23  **A.  Oh, yes, sir.**
24  Q.  Okay.
25  **A.  Any of that training is always good.**

### Page 474

1  Q.  Okay. Now, in the police department, that woman never
2     said anything about the police department's training,
3     did it?
4  **A.  No, sir.**
5  Q.  Okay. And so when you say diversity training is
6     important, you don't know all the training the police
7     department had because you were not involved except
8     the 11 months you were there, you had no involvement,
9     correct?
10  **A.  That's correct.**
11  Q.  Okay. Now, when -- when did the mayor tell you former
12     Director Green was a racist and a drunk and no
13     interest in diversifying the City's police department,
14     when did he say that?
15  **A.  February, March, April, it was a repeated statement.**
16  Q.  Okay. So right after you got hired.
17  **A.  Uh-huh.**
18  Q.  You had this conversation with the mayor?
19  **A.  After -- yes sir, yes, I did.**
20  Q.  Okay. So you were armed with that knowledge?
21  **A.  Uh-huh.**
22  Q.  Correct?
23  **A.  Yes, sir.**
24  Q.  What, if anything, did you do about it? Nothing,
25     correct, nothing?

### Page 475

1  **A.  No, I spoke with the police commissioner.**
2  Q.  Once?
3  **A.  Regarding diversity -- no, I've spoken to the former**
4     **police commissioner several times.**
5  Q.  You told us you only spoke to him once, you didn't
6     want to go back because he had a gun; do you remember
7     that?
8  **A.  You asked -- I shared with you that the police**
9     **commissioner told some of his command officers that**
10     **after the meeting with the police commissioner, that**
11     **the police commissioner told his command officer, and**
12     **I told them they got to stay out of my house and --**
13  Q.  What?
14  **A.  Yes, yes, sir.**
15  Q.  You never said that in your testimony earlier.
16  **A.  Yes, yes, sir, I did.**
17  Q.  You most certainly did not.
18  **A.  Well, I think -- I think I did.**
19  Q.  Did you just think of this now?
20  **A.  No, I think I did.**
21  Q.  Okay, well, let me ask something. Let me go back to
22     my earlier question.
23  **A.  Okay.**
24  Q.  Here you just get hired in Warren --
25  **A.  Yes.**



GREGORY MURRAY
August 6, 2018

---

Page 476

1   Q.  -- as diversity coordinator.
2   A.  Yes, sir.
3   Q.  You're told these disparaging things, you say by the
4       mayor, yet you did nothing about it?
5   A.  Disparaging things by the mayor?
6   Q.  About -- by -- from the mayor about the former police
7       commissioner.
8   A.  I did share what was told to me by Matt Nichols was
9       the comment that the then police commissioner, Jere
10      Green, said.  I did share that with the mayor.
11  Q.  I didn't ask you that.
12  A.  That's what I thought you said.
13  Q.  Listen to my question, please, sir.
14  A.  Okay.
15  Q.  When you became aware --
16  A.  Uh-huh.
17  Q.  -- of these limitations of the former police
18      commissioner, you didn't do anything about it to
19      change things in the police department?  You did
20      nothing?
21  A.  That's not true.
22  Q.  Did you?
23  A.  I spoke to the mayor --
24  Q.  You yourself did nothing?
25  A.  -- who the police commissioner reports to, and it's

---

Page 477

1       his job, the mayor's job to address issues on a
2       department level once he becomes aware of them.
3           I had no authority to barge into the police
4       department and start demanding changes.
5   Q.  Sir, weren't you brought in as an agent of change, yes
6       or no?
7   A.  Yes.
8   Q.  But you made no effort, nothing in writing,
9       recommendations to assist the mayor in dealing with
10      the former police commissioner, you gave nothing in
11      writing as far as anyone can see, correct?
12  A.  No, sir, that is incorrect.
13  Q.  You have something in writing?
14  A.  I don't have anything because as I said before --
15  Q.  Okay.
16  A.  -- I didn't take any property from the City of Warren
17      when I left.
18  Q.  Okay.  Okay.  Did you prepare any memorandums advising
19      the mayor on what to do with former Commissioner
20      Green?
21  A.  No, sir.
22  Q.  Yes or no?
23  A.  No, sir.
24  Q.  Okay.  So really, you didn't do anything about
25      Commissioner Green; correct?

---

Page 478

1   A.  That's a mischaracterization.
2   Q.  Well, you didn't do anything?
3   A.  I reported it to the mayor as I should have, reported
4       to my superior.
5   Q.  No, you didn't.
6   A.  Yes, I did.
7   Q.  The mayor reported it to you.
8   A.  No, sir.
9   Q.  You said the mayor told you --
10          MR. MUNGO:  Objection, mischaracterizes the
11      testimony, sir.
12  BY MR. ACHO:
13  Q.  You said the mayor told you this, are you denying
14      that?
15  A.  The mayor did tell me that.
16  Q.  Okay.
17  A.  I thought you were referring to the comment made by
18      Jere Green after my meeting with him.
19  Q.  No.
20  A.  I reported that to the mayor which was the proper
21      protocol.
22  Q.  Sir, other than that, you did nothing?
23  A.  That's --
24  Q.  Is that true, nothing?
25  A.  Nothing in regards to what again?

---

Page 479

1   Q.  To grieve, nothing?
2   A.  Well, I -- I introduced NOBLE to them.
3   Q.  You --
4   A.  Got a contract secured and Green was there when it
5       happened.
6   Q.  Sir, you did nothing about Green's problems, right?
7   A.  Oh, no, sir.  Problems.
8   Q.  Yet, you were brought in --
9   A.  Uh-huh.
10  Q.  -- as an agent of change.
11  A.  Yes, sir.
12  Q.  Including the police department, correct?
13  A.  Eventually, yes, sir.
14  Q.  But you did nothing as an agent of change of the top
15      of the police department, you did nothing?
16  A.  That's a mischaracterization, I can't answer that
17      question yes or no.
18  Q.  You're not aware you did anything?
19  A.  I think I affected the culture of the police
20      department.
21  Q.  Oh, you believe you affected the culture?
22  A.  Uh-huh.  Yes, you have to first know what the culture
23      is before you can affect it.  And so part of my due
24      diligence is to sit back and to observe, to request
25      documents as I did, come to an informed decision and

---



GREGORY MURRAY
August 6, 2018

Page 480

1   then make a recommendation, but you can't just go in
2   like a bull in a china shop and start demanding
3   changes based on a lack of information.
4   Q. And the only thing you put in writing about the police
5   department was a laudatory letter to Police
6   Commissioner Dwyer, correct?
7   A. Correct.
8   Q. That's the only thing you did in writing?
9   A. I did do that in writing, yes.
10  Q. But that's all you did to describe the culture of the
11  police department in Warren; isn't that true?
12  A. In writing, yes.
13  Q. Okay. Were you sincere about the compliments about
14  the culture in the Warren Police Department?
15  A. I was sincere about the letter of appreciation as to
16  how they addressed the issue of a woman who had fallen
17  out right across from City Hall.
18  Q. Okay, let's go over the question again, I'd like you
19  to answer my question.
20  A. That was isolated.
21  Q. Were you sincere about the compliments about the
22  culture in the Warren Police Department, yes or no?
23  A. I didn't -- you used the word "culture," and that's
24  what threw me off.
25  Q. That is your word. I didn't use the word "culture,"

Page 481

1   you did.
2   A. But I did not use the word "culture" in my letter of
3   appreciation regarding the incident.
4   Q. But the conduct evidences culture, doesn't it, yes or
5   no?
6   A. It -- no, not necessarily, you can't apply that to
7   everybody in the police department. Those officers
8   responded in a very professional manner. I witnessed
9   that, and I put that in writing.
10  Q. But you have no personal knowledge of any police
11  officers engaging in improper activities, none?
12  A. I have no personal direct knowledge, no.
13  Q. That's right.
14  A. Yeah.
15  Q. So anything you would say would be just hearsay or
16  your guess, correct?
17  A. Or educated observations.
18  Q. But you didn't observe any racism in the police
19  department in the officers. You didn't. I have your
20  testimony.
21  A. Not directly, no.
22  Q. That's what I'm talking about.
23  A. Okay, so the answer's no.
24  Q. That's what you just said, educated observations.
25  A. Right.

Page 482

1   Q. What is an observation, sir? What is it, it's seeing?
2   A. Or reading or hearing.
3   Q. Wait, wait, wait.
4   A. You can observe --
5   Q. Well, hold on.
6   A. Okay.
7   Q. An educated observation --
8   A. Uh-huh.
9   Q. -- is something you can read?
10  A. It's my definition of it, yes, it's an observation,
11  when you're presented with information. The lack of
12  information might lead to another conclusion. The
13  presentation of information might lead to another
14  conclusion.
15  Q. Did you make an educated observation of the police
16  department?
17  A. Yes.
18  Q. Yes or no?
19  A. Yes.
20  Q. When did you make that observation?
21  A. After I was personally involved in interaction with
22  the police department around the treatment of deaf
23  persons.
24  Q. Okay. Other than the deaf, okay, other than that deaf
25  situation.

Page 483

1   A. Yes.
2   Q. Did you have any other educated observations, yes or
3   no?
4   A. In reading the contracts, yes, I had an observation.
5   The observation was that there was no diversity policy
6   within the contracts, which is something --
7   Q. But wait, wait, wait, wait. Do you know whether that
8   was necessary, yes or no? Yes or no?
9   A. I would say yes, it would be necessary.
10  Q. Why, why would it be necessary if there are general
11  orders that cover it?
12  A. Because of the sparsity of the general order as you
13  read it to me.
14  Q. Sparsity?
15  A. Yes, sir.
16  Q. Okay, we're going to introduce it.
17  A. That's fine.
18  Q. You call it a sparsity?
19  A. Yes, sir.
20  Q. That prohibits sexual and racial discrimination,
21  that's sparse?
22  A. Two sentences is sparse to me.
23  Q. Oh, okay. So the content is irrelevant unless it's
24  lengthy; is that right?
25  A. No, sir, unless it reflects a policy, it's hard to --



GREGORY MURRAY
August 6, 2018

### Page 484

1    it's hard to enforce.
2    Q.  But you didn't even know it when you made that
3    observation that it should have been in the contract,
4    it wasn't necessary, was it?
5    A.  I believe it was.
6    Q.  Okay.  Can you tell us when you talked to the labor
7    attorney, Howard Shifman.
8    A.  Uh-huh.
9    Q.  Did you tell him, you know what?  Even though it's in
10    the general orders, even though it's in the policies,
11    I would recommend to you that it be in the union
12    contract, did you ever do that?  Yes or no?  Yes or
13    no?
14    A.  In a way, yes.
15    Q.  In a way, yes?
16    A.  Because --
17    Q.  It's either you did or not.
18          MR. MARKO:  No.
19    BY MR. ACHO:
20    Q.  Because either you did or you didn't.
21    A.  Because I gathered -- I gathered together a number of
22    people, Ethan was there, the fire commissioner was
23    there, a representative of the police department was
24    there, the labor relations director was there,
25    Mr. Shifman was there, where we attempted to develop a

### Page 486

1    A.  I don't -- I can't answer, I can't respond to that.
2    Q.  Okay.  So you are of the opinion that the city police
3    department general orders and policies were sparse?
4    A.  Based on what you read to me, yes, sir.
5    Q.  But when I read them to you, you said they were
6    positive, they were good, didn't you?
7    A.  Yes, sir.
8    Q.  You didn't say they were deficient then?
9    A.  We are having this as part of the conversation now.
10    Q.  Oh, okay.
11    A.  You raised that.
12    Q.  Now, you don't know what else you could have done to
13    help recruit minorities in the police department,
14    correct?
15    A.  Well, there are other recommendations that I made, so
16    I don't know what you mean by do?  I didn't have the
17    power to implement anything.
18    Q.  But you had a policy to do some things?
19    A.  To recommend.
20    Q.  No, you could have done some things.
21    A.  All I can do is recommend.
22    Q.  No, no, no, that job fair, you could have done that
23    job fair?
24    A.  No, sir, I could not have.  You, apparently, Mr. Acho,
25    you are completely ignorant of the way the City of

### Page 485

1    city-wide diversity policy that would be incorporated
2    into any contracts that the city might -- might let
3    and would also become a general principle of the city.
4    BY MR. ACHO:
5    Q.  But, sir, you did that without having any knowledge,
6    zero knowledge, about police department general orders
7    and policies?
8    A.  Yes, sir.
9    Q.  Is that right?
10    A.  Yes.
11    Q.  So you don't know whether your opinion would have
12    still mandated that it be included in the contract,
13    because you don't know?
14    A.  Mandated.  I couldn't mandate anything, I don't --
15    Q.  By the way, you never told the mayor, hey, you know
16    what, mayor, this ought to be in the contract?  You
17    never told the mayor that?
18    A.  Oh, yes, I did.
19    Q.  Oh, you did?
20    A.  Yes.
21    Q.  But there's nothing in writing, I've looked all
22    around, I didn't see anything.
23    A.  I don't know what they provide to you.  I don't know
24    what they withhold from you, Mr. Acho.
25    Q.  Okay.

### Page 487

1    Warren operates, nothing gets done without the mayor's
2    direct approval, particularly when it affects
3    employees or policies, et cetera.  Nothing, it's a
4    strong mayoral environment and everything of any real
5    import goes through the mayor.
6    Q.  Oh, including the treasurer's office, is that what
7    you're telling us under oath?  Even the treasurer
8    mayor controls?
9    A.  He denied me --
10    Q.  Does the mayor control the treasurer?
11    A.  To some extent, yes.
12    Q.  And does the mayor control the clerk?
13    A.  Budget wise possibly, yes.  There are ways to control
14    other departments or other divisions based on the city
15    budget presentation, and again, their denial of my
16    ability to train the clerk's staff or the treasurer's
17    staff.
18    Q.  Did you follow up with the clerk and treasurer about
19    training?
20    A.  I was prohibited from doing so once the mayor became
21    aware that they were interested in it because I told
22    him that I believed, I wanted to do the training for
23    all departments, and he said no to the clerk and to
24    the treasurer.
25    Q.  Did you speak to the clerk and treasurer about this?



GREGORY MURRAY
August 6, 2018

Page 488

1   A. I spoke to the --
2   Q. Because they denied it.
3   A. -- clerk about it.
4   Q. Well, they deny you spoke to them about it.
5         MR. MUNGO: Objection, argumentative.
6   A. I can't -- I don't know what to tell you about that.
7         MR. ACHO: Okay, please have this marked.
8   A. I did speak to them.
9   BY MR. ACHO:
10  Q. Look at the second page of that. Contrary to your
11     saying nothing about money, look at the last page and
12     you specifically wrote this and mentioned money and it
13     was discussed at your meeting with the mayor and Ethan
14     Vinson and you deny it under oath.
15         MARKED FOR IDENTIFICATION:
16         DEPOSITION EXHIBIT 1
17         12:06 p.m.
18         MR. MARKO: That's not a question, so you
19     don't need to answer that.
20  BY MR. ACHO:
21  Q. You wrote this, didn't you?
22  A. Yeah.
23  Q. And you mentioned specifically money, didn't you?
24  A. I did mention conversation of that of a director.
25  Q. And it was discussed with Mr. Vinson and the mayor,

Page 489

1      this memorandum?
2   A. Oh, yes, several times, I believe.
3   Q. And the dollars were mentioned contrary to your
4      statement under oath that you never mentioned dollar
5      amounts, correct?
6   A. I never had a discussion -- I never mentioned -- I
7      wrote this, I do acknowledge that I wrote this. But I
8      never discussed dollar amounts, specific dollar
9      amounts with the mayor.
10  Q. Okay. Let me ask you something. When you stepped out
11     at the break to go to the bathroom --
12  A. Yes.
13  Q. -- did you talk to Mr. Mungo?
14  A. Just other than Mr. Ethan's bladder and him rushing
15     past us to get to the stall first.
16  Q. He talked to you about the general orders, didn't he?
17  A. No, he did not.
18  Q. Well, sir, isn't it true you believed that Warren is a
19     good place for African-Americans under Warren Mayor
20     Fouts' administration, right?
21  A. Not yet, sir. It doesn't reflect the demographics of
22     the city, and until it does that, then I would
23     possibly make a statement like that.
24  Q. Oh, so you would not recommend anyone to work at the
25     City of Warren who's a person of color, correct?

Page 490

1   A. That's not what I said, sir.
2   Q. Well, sir, wait a minute. Either Warren is a good
3      place for African-Americans under the mayor to work or
4      not, which is it?
5         MR. MARKO: Objection to form.
6   A. I've answered that question, I think I've answered
7      that question for you.
8   BY MR. ACHO:
9   Q. Oh, so it is a good place to work for
10     African-Americans or no?
11        MR. MARKO: Asked and answered.
12  A. I think I've answered that question.
13  BY MR. ACHO:
14  Q. I didn't get the answer.
15  A. The answer was that if the city were more
16     representative of its demographics, then it would be a
17     good place.
18  Q. But you wouldn't recommend it to anyone then who's
19     African-American; is that right, you wouldn't
20     recommend them?
21  A. That's not true.
22  Q. No, because you recommended your daughter-in-law,
23     stepdaughter, China Haley, you recommended she work --
24  A. Uh-huh.
25  Q. -- for Warren Mayor Fouts' administration?

Page 491

1   A. Yes, and was told that there was a prohibition against
2      family members and I let it die.
3   Q. But that's not my question. I didn't ask you that.
4   A. I did recommend her.
5   Q. Yeah.
6   A. So why would you say I never recommended anybody for
7      employment with the City of Warren when you know that
8      I did that?
9   Q. I'm testing your credibility. Because you're saying
10     that Warren is still not where it should be.
11  A. That's true.
12  Q. But yet you recommended your stepdaughter, right?
13  A. To try to help get to where it should be.
14  Q. Sir.
15  A. Yes.
16  Q. Oh, you recommended her --
17  A. Mr. Acho, Mr. Acho.
18  Q. -- so she could help the city, is that it?
19  A. Mr. Acho.
20  Q. Sir, is that it? That's my question, please answer
21     it.
22  A. I recommended her because she was qualified for the
23     position.
24  Q. And you thought it would be a good place to work,
25     right?



GREGORY MURRAY
August 6, 2018

---

Page 492

1          MR. ACHO:  So we're going to mark that as
2     an exhibit.
3          MR. MUNGO:  Asked and answered.
4  BY MR. ACHO:
5  Q.  And here is your letter of resignation.
6  A.  Okay.
7  Q.  We've gone over this briefly before.
8  A.  Uh-huh.
9  Q.  Now you remember writing it?
10  A.  Yes, sir.
11          MARKED FOR IDENTIFICATION:
12          DEPOSITION EXHIBIT 2
13          12:10 p.m.
14  BY MR. ACHO:
15  Q.  Now, this is a pretty aggressive letter, isn't it?
16  A.  No, sir.
17  Q.  No?
18  A.  It's detailed, not aggressive.
19  Q.  By the way, you talked about you had this great
20     relationship before you got hired with the media.
21     What great relationship did you have with the media
22     before you came to Warren?
23  A.  Well, I was a contributing editorial writer for the
24     Macomb Daily for I want to say six, seven, eight
25     years.  I had worked at the Detroit Free Press for

---

Page 493

1     five years before enlisting in the Air Force.  I
2     assisted with story development.  I had constant
3     exposure to the media in my role as the project
4     director for Macomb County Ministerial Alliance and
5     also engaged the media quite often in my capacity as
6     vice president of Macomb County branch of the NAACP.
7  Q.  Then how come you didn't use any of those resources to
8     recruit African-Americans for the Warren Police
9     Department, you didn't use any of them?
10  A.  That's not my responsibility.
11  Q.  I didn't ask you whether it was your responsibility,
12     why didn't you try to do it?
13  A.  Well, I spoke to people about coming to work at
14     Warren, yes.
15  Q.  Sir, I'm going to read this question again.
16  A.  You said do, okay.
17  Q.  You have all these connections with these media.
18  A.  Uh-huh.
19  Q.  Yet, you never used any of them to try and recruit
20     African-Americans in the police department, none of
21     them.  None of them, correct?
22  A.  Well, many of them turned their back on me after I
23     went to work for Jim Fouts.
24  Q.  Sir, I'm going to read it to you again.
25  A.  Okay.

---

Page 494

1  Q.  And answer this question, you never used any of those
2     connections to try and recruit African-Americans to
3     the police department, none of them?
4  A.  That's not correct.
5  Q.  Which ones did you contact?
6  A.  I spoke to people in the NAACP.  I spoke to people in
7     the Macomb County Ministerial Alliance regarding that,
8     regarding looking for people of color to join the
9     department.  I spoke at ALLPAC meetings regarding the
10     interest of the city to find qualified minority
11     candidates, so.
12  Q.  And so your testimony is, you did all this and nothing
13     came of it, zero?
14  A.  I don't know what came of it.
15  Q.  Well, you're not aware that anything came of it, are
16     you?
17  A.  I'm not aware, yes, you're correct.
18  Q.  Did you meet or talk to Mr. Mungo or any of his people
19     before this deposition?
20          MR. MARKO:  Objection to form, ambiguous as
21     to people.
22  BY MR. ACHO:
23  Q.  Go ahead, anybody.
24  A.  An investigator came to my door.
25  Q.  Recently?

---

Page 495

1  A.  No, sir.
2  Q.  No, I'm talking about since your last deposition?
3  A.  Oh, no, sir, no, sir.
4  Q.  But that investigator, you didn't even know and you
5     started saying --
6          MR. ACHO:  By the way, we're going to move
7     this into evidence as well.
8          MR. MUNGO:  You know, Mr. Acho, I am
9     totally confused as to which exhibits would be
10     referenced during your examination.  Because you have
11     not been numbering them as we go.  Which ones have you
12     numbered?
13          MR. ACHO:  Okay, let's --
14          MR. MUNGO:  Any, have you marked any of
15     these exhibits?
16          MR. ACHO:  I'll mark them right now.
17          (Discussion off the record at 12:14 p.m.)
18          (Back on the record at 12:14 p.m.)
19          MR. MUNGO:  I would appreciate if we can
20     mark them as you go, sir, so that the record is clear
21     which documents you're referencing.
22          MR. ACHO:  Okay, this is going to be number
23     3, the mayor's initiatives.
24          MARKED FOR IDENTIFICATION:
25          DEPOSITION EXHIBIT 3

---



GREGORY MURRAY
August 6, 2018

Page 496

1      12:14 p.m.
2          MR. ACHO:  We're going to get copies of
3  this one.
4          MR. MUNGO:  Can I see it?
5          MR. ACHO:  In a minute when I'm ready to
6  introduce it, yeah.
7          MR. MUNGO:  When you're ready to introduce
8  it, but we can save a lot of time, sir, if I could
9  have it.
10  BY MR. ACHO:
11  Q.  Now, you don't know specifically how dispatch police
12      runs their handle, do you?
13  A.  No, sir.
14  Q.  You never worked in a dispatch department?
15  A.  No, sir.
16  Q.  You don't know how the police runs are prioritized,
17      correct?
18  A.  That's correct.
19  Q.  And you don't know who the policy maker for the police
20      department is, do you?
21  A.  Yes, sir.
22  Q.  Who?
23  A.  The police chief and the mayor.
24  Q.  Both of them together?
25  A.  And the unions.

Page 497

1  Q.  And the unions?
2  A.  Yes, sir.  That's a collaborative process.
3  Q.  It is your sworn testimony that the policy makers for
4      the police department is a police commissioner, the
5      mayor and the union; is that correct?
6  A.  Yes, sir.
7  Q.  Okay.  But you have no knowledge how the policies are
8      formed, do you?
9  A.  That's correct.
10  Q.  And you have no personal knowledge of that process,
11      correct?
12  A.  That's correct.
13  Q.  And you're unaware how the city implements policies in
14      general, correct?
15  A.  Yes, sir.
16  Q.  And is the process for the city different than the
17      process for the police department?
18  A.  I would say yes, sir.
19  Q.  It is different?
20  A.  Based on -- based on the content area.
21  Q.  Wasn't it your job, which you were hired for, was
22      identifying best practices and policies that formed
23      the framework for Warren to better reflect its
24      demographics?
25  A.  Yes, sir.

Page 498

1  Q.  How could you do that in the police department if you
2      never knew how it was done?
3  A.  Taking a look at the EEO-4 forms and taking a look at
4      the required representation to the federal government
5      regarding the makeup of the department in terms of
6      gender, race, job classification and employment, that
7      gives you a real clear view of the status of the
8      police department in those areas.
9  Q.  You may know the status, but you're supposed to
10      identify best practices for policies.
11  A.  True.
12  Q.  But you didn't even know the policies or how they were
13      made, did you, ever, ever?
14  A.  Oh, that's not necessarily true, sir.  As I said
15      before, policies come from discussions.
16  Q.  Sir, I just asked you if you knew how the police
17      department policies were made and you said no.
18  A.  Okay.  I'm sorry, I misspoke.
19  Q.  You didn't know.  You didn't know.
20  A.  If allowed to answer the question, policy is generally
21      developed when a situation arises that requires a
22      response, either a different response or a -- an
23      initial response and that policy comes about as a
24      result of discussion, et cetera, just take for
25      example --

Page 499

1  Q.  No, wait, wait, hold on, hold on, we've got to cut our
2      time here.  You're speaking generally, you're not
3      speaking about the Warren Police Department, are you?
4  A.  I'm speaking generally --
5  Q.  Yeah, I'm talking about --
6  A.  -- which would include the police department.
7  Q.  But you don't know how Warren Police Department's
8      policies were created, you don't know?
9  A.  That is correct, I don't know how they were created.
10  Q.  Okay.  That's my point.  Then how were you going to
11      identify best practices and policies when you don't
12      even know how they were created in the police
13      department?
14  A.  Sir, I convened meetings with the police department
15      representatives, the city attorney's office, the fire
16      department's office, the labor relations department,
17      the human resource department and outside counsel to
18      discuss the validity of putting together a policy that
19      would be city wide.  That's how these things get done
20      in a municipality.
21  Q.  But this is a general statement, not what happened in
22      the Warren Police Department, correct?
23  A.  The police department participated in developing the
24      policy, so what are you saying?  The police
25      department --



GREGORY MURRAY
August 6, 2018

Page 500

1   Q. Sir, you didn't even know the policies of the police
2      department.
3   A. There was no -- there was no general diversity policy
4      statement in the police department. They didn't have
5      one. No one had one.
6   Q. You didn't see the general order?
7   A. That's not the same thing, sir.
8   Q. Okay.
9   A. That's not the same thing.
10  Q. Let me ask you something. Didn't you say in your
11     resignation letter that the mayor would have to agree
12     to your demands or you're resigning?
13  A. Oh, yes, sir.
14  Q. And you gave him how long?
15  A. What, November 10th, two weeks, two weeks.
16  Q. One week. I'm reading one week.
17  A. This was given to him October 24th, November 10th is
18     two weeks.
19  Q. Sir, "We have but one week to work this out," isn't
20     that what you wrote? Yes or no?
21          MR. MARKO: That's a different question.
22  A. That was a different question.
23  BY MR. ACHO:
24  Q. Did you write that?
25  A. Yes, I did.

Page 501

1   Q. Okay. You also said you wanted a serious, immediate,
2      irrevocable adjustment to your compensation, right?
3   A. Based on assuming the position of a liaison if forced
4      to, if forced to perform those job duties which are
5      generally contracted out with firms, it's not just one
6      person for any city performing those duties.
7   Q. Okay. Now, I'm going to show you what is marked as
8      what, number 4, I believe.
9   A. It says 3.
10  Q. 3?
11  A. Yeah.
12  Q. Okay. Well, wait a minute. 3 should be your --
13  A. It says 3 on what you just handed me.
14  Q. Okay.
15          MR. MUNGO: Let the record reflect that
16     Mr. Acho is again consulting with Ms. Badalamenti.
17     Can I see that document, sir?
18          MR. ACHO: Okay, you want a break then
19     because I was going to ask him.
20          MR. MUNGO: No.
21  BY MR. ACHO:
22  Q. Okay. So, sir, there are a lot of things that the
23     mayor did, right, a lot of things that he did?
24  A. Sure.
25  Q. And he did you favors, didn't he?

Page 502

1   A. Favors?
2   Q. Yeah.
3   A. What's your definition of a favor?
4   Q. Like taking that mental health day off, he did you a
5      favor and okayed it.
6   A. He approved it.
7   Q. And he okayed you going to go see your son even though
8      you could have made up the time, he approved that?
9   A. Yes, sir, he did.
10  Q. Okay. So he did good things for you, and you --
11     right?
12  A. Some, yes.
13  Q. And he treated you with dignity and respect?
14  A. Up to a point.
15  Q. Up to the point where you demanded what, $20,000 more
16     money?
17  A. No, sir, up to the point where I shared with him that
18     I had an issue with putting diversity on the back
19     burner until after the 2019 election.
20  Q. Okay. All right. Now, by the way, you're not aware
21     of any conspiracy against the plaintiff, you have no
22     personal knowledge of any conspiracy?
23  A. Conspiracy, no.
24  Q. Okay, I just want to make sure. Okay. When you had
25     that meeting with the mayor --

Page 503

1   A. Uh-huh.
2   Q. -- and Mr. Vinson, didn't the mayor say he misspoke or
3      you misunderstood him about the back burner on the
4      training? Didn't he say that to you?
5   A. He did say that.
6   Q. He did say that to you?
7   A. Yes.
8   Q. And the mayor has always been direct and truthful with
9      you, he's been direct with you?
10  A. He's been direct, yes.
11  Q. Okay, yeah.
12  A. Truthful, that's a different question.
13  Q. Well, okay.
14  A. It's relative.
15  Q. Okay. It's relative like whether you're truthful.
16     You say people lie. Well, let me ask you this, the
17     mayor said you misunderstood about the training and
18     back burner, right?
19  A. He did say that.
20  Q. What did you do after that meeting?
21  A. I went back to work.
22  Q. Well, about the training, I mean?
23  A. Because the mayor --
24  Q. No, no, what did you do about the diversity training
25     after you met with the mayor and Mr. Vinson, the city



GREGORY MURRAY
August 6, 2018

**Page 504**

1  attorney?
2  A. We met -- after the meeting, where we discussed my
3  resignation letter, I went down to my office, the
4  mayor called me and said I want you to continue
5  working for me and I agreed to it because he had taken
6  the responsibility -- potential responsibility --
7  Q. I'm asking what you did, not what the mayor said.
8  MR. MUNGO: Counsel, let him finish.
9  MR. ACHO: I'm limited to time.
10  MR. MUNGO: Counsel --
11  BY MR. ACHO:
12  Q. What did you do, that's what I'm asking, about
13  diversity training?
14  MR. MUNGO: Objection, Counsel, you've got
15  to give him an opportunity to answer, sir.
16  MR. ACHO: But to my question.
17  BY MR. ACHO:
18  Q. What did you do after the meeting with Mr. Vinson and
19  the mayor after the meeting?
20  A. Well, I participated in conversations with NOBLE and
21  the police chief around revising their recruitment
22  strategies, producing materials that would better
23  reflect or better perhaps generate interest on the
24  part of people of color in terms of applying to the
25  department.

**Page 505**

1  Q. Okay. And the police commissioner, Dwyer at the time,
2  was supportive of that?
3  A. Oh, yes, absolutely.
4  Q. So everything was good at that point?
5  A. Good?
6  Q. Yeah, because you got along with Dwyer?
7  A. Yes, sir.
8  Q. And he supported things that you said?
9  A. Yes, sir.
10  Q. And he said he was going to do them?
11  A. Yes, sir.
12  Q. And you never asked him for the policies and general
13  orders. You didn't?
14  A. No, sir, I didn't.
15  Q. Okay, you didn't?
16  A. He had only been on job for a month or so.
17  Q. Sir, he was on the job three months before you left.
18  A. He had only been on the job --
19  Q. You've got August, correct?
20  A. -- September, October, November.
21  Q. Three months?
22  A. Yeah.
23  Q. But you never asked him for the policies?
24  A. No, sir.
25  Q. Or the general order, nothing?

**Page 506**

1  A. No, sir.
2  Q. But everything was fine after the meeting, yes or no?
3  A. After the meeting?
4  Q. Yes. There was no issues after the meeting other than
5  compensation, correct?
6  A. There was no issue of compensation after the meeting.
7  Q. What I'm saying is, there were no issues left?
8  A. There were issues left.
9  Q. What issue?
10  A. The issue of whether or not the mayor would genuinely
11  because when I left that meeting, I still had the
12  impression that the mayor was not genuine about
13  diversity.
14  Q. Okay, so you still weren't convinced?
15  A. That's correct.
16  Q. Okay. Let me ask you something.
17  A. Yes, sir.
18  Q. You were involved in the discipline of Barb Beyer?
19  A. Yes, sir.
20  Q. Okay. And you were not familiar with contractual
21  payout provisions in Barbara Beyer's contract, are
22  you?
23  A. Only one provision that I was aware of --
24  Q. Okay.
25  A. -- which was a longevity.

**Page 507**

1  Q. Okay. You have no idea what type of vacation payment
2  Beyer was entitled to under a Collective Bargaining
3  Agreement, correct?
4  A. That's correct.
5  Q. Okay. You have no idea when individuals in Beyer's
6  union are to receive contractual vacation payments,
7  correct?
8  A. That's correct.
9  Q. And that vacation payments under contractual agreement
10  are separate and apart from discipline, correct?
11  A. I would believe so, yes, generally, yes.
12  Q. If an employee such as Beyer is disciplined, the City
13  is still bound to follow the Collective Bargaining
14  Agreement covering the employee, correct?
15  A. That's correct.
16  Q. Okay. On the Tourette's, do you remember you talked
17  about that?
18  A. Yes, sir.
19  Q. Wasn't that an educational example in front of a room
20  full of people?
21  A. No, sir.
22  Q. It wasn't?
23  A. No, sir.
24  Q. There was no role playing -- role playing for
25  training?



GREGORY MURRAY
August 6, 2018

### Page 508

1  A.  There had been no role training up to and then even
2     after that point.
3  Q.  And I guess I'm trying to understand something.  Here
4     you have a woman filing a lawsuit and yet never really
5     filing but one complaint in ten years; isn't that
6     true?
7  A.  I'm not aware of what she did and did not do in terms
8     of filing anything.
9  Q.  If a person, since you have been involved with unions,
10    if a person has an issue, they can file a grievance,
11    right?
12 A.  They can, yes, sir.
13 Q.  Okay.  Did you ask the union about the plaintiff and
14    whether she ever requested a grievance?
15 A.  No, sir.
16 Q.  How come?
17 A.  Because it had been investigated internally.  I was
18    not involved in that internal investigation, and as
19    such, I did not have a conversation with the union
20    regarding her specific case.
21 Q.  But what happened was, in fact, what you recommended?
22        MR. ACHO:  Can we have this marked?  I
23    don't think we got it marked.
24        MARKED FOR IDENTIFICATION:
25        DEPOSITION EXHIBIT 4

### Page 509

1        12:28 p.m.
2  A.  I did recommend that Ms. --
3  BY MR. ACHO:
4  Q.  No, listen to my question, you cut it quick.  What
5     happened was, in fact, what you recommended regarding
6     her, correct, the discipline?
7  A.  A portion of her discipline, yes.
8  Q.  Well, the discipline was two weeks off, right?
9  A.  But that was delayed.
10 Q.  Sir, was the discipline two weeks off, yes or no?
11 A.  Yes.
12 Q.  Okay.  Now, take a look at this document.
13 A.  Uh-huh.
14 Q.  And it appears to talk about diversity -- no, right
15    here, about diversity training.
16 A.  Which one?
17 Q.  Okay.  No, I'm going to ask you about this next.
18 A.  Okay, yes, sir.
19 Q.  Okay.  So the mayor was supporting diversity training?
20        MR. ACHO:  And I gave him one here.
21        MR. VINSON:  Oh, he has one.
22        MR. MUNGO:  Yeah, yeah.
23 A.  The mayor approved diversity training.
24 BY MR. ACHO:
25 Q.  Okay.  And this was in August of 2017?

### Page 510

1  A.  Yes.
2  Q.  By the way, let's look at all the things the mayor
3     did.
4  A.  Uh-huh.
5  Q.  There are about 25 initiatives, okay?
6  A.  Okay.
7  Q.  And let me ask you, were those positive for diversity
8     or not?
9        MR. MUNGO:  What exhibit number are we
10    referencing, sir?
11        THE WITNESS:  3.
12        MR. MUNGO:  3.
13        MR. ACHO:  I will give you copies after.
14        MR. MUNGO:  This last one, August diversity
15    training is number 4, correct?
16        MR. ACHO:  Yeah.
17        MR. MUNGO:  Okay.
18        MR. ACHO:  And we're going to get the
19    orders in that we referenced before.
20 A.  I have 1, 2, 3 and 4.
21 BY MR. ACHO:
22 Q.  Okay, were they good for diversity or not?
23 A.  Yes.
24 Q.  Okay.  Now, lastly, I just want to get these orders
25    entered as exhibits, and then I'd like to find out how

### Page 511

1     much time we have.
2        MARKED FOR IDENTIFICATION:
3        DEPOSITION EXHIBITS 5-7
4        12:30 p.m.
5        MR. MARKO:  For the record, we've only
6     presented to Mr. Murray 1 through 4.
7  BY MR. ACHO:
8  Q.  Okay, these are 5, 6, 7.  These are things you've
9     already said you have not seen.
10 A.  Yes.
11 Q.  Correct?
12 A.  Yes, sir.
13 Q.  And they're documents you did not request from the
14    current police commissioner that was there for three
15    months before you left, correct?
16 A.  That's correct.
17        MR. MARKO:  Asked and answered.
18        MR. MUNGO:  What was the answer?
19        MR. MARKO:  He said that's correct.
20 BY MR. ACHO:
21 Q.  Now, let me ask you, all of those diversity
22    initiatives, about 25 of them, the only ones you had
23    any involvement in is the recommendation of City
24    Attorney Ethan Vinson, correct?
25 A.  The recommendation of Clarissa Clayton.



US LEGAL SUPPORT
The Power of Commitment™

GREGORY MURRAY
August 6, 2018

**Page 512**

1  Q.  Okay.  So of the 25 positive diversity initiatives,
2      you only were involved in two of them, the mayor did
3      all the others without you, correct?
4  A.  Well, that's correct.
5          MR. ACHO:  How much time do I have left?
6          (Recess taken at 12:31 p.m.)
7          (Back on the record at 12:42 p.m.)
8  BY MR. ACHO:
9  Q.  We talked about the 25 initiatives the mayor initiated
10      which you said were good things, correct?
11  A.  Yes.
12  Q.  And the mayor also approved diversity training which
13      you said was good?
14  A.  Yes.
15  Q.  And the city has now way, you know, way more diversity
16      and inclusion than it ever did before Mayor Fouts took
17      office, correct?
18  A.  Yes.
19  Q.  So he's done all those positive things that are
20      supportive of diversity, inclusion, for the people of
21      Warren, correct?
22  A.  On its face, yes.
23  Q.  And so despite doing all those many things, that you
24      all described as positive —
25  A.  Uh-huh.

**Page 513**

1  Q.  — you still contend that the mayor is not sincere
2      about diversity and inclusion?
3  A.  Yes, I share with the mayor that there's a difference
4      between being genuine and doing things for political
5      calculations, and I reference the word "political
6      calculation" in my resignation letter.
7  Q.  Well, let me understand something.  So creating the
8      first Macomb County Martin Luther, Jr. Day, was that a
9      good thing, yes or no?
10  A.  He did not create the first Martin Luther King
11      celebration.
12  Q.  In Macomb County?
13  A.  No, he did not.  I organized at least ten annual
14      Martin Luther King celebration events county-wide, so
15      no, he was not the first to do that.
16  Q.  Okay.  Who else initiated getting a large picture of
17      Martin Luther King, Jr.?
18  A.  Oh, I don't know.  I can't answer that.
19  Q.  He did.
20  A.  Okay, if you say so.
21  Q.  Right?
22  A.  If you say so.
23  Q.  No, not if I say so.  You were there.
24  A.  You said initiated.  I can't answer that question.
25  Q.  But you were there.

**Page 514**

1  A.  I saw the picture, yes.
2  Q.  You were there for the dedication?
3  A.  I saw the picture, the picture was there before I was
4      hired.
5  Q.  Now, you say that's a political calculation, is that
6      what you're still saying?
7  A.  Delaying, yes, delaying diversity until after the 2019
8      election is in my estimation a political calculation.
9  Q.  But sir, how would that jibe with all the things he's
10      doing for Martin Luther King Day?  That is a promotion
11      of African-Americans, correct, is it?
12  A.  It's a calculated event — an event calculated to
13      endear himself to the larger communities.
14  Q.  Hold on, isn't Warren the only city that has a Martin
15      Luther King, Jr. Day?
16  A.  You asked that, that is possibly true.
17  Q.  You don't even know?
18  A.  I know that other —
19  Q.  You don't know?
20  A.  I know that other municipalities do celebrate Martin
21      Luther King Day, the county, Macomb County celebrates
22      Martin Luther King Day.
23  Q.  Wait, I'm —
24  A.  So there are other celebrations by municipalities of
25      Martin Luther King.

**Page 515**

1  Q.  Okay.  You're saying he plays up to the black
2      community with this Martin Luther King, right?
3  A.  Yes, sir.
4  Q.  But yet he's playing to the white community by not
5      having diversity training?
6  A.  That's the calculation, sir.
7  Q.  Well, that's doesn't make sense because they're
8      contradictory, one is white, one is black.  Who is he
9      appealing to?  Who is he appealing to?
10  A.  He's appealing to the population at hand.
11  Q.  Population at hand —
12  A.  Yes.
13  Q.  — is mostly white, correct?
14  A.  Warren's population is roughly about 75 percent white,
15      yeah.
16  Q.  Okay.  If he's playing up to the white voters —
17  A.  Uh-huh.
18  Q.  — he wouldn't be putting up a Martin Luther King
19      picture, would he?
20  A.  Well, sir, that could be political posturing, I told
21      you that.
22  Q.  Sir, how can you politically posture —
23  A.  Because that's a benign —
24  Q.  — two different ways?
25  A.  It's a benign event.



**US LEGAL SUPPORT**
The Power of Commitment™

GREGORY MURRAY
August 6, 2018

Page 516

1   Q. Giving all the employees in the city off one day is
2      very costly, isn't it?
3   A. It's a federal holiday.
4   Q. Sir, no one in Macomb, there's no guarantee for --
5      because it's a federal holiday, does that mean the
6      city is mandated to give the time off, yes or no?
7   A. It's a negotiated event.
8   Q. Sir, is the city mandated to give a day off because it
9      is a federal holiday, yes or no, or don't you know?
10  A. By contract, yes. By contract, yes.
11  Q. But that's not what I asked you.
12  A. You said is it mandated, and it is mandated by the
13     contracts.
14          MR. MARKO: We have one minute.
15  BY MR. ACHO:
16  Q. Sir, so no matter what the mayor did in all these 25
17     initiatives, no matter all the things that he did,
18     diversity training and initiatives, none of that
19     really persuades you that he's sincere, correct?
20  A. My exposure to him, direct exposure to him led made me
21     to believe that he was not sincere.
22  Q. But yet you wanted to stay working for him?
23  A. I continued working for him after he rejected my
24     resignation letter because I liked the work.  The work
25     is the mission, the work is the ministry and that's

Page 517

1      why I came on board in the first place.
2   Q. But you liked working with him and you said that to
3      us?
4   A. Up to a point.
5          MR. ACHO: Okay.  No further questions.
6          (Mr. Ethan Vinson leaves the
7          room at 12:48 p.m.)
8          EXAMINATION
9   BY MR. MUNGO:
10  Q. So, Mr. Murray, you continued to work for Mayor Fouts
11     after the -- after your resignation letter, if I
12     understood your testimony earlier correctly, because
13     the mayor agreed, conceded to allow you to go forth
14     and do the diversity work, correct?
15  A. He asked me to continue working for him, yes.
16  Q. And that's why you continued to work for him after you
17     wrote the resignation letter, correct?
18  A. Yes, sir.
19  Q. And he -- he rejected the resignation letter and
20     agreed to allow you to do diversity work, correct?
21  A. Yes.  Yes.
22  Q. Okay.  All right.  Also, the counsel introduced
23     Deposition Exhibits 5, 6 and 7 which were executive
24     orders which you said you never saw before, correct?
25  A. That's correct.

Page 518

1   Q. Okay.  Were those part of the documents that you had
2      requested from then Commissioner Jere Green?
3   A. Yes, sir.
4   Q. Okay.  And had he even responded to you, and you said
5      he did not, correct --
6   A. That's correct.
7   Q. -- when you made that request --
8   A. Yes.
9   Q. -- for any information pertaining to diversity?
10  A. In writing.
11  Q. In writing in his department?
12  A. Yes.
13  Q. Okay.  And you expected to have -- you would have
14     anticipated seeing Deposition Exhibits 5, 6 and 7 as
15     part of what you had requested from Jere Green,
16     correct?
17  A. Yes, sir.
18  Q. That he did not provide you, correct?
19  A. Yes, sir.
20  Q. Okay.  And I want to show you Deposition Exhibit
21     Number --
22          Ma'am, did you mark this?
23          MARKED FOR IDENTIFICATION:
24          DEPOSITION EXHIBITS 8-13
25          12:50 p.m.

Page 519

1          MR. MUNGO:  Let the record reflect I'm
2      showing Mr. Murray Deposition Exhibit Number 8.
3   BY MR. MUNGO:
4   Q. Do you see that document, sir?
5   A. This says 10.
6   Q. Okay, very good.  I apologize.
7   A. No, that's okay.
8   Q. It is 10.
9   A. It is 10.
10  Q. I want you to take a look at that document, sir, and
11     tell me if you've ever seen that document before?
12  A. No, sir.
13  Q. Okay.  And what does that document appear to be?
14  A. A letter from Mr. Acho.
15  Q. Take that rubber band off.  Uh-huh.  Supplementing his
16     discovery request?
17  A. Oh, it looks like a lot of documents that have been
18     requested of the City, I guess.
19  Q. Okay.  Okay.  Sir, I want you to look at -- excuse me,
20     starting with the first page, and that page would be
21     number 2156, the Bates stamp number at the very
22     bottom; do you see?
23  A. 2156?
24  Q. Yes, do you see that, let's see here.  This right
25     here.



GREGORY MURRAY
August 6, 2018

Page 520

1  A. Oh, I'm sorry.
2  Q. No, you're okay. This begins the document. Right
3     there.
4  A. Okay.
5  Q. Okay. Beginning with Bates stamp number 2156. The
6     first year listed there is 2005, correct?
7  A. Yes.
8  Q. And then the rest of this appears to be for that year,
9     you can just finger through it real quickly, does it
10    appear to be police training, training for the police
11    department?
12         MR. ACHO: I'm going to object, this
13    witness appears to have no personal knowledge about
14    ever seeing this or any familiarity with it, so it
15    lacks foundation.
16 BY MR. MUNGO:
17 Q. Go ahead, sir.
18 A. Yes, it does appear to be materials that would be
19    presented to the police department.
20 Q. Okay. And if you -- if you take a look at -- but
21    you've never seen this?
22 A. No, sir.
23 Q. Okay. And Commissioner Green never provided this to
24    you, correct?
25 A. That's correct.

Page 521

1  Q. Okay. And if you take a look at page -- page,
2     beginning with page -- okay, Bates stamp on the side.
3     Okay. Page 21 -- 2171; do you see that?
4  A. Yeah I'll get to it.
5  Q. Page 2171.
6  A. 2171?
7  Q. Yes. Where the page says racial profiling; do you see
8     that?
9  A. One second.
10 Q. Oh, that number is on the side now.
11 A. Oh, yeah, I'm there. I saw that method of marking.
12 Q. Let the record reflect we are still discussing
13    Deposition Exhibit --
14 A. I do see 2171.
15 Q. Okay. Does that page 2171 appear to address diversity
16    training?
17         MR. ACHO: Objection, speculative.
18 A. Not in and of itself training.
19 BY MR. MUNGO:
20 Q. Okay.
21 A. No, it's all together different, training is a
22    different activity altogether.
23 Q. Okay. And go to page 2180, that number is at the very
24    bottom in the middle; do you see that, page 2180?
25 A. Yes, sir.

Page 522

1  Q. Okay. Page 2180, it says cultural diversity.
2  A. Yes, sir.
3  Q. Okay. I want you to finger through those pages and
4     tell me whether or not those pages reflect content
5     that relates to cultural diversity training, as you
6     know, it should be and ought to have been for the
7     Warren Police Department.
8          MR. ACHO: Okay, Mr. Mungo, would you agree
9     to a continued objection so I don't interrupt your
10    flow?
11         MR. MUNGO: I'm not going to continue -- I
12    I'm not going to stipulate to anything, sir, you make
13    an objection.
14         MR. ACHO: Even to make it easier for the
15    man and to speed up the process?
16         MR. MUNGO: I just gave my answer, sir.
17         MR. ACHO: Okay, my objection is the same,
18    lack of foundation.
19 BY MR. MUNGO:
20 Q. Go ahead, sir, Mr. Murray.
21 A. I'm looking through it. These are all elements of
22    what we shared.
23 Q. In cultural diversity training?
24 A. In cultural diversity, yes, sir.
25 Q. Would it have been adequate, in your opinion, had it

Page 523

1     been conducted?
2          MR. ACHO: Objection, speculative. He
3     hasn't even read the whole thing.
4  A. Well, in looking at what I have, my professional
5     opinion is this would not have been sufficient to
6     support the definition of training.
7  BY MR. MUNGO:
8  Q. Okay. Of diversity training?
9  A. Of diversity training, yes, sir.
10 Q. Okay. And why is that, sir?
11 A. Because there are a lot of elements to that I don't
12    see in here. I don't see implicit bias, subconscious
13    prejudice, and so those are some of the elements that
14    I don't see and I'm at 2192 now.
15 Q. Okay. Any others, just go ahead on through and tell
16    me what your opinion is as it relates to the adequacy
17    of this -- these -- this outline as adequate diversity
18    training?
19         MR. ACHO: Actually, Counsel, I should ask
20    you, not Mr. Mungo whether you stipulate to a
21    continuing objection as opposed to Mr. Mungo, will
22    you?
23         MR. MARKO: An objection with regards to?
24         MR. ACHO: Everything contained, questions
25    regarding this document.



GREGORY MURRAY
August 6, 2018

**Page 524**

1         MR. MARKO:  No, I can't do that, we'll just
2    continue forward.
3    A.  I'm at through 2198.
4    BY MR. MUNGO:
5    Q.  Uh-huh.
6    A.  And so after getting to 2199, I would say that this
7    would not constitute --
8    Q.  Adequate?
9    A.  -- an adequate diversity training.
10   Q.  Okay, okay, and why not, sir?
11   A.  Because again, for the examples that I gave you, there
12   are omissions here in terms of certain subject matter
13   that would be a part of diversity training, such as
14   implicit bias, subconscious prejudice and things of
15   that nature.
16   Q.  Okay.  Let's take a look at the next page, it's 2006,
17   it starts out with the first page, cultural awareness.
18   A.  Yes.
19   Q.  And can you take a look at that, sir, and I think that
20   runs through page 2213.  And the question is, had this
21   training been offered to the Warren Police Department
22   office of police officers, would it have, in your
23   opinion, be adequate diversity training?
24         MR. ACHO:  I'm going to object.  He's
25   asking for expert opinion which he has not laid a

**Page 525**

1    foundation, plus lack of foundation.  And it is
2    inconceivable for this witness to read all of these
3    things, these several hundred pages and multiple lines
4    in those pages and then testify.  It is pure
5    speculation.
6    BY MR. MUNGO:
7    Q.  And let the record reflect that this document consists
8    of a lot of different training offered by the police
9    department, Warren Police Department, and we're
10   isolating and specifically surgically looking at the
11   cultural diversity training portions.
12         Let me know when you're done there,
13   Mr. Murray.
14   A.  I'm at 11 now.  I'm at 2213.
15   Q.  Uh-huh.
16   A.  And this would not be an adequate diversity training.
17   Q.  Why not, sir?
18   A.  Because again --
19         MR. ACHO:  Same objection.  Same objection.
20   A.  It's absent certain aspects of diversity training such
21   as the items that I mentioned to you previously.
22   BY MR. MUNGO:
23   Q.  Okay, very good.  All right.  Then I want you to go to
24   2007; do you see that, sir?
25   A.  Yes, sir.

**Page 526**

1    Q.  Okay.  And I think you have to start on page 2217
2    where it deals with cultural diversity.  I want your
3    same opinion on the cultural diversity training
4    outline in the -- behind 2007?
5         MR. ACHO:  Same objection I had previously.
6    BY MR. MUNGO:
7    Q.  Let me know once you're done.
8    A.  Okay.  And then 222, 223, I would -- this is primarily
9    statistical information, so I would say the content is
10   lacking.
11   Q.  Lacking?
12   A.  Yeah.
13   Q.  And if it was used as an outline for teaching cultural
14   diversity to the Warren Police Department officers,
15   police officers, it would be inadequate, in your
16   opinion?
17         MR. ACHO:  Same objection.
18   A.  It would be insufficient, yes.
19   BY MR. MUNGO:
20   Q.  Okay.  All right.  2008 would be the next one, sir,
21   you begin with tab -- I'm sorry, page 2235; do you see
22   that?
23   A.  2235?
24   Q.  Yes, sir.  And I want you to just finger through and
25   tell me whether or not you can identify any cultural

**Page 527**

1    diversity training for 2008?
2         MR. ACHO:  Same objection.
3    BY MR. MUNGO:
4    Q.  And if so, your opinion as to whether or not that
5    would be adequate?
6    A.  Same objection, I would say this is more engagement
7    related than it is diversity related.
8    Q.  So the 2008, sir, you didn't see any outlines that
9    would represent an outline to be followed for cultural
10   diversity training?
11         MR. ACHO:  Same objection.
12   A.  That's correct, I would not.
13   BY MR. MUNGO:
14   Q.  Okay, so the same as not having any diversity training
15   depicted during the year of 2008, correct?
16   A.  Yeah.
17         MR. ACHO:  Same objection.
18   A.  Yeah.
19   BY MR. MUNGO:
20   Q.  Go ahead to the next one, 2009, sir.  I think that one
21   starts with page 2267 for 2009.
22   A.  Uh-huh.
23   Q.  If you go through that outline, any information during
24   2009 that you, in your opinion, would constitute
25   adequate cultural diversity training?



GREGORY MURRAY
August 6, 2018

Page 528

1    MR. ACHO: Same objection.
2    A. I would -- I'm familiar with some of this material as
3       discussed when I attended Mr. Friedman's in-service
4       and as I previously said, it's not diversity training.
5    MR. ACHO: Same objection.
6    BY MR. MUNGO:
7    Q. Okay. I want you to finger through the rest of that
8       just to make sure you are confirming that you're
9       familiar with that training outline being used as a
10      cultural diversity training outline?
11   A. Yes.
12   MR. ACHO: Same objection.
13   BY MR. MUNGO:
14   Q. And I will go to 2010, and I want you to take a look
15      at 2010 for any cultural diversity training outlines
16      there as well?
17   MR. ACHO: Same objection.
18   A. You said 2010?
19   BY MR. MUNGO:
20   Q. Yes, sir.
21   A. What page would that be?
22   Q. That starts at 2310.
23   A. Okay, 2310. I'm at 2316 now. I've gone through 2318
24      and that too is still deficient --
25   Q. Okay.

Page 529

1    A. -- and wouldn't really constitute an adequate
2       definition of diversity training.
3    Q. Okay. I need you to continue on until you hit the
4       next year. What is the next year there? I believe it
5       will be 2012, which begins on page 2353.
6    A. You said 53?
7    Q. Uh-huh.
8    MR. ACHO: I'm going to object to any
9       response since it would be the same objection that are
10      multiple objections I raised previously.
11   BY MR. MUNGO:
12   Q. When you get to that page, you will be in year 2012;
13      do you see it there?
14   A. Yeah, I see it, I'm on 2355.
15   Q. Are there any outlines on diversity training for the
16      year 2012 depicted behind the tab that's --
17   A. No, sir.
18   Q. -- labeled 2012?
19   MR. ACHO: Same objection.
20   A. Up to 2357, no.
21   BY MR. MUNGO:
22   Q. Okay. All right. And then I think on page 2358
23      begins the year 2015.
24   A. Uh-huh, I see that.
25   Q. Do you see any -- are there any outlines for cultural

Page 530

1    diversity training represented there that, in your
2    opinion, would constitute adequate cultural diversity
3    training?
4    MR. ACHO: Same objection.
5    A. Okay. I've gone through and up to 2365 and I would
6       say that's inadequate and could not be considered
7       diversity training.
8    BY MR. MUNGO:
9    Q. Well, I see 2016 there is the next page, what page
10      number does that start on?
11   A. 2366.
12   Q. 2366, any outlines on cultural diversity training
13      there that you would consider adequate?
14   MR. ACHO: Same objection as previously.
15   A. No, sir.
16   BY MR. MUNGO:
17   Q. And again, why were those outlines that you would use
18      that purported to be outlines for diversity training
19      not adequate, in your opinion?
20   MR. ACHO: Same objection.
21   A. Again, because of various elements that are missing
22      from -- are consistently missing from all of these
23      which is implicit bias training, which I said,
24      unconscious prejudice, privilege, the idea of
25      privilege, for example, things of that nature, there

Page 531

1    are several elements that are completely absent in all
2    of these.
3    MR. MUNGO: Okay. And let the record
4    reflect that the document that is Deposition Exhibit
5    Number 10 is Defendant's Supplemental Response to
6    Plaintiff's Production Request Numbers 7, 8 and 9 of
7    Plaintiff's First Request For Production of Documents.
8    Let the record reflect I'm about to show the deponent
9    Deposition Exhibit Number 8.
10   BY MR. ACHO:
11   Q. There you are. And could you take a look at that
12      document, sir? Can you tell me right off whether or
13      not you've ever seen that document?
14   A. No, I've never seen it.
15   Q. Okay. I want you to go to the very last three pages
16      of that document.
17   MR. ACHO: I'm going to object to any
18      testimony in light of the fact that there's no
19      foundation that this witness has any knowledge and
20      anything he would testify would be pure speculation.
21   BY MR. MUNGO:
22   Q. Okay. All right. So, sir, starting from the very
23      back page, I want you to take a look at any reference
24      to diversity training and tell me whether or not
25      information is sufficient with regard to the outline



GREGORY MURRAY
August 6, 2018

Page 532

1    for diversity training that, in your opinion, would
2    constitute adequate or sufficient and effective
3    training in diversity?
4            MR. ACHO:  Same objections.
5    BY MR. MUNGO:
6    Q.  And if you find a year that does present an outline of
7    diversity training that the notes, in your opinion,
8    would be adequate diversity training, please let me
9    know which year that would be in?
10           MR. ACHO:  Same objection.
11   A.  The last -- I don't see anything in the last three
12   pages --
13   BY MR. MUNGO:
14   Q.  Okay.  All right.
15   A.  -- that would constitute the definition of diversity
16   training.
17   Q.  And the first of those three pages in Deposition
18   Exhibit Number 8 at the very top give the year 2017,
19   correct?
20   A.  2017, February through May.
21   Q.  Okay.  All right.  And, sir, you were asked earlier
22   about whether the mayor allowed you to do diversity
23   training, and you indicated that yes, he did, correct?
24   A.  Yes.
25   Q.  And you performed diversity training for certain

Page 533

1    department heads?
2    A.  Yes.  I facilitated the scheduling of the training and
3    identified the trainers and discussed with the
4    trainers what the content -- what content would be
5    included in it, yes.
6    Q.  Okay.  So you actually trained department heads on
7    diversity?
8    A.  Yes.
9    Q.  And was the police -- was the police commissioner
10   present?
11   A.  Jere Green was not present.
12   Q.  He was not present?
13   A.  No, sir.
14   Q.  So he never got the training?
15   A.  That's correct.
16   Q.  Okay, and why wasn't he present?
17   A.  Oh, I have no idea.
18   Q.  Okay.  And after that, after this training of
19   department heads, was the clerk and/or the treasurer a
20   part of that training?
21   A.  No, sir.
22   Q.  Okay.  Was this around the time period in which the
23   clerk and the treasurer had requested and talked to
24   you about the desire to attend a training?
25   A.  They had communicated that to me, yes.

Page 534

1    Q.  And that was the training that they would have
2    attended had they attended any?
3            MR. ACHO:  Objection, speculation.
4    BY MR. MUNGO:
5    Q.  Is that correct?
6    A.  Yes, sir, there were two trainings, they would have
7    attended both trainings.
8    Q.  Okay, but they didn't attend either one?
9    A.  Either one, no, sir.
10   Q.  I want to show the deponent Deposition Exhibit
11   Number 1.  Here you go, sir.  Here we go.  Okay, wait
12   a minute.  You've got a stamp on there too?  Let me
13   see that.  Yes, there is.  This is number 9.  Okay.
14   It's all the same.  All right.  So let's not worry
15   about that.  Let's take this off.  This is Deposition
16   Exhibit Number 8.
17           MR. MUNGO:  Ma'am, you just happened to,
18   it's my fault, put a different number sticker on the
19   same exhibit.  Okay, but that's fine.  I got it right
20   here.
21           MR. ACHO:  We already have an 8.
22           MR. MUNGO:  What's the number on --
23   A.  This is Exhibit Number 1.  It's from a previous
24   deposition.
25           MS. BADALAMENTI:  That's the right exhibit

Page 535

1    sticker.
2            MR. ACHO:  Okay, let's take a break and
3    find out how much time we've got.
4            MR. MUNGO:  That's fine.
5            (Recess taken at 1:15 p.m.)
6            (Back on the record at 1:17 p.m.)
7    BY MR. MUNGO:
8    Q.  I want you to listen to this recording and tell me if
9    you recognize this voice, sir.
10           (Recording playing at 1:17 p.m.)
11   A.  I recognize the voice.
12   BY MR. MUNGO:
13   Q.  And who -- you recognize that voice as the voice of
14   whom, sir?
15           MR. ACHO:  I'm going to object, lack of
16   foundation.
17   A.  Mayor Fouts.
18   BY MR. ACHO:
19   Q.  Mayor Fouts?
20   A.  Yes.
21   Q.  Okay.  I want you to listen to this recording and tell
22   me if you recognize this one.
23           (Recording playing at 1:18 p.m.)
24   BY MR. MUNGO:
25   Q.  You recognize that voice, sir?



GREGORY MURRAY
August 6, 2018

### Page 536

1  A. Yes.
2      MR. ACHO: Same objection.
3  BY MR. MUNGO:
4  Q. Whose voice do you recognize that as?
5  A. Mayor Fouts.
6  Q. Mayor Fouts. And you feel you're able to recognize
7     his voice, sir?
8      MR. ACHO: Same objection.
9  A. Yes.
10 BY MR. MUNGO:
11 Q. Okay. All right. And so let the record reflect I'm
12    about to the show the deponent Deposition Exhibit
13    Number 13. There you are, sir, I want you to tell me
14    what that document is, sir, and whether or not the
15    City of Warren has been in compliance with that
16    document since your experience there beginning in
17    January of 2017?
18 A. Ah, yes, this is a document that's required to be
19    delivered to MDOT before October, I believe, of every
20    year. And it just asked for us -- statistical
21    information regarding services provided to the City of
22    Warren, and provided by the City of Warren to its
23    residents. And it's just a reporting form, so you
24    just gather information and it populates these various
25    areas.

### Page 537

1  Q. Do you know whether or not the City of Warren has been
2     in compliance with that reporting sequence and whether
3     or not they satisfied the law?
4  A. I believe that they have filed these every year.
5  Q. Okay. That's good enough.
6  A. Yeah.
7  Q. All right. So last question or second to last
8     question. You said that the mayor did approve
9     diversity training, he only approved it for the
10    department heads, but not for the police department,
11    correct?
12 A. That's correct.
13 Q. And the police commissioner was not there, correct?
14 A. That's correct.
15 Q. Or the training that you did?
16 A. Right.
17 Q. And the -- and the mayor told you not to talk to the
18    clerk or the treasurer regarding diversity training
19    anymore, correct?
20 A. That's correct.
21 Q. Is that why the treasurer indicates in her e-mail
22    that's part of deposition exhibit number -- what's
23    that number on there?
24 A. This is my 9.
25 Q. Number 9?

### Page 538

1  A. Uh-huh.
2  Q. Why she indicated that she had not heard back from
3     you?
4      MR. ACHO: Objection, speculation.
5  A. That's correct. Yeah.
6  BY MR. MUNGO:
7  Q. Okay. All right. And at any point in time, is any of
8     your testimony here intended to convey that the mayor
9     intended for you to do diversity training and wanted
10    you to do diversity training for the City of Warren?
11 A. No.
12     MR. MARKO: Thanks, guys.
13     MR. ACHO: Ordering.
14     MR. MARKO: Not for me.
15     MR. MUNGO: I'll take one, a mini.
16     Let the record reflect that the audio that
17 was played that the deponent identified as the voice
18 of Mayor Fouts using the word "nigger" and identifying
19 blacks as looking as chimpanzees is Deposition Exhibit
20 Number 11.
21     MR. ACHO: I would object, that is improper
22 foundation. You've not provided anything. There was
23 nothing in the record, this is just counsel's
24 statements. It is highly inappropriate and I would
25 object to it.

### Page 539

1      (The deposition was concluded at 1:22 p.m.
2  Signature of the witness was not requested by
3  counsel for the respective parties hereto.)



GREGORY MURRAY
August 6, 2018

Page 540

```
 1              CERTIFICATE OF NOTARY
 2    STATE OF MICHIGAN )
 3              ) SS
 4    COUNTY OF WAYNE   )
 5
 6         I, KATHRYN L. JANES, certify that this
 7    deposition was taken before me on the date
 8    hereinbefore set forth; that the foregoing questions
 9    and answers were recorded by me stenographically and
10    reduced to computer transcription; that this is a
11    true, full and correct transcript of my stenographic
12    notes so taken; and that I am not related to, nor of
13    counsel to, either party nor interested in the event
14    of this cause.
15
16
17
18
19
20
21                 Kathryn L.
22              KATHRYN L. JANES, CSR-3442
23              Notary Public,
24              Wayne County, Michigan.
25    My Commission expires:  October 22, 2022
```



Page 540